**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
————————————————————

| |
|---|
| **JOHN G. PEDICINI,**  |
|  |
|     **Plaintiff**  |
|     **CIVIL ACTION NO. 04-12395-JLT** |
| **-vs-**  |
|  |
| **UNITED STATES OF AMERICA**  |
| **UNITED STATES**  |
| **DEPARTMENT OF AGRICULTURE,** |
| **ANN M. VENEMAN, SECRETARY,** |
|      **Defendants** |

## Plaintiff's Motion for Leave to Depose Additional Witnesses

Pursuant to Federal Rules of Civil Procedure Rule 30(a)(2) and Local Rule 26.1(C), Plaintiff John G. Pedicini requests permission to depose three additional relevant witnesses before November 30, 2005, namely, Larry Blim, FFIS Administrator at the USDA Food and Nutrition Services, Lisha Dorman, and Angela McElmurry.  Larry Blim, Lisha Dorman, and Angela McElmurry have relevant information on the key issue of Plaintiff, John G. Pedicini's duties and title. In support of this motion, Plaintiff files a memorandum, an Affidavit with exhibits of John G. Pedicini, Plaintiff, and an Affidavit with exhibits of Sarah Catapano-Friedman, co-counsel for Plaintiff, with this motion and

1

asks this court to order the above named witnesses to be deposed.


Dated: October 19, 2005

                              Respectfully Submitted,
                              /s/ Robert S. Catapano-Friedman
_____Robert S. Catapano-Friedman
                              The Catapano-Friedman Law Firm
                              50 Franklin Street, 4th Floor
                              Boston, MA 02110
                              (617) 542-7711
                              Counsel for Plaintiff
                              BBO # 078980


                    **<u>CERTIFICATION UNDER L.R. 7.1</u>**
I certify that in accordance with Local Rule 7.1, I have
conferred with Defendants' counsel and have attempted in good
faith to resolve the issues addressed in this Motion.

                              /s/ Robert Catapano-Friedman
_____Robert S. Catapano-Friedman
                              Attorney for Plaintiff, John G. Pedicini

2

## CERTIFICATION OF SERVICE

Pursuant to L.R. 5.2(b) I hereby certify that a true copy of the above document, the memorandum of law in support of the above motion, and the two affidavits attached to this document in support of the above motion-Affidavits with exhibits of John G. Pedicini and Sarah Catapano-Friedman--will be served on the attorney of record for each Defendant by electronic notification by the court on October 19, 2005.

By: s/Robert S. Catapano-Friedman
    Robert S. Catapano-Friedman, Esq.
    The Catapano-Friedman Law Firm
    Attorney for Plaintiff

Dated: October 19, 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOHN G. PEDICINI,       |

     Plaintiff       |

                  | CIVIL ACTION NO. 04-12395-JLT

-vs-             |

UNITED STATES OF AMERICA | Affidavit
UNITED STATES         |
DEPARTMENT OF AGRICULTURE,|
ANN M. VENEMAN, SECRETARY,|
      Defendants      |

COMMONWEALTH OF MASSACHUSETTS )
                          ) ss.:
COUNTY OF SUFFOLK        )

JOHN PEDICINI, being duly sworn, deposes and says:

    1. I am the Plaintiff in the above captioned case and I assert the following based on my personal observation and knowledge.

    2. Since April 19, 2005 I have learned of three additional witnesses with relevant information to the above captioned matter. Those witnesses are Larry Blim, Lisha Dorman, and Angela McElmurry.

    3. Larry Blim is the FFIS Administrator at United States Department of Agriculture Food and Nutrition Services ( hereinafter "FNS") and works at the FNS Headquarters in Alexandria, Virginia.

    4. Larry Blim oversees all Funds Officers and Back Up Funds Officers at all FNS offices across the country and, as such, has extensive knowledge of the duties and responsibilities of Funds Officers and Back Up Funds Officers.

1

5. Lisha Dorman is currently the Budget Officer at FNS Headquarters in Alexandria, Virginia, but until the Summer of 2005 she was the FFIS system Administrator for FNS and the principal who conducted training for Funds Officers and Back Up Funds Officers.

6. Lisha Dorman has extensive knowledge of the duties and responsibilities of Funds Officers and Back Up Funds Officers.

7. On April 19, 2005 and April 20, 2005 I attended the Fiscal Year 2005 Funds Officer Meeting for the United States Department of Agriculture Food and Nutrition Services ("FNS") held in New Orleans, Louisiana (hereinafter "Meeting").

8. The attached document, Exhibit A, is a true copy of the schedule of the Meeting which was given to me at the Meeting by FNS.

9. At the Meeting Lisha Dorman conducted a discussion entitled "Responsibilities of Back Up Funds Officers." In that discussion, Lisha Dorman stated that Back Up Funds Officers have all the duties and responsibilities of Primary Funds Officers by virtue of their title as Back Up Funds Officer.

10. At the Meeting, Larry Blim spoke with me and told me that I was a Back Up Funds Officer. Larry Blim also stated that on the E-travel spreadsheet, in the column entitled "Alternate Funds Control Officer," I was to have all the duties of the Budget/Funds Officer, including the right to certify funds availability. He said that Douglas MacAllister's action of removing my right to certify funds availability violated agency policy.

11. Larry Blim knows every FNS Funds Officer or Back Up Funds Officer.

12. Larry Blim organizes the annual Funds Officer meetings in his role as FFIS Administrator at FNS.

13. Larry Blim oversees Funds Officers at FNS across the country and, as such, has direct knowledge of their positions, rights, and responsibilities.

14. On August 2, 2005 I attended the deposition of Jonathan Lash. At that deposition, Jonathan Lash stated that Angela McElmurry was responsible for keeping the list of Funds Officers and Back Up Funds Officers at FNS Headquarters prior to Jonathan Lash taking over that duty from Angela McElmurry.

15. I heard Jonathan Lash state in his deposition on August 2, 2005 that Angela McElmurry promulgated the 1999 list of Funds Officers and Back Up Funds Officers on which my name appeared as a back up Funds Officer ("The List").

16. A copy of The List is attached to this affidavit as Exhibit B. I received The List in Exhibit B in 1999 from FNS-Headquarters and certify that Exhibit B is a true copy of The List.

17. It is the responsibility of the Budget Division at FNS-

Headquarters to maintain a yearly list of Funds Officers and Back Up Funds Officers, as outlined in the FNS Handbook 101 for Funds Officers, which is promulgated by FNS-Headquarters and the United States Department of Agriculture Office of the Chief Financial Officer. A true copy of the relevant pages of the FNS Handbook 101 is attached to this affidavit at Exhibit C. As such, The List is an official document created by Angela McElmurry.

18. On July 15, 2005 I attended the deposition of Douglas MacAllister. At that deposition, Douglas MacAllister stated that he changed the printed title of "alternate funds control officer" to "alternate funds approver" on a blank e-travel form that he received from Lisha Dorman. I heard Douglas MacAllister state that he made this change to clarify the position and that he did not know what the duties of "alternate funds control officer" entailed because it was not a working title at FNS. On information and belief, Lisha Dorman knows the duties of "alternate funds control officer" and whether or not "alternate funds control officer" is a working title at FNS. I heard Douglas MacAllister testify that he objected to the term "alternative funds control officer" on the form.

19. I believe that Lisha Dorman will testify that she was the principal responsible for training Funds Officers and Back Up Funds Officers in their duties and responsibilities and has comprehensive knowledge of those. I believe Lisha Dorman will testify that all Back Up Funds Officers have the responsibility of certifying the availability of funds in the absence of the Primary Funds Officer and that I am officially supposed to be the Back Up Funds Officer for FNS-NERO and have been since 1999, despite my supervisors' reduction of my duties and title.

20. I believe that Lisha Dorman will testify that she sent the blank e-travel form to me which included the term "alternate funds control officer." I forwarded the blank e-travel form to Douglas MacAllister, who accused me of fabricating the column of "alternate funds control officer." I believe she will testify that that term refers to the Back Up Funds Officer and includes certification of the availability of funds authority.

21. I believe that Larry Blim will testify that I am officially supposed to be the Back Up Funds Officer for FNS-NERO with all the certification rights and duties of the Primary Funds Officer.

22. I believe that Angela McElmurry will testify that she received my name in 1998 or 1999 from FNS-NERO as the Back Up Funds Officer for the Northeast Region. I believe she will testify that she received my name from Arthur LeBlanc and that Arthur LeBlanc told Angela McElmurry in 1998 or 1999 that I was the Back Up Funds Officer for FNS-NERO. I believe that Angela McElmurry will authenticate The List and testify that she created the list based on information provided her from the supervisors

for the regional offices for FNS.

23. During all relevant time periods, my first line supervisor was Arthur LeBlanc, then Joseph Stanco, and then Michael Malone. During all relevant time periods my second line supervisor was Douglas MacAllister. During all relevant time periods the Regional Administrator was Frances Zorn. During all relevant time periods the Deputy Regional Administrator was John Ghiorzi and then Robert Canavan.

24. Arthur LeBlanc told me in 1998 that I was the BackUp Funds Officer. My name then appeared on The List in 1999.

25. I am not Martin Hines' first line supervisor. I do not supervise Martin Hines at all.

26. Larry Blim and Lisha Dorman are current employees of Defendant FNS at FNS Headquarters in Alexandria, Virginia.

27. Angela McElmurry is a current employee of Defendant the United States of America and she is an employee of the Internal Revenue Service in Washington, District of Columbia.

28. I held the title of backup or alternate funds officer with certification of funds availability rights and duties from 1998 until I was banned from using that title by my supervisors and my certification of availability of funds rights and duties were taken away by my supervisors. These reductions began in February and March of 2003 and continue through present and they prevent me from performing a key and important element of my job that I assert in this lawsuit as part of the damages that I have sustained from Defendants illegal retaliation against me.

29. Defendants have consistently taken the position throughout discovery in this case that I have not suffered this damage because they assert that I never had the authority to certify the availability of funds.

30. Defendants have also taken positions in discovery that contradict my understanding of the role of Backup Funds Officers and my understanding that the Back Up Funds Officer is an official working title which I held until my supervisors reduced my duties and title from February and March 2003 through present and which describes the role of back up to the primary funds officer and includes certification of the availability of funds. Defendants have also taken positions in discovery which relate to important factual issues in the case regarding the official procedure for certifying the availability of funds, about which factual issues I believe that these three individuals have personal knowledge and will be able to provide relevant testimony.

31. I believe that the testimony of these three individuals will help me to prove that Defendants positions are false and that I had and have certification of the availability of funds authorization that Defendants have unjustly and improperly denied me the right to exercise in the course of my employment and that

4

my understanding of agency procedure and the role of Backup Funds
Officers is correct and that Defendants' positions are incorrect.
    32.   Accordingly, I believe that the depositions of these
three individuals is needed to address key contested factual
issues in this case.

_____
**John G. Pediani**
**Plaintiff**

Dated: _10/19/05_

Sworn to before me this _19_ day of October, 2005

_____
**Notary Public**

5

**EXHIBIT A**
**2 pages**

## FY 2005 FUNDS OFFICER MEETING
### APRIL 19-20, 2005
### NEW ORLEANS, LA

**National Finance Center**
**April 19, 2005**

| | | |
|---|---|---|
| 8:30 AM | *Opening Remarks* | Chuck Wallace |
| 8:45 AM | Review of Agenda | Larry Blim |
| 9:00 AM | FFIS Baseline Transactions & Budgetary Standard General Ledger Review | Lisha Dorman |
| 10:15 AM | Break | |
| 10:30 AM | Elimination Entries | Ozzy Zarabia/Lisha Dorman |
| 11:30 AM | Lunch | |
| 12:30 PM | Closing of MPOL/FTSP & PRCH | Ozzy Zarabia/Lisha Dorman/ NFC |
| 1:30 PM | General Issues | Larry Blim/ Lisha Dorman/Group |
| 2:00 PM | Break | |
| 2:15 PM | General Issues (Continued) | Lisha Dorman/Group |
| 2:45 PM | FY 2005 Year-end Close | Group |
| 3:45 PM | Responsibilities of Back up Funds Officers | Lisha Dorman/Group |

### April 20, 2005

| 8:30 AM | Open Issues from April 19 Session | |
| 9:00 AM | S&B Module/Appropriations Law | Larry Blim |
| 10:00 AM | Break | Jon Lash/NFC |
| 10:15 AM | IAS | |
| | | Brenda Komloske/ |
| | | Lisha Dorman |
| 11:30 AM | Lunch | |
| 12:30 PM | BRIO Reports | |
| 2:30 PM | Break | Ted Kozlow |
| 2:45 PM | E Travel | |
| | | NFC/Group |
| 4:00 PM | Wrap-up | |
| | | Larry Blim |

**EXHIBIT B**
**2 pages**

## Funds Officer Listing
## 01/26/99

| ORG Number | Organization | Allowance Holder | Phone Number | FPA Officer | FPA Backup | Phone Number | Fax Number |
|---|---|---|---|---|---|---|---|
| 10 | Administrator's Office/CR/EEO | Samuel Chambers | 703-305-2062 | Dave Burr | Marlene Cash | 703-305-2058 | 703-305-1908 |
| 11 | Office of Consumer Affairs | Joyce Willis | 703-305-2281 | Tom Widener | Jon Lash | 703-305-2136 | 703-305-2356 |
| 13 | OAE | Alberta Frost | 703-305-7017 | Retha Harrah | None | 703-305-2136 | |
| 14 | OGAPI | Mike Haga | 703-305-2039 | Angie McElmurray | None | 703-305-2145 | 703-305-2576 |
| 20 | Food Stamp Program | Susan C. Gossman | 703-305-2026 | Suzan English | None | 703-305-2179 | 703-305-2356 |
| 30 | Special Nutrition Programs | Ed Cooney | 703-305-2052 | Barbara Keene | Tama Eliff | 703-305-2945 | 703-305-3454 |
| 41 | MARO | Chris Martin | 609-259-5025 | William Khuzen | None | 703-305-2056 | 703-305-2782 |
| | | | | | | 703-305-2897 | |
| 42 | MWRO | Ted Bell | 312-353-6664 | Bob Flannery | Edwina Thomas | 609-259-5145 | 609-259-5147 |
| 43 | MPRO | Bill Ludwig | 303-844-0300 | Mark Hoskins | Brenda Komloske | 312-836-2531 | 312-353-7274 |
| | | | | | | 312-353-4650 | |
| 44 | NERO | Fran Zorn | 617-565-6370 | Marty Hines | John Pedicini | 303-844-0321 | 303-844-2160 |
| 45 | SERO | Virgil Conrad | 404-562-1801 | Sherry Roberts | Michelle Crawford | 617-565-6454 | 617-565-6472 |
| 46 | SWRO | Ruthie Jackson | 214-290-9800 | Ester Phillips | Cindy McCumber | 404-562-1924 | 404-562-4505 |
| 47 | WRO | Allen Ng | 415-705-1310 | Jeff Fleckenstein | Grace Ebara | 214-290-9800 | 214-767-9683 |
| 50 | CNPP | Rajen Anand | 202-418-2312 | Tom Widener | Jon Lash | 415-705-1358 | 415-705-1364 |
| | | | | | | 415-705-1350 | |
| 60 | Default | Gary Maupin | 703-305-2046 | Lisha Dorman | None | 703-305-2186 | 703-305-2356 |
| | | | | | | 703-305-2136 | |
| 70 | Financial Management | Gary Maupin | See Above | Mary Ellen Cajka | None | 703-305-2307 | 703-305-2356 |
| 81 | FM MISCOPS | Gary Maupin | See Above | Jon Lash | None | 703-305-2094 | 703-305-2240 |
| 82 | MGMT POC Renovations | Joe Leo | 703-305-2030 | Linda Young | None | 703-305-2182 | 703-305-2356 |
| 83 | MGMT Mandatory Training | Joe Leo | See Above | Cheryl Pratt | None | 703-305-2233 | 703-305-1114 |
| 84 | MGMT Commercial Services | Joe Leo | See Above | Linda Young | None | 703-305-2335 | 703-305-2299 |
| 85 | MGMT Commercial Leases | Joe Leo | See Above | Linda Young | None | 703-305-2233 | 703-305-1114 |
| | | | | | | 703-305-2233 | 703-305-1114 |



P-1170

Funds Officer Listing
01/26/99

| 86 | MGMT/IRM Long Range (CN/FS) Commercial Supply (FPA) | Joe Leo | See Above | Linda Levins | Julie Fadely | 703-305-2587 703-305-2233 | 703-305-2921 703-305-1114 |
| 87 | MGMT/Computer Support/Tax Offset Redemption Cert /Bank Monitoring | Joe Leo | See Above | Linda Levins | Julie Fadely | 703-305-2587 612-370-3320 Minneapolis | 703-305-2921 612-370-3355 Minneapolis |
| 88 | NIQCS (FS) | Joe Leo | See Above | Linda Levins | Julie Fadely | 703-305-2587 | 703-305-2921 |
| 89 | Food Stamps DRS | Joe Leo | See Above | Linda Levins | Julie Fadely | 703-305-2587 | 703-305-2921 |
| 90 | Management/DA | Joe Leo | 703-305-2040 | Geoff Gay | None | 703-305-2040 | 703-305-2587 |

*Prepared By: Budget Division/am*

P-1171

**EXHIBIT C**
**3 pages**

# FNS HANDBOOK 101

Published on December 9, 2002

First Edition

FNS HANDBOOK 101

5       Reports should be reviewed monthly for accuracy and completeness.

D       Major Funds Control Components.

1       Accounting System.  As part of the funds control process NFC maintains an accounting
        system for all USDA agencies, including FNS.  The accounting system, Foundation
        Financial Information System (FFIS), has separate applications for each agency and a
        common application for Department controlled information.  FFIS records the available
        budgetary resources (appropriations, apportionments, reimbursements, allocations,
        allotments, and sub-allotments) and monitors the amount of commitments, obligations,
        accrued expenditures, and disbursements incurred against those resources.  Although NFC
        provides accounting services for FNS, responsibility for funds control rests with the
        Agency.

2       Internal Records.  Each allowance holder assigns responsibility for maintaining local
        records for funds control.  Individuals designated by the allowance holder to maintain
        control of allowanced funds are called funds officers.  Before personnel are hired,
        promoted, or awarded; or goods or services are ordered, funds officers verify available
        funds and certify that availability by signing the appropriate commitment and/or
        obligation document.

3       Reporting.  Reports for internal management are produced by the accounting system for
        each allowance holder and summary reports for each appropriation at the Agency level.
        The accounting system also produces external reports required by the Department of
        Treasury and the Office of Management and Budget.

302     ROLES AND RESPONSIBILITIES

Accounting functions for FNS administrative funds and certain FNS program funds have been delegated to
NFC and the FNS Accounting Division.  NFC is under the supervision of the USDA Office of the Chief
Financial Officer (OCFO).  FNS reimburses NFC for services provided.

This section summarizes the major responsibilities of the key organizational units and personnel involved in
the funds control process.

A       Administrator.

1       Presents agency budgets to the Department, OMB, and Congress.

2       Makes funding decisions within the Agency.

3       Approves operating plans for agency allowance holders.

B       Budget Division.

1       Develops budgetary requests relating to appropriations and apportionments for

FNS HANDBOOK 101

submission to the Department, OMB, and Congress.

2 Issues allocations and allotments for administrative funds, as directed by the Administrator, and establishes the related accounting codes.

3 Prepares special analyses and projections, based on the monthly status of funds reports, for use by the Administrator and other top agency officials.

4 Assists the Administrator and Deputy Administrator for Financial Management in monitoring the financial performance of all allowance holders.

5 Provides guidance, materials, training, and assistance to allowance holders, funds officers, and other agency personnel who have questions or problems relating to administrative funds control.

6 Distributes certain NFC-FFIS reports to headquarters offices.

7 Maintains current list of funds officers and their assigned areas of responsibility.

8 Maintains an up-to-date file of delegations of funding authority that will include the highest level of officials authorized to approve the obligation of funds. This list will also specify whether the approval function for a particular document may or may not be redelegated.

9 Works with NFC on policy matters, changes to agency reports , and other nonroutine items.

10 Reviews any undistributed charges and assigns the appropriate accounting code.

11 Monitors prior year obligations and liquidation of obligations.

12 Maintains copies of selected FFIS reports.

C Allowance Holders.  (Includes the Administrator, Staff Directors, Deputy Administrators, and Regional Administrators.)

1 Authorize the obligation and expenditure of funds in accordance with legislative intent and within the amount of the allowance.

2 Subdivide allowances to a lower organizational level, if desired.

3 Assign specific responsibility for maintaining funds control within their organization.

D Funds Officers.

1 Verify and certify the availability of funds.

2 Maintain records of documents certified for available funds.

3 Enter commitments and appropriate obligations directly in FFIS.

December 9, 2002

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOHN G. PEDICINI,        |
                          |
       Plaintiff       |
                        | CIVIL ACTION NO. 04-12395-JLT
-vs-                   |
                        |
UNITED STATES OF AMERICA | Affidavit
UNITED STATES          |
DEPARTMENT OF AGRICULTURE,|
ANN M. VENEMAN, SECRETARY,|
       Defendants       |

COMMONWEALTH OF MASSACHUSETTS )
                             ) ss.:
COUNTY OF SUFFOLK         )

SARAH CATAPANO-FRIEDMAN, being duly sworn, deposes and says:

    1. I am an attorney for Plaintiff, John G. Pedicini, in the above captioned matter.

    2. I attended all the depositions taken in relation to the above captioned matter and I am familiar with the transcripts of those depositions. I verify the following statements from my own personal knowledge.

    3. John G. Pedicini has complained in his Amended Complaint for the above captioned case that he was retaliated against by his supervisors in the form of reduction of duties and title. The Amended Complaint in the above captioned case claims that John G. Pedicini held the title of Alternate or Back Up Funds Officer and John G. Pedicini had the responsibility for certification of funds availability by virtue of that title. The Amended Complaint in the above captioned case also claims that, beginning in February and March 2003 and continuing through present, John G. Pedicini's supervisors took away John G. Pedicini's title of Back Up or Alternate Funds Officer and took away his rights and responsibilities for certification of the availability of funds in retaliation for John G. Pedicini's protected activities.

4. Defendants' Answer in the above-captioned case claims that there is no such position as Back Up or Alternate Funds Officer, that John G. Pedicini never held the position of Back Up or Alternate Funds Officer and that John G. Pedicini never had the right or responsibilities to certify the availability of funds.

5. The issue as to whether or not John G. Pedicini is or was a Back Up or Alternate Funds Officer is an essential disputed factual issue in the above captioned matter, as revealed by the Amended Complaint and Answer and the depositions in this case.

6. The issue of whether or not John G. Pedinici has or had the right and responsibility to certify the availability of funds is an essential disputed factual issue in the above captioned matter.

7. In their depositions, John G. Pedicini's superiors have claimed that John G. Pedicini is not and never was the Back Up Funds Officer or Alternate Funds Officer at the United States Department of Agriculture Food and Nutrition Services Northeast Regional Office (hereinafter "FNS-NERO") and that John G. Pedicini never had and does not have the responsibility or rights of certification of the availability of funds.

8. John G. Pedicini's second line supervisor, Douglas MacAllister stated in his deposition, "There has never been a backup for Marty to certify funds availability, other than the supervisor and myself, since I have been the financial director." (Douglas MacAllister deposition Vol. 1 June 6, 2005 page 30 line 12-15 attached hereto as Exhibit A) Douglas MacAllister also stated, "he [John Pedicini] has never been delegated eligibility to certify...." (Douglas MacAllister deposition Vol. 1 June 6, 2005 page 28 line 1 attached hereto as Exhibit B).

