UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,                    :
                                     :
          Plaintiff,                 :
                                     :
     v.                              :
                                     :   Case No. 04-12395 JLT
UNITED STATES OF AMERICA,            :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE, AND LINDA               :
SPRINGER, DIRECTOR, UNITED           :
STATES OFFICE OF PERSONNEL           :
MANAGEMENT,                          :
                                     :
          Defendants.                :

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO DEPOSE ADDITIONAL WITNESSES**

The Plaintiff has moved for leave to depose three additional witnesses in the above-captioned action. Plaintiff, thus far, has deposed 13 people, some for multiple days, which has caused the government to expend approximately $24,500 in fees and costs. Further, based on his motion, plaintiff seeks to question the three proposed deponents on topics he has already explored with the majority of the 13 previous deponents. Moreover, as discussed below, the proposed deponents will not offer the testimony plaintiff expects. Accordingly, the Court must deny Plaintiff's motion because the plaintiff has taken an adequate number of depositions already, the proposed depositions are unreasonably cumulative and duplicative, the additional depositions will unduly burden the defendants, and the proposed depositions will be futile.

**RELEVANT FACTS**

**I.    PLAINTIFF'S CLAIMS RELEVANT TO HIS MOTION FOR LEAVE**

Plaintiff, a financial management specialist for the United States Department of Agriculture, Food and Nutrition Service ("USDA-FNS"), claims that the USDA-FNS retaliated against him for filing actions against the agency in 2001 and 2003, and for asserting his "right" to represent co-workers in Equal Employment Opportunity matters. He alleges that the USDA, in violation of Title VII, retaliated against him by, *inter alia,* reducing his job duties and title. Amended Complaint ¶¶39, 78, 110.

In relevant part, plaintiff claims that in 1998 his supervisor appointed him a back-up (or alternative) to the funds officer in his office, the North East Regional Office ("NERO"). Plaintiff claims that by virtue of having the "title" of "back-up funds officer" he had the right to certify funds availability for spending actions. Amended Complaint ¶38. Plaintiff claims that the USDA took away this title and the right to certify funds availability in retaliation. Amended Complaint ¶¶39, 78, 110. The USDA does not deny that plaintiff was assigned back up functions to the funds officer in NERO; however, the USDA disputes that a title of "back-up funds officer" exists within the agency and that plaintiff had the authority to certify funds availability.

## II.  CERTIFICATION OF FUNDS AVAILABILITY

The Secretary for the USDA requires the National Finance Center to consolidate the administrative payments of all the sub-agencies within USDA and to provide centralized accounting services for the entire agency.  See Affidavit of Lisha Dorman ("Dorman Aff.") at ¶6, attached hereto as Exhibit A.  Each sub-agency, however, is responsible for "funds control."  Id.  The USDA defines "funds control" as the various policies, procedures, and records used to exercise management control over public funds.  Id.  Funds control requires that each sub-agency implement specific procedures which the sub-agency and its employees must follow whenever they obligate or expend Federally Appropriated Funds.  Id.

The Budget Division of the USDA allocates Federally Appropriated Funds to "allowance holders," which could include the Administrator, Deputy Administrators, Staff Directors, and Regional Administrators.  Id. at ¶7.  The allowance holder, in turn, designates an individual as a funds officer.  Id.  Each of the seven regions within USDA-FNS has at least one funds officer. Id.  A funds officer is responsible for monitoring/tracking the agency's status of funds and for providing data on fund availability to the allowance holder.  Id. at ¶8.  The funds officer is also responsible for (i) certifying that funds are available before spending actions occur, (ii) committing the

- 3 -

funds for the spending actions in the agency financial system
(i.e., the Foundation Financial Information System ("FFIS")), and
(iii) reporting the monthly status of the accounts to his/her
allowance holder and quarterly to the Budget Division.  Id.
Plaintiff claims that because he is the designated back-up to
Martin Hines, the funds officer for NERO, he has the authority to
certify funds availability.  Amended Complaint ¶38.

**ARGUMENT**

**I.    STANDARD OF REVIEW**

Rule 30(a)(2) of the Federal Rules of Civil Procedure,
provides, in pertinent part:

> A party must obtain leave of court, which shall be
> granted to the extent consistent with the principles
> stated in Rule 26(b)(2) . . . if, without the written
> stipulation of the parties . . . a proposed deposition
> would result in more than ten depositions being taken
> under this rule . . . by the plaintiffs, or by the
> defendants, or by third-party defendants.

Fed. R. Civ. P. 30(a).  Rule 26(b)(2) provides, in relevant part,
that discovery should be limited if the Court determines that:

> (i) the discovery sought is unreasonably cumulative or
> duplicative, or is obtainable from some other source
> that is more convenient, less burdensome, or less
> expensive; (ii) the party seeking discovery has had
> ample opportunity by discovery in the action to obtain
> the information sought; or (iii) the burden or expense
> of the proposed discovery outweighs its likely benefit,
> taking into account the needs of the case, the amount
> in controversy, the party's resources, the importance
> of the issues at stake in the litigation, and the
> importance of the proposed discovery in resolving the
> issues.

- 4 -

Fed. R. Civ. P. 26(b)(2). Further, Local Rule 26.1©) provides, in pertinent part:

> Discovery Event Limitations. Unless the judicial officer orders otherwise, the number of discovery events shall be limited to each side . . . to ten (10) depositions . . . .

L.R. 26.1©).

## II.   PLAINTIFF SEEKS UNREASONABLY CUMULATIVE AND DUPLICATIVE DISCOVERY AND HAS ALREADY TAKEN AN ADEQUATE NUMBER OF DEPOSITIONS

Plaintiff wishes to depose Lisha Dorman, an Administrative Officer at USDA-FNS, Larry Blim, the Director of FFIS Operations at USDA-FNS, and Angela McElmurry, an employee of the Internal Revenue Service. He claims that the three proposed deponents will provide testimony supporting his claim that (i) he was appointed an alternate funds officer and (ii) he had the authority to certify that funds are available by virtue of holding the position of alternate funds officer.

Thus far, the plaintiff has deposed 13 people, ranging from plaintiff's co-workers to senior management officials within the agency. Indeed, plaintiff deposed the Administrator of the USDA-FNS, a presidential appointee. During the majority of the depositions, plaintiff exhausted questions concerning the topics he wishes to question the three proposed deponents on. Indeed, Plaintiff already elicited from Jonathan Lash testimony concerning a list of funds officers' contact information, which included plaintiff's name as an alternate to the funds officer.

- 5 -

<u>See</u> Deposition of Jonathan Lash, pp. 10-14, 16-17, attached hereto as Exhibit C.  This is the same list he wishes to question McElmurry on.  Moreover, as stated above, every management deponent testified that plaintiff performed the back-up functions to the funds officer in NERO - they disagreed only with plaintiff's claim that he had the authority to certify that funds are available.[1]  Therefore, it is completely unnecessary to conduct further discovery on whether the plaintiff was a back-up to the funds officer in NERO.  Plaintiff also exhausted the issue of whether he had the authority to certify that funds are available by virtue of holding the position of alternate funds officer.[2]

Nothing revealed during the 13 depositions necessitates the three additional depositions.  Plaintiff simply hopes that through additional fishing he eventually will discover testimony supporting his claims.  The discovery plaintiff seeks is

---

[1]<u>See</u> Depositions of Douglas MacAllister at pp. 2-225-2-228, attached hereto as Exhibit D; John Ghiorzi at p. 28, attached hereto as Exhibit E; Robert Canavan at pp. 124-125, attached hereto as Exhibit F; Frances Zorn at pp. 105-106, 135-136, attached hereto as Exhibit G; Arthur LeBlanc at pp. 17, 53-54, attached hereto as Exhibit H; and Michael Malone at pp. 140, 167-168, attached hereto as Exhibit I.

[2]<u>See</u> Depositions of Douglas MacAllister at pp. 28, 30-33, attached hereto as Exhibit D; Robert Canavan at pp. 61, 152-159, attached hereto as Exhibit F; Frances Zorn at pp. 105-112, attached hereto as Exhibit G; Arthur LeBlanc at pp. 8, 17, 48-49, 54-55, attached hereto as Exhibit H; and Paride Monti at pp. 9-11, 15, 18-19, attached hereto as Exhibit J.

- 6 -

unreasonably cumulative and duplicative of the testimony now on record, and, furthermore, he clearly has had ample opportunities to obtain information on these topics.  As such the Court should deny the plaintiff's motion for leave.

## III.  THE THREE ADDITIONAL DEPOSITIONS WILL UNDULY BURDEN THE DEFENDANTS

Plaintiff took multiple days to complete some of his depositions.  In all, the plaintiff's depositions took ten days and approximately 75 hours.  Based on a billable rate of $265 per hour, the government's reasonable attorney's fees for defending the depositions amount to $19,875.[3]  Further, the government has expended $4,698.95 on the transcripts of plaintiff's deposition.  Plaintiff's depositions have taken up a considerable amount of time, and have caused the United States to expend a considerable amount of resources.  Because the burden and expense of the proposed depositions outweighs their purported benefit, the Court should deny the plaintiff's motion.

## IV.  THE PROPOSED DEPOSITIONS OF DORMAN AND BLIM WILL BE FUTILE

Moreover, the Court should deny Plaintiff's motion for leave because proposed deponents Dorman and Blim will not offer the testimony plaintiff expects.  Indeed, contradicting plaintiff's representations as to Blim's expected testimony, Blim states that

---

[3]The billable rate of $265 per hour is based on the undersigned counsel's billable rate from private practice, which he left a little over one year ago.