9. Robert Canavan, the now Acting Regional Administrator for FNS-NERO testified at his deposition, "The current funds officer as designated by the allowance holder is Martin Hines. The responsibilities of that position in his absence are assigned to his first line supervisor and to Douglas MacAllister." (Robert Canavan deposition Vol. 1 June 7, 2005 page 158 line 8-12 attached hereto as Exhibit C). In response to the question "Who is the backup funds officer at NERO," Robert Canavan replied, "The funds officer is Marty Hines. In his absence, he's backed up by his first line supervisor. In their absence, the responsibility would go to Doug MacAllister." (Canavan deposition Vol. 1 June 7, 2005 page 61 line 8-11 attached hereto as Exhibit D).

10. Michael Malone stated in his deposition, "No, it was not," in response to the question, "Alternate funds officer-NERO, was that a title that Mr. Pedicini was entitled to use in your opinion?" (Malone deposition Vol. 1 July 8, 2005 page 140 line 12-15 attached hereto as Exhibit E).

2

11. In response to the question, "And did John Pedicini act as his [Martin Hines] backup in certifying the availability of operational funds when you were section chief?" Joseph Stanco, aka Paride Monti, replied in his deposition, "That was always an unclear point. And I believe that Mr. Pedicini was never assigned to certifying funds for him specifically." (Paride Monti videoconference deposition Vol. 1 June 23, 2005 page 9 line 16-23 attached hereto as Exhibit F).

12. In response to the question, "Who was Mr. Hines' backup in certifying funds?" Arthur LeBlanc responded in his deposition, "When I was chief, I was the backup." (Arthur J. LeBlanc Deposition, Vol. 1, June 23, 2005 page 8 line 16-line 18 attached hereto as Exhibit G). In response to the question, "So you don't remember whether or not you named Mr. Pedicini as a backup to certify funds?" Arthur LeBlanc replied in his deposition, "No. As previously mentioned, I was his backup. I would have been the backup." (Arthur J. LeBlanc deposition, Vol. 1, June 23, 2005 page 10 line 13-line 16 attached hereto as Exhibit H).

13. In his deposition on July 28, 2005, John Ingemi stated, "I believe John [Pedicini] was an assistant to Marty while I was there, so I assume he had some process involved there if he was the assistant...The Backup. Actually he [John Pedicini] was his [Martin Hines'] backup, I believe." (John Ingemi deposition July 28, 2005 page 18 line 20- page 19 line 1 attached hereto as Exhibit I). In response to the question, "He [John Pedicini] was the backup funds officer?" John Ingemi replied in his deposition, "Exactly. When Marty was out, then I think John would take over." (Ingemi deposition July 28, 2005 page 19 line 2-4 attached hereto as Exhibit I). In response to the question, "So that when Marty was out, was John Pedicini the individual who would certify the availability of funds?" John Ingemi replied in his deposition, "That's the way I understood it." (Ingemi deposition July 28, 2005 page 19 line 5-8 attached hereto as Exhibit I).

14. In his deposition on August 2, 2005 Jonathan Lash identified Larry Blim by stating, "He's got a pretty long title. I can't really recall what it is right now. He is a GS-15 who has I think ultimate responsibility for making sure that the FFIS system is run properly....He periodically communicates with the funds officers to notify them of changes in procedure or improvements or enhancements or whatever they need to know to do their jobs well." (Lash deposition August 2, 2005 page 31 line 16 - page 32 line 3 attached hereto as Exhibit J)

15. In his deposition on August 2, 2005 Jonathan Lash identified Lisha Dorman, stating, "She is now as of a week or so ago a funds officer. She was the functional administrator of FFIS before that." (Lash deposition August 2, 2005 page 32 line 8 - line 15 attached hereto as Exhibit J)

16. In his deposition, Jonathan Lash testified that John

3

Pedicini is and was the Backup Funds Officer for FNS-NERO and
Jonathan Lash believed John Pedicini had the responsibility to
certify the availability of funds at FNS-NERO as a function of
John Pedicini being the BackUp Funds Officer for FNS-NERO in 2003
and for many years prior to 2003. (Lash deposition August 2, 2005
page 13 line 17 - page 14 line 18; page 17 line 22 - page 19 line
17 attached hereto as Exhibit K)

17. In his deposition, Martin Hines testified that at the
time of the Annual Funds Officer Meeting from April 19-20, 2005,
Lisha Dorman was the FFIS system administrator for FNS and was
the principal who conducted training for Funds Officers and
BackUp Funds Officers. (Hines Deposition July 22, 2005 page 62
line 14-17; page 160 line 4 - page 163 line 15 attached hereto as
Exhibit L)

18. In his deposition, Martin Hines testified that Lisha
Dorman was the principal who conducted training for Funds
Officers and Backup Funds Officers and at the Annual Funds
officer Meeting on April 19-20 2005 Lisha Dorman gave a
discussion on several topics relating to funds officers and
reaffirmed that back up funds officers have all the same duties
as the primary funds officers, including certification of funds.
(Hines deposition July 22, 2005 page 62 line 23 - page 63 line 15
attached hereto as Exhibit L).

19. In his deposition, Douglas MacAllister admitted to
altering, during the relevant time period, the name of a position
on the approval chain for e-travel from "alternate funds control
officer" to "alternate funds approver" and to receiving the blank
e-travel form with "alternate funds control officer" listed as a
position on it from Lisha Dorman. MacAllister testified that he
changed the title from "alternate funds control officer" to
"alternate funds approver" prior to filling in John Pedicini's
name under the caption of "alternate funds approver."
(MacAllister Deposition July 15, 2005 page 230 line 1 - page 240
line 13 attached hereto as Exhibit M).

20. In his deposition, Martin Hines testified that Lisha
Dorman has relevant information regarding the approval chains
including "alternate funds control officer" which MacAllister
admitted in his deposition to changing to "alternate funds
approver" on the e-travel form during the relevant time period.
(Hines deposition July 22, 2005 page 85 line 6 - page 98 line 4
attached hereto as Exhibit N).

21. In his deposition, Martin Hines testified, "And it
became obvious to me in this March of 2003 incident that my work
and John's assistance as the backup funds officer was trying to
be altered or changed in some way because he had been the backup
for about three or four years prior to this occurring....It
looked like to me in my opinion that there was some concerted
effort or some decision had been made to limit his role as the

4

alternate funds officer which was my backup and that continued
after that time.... Yes. It means that he's [John Pedicini's] the
backup alternate funds officer for NERO." (Hines deposition July
22, 2005 page 26 line 7-12; page 36 line 16-line 20; page 84 line
20-21 attached hereto as Exhibit O).

22. In his deposition, Martin Hines accentuated that there
was no legitimate business reason or performance reason for John
Pedicini's supervisors to refuse to allow John Pedicini to be the
backup funds officer and refuse to allow John Pedicini to certify
funds. (Hines deposition page 36 line 23- page 37 line 16
attached hereto as Exhibit P).

23. In his deposition, Martin Hines refuted Arthur LeBlanc'
testimony by stating, "All I know is that he-my supervisor, Art
LeBlanc-in 1998 I had returned from the annual funds officer
meeting. There's usually a meeting every year where all of the
funds officers meet. And at that meeting in 1998, every
allowance-every organization was told that a backup alternate had
to be appointed. The agency was getting very-they wanted to make
sure that in the absence of a funds officer-because there had
been some funds officers who had been out for sickness and other
reasons for absence. They want to make sure there was continuity
of that function. And when I came back, I advised Arthur LeBlanc
who was the section chief that the agency, the FNS division, had
announced at the meeting that every organization had to appoint
an alternate. And later he came back to me and said that John
Pedicini was designated the alternate funds officer, and he would
send the communication to the budget division that he was now the
alternate-now the backup to me. And he informed me of that
verbally, and he notified headquarters I believe by an E-mail and
from that point on, John Pedicini was involved in doing various
tasks, funds officer type functions, in both a support role and
doing certain functions on his own backing me up." (Hines
deposition page 37 line 20-page 39 line 1 attached hereto as
Exhibit P)

24. In his deposition, Martin Hines replied to the question,
"Marty, before this IAS issue came up in March of 2003 that we
have previously discussed, did Mr. LeBlanc, Mr. Stanco, Mr.
MacAllister or anybody else at FNS-NERO ever tell you either
orally or in writing or in any other manner that John Pedicini
was not authorized to certify funds availability?" by stating,
"No, no one ever did. As I said, it became an issue in March 2003
when the IAS document was being prepared and as I said earlier,
it appeared to me at that point that that individual's [John
Pedicini's] role was now being limited." (Hines Deposition July
22, 2005 page 98 line 5-16 attached hereto as Exhibit Q)

25. In his deposition, Martin Hines explained a conversation
with Lisha Dorman at the 2005 annual Funds Officer Conference in
New Orleans, La. In that conversation, Martin Hines claimed Lisha

5

Dorman responded regarding the issue of whether John Pedicini is
or was a back up funds officer with certification duties and
rights, "Well, that she thought it was a moot issue, that it's
common knowledge that alternates perform everything that the
primary does, primary funds officer does which would include
certification of funds....Well, she knows he's [John Pedicini's]
been the alternate. She's seen him at the training sessions and
the meetings. He's been addressed in all of the-and handled many
work items including some of the ones we were discussing earlier
such as the approval chains for IAS and the one for fed travel.
Those were addressed back to her. . . . My understanding of her
comments was that alternate funds officer have the same
responsibilities and perform the same duties of the primary in
their absence. Whatever the primary funds officer does, the
alternate funds officer can do....That as an alternate funds
officer, he [John Pedicini] would perform all the duties that I
do in my absence." (Hines deposition July 22, 2005 page 161 line
23-page 163 line 15 attached hereto as Exhibit R).

      26. On the morning of April 19, 2005, John G. Pedicini by
his attorneys requested thirteen individuals employed by or
formerly employed by the Defendants be deposed in relation to the
above captioned matter. This court granted leave to depose these
thirteen individuals. These thirteen individuals have been
deposed by Plaintiff through his attorneys.

      27. In his deposition, Jonathan Lash stated that Angela
McElmurry kept the list of who is a Funds Officer and Back Up
Funds officer in FNS before he did and she created a list of
these officers in 1999, when John Pedicini appeared on a listing
of those officers. On being shown the 1999 listing of those
officers, including John Pedicini as a Back Up (FPA) Funds
Officer, Jonathan Lash testified, "Oh, yes, I recognize it. I
don't think I prepared this one. I think maybe Angie McElmurray
prepared this one. Yes, that's her initials....Yes, since Angie
left I took over editing this as changes are made, as funds
officers leave and new ones arrive. I have this file." (Lash
Deposition, page 11 line 10 - page 12 line 2 attached hereto as
Exhibit K).

      28. Frances Zorn, Regional Administrator of FNS-NERO for
all relevant time periods, testified, "There is no such title,"
in response to the question, "Has John Pedicini ever held the
title of backup funds officer?" (Zorn Depostion June 6, 2005 page
105 line 20-22 attached hereto as Exhibit S).

      29. In response to the question, "Do you know whether John
Pedicini has fund certification authority?" France Zorn
testified, "He does not. And by that, I mean, he is not delegated
authority as the budget officer of an alternate in the budget
officer role." (Zorn Deposition June 6, 2005 page 105 line 1-line
5 attached hereto as Exhibit S).

30. In response to the question, "Do you know whether John Pedicini ever obtained the title of alternate funds officer during--", Frances Zorn interjected, "He did not." (Zorn Deposition June 6, 2005 page 105 line 6-9 attached hereto as Exhibit S)

31. Frances Zorn testified, "The funds officer position is one that is delegated from the regional administrator. And I sign letters of delegation, and they have been consistently to Martin Hines and with alternates being the first and second line supervisors." (Zorn deposition June 6, 2005 page 105 line 15-19 attached hereto as Exhibit S).

32. Martin Hines testified, "As I stated earlier, John Pedicini was designated the alternate funds officer in late 1998, early 1999." (Hines Deposition page 199 line 7-9 attached hereto as Exhibit T)

33. In response to the question, "Marty, I want you to explain something to me. I want you to explain why having a supervisor act as your backup in certifying the availability of funds was contrary to the new direction in 1998 and 1998," Martin Hines replied, "There should be a separation of duties between management approving official authorizing an expense and a financial person certifying the expense....There should be separation of duties, and the reason that funds officers are certifying funds is to ensure the integrity of the accounting operation, that the accounting operation is not victimized by any improper actions or lost document or any improper decisions being made. I don't have the authority to procure anything. I can't go out and buy a thing and there's a good reason for that. Because I certify funds....It's the same thing with management officials. They have a right to say that these are the program goals that we want to achieve, but there are other employees in the organization who have separate and distinct duties and there's a valid good reason for it." (Hines deposition July 22, 2005 page 201 line 16- page 203 line 6 attached hereto as Exhibit U). And when asked, "So would the words 'conflict of interest' play a role here?" in describing why a supervisor could not act as a back up for certification of funds availability, Martin Hines responded, "Yes, and financial integrity." (Hines deposition July 22, 2005 page 203 line 7-9 attached hereto as Exhibit U).

34. In response to the question, "So even if a supervisor like Mr. MacAllister or Mr. Malone or Mr. Ghiorzi or Mr. Stanco were properly trained and had all the skills and knowledge you would need to certify the availability of funds, would having them certify the availability of funds run counter to the new direction taken in 1999 and 1998?" Martin Hines testified, "I would think it does. I would think there should be that separation of duties that ensures it's a funds officer and only a funds officer or an alternate that's performing that function."

7

(Hines Deposition July 22, 2005 page 204 line 14-24 attached hereto as Exhibit U).

    35. In his depositions, in response to several questions, Martin Hines identified the FNS Handbook 101 as an official guidebook published by FNS by stating, "This is agency procedure. These are in FNS Handbook 101. This is the guidebook. This is what I'm supposed to be following. This is what every allowance holder, every organization at FNS is supposed to be following. . . .This handbook, FNS Handbook 101, is the guidebook. We refer to it as the bible....The policy is actually in that handbook right there, Handbook 101, which was published by headquarters FNS to promulgate how they wanted these tasks to occur....This is published by FNS, and it's been updated a number of times. This 1 believe is that last edition. I had the privilege to write one of the chapters in here...." (Hines Deposition July 22, 2005 page 56 line 6-11, page 288 line 14-15; Hines Deposition August 19, 2005 page 28 line 16-19, page 72 line 11-16 attached hereto as Exhibit V).

                    **Sarah Catapano-Friedman**
                    **Attorney for Plaintiff**

**Dated:** *October 19, 2005*

**Sworn to before me this** *19* **day of October, 2005**

**Notary Public**

8

**EXHIBIT A**
**2 Pages**

1

Volume I
Pages 1 to 39
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
                                :
     vs.                        :    Civil Action
                                :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF DOUGLAS MacALLISTER, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Monday, June 6, 2005, commencing
at 4:06 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA  02110, for
          the Plaintiff.


          (Continued on Next Page)

30

1       A.    Marty Hines has been the funds officer for

2    a long time.

3       Q.    Did he have a backup back in 1995?

4       A.    A backup?

5       Q.    A funds officer who would certify in his

6    absence.

7       A.    Who would certify funds availability --

8       Q.    Funds availability in his absence.

9       A.    Not that I'm aware of.

10      Q.    So you certainly were not his backup in

11   1995, correct?

12      A.    There has never been a backup for Marty to

13   certify funds availability, other than the

14   supervisor and myself, since I have been the

15   financial director.

16      Q.    So you were a backup to Marty Hines --

17      A.    For certifying funds availability, I sure

18   was, yes.

19      Q.    Well, that was my question.

20      A.    There's your answer.

21      Q.    Now, in 1998, did that change?

22      A.    No.   The delegated responsibilities were

23   still the same.   Supervisor for certifying funds

24   availability and then up to director for financial

**EXHIBIT B**
**2 Pages**

1

Volume I
Pages 1 to 39
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
        Plaintiff,              :
                                :
        vs.                     :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
        Defendants.             :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF DOUGLAS MacALLISTER, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Monday, June 6, 2005, commencing
at 4:06 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.


        (Continued on Next Page)

28

1    he has never been delegated eligibility to certify,

2    so I have never asked him if he knows how to

3    certify.

4        Q.    Do you know whether Mr. Pedicini has been

5    listed as the backup funds officer for NERO on any

6    agency document?

7        A.    What do you mean by "agency documents"?

8        Q.    On any list that you've received from NERO,

9    national or otherwise.

10       A.    Whose list?  See, I have a problem, in that

11   somebody may send out a list, but I don't know if

12   it's blessed by FNS or it's not.

13       Q.    Do you know a person by the name of

14   Jonathan Lash?

15       A.    Yes, I do.

16       Q.    Who is Jonathan Lash?

17       A.    He works in the budget headquarters.  He's

18   a budget analyst, as far as I know.

19       Q.    Does he maintain a list with respect to the

20   individuals who are authorized to certify funds?

21       A.    I do not know for a fact that he does.

22       Q.    Does he have any knowledge as to who the

23   individuals are who are authorized to certify funds

24   within FNS?

**EXHIBIT C**
**2 Pages**

1

Volume I
Pages 1 to 195
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                         :
JOHN G. PEDICINI,         :
      Plaintiff,      :
                         :
     vs.            :   Civil Action
                         :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and  :
ANN M. VENEMAN, SECRETARY,    :
UNITED STATE DEPARTMENT OF     :
AGRICULTURE,            :
      Defendants.     :
                         :
- - - - - - - - - - - - - - - -x

       DEPOSITION OF ROBERT L. CANAVAN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Tuesday,
June 7, 2005, commencing at 11:09 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.

    (Continued on Next Page)

Page 156

[1]   A: Say that one again.

[2]   Q: If Frances Zorn or her predecessor, as the
[3] regional administrator, had not delegated to Douglas
[4] MacAllister the authority to appoint funds officer
[5] duties, then Mr. MacAllister would not have the
[6] authority to make such appointments, correct?

[7]   A: His authority would come from her
[8] delegation.

[9]   Q: And only through her delegation, to your
[10] knowledge?

[11]   A: To my knowledge.

[12]   Q: Do you know whether John Pedicini received
[13] delegation as backup funds officer through the
[14] delegation at any point in time from the regional
[15] administrator?

[16]   A: Not to my knowledge.

[17]   Q: Do you know whether the regional
[18] administrator delegated that authority to John
[19] Ghiorzi or Douglas MacAllister?

[20]   A: I am not certain of that.

[21]   Q: Do you know whether the regional
[22] administrator had delegated that authority to Arthur
[23] LeBlanc?

[24]   A: I don't know the answer to that.

Page 157

[1]   Q: So you don't know whether or not any of
[2] these individuals had the authority to appoint John
[3] Pedicini backup funds officer, correct?

[4]   A: I don't know what delegations that regional
[5] administrators have made. I'm just not familiar
[6] with what they might have been in the past.

[7]   Q: So since you don't know who may have had
[8] the authority to delegate this position to Mr.
[9] Pedicini, don't you think it would be a good idea to
[10] ask him what evidence he has about having received
[11] this authority?

[12]   A: See the documentation and see what it is.

[13]   Q: So you agree, then, it would be a good idea
[14] for you personally to receive this documentation
[15] from Mr. Pedicini, so you can review it, correct?

[16]   MR. WILMOT: Objection. You may answer.

[17]   Q: I'm asking whether you would like to at
[18] this point receive the documentation that Mr.
[19] Pedicini has regarding his appointment as backup
[20] funds officer based on the information you now have.

[21]   A: I think whatever information bears on this
[22] case should be on the table.

[23]   Q: Okay. So if Mr. Pedicini at this point in
[24] time were to present you with this evidence, would

Page 158

[1] this be something that you would review?

[2]   A: I'll review anything that's on the table
[3] that's pertinent to this case.

[4]   Q: And if he were to satisfy you that he in
[5] fact was properly appointed backup funds officer,
[6] would that change your position with respect to his
[7] use of that title?

[8]   A: The current funds officer as designated by
[9] the allowance holder is Martin Hines. The
[10] responsibilities of that position in his absence are
[11] assigned to his first line supervisor and to Douglas
[12] MacAllister. I can't testify encyclopedically to
[13] all history. I know that for as long as
[14] documentation is available, which goes back, I want
[15] to say, ten years, that has been the line of
[16] delegation.

[17]   Q: So it really doesn't matter to you whether
[18] Mr. Pedicini had been appointed alternate funds
[19] officer in the past?

[20]   A: I don't know what has been done in the
[21] past. What I know is in the period throughout our
[22] current documentation, going back a decade, there
[23] has been an unchanging structure of delegation.

[24]   Q: And if he were to have had this delegation,

Page 159

[1]   okay with you that it's now been taken away?

[2]   A: It's not been taken away. It hasn't
[3]   existed, so —

[4]   Q: Well, you don't know whether it's existed
[5]   or not, do you?

[6]   A: Well, by examination of documents and
[7]   discussion with the people who are in a position to
[8]   know this delegation, I would say, No, I'm
[9]   confident that he has not been and is not the
[10] alternate funds officer.

[11]   Q: Yet, you refuse to see the documentation
[12] that he says he has —

[13]   MR. WILMOT: Can we take a quick break. I
[14]   need to call my office.

[15]   (Off the record)

[16]   BY MR. CATAPANO-FRIEDMAN:

[17]   Q: I've now presented Mr. Canavan with
[18]   what's Exhibit 24, which is a series of emails
[19] from John Pedicini and I believe from Joe Stanco.
[20]   Is there anybody else who has sent emails in
[21] this document, Mr. Canavan?

[22]   (Witness reviews document)

[23]   MR. CATAPANO-FRIEDMAN: I'm asking Mr.
[24]   Canavan if he recognizes these emails, because I

**EXHIBIT D**
**2 Pages**

1

Volume I
Pages 1 to 195
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
JOHN G. PEDICINI,                 :
          Plaintiff,              :
                                  :
                                  :
          vs.                     :    Civil Action
                                  :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and     :
ANN M. VENEMAN, SECRETARY,        :
UNITED STATE DEPARTMENT OF        :
AGRICULTURE,                      :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF ROBERT L. CANAVAN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Tuesday,
June 7, 2005, commencing at 11:09 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA  02110, for
          the Plaintiff.


          (Continued on Next Page)

---

Page 60

[1]  **A:** Martin T. Hines.

[2]  **Q:** Is he a good employee?

[3]  **A:** Yes, he is.

[4]  **Q:** Is he an honest man?

[5]  **MR. WILMOT:** Objection.

[6]  **Q:** To the best of your — your opinion. Do

[7] you think he's an honest man?

[8]  **A:** I believe he is.

[9]  **Q:** Did you ever think he was telling you a

[10] lie?

[11]  **A:** I'm sorry, would I or did I?

[12]  **Q:** Did you.

[13]  **A:** No.

[14]  **Q:** So have you had discussions with Martin

[15] Hines?

[16]  **A:** Yes.

[17]  **Q:** Did you have many discussions with Martin

[18] Hines over the years?

[19]  **A:** We have had conversations over many, many

[20] years, but relatively infrequently.

[21]  **Q:** But you've had many conversations over a

[22] long period of time, correct?

[23]  **A:** Yes.

[24]  **Q:** And in those many conversations, can you

---

Page 61

[1] recall any situation where you felt that Martin

[2] Hines was not telling you the truth?

[3]  **A:** No.