- 7 -

he does not remember having any discussions with plaintiff or Martin Hines during the USDA-FNS's annual funds officer meeting in April 2005, or at any other time, concerning plaintiff's role or responsibilities as "back-up" funds officer to Hines in NERO. See Affidavit of Larry Blim ("Blim Aff.") at ¶7, attached hereto as Exhibit B.  He also states that he did not inform plaintiff that he was the "alternate funds control officer" for e-travel in NERO.  Id.  Blim further states that he did not inform plaintiff that he had the right to certify that funds were available by virtue of serving as a back up to Hines, the funds officer in NERO.  Id.  Blim also did not inform plaintiff that Douglas MacAllister violated agency policy by removing plaintiff's "right" to certify funds availability.  Id.

Dorman somewhat corroborates plaintiff's rendition of her comments during the April 2005 annual funds officer meeting, stating that, during her session entitled "Responsibilities of Back-Up Funds Officers," plaintiff asked her what are the responsibilities of a "back-up" funds officer.  See Dorman Aff. at ¶11.  Dorman states that in response to this question she answered that a "back-up" funds officer is responsible for all of the functions the primary funds officer performs in the event that the funds officer is unable to perform them him/herself. Id.  Dorman, however, states that she did not have any further discussion with plaintiff on this topic.  Id.

Dorman's answer to plaintiff's question, however, will not support his claim that he had the authority to certify that funds are available by virtue of holding the position of alternate funds officer.  Indeed, Dorman further states that she answered plaintiff's question in a "general sense."  <u>Id.</u> at ¶12.  Dorman states that a "back-up" funds officer <u>should</u> be able to perform all of the functions the primary funds officer performs.  <u>Id.</u>

Both Dorman and Blim state that there is no USDA-FNS policy granting a "back-up" funds officer the authority to perform all of the functions of the primary funds officer.  Blim Aff. at ¶8; Dorman Aff. at ¶12.  In fact, there are no USDA-FNS policies or procedures that even mention a "back-up" or "alternate" funds officer.  Blim Aff. at ¶8; Dorman Aff. at ¶12.  Generally, each allowance holder has the authority to delegate his/her authority to allocate Federally Appropriated Funds to whomever he/she decides.  Blim Aff. at ¶9; Dorman Aff. at ¶13.  There is no USDA-FNS policy prohibiting the allowance holder from <u>not</u> delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to the designated "back-up" funds officer.  Blim Aff. at ¶10; Dorman Aff. at ¶14.  Further, there is no USDA-FNS policy prohibiting the allowance holder from delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to a USDA-FNS supervisor or manager.

Blim Aff. at ¶11; Dorman Aff. at ¶15.

Clearly Blim and Dorman will not give the testimony plaintiff expects, and it certainly will not be helpful to his case. Deposing Blim and Dorman, like much of the 13 previous depositions, will be merely an exercise of futility for plaintiff and a needless waste of time and government resources. Accordingly, the Court should deny the plaintiff's motion for leave to take the additional depositions.

### CONCLUSION

Accordingly, for the reasons articulated above, the Court should deny plaintiff's motion for leave.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ Damian W. Wilmot
DAMIAN W. WILMOT
Assistant U.S. Attorney
Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated: November 2, 2005

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,

    Plaintiff,

    v.

                              Case No. 04-12395 JLT

UNITED STATES OF AMERICA, :
ANN M. VENEMAN, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE, AND LINDA
SPRINGER, DIRECTOR, UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT,

    Defendants.

## AFFIDAVIT OF LISHA DORMAN

Lisha Dorman, hereby state as follows:

1.     I am over the age of 18, and am mentally competent to testify as to the matters contained in this affidavit.

2.     The information contained in this affidavit is based upon my personal knowledge.

3.     I make this affidavit knowingly and voluntarily.

4.     Since 1993, I have worked for the United States Department of Agriculture, Food and Nutrition Service ("USDA-FNS") in various capacities with regard to financial management within the agency. My official title is Administrative Officer (Grade 13). I currently hold the position of Funds Officer for the Deputy Administrator of Management at Headquarters.

5.     I am very familiar with USDA-FNS policies concerning financial management. In particular, I am familiar with USDA-FNS policies concerning the duties and responsibilities of the Funds Officer position. Indeed, I helped to draft the USDA-FNS's handbook on its budget and funds management process, including the duties and responsibilities of Funds Officers and allowance holders, which is entitled "FNS Administrative Accounting Handbook 101." Further, from 1993 to July 2005, I conducted training on the duties and responsibilities of Funds Officers within the agency. In addition, as I referred to above, I currently hold the position of Funds Officer for the Deputy Administrator of Management since July, 2005 to the present.

6.    By way of background, the Secretary for the USDA requires the National Finance Center to consolidate the administrative payments of all the sub-agencies within USDA and to provide centralized accounting services for the entire agency. Each sub-agency, however, is responsible for "funds control." The USDA defines "funds control" as the various policies, procedures, and records used to exercise management control over public funds. Funds control requires that each sub-agency implement specific procedures by which the sub-agency and its employees must follow whenever they obligate or expend Federally Appropriated Funds.

7.    The Budget Division of the USDA allocates Federally Appropriated Funds to "allowance holders," which could include the Administrator, Deputy Administrators, Staff Directors, and Regional Administrators. The allowance holder, in turn, designates an individual as a funds officer. Each of the seven regions within USDA-FNS has at least one funds officer.

8.    A funds officer is responsible for monitoring/tracking the agency's status of funds and for providing data on fund availability to the allowance holder. The funds officer is also responsible for (i) certifying that funds are available before spending actions occur, (ii) committing the funds for the spending actions in the agency financial system (i.e., the Foundation Financial Information System ("FFIS")), and (iii) reporting the monthly status of the accounts to his/her allowance holder and quarterly to the Budget Division.

9.    On April 19, 2005, and April 20, 2005, USDA-FNS held its annual funds officer meeting in New Orleans, Louisiana. I, along with some of my colleagues, conducted several sessions on subjects germane to the duties and responsibilities of Funds Officers.

10.   On April 19, 2005, I conducted a session entitled "Responsibilities of Back-Up Funds Officers." Generally, "back-up" funds officers are persons designated within each sub-agency as having the responsibility to perform the functions of the funds officer in the event that the funds officer is unable to do so him/herself.

11    During the session on "back-up" funds officers, the plaintiff in this action, John Pedicini, asked me what are the responsibilities of a "back-up" funds officer. In response to this question I answered that a "back-up" funds officer is responsible for all of the functions the primary funds officer performs in the event that the funds officer is unable to perform them him/herself. I did not have any further discussion with Mr. Pedicini on this topic.

12.   I answered Mr. Pedicini's question in a general sense, that is, that a "back-up" funds officer should be able to perform all of the functions the primary funds officer performs. There is no FNS policy, however, granting a "back-up" funds officer the authority to perform all of the functions of the primary funds officer.

In fact, there are no FNS policies or procedures that even mention a "back-up" or "alternate" funds officer.

13. As referred to above, generally, each allowance holder has the authority to delegate his/her authority to allocate Federally Appropriated Funds to whomever he/she decides.

14. There is no FNS policy prohibiting the allowance holder from not delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to the designated "back-up" funds officer.

15. Further, there is no FNS policy prohibiting the allowance holder from delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to an FNS supervisor or manager.

16. FNS funds control policy concerning certification of funds availability has not been violated provided that the supervisor or manager - who the allowance holder has delegated the authority to allocate Federally Appropriated Funds - (i) verifies in the agency financial system (i.e., FFIS) that the agency has the funds available for the requested spending action, and (ii) executes a certification on the procurement document that funds are available for the spending action. If the supervisor does not have access to FFIS or does not know how to verify in FFIS that the agency has the funds available for the requested spending action, he/she must have someone who does have access to FFIS take the necessary steps to verify that the agency has the funds available for the requested spending action before certifying on the procurement document that such funds are available.

Signed this 2nd day of November, 2005, under the pains and penalties of perjury.

LISHA DORMAN

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,

     Plaintiff,

  v.

Case No. 04-12395 JLT

UNITED STATES OF AMERICA,
ANN M. VENEMAN, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE, AND LINDA
SPRINGER, DIRECTOR, UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT,

     Defendants.

## AFFIDAVIT OF LARRY BLIM

I, Larry Blim, hereby state as follows:

I am over the age of 18, and am mentally competent to testify as to the matters contained in this affidavit

2.    The information contained in this affidavit is based upon my personal knowledge.

3.    I make this affidavit knowingly and voluntarily.

4.    Since **1987**, I have worked for the United States Department of Agriculture, Food and Nutrition Service ("USDA-FNS") in various capacities with regard to financial management within the agency. My official title is Director, FFIS Operations (Grade 15). I currently hold the position of Assistant to the Deputy Administrator for Financial Management in **Alexandria, Virginia.** I supervise the agency's administrative accounting system (i.e., Foundation Financial Information System ("FFIS")).

5.    I am very familiar with USDA-FNS policies concerning financial management. In particular, I am familiar with USDA-FNS policies concerning the duties and responsibilities of the Funds Officer position. Indeed, since **2001**, I have conducted training on the duties and responsibilities of Funds Officers within the agency.

6.    On April 19, 2005, and April 20, 2005, USDA-FNS held
      its annual funds officer meeting in New Orleans,
      Louisiana.  I, along with some of my colleagues,
      conducted several sessions on subjects germane to the
      duties and responsibilities of Funds Officers.

7     I do not remember having any discussions with John
      Pedicini or Martin Hines during the annual meeting, or
      at any other time, concerning Mr. Pedicini's role or
      responsibilities as "back-up" funds officer to Mr.
      Hines in the North East Regional Office ("NERO").  I
      did not inform Mr. Pedicini that he was the "alternate
      funds control officer" for e-travel in NERO.  Nor did I
      inform Mr. Pedicini that he had the right to certify
      that funds were available by virtue of serving as a
      back up to Mr. Hines, the funds officer in NERO.  I
      also did not inform Mr. Pedicini that Douglas
      MacAllister violated agency policy by removing Mr.
      Pedicini's "right" to certify funds availability.