[4]  **Q:** So as we sit here today, you've got no

[5] reason to question Martin Hines' honesty, correct?

[6]  **A:** That's correct.

[7]  **Q:** Who is the backup funds officer at NERO?

[8]  **A:** The funds officer is Marty Hines. In his

[9] absence, he's backed up by his first line

[10] supervisor. In their absence, the responsibility

[11] would go to Doug MacAllister.

[12]  **Q:** Is that always how it's been at NERO since

[13] Marty Hines has been there?

[14]  **A:** As far back as I can recall, Marty Hines

[15] has been there since the region — close to when the

[16] region opened.

[17]  **Q:** Well, when was that, approximately? And

[18] then you can finish, if you can tell me

[19] approximately when it opened.

[20]  **A:** September 1975.

[21]  **Q:** Okay. Go ahead. Complete your answer.

[22]  **A:** For as far back as I can recall and as far

[23] as I can see documented, that has been the structure

[24] of authorization of delegation of that

---

Page 62

[1] responsibility.

[2]  **Q:** And Marty Hines now is in your unit,

[3] correct? You're ultimately responsible for Mr.

[4] Hines — he's within your unit? He reports

[5] indirectly to you?

[6]  **A:** He works in the northeast region.

[7]  **Q:** Right. But who does he report to?

[8]  **A:** Michael Malone.

[9]  **Q:** And who does Michael Malone report to?

[10]  **A:** Doug MacAllister.

[11]  **Q:** And who does he report to?

[12]  **A:** To me.

[13]  **Q:** So he's part of your unit, then, correct?

[14]  **A:** Okay.

[15]  **Q:** He's within your line of — chain of

[16] command?

[17]  **A:** Correct, correct. "Unit" has a different

[18] meaning.

[19]  **Q:** I understand. But I'm just looking for

[20] what your overall responsibility is there.

[21]     How long have you had responsibility for

[22] Marty Hines?

[23]  **A:** Since my appointment as deputy regional

[24] administrator.

---

Page 63

[1]  **Q:** Which was in?

[2]  **A:** June 13, 2004.

[3]  **Q:** 2004. Before that, you held — you told us

[4] what position you held. What position was that,

[5] again?

[6]  **A:** Regional food stamp program director.

[7]  **Q:** Was Marty Hines at all in your chain of

[8] command as regional food stamp director?

[9]  **A:** Chain of command, no.

[10]  **Q:** So he didn't report to you in any sense up

[11] the line?

[12]  **A:** No.

[13]  **Q:** Did you have any responsibilities over

[14] Marty Hines at that point in time?

[15]  **A:** Over him, no.

[16]  **Q:** But you worked together with him from time

[17] to time?

[18]  **A:** My staff would collaborate with Marty on

[19] accounts and funds issues.

[20]  **Q:** So prior, then, to 2004, you don't know who

[21] the backup funds officer was, correct?

[22]  **A:** By documentation, I can see that it has

[23] been — that the delegation of funds officer role

[24] was to Marty Hines, with an alternative assignment

**EXHIBIT E**
**2 Pages**

1

Volume I
Pages 1 to 214
Exhibits 32 - 46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                     :
JOHN G. PEDICINI,         :
       Plaintiff,     :
                     :
      vs.            :   Civil Action
                     :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and :
ANN M. VENEMAN, SECRETARY,   :
UNITED STATE DEPARTMENT OF    :
AGRICULTURE,             :
       Defendants.    :
                     :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF MICHAEL D. MALONE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 8, 2005, commencing
at 11:30 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

Michael D. Malone
Vol. 1, July 8, 2005

---

Page 139

[1] Mr. Pedicini performs at the top level, correct?

[2]    **MR. WILMOT:** Objection. You can answer if

[3] you can.

[4]    **A:** I don't necessarily like the term "many."

[5]    **MR. WILMOT:** You can clarify his question

[6] or ask him to clarify it.

[7]    **A:** Several. I would agree that there are

[8] several he performs that are very high level.

[9]    **Q:** Okay.

[10]    **MR. WILMOT:** Are you marking a few exhibits

[11] right now?

[12]    **MR. CATAPANO-FRIEDMAN:** We are.

[13]    **MR. WILMOT:** Can we take a quick bathroom

[14] break while you do that?

[15]    **MR. CATAPANO-FRIEDMAN:** Quick, yeah,

[16] because we're running out of time and we still have

[17] a number of things to go over with this witness.

[18] Mark 41 through 45.

[19]    (Documents marked as Plaintiff

[20] Exhibits 41 - 45 for identification.)

[21]    (Recess taken)

[22]    **Q:** I want to show you what's been marked

[23] Plaintiff's Exhibit 22 and ask you whether you

[24] recognize this document?

---

Page 140

[1]    **A:** Yes, I do.

[2]    **Q:** Is this the cover sheet to the leave

[3] without pay analysis that is attached to Plaintiff's

[4] Exhibit 20?

[5]    **A:** Yes, it is.

[6]    **Q:** And on this cover sheet, who does it say

[7] the analysis is from?

[8]    **A:** John G Pedicini.

[9]    **Q:** Does it say anything else?

[10]    **A:** Beside his name is has "alternate funds

[11] officer-NERO."

[12]    **Q:** Alternate funds officer-NERO, was that a

[13] title that Mr. Pedicini was entitled to use in your

[14] opinion?

[15]    **A:** No, it was not.

[16]    **Q:** Was that one of the reasons why the front

[17] office and you found the leave without pay analysis

[18] objectionable?

[19]    **MR. WILMOT:** Objection. You can answer.

[20]    **A:** Yes.

[21]    **Q:** Just to make it clear, what you found

[22] objectionable was the use by Mr. Pedicini of the

[23] title alternate funds officer-NERO?

[24]    **MR. WILMOT:** Objection. You can answer.

---

Page 141

[1]    **Q:** Is that correct?

[2]    **A:** Correct.

[3]    **Q:** All right. I'd like to show you

[4] Plaintiff's Exhibit 45 and see if you recognize this

[5] document.

[6]    **A:** Yes, I do.

[7]    **Q:** And is this a document that you received?

[8]    **A:** Yes, it is.

[9]    **Q:** Well, I guess a communication that you

[10] received from Mr. Pedicini is part of the document,

[11] correct?

[12]    **A:** Correct.

[13]    **Q:** Right. And is that an E-mail dated October

[14] 14, 2004?

[15]    **A:** Yes, it is.

[16]    **Q:** And then up above that there appears to be

[17] a response from you to Mr. Pedicini. Is that a

[18] response that you in fact prepared and sent to

[19] Mr. Pedicini?

[20]    **A:** Yes, it is.

[21]    **Q:** And what does the response say?

[22]    **A:** "Mr. Pedicini, I received your message.

[23] The Supervisory Instruction stands. Mike Malone."

[24]    **Q:** And the communication below that

---

Page 142

[1] Mr. Pedicini sent to you stated a number of

[2] objections to your supervisory instruction, did it

[3] not?

[4]    **MR. WILMOT:** Objection. You can answer.

[5]    **A:** Yes, it does.

[6]    **Q:** And in making the response that you did,

[7] was it your intention to respond in a negative

[8] fashion to all of the objections raised by

[9] Mr. Pedicini?

[10]    **MR. WILMOT:** Objection. You can answer.

[11]    **Q:** Let me rephrase it. Was it your intention

[12] to reject the objections that Mr. Pedicini raised in

[13] his E-mail to you?

[14]    **MR. WILMOT:** Objection. You can answer.

[15]    **A:** That was not my specific intention.

[16]    **Q:** What was your intention?

[17]    **A:** My intention in the response was that based

[18] on what he supplied to me, nothing in what he

[19] provided to me changed the instruction that I had

[20] sent.

[21]    **Q:** I'd like to direct your attention to

[22] Paragraph 6 of Mr. Pedicini's E-mail to you. Can

[23] you read that for the record?

[24]    **A:** "Fourth" —

---

**EXHIBIT F**
**2 Pages**

1

Volume I
Pages 1 to 61
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x
                              :
JOHN G. PEDICINI,            :
          Plaintiff,         :
     vs.                     :     Civil Action
                             :     No. 04-12395 JLT
UNITED STATES OF AMERICA, and :
ANN M. VENEMAN, SECRETARY,   :
UNITED STATES DEPARTMENT OF  :
AGRICULTURE,                 :
          Defendants.        :
                              :
- - - - - - - - - - - - - - -x

        VIDEOCONFERENCE DEPOSITION OF PARIDE MONTI
f/k/a JOSEPH STANCO, a witness called on behalf of
the Plaintiff, taken pursuant to the Federal Rules
of Civil Procedure, before Daniel P. Wolfe,
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Offices of Doris O. Wong Associates, 50 Franklin
Street, Boston, Massachusetts, on Thursday, June 23,
2005, commencing at 3:25 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.) 50 Franklin
        Street, Boston, MA  02110, for the Plaintiff.

    United States Department of Justice, United
        States Attorney's Office
        (By Gina Y. Walcott-Torres, Assistant
        United States Attorney) United States
        Courthouse, 1 Courthouse Way, Suite 9200,
        Boston, MA 02210, for the Defendants.

Also Present: John Pedicini
              Salama Abdurrahim, summer intern.

9

1   availability of funds; is that correct?

2       A.    If you don't confirm what I am asking, I

3   will say yes, I do not understand your question.

4       Q.    Did a fellow by the name of Marty Hines

5   report to you when you were at FNS?

6       A.    Yes.

7       Q.    What was his job title?

8       A.    Budget officer, I believe.

9       Q.    Do you know what functions he performed as

10  budget officer?

11      A.    Administering the budget for the region.

12      Q.    Did he also certify the availability of

13  funds?  Did he function in that capacity?

14      A.    Certifying the availability of operational

15  funds.

16      Q.    Okay.  And did John Pedicini act as his

17  backup in certifying the availability of operational

18  funds when you were section chief?

19          MS. WALCOTT-TORRES:  Objection.  You may

20  answer.

21      A.    That was always an unclear point.  And I

22  believe that Mr. Pedicini was never assigned to

23  certifying funds for him specifically.

24      Q.    Nevertheless, did Mr. Pedicini certify

**EXHIBIT G**
**2 Pages**

1

Volume I
Pages 1 to 57
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x
                  :
JOHN G. PEDICINI,        :
      Plaintiff,     :
                  :   Civil Action
     vs.           :   No. 04-12395 JLT
                  :
UNITED STATES OF AMERICA, and  :
ANN M. VENEMAN, SECRETARY,    :
UNITED STATES DEPARTMENT OF   :
AGRICULTURE,           :
      Defendants.    :
                  :
- - - - - - - - - - - - - -x

       DEPOSITION OF ARTHUR J. LeBLANC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston, Massachusetts,
on Thursday, June 23, 2005, commencing at 1:25 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.) 50 Franklin
        Street, Boston, MA  02110, for the Plaintiff.

    United States Department of Justice, United
        States Attorney's Office
        (By Gina Y. Walcott-Torres, Assistant
        United States Attorney) United States
        Courthouse, 1 Courthouse Way, Suite 9200,
        Boston, MA  02210, for the Defendants and
        the Deponent.

Also Present: John G. Pedicini
             Salama Abdurrahim, summer intern.

8

Q.    What was his position?

A.    He was the funds officer.

Q.    As the funds officer, what did Marty Hines
do?

A.    He was responsible for the FPA, the
administrative funds that were given.

Q.    As part of his responsibilities did he
certify funds, the availability of funds?

A.    Administrative funds, yes.

Q.    Who was Mr. Hines's backup in certifying
funds?

       MS. WALCOTT-TORRES:  Objection.

Q.    Did Mr. Hines have a backup in certifying
funds?

A.    Yes.

Q.    Who was Mr. Hines's backup in certifying
funds?

A.    When I was chief, I was the backup.

Q.    Was there anybody else who was backup?

       MS. WALCOTT-TORRES:  With respect to
certifying the funds?

Q.    With respect to certifying funds.

A.    Yes.   After me would be Douglas
MacAllister.

**EXHIBIT H**
**2 Pages**

1

Volume I
Pages 1 to 57
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
            Plaintiff,          :
       vs.                      :          Civil Action
                                :          No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
            Defendants.         :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF ARTHUR J. LeBLANC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston, Massachusetts,
on Thursday, June 23, 2005, commencing at 1:25 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.) 50 Franklin
        Street, Boston, MA  02110, for the Plaintiff.

    United States Department of Justice, United
        States Attorney's Office
        (By Gina Y. Walcott-Torres, Assistant
        United States Attorney) United States
        Courthouse, 1 Courthouse Way, Suite 9200,
        Boston, MA  02210, for the Defendants and
        the Deponent.

Also Present: John G. Pedicini
              Salama Abdurrahim, summer intern.

10

should not have, because, as I mentioned, it went to
me after Marty.

Q.    Do you recall whether someone from FNS
headquarters -- strike that.  Do you recall whether
Mr. Hines came to you and told you that someone at
headquarters had required that Mr. Hines have a
backup in connection with the availability -- to
certify the availability of funds?

A.    I am not aware.

Q.    You don't recall whether Mr. Hines came to
you about that or not?

A.    I don't remember that, no.

Q.    So you don't remember whether or not you
named Mr. Pedicini as a backup to certify funds?

A.    No.  As previously mentioned, I was his
backup.  I would have been the backup.  That was
part of my role.

Q.    Let me ask you this:  Who appointed you
backup to certify availability of funds?

A.    Douglas MacAllister.

Q.    Did he do this verbally or in writing?

A.    In writing.

Q.    Do you have a copy of the writing by which
he did that?

**EXHIBIT I**
**2 Pages**

1

Volume I
Pages 1 to 89
Exhibits:  None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
          Plaintiff,            :
                                :
                                :
     vs.                        :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF JOHN INGEMI, a witness called
on behalf of the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure, before Laura E.
Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Thursday, July 28, 2005,
commencing at 2:00 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA 02110,
          for the Plaintiff.


(Continued on next page)

Page 18

[1] didn't get involved in that. I wasn't really
[2] involved in the funds processing, but I'm familiar
[3] with it in a general sense.
[4]     **Q:** Were you familiar with how budget control
[5] was exercised at FNS-NERO while you were there?
[6]     **A:** Budget controls? In what capacity?
[7]     **Q:** Let's see. Did you know who the budget
[8] control officer was or the budget funds officer was?
[9]     **A:** I believe that was Marty. I believe it was
[10] Marty Hines.
[11]     **Q:** Marty Hines, okay. And do you know whether
[12] Marty Hines had an involvement in certifying the
[13] availability of funds while you were at FNS-NERO?
[14]     **A:** Did I know Marty was involved with that
[15] while I was in NERO?
[16]     **Q:** Right.
[17]     **A:** Yes.
[18]     **Q:** Did you know whether John Pedicini was also
[19] involved in that process when you were at FNS-NERO?
[20]     **A:** I believe John was an assistant to Marty
[21] while I was there, so I assume he had some process
[22] involved there if he was the assistant.
[23]     **Q:** Do you know whether —
[24]     **A:** The backup. Actually he was his backup, I

Page 19

[1] believe.
[2]     **Q:** He was the backup funds officer?
[3]     **A:** Exactly. When Marty was out, then I think
[4] John would take over.
[5]     **Q:** So that when Marty was out, was John
[6] Pedicini the individual who would certify the
[7] availability of funds?
[8]     **A:** That's the way I understood it.
[9]     **Q:** Why did you leave FNS-NERO?
[10]     **A:** I left FNS-NERO to take on a different job
[11] as an investigator with the Food Nutrition Service.
[12] I applied for a position. I wanted to try a
[13] different aspect in the agency and just for a
[14] change.
[15]     I had the opportunity with this job to work
[16] out of my home. That was a big part of it. Instead
[17] of going into Boston every day, I could work out of
[18] my house so that was a perk.
[19]     **Q:** And how did it work out for you, that
[20] change?
[21]     **A:** It worked out good.
[22]     **Q:** Have you had any EEO problems at your
[23] current position?
[24]     **A:** EEO problems?

Page 20

[1]     **Q:** That you would consider an EEO problem.
[2]     **A:** There are some problems going on now but
[3] I'm not sure if it's at this point an EEO complaint.
[4]     **Q:** Did you file a complaint of any nature in
[5] your current position, whether EEO or something
[6] else, involving your employment?
[7]     **MS. LUCAS PISMAN:** Objection. Relevance.
[8]     **MR. CATAPANO-FRIEDMAN:** Yes, there is a
[9] relevance. I believe that Mr. Pedicini was involved
[10] and there are issues in this case that relate to his
[11] involvement in representative capacities with
[12] individuals who filed grievances or complaints and
[13] that's where the relevance lies, Wendy.
[14]     **MS. LUCAS PISMAN:** Are you talking about —
[15] I'm a little unclear. Are you talking about while
[16] Mr. Ingemi was at NERO or subsequent to being at
[17] NERO?
[18]     **MR. CATAPANO-FRIEDMAN:** Subsequent to being
[19] at NERO I believe there was an instance.
[20]     **MS. LUCAS PISMAN:** So that's what I why to
[21] make — secondly, I wanted to ask you to clarify a
[22] question as to what period of time you were asking
[23] about.
[24]     **MR. CATAPANO-FRIEDMAN:** Okay.

Page 21

[1]     **Q:** Have you filed more than one grievance or
[2] complaint in your current position, John?
[3]     **MS. LUCAS PISMAN:** Go ahead, John.
[4]     **A:** Yes.
[5]     **Q:** Okay. All right. Did you file one around
[6] 2004 or did you have meetings that related to — in
[7] 2004 that related to a prior complaint?
[8]     **A:** Yes, we filed one in 2004.
[9]     **Q:** You had others before that?
[10]     **A:** That was my first grievance.
[11]     **Q:** Your first grievance was in 2004?
[12]     **A:** Yes.
[13]     **Q:** Okay. All right. Was Mr. Pedicini at all
[14] involved in that grievance?
[15]     **A:** Yes. Not so much in the grievance union
[16] aspect, but he consulted me when I asked him
[17] questions about aspects of that.
[18]     **Q:** Did you request that he act as a
[19] representative for you in connection with that
[20] grievance at any point in time?
[21]     **A:** Yes.
[22]     **Q:** Can you tell us about that?
[23]     **A:** I can tell you about an instance where —
[24] well, first of all before I filed a grievance, I was

**EXHIBIT J**
**2 Pages**

1

Volume I
Pages 1 to 59
Exhibit 77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
        Plaintiff,              :
                                :
                                :
        vs.                     :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
        Defendants.             :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF JONATHAN LASH, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Tuesday, August 2, 2005,
commencing at 1:15 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

---

Page 30

[1] funds without going into the FFIS system, has that
[2] individual violated FNS policy?
[3]   **A:** I would think that — yes.
[4]   **Q:** Is training in federal appropriations law
[5] important in the certifying the availability of
[6] funds process?
[7]   **A:** Yes.
[8]   **Q:** Why is that?
[9]   **A:** Many times you can be presented with a
[10] request to purchase something that is specifically
[11] forbidden but without that training in
[12] appropriations law and specific things that are
[13] prohibited, you wouldn't know and you might go ahead
[14] and approve it.
[15]   **Q:** Should a person who certifies funds
[16] availability have knowledge of the Anti-Deficiency
[17] Act?
[18]   **A:** I would think so, yes.
[19]   **Q:** And why is that?
[20]   **A:** You don't want to commit the agency to
[21] spending funds that would over — that would break
[22] the limits of the appropriation.
[23]   **Q:** Do you know who Angie McElmurray was?
[24]   **A:** I think she still is. Yes, I know her.

---

Page 31

[1]   **Q:** Do you know who she is? Who is she?
[2]   **A:** I'm not sure exactly where she works now,
[3] but she was in the budget division when I came to
[4] work there.
[5]   **Q:** Okay.
[6]   **A:** I know her husband. He's still at FNS.
[7]   **Q:** What's her role with respect to funds
[8] officers?
[9]   **A:** She was a funds officer I believe for —
[10] I'm not sure if it was CGA or another organization.
[11] It's right here. She was the funds officer for
[12] Office of Government Affairs and Public Information
[13] which has since been renamed to CGA.
[14]   **Q:** Do you know who Larry Blim is?
[15]   **A:** Yes.
[16]   **Q:** Who is Larry Blim? What role does he play
[17] with respect to funds officers?
[18]   **A:** He's got a pretty long title. I can't
[19] really recall what it is right now. He is a GS-15
[20] who has I think ultimate responsibility for making
[21] sure that the FFIS system is run properly.
[22]   **Q:** What's his role in connection with funds
[23] officers?
[24]   **A:** He periodically communicates with the funds

---

Page 32

[1] officers to notify them of changes in procedure or
[2] improvements or enhancements or whatever they need
[3] to know to do their jobs well.
[4]   **MR. WILMOT:** I don't mean to interrupt your
[5] flow. Can I take a two-minute break?
[6]   **MR. CATAPANO-FRIEDMAN:** Sure. Sure.
[7]   (Recess taken)
[8]   **Q:** Do you know who Lisha Doorman is,
[9] D-o-r-m-a-n?
[10]   **A:** Yes, I do.
[11]   **Q:** Do you know what role she plays with
[12] respect to FNS funds officers?
[13]   **A:** She is now as of a week or so ago a funds
[14] officer. She was the functional administrator of
[15] FFIS before that.
[16]   **Q:** What was her position before that?
[17]   **A:** Functional administrator are the duties she
[18] held. She worked in the accounting division and I'm
[19] not really sure of what title she had over there
[20] because I don't believe she was an accountant but —
[21]   **Q:** Okay. Do you know who Rose McClyde is?
[22]   **A:** Yes, I do. Director of the accounting
[23] division.
[24]   **Q:** What is her role, if any, with respect to

---

Page 33

[1] funds officers?
[2]   **A:** Very tangential at most.
[3]   **Q:** Do you know who —
[4]   **A:** The funds officers primarily respond to the
[5] budget division and not accounting division,
[6] although there are some — there is some reporting
[7] that funds officers do to the accounting division in
[8] certifying things for financial statements.
[9]   **Q:** Do you know who David Burr is?
[10]   **A:** Yes, he's the director of the budget
[11] division.
[12]   **Q:** What's his role in connection with funds
[13] officers?
[14]   **A:** He would have some contact with them but
[15] probably not much. It's mostly my branch, the
[16] administrative branch, that has contact with the
[17] funds officers.
[18]   **Q:** So you have regular contact with funds
[19] officers?
[20]   **A:** As needed. People call me and ask me
[21] questions and I try to help them.
[22]   **Q:** Are you familiar with the process by which
[23] disbursements are approved?
[24]   **A:** Yes, I am a certifying officer for

---

**EXHIBIT K**
**4 Pages**

1

Volume I
Pages 1 to 59
Exhibit 77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x
                    :
JOHN G. PEDICINI,        :
     Plaintiff,       :
                    :
     vs.            :  Civil Action
                    :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and :
ANN M. VENEMAN, SECRETARY,  :
UNITED STATES DEPARTMENT OF  :
AGRICULTURE,           :
     Defendants.      :
                    :
- - - - - - - - - - - - - - -x

     DEPOSITION OF JONATHAN LASH, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Tuesday, August 2, 2005,
commencing at 1:15 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

John G. Pedicini   v.
United States of America, et al.