8.    There is no USDA policy granting a "back-up" funds
      officer the authority to perform all of the functions
      of the primary funds officer.  In fact, there are no
      USDA policies or procedures that even mention a "back-
      up" or "alternate" funds officer.

9     Generally, each allowance holder has the authority to
      delegate his/her authority to allocate Federally
      Appropriated Funds to whomever he/she decides.

      There is no USDA policy prohibiting the allowance
      holder from not delegating the authority to allocate
      Federally Appropriated Funds, including the authority
      to certify that funds are available, to the designated
      "back-up" funds officer.

11.   Further, there is no USDA policy prohibiting the
      allowance holder from delegating the authority to
      allocate Federally Appropriated Funds, including the
      authority to certify that funds are available, to a
      USDA-FNS supervisor or manager.

      USDA funds control policy concerning certification of
      funds availability has not been violated provided that
      the supervisor or manager - who the allowance holder
      has delegated the authority to allocate Federally
      Appropriated Funds - (i) verifies in the agency
      financial system (i.e., FFIS) that the agency has the
      funds available for the requested spending action, and

(ii) executes a certification on the procurement
document that funds are available for the spending
action.  If the supervisor does not have access to FFIS
or does not know how to verify in FFIS that the agency
has the funds available for the requested spending
action, he/she must have someone who does have access
to FFIS take the necessary steps to verify that the
agency has the funds available for the requested
spending action before certifying on the procurement
document that such funds are available.

Signed this 2nd day of November, 2005, under the pains and
penalties of perjury.

LARRY BLIM

# EXHIBIT C

1

Volume I
Pages 1 to 59
Exhibit 77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
          Plaintiff,            :
                                 :
     vs.                        :  Civil Action
                                 :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                 :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF JONATHAN LASH, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Tuesday, August 2, 2005,
commencing at 1:15 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA 02110,
          for the Plaintiff.


(Continued on next page)

10

1     A.   I was a management analyst Step 12 for

2    approximately nine years.  Before that I was -- I

3    worked in the Food Stamp Program from when I went

4    from Grade 2 to Grade 11.

5     Q.   Grade 2 to Grade 11 over what period of

6    time?

7     A.   Six years.

8     Q.   Wow.

9     A.   I was getting a master's degree.

10     Q.   Great.  Now you're currently stationed in

11    Washington, D.C. at headquarters?

12     A.   Yes, sir.

13     Q.   And have you always been stationed at -- in

14    headquarters in Washington, D.C.?

15     A.   Yes, sir.

16     Q.   As part of your duties, do you keep any

17    lists of the budget analysts or budget officers

18    within FNS?

19     A.   We have a telephone list of the people who

20    work in the budget division in headquarters.

21     Q.   Do you know who prepares the list?

22     A.   Gloria Morton works in the program

23    accountability branch I think it's called.

24     Q.   Did you receive your list from her?

11

1     A.    Yes.

2     Q.    Did she provide this list to you in the

3 ordinary course of business?

4     A.    Yes.  It's a courtesy really.  She just

5 keeps tracks of people's phone numbers as they

6 change.  It's not a formal published list.  It's

7 just when people change their desks or new employees

8 show up, she'll just add the name and E-mail it

9 around to everybody if we need to call somebody.

10    Q.    Let me have some documents.  We'll go right

11 to the documents.  Let me show you what's been

12 marked as Plaintiff's Exhibit 10 and ask you to take

13 a look at this document and see if you recognize it.

14    A.    Oh, yes, I recognize it.  I don't think I

15 prepared this one.  I think maybe Angie McElmurray

16 prepared this one.  Yes, that's her initials.

17    Q.    Can you tell me what this document is?

18    A.    Listing of the funds officers.

19    Q.    And you said you don't think you prepared

20 this particular document?

21    A.    No, I didn't.

22    Q.    Have you prepared other funds officers

23 listings?

24    A.    Yes, since Angie left I took over editing

12

1   this as changes are made, as funds officers leave

2   and new ones arrive.  I have this file.

3        Q.    Is this an official list of funds officers?

4        A.    Could you define "official" for me?

5        Q.    Why don't you tell me what this document

6   is.

7        A.    It's an Excel spreadsheet that we type in

8   the names and phone numbers of people as allowance

9   holders of organizations and funds officers as they

10  change.

11       Q.    Do you do this in the ordinary course of

12  business?

13       A.    Yes.

14       Q.    Is this to your knowledge an accurate list

15  of funds officers and allowance holders as of the

16  date of this list?

17       A.    January 26, 1999?

18       Q.    Yes.

19       A.    I have no reason to doubt its authenticity

20  or accuracy.

21       Q.    Is this a list that you received and

22  possessed in the ordinary course of business?

23       A.    I don't believe I possessed this one

24  because I wasn't working in the budget division at

13

1   the time this one was created; however, I probably

2   received subsequent versions with different names.

3        Q.    With different names?

4        A.    As they were updated as people left, people

5   retired.

6        Q.    Let me direct your attention to the NERO

7   line.  Do you see where it relates to NERO?  And can

8   you tell me what it says about NERO on that list?

9        A.    The allowance holder is Fran Zorn, her

10  phone number.  The FPA officer is Marty Hines.  The

11  FPA backup is John Pedicini and the phone number of

12  each one of them and the fax number.

13       Q.    To your knowledge, was Fran Zorn as of the

14  date of that list the allowance holder for FNS-NERO?

15       A.    To the best of my knowledge she would have

16  been, yes.

17       Q.    And to the best of your knowledge, was

18  Marty Hines the -- was it funds officer for

19  FNS-NERO?

20       A.    As long as I've known the funds officers,

21  Marty Hines has been the funds officer for NERO.

22       Q.    And to your knowledge, was John Pedicini

23  the -- what was he listed as?

24       A.    Backup.

14

1    Q.    Back-up funds officer?

2    A.    Yes.

3    Q.    At FNS-NERO on the date of that list in

4    1999?

5    A.    That's his name there.  I assume that he

6    was the backup funds officer on that date.

7    Q.    To your knowledge, did Mr. Pedicini

8    continue to be the backup funds officer after that

9    date?

10    A.    Yes.

11    Q.    Did you prepare a list subsequent to the

12    date of this list on which Mr. Pedicini's name

13    appears as the backup funds officer?

14    A.    I can't say with certainty, but it's

15    probable that I did.

16    Q.    And you in fact did prepare this list at

17    subsequent periods of time?

18    A.    Yes.

19    Q.    Do you continue to perform this list as

20    part of your ordinary duties in the ordinary course

21    of business?

22    A.    Yes.

23    Q.    I'm going to show you what's been marked

24    Plaintiff's Exhibit 11 and ask you whether you

16

1     Q.    Were those statements true when you made

2   them?

3     A.    To the best of my knowledge, yes.

4     Q.    Are those statements true today?

5     A.    To the best of my knowledge, yes.

6     Q.    Do you have any reason to believe that

7   those statements were not true when you made them?

8     A.    No.

9     Q.    Do you have any reason to believe that

10  those statements are not true today?

11    A.    No.

12    Q.    In fact today you're the one who keeps the

13  list of backup funds officers and funds officers?

14    A.    We have a list of -- that looks like this

15  one and when I think of it or if I think a change

16  has been made and we need to put out a new version

17  of it, then I do that.

18    Q.    Can you tell me why you prepare and keep

19  this list?

20    A.    To let everyone know who is doing what.

21    Q.    And is this an official part of your job,

22  to do this, keep this list?

23    A.    No.

24    Q.    Is this a function, however, that you've

17

1    done routinely over the years since you've held your

2    current position?

3        A.    Yes.

4        Q.    Is this a function that was done routinely

5    to the best of your knowledge by your predecessor?

6        A.    Yes.

7        Q.    Are there standard functions that backup

8    funds officers perform within FNS?

9        A.    I don't believe the backup funds officers

10   have set duties in one position description that

11   comes from headquarters.

12           I believe that those things are negotiated

13   at each individual organization depending on the

14   needs of the allowance holder and what works best.

15       Q.    What about with respect to certification of

16   availability of funds?  Is that something that is

17   standard throughout FNS-NERO with respect to the

18   functioning of backup funds officers?

19       A.    I'd like to be able to answer that with

20   authority, but frankly I really never deal with

21   anybody but Marty Hines so I don't know.

22       Q.    Well, you made a statement in that E-mail

23   that as a backup funds officer, Mr. Pedicini had the

24   right to certify the availability of funds.

# EXHIBIT D

1

Volume I
Pages 1 to 39
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
JOHN G. PEDICINI,                :
         Plaintiff,           :
                                     :
       vs.                   : Civil Action
                                     : No. 04-12395 JLT
UNITED STATES OF AMERICA, and  :
ANN M. VENEMAN, SECRETARY,     :
UNITED STATE DEPARTMENT OF     :
AGRICULTURE,                   :
         Defendants.         :
                                     :
- - - - - - - - - - - - - - - - - -x

         DEPOSITION OF DOUGLAS MacALLISTER, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Monday, June 6, 2005, commencing
at 4:06 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.


        (Continued on Next Page)

28

1    he has never been delegated eligibility to certify,

2    so I have never asked him if he knows how to

3    certify.

4        Q.    Do you know whether Mr. Pedicini has been

5    listed as the backup funds officer for NERO on any

6    agency document?

7        A.    What do you mean by "agency documents"?

8        Q.    On any list that you've received from NERO,

9    national or otherwise.

10       A.    Whose list?  See, I have a problem, in that

11   somebody may send out a list, but I don't know if

12   it's blessed by FNS or it's not.

13       Q.    Do you know a person by the name of

14   Jonathan Lash?

15       A.    Yes, I do.

16       Q.    Who is Jonathan Lash?

17       A.    He works in the budget headquarters.  He's

18   a budget analyst, as far as I know.