Jonathan Lash
Vol. 1, August 2, 2005

---

Page 10

[1]   **A:** I was a management analyst Step 12 for
[2] approximately nine years. Before that I was — I
[3] worked in the Food Stamp Program from when I went
[4] from Grade 2 to Grade 11.
[5]   **Q:** Grade 2 to Grade 11 over what period of
[6] time?
[7]   **A:** Six years.
[8]   **Q:** Wow.
[9]   **A:** I was getting a master's degree.
[10]   **Q:** Great. Now you're currently stationed in
[11] Washington, D.C. at headquarters?
[12]   **A:** Yes, sir.
[13]   **Q:** And have you always been stationed at — in
[14] headquarters in Washington, D.C.?
[15]   **A:** Yes, sir.
[16]   **Q:** As part of your duties, do you keep any
[17] lists of the budget analysts or budget officers
[18] within FNS?
[19]   **A:** We have a telephone list of the people who
[20] work in the budget division in headquarters.
[21]   **Q:** Do you know who prepares the list?
[22]   **A:** Gloria Morton works in the program
[23] accountability branch I think it's called.
[24]   **Q:** Did you receive your list from her?

---

Page 11

[1]   **A:** Yes.
[2]   **Q:** Did she provide this list to you in the
[3] ordinary course of business?
[4]   **A:** Yes. It's a courtesy list. She just
[5] keeps tracks of people's phone numbers as they
[6] change. It's not a formal published list. It's
[7] just when people change their desks or new employees
[8] show up, she'll just add the name and E-mail it
[9] around to everybody if we need to call somebody.
[10]   **Q:** Let me have some documents. We'll go right
[11] to the documents. Let me show you what's been
[12] marked as Plaintiff's Exhibit 10 and ask you to take
[13] a look at this document and see if you recognize it.
[14]   **A:** Oh, yes, I recognize it. I don't think I
[15] prepared this one. I think maybe Angie McElmurray
[16] prepared this one. Yes, that's her initials.
[17]   **Q:** Can you tell me what this document is?
[18]   **A:** Listing of the funds officers.
[19]   **Q:** And you said you don't think you prepared
[20] this particular document?
[21]   **A:** No, I didn't.
[22]   **Q:** Have you prepared other funds officers
[23] listings?
[24]   **A:** Yes, since Angie left I took over editing

---

Page 12

[1] this as changes are made, as funds officers leave
[2] and new ones arrive. I have this file.
[3]   **Q:** Is this an official list of funds officers?
[4]   **A:** Could you define "official" for me?
[5]   **Q:** Why don't you tell me what this document
[6] is.
[7]   **A:** It's an Excel spreadsheet that we type in
[8] the names and phone numbers of people as allowance
[9] holders of organizations and funds officers as they
[10] change.
[11]   **Q:** Do you do this in the ordinary course of
[12] business?
[13]   **A:** Yes.
[14]   **Q:** Is this to your knowledge an accurate list
[15] of funds officers and allowance holders as of the
[16] date of this list?
[17]   **A:** January 26, 1999?
[18]   **Q:** Yes.
[19]   **A:** I have no reason to doubt its authenticity
[20] or accuracy.
[21]   **Q:** Is this a list that you received and
[22] possessed in the ordinary course of business?
[23]   **A:** I don't believe I possessed this one
[24] because I wasn't working in the budget division at

---

Page 13

[1] the time this one was created; however, I probably
[2] received subsequent versions with different names.
[3]   **Q:** With different names?
[4]   **A:** As they were updated as people left, people
[5] retired.
[6]   **Q:** Let me direct your attention to the NERO
[7] line. Do you see where it relates to NERO? And can
[8] you tell me what it says about NERO on that list?
[9]   **A:** The allowance holder is Fran Zorn, her
[10] phone number. The FPA officer is Marty Hines. The
[11] FPA backup is John Pedicini and the phone number of
[12] each one of them and the fax number.
[13]   **Q:** To your knowledge, was Fran Zorn as of the
[14] date of that list the allowance holder for FNS-NERO?
[15]   **A:** To the best of my knowledge she would have
[16] been, yes.
[17]   **Q:** And to the best of your knowledge, was
[18] Marty Hines the — was it funds officer for
[19] FNS-NERO?
[20]   **A:** As long as I've known the funds officers,
[21] Marty Hines has been the funds officer for NERO.
[22]   **Q:** And to your knowledge, was John Pedicini
[23] the — what was he listed as?
[24]   **A:** Backup.

---

Page 14

[1] **Q:** Back-up funds officer?
[2] **A:** Yes.
[3] **Q:** At FNS-NERO on the date of that list in
[4] 1999?
[5] **A:** That's his name there. I assume that he
[6] was the backup funds officer on that date.
[7] **Q:** To your knowledge, did Mr. Pedicini
[8] continue to be the backup funds officer after that
[9] date?
[10] **A:** Yes.
[11] **Q:** Did you prepare a list subsequent to the
[12] date of this list on which Mr. Pedicini's name
[13] appears as the backup funds officer?
[14] **A:** I can't say with certainty, but it's
[15] probable that I did.
[16] **Q:** And you in fact did prepare this list at
[17] subsequent periods of time?
[18] **A:** Yes.
[19] **Q:** Do you continue to perform this list as
[20] part of your ordinary duties in the ordinary course
[21] of business?
[22] **A:** Yes.
[23] **Q:** I'm going to show you what's been marked
[24] Plaintiff's Exhibit 11 and ask you whether you

Page 15

[1] recognize what appears to be a series of E-mails.
[2] **A:** I'm sorry, sir. Could you please repeat
[3] the question?
[4] **Q:** Do you recognize this document, the E-mails
[5] that are contained on this document?
[6] **A:** I recognize them.
[7] **Q:** Are these E-mails that you prepared or
[8] received at the point in time identified on this
[9] document?
[10] **A:** Except for the one between John Pedicini
[11] and Joseph Stanco, yes.
[12] **Q:** The E-mail — is there one or more than one
[13] E-mail — I don't have it in front of me — that you
[14] prepared?
[15] **A:** There are two that I prepared.
[16] **Q:** What do those E-mails say?
[17] **A:** In chronological order, "Subject:
[18] Alternate to NERO Funds Officer." I wrote: "Yes,
[19] John, we've had you listed as the backup Funds
[20] Officer in NERO for years."
[21] In a subsequent message a few minutes later
[22] I write: "John, as with all backup funds officers,
[23] in the absence of the primary funds officer, you are
[24] authorized to certify funds availability."

Page 16

[1] **Q:** Were those statements true when you made
[2] them?
[3] **A:** To the best of my knowledge, yes.
[4] **Q:** Are those statements true today?
[5] **A:** To the best of my knowledge, yes.
[6] **Q:** Do you have any reason to believe that
[7] those statements were not true when you made them?
[8] **A:** No.
[9] **Q:** Do you have any reason to believe that
[10] those statements are not true today?
[11] **A:** No.
[12] **Q:** In fact today you're the one who keeps the
[13] list of backup funds officers and funds officers?
[14] **A:** We have a list of — that looks like this
[15] one and when I think of it or if I think a change
[16] has been made and we need to put out a new version
[17] of it, then I do that.
[18] **Q:** Can you tell me why you prepare and keep
[19] this list?
[20] **A:** To let everyone know who is doing what.
[21] **Q:** And is this an official part of your job,
[22] to do this, keep this list?
[23] **A:** No.
[24] **Q:** Is this a function, however, that you've

Page 17

[1] done routinely over the years since you've held your
[2] current position?
[3] **A:** Yes.
[4] **Q:** Is this a function that was done routinely
[5] to the best of your knowledge by your predecessor?
[6] **A:** Yes.
[7] **Q:** Are there standard functions that backup
[8] funds officers perform within FNS?
[9] **A:** I don't believe the backup funds officers
[10] have set duties in one position description that
[11] comes from headquarters.
[12] I believe that those things are negotiated
[13] at each individual organization depending on the
[14] needs of the allowance holder and what works best.
[15] **Q:** What about with respect to certification of
[16] availability of funds? Is that something that is
[17] standard throughout FNS-NERO with respect to the
[18] functioning of backup funds officers?
[19] **A:** I'd like to be able to answer that with
[20] authority, but frankly I really never deal with
[21] anybody but Marty Hines so I don't know.
[22] **Q:** Well, you made a statement in that E-mail
[23] that as a backup funds officer, Mr. Pedicini had the
[24] right to certify the availability of funds.

---

Page 18

[1] **A:** I accepted on the face value — because
[2] I've met John before and Marty seemed to regard John
[3] as hi backup — that he had all of the associated
[4] rights or authorizations to act in Marty's stead if
[5] Marty were not — were absent.
[6] **Q:** So was that statement made from your
[7] understanding of the individual situation at NERO
[8] only and not on other grounds?
[9] **MR. WILMOT:** Objection. You can answer.
[10] **Q:** You can answer the question if you
[11] understand it.
[12] **MR. WILMOT:** I'm just objecting as to the
[13] form, but you can answer his question if you
[14] understand it.
[15] **A:** Can you repeat the question?
[16] **Q:** Yes. My question is where you say — let
[17] me have that. I'm reading your statement. You say:
[18]    "As with all backup funds officers, in the absence
[19] of the primary funds officer, you are authorized to
[20] certify funds availability." My question to you is
[21] was that a correct statement when made?
[22] **A:** To the best of my knowledge, yes.
[23] **Q:** You said there I believe that all backup
[24] funds officers are authorized to certify the funds

---

Page 19

[1] availability. Is that a correct interpretation of
[2] what you said?
[3] **A:** I believe that.
[4] **Q:** My question for you is was it your
[5] understanding then that all backup funds officers
[6] within FNS have the authority to certify the funds
[7] availability?
[8] **A:** That is my understanding based on practice.
[9] I have never seen anything documented that says that
[10] that is the case.
[11] **Q:** Was it the practice back on March 4, 2003,
[12] throughout FNS that all backup funds officers had
[13] the authorization to certify funds availability?
[14] **A:** To the best of my knowledge, yes.
[15] **Q:** To the best of your knowledge, is that the
[16] practice today?
[17] **A:** Yes.
[18] **Q:** I think you said that when changes occur in
[19] budget officers and backup —
[20] **A:** FPA officer.
[21] **Q:** — individuals, that you make changes to
[22] your list. Is that a correct statement?
[23] **A:** Yes, but it's not something I do on a
[24] calendar month-to-month basis. I do it when I think

---

Page 20

[1] of it.
[2] **Q:** And how often do you update your list?
[3] **A:** Maybe once a year.
[4] **Q:** Once a year, okay. So it's possible that
[5] your list could be missing information that may have
[6] occurred during the prior 12 months?
[7] **A:** Sure, yes.
[8] **Q:** But otherwise do you believe your list to
[9] be accurate?
[10] **A:** Yes.
[11] **Q:** I'd like to show you a series of documents.
[12] I want to make sure I get them in the right order.
[13] These are marked Plaintiff's Exhibit 65, Plaintiff's
[14] Exhibit 62 and Plaintiff's Exhibit 64 in that order.
[15] They're not in numerical order. I'd like to show
[16] you these documents and see if you have seen them
[17] before, whether you recognize these documents.
[18] **A:** Regarding Exhibit 65, I do not recall this
[19] document even though my name is on the E-mail. I
[20] might have opened it and looked at it briefly, but I
[21] don't have any responsibilities for approval chains
[22] or anything to do with E-travel that would require
[23] my interacting with this document.
[24] **Q:** Okay. So this blank sheet is not something

---

Page 21

[1] that you recognize, and the request that regions
[2] fill out these categories for themselves is not
[3] something that you're aware of?
[4] **A:** I think I saw this — something like this
[5] when I was on a regional review in San Francisco in
[6] May and I assume that this would be something that
[7] the funds officers would have to fill out.
[8] **Q:** But it's not a document that you prepared?
[9] **A:** No.
[10] **Q:** Or sent out?
[11] **A:** No. I believe Lisha Doorman would have
[12] prepared it.
[13] **Q:** Could you look at the next document in
[14] order.
[15] **A:** 62.
[16] **Q:** Right. There are certain changes that are
[17] written in to the categories. Do you see that?
[18] **A:** The handwriting with the arrows?
[19] **Q:** The handwriting, yes. Is this a document
[20] that you've seen or you recognize?
[21] **A:** No, because I didn't really have much to do
[22] with E-travel. This is a document that would enable
[23] someone to be registered for E-travel approval, I
[24] believe, NERO approval chain for expense report.

---

**EXHIBIT L**
**4 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
JOHN G. PEDICINI,                  :
            Plaintiff,             :
                                   :
        vs.                        :   Civil Action
                                   :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and      :
ANN M. VENEMAN, SECRETARY,         :
UNITED STATES DEPARTMENT OF        :
AGRICULTURE,                       :
            Defendants.            :
                                   :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

Page 61

[1] complicated system.
[2]     I think there's like 500 tables. I don't
[3] use 500 but I use — learning the ones that I needed
[4] took quite a bit of time to learn and to find the
[5] information that was needed to — and if anybody
[6] just went in without any training at all, I would
[7] think they'd be completely lost.
[8]     Q: How many tables do you use in the FFIS
[9] system?
[10]     A: I'm going to guess I probably use 15 or 20
[11] of them.
[12]     Q: Well, is there anybody at FNS-NERO who has
[13] the proper education, background, skills and
[14] training —
[15]     A: Well, myself and John Pedicini.
[16]     Q: — to do the funds officer job?
[17]     A: John Pedicini has the training. In fact he
[18] has FFIS access. He has an ID and not only that, he
[19] has performed a lot of functions and also handled
[20] certain functional areas on his own in FFIS, one of
[21] them being when we converted in 2002, he was the
[22] coordinator for all of the assignment of vendor
[23] numbers which was a new requirement that had to be
[24] constructed.

Page 62

[1]     Vendor numbers are used to direct payments
[2] to the right vendor and very large corporate
[3] entities have many, many vendor numbers and that's
[4] just an example of one small area that he handled.
[5]     But he took the two-week course that I
[6] took, and I know that there was a course given
[7] sometime last year. There was another course given
[8] to newer funds officers because there had been some
[9] changes since 2002 in FNS.
[10]     And I'm going to guess five, six, seven,
[11] eight individuals took I think it was about a week's
[12] training or maybe a little longer with Lisha
[13] Doorman.
[14]     Lisha Doorman until just a few weeks ago
[15] was the FFIS systems administrator for the agency,
[16] and she conducted — she was the principal involved
[17] in conducting that training.
[18]     Q: The reason why you said earlier it didn't
[19] make sense to exclude certifying the availability of
[20] funds from any backup role to your position, is the
[21] reason you said that because that's so critical to
[22] the number one —
[23]     A: At the last funds officers meeting there
[24] was a brief discussion of a discussion point on the

Page 63

[1] agenda. It was stated by Lisha Doorman. Larry Blim
[2] was there. He's another one of the principals in
[3] this FFIS maintenance — of maintaining the system
[4] for the entire agency.
[5]     At that time, they reaffirmed that
[6] alternate funds officers performed the duties, all
[7] of the duties, that the primary funds officer does
[8] in the absence of the primary funds officer.
[9]     Q: Did you say earlier that the number one
[10] duty was certifying the availability of funds?
[11]     A: Well, right, providing funds control.
[12] Providing adequate funds control is really the
[13] primary function of a funds officer. It's the
[14] primary function. I mean I do a lot of other
[15] things, but that's the primary function.
[16]     In effect we are — in effect you're really
[17] working for the budget division as well as the
[18] allowance holder. The allowance holder is the
[19] person that the funds are assigned to, and in the
[20] case of a region it's the regional administrator.
[21]     But the budget division really controls the
[22] funds overall. In effect you're an extension of
[23] that organization. Particularly back in 19 — I'm
[24] not sure what year it was. In '98 or '99 they

Page 64

[1] issued a couple of memos. Roger Butler signed one
[2] and Gary Maupin signed another memo.
[3]     Both of these memos made it pretty clear of
[4] the role of the funds officer and how important it
[5] was. I don't have those memos with me, but they
[6] spell out the importance of those functions for
[7] providing funds control.
[8]     And those were the memos that I gave to
[9] Malone when this document and that issue came up and
[10] that E-mail that he had sent me with regard to him
[11] certifying and I said, "Here. It says here here are
[12] the procedures."
[13]     Q: You said you needed a password or a code to
[14] get into the FFIS system; is that what you said?
[15]     A: Yes.
[16]     Q: Can you explain to me what that is?
[17]     A: You have to be assigned — you have to be
[18] authorized by the security people in FNS and the
[19] agency at headquarters.
[20]     A request has to be made to grant you or
[21] assign you an ID, a system ID which gives you access
[22] to that system, and I have that and John Pedicini
[23] also has it into FFIS. He was assigned a password
[24] and has access.

**Page 157**

[1] funds officers?

[2]    **A:** No, not usually. I don't remember an

[3] instance where say a management official or someone

[4] else, no, because usually they're working meetings

[5] where the purpose of the meeting is training

[6] oriented, update on changes, so it's meetings that

[7] are principally designed for funds officers.

[8]    **Q:** Since 1998, how many of these funds

[9] officers conferences have occurred?

[10]    **A:** Well, there wasn't any last year. I don't

[11] think there was one in 2002 when we had the FFIS

[12] training. I think there was one every other year —

[13] every year I should say, not every other, every

[14] year.

[15]    **Q:** So at least five, five or six?

[16]    **A:** Yes.

[17]    **Q:** Were you invited to attend —

[18]    **A:** Yes.

[19]    **Q:** — all of those meetings?

[20]    **A:** Yes, I was.

[21]    **Q:** Was anybody else at FNS-NERO invited to

[22] attend those meetings?

[23]    **A:** Yes, John Pedicini was addressed in the

[24] same E-mails that I received announcing the

**Page 158**

[1] meetings, their times and inviting all of the

[2] addressees to attend if possible.

[3]    **Q:** Did you attend all of those meetings?

[4]    **A:** Yes, I attended all of — since 1999 or

[5] '98?

[6]    **Q:** Since '98 all of the meetings that were

[7] held.

[8]    **A:** Yes, I think.

[9]    **Q:** The annual funds officers conference?

[10]    **A:** Yes, I think I went to them all.

[11]    **Q:** Did anybody accompany you in attendance at

[12] these meetings from FNS-NERO?

[13]    **A:** Yes, John Pedicini went to two of those

[14] meetings I believe and was scheduled to go on a

[15] third meeting but his father had passed away at that

[16] time.

[17]    **Q:** Can you tell me which meetings Mr. Pedicini

[18] attended?

[19]    **A:** I think it was 2005 and two thousand — I'm

[20] not sure. 2001 maybe. I'm not sure of the other

[21] date. It was around that year.

[22]    **Q:** And do you remember which year he did not

[23] attend because his father passed away?

[24]    **A:** I think that was 2003, I believe.

**Page 159**

[1]    **Q:** Do you know why Mr. Pedicini did not attend

[2] the other funds officers conferences since '98?

[3]    **A:** I don't know if there was a work conflict

[4] or vacation or whatever. Sometimes those meetings

[5] are in the spring. They vary by dates. I'm not

[6] sure why.

[7]    **Q:** But was he invited?

[8]    **A:** Yes, he was invited. And as I said, one

[9] year there was — I believe there was no meeting the

[10] year we had the FFIS training because that was two

[11] weeks in June which is when the normal time frame of

[12] that meeting were to take place.

[13]      One year there was no meeting. 2004 there

[14] was no meeting, and I believe he attended two of the

[15] other meetings and was going to a third meeting and

[16] was unable to attend that one.

[17]    **Q:** Do you remember where these meetings were

[18] held?

[19]    **A:** New Orleans.

[20]    **Q:** Do they last a day, two days?

[21]    **A:** Two days.

[22]    **Q:** When did the 2005 funds officers conference

[23] occur?

[24]    **A:** I believe that was in April of this year.

**Page 160**

[1]    **Q:** Did you attend the April 2005 funds officer

[2] conference?

[3]    **A:** Yes, I did.

[4]    **Q:** Did anybody from FNS-NERO attend with you?

[5]    **A:** Yes, John Pedicini also attended. April

[6] 19th and 20th were the dates.

[7]    **Q:** Do you remember any specific topics that

[8] came up during that conference?

[9]    **A:** Well, there was a lot of discussion of

[10] FFIS, fed trav, and there was a topic also on the

[11] role of the alternate funds officers.

[12]    **Q:** Can you tell me what was said about the

[13] role of the alternate funds officers?

[14]    **A:** Lisha Doorman handled that discussion. It

[15] was a very brief discussion. She said that

[16] alternate funds officers have all of the

[17] responsibilities that the primary funds officer has

[18] and in the absence of the primary funds officer

[19] performs those duties.

[20]      Now she at the time chaired the meeting.

[21] Also in attendance was Larry Blim. Larry Blim is

[22] the director of the FFIS system implementation and

[23] she was the system administrator.

[24]    **Q:** Did anybody address specifically John

Page 161

[1] Pedicini's role at FNS-NERO?
[2]   **A:** At that meeting?
[3]   **Q:** Yes.
[4]   **A:** I don't remember any specific comments at
[5] the meeting, but there was a brief discussion about
[6] the responsibilities and Lisha Doorman was the
[7] speaker at the session.
[8]   **Q:** Did the issue of certifying funds
[9] availability come up at the meeting?
[10]   **A:** Yes. I think she said that included the
[11] ability to do all of the duties that the funds
[12] officer — that the primary funds officer has, but I
[13] don't remember her exact comments.
[14]   **Q:** Not her exact words —
[15]   **A:** It was a brief discussion and it was more
[16] or less that that was the responsibility of the
[17] alternate.
[18]   **Q:** Did you have a conversation with Lisha
[19] Doorman and John Pedicini during that conference?
[20]   **A:** Yes, we talked about it.
[21]   **Q:** And can you tell me what Lisha Doorman said
[22] during that conversation?
[23]   **A:** Well, that she thought it was a moot issue,
[24] that it's common knowledge that alternates perform

Page 162

[1] everything that the primary does, primary fund
[2] officer does which would include certification of
[3] funds.
[4]   **Q:** So what did she say about John Pedicini's
[5] function?
[6]   **A:** Well, she knows he's been the alternate. We
[7] She's seen him at the training sessions and the
[8] meetings. He's been addressed in all of the — and
[9] handled many work items including some of the ones
[10] we were discussing earlier such as the approval
[11] chains for IAS and the one for fed travel. Those
[12] were addressed back to her.
[13]   **Q:** Did she say anything with respect to
[14] Mr. Pedicini's authority to certify the availability
[15] of funds?
[16]   **A:** Well, again alternate the funds officer has
[17] all of the rights and has all of the
[18] responsibilities that the primary has which would
[19] include that.
[20]   **Q:** Did she say that to you?
[21]   **A:** I don't remember her exact words. We
[22] discussed it. She discussed it at the session. It
[23] was a very brief discussion, and I think that most
[24] people were somewhat caught by surprise by it

Page 163

[1] because it doesn't seem to be an issue anywhere else
[2] other than NERO.
[3]   **Q:** I'm not asking for exact words. I'm asking
[4] for your understanding of what she said.
[5]   **A:** Okay. My understanding of her comments was
[6] that alternate funds officers have the same
[7] responsibilities and perform the duties of the
[8] primary in their absence. Whatever the primary
[9] funds officer does, the alternate funds officer can
[10] do.
[11]   **Q:** Specifically in relation to John Pedicini,
[12] what was your understanding of what she said?
[13]   **A:** That as the alternate funds officer, he
[14] would perform all of the duties that I do in my
[15] absence.
[16]   **Q:** Okay. Thank you. Marty, is there a
[17] difference between the kind of training Mr. Malone
[18] instructed you to provide and on-the-job training?
[19]   **A:** Well, I think what he wanted me to do — he
[20] never designated the individuals, but I think he —
[21] his intent was that I was to provide direct
[22] on-the-job type training, hands-on training, to
[23] individuals that he was going to designate. They
[24] were never named and in fact as I said earlier, we

Page 164

[1] went from drive one to reverse and that never
[2] happened.
[3]   **Q:** Marty, when you received your letters of
[4] instruction from Mr. Malone, was this done at a
[5] meeting with Mr. Malone?
[6]   **A:** No, they were placed in sealed envelopes in
[7] my in-basket.
[8]   **Q:** Did you ever meet with Mr. Malone with
[9] respect to these letters of instruction?
[10]   **A:** Yes, when he requested me to, I did.
[11]   **Q:** When did you meet with him in connection
[12] with those letters of instruction?
[13]   **A:** Well, it was probably a couple days later.
[14] I don't remember the exact date, but he did request
[15] to meet with me and discuss the letters and then
[16] that's when I drafted up that initial outline of
[17] training and then got the subsequent second letter
[18] from him.
[19]   **Q:** Now at the meeting you had with Mr. Malone,
[20] was anybody else present?
[21]   **A:** No.
[22]   **Q:** Was Peggy Mann present?
[23]   **A:** No, I don't believe so. No, I don't
[24] believe she was. There was more than one meeting.