19       Q.    Does he maintain a list with respect to the

20   individuals who are authorized to certify funds?

21       A.    I do not know for a fact that he does.

22       Q.    Does he have any knowledge as to who the

23   individuals are who are authorized to certify funds

24   within FNS?

30

1      A.    Marty Hines has been the funds officer for

2  a long time.

3      Q.    Did he have a backup back in 1995?

4      A.    A backup?

5      Q.    A funds officer who would certify in his

6  absence.

7      A.    Who would certify funds availability --

8      Q.    Funds availability in his absence.

9      A.    Not that I'm aware of.

10      Q.    So you certainly were not his backup in

11  1995, correct?

12      A.    There has never been a backup for Marty to

13  certify funds availability, other than the

14  supervisor and myself, since I have been the

15  financial director.

16      Q.    So you were a backup to Marty Hines --

17      A.    For certifying funds availability, I sure

18  was, yes.

19      Q.    Well, that was my question.

20      A.    There's your answer.

21      Q.    Now, in 1998, did that change?

22      A.    No.   The delegated responsibilities were

23  still the same.   Supervisor for certifying funds

24  availability and then up to director for financial

31

1    management.

2        Q.    Well, let me ask you this.  Did it come to

3    your attention sometime in 1998 or 1999 that having

4    supervisors as the backup funds officers was not

5    adequate from the point of view of FNS?

6            MR. WILMOT:  Objection.  You can answer.

7        A.    No, I was not aware of any such thing.

8        Q.    It never came to your attention that you

9    needed an independent person as the backup funds

10   officer?

11           MR. WILMOT:  Objection.  You can answer.

12       A.    No, it has not.  It did not.

13       Q.    And Arthur LeBlanc in 1998 appointed a

14   backup funds officer, did he not?

15           MR. WILMOT:  Objection.  You can answer.

16       A.    A backup funds officer?

17       Q.    Yes.

18       A.    I guess I'm not really sure what's your

19   definition of a backup funds officer.

20       Q.    What's your definition of a backup funds

21   officer?

22       A.    To me, a backup funds officer is not

23   available.  We have people who have backup functions

24   to the funds officer, but we have no backup funds

32

1    officer.  We assign various functions to various

2    people to back up the funds officer, but they are

3    not backup funds officers.

4        Q.    Did it come to your attention sometime in

5    1998 or 1999 that FNS required someone other than a

6    supervisor to back up Marty Hines in his fund

7    certification authority?

8            MR. WILMOT:  Objection.  You can answer.

9        A.    You mean certifying --

10       Q.    Certifying the availability of funds.

11       A.    No, it did not come to my attention.

12       Q.    Did it come to your attention that Arthur

13   LeBlanc in 1998 or 1999 appointed John Pedicini as

14   the individual to provide backup to Marty Hines in

15   certifying funds availability?

16           MR. WILMOT:  Objection.  You can answer.

17       A.    Not in certifying funds availability, no.

18       Q.    Well, what did come to your attention?

19       A.    That Mr. Pedicini was given some functions

20   in which he would perform them if Marty Hines was

21   not there.

22       Q.    And what were those functions?

23       A.    Off the top of my head, I am not absolutely

24   certain what they are.  He was the supervisor.  He

33

1   was making the assignments.

2       Q.    But now that we mention it, you do know

3   that Arthur LeBlanc did provide Mr. Pedicini with

4   some backup responsibilities regarding Marty Hines

5   back in 1998 and 1999, correct?

6       A.    I can't swear to the time frame, but yes.

7       Q.    But I need to speak to Mr. LeBlanc as to

8   what those responsibilities were, because you don't

9   remember what they are, right?

10          MR. WILMOT:  Objection.

11      A.    I've already answered.  I don't know.

12      Q.    That's correct.  You don't remember,

13  correct?

14      A.    I don't remember the dates.

15      Q.    And you don't remember what

16  responsibilities they were, correct?

17      A.    I don't remember specifically what

18  responsibilities they were, correct.

19          MR. WILMOT:  And objection to the question.

20      Q.    Now, was it your responsibility to nominate

21  individuals to receive awards on October 7, 2004?

22      A.    Anyone in the office can nominate another

23  person for an award.  So the answer to that is,

24  Sure, I could nominate people.

2-1

Volume II
Pages 2-1 to 2-267
Exhibits 47 to 67

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,                    :
          Plaintiff,                 :
                                     :
      vs.                            :   Civil Action No.
                                     :   04-12395 JLT
UNITED STATES OF AMERICA, and        :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE,                         :
          Defendants.                :
- - - - - - - - - - - - - - - -x

          CONTINUED DEPOSITION OF DOUGLAS A.
MacALLISTER, a witness called on behalf of the
Plaintiff, taken pursuant to the Federal Rules of
Civil Procedure, before Susan J. Cataldo, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of Doris
O. Wong Associates, Inc., 50 Franklin Street, Boston,
Massachusetts, on Friday, July 15, 2005, commencing at
10:13 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (by Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

    United States Department of Justice,
        United States Attorney's Office
        (by Damin Wilmot, Assistant United States
        Attorney) United States Courthouse,
        1 Courthouse Way, Suite 9200,
        Boston, MA 02210, for the Defendants.

Also Present:  John G. Pedicini

                    *  *  *  *  *

2-225

1    this exhibit.

2        A.    (Witness reviews document)  Not being

3    included in it, I don't recognize the specific

4    communications back and forth, no.

5        Q.    Mr. MacAllister, do you recall having

6    objected to a -- to the use of a title by

7    Mr. Pedicini?

8        A.    I do recall that there or an objection to

9    the use of a title that I concurred with, yes.

10       Q.    Okay.  And what was that objection?

11       A.    The objection by the deputy regional

12   administrator was that Mr. Pedicini was using a

13   title was not either a working title or part of his

14   job title and that he wanted us to look into it, and

15   we did.  I relayed the information down to his

16   supervisor.

17       Q.    Okay.  And did his supervisor at your

18   instructions instruct Mr. Pedicini no longer to use

19   that particular job title?

20       A.    He did so inform Mr. Pedicini, yes.

21       Q.    Okay.  And do you recall what that job

22   title was?

23       A.    Alternate funds officer.

24       Q.    Alternate or backup funds officer, correct?

2-226

1      A.    I believe --

2            MR. WILMOT:   Objection.

3      A.    I believe it said "alternate funds

4   officer."  There is a difference between backup and

5   alternate.

6      Q.    What's the difference backup and alternate

7   funds officer?

8      A.    Neither one are specific job titles.

9   However, Mr. Pedicini backed up the funds officer in

10  some functions, and that's the phrase we always use.

11  We don't use "he's the alternative funds officer."

12  We use "you're the backup funds officer."

13     Q.    Okay.  And what is an alternative funds

14  officer?

15     A.    I have no idea.  You tell me.  There's no

16  formal job title in FNS called alternative funds

17  officer.

18     Q.    Okay.  So it's a title that you do not use

19  at FNS NERO, correct?

20     A.    I've been the FMD for 16 years.  I don't

21  ever remember it being used.  It doesn't mean it

22  can't have slipped by me, but I certainly don't

23  remember seeing it used.

24     Q.    Okay.  Do you know whether certifying

2-227

1   availability of funds authorization attaches to

2   either an alternate funds officer or a backup funds

3   officer?

4      A.   I'm sorry.  Repeat the question again,

5   please.

6      Q.   Yes.  Do you know whether the authorization

7   to certify the availability of funds attaches to the

8   title of alternate funds officer or backup funds

9   officer?

10         MR. WILMOT:  Objection.  Answer.

11     Q.   Well, let me ask the question in a

12  different way.  Do you know whether a backup funds

13  officer or alternate funds officer has the authority

14  within FNS to certify the availability of funds?

15         MR. WILMOT:  Objection.

16     A.   There's no such title in FNS that I'm aware

17  of, so they don't have any authority to do anything,

18  because there's not a job title called alternate

19  funds officer.  There's not a formal job title

20  called backup funds officer.

21     Q.   Okay.  So it's your testimony that the

22  title alternate funds officer does -- or backup

23  funds officer does not exist at FNS?

24     A.   In no formal PD am I aware of that the job

2-228

1    title for that position is backup funds officer or

2    alternative funds officer.  That's my testimony.

3        Q.   Okay.  What about the title alternate funds

4    control officer, does that exist at FNS NERO --  at

5    FNS?

6        A.   Not in NERO.  I don't know about throughout

7    FNS.

8        Q.   So that's a title that may attach to

9    certain individuals in other regions of FNS?

10           MR. WILMOT:  Objection.  Answer.

11       A.   I have no way of knowing one way or the

12   other.

13       Q.   Okay.  And you've never seen the use of the

14   title alternate funds control officer within FNS?

15           MR. WILMOT:  Objection.  You can answer.

16       A.   Not that I can recollect, no.

17       Q.   Okay.

18           MS. CATAPANO-FRIEDMAN:  Mark that.

19               (Document marked as Plaintiff

20               Exhibit 62 for identification)

21           MS. CATAPANO-FRIEDMAN:  And those as well.

22               (Documents marked as Plaintiff

23               Exhibit 63 to 65 for identification)

24           (Discussion off the record)

# EXHIBIT E

1

Volume I
Pages 1 to 106
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
          Plaintiff,            :
     vs.                         :    Civil Action
                                 :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                     :
          Defendants.           :
                                 :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF JOHN J. GHIORZI, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Thursday, June 23, 2005,
commencing at 10:05 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Gina Y. Walcott-Torres, Assistant
          United States Attorney) United States
          Courthouse, 1 Courthouse Way, Suite 9200,
          Boston, MA  02210, for the Defendants.

Also Present: John G. Pedicini
              Salama Abdurrahim, summer intern.

28

1    look, and John can stay.