**EXHIBIT M**
**5 Pages**

2-1

Volume II
Pages 2-1 to 2-267
Exhibits 47 to 67

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,                    :
           Plaintiff,                :
                                     :
        vs.                          :    Civil Action No.
                                     :    04-12395 JLT
UNITED STATES OF AMERICA, and        :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE,                         :
           Defendants.               :
- - - - - - - - - - - - - - - -x

        CONTINUED DEPOSITION OF DOUGLAS A.
MacALLISTER, a witness called on behalf of the
Plaintiff, taken pursuant to the Federal Rules of
Civil Procedure, before Susan J. Cataldo, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of Doris
O. Wong Associates, Inc., 50 Franklin Street, Boston,
Massachusetts, on Friday, July 15, 2005, commencing at
10:13 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (by Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

    United States Department of Justice,
        United States Attorney's Office
        (by Damin Wilmot, Assistant United States
        Attorney) United States Courthouse,
        1 Courthouse Way, Suite 9200,
        Boston, MA 02210, for the Defendants.

Also Present:   John G. Pedicini

                *  *  *  *  *

Page 227

[1] availability of funds authorization attaches to
[2] either an alternate funds officer or a backup funds
[3] officer?
[4]    **A:** I'm sorry. Repeat the question again,
[5]  please.
[6]    **Q:** Yes. Do you know whether the authorization
[7] to certify the availability of funds attaches to the
[8] title of alternate funds officer or backup funds
[9] officer?
[10]    **MR. WILMOT:** Objection. Answer.
[11]    **Q:** Well, let me ask the question in a
[12] different way. Do you know whether a backup funds
[13] officer or alternate funds officer has the authority
[14] within FNS to certify the availability of funds?
[15]    **MR. WILMOT:** Objection.
[16]    **A:** There's no such title in FNS that I'm aware
[17] of, so they don't have any authority to do anything,
[18] because there's not a job title called alternate
[19] funds officer. There's not a formal job title
[20] called backup funds officer.
[21]    **Q:** Okay. So it's your testimony that the
[22] title alternate funds officer does — or backup
[23] funds officer does not exist at FNS?
[24]    **A:** In no formal PD am I aware of that the job

Page 228

[1] title for that position is backup funds officer or
[2] alternative funds officer. That's my testimony.
[3]    **Q:** Okay. What about the title alternate funds
[4] control officer, does that exist at FNS NERO — at
[5] FNS?
[6]    **A:** Not in NERO. I don't know about throughout
[7] FNS.
[8]    **Q:** So that's a title that may attach to
[9] certain individuals in other regions of FNS?
[10]    **MR. WILMOT:** Objection. Answer.
[11]    **A:** I have no way of knowing one way or the
[12] other.
[13]    **Q:** Okay. And you've never seen the use of the
[14] title alternate funds control officer within FNS?
[15]    **MR. WILMOT:** Objection. You can answer.
[16]    **A:** Not that I can recollect, no.
[17]    **Q:** Okay.
[18]    **MS. CATAPANO-FRIEDMAN:** Mark that.
[19]     (Document marked as Plaintiff
[20] Exhibit 62 for identification)
[21]    **MS. CATAPANO-FRIEDMAN:** And those as well.
[22]     (Documents marked as Plaintiff
[23] Exhibit 63 to 65 for identification)
[24]  (Discussion off the record)

Page 229

[1]    **MR. CATAPANO-FRIEDMAN:** Let's mark this as
[2] an exhibit, too.
[3]    **MS. CATAPANO-FRIEDMAN:** Shall we make —
[4] we'll make a copy for you after it's marked.
[5]     (Document marked as Plaintiff
[6] Exhibit 66 for identification)
[7]    **MS. CATAPANO-FRIEDMAN:** This too.
[8]     (Document marked as Plaintiff
[9] Exhibit 67 for identification)
[10]  (Discussion off the record)
[11]    **MR. CATAPANO-FRIEDMAN:** Back on the record
[12] here.
[13]          **BY MR. CATAPANO-FRIEDMAN:**
[14]    **Q:** Let me just show you a series of exhibits
[15] marked Plaintiff's Exhibit 65, 62, 63 and 64 in that
[16] order, okay. They do not follow the numbering of
[17] the exhibits.
[18]    **A:** (Witness reviews document)
[19]    **Q:** I'd like to show you these exhibits. See
[20] if you recognize them and keep them in that order,
[21] please.
[22]    **A:** (Witness reviews document)
[23]    **Q:** And just let me know when you're finished
[24] reviewing them.

Page 230

[1]    **A:** (Witness reviews document) If not all of
[2] them, I recognize most of them.
[3]    **Q:** All right. Well, let's look at what's been
[4] marked Plaintiff's Exhibit 65. Do you recognize
[5] this document, sir?
[6]    **A:** Specifically I can't say I saw this
[7] document. The form and format in other documents
[8] and other iterations, I'm certainly familiar with
[9] the form and format.
[10]    **Q:** Okay. When you're talking about the form
[11] and format, you're referring to what we see on Pages
[12] 2, 3 and 4 of this document?
[13]    **A:** Correct. That headquarters sent out this
[14] form and format for completion —
[15]    **Q:** Okay.
[16]    **A:** — as part of e-travel. I believe this is
[17] part of e-travel.
[18]    **Q:** Okay. All right. And on the third column
[19] of this form, there is a caption. Can you read
[20] that?
[21]    **A:** I'm on the last page. "The alternate
[22] approver chain." Is that what you're talking about?
[23]    **Q:** No. No. The second, third and fourth
[24] pages.

Page 231

[1] **A:** I'm not sure —

[2] **Q:** Well, you recognize the form on the second,
[3] third and fourth pages? On the second page —

[4] **A:** Okay. Sure.

[5] **Q:** — it's a document dated 11/18/2004.

[6] **A:** Yes.

[7] **Q:** Do you see that?

[8] **A:** Sure.

[9] **Q:** Okay. The third to last column, what's
[10] the —

[11] **A:** Third to last, okay.

[12] **Q:** — caption?

[13] **A:** I was going from the right —

[14] **Q:** The third to last column.

[15] **A:** You're talking about "funds control
[16] officer."

[17] **Q:** Right.

[18] **A:** Yeah.

[19] **Q:** Okay. What's a funds control officer at
[20] FNS?

[21] **A:** As far as I know, there is no official
[22] funds control officer title, because we don't have
[23] one in NERO. I would — I would and did interpret
[24] this as part and parcel of a systems development for

Page 232

[1] e-travel and that somebody decided that that's what
[2] they're going to call this particular function, and
[3] that's way I interpreted it when I saw it in a
[4] filled mode. I don't remember seeing it in a vacant
[5] mode.

[6] **Q:** Okay. So it's your testimony that this is
[7] a function — this is a title that was recently
[8] created that you really don't know much about?

[9] **MR. WILMOT:** Objection. You can answer.

[10] **A:** What I would say to you is I don't recall
[11] seeing the specific "funds control officer" in any
[12] specific arena other than this one now —

[13] **Q:** Okay.

[14] **A:** — that there is no official job title that
[15] I'm aware of called funds control officer, because
[16] we don't have one in NERO —

[17] **Q:** Okay.

[18] **A:** — and that I would expect that this is a
[19] reference based on the system that's being
[20] implemented. Probably the people who developed it
[21] use certain terms. Funds control officer was
[22] probably one of those terms.

[23] **Q:** Okay. And did you have an objection to
[24] their use of the title funds control officer?

Page 233

[1] **A:** I didn't at the time, because I didn't
[2] think I would have much of a chance to change it if
[3] it was part of a system anyway, but I don't — I
[4] didn't object, no.

[5] **Q:** Okay. And next to that column is another
[6] column, and that's — reads what?

[7] **A:** Alternative funds control officer.

[8] **Q:** Okay. And is that a title that you
[9] recognize?

[10] **A:** It's not a working title, no. It's not a
[11] specific title rather.

[12] **Q:** Okay.

[13] **A:** I do recognize it as having been on this
[14] form when it came out, sure.

[15] **Q:** Okay. And similar to funds
[16] control officer, the term alternative funds control
[17] officer is not a title used at NERO?

[18] **A:** Correct.

[19] **MR. WILMOT:** Objection to the question.

[20] **Q:** Okay. All right. And did you — I'll
[21] strike the question. Did you raise objections to
[22] the use of the term "alternative funds control
[23] officer" on this form?

[24] **A:** I was concerned about the use of it. I did

Page 234

[1] not specifically contact headquarters on it myself.
[2] I'm not sure that anybody did. I'm not sure how the
[3] change came about. You're going to talk to me —
[4] there's a change here I noticed in —

[5] **Q:** We'll get to that. My question is —

[6] **A:** Okay. I did not specifically myself
[7] contact anybody at headquarters.

[8] **Q:** Okay. Did you tell anybody within NERO
[9] that you objected to the use of the title
[10] "alternative funds control officer" on this form?

[11] **A:** Yes, I did.

[12] **Q:** Who did you tell that to?

[13] **A:** I told it to both of my section chiefs and
[14] the deputy regional administrator.

[15] **Q:** And by name they are who?

[16] **A:** I believe at this time, Bob Canavan was our
[17] deputy regional administrator, Robert Canavan, and
[18] Roger Hamilton and Mike Malone.

[19] **Q:** Okay. Did you tell any of these
[20] individuals that you wanted to do something about
[21] the use of this title?

[22] **A:** This particular instance — I had told
[23] people in the past, yes. This particular instance,
[24] I'm — I don't specifically believe that I was the

[1] one — it came out of NERO to suggest that it needed
[2] to be changed.
[3] **Q:** Okay. So if this caption and term "funds
[4] control officer" was changed by somebody at NERO,
[5] that individual was not you, correct?
[6] **A:** Changed by somebody. I didn't write this
[7] on here —
[8] **Q:** Right.
[9] **A:** — if that's what you're asking —
[10] **Q:** Right.
[11] **A:** — correct.
[12] **Q:** But if somebody at NERO changed the caption
[13] "alternative funds control officer," that person was
[14] not you, right?
[15] **A:** Okay. I guess I need you to explain a
[16] little bit. You mean did I physically change
[17] something?
[18] **Q:** I'll rephrase the question.
[19] **A:** Okay.
[20] **Q:** Did you yourself change the title
[21] "alternative funds control officer" on this form?
[22] Yes or no?
[23] **A:** No, I did not.
[24] **Q:** Did you instruct anybody at FNS NERO to

[1] **MS. CATAPANO-FRIEDMAN:** Yeah, the one with
[2] the handwriting.
[3] **MR. CATAPANO-FRIEDMAN:** That's Plaintiff's
[4] Exhibit 62.
[5] **MS. CATAPANO-FRIEDMAN:** Uh-huh.
[6] **Q:** Now, there appears to be some handwritten
[7] notes on this form — first off, is this the
[8] same form that we were referring to in Plaintiff's
[9] Exhibit 61?
[10] **MS. CATAPANO-FRIEDMAN:** 65.
[11] **MR. CATAPANO-FRIEDMAN:** Is that 65, the
[12] first one?
[13] **MS. CATAPANO-FRIEDMAN:** Yes.
[14] **Q:** Okay. Plaintiff's Exhibit 65.
[15] **A:** Yes. Well, the same columns. They look —
[16] they're titled the same, correct.
[17] **Q:** Correct. Except that it's been filled in
[18] by FNS NERO?
[19] **A:** Correct.
[20] **Q:** Okay.
[21]    (Witness and counsel confer)
[22] **Q:** Now, can you tell me whose handwriting the
[23] notes on this form are?
[24] **A:** Yes. It's mine.

[1] change the caption "alternative funds control
[2] officer" on this form?
[3] **A:** Not that I recall.
[4] **Q:** Okay. And this was a form that somebody at
[5] headquarters had requested that FNS NERO complete,
[6] correct?
[7] **A:** Yes.
[8] **MR. WILMOT:** Objection to the question.
[9] **A:** Yes.
[10] **Q:** All right. Let's move on to the next
[11] exhibit in order, time order, which I believe is
[12] No. 65; is that —
[13] **MS. CATAPANO-FRIEDMAN:** No. That was the
[14] first one.
[15] **Q:** What's the second one that I gave you in
[16] sequential order?
[17] **MR. WILMOT:** 66.
[18] 65 first, 62, 63. Is that what you're
[19] asking for, 63?
[20] **MS. CATAPANO-FRIEDMAN:** Right. The next
[21] one is 62.
[22] **Q:** The next one is 62. It's the one with the
[23] handwriting?
[24] **A:** 62 is that what you want?

[1] **Q:** That's your handwriting?
[2] **A:** Yes, it is.
[3] **Q:** Okay. So the written notes on this form
[4] are notes that you made on the form?
[5] **A:** Yes, it is.
[6] **Q:** Okay. Can you read me what notes you made
[7] on the top of the form?
[8] **A:** You mean the "two worksheets noted"?
[9] **Q:** The first page of this exhibit, looking at
[10] the first page.
[11] **A:** Way up the top?
[12] **Q:** At the top, yeah.
[13] **A:** You're talking about with the star? "FM's,
[14] (only two worksheets noted) (this and blanked) (out
[15] of region)," that is not my writing.
[16] **Q:** That's not your writing?
[17] **A:** Correct.
[18] **Q:** Okay. Do you know what that — who wrote
[19] that?
[20] **A:** I think it's Marty Hines, but I would never
[21] swear to it in court.
[22] **Q:** Okay.
[23] **A:** I think.
[24] **Q:** Okay. But, in any event, that is not your

[1] handwriting?

[2]    **A:** That is definitely not me. It's not

[3] scratched enough.

[4]    **Q:** Okay. Do you know what that — those notes

[5] mean?

[6]    **A:** Not really.

[7]    **Q:** Okay.

[8]    **A:** "FM's, (only two worksheets noted) (this

[9] and blanked) (out of region)," no, I don't

[10]    **Q:** Can you tell me what is your writing on

[11] this form?

[12]    **A:** Okay. The names with the arrows going down

[13] in the boxes, that's me.

[14]    **Q:** Okay.

[15]    **A:** The squares — this is on the first page.

[16]    **Q:** Right.

[17]    **A:** The squares on the top two columns changing

[18] whatever that was to "approver."

[19]    **Q:** Okay. So you changed on this form

[20] "alternative funds control officer" to "alternative

[21] funds approver"?

[22]    **A:** Yes.

[23]    **Q:** Okay. You changed on this form "second

[24] alternative funds control officer" to "second

[1] alternative funds approver"?

[2]    **A:** Yes.

[3]    **Q:** Okay. And under the new caption

[4] "alternative funds approver," you wrote in John P?

[5]    **A:** Yes, I did.

[6]    **Q:** Okay. And who is John P?

[7]    **A:** John Pedicini.

[8]    **Q:** And under the caption "second alternative

[9] funds approver," you wrote in Janice S?

[10]    **A:** Janice Sciarappa, yes.

[11]    **Q:** Okay. And under the funds control officer,

[12] the name Martin T. Hines is typed in, correct?

[13]    **A:** Correct.

[14]    **Q:** Okay. Now, you testified earlier that none

[15] of these captions are titles that are recognized by

[16] FNS NERO, none of these captions in the last three

[17] columns, correct, Mr. MacAllister.

[18]    **A:** They are not official titles, correct.

[19] That's what —

[20]    **Q:** Correct?

[21]    **A:** — I stated.

[22]    **Q:** Okay. And that you had equal objections to

[23] all three of these captions, correct?

[24]    **A:** I don't think you asked me that question.

[1] I don't remember responding to it. Equal

[2] objections? I don't remember.

[3]    **Q:** You objected to all three of these

[4] captions, Mr. MacAllister?

[5]    **A:** I thought my testimony on "funds control

[6] officer" was that it didn't bother me, but it's not

[7] an official title.

[8]    **Q:** Okay.

[9]    **A:** That's what I remember.

[10]    **Q:** Can you tell me why that — the

[11] unofficial -- the designation "funds control

[12] officer" doesn't bother you even though it's not an

[13] official title, but the caption "alternative funds

[14] control officer" does bother you even though it's

[15] not an official title?

[16]    **A:** Sure. "Funds control officer" is a title

[17] that has been around for a while in various portions

[18] of FNS for various systems. "Alternative funds

[19] officer" is something that's relatively new. I've

[20] never seen it before, and obviously there was a

[21] sensitivity to using a title that's not an official

[22] title, so we changed "alternative funds" — wait a

[23] minute — "alternative funds officer" to "approver."

[24]    **Q:** I'm sorry. Mr. MacAllister, I understood

[1] your previous testimony to have been that the

[2] caption "funds control officer" was also not a title

[3] used at FNS NERO. Are you now telling me that that

[4] is not what you previously testified to?

[5]    **A:** No. I testified that it is not an official

[6] title for a position description. What I just told

[7] you was it has been around informally and

[8] unofficially for a while in various systems. I know

[9] other regions use it as an informal title.

[10]    **Q:** Okay. And the term "alternative funds

[11] officer," has that not been around and used in

[12] certain systems within FNS?

[13]    **A:** I have — my answer to you is I thought so.

[14] But when I did an investigation to find out, the

[15] answer I have now in my mind is, no, because I

[16] couldn't find it when I sought to find is there an

[17] alternative funds officer in our systems.

[18]    **Q:** I see. So you never used — saw the term

[19] "alternative funds officer" being used in any — on

[20] any form at FNS in the past?

[21]    **A:** I won't testify to that. I might have.

[22]    **Q:** But when you looked to find it, you

[23] couldn't find it; is that right?

[24]    **A:** No. When I requested the official titles

**EXHIBIT N**
**5 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,           :
      Plaintiff,      :
                    :
      vs.            :   Civil Action
                    :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and :
ANN M. VENEMAN, SECRETARY,   :
UNITED STATES DEPARTMENT OF   :
AGRICULTURE,            :
      Defendants.     :
- - - - - - - - - - - - - - - - -x

      DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
       (By Robert S. Catapano-Friedman, Esq., and
       Sarah Catapano-Friedman, Esq.)
       50 Franklin Street, Boston, MA 02110,
       for the Plaintiff.

(Continued on next page)

**Page 85**

[1] particularly in the large organizations, the regions
[2] and the major divisions.
[3]      They wanted an individual designated as a
[4] backup, and the time frame was — this is like, you
[5] know, a few months later, January '99.
[6]      Q: You said in 2005 there was always a related
[7] issue. Did this involve terminology involving the
[8] term alternate funds control officer? Let me show
[9] you some exhibits.
[10]      I'd like to show you what's been marked as
[11] Plaintiff's Exhibit 65, 62, 63 and 64 and I'd like
[12] you to tell me whether these documents relate to the
[13] issue you were pointing out.
[14]      A: Yes, these are all in relation to the —
[15] they're calling it here approval chain for fed.
[16] trav. Fed. trav. was the new automated on-line
[17] travel system that would replace the trav. system,
[18] and headquarters and specifically Lisha Doorman had
[19] sent out these approval chains which required the
[20] key players in that chain process to be identified
[21] and listed so that when fed trav. was brought on
[22] line, this would be all structured.
[23]      This was how the documents for both travel
[24] authorizations and travel vouchers — who they would

**Page 86**

[1] flow to in terms of both the approval process of the
[2] travel, the fund cert. process of the travel, and
[3] then the ultimate submission into the automated
[4] system.
[5]      Q: Do you recognize all of these documents as
[6] being part of that process?
[7]      A: Yes.
[8]      Q: Did you receive copies of these documents
[9] in the past?
[10]      A: Yes, I've received a copy of them.
[11]      Q: Could you go through them to me in their
[12] proper order and explain to me what happened here
[13] during this process?
[14]      A: Okay. Exhibit 62 is labeled NERO approval
[15] chain for expense report which would have been a
[16] voucher, a travel voucher, and what is listed is
[17] every individual employee within the organization is
[18] shown and then the chain of approval for each name
[19] goes to the right with who would approve it.
[20]      The first approval would be the
[21] supervisor's approval and then there's a second
[22] backup to that which in most cases looks like the
[23] director of the organization that is over that
[24] supervisor and then further to the right — and

**Page 87**

[1] there's some blank columns that would allow you to
[2] put multiple — more than one backup in, and then
[3] there's a column funds control officer which has my
[4] name in it.
[5]      Q: This title funds control officer, is that
[6] your official title or what's your official title?
[7]      A: These are all synonymous.
[8]      Q: Because it's budget — your official title
[9] is what?
[10]      A: My position description has my actual job
[11] title.
[12]      Q: Which is?
[13]      A: Which is budget analyst. Up until a few
[14] years ago, it was budget officer and they decided to
[15] change that, that only one person in an agency can
[16] have that title.
[17]      Through the years for many years it was
[18] first known as FPA funds officer. As we added many,
[19] many more program accounts to the administrative
[20] arena, funds officer or funds control officer became
[21] more of shall we say a working title, but it's all
[22] synonymous.
[23]      Q: So that's an accurate working title for
[24] you, funds control officer?

**Page 88**

[1]      A: Yes, yes.
[2]      Q: Okay. All right. And your name is under
[3] funds control officer there?
[4]      A: Correct. My name exclusively is in that
[5] column all the way down.
[6]      Q: Okay.
[7]      A: And then next to that — it looks like
[8] someone crossed out funds — well, initially it said
[9] alternate funds control officer. Someone scratched
[10] out "control officer" and made it "approver" or
[11] changed it to be "approver." I don't recognize that
[12] handwriting. And then listed second alternate funds
[13] approver. Again somebody altered and made changes
[14] to the chain as it came from headquarters.
[15]      Q: Well, if I told you that Mr. MacAllister
[16] has admitted to being the person who made those
[17] changes, would that help you at all with your
[18] analysis?
[19]      MR. WILMOT: Objection to Attorney
[20] Catapano-Friedman's testimony on the record. You
[21] can answer.
[22]      A: Well, why would he do that?
[23]      Q: Well, let me ask you this. If
[24] Mr. MacAllister was the one who altered this

Page 89

[1] document, can you tell me why Mr. MacAllister did
[2] that?
[3]    MR. WILMOT: Objection.
[4]    A: Well, I don't know why he's done it other
[5] than the fact that John Pedicini's name is in that
[6] column as it has been penned in here under what
[7] should be alternate funds control officer and
[8] apparently he decided to change that in terms of
[9] this document calling it "approver."
[10]    Q: Well, what was the reason for this
[11] document? What was the function that it was trying
[12] to address?
[13]    A: This document establishes the control flow
[14] for automated on-line travel documents to be
[15] processed, and one of the steps is for the funds
[16] officer to certify that there are funds available in
[17] the same manner as we talked about earlier,
[18] verifying that there's a correct accounting and that
[19] funds exist to cover that cost, to cover that
[20] obligation.
[21]    And then the other columns would be to —
[22] certainly the next column would be for the alternate
[23] to be available if the funds control officer is
[24] absent.