2        BY MR. CATAPANO-FRIEDMAN:

3        Q.   Let's move on.  Do you recall that Mr.

4    Pedicini had been appointed -- held the position of

5    alternative funds officer at one point in time?

6            MS. WALCOTT-TORRES:  Objection.  You may

7    answer.

8        A.   I recall that title being discussed with me

9    by Mr. Pedicini.  I don't think that there was such

10   a title of an individual in our organizational

11   chart.  What did you call it?

12       Q.   Alternative or backup funds officer.

13       A.   I don't recall that being an official title

14   of a position in our organization.

15           MS. WALCOTT-TORRES:  Counselor, are you

16   using "alternative" and "backup" interchangeably, or

17   which is the title?

18           MR. CATAPANO-FRIEDMAN:  Yes, I think it is

19   interchangeable, "backup," "alternative,"

20   "alternate."

21           MR. PEDICINI:  Alternate funds officer?

22           MS. WALCOTT-TORRES:  Alternate funds

23   officer, yes.

24       Q.   I'm sorry.  Alternate funds officer.

# EXHIBIT F

1

Volume I
Pages 1 to 195
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
JOHN G. PEDICINI,                 :
          Plaintiff,              :
                                  :
     vs.                          :    Civil Action
                                  :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and     :
ANN M. VENEMAN, SECRETARY,        :
UNITED STATE DEPARTMENT OF        :
AGRICULTURE,                      :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF ROBERT L. CANAVAN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Tuesday,
June 7, 2005, commencing at 11:09 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA  02110, for
          the Plaintiff.


          (Continued on Next Page)

61

1    recall any situation where you felt that Martin

2    Hines was not telling you the truth?

3        A.    No.

4        Q.    So as we sit here today, you've got no

5    reason to question Martin Hines' honesty, correct?

6        A.    That's correct.

7        Q.    Who is the backup funds officer at NERO?

8        A.    The funds officer is Marty Hines.  In his

9    absence, he's backed up by his first line

10    supervisor.  In their absence, the responsibility

11    would go to Doug MacAllister.

12        Q.    Is that always how it's been at NERO since

13    Marty Hines has been there?

14        A.    As far back as I can recall.  Marty Hines

15    has been there since the region -- close to when the

16    region opened.

17        Q.    Well, when was that, approximately?  And

18    then you can finish, if you can tell me

19    approximately when it opened.

20        A.    September 1975.

21        Q.    Okay.  Go ahead.  Complete your answer.

22        A.    For as far back as I can recall and as far

23    as I can see documented, that has been the structure

24    of authorization of delegation of that

124

1  report?

2      A.    I don't recall whether I immediately picked

3  up the phone or whether it was the next time I saw

4  Doug MacAllister.  I returned this to him.  I

5  clarified that for purposes of keeping clear control

6  over these kinds of reports, that I wanted to send

7  it back to Marty and have it prepared for Marty's

8  signature, wherein Marty certified to us that this

9  reflects his review of whatever the particular

10  contents -- in this instance, it was leave without

11  pay.  In other instances, it could be other

12  documents, some of which would include research

13  conducted by other members of the section staff.  I

14  recognized that.

15      Q.    And did you tell Mr. MacAllister and Mr.

16  Malone anything else that you found objectionable

17  about this report?

18      A.    It wasn't objectionable so much as

19  inaccurate.  It was the assignment of the title

20  "alternate funds officer" to Mr. Pedicini.

21      Q.    What did you tell them about that

22  inaccuracy?

23      A.    Confirmed with them that there is not a

24  title "alternate funds officer" and directed them to

125

1    clarify any misunderstanding that might be on

2    anybody's part.

3        Q.    I'd like you to see -- examine Plaintiff's

4    Exhibit No. 21 and let me know whether you can

5    identify that.

6        A.    That was October 19th?

7        Q.    Right.

8        A.    And this is October 22nd from Michael

9    Malone to John Pedicini.  "Subject:  Inappropriate

10   use of non-official job title."

11           "In reviewing recent correspondence, I

12   recognized that you included in a memorandum your

13   title as 'Alternate Funds Officer-NERO.'  This was

14   inappropriate because your official job title on

15   your AD-332 is 'Financial Management Specialist.'

16   Designations regarding roles and/or rights you have

17   in a system such as Alternate Funds Officer (FFIS)

18   and Certifying Officer (IAS) does not mean that you

19   have those job titles or have signatory

20   responsibility using those titles.

21           "Please refrain from using those titles in

22   the future.

23           "Please see me in person if you have any

24   questions."

152

1    have?

2        A.    I don't know that that has or hasn't taken

3    place.

4        Q.    Well, let's assume it hasn't taken place.

5    As deputy administrator, isn't that something you

6    personally would like to know?

7        A.    Well, as deputy regional administrator, I

8    work directly for the allowance holder, who has sole

9    responsibility for the assignment of the funds

10   officer responsibility in a region.  I know

11   categorically and definitively from her that she has

12   delegated the funds officer status to Martin Hines

13   throughout her tenure as regional administrator.

14   And in his absence, that that function is assigned

15   to his first line and then subsequently to a second

16   line supervisor.  Since the allowance holder has the

17   sole utterance that bears on this, I --

18       Q.    So you don't care.  You don't care what

19   information Mr. Pedicini might provide.  If Frances

20   Zorn says she doesn't want him as alternate funds

21   officer, that's all you need to know; is that right?

22       A.    She has the sole authority to designate the

23   funds officer.  And she has the first and the last

24   word on that.

153

1    Q.    And how do you know that?

2    A.    That's long established practice that I've

3    confirmed in conversations with my regional

4    administrator and with people in the budget office.

5    Q.    In the national budget office?

6    A.    Uh-hum.

7    Q.    Including Jonathan Lash?  Have you spoken

8    to him about it?

9    A.    Jonathan Lash doesn't have standing in this

10   issue.

11   Q.    He has no standing whatsoever?

12   A.    He has no standing on the assignment of

13   funds officer.

14   Q.    What about Larry Blim?  Does he have any

15   standing on this matter?

16   A.    The budget officer has -- ultimately, it's

17   the deputy for financial management who would assign

18   this authority to the allowance holders.

19   Q.    And what's Mr. Blim's position?

20   A.    He's the director of the accounting

21   division.

22   Q.    Does Mr. Blim have any authority with

23   respect to this matter?

24   A.    No.

154

1     Q.    To your knowledge.

2     A.    To my knowledge, no.

3     Q.    Who does have authority with respect to

4 this matter in the national office?

5     A.    I would say David Burr and Gary Maupin.

6     Q.    And what are their positions?

7     A.    David Burr is the director of the budge

8 office, office of budget; and Gary Maupin is the

9 deputy administrator for financial management.

10    Q.    Have you spoken to either David Burr or

11 Gary Maupin as to whether John Pedicini ever had

12 alternate funds officer -- ever held the alternate

13 funds officer position?

14    A.    I have not had that conversation with them.

15    Q.    Do you know whether Frances Zorn has had

16 that conversation?

17    A.    I believe she has.

18    Q.    Has she told you she had that conversation

19 with him?

20    A.    I believe that's a fair account of the

21 discussion that we've had.

22    Q.    And she told you that both of them said

23 that -- what did she tell you about that

24 conversation she had?

155

1      A.    That that conversation confirmed that
2   allowance holders within the agency have exclusive
3   authority to establish funds officer status in their
4   area of responsibility.
5      Q.    So that Douglas MacAllister never had the
6   authority to establish funds officer authority; is
7   that correct?
8           MR. WILMOT:   Objection.
9      Q.    To your knowledge.
10      A.    She could have delegated that -- the
11   identification of that to him.
12      Q.    Absent a delegation by the regional
13   administrator, would Mr. MacAllister have the
14   authority to delegate to others the function of the
15   funds officer?
16      A.    He would have that authority through
17   delegation from the regional administrator.
18      Q.    Only through delegation; is that right?
19      A.    She has the authority to designate a funds
20   officer, so she would need to delegate that to Doug.
21      Q.    So if Frances Zorn or her predecessor had
22   not delegated that authority to Doug MacAllister,
23   then he would not have the authority; is that
24   correct?

156

1      A.    Say that one again.

2      Q.    If Frances Zorn or her predecessor, as the

3    regional administrator, had not delegated to Douglas

4    MacAllister the authority to appoint funds officer

5    duties, then Mr. MacAllister would not have the

6    authority to make such appointments, correct?

7      A.    His authority would come from her

8    delegation.

9      Q.    And only through her delegation, to your

10   knowledge?

11     A.    To my knowledge.

12     Q.    Do you know whether John Pedicini received

13   the authority as backup funds officer through

14   delegation at any point in time from the regional

15   administrator?

16     A.    Not to my knowledge.

17     Q.    Do you know whether the regional

18   administrator delegated that authority to John

19   Ghiorzi or Douglas MacAllister?

20     A.    I am not certain of that.

21     Q.    Do you know whether the regional

22   administrator had delegated that authority to Arthur

23   LeBlanc?

24     A.    I don't know the answer to that.

157

1     Q.   So you don't know whether or not any of

2   these individuals had the authority to appoint John

3   Pedicini backup funds officer, correct?

4     A.   I don't know what delegations that regional

5   administrators have made.  I'm just not familiar

6   with what they might have been in the past.

7     Q.   So since you don't know who may have had

8   the authority to delegate this position to Mr.

9   Pedicini, don't you think it would be a good idea to

10   ask him what evidence he has about having received

11   this authority?

12     A.   See the documentation and see what it is.

13     Q.   So you agree, then, it would be a good idea

14   for you personally to receive this documentation

15   from Mr. Pedicini, so you can review it, correct?

16         MR. WILMOT:  Objection.  You may answer.

17     Q.   I'm asking whether you would like to at

18   this point receive the documentation that Mr.