Page 90

[1]    In order to prevent all of these documents
[2] from being backlogged and held up and not processed,
[3] they would flow to the alternate funds control
[4] officer for certification. That's the way this
[5] would have been structured or should have been
[6] structured.
[7]    Q: So the purpose of this form was to list
[8] people with certification of availability of funds
[9] rights in connection with travel; is that right?
[10]    A: Correct, on the last three columns.
[11]    MR. WILMOT: Objection to the question.
[12]    Q: On the last three columns. Well —
[13]    A: These other individuals, other columns,
[14] approve the travel. In other words, we're
[15] authorizing you to go from Point A to Point B to
[16] perform some task and return.
[17]    Q: But the last three columns was a
[18] certification function?
[19]    A: Correct.
[20]    MR. WILMOT: Objection to the question
[21] again.
[22]    Q: In the second column, what was the initial
[23] title?
[24]    A: Initially it looks like to me it said or

Page 91

[1] says — reads as alternate funds control officer.
[2] I'm trying to read something up above it that's kind
[3] of faint. There's something above it that I can't
[4] read, and it looks like the word "control officer"
[5] was lined off or crossed out and changed to be
[6] "approver."
[7]    Q: So the new title was alternate funds
[8] approver on that?
[9]    A: That's what this looks like to me.
[10]    Q: Can you tell me what an alternate funds
[11] approver is?
[12]    A: It's a term I'm not familiar with. I've
[13] never heard that term.
[14]    Q: So you can't tell me what the distinction
[15] then would be between —
[16]    A: I know what a funds officer is, but an
[17] approver — I don't know what that — in conjunction
[18] with this word whomever made the change, I don't know
[19] what their intent was.
[20]    I'm not familiar with it as an authorized
[21] title. It's the only place on the chart — it's the
[22] only place here I see the word "approver." I don't
[23] see it under any other column.
[24]    Q: Whose name is under that second column?

Page 92

[1]    A: John P. is listed under that column.
[2]    Q: And who is John P., do you know?
[3]    A: I'm assuming it would be John Pedicini.
[4]    Q: Is there anybody else at FNS-NERO that you
[5] know of who has the name John and the initial "P"?
[6]    A: Not to my knowledge.
[7]    Q: Did you discuss at all the purpose of this
[8] form at the funds officer conference in 2005?
[9]    A: At that time I believe it was on hold. The
[10] system was on hold. There was an update given that
[11] fed. trav. was being delayed. I didn't prepare this
[12] document.
[13]    Q: Could you move on then with the others in
[14] sequence, the other documents and tell me what —
[15]    A: Okay. Exhibit 63.
[16]    Q: —they mean to you.
[17]    A: Exhibit 63 is an E-mail from Mike Malone to
[18] John Pedicini saying send to headquarters the final
[19] approval chain. It further goes down. There's
[20] additional E-mails here dated February 10th
[21] discussing the changes that were made in the various
[22] lines.
[23]    Q: What does it say about the changes?
[24]    A: Well, do you want me to read this?

Page 93

[1] **Q:** Read it or state it in your own words,
[2] however you wish.
[3] **A:** Well, it just says that, for instance, in
[4] the WIC program, "I changed the second alternate
[5] level." That would have been in the chain from one
[6] name to another name.
[7] **Q:** Is there anything in there that addresses
[8] the change of the title alternate funds control
[9] officer to alternate funds approver?
[10] **A:** Not that I see.
[11] **Q:** Then what about the next document in order?
[12] What does that --
[13] **A:** The next exhibit is Exhibit 64.
[14] **Q:** Right.
[15] **A:** It's an E-mail from John Pedicini to Lisha
[16] Doorman. It say Lisha, here is the approval chain
[17] for NERO, and this looks like the final copy of
[18] exhibit -- Exhibit 62 is a penned up, marked up
[19] copy, and this exhibit has attached -- Exhibit 64
[20] has attached the final approval chain and it has
[21] those alterations, those changes that were made by
[22] NERO changing the titles on those last two columns.
[23] **Q:** From alternate funds control officer to
[24] alternate funds approver? Is that the change that

Page 94

[1] you're referring to?
[2] **A:** Correct.
[3] **Q:** And whose name is listed there for NERO?
[4] **A:** Under the alternate funds approver, John G.
[5] Pedicini.
[6] **Q:** All right. And is it your understanding
[7] from this document that -- what is your
[8] understanding from this document that Mr. Pedicini's
[9] function is in connection with travel?
[10] **A:** Well, it's my understanding that he would
[11] be the backup to the funds control officer to
[12] certify these documents if I was absent, if I was
[13] not at work, that these documents -- the whole
[14] purpose of this is to have an automated in place
[15] preestablished flow electronically of these
[16] documents through the various approval processes or
[17] individual, I should say. And if I was absent,
[18] certainly it would go there in my absence.
[19] **Q:** In connection with these documents, what
[20] are your view of the proper procedures to certify
[21] the availability of funds at NERO in connection with
[22] travel if you're not there?
[23] **A:** I'll get back to what I said earlier that,
[24] only a funds officer, primary or an alternate,

Page 95

[1] should be certifying funds. I don't know why this
[2] change was made to be calling it approver. I don't
[3] know what the intent was of it or if there was some
[4] change in the structure of duties in conjunction
[5] with that.
[6]     But it's my understanding that this chart
[7] was supposed -- those columns were to be the backup
[8] funds officer and either one or two individuals
[9] designated for that purpose.
[10] **Q:** Have you discussed Mr. Pedicini's functions
[11] as alternate funds approver in this document with
[12] Mr. Malone or Mr. MacAllister?
[13] **A:** No, this was not discussed with me. I
[14] didn't prepare this, but I did get a final copy of
[15] this and I did see the change after it was made. It
[16] was never discussed with me.
[17] **Q:** So you don't know at this point in time why
[18] this change was made from alternate funds control
[19] officer to alternate funds approver?
[20] **A:** No, I do not. It seems so strange to me
[21] that a predocumented format would be altered in that
[22] manner when in effect the agency would be trying to
[23] prescribe, you know, a standardized structure and
[24] why would only those -- you know, why would they be

Page 96

[1] relabeled? I don't know.
[2] **Q:** Let me ask you this. If the purpose of the
[3] change were to show that Mr. Pedicini did not have
[4] funds availability certification authority, would
[5] that make any sense to you in connection with this
[6] document?
[7] **A:** It would tell me that we're violating FNS
[8] funds control officer procedures as prescribed in
[9] Handbook 101 which again only funds control
[10] officers, primaries and alternates, should be
[11] certifying and approving any document -- these are
[12] just travel documents -- but any document process
[13] that has a budgetary impact. And I don't know. I
[14] don't know why this change would be made other than
[15] to alter that role.
[16] **Q:** In your view, is Mr. Pedicini qualified to
[17] certify the availability of funds --
[18] **A:** Absolutely.
[19] **Q:** -- in connection with travel?
[20] **A:** Absolutely.
[21] **Q:** In your view, is anybody else at FNS-NERO
[22] other than Mr. Pedicini and yourself qualified to
[23] certify the availability of funds in connection with
[24] travel?

**Page 97**

[1] **A:** I would say right now that he is the only
[2] individual that has the FFIS training which you
[3] would need and knowledge of the accounting
[4] structure, knowledge of the chart of accounts and of
[5] all of the other processes that we've talked about
[6] to do that task.
[7]   **Q:** If that were the purpose, do you know of
[8] any reason why the person who made that change would
[9] have that purpose?
[10]   **A:** I can only assume that it would be to limit
[11] that person's duties. I don't know of the intention
[12] other than to limit — I don't know what the term
[13] "approver" means. It's a term foreign to me. I'm
[14] not familiar with it.
[15]   **Q:** Is there any other document in that set?
[16]   **A:** Yes.
[17]   **Q:** What is that?
[18]   **A:** This is Exhibit 65, an E-mail from Lisha to
[19] John. I'm on here also as an addressee. Updated
[20] employee roster file. What's the date on this?
[21] This is February 1, 2005. This looks like it was
[22] the incoming document that came in initially.
[23]   **Q:** So that should have been first?
[24]   **A:** Yes. This looks like the first document.

**Page 98**

[1] It's a clean, uncompleted shell, and I'm assuming it
[2] was sent out by Lisha for completion by the region
[3] to indicate all of the players in the approval chain
[4] for fed. trav. for NERO.
[5]   **Q:** That's fine. Marty, before this IAS issue
[6] came up in March of 2003 that we have previously
[7] discussed, did Mr. LeBlanc, Mr. Stanco,
[8] Mr. MacAllister or anybody else at FNS-NERO ever
[9] tell you either orally or in writing or in any other
[10] manner that John Pedicini was not authorized to
[11] certify funds availability?
[12]   **A:** No, no one ever did. As I said, it became
[13] an issue in March of 2003 when the IAS document was
[14] being prepared and as I said earlier, it appeared to
[15] me at that point that that individual's role was now
[16] being limited.
[17]   **Q:** Going back to that March 2003 meeting, did
[18] anybody ever tell you that your meeting that you had
[19] called was being canceled or delayed?
[20]   **A:** No. As I said, I tried to attend the
[21] meeting. I was never told it was delayed. I was
[22] told I was not invited. In fact there was — I got
[23] an E-mail I believe — I believe there was an E-mail
[24] sent that had a bunch of typos in it, and I remember

**Page 99**

[1] the typos because it looked like somebody quite
[2] quickly and quite angrily issued it, and it
[3] specifically said I was not invited.
[4]   **Q:** Were you told by anybody at that time that
[5] there would be another meeting to address the IAS
[6] issue?
[7]   **A:** No, I was not.
[8]   **Q:** Nobody told you that at that time?
[9]   **A:** No.
[10]   **Q:** Did you hear anybody threaten disciplinary
[11] action if Mr. Pedicini did not attend that March
[12] meeting?
[13]   **A:** Yes, I believe Mr. MacAllister said
[14] something to that effect to him but again, I was not
[15] party to all of it. I tried to attend the meeting.
[16] I was outside the door. I never got in the meeting.
[17]   **Q:** What did you hear Mr. MacAllister say in
[18] connection with threatening disciplinary action?
[19]   **A:** He specifically said that I was not invited
[20] to the meeting and couldn't come in, and he said
[21] something to John Pedicini to that effect and that
[22] only he was supposed to be here and Joe Stanco.
[23]   **Q:** Did you hear Mr. MacAllister threaten
[24] disciplinary action against Mr. Pedicini?

**Page 100**

[1]   **A:** I think he said something to that effect.
[2]   **MR. WILMOT:** Objection to the question.
[3]   **A:** What exactly he may have said — as I said,
[4] I was outside of the room. I didn't hear everything
[5] that occurred because I was outside the room. I
[6] never got in the room.
[7]   **Q:** I understand. But you did hear certain
[8] things, correct?
[9]   **A:** Well, he said something to that effect, but
[10] I didn't get the gist of the whole thing. I decided
[11] that it was not worth any confrontation or any
[12] challenge, and then I went back to my workstation.
[13]   **Q:** Did anybody at FNS-NERO ask about your
[14] retirement plans before the October 7, 2004 —
[15]   **A:** No one ever asked me if I had any intention
[16] of retiring. And as I stated earlier, at that time
[17] I was not eligible to retire. In fact I'm still not
[18] eligible to retire.
[19]   **Q:** I'd like to show you what's been marked
[20] Plaintiff's Exhibit 48 and see whether you recognize
[21] these documents.
[22]   **A:** Again these are various spending documents.
[23] Is this one exhibit? This is one exhibit.
[24]   **Q:** Yes, it's a single exhibit, multiple

**EXHIBIT O**
**4 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                    :
JOHN G. PEDICINI,                   :
            Plaintiff,              :
                                    :
        vs.                         :      Civil Action
                                    :      No. 04-12395 JLT
UNITED STATES OF AMERICA, and       :
ANN M. VENEMAN, SECRETARY,          :
UNITED STATES DEPARTMENT OF         :
AGRICULTURE,                        :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

Page 25

[1] Q: Mr. Hines, could you identify this or do
[2] you recognize this document? Have you seen it
[3] before?
[4] A: Yes. This designation of representative, I
[5] have seen that.
[6] Q: What does this document do?
[7] A: Well, when I was denied access to the
[8] meeting, John Pedicini I believe had — was
[9] originally going to go with the union representative
[10] and he said to me, "I'll designate you as the EEO,
[11] my EEO rep."
[12] I also was an EEO officer in the military
[13] as an alternate function. It's something I'm very
[14] sensitive to. And I said okay because I felt the
[15] meeting was essential, and I would attend the
[16] meeting as his representative and that way the
[17] meeting would take place. So I'm familiar with
[18] that.
[19] Q: Are you saying that you had been appointed
[20] John's EEO representative?
[21] A: Correct, at that time I got involved in
[22] this issue. I tried to stay out of it but at that
[23] point, I was now involved because I could see that
[24] it was going to impact on my performance or my job.

Page 27

[1] A: This was after I had been denied access to
[2] the meeting.
[3] Q: No, but had he filed a complaint about
[4] something that you became his representative on?
[5] Was there some complaint outstanding that John had
[6] filed?
[7] A: I believe there was some other issues with
[8] other employees, none that I was involved with
[9] directly.
[10] Q: I mean was it solely to attend this meeting
[11] or was it to address issues that this meeting was
[12] supposed to be addressing?
[13] A: Well, both.
[14] Q: Because this Exhibit 68 where it says
[15] "designation of representative" it says "you are
[16] entitled to a representative of your choice at any
[17] time during the EEO complaint process, however, you
[18] must notify the Agency in writing of their
[19] designation to act on your behalf. Written notice
[20] of the name, address, and telephone number of the
[21] named representative must be provided to this
[22] office. Upon receipt of this information, all
[23] official correspondence and counseling contacts
[24] shall be with your representative."

Page 26

[1] The funds control officer in any government
[2] agency has a very critical function of making sure
[3] there's no anti-deficiency violation of federal laws
[4] of funding, and it's critical that there's a backup,
[5] that there are people who are trained to do these
[6] functions and do them correctly.
[7] And it became obvious to me in this March
[8] of 2003 incident that my work and John's assistance
[9] as the backup funds officer was trying to be altered
[10] or changed in some way because he had been the
[11] backup for about three or four years prior to this
[12] occurring.
[13] So it seemed kind of strange to me why this
[14] was happening, particularly the fact that I had
[15] tried to resolve this and resolve the issue by
[16] requesting a meeting and then when I was denied
[17] access I said to myself, this is — this stinks.
[18] There's something bizarre about all of this that
[19] will eventually come out.
[20] Q: Could you clarify it for me? You were
[21] appointed an EEO representative for Mr. Pedicini in
[22] connection with what?
[23] A: To try to attend the meeting on that basis.
[24] Q: He had filed a complaint?

Page 28

[1] And then you're designated I guess by
[2] Mr. Pedicini as his representative, so my question
[3] is there must have — was there some complaint that
[4] Mr. Pedicini had filed that he designated you as his
[5] representative for?
[6] A: Well, I think it was based on this issue of
[7] his designation as the backup in this IAS meeting.
[8] It was concerning IAS and whether or not he was
[9] being removed as the backup because it appeared to
[10] me that something was going on.
[11] Some change or some event had taken place
[12] probably recently from that time that caused my
[13] requested meeting to be treated in the manner that I
[14] thought was just shocking, just shocking.
[15] Q: Did your request for a meeting request to
[16] address the same issues regarding IAS?
[17] A: Yes, yes. That's what the meeting was for.
[18] I showed up to go to the meeting and I was not
[19] permitted to attend the meeting by Mr. MacAllister.
[20] Q: And was Mr. MacAllister informed in advance
[21] of the meeting that you were —
[22] A: Oh, yes.
[23] Q: — John's EEO representative in
[24] connection —

Page 33

[1]  He didn't even discuss it with me, and a
[2] day later or day or two later I got an E-mail saying
[3] there's no change in your rating. And I knew at
[4] that time that all of these events were jelling in
[5] the sense that I was being targeted.
[6]  Q: So other than Messrs. Malone and
[7] MacAllister, do you know of anybody else who
[8] participated in giving you your rating?
[9]  A: I don't have any direct knowledge, but I
[10] would think that the front office of FNS would have
[11] been involved or possibly could have been involved,
[12] but I have no knowledge of that.
[13]  Q: Other than Mr. MacAllister, do you know of
[14] anybody else in FNS management who knew that you
[15] were John Pedicini's EEO representative?
[16]  A: Oh, I'm sure that all of the — I'm sure
[17] that the deputy and the regional administrator knew
[18] of that. I'm sure that Doug MacAllister brought
[19] that to their attention.
[20]  Q: Who are these people?
[21]  A: Well, you've got — at the time the
[22] regional administrator was Frances Zorn and Robert
[23] Canavan was the deputy.
[24]  Q: And what about Mr. Malone? Did he know

Page 34

[1] that you were John Pedicini's representative?
[2]  A: I don't know with regard to that meeting
[3] because that was a year prior to his appointment as
[4] the acting section chief. So whether or not he had
[5] knowledge of that, I don't know.
[6]  Q: Did his predecessor have knowledge of it?
[7]  A: Yes.
[8]  Q: Who was his predecessor?
[9]  A: Joe Stanco.
[10]  Q: Was he part of the meeting?
[11]  A: Which meeting are you referring to?
[12]  Q: The one that you had requested for John
[13] Pedicini in —
[14]  A: Yes, he was the supervisor at that time in
[15] March of 2003, yes.
[16]  Q: Do you know of anybody else at FNS-NERO who
[17] has acted as an EEO representative for other
[18] employees?
[19]  A: Brooksie Spears I believe has.
[20]  Q: Brooksie Spears?
[21]  A: Right.
[22]  Q: Do you know of anybody else besides
[23] Brooksie Spears who has acted as an EEO
[24] representative for FNS-NERO?

Page 35

[1]  A: John Pedicini I believe also has.
[2]  Q: Oh, okay. John Pedicini. Do you know who
[3] he's acted as an EEO representative for?
[4]  A: Yes, Ann Bellezza, I believe, and Luis
[5] Perez I believe was another individual both in the
[6] same section I'm in.
[7]  Q: And do you know when he acted as an EEO
[8] representative?
[9]  A: Well, I know it was probably in 2001, 2002.
[10] I have in part of my complaint that I submitted
[11] documentation that I read through that describes
[12] that and describes those events. That's in my
[13] complaint.
[14]  Q: Okay. Do you know whether anybody at
[15] FNS-NERO management knew about Mr. Pedicini acting
[16] as an EEO representative in the Bellezza and Perez
[17] cases?
[18]  A: Oh, I'm sure they all knew, yes. Why
[19] wouldn't they know?
[20]  Q: Do you know whether any events happened to
[21] Mr. Pedicini after he acted as an EEO representative
[22] that you observed?
[23]  A: Well, this meeting we were talking about in
[24] March of 2003 that was shot out of the sky happened

Page 36

[1] after that because his — from what I read, his EEO
[2] activity was in 2001 or 2002, I believe. It was in
[3] that time frame which would have been prior to 2003,
[4] March of 2003.
[5]  Q: So the issues that were to be addressed in
[6] this 2003 meeting, did they occur after John
[7] Pedicini was an EEO representative for Ms. Bellezza
[8] and Mr. Perez?
[9]  A: Yes, correct.
[10]  Q: Do you know of any reason why these issues
[11] arose?
[12]  A: With these other employees?
[13]  Q: No, with Mr. Pedicini. These issues were
[14] going to be addressed in March of 2003. Do you know
[15] any reason why they arose?
[16]  A: It looked like to me in my opinion that
[17] there was some concerted effort or some decision had
[18] been made to limit his role as the alternate funds
[19] officer which was my backup and that continued after
[20] that time.
[21]  Q: Okay. And —
[22]  A: Prior to that time he — I'm sorry.
[23]  Q: You know, I mean is there anything about
[24] John's performance on the job that in your mind

Page 81

[1] of COOP.

[2] **Q:** Do you know for sure that MacAllister was
[3] the preparer of this document?

[4] **A:** Yes, I believe he did prepare it. I don't
[5] see a signature on it. There is no preparer listed
[6] on it.

[7] **Q:** I'll tell you the reason why I ask you that
[8] is didn't Mr. MacAllister in March of 2003 say that
[9] John couldn't certify the availability of funds?

[10] **MR. WILMOT:** Objection. You can answer.

[11] **Q:** You can answer the question.

[12] **A:** He didn't say that directly to me. He may
[13] have said it to Stanco or to Mr. Pedicini.

[14] **Q:** Was that only in connection with IAS, that
[15] issue —

[16] **MR. WILMOT:** Objection.

[17] **Q:** — back in March of 2003?

[18] **A:** Correct.

[19] **Q:** Correct. So that wasn't your understanding
[20] an overall denial of Mr. Pedicini's authorization to
[21] certify the availability of funds?

[22] **MR. WILMOT:** Objection. You can answer.

[23] **Q:** What was your understanding of what
[24] happened in March of 2003 in connection with

Page 82

[1] Mr. Pedicini's authority to certify the availability
[2] of funds?

[3] **A:** It was my impression that when they were
[4] rolling out IAS that a decision had been made to
[5] limit Mr. Pedicini's tasks in conjunction with funds
[6] officer duties and that from then on that it
[7] appeared to me that they were going to try to limit
[8] those duties.

[9] This came up again when the fed. travel
[10] system, another system, another new electronic
[11] system going to be fielded for 2005, and that
[12] system also required another same exact type of
[13] scheme, flow scheme, where here's the principals and
[14] of course as we've mentioned earlier, one of the
[15] principal stops on that flow is every travel
[16] document being certified by a funds officer or the
[17] alternate funds officer as a backup.

[18] **Q:** Now in what context did this issue come up
[19] in connection with that?

[20] **A:** In fed. travel?

[21] **Q:** Right.

[22] **A:** There was a flow — I'll call it a flow
[23] chart, but there was a document that was sent out by
[24] headquarters to all allowances saying fill in the

Page 83

[1] names of all of the individuals so that documents in
[2] this new fed. travel system will flow from the
[3] individual to the supervisor for approval to the
[4] funds officer, backups, backups both to the
[5] supervisors and to the funds officers, and it was
[6] like an approval chain I guess is the way to
[7] describe this document.

[8] **Q:** Okay. Let's get back to that, but let's
[9] look at the final document that you have.

[10] **A:** This is Exhibit 10.

[11] **A:** Right.

[12] **A:** Funds officer listing. This again is
[13] similar to Exhibits 12 and 14.

[14] **Q:** Do you recognize this document?

[15] **A:** Yes, I do.

[16] **Q:** Have you seen it before?

[17] **A:** Yes. This is again a funds officer listing
[18] that was issued by budget division at FNS
[19] headquarters.

[20] **Q:** What was the date of this document?

[21] **A:** The date on it is January 26, 1999. There
[22] is a signature line or authority line — author
[23] line. Here it says prepared by budget division at
[24] the bottom.

Page 84

[1] **Q:** What does it say with respect to FNS-NERO?