19   Pedicini has regarding his appointment as backup

20   funds officer based on the information you now have.

21     A.   I think whatever information bears on this

22   case should be on the table.

23     Q.   Okay.  So if Mr. Pedicini at this point in

24   time were to present you with this evidence, would

158

1  this be something that you would review?

2      A.    I'll review anything that's on the table

3  that's pertinent to this case.

4      Q.    And if he were to satisfy you that he in

5  fact was properly appointed backup funds officer,

6  would that change your position with respect to his

7  use of that title?

8      A.    The current funds officer as designated by

9  the allowance holder is Martin Hines.  The

10 responsibilities of that position in his absence are

11 assigned to his first line supervisor and to Douglas

12 MacAllister.  I can't testify encyclopedically to

13 all history.  I know that for as long as

14 documentation is available, which goes back, I want

15 to say, ten years, that has been the line of

16 delegation.

17     Q.    So it really doesn't matter to you whether

18 Mr. Pedicini had been appointed alternate funds

19 officer in the past?

20     A.    I don't know what has been done in the

21 past.  What I know is in the period throughout our

22 current documentation, going back a decade, there

23 has been an unchanging structure of delegation.

24     Q.    And if he were to have had this delegation,

159

1   it's okay with you that it's now been taken away?

2       A.   It's not been taken away.  It hasn't

3   existed, so --

4       Q.   Well, you don't know whether it's existed

5   or not, do you?

6       A.   Well, by examination of documents and

7   discussion with the people who are in a position to

8   take action on this delegation, I would say, No, I'm

9   confident that he has not been and is not the

10  alternate funds officer.

11      Q.   Yet, you refuse to see the documentation

12  that he says he has --

13          MR. WILMOT:  Can we take a quick break.  I

14  have to call my office.

15          (Off the record)

16  BY MR. CATAPANO-FRIEDMAN:

17      Q.   I've now presented Mr. Canavan with

18  Plaintiff's Exhibit 24, which is a series of emails

19  from John Pedicini and I believe from Joe Stanco.

20  And is there anybody else who has sent emails in

21  this document, Mr. Canavan?

22      A.   (Witness reviews document)

23          MR. CATAPANO-FRIEDMAN:  I'm asking Mr.

24  Canavan if he recognizes these emails, because I

# EXHIBIT G

1

Volume I
Pages 1 to 208
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
         Plaintiff,             :
                                 :
     vs.                         :   Civil Action
                                 :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                     :
         Defendants.            :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF FRANCES E. ZORN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Monday,
June 6, 2005, commencing at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.


        (Continued on Next Page)

105

1     Q.   Do you know whether John Pedicini has fund

2   certification authority?

3     A.   He does not.  And by that, I mean, he is

4   not delegated authority as the budget officer or an

5   alternate in the budget officer role.

6     Q.   Do you know whether John Pedicini ever

7   obtained the title of alternate funds officer

8   during --

9     A.   He did not.

10     Q.   He did not.  He never did?

11     A.   That's correct.

12     Q.   And it never came to your attention that he

13   had obtained this title?

14     MR. WILMOT:  Objection.

15     A.   The funds officer position is one that is

16   delegated from the regional administrator.  And I

17   sign letters of delegation, and they have been

18   consistently to Martin Hines and with alternates

19   being the first and second line supervisors.

20     Q.   Has John Pedicini ever held the title of

21   backup funds officer?

22     A.   There is no such title.

23     Q.   So there's no such title that you have

24   approved for John Pedicini, correct?

106

1      A.    He has a title.

2      Q.    All right.  Well, what is his title?

3      A.    His title is financial management

4   specialist.

5      Q.    Okay.  What about Martin Hines?  Does he

6   have the title of funds officer?

7      A.    He does.

8      Q.    Does he also have the title of budget

9   analyst?

10     A.    His position description I think is called

11  "budget officer" or something like that.

12     Q.    Budget analyst or funds officer; are they

13  interchangeable?

14     A.    No, they're not.

15     Q.    They're not interchangeable, funds officer

16  and budget analyst?

17     A.    The funds officer is delegated through the

18  agency.  He has delegation authority from me through

19  a letter of delegation.

20     Q.    And what about the position of budget

21  analyst?

22     A.    That is a classification of a job within

23  the federal personnel system.

24     Q.    Okay.  And was that a classification used

107

1    to describe Martin Hines' job with your agency?

2        A.    It can be.  But he has been given a

3    specific delegated role, called "funds officer."

4        Q.    In addition to being a budget analyst?

5        A.    Yes.

6        Q.    And does Mr. Hines have fund certification

7    authority?

8        A.    He certifies that funds are available in

9    order to release funds in our financial systems.

10       Q.    Okay.  And who else has that authority

11   within your agency, within your region?

12       A.    Marty is the primary person, Martin Hines.

13       Q.    Okay.

14       A.    And if he is unavailable, it is his

15   supervisor, Mike Malone, or it is Doug MacAllister,

16   the financial management director.

17       Q.    Okay.  And then at some point in time did

18   Mr. Stanco have that authority as well?

19       A.    He did, as the first line supervisor.

20       Q.    And each of these people received that

21   authority by your designation?

22       A.    A letter of delegation, yes.

23       Q.    A letter of delegation from you?

24       A.    Yes.

108

1    Q.    So you have the authority to certify funds?

2    A.    In theory.

3    Q.    In theory, but not in practice?

4    A.    Right.

5    Q.    Because you don't know how to do it, right?

6    A.    Well, I'm the executive in charge.  I'm not

7    the person who is operating our account systems and

8    certifying that the funds are available.  It's a

9    function of our internal controls procedure.

10    Q.    Okay.  And you never delegated this

11    authority to John Pedicini, correct?

12    A.    I did not.

13    Q.    But John Pedicini has certified funds for

14    your agency on occasion, has he not?

15        MR. WILMOT:  Objection.

16    A.    If he's done so, he's done so without

17    authority.

18    Q.    Without authority from you?

19    A.    Right.

20    Q.    And you do know that John Pedicini knows

21    how to certify funds, don't you?

22        MR. WILMOT:  Objection.

23    A.    Knowing how and being authorized to do so

24    are two different things entirely.

109

1    Q.    Okay.  To your knowledge, does Mr. Pedicini

2  know how to certify funds?

3    A.    Well, actually, I don't know whether he

4  does know or not.

5    Q.    You don't.  You have no knowledge one way

6  or the other?

7    A.    Right.

8    Q.    Do you have any information on whether John

9  Pedicini knows how to certify funds from somebody

10  else?

11    A.    Like what kind of information?

12    Q.    Has anybody told you within your agency

13  whether John Pedicini knew how to certify funds?

14    A.    I don't think so.

15    Q.    So you never had a discussion with Martin

16  Hines about this?

17    A.    Not that I'm recalling.

18    Q.    And you never had a discussion with Douglas

19  MacAllister about this?

20    A.    Only to the extent that -- you know, where

21  the letter of delegations are coming from.  You

22  know, the process and sort of the chain of who would

23  be the primary and who would then --

24    Q.    Okay.  Can you tell me about what

110

1    conversations you had with Douglas MacAllister about

2    who should certify funds.

3        A.    When he came to me with letters of

4    delegation, he explained to me that the way that we

5    had been doing the process of delegation of the

6    funds officer role was long-standing and predated my

7    appearance at the region, and that it had always

8    been a funds officer, backed up by the supervisory

9    chain.

10       Q.    Okay.  And did Douglas MacAllister tell you

11   since he was part -- when did Douglas MacAllister --

12   what's his position?

13       A.    He's the financial management director.

14       Q.    And when did he assume that position in

15   your organization?

16       A.    I'm not entirely sure when, but it predated

17   my arrival at the region by a number of years.

18       Q.    So he was there in 1996, when you got

19   there, right?

20       A.    Yes.

21       Q.    And the information you got from him was

22   that Marty Hines certified funds, as did --

23   historically, as did his supervisors, Marty Hines'

24   supervisors, correct?

111

1      A.    Well, the information I had was that it was

2    rarely needed.    It was a rare occasion when

3    something needed to be signed outside of Martin

4    Hines' signature.

5      Q.    Okay.

6      A.    That usually we could wait until he was

7    back.

8      Q.    Okay.    But in those rare instances, it was

9    the supervisor --

10     A.    It was the supervisor or the financial

11   management director, Doug, himself.

12     Q.    Okay.    So it would be either Doug in his

13   absence or the immediate supervisor, which would be

14   when you arrived, that was Ghiorzi -- no.    It was

15   LeBlanc?

16     A.    It was LeBlanc.

17           MR. WILMOT:    Objection.

18     Q.    Art LeBlanc.    So at that time it was either

19   MacAllister or LeBlanc, correct?

20     A.    Yes.

21     Q.    And it was your understanding that both of

22   them had been designated and delegated the authority

23   to certify funds before you arrived, correct?

24     A.    Yes.

112

1    Q.    And did it ever come to your attention that

2    Mr. MacAllister had not been authorized to certify

3    funds previously?

4    A.    No.

5    Q.    That never came to your attention?

6    A.    No.

7    Q.    Well, did you ever feel the need to

8    delegate certification authority to Douglas

9    MacAllister?

10    A.    I have delegated it and redelegated it --

11    or reinforced it through a second letter, just sort

12    of a resumption -- I'm not using the right word.

13    Once in a while you reup it, the certification.

14            MR. CATAPANO-FRIEDMAN:  Could I have these

15    marked as Plaintiff's Exhibit 7 and 8.  And this

16    will be whatever the next one is.  And I've got

17    three more.