[2] **A:** Well, it shows — it has the allowance
[3] holder listed Fran Zorn and her phone number and
[4] then it has myself, Marty Hines, listed as the FPA
[5] officer.

[6] At one time that's what we were initially
[7] called. Our principal funding allowance was FPA,
[8] but that's now been changed to NPA as our principal
[9] and that was kind of a working title for many years.
[10] It's synonymous with funds control officer.

[11] Next to that is FPA backup and John
[12] Pedicini is listed here, and then after that is my
[13] phone number and the NERO financial management fax
[14] phone number.

[15] **Q:** When John Pedicini was listed as F — was
[16] that BA or PA?

[17] **A:** PA.

[18] **Q:** — FPA backup, do you have an understanding
[19] of what that means?

[20] **A:** Yes. It means that he's the backup
[21] alternate funds officer for NERO. The date on this
[22] is 1999. As I said earlier in my testimony that in
[23] 1998 at the funds officers meeting, all
[24] organizations were required to designate a backup,

**EXHIBIT P**
**3 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                            :
JOHN G. PEDICINI,          :
        Plaintiff,     :
                            :
     vs.                  :
                            :    Civil Action
UNITED STATES OF AMERICA, and  :    No. 04-12395 JLT
ANN M. VENEMAN, SECRETARY,    :
UNITED STATES DEPARTMENT OF   :
AGRICULTURE,              :
        Defendants.    :
                            :
- - - - - - - - - - - - - - - -x

       DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
       (By Robert S. Catapano-Friedman, Esq., and
       Sarah Catapano-Friedman, Esq.)
       50 Franklin Street, Boston, MA 02110,
       for the Plaintiff.

(Continued on next page)

---

Page 33

[1]   He didn't even discuss it with me, and a
[2] day later or day or two later I got an E-mail saying
[3] there's no change in your rating. And I knew at
[4] that time that all of these events were jelling in
[5] the sense that I was being targeted.
[6]   **Q:** So other than Messrs. Malone and
[7] MacAllister, do you know of anybody else who
[8] participated in giving you your rating?
[9]   **A:** I don't have any direct knowledge, but I
[10] would think that the front office of FNS would have
[11] been involved or possibly could have been involved,
[12] but I have no knowledge of that.
[13]   **Q:** Other than Mr. MacAllister, do you know of
[14] anybody else in FNS management who knew that you
[15] were John Pedicini's EEO representative?
[16]   **A:** Oh, I'm sure that all of the — I'm sure
[17] that the deputy and the regional administrator knew
[18] of that. I'm sure that Doug MacAllister brought
[19] that to their attention.
[20]   **Q:** Who are these people?
[21]   **A:** Well, you've got — at the time the
[22] regional administrator was Frances Zorn and Robert
[23] Canavan was the deputy.
[24]   **Q:** And what about Mr. Malone? Did he know

---

Page 34

[1] that you were John Pedicini's representative?
[2]   **A:** I don't know with regard to that meeting
[3] because that was a year prior to his appointment as
[4] the acting section chief. So whether or not he had
[5] knowledge of that, I don't know.
[6]   **Q:** Did his predecessor have knowledge of it?
[7]   **A:** Yes.
[8]   **Q:** Who was his predecessor?
[9]   **A:** Joe Stanco.
[10]   **Q:** Was he part of the meeting?
[11]   **A:** Which meeting are you referring to?
[12]   **Q:** The one that you had requested for John
[13] Pedicini in —
[14]   **A:** Yes, he was the supervisor at that time in
[15] March of 2003, yes.
[16]   **Q:** Do you know of anybody else at FNS-NERO who
[17] has acted as an EEO representative for other
[18] employees?
[19]   **A:** Brooksie Spears I believe has.
[20]   **Q:** Brooksie Spears?
[21]   **A:** Right.
[22]   **Q:** Do you know of anybody else besides
[23] Brooksie Spears who has acted as an EEO
[24] representative for FNS-NERO?

---

Page 35

[1]   **A:** John Pedicini I believe also has.
[2]   **Q:** Oh, okay. John Pedicini. Do you know who
[3] he's acted as an EEO representative for?
[4]   **A:** Yes, Ann Bellezza, I believe, and Luis
[5] Perez I believe was another individual both in the
[6] same section I'm in.
[7]   **Q:** And do you know when he acted as an EEO
[8] representative?
[9]   **A:** Well, I know it was probably in 2001, 2002.
[10] I have in part of my complaint that I submitted
[11] documentation that I read through that describes
[12] that and describes those events. That's in my
[13] complaint.
[14]   **Q:** Okay. Do you know whether anybody at
[15] FNS-NERO management knew about Mr. Pedicini acting
[16] as an EEO representative in the Bellezza and Perez
[17] cases?
[18]   **A:** Oh, I'm sure they all knew, yes. Why
[19] wouldn't they know?
[20]   **Q:** Do you know whether any events happened to
[21] Mr. Pedicini after he acted as an EEO representative
[22] that you observed?
[23]   **A:** Well, this meeting we were talking about in
[24] March of 2003 that was shot out of the sky happened

---

Page 36

[1] after that because his — from what I read, his EEO
[2] activity was in 2001 or 2002, I believe. It was in
[3] that time frame which would have been prior to 2003,
[4] March of 2003.
[5]   **Q:** So the issues that were to be addressed in
[6] this 2003 meeting, did they occur after John
[7] Pedicini was an EEO representative for Ms. Bellezza
[8] and Mr. Perez?
[9]   **A:** Yes, correct.
[10]   **Q:** Do you know of any reason why these issues
[11] arose?
[12]   **A:** With these other employees?
[13]   **Q:** No, with Mr. Pedicini. These issues were
[14] going to be addressed in March of 2003. Do you know
[15] any reason why they arose?
[16]   **A:** It looked like to me in my opinion that
[17] there was some concerted effort or some decision had
[18] been made to limit his role as the alternate funds
[19] officer which was my backup and that continued after
[20] that time.
[21]   **Q:** Okay. And —
[22]   **A:** Prior to that time he — I'm sorry.
[23]   **Q:** You know, I mean is there anything about
[24] John's performance on the job that in your mind

---

Page 37

[1] would justify FNS-NERO limiting his role in this
[2] way?
[3]     A: Absolutely not. In fact all of the areas
[4] of work that he worked on with me were done in a
[5] highly exemplary manner.
[6]     And after he was designated as the
[7] alternate, which I believe was in late 1998, he
[8] performed a whole bunch of financial tasks, funds
[9] officer tasks, to assist me and his work was very
[10] good, very positive, always got things done timely
[11] and they were complete, and I think he enjoys a
[12] reputation even today as an outstanding worker.
[13]     Q: Do you know of any business reason why
[14] Mr. Pedicini would be removed from the position of
[15] alternate funds officer?
[16]     A: No.
[17]     Q: Do you know whether anybody in FNS-NERO
[18] management has denied that Mr. Pedicini was ever
[19] appointed an alternate funds officer?
[20]     A: Well, I don't know of anybody — if anybody
[21] has denied that. All I know is that he — my
[22] supervisor, Art LeBlanc — in 1998 I had returned
[23] from the annual funds officers meeting. There's
[24] usually a meeting every year where all of the funds

Page 38

[1] officers meet.
[2]     And at that meeting in 1998, every
[3] allowance — every organization was told that a
[4] backup alternate had to be appointed. The agency
[5] was getting very — they wanted to make sure that in
[6] the absence of a funds officer — because there had
[7] been some funds officers who had been out for
[8] sickness and other reasons for absence.
[9]     They wanted to make sure there was
[10] continuity of that function. And when I came back,
[11] I advised Arthur LeBlanc who was the section chief
[12] that the agency, the FNS budget division, had
[13] announced at the meeting that every organization had
[14] to appoint an alternate.
[15]     And he later came back to me and said that
[16] John Pedicini was designated as the alternate funds
[17] officer, and he would send the communication to the
[18] budget division that he was now the alternate — now
[19] the backup to me.
[20]     And he informed me of that verbally, and he
[21] notified headquarters I believe by an E-mail and
[22] from that point on, John Pedicini was involved in
[23] doing various tasks, funds officer type functions,
[24] in both a support role and doing certain functions

Page 39

[1] on his own backing me up.
[2]     And all organizations were required to do
[3] that, not just NERO. Every organization was now
[4] required to have a backup. In fact for a number of
[5] years after that, they used to publish a listing of
[6] the primary funds officers and the backups with both
[7] of their phone numbers and fax numbers for
[8] coordination and for contacting each other in the
[9] event it was ever needed to reach each other, and
[10] that was published for a number of years.
[11]     Q: Back in 1998, did NERO have other backups
[12] to you to do — strike that question. Did this
[13] alternate funds officer role include the function of
[14] certifying the availability of funds?
[15]     A: Yes. An alternate has all of the duties
[16] that a primary has or is supposed to have. In terms
[17] of what was happening in the agency, the agency was
[18] going to a lot of automated systems, automated
[19] systems that required IDs, passwords.
[20]     And in order to perform that task, somebody
[21] had to both be trained and had to have password
[22] access and ID access to these systems to do those
[23] functions.
[24]     Q: Who announced it in 1998 at the annual

Page 40

[1] funds meeting that each region had to have a backup
[2] or alternate funds officer?
[3]     A: I think it was Jon Lash. It was a member
[4] of the budget division. It was either Jon Lash or
[5] Roger Butler was there. He was the director at the
[6] time. Or it could have been Margaret Indellicate.
[7] She was the admin. branch chief.
[8]     One of those individuals announced that and
[9] made that request. I don't remember specifically
[10] which one. I think it was Jon Lash, but it may have
[11] been one of the other two individuals that actually
[12] made that announcement. I don't keep records back
[13] that far.
[14]     Q: Did they say why they were — was this a
[15] request or requirement — strike that. Was this a
[16] request or requirement?
[17]     A: Well, this was a requirement. They wanted
[18] to be advised in writing and that person would then
[19] be trained to serve as the backup. Some of the
[20] bigger organizations already had alternates or
[21] second funds officers who would either perform a
[22] portion — if it was a big enough organization, they
[23] would perform say an area of funds control such as
[24] in the area of travel costs, so some organizations

**EXHIBIT Q**
**2 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

JOHN G. PEDICINI,                    :
          Plaintiff,                 :
                                     :
     vs.                             :        Civil Action
                                     :        No. 04-12395 JLT
UNITED STATES OF AMERICA, and        :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE,                         :
          Defendants.                :
                                     :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA 02110,
          for the Plaintiff.

(Continued on next page)

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

Page 97

[1] **A:** I would say right now that he is the only
[2] individual that has the FFIS training which you
[3] would need and knowledge of the accounting
[4] structure, knowledge of the chart of accounts and of
[5] all of the other processes that we've talked about
[6] to do that task.
[7] **Q:** If that were the purpose, do you know of
[8] any reason why the person who made that change would
[9] have that purpose?
[10] **A:** I can only assume that it would be to limit
[11] that person's duties. I don't know of the intention
[12] other than to limit — I don't know what the term
[13] "approver" means. It's a term foreign to me. I'm
[14] not familiar with it.
[15] **Q:** Is there any other document in that set?
[16] **A:** Yes.
[17] **Q:** What is that?
[18] **A:** This is Exhibit 65, an E-mail from Lisha to
[19] John. I'm on here also as an addressee. Updated
[20] employee roster file. What's the date on this?
[21] This is February 1, 2005. This looks like it was
[22] the incoming document that came in initially.
[23] **Q:** So that should have been first?
[24] **A:** Yes. This looks like the first document.

Page 98

[1] It's a clean, uncompleted shell, and I'm assuming it
[2] was sent out by Lisha for completion by the region
[3] to indicate all of the players in the approval chain
[4] for fed. trav. for NERO.
[5] **Q:** That's fine. Marty, before this IAS issue
[6] came up in March of 2003 when we have previously
[7] discussed, did Mr. LeBlanc, Mr. Stanco,
[8] Mr. MacAllister or anybody else at FNS-NERO ever
[9] tell you either orally or in writing or in any other
[10] manner that John Pedicini was not authorized to
[11] certify funds availability?
[12] **A:** No, no one ever did. As I said, it became
[13] an issue in March of 2003 when the IAS document was
[14] being prepared and as I said earlier, it appeared to
[15] me at that point that that individual's role was now
[16] being limited.
[17] **Q:** Going back to that March 2003 meeting, did
[18] anybody ever tell you that your meeting that you had
[19] called was being canceled or delayed?
[20] **A:** No. As I said, I tried to attend the
[21] meeting. I was never told it was delayed. I was
[22] told I was not invited. In fact there was — I got
[23] an E-mail I believe — I believe there was an E-mail
[24] sent that had a bunch of typos in it, and I remember

Page 99

[1] the typos because it looked like somebody quite
[2] quickly and quite angrily issued it, and it
[3] specifically said I was not invited.
[4] **Q:** Were you told by anybody at that time that
[5] there would be another meeting to address the IAS
[6] issue?
[7] **A:** No, I was not.
[8] **Q:** Nobody told you that at that time?
[9] **A:** No.
[10] **Q:** Did you hear anybody threaten disciplinary
[11] action if Mr. Pedicini did not attend that March
[12] meeting?
[13] **A:** Yes, I believe Mr. MacAllister said
[14] something to that effect to him but again, I was not
[15] party to all of it. I tried to attend the meeting.
[16] I was outside the door. I never got in the meeting.
[17] **Q:** What did you hear Mr. MacAllister say in
[18] connection with threatening disciplinary action?
[19] **A:** He specifically said that I was not invited
[20] to the meeting and couldn't come in, and he said
[21] something to John Pedicini to that effect and that
[22] only he was supposed to be here and Joe Stanco.
[23] **Q:** Did you hear Mr. MacAllister threaten
[24] disciplinary action against Mr. Pedicini?

Page 100

[1] **A:** I think he said something to that effect.
[2] **MR. WILMOT:** Objection to the question.
[3] **A:** What exactly he may have said — as I said,
[4] I was outside of the room. I didn't hear everything
[5] that occurred because I was outside the room. I
[6] never got in the room.
[7] **Q:** I understand. But you did hear certain
[8] things, correct?
[9] **A:** Well, he said something to that effect, but
[10] I didn't get the gist of the whole thing. I decided
[11] that it was not worth any confrontation or any
[12] challenge, and then I went back to my workstation.
[13] **Q:** Did anybody at FNS-NERO ask about your
[14] retirement plans before the October 7, 2004 —
[15] **A:** No one ever asked me if I had any intention
[16] of retiring. And as I stated earlier, at that time
[17] I was not eligible to retire. In fact I'm still not
[18] eligible to retire.
[19] **Q:** I'd like to show you what's been marked
[20] Plaintiff's Exhibit 48 and see whether you recognize
[21] these documents.
[22] **A:** Again these are various spending documents.
[23] Is this one exhibit? This is one exhibit.
[24] **Q:** Yes, it's a single exhibit, multiple

**EXHIBIT R**
**2 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,                     :
            Plaintiff,                :
                                      :
        vs.                           :
                                      :   Civil Action
UNITED STATES OF AMERICA, and         :   No. 04-12395 JLT
ANN M. VENEMAN, SECRETARY,            :
UNITED STATES DEPARTMENT OF           :
AGRICULTURE,                          :
            Defendants.               :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 - Fax (617) 482-7813

Page 161

[1] Pedicini's role at FNS-NERO?

[2]   **A:** At that meeting?

[3]   **Q:** Yes.

[4]   **A:** I don't remember any specific comments at
[5] the meeting, but there was a brief discussion about
[6] the responsibilities and Lisha Doorman was the
[7] speaker at the session.

[8]   **Q:** Did the issue of certifying funds
[9] availability come up at the meeting?

[10]   **A:** Yes. I think she said that included the
[11] ability to do all of the duties that the funds
[12] officer — that the primary funds officer has, but I
[13] don't remember her exact comments.

[14]   **Q:** Not her exact words --

[15]   **A:** It was a brief discussion and it was more
[16] or less that that was the responsibility of the
[17] alternate.

[18]   **Q:** Did you have a conversation with Lisha
[19] Doorman and John Pedicini during that conference?

[20]   **A:** Yes, we talked about it.

[21]   **Q:** And can you tell me what Lisha Doorman said
[22] during that conversation?

[23]   **A:** Well, that she thought it was a moot issue,
[24] that it's common knowledge that alternates perform

Page 162

[1] everything that the primary does, primary fund
[2] officer does which would include certification of
[3] funds.

[4]   **Q:** So what did she say about John Pedicini's
[5] function?

[6]   **A:** Well, she knows he's been the alternate.
[7] She's seen him at the training sessions and the
[8] meetings. He's been addressed in all of the — and
[9] handled many work items including some of the ones
[10] we were discussing earlier such as the approval
[11] chains for IAS and the one for fed travel. Those
[12] were addressed back to her.

[13]   **Q:** Did she say anything with respect to
[14] Mr. Pedicini's authority to certify the availability
[15] of funds?

[16]   **A:** Well, again alternate the funds officer has
[17] all of the rights and has all of the
[18] responsibilities that the primary has which would
[19] include that.

[20]   **Q:** Did she say that to you?

[21]   **A:** I don't remember her exact words. We
[22] discussed it. She discussed it at the session. It
[23] was a very brief discussion, and I think that most
[24] people were somewhat caught by surprise by it

Page 163

[1] because it doesn't seem to be an issue anywhere else
[2] other than NERO.

[3]   **Q:** I'm not asking for exact words. I'm asking
[4] for your understanding of what she said.

[5]   **A:** Okay. My understanding of her comments was
[6] that alternate funds officers have the same
[7] responsibilities and perform the duties of the
[8] primary in their absence. Whatever the primary
[9] funds officer does, the alternate funds officer can
[10] do.

[11]   **Q:** Specifically in relation to John Pedicini,
[12] what was your understanding of what she said?

[13]   **A:** That as the alternate funds officer, he
[14] would perform all of the duties that I do in my
[15] absence.

[16]   **Q:** Okay. Thank you. Marty, is there a
[17] difference between the kind of training Mr. Malone
[18] instructed you to provide and on-the-job training?

[19]   **A:** Well, I think what he wanted me to do — he
[20] never designated the individuals, but I think he —
[21] his intent was that I was to provide direct
[22] on-the-job type training, hands-on training, to
[23] individuals that he was going to designate. They
[24] were never named and in fact as I said earlier, we

Page 164

[1] went from drive one to reverse and that never
[2] happened.

[3]   **Q:** Marty, when you received your letters of
[4] instruction from Mr. Malone, was this done at a
[5] meeting with Mr. Malone?

[6]   **A:** No, they were placed in sealed envelopes in
[7] my in-basket.

[8]   **Q:** Did you ever meet with Mr. Malone with
[9] respect to these letters of instruction?

[10]   **A:** Yes, when he requested me to, I did.

[11]   **Q:** When did you meet with him in connection
[12] with those letters of instruction?

[13]   **A:** Well, it was probably a couple days later.
[14] I don't remember the exact date, but he did request
[15] to meet with me and discuss the letters and then
[16] that's when I drafted up that initial outline of
[17] training and then got the subsequent second letter
[18] from him.

[19]   **Q:** Now at the meeting you had with Mr. Malone,
[20] was anybody else present?

[21]   **A:** No.

[22]   **Q:** Was Peggy Mann present?

[23]   **A:** No, I don't believe so. No, I don't
[24] believe she was. There was more than one meeting.

**EXHIBIT S**
**2 Pages**

0216

1

Volume I
Pages 1 to 208
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                    :
JOHN G. PEDICINI,                   :
            Plaintiff,              :
                                    :
                                    :
        vs.                         :    Civil Action
                                    :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and       :
ANN M. VENEMAN, SECRETARY,          :
UNITED STATE DEPARTMENT OF          :
AGRICULTURE,                        :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF FRANCES E. ZORN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Monday,
June 6, 2005, commencing at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.


        (Continued on Next Page)

105

Q.   Do you know whether John Pedicini has fund
certification authority?

A.   He does not.  And by that, I mean, he is
not delegated authority as the budget officer or an
alternate in the budget officer role.

Q.   Do you know whether John Pedicini ever
obtained the title of alternate funds officer
during --

A.   He did not.

Q.   He did not.  He never did?

A.   That's correct.

Q.   And it never came to your attention that he
had obtained this title?

MR. WILMOT:  Objection.

A.   The funds officer position is one that is
delegated from the regional administrator.  And I
sign letters of delegation, and they have been
consistently to Martin Hines and with alternates
being the first and second line supervisors.

Q.   Has John Pedicini ever held the title of
backup funds officer?

A.   There is no such title.

Q.   So there's no such title that you have
approved for John Pedicini, correct?

**EXHIBIT T**
**2 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,                      :
          Plaintiff,                   :
                                       :
      vs.                              :
                                       :   Civil Action
UNITED STATES OF AMERICA, and          :   No. 04-12395 JLT
ANN M. VENEMAN, SECRETARY,             :
UNITED STATES DEPARTMENT OF            :
AGRICULTURE,                           :
          Defendants.                  :
                                       :
- - - - - - - - - - - - - - - - - -x

          DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

[1] 20 reports probably were prepared and his
[2] name was clearly put on the reports. I like to
[3] think that people who do the work should get some of
[4] the credit. At least the school I went to kind of
[5] taught you a good manager would recognize people who
[6] do the work and they should get the credit, and one
[7] way to get the credit is to put your name or your
[8] initials or who prepared it or who accomplished it.
[9]    Q: So what was Mr. Malone instructing you to
[10] do in Exhibit 20?
[11]    A: Let me take a moment to read it. He was
[12] telling me here that any work going to the front
[13] office that he now needed to see. That was a change
[14] from all of my work. If it needed front office
[15] approval, it just went to the front office.
[16]    And I saw this as an attempt to handcuff
[17] some of my functions as well as John's functions in
[18] the area of work that he had done for a long time
[19] and to limit his role. I was very surprised by this
[20] when it came back.
[21]    I thought it was pettiness. I thought it
[22] was just a cheap shot. I work hard to give them
[23] information that they want. It's important. And
[24] then the — it was the following quarter in

[1] December — we do this summary every quarter, six,
[2] seven pay periods. This was all changed. I was
[3] advised that John Pedicini could submit the report
[4] directly again.
[5]    Q: This came shortly after the October 7th
[6] meeting. Do you see any connection between the two?
[7]    A: There has to be a connection. All of these
[8] events occurred within a very short time frame and
[9] something occurred that put all of these actions
[10] that had been designed to limit the role of the
[11] alternate funds officer and also to change the style
[12] of the primary funds officer.
[13]    I always had direct access to the front
[14] office. When I saw that memo, I knew that the
[15] lights had changed but as I said, when the issue
[16] came up, the report was — in fact two quarters have
[17] been submitted. Both the report at the end of the
[18] first quarter and there was a report at the end of
[19] the second quarter that have gone to the front
[20] office and been sent by John Pedicini, and we're
[21] about to do another quarter.
[22]    Q: Do you know when John Pedicini filed his
[23] complaint in this lawsuit?
[24]    A: I don't know the exact date, but I think it

[1] was in October, November.
[2]    Q: Of 2004?
[3]    A: Yes, sometime in the fall. I'm not sure of
[4] the exact date. A leave without pay report — can I
[5] add to this issue?
[6]    Q: Absolutely, go ahead. Whatever you like.
[7]    A: As I stated earlier, John Pedicini was
[8] designated the alternate funds officer in late 1998,
[9] early 1999.
[10]    That output was one of many tasks that I
[11] gave to him, and there were others and some of them
[12] were very significant tasks that the front office
[13] was aware of, and I will give you some examples.
[14]    One was the travel management contracts
[15] that the region operated under. They were
[16] negotiated by him in his role as the alternate funds
[17] officer. These were major events. He went out and
[18] negotiated the best deal we could get for travel
[19] services.
[20]    They were aware of this. He presented the
[21] proposals to them. He also prepared analysis of a
[22] very large temp. contract that we had in use in our
[23] field offices. They were aware of this analysis,
[24] that it went to the director of field operations.