18                    (Documents marked as Plaintiff's

19                     Exhibits 7 through 13

20                     for identification)

21    Q.    What's an allowance holder?

22    A.    It's the term we use in the Food and

23    Nutrition Service to allot money to -- we allot

24    money to various organizations.  The regions are one

1    Q.    It's some other alternate funds officer?

2    A.    That it's an alternate capacity to input

3  data into the -- in this case, FFIS system, the

4  accounting system.  It does not mean that it is --

5  only the funds officer can release the funds,

6  ultimately.

7    Q.    So even though Mr. Pedicini is listed as

8  alternate funds officer on this list, it could be

9  for a different purpose than being the alternate

10  funds officer for certifying purposes; is that

11  correct?

12    A.    In terms of what was delegated -- what

13  we've been talking about in the letters that I use

14  to delegate?

15    Q.    Correct.

16    A.    This is something entirely different.

17    Q.    Something entirely different.  So even

18  though you did not delegate Mr. Pedicini alternate

19  funds officer duties, he may have had them in a

20  different context; is that right?

21          MR. WILMOT:    Objection.

22    Q.    You can answer the question.

23    A.    He had responsibilities to input

24  information into our accounting system that would be

136

1   later certified for release by our budget officer,

2   our funds officer.

3       Q.   And that's what this means here on this

4   list?

5       A.   That's what I would read it as.

6       Q.   And did Mr. MacAllister also have

7   responsibility to input information into the FFIS

8   NERO system that would later be used by the funds

9   officer?

10      A.   This is a contingency plan, so yes.  In a

11  contingency, he could.  And since --

12      Q.   And Stanco can do that, too, in a

13  contingency, right?

14           MR. WILMOT:  If she's answering the

15  question, could you let her finish her answer before

16  you --

17      Q.   Sure.  I'm sorry, I didn't mean to cut you

18  off.  Go ahead and finish your answer.

19      A.   But since Doug was also an alternate to the

20  funds officer, he could certainly certify them

21  himself without Marty.

22      Q.   Okay.  Now, is this information you have to

23  your knowledge or are you speculating on an

24  alternative meaning to the "alternate funds officer"

# EXHIBIT H

1

Volume I
Pages 1 to 57
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                  :
JOHN G. PEDICINI,                 :
          Plaintiff,              :
     vs.                          :   Civil Action
                                  :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and     :
ANN M. VENEMAN, SECRETARY,        :
UNITED STATES DEPARTMENT OF       :
AGRICULTURE,                      :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF ARTHUR J. LeBLANC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston, Massachusetts,
on Thursday, June 23, 2005, commencing at 1:25 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Gina Y. Walcott-Torres, Assistant
          United States Attorney) United States
          Courthouse, 1 Courthouse Way, Suite 9200,
          Boston, MA  02210, for the Defendants and
          the Deponent.

Also Present: John G. Pedicini
              Salama Abdurrahim, summer intern.

8

1    Q.    What was his position?

2    A.    He was the funds officer.

3    Q.    As the funds officer, what did Marty Hines

4    do?

5    A.    He was responsible for the FPA, the

6    administrative funds that were given.

7    Q.    As part of his responsibilities did he

8    certify funds, the availability of funds?

9    A.    Administrative funds, yes.

10    Q.    Who was Mr. Hines's backup in certifying

11    funds?

12        MS. WALCOTT-TORRES:    Objection.

13    Q.    Did Mr. Hines have a backup in certifying

14    funds?

15    A.    Yes.

16    Q.    Who was Mr. Hines's backup in certifying

17    funds?

18    A.    When I was chief, I was the backup.

19    Q.    Was there anybody else who was backup?

20        MS. WALCOTT-TORRES:    With respect to

21    certifying the funds?

22    Q.    With respect to certifying funds.

23    A.    Yes.    After me would be Douglas

24    MacAllister.

17

1    another backup and you don't remember that, correct?

2            MS. WALCOTT-TORRES:  Objection.  Asked and

3    answered.  The witness has said he does not remember

4    that.

5        Q.    You can answer the question.

6        A.    It's possible.

7        Q.    And it is also possible that you appointed

8    Mr. Pedicini as backup funds officer to back up Mr.

9    Hines in certifying the availability of funds and

10   you don't remember that, correct?

11           MS. WALCOTT-TORRES:  Objection.

12       A.    I disagree.  I believe I'd remember that.

13       Q.    But it is possible you don't remember that?

14       A.    Anything is possible.

15       Q.    Sure.  That's seven years ago, and you

16   remember everything that happened to you seven years

17   ago, correct?

18           MS. WALCOTT-TORRES:  You can answer.

19       A.    I don't remember everything that happened

20   seven years ago.

21       Q.    You stated that you were appointed by Mr.

22   MacAllister to back up Mr. Hines on funds

23   availability certifications, correct?

24       A.    Right.

48

1       A.    Yes.

2       Q.    You just don't know what an FPA backup is?

3       A.    Yes, that's true.

4       Q.    This is a term you never saw before,

5   correct?

6       A.    Right.

7       Q.    This is the first time, as I show you this

8   list?  You have never seen that terminology used

9   before, correct?

10      A.    Right.

11      Q.    Do you know the name John Lash?

12      A.    He is from headquarters.  Yes.

13      Q.    Who is he?

14      A.    I know he is an FM.  I'm not sure what his

15  role is.

16      Q.    But he is from headquarters?

17      A.    Right.

18      Q.    If John Lash said that John Pedicini was an

19  FPA backup with the authority to certify the

20  availability of funds, would he have any reason to

21  lie, to your knowledge?

22            MS. WALCOTT-TORRES:  Objection.

23      A.    Again, I don't know that he would have any

24  reason to lie.  I just don't know that he is

49

1    authorized to say that.

2        Q.    Okay.  So if he said that, you would

3    question his authority, correct?

4        A.    I would, yes, because in my tenure the only

5    one that can designate the FPA officer in NERO is

6    the regional administrator.

7        Q.    The regional administrator being Frances

8    Zorn when you were there?

9        A.    Right.

10        Q.    So Mr. MacAllister's appointment of you in

11    1995 was not authorized, then?

12        A.    I don't know that it was.  I'm not sure.  I

13    have only shown you two documents.  There are other

14    documents where I believe it was delegated to me

15    from Fran.  I just don't have the document.

16        Q.    So you have no other document where you get

17    a direct --

18        A.    I don't personally.

19            MS. WALCOTT-TORRES:  One at a time.

20        Q.    You have no document?

21        A.    I have no document.

22        Q.    You don't know for sure whether such a

23    document exists, correct?

24        A.    I believe it does, but I don't have it and

53

1    ability to delegate from Fran Zorn the authority to

2    certify the availability of funds?

3            MS. WALCOTT-TORRES:  Objection.  Asked and

4    answered a number of times.

5        Q.    "Yes" or "no"?

6        A.    I think my answer is there were no others

7    other than Doug and myself.

8        Q.    Okay.  That's fine.

9            MR. CATAPANO-FRIEDMAN:  Could we have a

10   minute, please.

11           (Recess taken)

12           MS. WALCOTT-TORRES:  Did you suspend,

13   conclude, rest?

14           MR. CATAPANO-FRIEDMAN:  Pending follow-up.

15           MS. WALCOTT-TORRES:  Gina Walcott-Torres,

16   Assistant United States Attorney, for the Defendant.

17                   CROSS EXAMINATION

18   BY MS. WALCOTT-TORRES:

19       Q.    Mr. LeBlanc, to your knowledge or at least

20   during your tenure, was there ever a position,

21   either alternate funds officer or backup funds

22   officer?

23       A.    Not that I am aware of.  No, there wasn't.

24       Q.    And would you have known if such a position

54

1    existed in your role?

2        A.    Yes.

3        Q.    Why is that?

4        A.    I was a section chief over that unit.

5        Q.    Mr. LeBlanc, you were shown Plaintiff's

6    Exhibit 10 a few moments ago by Attorney

7    Catapano-Friedman, and attention was drawn to the

8    column marked "FPA Backup."  Have you ever heard of

9    a position called an "FPA Backup"?

10        A.    No, not in name.  I know there are people

11    there to do backup work.  But no, I have not.

12        Q.    Was John Pedicini during your tenure

13    ever -- did he ever hold a title of "FPA Backup"?

14            MR. CATAPANO-FRIEDMAN:    I am going to

15    object.  But you can answer the question.

16        A.    No.

17        Q.    In fact, "FPA Backup" could be a

18    descriptive name referring to someone providing

19    support or assistance to the FPA officer and not a

20    formal title; isn't that right?

21            MR. CATAPANO-FRIEDMAN:    Objection.

22        A.    I agree.

23        Q.    And as section chief of that unit, wouldn't

24    you have been aware if anyone other than yourself

55

1    and Mr. MacAllister and Mr. Hines had been provided

2    with certification authority?

3            MR. CATAPANO-FRIEDMAN:   Objection.

4       A.   Yes.

5       Q.   And to your knowledge, during that time no

6    one else other than you, Mr. MacAllister, and Mr.

7    Hines had certification authority in your unit; is

8    that right?

9            MR. CATAPANO-FRIEDMAN:   Objection.

10      A.   Yes.

11           MS. WALCOTT-TORRES:   No further questions.

12           MR. CATAPANO-FRIEDMAN:   We will just move

13   on to the video conference.   We are done on this

14   one.

15           MS. WALCOTT-TORRES:   Once again, this time

16   briefly I would like to reserve the right for

17   Assistant U.S. Attorney Damian Wilmot to come back

18   and ask questions, should the need arise, of Mr.

19   LeBlanc.

20           MR. CATAPANO-FRIEDMAN:   Sure.

21                (Whereupon, the deposition was

22                suspended at 2:50 p.m.)