[1]    He performed those FEMA claims that we saw
[2] earlier. Those were going outside of the agency.
[3] He put all those together. He's handled many of the
[4] tasks in the major area of travel including
[5] preparing authorizations.
[6]    I already mentioned all of the coordination
[7] with vendor numbers in the FFIS system, payment
[8] inquiries. I mean I can go on and on. It's not
[9] like that he did one or two items. I will continue.
[10]    Processing of voucher claims, resolving
[11] voucher claims, resolving issues with upstarting new
[12] systems. Particularly he played the lead role in
[13] the IAS rollout. He was the individual that was
[14] putting the decision scheme together with all of the
[15] names. I didn't do that. He did all of this even
[16] though it was a funds officer related financial
[17] function, financial task.
[18]    The same thing with the fed. travel scheme.
[19] We saw that. We saw that document. These were all
[20] function areas that he was performing as the
[21] alternate yet out of the clear blue, when we see his
[22] name here on this one-page report and all of a
[23] sudden, here's an issue. Yet over all of these
[24] years, he was performing numerous functions.

**EXHIBIT U**
**2 Pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
                                :
     vs.                        :
                                :    Civil Action
UNITED STATES OF AMERICA, and   :    No. 04-12395 JLT
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

   The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

John G. Pedicini   Case 1:04-cv-12395-JLT   Document 35-3   Filed 10/19/2005   Page 84 of 91
United States of America, et al.

Martin T. Hines
Vol. I, July 22, 2005

Page 201

[1]    Q: Marty, from a strictly performance point of
[2] view and what makes sense in doing the job point of
[3] view, what made more sense to you: Restricting John
[4] Pedicini's activities, keeping them the same or
[5] expanding his role?

[6]    A: That's an obvious answer. His role should
[7] be expanded because if you were to have an
[8] alternate, the whole purpose of having an alternate
[9] is to have someone as a backup in case on a
[10] temporary or permanent basis the primary person were
[11] to be absent, and that permanent basis could include
[12] all kinds of things.

[13]    MR. CATAPANO-FRIEDMAN: I only need one
[14] minute. Can we just have one minute.

[15]    (Recess taken)

[16]    Q: Marty, I want you to explain something to
[17] me. I want you to explain why having a supervisor
[18] act as your backup in certifying the availability of
[19] funds was contrary to the new direction in 1998 and
[20] 1999.

[21]    A: There should be a separation of duties
[22] between a management approving official authorizing
[23] an expense and a financial person certifying the
[24] expense.

Page 202

[1]    MR. CATAPANO-FRIEDMAN: Let's go off the
[2] record.

[3]    (Discussion off the record)

[4]    A: There's very good reasons for all of that.

[5]    Q: Can you tell me why? What are the reasons
[6] for that?

[7]    A: Well —

[8]    MR. WILMOT: This is asked and answered as
[9] well.

[10]    A: There should be separation of duties, and
[11] the reason that funds officers are certifying funds
[12] is to ensure the integrity of the accounting
[13] operation, that that accounting operation is not
[14] victimized by any improper actions or lost documents
[15] or any improper decisions being made.

[16]    I don't have the authority to procure
[17] anything. I can't go out and buy a thing and
[18] there's a good reason for that. Because I certify
[19] the funds. I'm the funds person.

[20]    And if someone came up to me and said, "I
[21] want you to authorize us to go out and buy a box of
[22] pencils," they would be asking me to do an illegal
[23] transaction because of the required separation of
[24] duties.

Page 203

[1]    It's the same thing with management
[2] officials. They have a right to say that these are
[3] the program goals that we want to achieve, but there
[4] are other employers in the organization who have
[5] separate and distinct duties and there's valid good
[6] reasons for it.

[7]    Q: So would the words "conflict of interest"
[8] play a role here?

[9]    A: Yes, and financial integrity.

[10]    Q: So would you say it's fair to say that a
[11] supervisor certifying the availability of funds
[12] would be in a position of having a conflict of
[13] interest?

[14]    A: Yes, potentially. Potentially. And as I
[15] said, the agency in 1998 reaffirmed the role of
[16] funds officers as the individuals that certify funds
[17] and the reason is that in terms of certifying funds,
[18] you're not just signing your name.

[19]    You are conducting a test in some way that
[20] there are funds available by going into an
[21] accounting system and making that determination. In
[22] addition to signing your name in a prescribed manner
[23] with that brief statement that says "I certify," you
[24] are also required to assign the accounting code and

Page 204

[1] determine the correct budget object classification
[2] code to properly account for that expense.

[3]    Q: As a funds officer, are you ever in a
[4] position where you are authorizing the payment of
[5] funds and requesting that funds availability be
[6] certified?

[7]    A: No, I wouldn't — I would not sign my own
[8] document.

[9]    Q: But a supervisor such as Mr. MacAllister or
[10] Mr. Malone or Mr. Stanco or Mr. Ghiorzi, would he be
[11] in a position to authorize the payment of funds and
[12] seek the certification of the availability of funds?

[13]    A: From a funds officer, correct, yes.

[14]    Q: So even if a supervisor like
[15] Mr. MacAllister or Mr. Malone or Mr. Ghiorzi or
[16] Mr. Stanco were properly trained and had all the
[17] skills and knowledge you would need to certify the
[18] availability of funds, would having them certify the
[19] availability of funds run counter to the new
[20] direction taken in 1999 and 1998?

[21]    A: I would think it does. I would think there
[22] should be that separation of duties that ensures
[23] that it's a funds officer and only a funds officer
[24] or an alternate that's performing that function.

**EXHIBIT V**
**6 pages**

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
                                :
     vs.                        :    Civil Action
                                :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA 02110,
          for the Plaintiff.

(Continued on next page)

Page 53

[1] indicated the FFIS reference and then signed it with
[2] the language that is prescribed by headquarters that
[3] funds officers use.
[4]    Q: What was deficient about Mr. MacAllister's
[5] certification?
[6]    A: It doesn't verify that there were any funds
[7] by determining in which accounting code — it had no
[8] accounting code placed on the document, no
[9] accounting code to support it, and it was not
[10] entered into FFIS to create an obligation.
[11]    Q: I'd like to show you what has been marked
[12] as Plaintiff's Exhibit 40 and see if you recognize
[13] this document.
[14]    A: Okay, this is an AD700 procurement request.
[15] This looks like one of the ones that I was referring
[16] to earlier that Malone had left me an E-mail about.
[17] Again he took my stamp, signed it. I correctly
[18] certified it down at the bottom. What are the dates
[19] here? Two days later.
[20]    I've indicated an accounting code, verified
[21] the object class and signed it in the proper way.
[22] And the reason I crossed out his signature on my
[23] signature block — in fact I don't even like the
[24] fact that he's — they're taking my stamp because

Page 54

[1] that stamp is for my use.
[2]    And the action that he took by just signing
[3] the document, you know, it's not a certification.
[4] It's just a signature.
[5]    Q: Can you tell me what was deficient about
[6] Mr. Malone's certification?
[7]    A: He hasn't verified there were funds. He
[8] hasn't indicated in what accounting code the funds
[9] were coming from or were available in, and that's
[10] the key. The key process is to do that test. In
[11] fact in Handbook 101, that's the funds officer
[12] guidebook or agency manual. It's very specific in
[13] Chapter 3.
[14]    In that chapter, it clearly spells out that
[15] a funds officer is supposed to verify and certify.
[16] To verify means you're making a determination by
[17] going into an accounting system that there's a
[18] dollar balance available to support that expense.
[19]    You know, these are important tests. No
[20] one has the authority to sign documents — every
[21] document — and in that chapter Chapter 3 it clearly
[22] discusses funds control procedures for FNS as an
[23] agency, and it lists out all documents that have a
[24] budget impact whether it be a print request or a

Page 55

[1] procurement request or a personnel action must be
[2] signed by the funds officer, verified and certified.
[3]    And you know, I'm only trying to do my job
[4] according to these regulations which I didn't — I
[5] didn't write these things up. I didn't dream them
[6] up. This is agency procedure. These are in FNS
[7] Handbook 101.
[8]    This is the guidebook. This is what I'm
[9] supposed to be following. This is what every
[10] allowance holder, every organization at FNS is
[11] supposed to be following.
[12]    Q: Can you tell me what harm Mr. Malone may
[13] have done by what he did?
[14]    A: Well, these actions go forward and create
[15] an order for the government to incur some expense.
[16] Potentially it could result in a violation of the
[17] Anti-deficiency Act. The Anti-deficiency Act is a
[18] very serious matter that if any federal allowance —
[19] any federal entity exceeds their authorized funding
[20] level, they could be held liable for exceeding those
[21] levels.
[22]    That's the reason there's a backup. The
[23] reason there's a backup is that person is trained to
[24] perform the certifications, the verification in the

Page 56

[1] accounting system so that those things don't occur.
[2]    It hasn't happened in all of my years.
[3] It's the whole purpose for funds control otherwise
[4] we wouldn't need this if we didn't have an
[5] allocation that we're not supposed to exceed.
[6]    We have ceilings. We have authority only
[7] to incur expenses up to a certain level. That's the
[8] reason you have these procedures. That's the reason
[9] you have these regulations, to ensure that an
[10] organization just doesn't go hog wild spending money
[11] without any control.
[12]    It's further complicated by the fact that
[13] we have this FFIS accounting system which was
[14] started in 2002, very extensive, many, many charts,
[15] many, many tables. We have 14 different operating
[16] accounts, so we're talking about managing the many
[17] budgets, not one budget.
[18]    This is the primary function of any funds
[19] officer. This is the number one duty of every funds
[20] officer is to ensure that their allowance is not
[21] exceeded and that there's not a violation of the
[22] Anti-deficiency Act and that's discussed at every
[23] meeting, every annual meeting. I mean the budget
[24] division, you know, even in issuing the allocations

Page 285

[1]   **A:** No, not to my knowledge. That was a number
[2] of years ago. But what was mentioned was a backup
[3] to perform the functions of the funds officer which
[4] includes certification.
[5]   **Q:** You said there were 15 funds officers?
[6]   **A:** Well, I'm going to say primary funds. 15,
[7] 18 maybe. I mean it's just a rough — don't hold me
[8] to that to be an exact number. And then most of the
[9] large organizations have an alternate or a backup
[10] person.
[11]   **Q:** So not all of the funds officers actually
[12] have a backup?
[13]   **A:** Not the small organizations.
[14]   **Q:** Would they be in violation of this rule
[15] that you've described?
[16]   **A:** I don't know. That would be up to the
[17] budget division to decide if there's a need. I
[18] would think that would depend on the volume of
[19] documents, the size of the budget and whether or not
[20] there's some other arrangement where another funds
[21] officer in headquarters — where there's a lot of
[22] small organizations, someone else in another
[23] organization may be a backup. I don't know. We're
[24] outstationed in the regions.

Page 286

[1]   **Q:** Do you know how the certifying that funds
[2] availability backup function how that is set up in
[3] each FNS office?
[4]   **A:** No, no. I'm familiar with who some of the
[5] backups are. I've met them over the years and have
[6] spoke with a number of them. Some of them have
[7] called me over the years, so I'm familiar with some
[8] of them by name.
[9]   **Q:** Do you know whether all the alternate funds
[10] officers in the other FNS offices have the authority
[11] to certify funds availability?
[12]   **A:** I don't know how the other offices are
[13] operated.
[14]   **Q:** Was Jonathan Lash a member of management in
[15] 1988?
[16]   **A:** I would say no, but I'm not — in my
[17] opinion he was not, but I'm not certain of that. He
[18] was a budget analyst in the budget division.
[19]   **Q:** Is he now?
[20]   **A:** I don't know for sure because he may now be
[21] a supervisor because he's a Grade 13, but I'm not
[22] certain of that. I don't know.
[23]   **Q:** Does the management of each FNS office have
[24] the authority to decide who performs the function of

Page 287

[1] certifying funds availability?
[2]   **A:** I would say no. I would think that's
[3] standardized from the headquarters and they would
[4] have a standard structure that they would spell out.
[5]   You saw that with regard to that memo that
[6] was issued as far as designating payments certifying
[7] officers. I'm not certain if there's a structure in
[8] place or not for funds officers who are certifying
[9] the availability of funds which is a different
[10] certification.
[11]   **Q:** You testified earlier that you believed
[12] anyway that Arthur LeBlanc understood when you told
[13] him that you needed a backup that would include the
[14] function of certifying that funds are available.
[15] What is that understanding based on?
[16]   **A:** Well, the word "backup."
[17]   **Q:** Anything else?
[18]   **A:** That implies that that person would backup
[19] my duties in my absence.
[20]   **Q:** Anything else other than that?
[21]   **A:** That was my understanding, that that's what
[22] the function was.
[23]   **Q:** Now you testified earlier about the
[24] Handbook 101.

Page 288

[1]   **A:** Yes.
[2]   **Q:** That in there — well, I'll ask the
[3] question. In that handbook does it discuss the
[4] function of certifying that funds are available?
[5]   **A:** It sure does.
[6]   **Q:** Can you point that out to me?
[7]   **A:** Yes.
[8]   **MR. WILMOT:** Why don't we mark it as an
[9] exhibit first.
[10]   **MR. CATAPANO-FRIEDMAN:** Could we mark that
[11] as an exhibit first?
[12]   (Document marked as Defendants'
[13] Exhibit 16 for identification)
[14]   **A:** This handbook, FNS Handbook 101, is the
[15] guidebook. We refer to it as the bible. I've only
[16] extracted certain pages of this but the pages that I
[17] thought were relevant because it's pretty thick and
[18] it goes into all of the different types of
[19] expenditures.
[20]   In the very first chapter, it says right
[21] here the funds officer certifies funds availability
[22] before spending actions occur, commits/obligates the
[23] funds for the spending actions in FFIS and reports
[24] the monthly status of the accounts to the allowance

2-1

Volume II
Pages 2-1 to 2-80
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x

JOHN G. PEDICINI,                    :
          Plaintiff,                 :
                                     :
                                     :
          vs.                        :   Civil Action
                                     :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and        :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATE DEPARTMENT OF           :
AGRICULTURE,                         :
          Defendants.                :
                                     :
- - - - - - - - - - - - - - - - - -x

          CONTINUED DEPOSITION OF MARTIN T. HINES, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, August 19, 2005,
commencing at 3:02 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA  02110, for
          the Plaintiff.


          (Continued on Next Page)

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

John G. Pedicone
Case 1:04-cv-12395-JLT    Document 35-3    Filed 10/19/2005    Page 90 of 91
United States of America, et al.

Martin T. Hines
Vol. 2, August 19, 2005

---

Page 26

[1] answer.

[2]     **A:** Both.

[3]     **Q:** So if someone certifies that funds are
[4] available on a procurement document, but failed to
[5] include the account code, it's an illegal action?
[6] Is that your testimony?

[7]     **A:** It's an incomplete certification and
[8] inappropriate; because in order to certify the
[9] funds, you have to assign accounting data. That's
[10] part of the process. I think we talked about the
[11] aspects; that it's a multi-step process; that you
[12] just don't sign your name on a stamp.

[13]     **Q:** Did you speak with anyone in management
[14] before crossing out Mr. Malone's signature?

[15]     **A:** No.

[16]     **Q:** Did you ever bring that to anyone's
[17] attention?

[18]     **A:** No. I corrected it, and then I crossed it
[19] off.

[20]     **Q:** Why not? Why didn't you?

[21]     **A:** Him and I discussed it. Him and I had a
[22] discussion about it, and I tried to explain it to
[23] him — I don't know the date; sometime in June of
[24] 2004, I believe. And he got quite hot about it. I

---

Page 28

[1]     **A:** Yes. I would think it would be the
[2] financial management division in headquarters and
[3] principally the budget division was the entity —
[4] and that's somewhat shared with the accounting
[5] division also, but the budget division, I believe —
[6] and Gary Maupin, the head of all of these divisions,
[7] signed those memos that I was referring to earlier,
[8] copies of which I gave to Malone.

[9]     **Q:** Is Gary Maupin still the head —

[10]     **A:** Yes, he is, still the head of the financial
[11] management unit.

[12]     **Q:** So is Gary Maupin the final word as to what
[13] the policies are within funds control?

[14]     **A:** Well, those memorandums that were issued I
[15] think were designed to reaffirm the agency policy.
[16] The policy is actually in that handbook right there,
[17] Handbook 101, which was published by headquarters
[18] FNS to promulgate how they wanted these tasks to
[19] occur.

[20]     Funds control is a very critical process in
[21] any organization. Without this, what can happen can
[22] lead to compromise of the integrity of the agency's
[23] accounting systems and violations of the
[24] Anti-Deficiency Act.

---

Page 27

[1] tried to explain — I even gave him copies of two
[2] memos, and I showed him; I said, "These clearly show
[3] that this is a funds officer responsibility." And I
[4] tried to explain it to him.

[5]     But again, if you don't have any — as we
[6] talked earlier, if you don't have an extensive
[7] knowledge of accounting, then you don't know what
[8] I'm talking about. You don't know what accounting
[9] data means when you have a set of — a string of
[10] numbers here. And if you don't have access to the
[11] FFIS system and have the capability to go in, then
[12] the whole thing is bogus. You're not properly
[13] certifying funds.

[14]     That's the reason the agency has this
[15] policy in place. They tried to strengthen the role
[16] of funds officers, because they want to prevent
[17] people from doing just this, signing — using other
[18] people's rubber stamps or signing people's names or
[19] just carte blanche signing documents without
[20] verifying funds were available in the accounting
[21] system.

[22]     **Q:** Do you know who within the agency is
[23] ultimately responsible for the interpretation of the
[24] policies that you just described to me?

---

Page 29

[1]     We're talking about something that's very
[2] important here. That's why the agency has
[3] strengthened and put out those memorandums in '98 —
[4] I think they're in '98 or '99; I'm not sure of the
[5] exact dates — but to reaffirm the requirement that
[6] it was FNS policy that funds officers would certify
[7] the availability of funds and their alternates as
[8] their backups.

[9]     **Q:** So I'll ask my question again. Is Gary
[10] Maupin the final word as to what the funds control
[11] policies mean —

[12]     **MR. CATAPANO-FRIEDMAN:** Objection.

[13]     **Q:** — within the agency?

[14]     **A:** When you say "final word," can you explain
[15] that a little bit? What do you mean by "final
[16] word"?

[17]     **Q:** In terms of the interpretation of the funds
[18] control policy within the agency, who is — whose
[19] interpretation reigns, I guess, within the agency?

[20]     **MR. CATAPANO-FRIEDMAN:** Objection.

[21]     **A:** I believe it would be more in the area of
[22] the budget division in the administrative funds
[23] management branch, which is Margaret Indellicate.
[24] She is the chief of that branch. And I would think

---

Page 70

[1]   **Q:** On Fridays — strike that.

[2]   And how far does John Pedicini live from

[3]   the FNS-NERO office?

[4]   **A:** I'm going to say about the same distance,

[5]   probably.

[6]   **Q:** And how long does it take you to get into

[7]   the FNS-NERO office —

[8]   **A:** If I had to go in there, 25 minutes.

[9]   **Q:** And how long does it take John Pedicini, do

[10]   you know, to get into the FNS-NERO office?

[11]   **A:** About the same time, I would think,

[12]   depending on the route and the time of day.

[13]   **Q:** If someone at FNS-NERO needed to have a

[14]   certification of funds availability occur on a

[15]   Friday, would that individual know how to reach

[16]   either you or John Pedicini regarding that matter?

[17]   **A:** Yes, I told them. Absolutely.

[18]   **Q:** And if an individual told you that he or

[19]   she needed a funds certification to occur on a

[20]   Friday and it was not in your — it was a day off,

[21]   obviously, for you, would you go into the office and

[22]   do the certification on that day?

[23]   **A:** I certainly would. In fact, I've worked on

[24]   Fridays in the past whenever it's been necessary.

Page 71

[1]   I've done that for a number of years during the

[2]   months of September in terms of the closeout of the

[3]   fiscal year. And there have been a few instances

[4]   when I was asked to be in the office on a Friday to

[5]   either present some budget analysis or something of

[6]   that effect, and I've come in, willingly come in.

[7]   **Q:** And do you know of any Friday when John

[8]   Pedicini has come into the office upon request to do

[9]   something?

[10]   **A:** I don't know the specific dates, but I

[11]   think he's been in on a few Fridays, but I wouldn't

[12]   know the specifics.

[13]   **Q:** And if for some reason an individual would

[14]   not be able to reach you on a Friday and asked John

[15]   Pedicini to go in, do you know whether he would come

[16]   into the office to certify the availability of funds

[17]   on a Friday?

[18]   **A:** I'm sure he would be available, if need be.

[19]   **MR. CATAPANO-FRIEDMAN:** Could we just have

[20]   a minute outside.

[21]   (Recess)

[22]   **BY MR. CATAPANO-FRIEDMAN:**

[23]   **Q:** Mr. Hines, Marty, I'd like to show you

[24]   what's been marked as Plaintiff's Exhibit 77. Do

Page 72

[1]   you see that?

[2]   **A:** Yes.

[3]   **Q:** Can you tell me what this document is.

[4]   **A:** This is the handbook or what's commonly

[5]   referred to as the Bible for funds control officers,

[6]   and it really contains all of the procedures and

[7]   goes into quite a bit of detail on funds control and

[8]   how to process all the various types of

[9]   transactions. It's very lengthy, numerous chapters,

[10]   but I'm familiar with it.

[11]   **Q:** Is this an official publication of FNS or

[12]   the USDA?

[13]   **A:** Yes, it is. This is published by FNS, and

[14]   it's been updated a number of times. This I believe

[15]   is the last edition. I had the privilege to write

[16]   one of the chapters in here, a chapter on salaries,

[17]   when it was first issued a number of years ago, back

[18]   in the '90s.

[19]   **Q:** And does this handbook contain the

[20]   definitive word on what the funds certification —

[21]   strike that.

[22]   Does this publication contain the

[23]   definitive word on how funds availability is

[24]   certified at FNS?

Page 73

[1]   **MR. WILMOT:** Objection.

[2]   **A:** Yes, it does contain that.

[3]   **Q:** I think Mr. Wilmot had asked you whether

[4]   certain individuals had the final word on the

[5]   certification of the availability of the funds

[6]   process. Do you recall that? Is that correct? And

[7]   to your recollection, that Mr. Wilmot had today

[8]   asked you some questions about whether certain

[9]   individuals had the final word as to the process of

[10]   funds availability certification?

[11]   **MR. WILMOT:** Objection. You can answer.

[12]   **A:** Yes, I believe you asked me about other

[13]   individuals other than funds officers.

[14]   **Q:** All right. I'm asking you whether a

[15]   particular — to your knowledge, whether a

[16]   particular individual has the final word on the

[17]   funds availability certification process or whether

[18]   the FNS Handbook 101 before you has the final word.

[19]   **MR. WILMOT:** Objection.

[20]   **A:** I believe the agency policy to be what's in

[21]   the handbook.

[22]   **Q:** So is it your testimony that the final word

[23]   on agency policy is contained in the FNS Handbook

[24]   101, which is marked Plaintiff's Exhibit 77?