23

24

# EXHIBIT I

1

Volume I
Pages 1 to 214
Exhibits 32 - 46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                       :
JOHN G. PEDICINI,        :
        Plaintiff,    :
                       :
      vs.            :  Civil Action
                       :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and :
ANN M. VENEMAN, SECRETARY,   :
UNITED STATE DEPARTMENT OF    :
AGRICULTURE,              :
        Defendants.   :
                       :
- - - - - - - - - - - - - - - - - -x

       DEPOSITION OF MICHAEL D. MALONE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 8, 2005, commencing
at 11:30 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

(Continued on next page)

140

1 A. Yes, I do.

2 Q. Is this the cover sheet to the leave

3 without pay analysis that is attached to Plaintiff's

4 Exhibit 20?

5 A. Yes, it is.

6 Q. And on this cover sheet, who does it say

7 the analysis is from?

8 A. John G Pedicini.

9 Q. Does it say anything else?

10 A. Beside his name is has "alternate funds

11 officer-NERO."

12 Q. Alternate funds officer-NERO, was that a

13 title that Mr. Pedicini was entitled to use in your

14 opinion?

15 A. No, it was not.

16 Q. Was that one of the reasons why the front

17 office and you found the leave without pay analysis

18 objectionable?

19 MR. WILMOT:  Objection.  You can answer.

20 A. Yes.

21 Q. Just to make it clear, what you found

22 objectionable was the use by Mr. Pedicini of the

23 title alternate funds officer-NERO?

24 MR. WILMOT:  Objection.  You can answer.

167

1   this particular E-mail?

2       A.    He's disagreeing with all statements in my

3   memo dated October 22, 2004.

4       Q.    And is there something in particular that

5   he is objecting to in this particular E-mail?

6       A.    The objection appears to be with the fact

7   that my initial response was that the designation of

8   alternate funds officer came from the system, the

9   FFIS system.  He's saying that that was incorrect

10  and that he has sent information to his legal

11  counsel.

12      Q.    Well, I don't think it exactly says that.

13  Would you just read Paragraph 2 into the record.

14      A.    Yes.  "Please be advised that I have

15  written proof that I have been the Alternate Funds

16  Officer for NERO for 6 years with certifying rights.

17  The designation does not come from 'a system' as you

18  incorrectly stated in your memo.  Those documents,

19  along with this memo and other 'letters of

20  instruction from you,' have been forwarded to my

21  legal counsel."

22      Q.    Did you ask Mr. Pedicini what documents he

23  has showing that he is an alternate funds officer?

24      A.    No, I did not.

168

1     Q.   Why didn't you ask him for that

2  documentation?

3     A.   Because I knew his official job title and

4  it was not alternate funds officer.  If he felt the

5  need to provide information to me, he could

6  certainly do so.

7     Q.   Did you tell him that?

8     A.   No, I did not.

9     Q.   Did you receive documentation from

10  Mr. Pedicini on this issue?

11     A.   Not to my knowledge.

12     Q.   I'd like to show you Plaintiff's Exhibit 10

13  and see if you recognize this document.

14     A.   Yes, I do.

15     Q.   Do you know who prepared this document?

16     A.   This particular document, no, I do not.

17  The date on this is 1/26/99.  It's prior to me

18  assuming my current position.

19     Q.   But you said you recognize it.  How do you

20  recognize this document?

21     A.   I recognize it in the fact that in a

22  similar form it is a document that is produced by

23  headquarters based on input from the regions and

24  their own knowledge as far as the funds officers in

# EXHIBIT J

1

Volume I
Pages 1 to 61
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
          Plaintiff,            :
     vs.                        :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - - -x

          VIDEOCONFERENCE DEPOSITION OF PARIDE MONTI
f/k/a JOSEPH STANCO, a witness called on behalf of
the Plaintiff, taken pursuant to the Federal Rules
of Civil Procedure, before Daniel P. Wolfe,
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Offices of Doris O. Wong Associates, 50 Franklin
Street, Boston, Massachusetts, on Thursday, June 23,
2005, commencing at 3:25 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Gina Y. Walcott-Torres, Assistant
          United States Attorney) United States
          Courthouse, 1 Courthouse Way, Suite 9200,
          Boston, MA 02210, for the Defendants.

Also Present: John Pedicini
              Salama Abdurrahim, summer intern.

9

1  availability of funds; is that correct?

2        A.    If you don't confirm what I am asking, I

3  will say yes, I do not understand your question.

4        Q.    Did a fellow by the name of Marty Hines

5  report to you when you were at FNS?

6        A.    Yes.

7        Q.    What was his job title?

8        A.    Budget officer, I believe.

9        Q.    Do you know what functions he performed as

10  budget officer?

11        A.    Administering the budget for the region.

12        Q.    Did he also certify the availability of

13  funds?  Did he function in that capacity?

14        A.    Certifying the availability of operational

15  funds.

16        Q.    Okay.  And did John Pedicini act as his

17  backup in certifying the availability of operational

18  funds when you were section chief?

19              MS. WALCOTT-TORRES:  Objection.  You may

20  answer.

21        A.    That was always an unclear point.  And I

22  believe that Mr. Pedicini was never assigned to

23  certifying funds for him specifically.

24        Q.    Nevertheless, did Mr. Pedicini certify

10

1   operational funds on occasion while you were a

2   section chief?

3           MS. WALCOTT-TORRES:  Objection.  You may

4   answer.

5       A.    I cannot remember any time, specific time

6   that Mr. Pedicini certified funds for Mr. Hines.

7   Basically it was really my job to certify in the

8   absence of Mr. Hines.

9       Q.    Did you have training in certifying the

10  availability of funds?

11      A.    Yes.

12      Q.    Where did you get this training?

13      A.    Again, throughout my career as a civil

14  servant in the government, I had the best experience

15  in certifying funds availability.

16      Q.    Who gave you the authority to certify the

17  availability of funds while at FNS?

18      A.    I believe it was a memo or a letter that

19  officially assigned these duties to me.

20      Q.    Who did that memo come from?

21      A.    I'm not sure at this point exactly who the

22  issuer was.

23      Q.    Okay.  Can you tell me what the process was

24  at FNS for certifying the availability of funds

11

1  while you were there?

2      A.    I had knowledge reported to me by Mr. Hines

3  of the status of funds being obligated, and when

4  presented with a document requiring funding, I will

5  evaluate.  And if funds were available, I would

6  certify.

7      Q.    Okay.  Did you review any documentation

8  before you certified the availability of funds?

9          MS. WALCOTT-TORRES:  Counselor, at what

10  time, or just in general?

11          MR. CATAPANO-FRIEDMAN:  In general, the

12  process.

13      Q.    Did the process entail your reviewing any

14  documentation before you certified funds?

15      A.    Let me repeat.  When presented with a

16  document to be certified requesting funds for some

17  specific purchase or reason, I would go back to the

18  reports that Mr. Hines would present to me as far as

19  the status of funds.  And based on those reports

20  which showed whether funds were available or not and

21  how much, I would then evaluate the document

22  presented to me and will make a decision whether to

23  certify or not.

24      Q.    Were these reports in hard copy or were

15

1 positive on this.

2     Q.   Okay.  Now, if you couldn't find the stamp

3 involved, would you certify funds anyway, or would

4 you wait until Mr. Hines came back to the office to

5 do it?

6     A.   I'd probably certify anyway.  I don't

7 think -- again, even the existence of a stamp or

8 not, I'm not clear.  But to me really what it meant

9 was -- the signature was the main act.

10     Q.   Who else in the office had the authority to

11 certify the availability of funds besides you and

12 Mr. Hines?

13     A.   My supervisor.

14     Q.   Who is that?

15     A.   MacAllister.  Mr. MacAllister.

16     Q.   Anybody else?

17     A.   I believe in that department probably we

18 are the only two in place of Mr. Hines.

19     Q.   Do you know what IAS -- the IAS system is?

20     A.   Say again.  The --

21     Q.   IAS system.

22     A.   Again, you have to forgive me, but I tend

23 to confuse -- it all sounds familiar, I mean in the

24 sense I heard it before.  But at this time I may

18

1      A.    I think I said that.  But what I mean is
2    that I think Mr. Pedicini implied or at the time
3    made statements that he had the authority.  But as
4    far as I remember, there was never any document
5    showing that he had the authority.  So by "unclear"
6    I mean there was objection.  So I think just that.
7      Q.    As you sit here today, Mr. Stanco, are you
8    telling me you never saw a document that Mr.
9    Pedicini showed you that indicated he did have
10   certification authority?
11          MS. WALCOTT-TORRES:  Objection.
12     A.    Yes.  I don't remember any document, yes.
13     Q.    You don't remember him providing you any
14   document that stated he was a backup funds officer
15   to Mr. Hines?
16          MS. WALCOTT-TORRES:  Objection.
17     A.    Yes.
18     Q.    Do you recall such a document?
19     A.    No, I don't recall such a document.
20     Q.    The name Mr. Lash, does that mean anything
21   to you?
22     A.    Lash?
23     Q.    Lash, L-a-s-h, in headquarters.
24     A.    This sounds -- it sounds like a name I

19

1    heard before, yes.

2         Q.    Did Mr. Pedicini show you a document from

3    Mr. Lash that stated that Mr. Pedicini was a backup

4    funds officer and had funds certification

5    availability authority?

6              MS. WALCOTT-TORRES:   Objection.

7         A.    You want me to answer the question?

8         Q.    Yes.

9         A.    No, I don't remember such a document.

10        Q.    You don't remember Mr. Pedicini sending you

11   e-mails stating that Mr. Lash had sent him a

12   document that verified his backup funds officer

13   status?

14             MS. WALCOTT-TORRES:   Objection.   You may

15   answer.

16        A.    I do remember that Mr. Pedicini made

17   various insinuations about certain things existing.

18   But I haven't seen any document that I can recollect

19   that stated that Mr. Pedicini was backup for

20   certifying funds.

21        Q.    I am going to read to you -- I am going to

22   show to you and read to you what is marked

23   Plaintiff's Exhibit 11.   This is an e-mail from John

24   Pedicini to you.   Can you see this document?