UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,                    :
                                     :
          Plaintiff,                 :
                                     :
     v.                              :
                                     :   Case No. 04-12395 JLT
UNITED STATES OF AMERICA,            :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE, AND LINDA               :
SPRINGER, DIRECTOR, UNITED           :
STATES OFFICE OF PERSONNEL           :
MANAGEMENT,                          :
                                     :
          Defendants.                :

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO
DEPOSE ADDITIONAL WITNESSES, MAKE DISCOVERY REQUESTS,
<u>AND EXTEND THE DISCOVERY PERIOD</u>**

In addition to his October 19, 2005 motion for leave to depose three additional witnesses (<u>see</u> Docket Entry Nos. 35 and 36), Plaintiff now moves for leave to depose two more witnesses and to serve document requests. He also requests that the Court extend the discovery period. As stated previously, Plaintiff has deposed numerous people for multiple days, causing the government to expend an exorbitant amount of money in fees and costs. The Court, therefore, should deny Plaintiff's motion because he has taken an adequate number of depositions already and the additional depositions will unduly burden the defendants. The Court should also deny Plaintiff's motion to serve document requests on the Defendants seeking postings and other documentation within the United States Department of Agriculture, Food and Nutrition Service, North East Regional Office ("FNS-

NERO") from 1999 through the present because the burden and expense of the Plaintiff's proposed discovery outweighs its likely benefit.  Indeed, the Plaintiff <u>never</u> exhausted administratively the alleged discrete acts of retaliation (i.e., failure to promote) that he is now trying to pursue in this Court.  Further, this information is irrelevant to the claims pending before the Court.  Finally, if the Court denies Plaintiff's motion for leave it should also deny his request to extend the discovery deadline as such an extension would be unnecessary.

ARGUMENT

**I.    THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT ADDITIONAL DEPOSITIONS**

    **A.    STANDARD OF REVIEW REGARDING ADDITIONAL DEPOSITIONS**

Rule 30(a)(2) of the Federal Rules of Civil Procedure, provides, in pertinent part:

> A party must obtain leave of court, which shall be granted to the extent consistent with the principles stated in Rule 26(b)(2) . . . if, without the written stipulation of the parties . . . a proposed deposition would result in more than ten depositions being taken under this rule . . . by the plaintiffs, or by the defendants, or by third-party defendants.

Fed. R. Civ. P. 30(a).  Rule 26(b)(2) provides, in relevant part, that discovery should be limited if the Court determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had

- 2 -

> ample opportunity by discovery in the action to obtain
> the information sought; or (iii) the burden or expense
> of the proposed discovery outweighs its likely benefit,
> taking into account the needs of the case, the amount
> in controversy, the party's resources, the importance
> of the issues at stake in the litigation, and the
> importance of the proposed discovery in resolving the
> issues.

Fed. R. Civ. P. 26(b)(2).  Further, Local Rule 26.1(c) provides,

in pertinent part:

> Discovery Event Limitations.  Unless the judicial
> officer orders otherwise, the number of discovery
> events shall be limited to each side . . . to ten (10)
> depositions . . . .

L.R. 26.1(c).

### B. PLAINTIFF SEEKS UNREASONABLY CUMULATIVE AND DUPLICATIVE DISCOVERY AND HAS ALREADY TAKEN AN ADEQUATE NUMBER OF DEPOSITIONS

Plaintiff wishes to depose Bruce Potvin, a co-worker of the

Plaintiff, and Roger Hamilton, a supervisor at FNS-NERO.

Plaintiff claims that the two proposed deponents will provide

testimony supporting his claim that FNS-NERO managers were

training the Plaintiff's co-workers on the Budget Analyst/Funds

Officer's functions so that one of them could replace the current

Budget Analyst/Funds Officer if and when the position became

vacant.  Plaintiff believes that prior to the period when FNS-

NERO began training his co-workers on these functions, he was the

heir apparent to the current Budget Analyst/Funds Officer, Martin

Hines.

Thus far, the plaintiff has deposed 13 people, ranging from

plaintiff's co-workers to senior management officials within the agency. Indeed, plaintiff deposed the Administrator of the USDA-FNS, a presidential appointee. During the majority of the depositions, plaintiff exhausted questions concerning the topics he wishes to question the three proposed deponents on. Indeed, Plaintiff already elicited ample testimony concerning FNS-NERO's reasons for training some of Plaintiff's co-workers on the Budget Analyst/Funds Officer functions. See Deposition of Robert Canavan, pages 97-118, attached hereto as Exhibit 1; Deposition of Douglas MacAllister, pages 3/7-3/14, 3/17-3/21, attached hereto as Exhibit 2; Deposition of Michael Malone, pages 77-80, attached hereto as Exhibit 3. Therefore, it is completely unnecessary to conduct further discovery as to the agency's reasons for providing this training.

Nothing revealed during the 13 previous depositions necessitates the two additional depositions on this subject matter. Plaintiff simply hopes that through additional fishing he eventually will discover testimony supporting his claims. The discovery plaintiff seeks is unreasonably cumulative and duplicative of the testimony now on record, and, furthermore, he clearly has had ample opportunities to obtain information on these topics. As such the Court should deny the plaintiff's motion for leave.

## C.   THE TWO ADDITIONAL DEPOSITIONS WILL UNDULY BURDEN THE DEFENDANTS

Plaintiff took multiple days to complete some of his depositions.  In all, the plaintiff's depositions took ten days and approximately 75 hours.  Based on a billable rate of $265 per hour, the government's reasonable attorney's fees for defending the depositions amount to $19,875.[1]  Further, the government has expended $4,698.95 on the transcripts of plaintiff's deposition. Plaintiff's depositions have taken up a considerable amount of time, and have caused the United States to expend a considerable amount of resources.  Because the burden and expense of the proposed depositions outweighs their purported benefit, the Court should deny the plaintiff's motion.

## D.   THE PROPOSED DEPOSITIONS OF POTVIN AND HAMILTON WILL BE FUTILE

Plaintiff essentially claims that FNS-NERO will retaliate against him in the future by not promoting him to the Budget Analyst/Funds Officer position, which is currently filled.  As an initial matter, Plaintiff admittedly failed to exhaust his administrative remedies concerning this claim, barring the Plaintiff from asserting it with this Court.  See Deposition of John Pedicini ("Pedicini Dep."), page 108, attached hereto as Exhibit 4.  Moreover, this claim is clearly specious and

---

[1]The billable rate of $265 per hour is based on the undersigned counsel's billable rate from private practice, which he left a little over one year ago.

speculative.  Because it is not a viable claim, conducting additional depositions on this issue, like much of the 13 previous depositions, will be merely an exercise of futility and a needless waste of time and government resources.  Accordingly, the Court should deny the plaintiff's motion for leave to take the additional depositions.

**II.  THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR LEAVE TO SERVE A DISCOVERY REQUEST**

As stated above, Plaintiff requests an order permitting him to serve a document request on the defendants seeking copies of (1) postings issued by FNS-NERO for the Section Chief of the Financial Management Unit from 1999 through the present; (2) postings issued by FNS-NERO for a temporary Supervisory Financial Management Specialist in October 2005; and (3) all of the corresponding crediting plans and the corresponding internal and external lists ranking the applicants for each of the postings. Plaintiff seeks this information to support his claim that he applied to each of these postings and FNS-NERO management did not promote him to the vacant position in retaliation.  Similar to the proposed additional depositions discussed above, Plaintiff's proposed document request is unwarranted under Federal Rule of Civil Procedure 26(b)(2).

Prior to asserting a claim against the USDA of employment retaliation in violation of Title VII, the Plaintiff must first exhaust all administrative remedies.  <u>See</u>, <u>e.g.</u>, <u>Lebron-Rios v.</u>

- 6 -

U.S. Marshal Serv., 341 F.3d 7, 13 (1st Cir. 2003); Misra v. Smithsonian Astrophysical Observatory, 248 F.3d 37, 40 (1st Cir. 2001).  The EEOC has the responsibility to establish the mechanisms and deadlines for employees to initiate the administrative process for discrimination claims under Title VII. See 42 U.S.C. § 2000e-16(b).  Thereunder, the EEOC issued regulations providing that aggrieved employees must bring the discriminatory events to the attention of the EEO Counselor "within 45 calendar days of the date of the alleged discriminatory event, the effective date of an alleged discriminatory personnel action, or the date that the aggrieved person knew or reasonably should have known of the discriminatory event or personnel action."  29 C.F.R. § 1613.214(a)(1).  If the Plaintiff failed to initially contact the counselor within the 45-day term provided by the regulations, he loses his right to subsequently bring the suit in court.  See, e.g., Velazquez-Rivera v. Danziq, 234 F.3d 790, 794 (1st Cir. 2000); Martinez v. Runyon, 100 F.3d 213, 217 (1st Cir. 1996).  Each discrete act of discrimination or retaliation - which is immediately noticeable once it occurs, such as, failure to promote - must be the subject of a timely administrative complaint and exhausted administratively to be actionable in federal court.  See, e.g., Amtrak v. Morgan, 536 U.S. 101, 114-115 (2002).

Plaintiff never exhausted the numerous failure-to-promote

claims he is attempting to assert now before this Court. Plaintiff filed his first formal administrative complaint against the USDA with the EEOC on or about November 17, 2000.  See Exhibit 5.  The administrative complaint, which speaks for itself, shows that Plaintiff did not assert any claim for failure to promote.  Id.  He later filed a complaint with the United States District Court for the District of Massachusetts on or about September 13, 2001.  See Exhibit 6.  Again, the federal complaint shows that Plaintiff did not assert any claim for failure to promote.  Plaintiff subsequently withdrew this complaint in 2001.

With regard to the claims currently before this Court, Plaintiff first contacted an EEO Counselor on March 5, 2003.  See Exhibit 7.  He did not assert a claim for failure to promote. Id.  He filed his formal administrative complaint on March 25, 2003, and did not assert a claim for failure to promote.  See Exhibit 8.

On February 5, 2004, Plaintiff contacted an EEO Counselor by e-mail complaining of reprisal in the agency's selection process for a Financial Management Specialist position, which purportedly the agency posted from July 16, 2003, to August 29, 2003, and October 31, 2003, to December 5, 2003.  See Exhibit 9. Plaintiff, however, admittedly failed to file a formal administrative complaint with the EEOC alleging the same.  See

Pedicini Dep., pp. 94-95.

On June 17, 2004, Plaintiff again contacted an EEO Counselor by e-mail, this time complaining about an incident in which an employee asked Plaintiff to certify that funds were available for a procurement request and his supervisor told him that he could not make such a certification.  See Exhibit 10.  Plaintiff did not assert a claim for failure to promote.  Id.  He subsequently filed a formal administrative complaint of discrimination alleging the same on July 15, 2004, which did not include a claim for failure to promote.  See Exhibit 11.  Finally, after filing the instant action with this Court on November 12, 2004, Plaintiff filed another formal administrative complaint with the EEOC on November 23, 2004, claiming reduction of duties.  See Exhibit 12.  Plaintiff did not assert a claim for failure to promote.

Clearly, Plaintiff never exhausted administratively the failure to promote allegations that he is now attempting to pursue in this court.  Moreover, the allegations, purportedly dating back to 1999, are clearly untimely.  Because Plaintiff failed to exhaust the pertinent administrative steps with regard to these claims, his cause of action is limited to those retaliation allegations in his complaint that were previously the subject of his timely formal EEO complaints.  See Morales-Vallellanes v. Potter, 339 F.3d 9, 18 (1st Cir. 2003).

Recognizing that their failure to promote claim may be barred, Plaintiff cites to United States v. Evans, 431 U.S. 553 (1977), and Dormann v. San Francisco Fire Dep't., 46 Fed. Appx. 394 (9th Cir. 2002), for the axiom that a plaintiff may introduce time-barred acts as evidence to provide background information in support of his timely claims.  Plaintiff's reliance on this axiom is misplaced however.  More properly stated, a plaintiff may introduce time-barred acts as evidence to provide background information in support of his timely hostile work environment claim.  See, e.g., Amtrak, 536 U.S. at 115; Levine v. McCabe, 357 F.Supp.2d 608, 616 (E.D.N.Y. 2005).  The Plaintiff, however, cannot introduce an untimely discrete act of retaliation as evidence to support a timely discrete act of retaliation. Plaintiff's claims before the Court constitute discrete acts of retaliation - not hostile work environment claims[2] - and, therefore, he cannot introduce time-barred discrete acts as background evidence to support his claims.  Due to its irrelevance, the burden and expense of Plaintiff's proposed discovery request clearly outweighs its likely benefit.  See Fed.

---

[2]Despite how Plaintiff wishes to label his claims, discrete acts of retaliation are distinguishable from hostile environment claims and a plaintiff cannot use discrete acts of retaliation as grounds for a hostile environment claim.  See, e.g., Keeley v. Small, 391 F.Supp.2d 30, 50-51 (D.D.C. 2005); Brierly v. Deer Park Union Free Sch. Dist., 359 F.Supp.2d 275, 293 (E.D.N.Y. 2005); Lester v. Natsios, 290 F.Supp.2d 11, 33 (D.D.C. 2003); Parker v. State Dep't of Pub. Safety, 11 F.Supp.2d 467, 475 (D. Del. 1998).

R. Civ. P. 26(b)(2).  Accordingly, the Court should deny

Plaintiff's motion for leave to serve a document request seeking

documents pertaining to these barred claims.[3]

**CONCLUSION**

Accordingly, for the reasons articulated above, the Court

should deny plaintiff's motion for leave.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Damian W. Wilmot
DAMIAN W. WILMOT
Assistant U.S. Attorney
Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated: November 29, 2005

---

[3]If the Court denies Plaintiff's motion for leave it should
also deny his request to extend the discovery deadline as such
extension would be unnecessary.

# EXHIBIT 1

1

Volume I
Pages 1 to 195
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
                                :
     vs.                        :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF ROBERT L. CANAVAN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Tuesday,
June 7, 2005, commencing at 11:09 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA  02110, for
          the Plaintiff.


          (Continued on Next Page)

97

1    to continue to do his very fine job as funds officer

2    in the region.

3        Q.    Okay.

4            MR. CATAPANO-FRIEDMAN:  I'd like this to be

5    identified as the next plaintiff's exhibit.  Can you

6    mark all these as separate exhibits.

7                    (Documents marked as Plaintiff's

8                    Exhibits 18 through 25

9                    for identification)

10        Q.    Let's just go back here to Exhibit 17, Item

11    5.  Now, again, the reference to "possible Budget

12    Analyst vacancy."  I think you told me that you can

13    conjecture what that means, but you don't know; is

14    that right?

15            MR. WILMOT:  Objection.

16        Q.    Do you know what that means?  Do you have

17    specific knowledge as to what that refers to or are

18    you conjecturing?

19        A.    I see it as relating to Item 11, which is a

20    general context of training of a whole group of

21    financial management specialists by those who are

22    senior and more experienced financial management

23    specialists.  And other than that, I can't

24    conjecture what --

98

1    Q.    What it means.

2    A.    No.

3    Q.    Okay.  Did you meet with anybody

4  specifically on what was meant by the words in Item

5  5, "Possible Budget Analyst vacancy?

6    A.    After this meeting, I did meet with, as I

7  recall, with Mr. Malone, Mr. MacAllister, talked

8  about the meeting.

9    Q.    And did you discuss Item 5?

10    A.    Yes, we did.

11    Q.    And what was said during that discussion of

12  Item 5?

13    A.    That while the intent was sound and

14  consistent with our overall objective of building a

15  thorough succession planning, that to have mentioned

16  one individual position, given an opportunity to do

17  it over again, I think Mr. Malone would have -- he

18  probably would have only Item 11, which would have

19  incorporated Item 5.

20    Q.    So you reprimanded Mr. Malone for

21  separating out Items 5 and 11; is that correct?

22          MR. WILMOT:  Objection.  You can answer.

23    A.    No.

24    Q.    You told Mr. Malone that it would have been

99

1  more appropriate if he put Items 5 and 11 together

2  during that meeting?

3        MR. WILMOT:  Objection.  You can answer.

4     A.    No.  We discussed it.  And I think amongst

5  us, it was agreed that given an opportunity to

6  reforge this agenda, it would make sense to fold the

7  two, which are essentially one agenda, into one.

8     Q.    And did Mr. Malone tell you during that

9  meeting why he separated the two out?

10    A.    I don't recall.

11    Q.    But he did agree with you that it would

12  have been better if he put them together?

13    A.    I would say that was the consensus of the

14  group.  I don't have a clearer recollection than

15  that.

16    Q.    Okay.  Did you meet with anybody else

17  regarding the meaning of "possible vacancy" in the

18  budget analyst position, other than Mr. Malone and

19  Mr. MacAllister?

20    A.    Sometime within the day, the following day

21  of the meeting, I met briefly with Martin Hines.

22    Q.    Can you tell me about what happened at that

23  meeting.

24    A.    Marty was upset.  He felt that he was being

100

1      identified as somebody on his way out and indicated

2      that he intended to continue working, which I recall

3      I indicated to him was good news for us.  And I

4      explained the agenda item and discussion in the

5      context of succession planning.  And my recollection

6      was that the term "succession planning" was a new

7      term to Mr. Hines.

8           Q.   So you explained to him that it was part of

9      succession planning, that item, Agenda 5?

10          A.   We talked about that.  I hoped to help to

11     put it in context

12          Q.   Can you tell me whether your meeting with

13     Mr. Hines preceded or came after the meeting that

14     you had with Messrs. Malone and MacAllister

15     regarding this matter?

16          A.   No, I don't really recall.

17          Q.   So you recall they both came shortly after

18     the meeting?

19          A.   Yeah.  You know, I want to say both

20     within -- I don't know, a day, a 24-hour period.  I

21     don't really remember a sequence.

22          Q.   Now, did you discuss with Messrs. Malone

23     and MacAllister whether anybody within the IF

24     section already possessed all the skills needed to

101

1    take over Mr. Hines' job when he retired?

2        A.    No.

3        Q.    Do you know whether there's anybody else

4    within the IF group who already possesses the skills

5    to take over Mr. Hines' position when he retires?

6        A.    I assume that people throughout the

7    financial management group and maybe elsewhere would

8    perhaps demonstrate those skills and abilities.

9        Q.    But you didn't have a discussion about

10   that?

11       A.    No.

12       Q.    Can you tell me why you're implementing

13   training for that position without knowing whether

14   or not people already possess the skills to fill the

15   position?

16       A.    There is value in succession planning to

17   reducing the number of positions that are sole

18   incumbent positions, where we're either a

19   statistician, a funds officer, however you think of

20   others, who are the sole possessors of a set of

21   skills that are critical to the continuation of

22   operations.

23            So training multiple people on components

24   of senior specialist jobs makes sense.

102

1    Q.    I'm not denying that that makes sense.

2    What I'm asking you is, before determining how many

3    people you need to train for those skills, why

4    didn't you find out who already possessed them?

5    A.    Why are we trying to broaden the base of

6    people with a wide range of skills?

7    Q.    No.  My question is, isn't it logical, sir,

8    to determine who already possesses skills before

9    determining who needs to be trained in them?

10    A.    I think managers have a sense of where

11    there are experienced and where there are less

12    experienced staff.  If there are more experienced

13    staff in one area or another, that shouldn't stand

14    as a barrier to managers' prudent training of a wide

15    range of employees within their group, should it?

16    Q.    I'm asking the questions, but --

17    A.    Strike my question.

18    Q.    I agree with what you're saying, but let's

19    take hypothetically that you had four other

20    individuals who already had the skills to do Mr.

21    Hines' job.  Wouldn't it be better to use your

22    training budget in other areas, where perhaps no one

23    had the skills to take over an essential job?  I

24    mean, isn't this something as a manager, you would

103

1   think about?

2       A.   We don't do overtraining.  Is that what --

3   we would not overtrain.  We would train an adequate

4   number of people to have the widest possible range

5   of skills related to their functional area.

6       Q.   Right.  Well, I'm asking, is your training

7   budget unlimited, sir?

8       A.   No.

9       Q.   So you have to pick and choose what skills

10  are most important to train, right?

11      A.   Yes.

12      Q.   Okay.  And that requires some knowledge of

13  what skills people possess and what skills they

14  don't, correct?

15      A.   Yes.

16      Q.   But you didn't do that in this case,

17  correct?

18      A.   I'm sorry?

19      Q.   But you didn't do that in the case of the

20  budget analyst position, correct?

21      A.   (No response)

22      Q.   You did not determine in the case of the

23  budget analyst position, before you announced

24  training for it, who possessed those skills and who

104

1    did not possess them, correct?

2        A.    The managers in the financial management

3    area would have a sense of where their employees'

4    skills were and where their employees' skills

5    development needs were as well.  That assessment

6    goes on every day.

7        Q.    Okay.  And did they --

8        A.    And based on that continuing assessment,

9    they make decisions about how best to use their

10   limited training resources, which they're doing

11   right now by asking all of the senior specialists in

12   the program to share training on components of their

13   responsibilities.  It's a sound plan, and it's based

14   on an assessment of a reality check of what skill

15   sets already exist within the program.  If I've

16   stated anything different before, let me stand

17   corrected, please.

18       Q.    And how many people are in the IF unit

19   under Grade 12, just approximately?  10?  15?  20?

20   30?

21       A.    8 to 12.

22       Q.    Okay, 8 to 12.  And are you going to be

23   training all of them on each job; that is, Grade 12?

24       A.    Within that section?

1    Q.   Yes.  Are you going to train all these 8 to

2   12 people on each job that's a Grade 12?

3    A.   There will be training for all specialists

4   in component areas of all of these senior

5   specialist's specialization areas.

6    Q.   So we can assume that all 8 to 12 people

7   will be trained on the budget analyst position?

8         MR. WILMOT:  Objection.  You can answer.

9    Q.   Well, is that a correct assumption or not?

10    A.   Without looking at the specific training

11  plan, I can't speak definitively that everyone will

12  be trained on every component.  I rely on managers

13  to make sound decisions on the level and depth of an

14  intensity of training that they need to do within

15  their sections.

16    Q.   Well, do you have any idea how many people

17  are going to be trained on the budget analyst

18  position held by Marty Hines?

19    A.   On any given component position, no.

20    Q.   Well, are different people going to be

21  trained on different components of the position or

22  are a number of people going to be trained on the

23  entire position?

24    A.   Well, the position is made up of the

106

1    various components.  And my understanding is that

2    training will be provided on components by project

3    area, report area, whatever; that the job will be

4    broken down into its critical components, and that

5    training will be provided to the other specialists

6    to see that they all get exposed to a broad range of

7    those responsibilities.

8        Q.    Okay.  So that all of these 8 to 12

9    specialists will be trained on at least one or more

10   components of Marty Hines' jobs, but they may not be

11   trained on the entire job?  Is that a fair

12   statement?

13       A.    It's broad enough to be probably accurate.

14       Q.    Okay, all right.  I'd like to show you

15   what's been marked as Plaintiff's Exhibit 18.  I'd

16   like you to see if you can identify this document.

17       A.    Yes.

18       Q.    Can you identify this document, Mr.

19   Canavan?

20       A.    It's an October 13 memorandum from Michael

21   Malone to Martin Hines.

22       Q.    Okay.  And can you tell me what the

23   document says?

24       A.    "The purpose of this memorandum is to make

107

1    it clear in writing that the statement you made

2    during the IT/IF staff meeting on October 7, 2004,

3    'I will not train anyone on the Budget Analyst

4    functions except John,' is not acceptable.

5           "You are responsible for training any and

6    all individuals identified by NERO management on the

7    functions of your position.  In addition, you will

8    provide to me a plan for training up to four

9    individuals by close of business Thursday, October

10   21, 2004.  This plan should not identify individuals

11   by name, but should specify functions and initial

12   timelines.

13          "I trust that you fully understand the

14   contents of this instruction and will comply in your

15   future actions.

16          "I will answer in person any questions that

17   you might have about this instruction, and be

18   available to meet with you as often as you need in

19   order to clarify expectations.

20          "A copy of this letter will not be placed

21   in your OPF."

22        Q.    Will or will not be?

23        A.    Will not be.

24        *Q.    So I take it it's the intention -- it's

108

1    your intention that Mr. Hines not be consulted on

2    which individuals are trained in his functions?  Is

3    that true?

4             THE WITNESS:  Can I ask to take a break

5    just for a moment?

6             MR. CATAPANO-FRIEDMAN:  Sure.  This is not

7    a marathon if you have to go to the bathroom.

8             THE WITNESS:  Nothing to do with the

9    process at all.

10            MR. CATAPANO-FRIEDMAN:  If you have to go

11   to the men's room or something like that, please do.

12   It's no problem.

13            THE WITNESS:  Thank you.

14            (Recess taken from 3:13 to 3:19)

15            MR. CATAPANO-FRIEDMAN:  Where were we?

16            *(Question read)

17   A.    It's the agency's intentions that managers

18   work with their senior specialists to craft a

19   meaningful training plan that will provide equitable

20   opportunities to everyone.

21            If an FNS manager let the statement in

22   quotes in the first paragraph stand unchallenged,

23   they would in fact be rightly seen as -- or

24   perceived as suffering or allowing a clear instance

109

1   of preselection in anticipation of a merit promotion

2   process, which on its face would be a dereliction of

3   our managers' duties.  Your question was whether

4   Marty would have any input into the training

5   process.

6       Q.   Yes, that's correct.

7       A.   And the answer to that is "yes."  Whether

8   he would have a solitary, solo, unrestricted and

9   unchecked authority to select his successor, the

10  answer is categorically no.

11      Q.   Well, Marty Hines has expressed to you and

12  your subordinates a clear preference as to who his

13  successor ought to be, correct?

14      A.   Not to me.  I don't know that he has made

15  that statement to Doug or to Mike or anybody else

16  who has been in his chain.  He has not made that

17  statement to me.

18      Q.   He has not?

19      A.   No.

20      Q.   Could you reread the first paragraph.

21      A.   "The purpose of this memorandum" --  from

22  Mike Malone to Martin.  "The purpose of this

23  memorandum is to make it clear in writing that the

24  statement you made during the IT/IF staff meeting on

110

1    October 7, 2004, 'I will not train anyone on the

2    Budget Analyst functions except John' is not

3    acceptable."

4        Q.    Isn't that a clear expression of Mr. Hines'

5    expectation of who his successor ought to be?

6            MR. WILMOT:   Objection.

7        Q.    To you.

8        A.    I don't know that.  I don't know what was

9    in his mind.

10       Q.    Well, do you know who he's referring to

11   when he says the word "John"?

12       A.    Uh-hum.

13       Q.    Who?

14       A.    I assume that's John Pedicini.

15       Q.    And reading that quote, you don't know what

16   Mr. Hines' preference would be as to his successor?

17       A.    I can deduce from that statement.  I think

18   my earlier response was that he has not said this to

19   me in response to your direct question, Has he said

20   it to me or my subordinates.

21            I don't know that he said it to my

22   subordinates, Malone and MacAllister.  He has not

23   said it to me.  I think the plain English reading of

24   this could be "I'm done with training, and I'm not

111

1    training anybody else," or it could be "I'm not

2    training anybody but John, who I have already

3    trained."

4        Q.   Right, right.  Either way, it's a clear

5    preference to have John succeed him in his position,

6    correct?

7        MR. WILMOT:  Objection.

8        Q.   I mean, it seems clear to me.  It's not

9    clear to you?

10       MR. WILMOT:  Objection.

11      Q.   You can answer the question.

12      A.   I can repeat what the two readings of this

13    could be.  "I'm not going to do any more training"

14    or "I'm not going to train anyone other than John."

15    I don't know what was in his mind when he said that.

16      Q.   Okay.  But he meant either done with

17    training, "because I already trained John for the

18    position" or "I'm not going to train anybody else

19    but John.  I'll train John."  Correct?

20      A.   Those are two possibilities.

21      Q.   In either case, isn't he expressing a clear

22    intention that he wants John to take over the

23    position when he's done with it?

24        MR. WILMOT:  Objection.  You can answer it.

112

1     Q.   It doesn't mean that to you?

2     A.   I don't know which of those two options

3   were in his mind.

4     Q.   Okay.  But does it matter?  Doesn't either

5   one mean he wants John to take over his job when

6   he's done?

7     A.   That is the likely meaning of that.

8     Q.   Okay.  So we're in agreement, then.  Okay?

9     MR. WILMOT:  Objection.

10     Q.   That's the plain reading of the statement,

11  correct?

12     MR. WILMOT:  Objection.

13     Q.   You can answer the question.

14     A.   It appears so.

15     Q.   Okay.  With that said, how many individuals

16  does the region intend to train for the budget

17  analyst position?

18     A.   We will make decisions -- our managers will

19  make decisions about how many specialists need to be

20  trained on the various components of that position,

21  which, like all positions within our agency and

22  within the government, is subject to review before

23  it is reannounced, readvertised, and recompeted.

24     Q.   So all of them, 8 or 12 of them, however

113

1    many there are, they're going to be trained on some

2    component of the budget analyst job?

3        A.    I think that's broad enough to say that --

4        Q.    That's the case.  Okay.  Is that what that

5    letter says?

6        A.    It identifies a somewhat smaller number,

7    four individuals, which is also an option that would

8    be available to managers.  As you asked earlier,

9    managers would make decisions about how many

10   individuals would be trained in each component.

11       Q.    Okay.  Specifically what does the letter

12   say about that?

13       A.    "You are responsible for training any and

14   all individuals identified by NERO management on the

15   functions of your position.  In addition, you will

16   provide to me a plan for training up to four

17   individuals by close of business Thursday, October

18   21, 2004."

19       Q.    So Mr. Malone was looking for a plan to

20   train no more than four individuals at that point in

21   time?

22       A.    At that point in time.

23       Q.    Correct?

24       A.    That was the plan that he asked for.

114

Q.    And do you know which individuals Mr.
Malone was referring to?

A.    No idea.  I would assume that they are
people within his section.

Q.    But you haven't discussed with Mr. Malone
which individuals he was referring to?

A.    No, no.

Q.    I've got Plaintiff's Exhibit 19 that I'd
like to show you.  See if you can identify that
exhibit for us.

A.    (Witness reviews document)  Okay.

Q.    Can you identify this document for us?

A.    It's a memorandum to Martin Hines dated
October 21, 2004.  It's follow-up to Supervisory
Instruction No. 1 of 10/13/04 from Michael Malone.

Q.    What is the substance of the letter?

A.    That in response to the previous -- I
believe it's in response to the previous exhibit,
that Martin Hines gave a plan that met some of the
needs of Mr. Malone, and he is asking him to take
another run at it.  And he specifies some things
about format, content, methodologies that would be
proposed, indicating that Mr. Malone would schedule
several individuals to train with Mr. Hines, keeping

115

1    in mind his work schedule leave, any specific

2    concerns he had about time frames.  And recognizing

3    that since he's indicated to him that he's going to

4    stay for several more years, he would set up a

5    schedule of training so he could give it on a

6    recurring basis.

7         Q.   So he acknowledges here that Mr. Hines has

8    made it clear that he doesn't intend to retire any

9    time soon, correct?

10        A.   He acknowledges Marty's statement that he

11   plans to be in the position for several more years.

12        Q.   Okay.  And that there was no urgency to

13   train his successor because of that, correct?

14        A.   There's always an implicit urgency in

15   succession planning that we want to have people who

16   are trained on the various components of various

17   jobs throughout the region that are ready.

18        Q.   And the date of this letter is what?

19             MR. WILMOT:  Did you finish your answer?

20        Q.   Are you done or did you have more to say on

21   that?

22        A.   One of the universal premises of succession

23   planning is that you anticipate and that you don't

24   wait until the 11th hour to prepare people to either

116

1    take over positions as they're currently constructed

2    or to work within the context of evolving positions,

3    structure.

4         Q.    I understand that.  What is the date of

5    this letter in front of you?

6         A.    October 21.

7         Q.    Of what year?

8         A.    2004.

9         Q.    And the meeting where the possible vacancy

10   occurred, that was on what date?

11        A.    The agenda says it was on October 7th.

12        Q.    Of 2004?

13        A.    2004.

14        Q.    And the letter in which Mr. Hines was

15   criticized for his statement that he won't train

16   anybody but John, that date was what?

17        A.    October 13, 2004.

18        Q.    So we're looking at a time span of less

19   than two weeks here or about two weeks; from October

20   7th to the 21st?

21        A.    Yes.

22        Q.    During this two-week period, what other

23   Grade 12s received instructions from Martin Malone

24   about training other employees on their jobs?

117

1      A.    I don't know the answer to that.

2      Q.    Well, are you aware of any other Grade 12

3   employee receiving written letters from Michael

4   Malone during this two-week time frame seeking a

5   training program to train employees on their jobs?

6      A.    I can't respond to that specific two-week

7   period.  I know that in that -- around that period,

8   that other senior specialists, GS-12s, were asked to

9   develop and deliver training components, but I can't

10  speak with more specificity on the scheduling of

11  that training.

12     Q.    And would you have letters -- would you be

13  able to produce letters to those other Grade 12

14  employees regarding the request to develop training

15  programs for their jobs?

16     A.    Do I --

17     Q.    Are you in possession of any of the

18  letters?

19     A.    No.

20     Q.    So you don't have any letters to that

21  effect.  So if such letters exist, who would have

22  them?  Mr. Malone?

23     A.    Yes.

24     Q.    Has Mr. Malone discussed with you the

118

1  training program for John Hines' position -- Marty

2  Hines' position, I'm sorry.

3      A.   We discussed it during this time frame.  I

4  remember his mentioning to me that he had received a

5  plan from Marty and that they were working on it

6  together to further refine the plan.  I haven't

7  spoken with him recently about it.

8      Q.   Do you recall discussions with Michael

9  Malone during this time frame, this October 7th to

10  21st time frame, regarding his receipt of training

11  programs from any other Grade 12 employee in his

12  section?

13      A.   Again, my specific recall about that time

14  period, those two weeks, is not there in memory.

15      Q.   If it's not there, it's not there.

16      A.   But in that time period, in the subsequent

17  time period, I have received updates that we have

18  with all the managers in the region about the

19  progress that has been going on on that training

20  across the board.

21      Q.   Can you remember anything specific that you

22  received from Michael Malone regarding any other

23  Grade 12 employee other than Marty Hines?

24      A.   Not to my immediate recall, no.

## ERRATA SHEET

Deposition of Robert L. Canavan,  taken June 6, 2005
*Pedicini v. United States of America*
*Civil Action No. 04-12395-JLT*

| Page | Line | Corrections |
|------|------|-------------|
| 26 | 17,22 | Kurt should be Kirk |
| 41 | 7,11,12,13 | Louis should be Luis |
| 42 | 2 | Marianne should be MaryAnn |
| 43 | 5,13 | Louis should be Luis |
| 47 | 17 | Mr. EEO's should be Mr Pedicini's EEO; Louis should be Luis |
| 54 | 12,13,14 | 13 and 14 should read: 13 or 14;  I recall my response stated simply that I contacted the individuals within our office to notify them of the scheduled depositions (not at their insistence or request) |
| 65 | 4 | Should read: "financial management area in headquarters" |
| 65 | 22-3 | Should read: "who has a co-assignment…" |
| 68 | 5,21,22 | Should be: Valdivielso |
| 75 | 22 | Should be: Valdivielso |
| 79 | 12 | Should read:  (skill) gap assessment |
| 80 | 1 | Should read: statistical job series on components of her…" |
| 87 | 11 | Velling should be Veling |
| 95 | 9 | Should read: "management specialists…" |
| 101 | 18,19,20 | I recall my response to have been: "…sole incumbent positions, whether a statistician, a funds officer, or others who are the sole possessors of a set of skills…" |
| 104 | 14 | Should read: "on an assessment or a reality check…" |
| 105 | 13 | Should read: ""…level and depth and intensity…" |
| 116 | 2 | Should read: "or to work within the context of evolving position structure." |
| | | |
| | | |
| | | |
| | | |
| | | |

Robert L. Canavan
August 12, 2006

194

```
1                C E R T I F I C A T E

2        I, ROBERT L. CANAVAN, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8        Dated at  Boston, MA, this  12th day of  August,

9    2005.

10

11                              _____

12

13

14

15

16

17

18

19

20

21

22

23

24
```

# EXHIBIT 2

3-1

Volume III
Pages 3-1 to 3-80
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
     vs.                        :    Civil Action
                                :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          CONTINUED DEPOSITION OF DOUGLAS
MacALLISTER, a witness called on behalf of the
Plaintiff, taken pursuant to the Federal Rules of
Civil Procedure, before Jane M. Williamson,
Registered Merit Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the
Offices of Doris O. Wong Associates, 50 Franklin
Street, Boston, Massachusetts, on Friday, August 19,
2005, commencing at 1:05 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Damian W. Wilmot, Assistant United
          States Attorney) John Joseph Moakley
          Federal Courthouse, 1 Courthouse Way,
          Suite 9200, Boston, MA  02210, for the
          Defendants.

Also Present:  John Pedicini

3-7

1    responsibilities, that there was an overreaction to

2    an agenda item on the agenda, and that things kind

3    of deteriorated during the course of the meeting.

4    And I believe Mr. Malone said that in the future, he

5    would not be providing agendas before staff

6    meetings.  I think that was basically the gist of

7    the conversation.

8        Q.    That's what he told you?

9        A.    Correct.

10       Q.    Did he tell you which agenda item was a

11   source of controversy during the meeting?

12       A.    There are actually two.  One was -- I saw

13   it here just a second ago -- training for possible

14   budget analysis vacancy, and the other one was

15   nutritional education.

16       Q.    What was the number of the second one?

17       A.    16.

18       Q.    And the number of the first was?

19       A.    5.

20       Q.    And No. 16 says what?

21       A.    "Nutrition Education final update."

22       Q.    And what did he say the controversy was

23   over Item 5?

24       A.    Over Item 5, it was basically the

3-14

1   entire job?  I don't know.

2        Q.    Do you know of any portions of Marty Hines'

3   job that John Pedicini is not qualified to do?

4        A.    Do I specifically know?

5        Q.    Yes.

6        A.    No.

7        Q.    And in fact, you're the division chief.

8   That includes Marty Hines and John Pedicini, right?

9        A.    Absolutely.

10        Q.    So did Mr. Malone tell you why he felt it

11   was critical that someone else be trained for Marty

12   Hines' position at that particular time?

13              MR. WILMOT:  Objection.  You can answer.

14        A.    He never used the word "critical" in any of

15   these discussions in regards to the budget analyst's

16   position.  What we did talk about was the need to

17   have more than one backup.  And every position we

18   have for every function we have, we have multiple

19   backups for most of our functions, not just one.  We

20   don't rely on one individual to back up another if

21   we can provide multiple backups.

22        Q.    Do you have any other employees at a

23   similar grade level to Marty Hines who are also

24   approaching retirement age?

3-15

1      A.   One for sure -- actually, I believe Ann is

2   already eligible.   Two -- you're talking at a 12

3   grade level, right?

4      Q.   Right.

5      A.   I think Julie Larkin is there, close to

6   there.   Bruce Potvin -- no, Bruce is an 11, I'm

7   sorry.   I misspoke on that.   Lisa, Agostino, Kurt

8   Hassel.   I believe that's it.

9      Q.   So there's Kurt Hassel --

10      A.   No.   I just said his name to run through

11   the 12s in my mind.

12      Q.   Well, who are the 12s?

13      A.   Julie Larkin and Ann Bellezza,

14   B-E-L-L-E-Z-Z-A.

15      Q.   So there's Judy Larkin and Ann Bellezza?

16      A.   Julie, with an L.

17      Q.   Julie Larkin and Ann Bellezza --

18      A.   Yes.

19      Q.   -- who are 12s and are also approaching

20   retirement age, correct?

21      A.   Yes.

22      Q.   Can you tell me who could step in now

23   without further training and perform Julie Larkin's

24   job?

3-16

1      A.    Without further training?

2      Q.    Right.

3      A.    If I were going to detail somebody into

4   Julie Larkin's job?

5      Q.    Right.

6      A.    I could probably put Pauline Driscoll over.

7   I could probably put Lisa Fitzgerald over, staying

8   within that section.  Bruce Potvin over, staying

9   within that section.  Again, I don't think they

10  could perform 100 percent, and they'd need

11  additional training.  I have nobody that could go in

12  there and do the job, I believe, without additional

13  training, but I do have people who know her function

14  and can back up her function.

15     Q.    Now, what about Ann Bellezza?  Who could

16  you put in Ann Bellezza's job and have that person

17  perform her job without further training?

18     A.    I don't believe I have anybody that

19  wouldn't need further training, but I have people

20  who have backup functions that could cover them all;

21  Janice Sciarappa, Kurt Hassel.  I don't know if John

22  is trained in that particular function or not, but

23  Janice I know has, and I know Kurt Hassel has worked

24  in that area and could pick up functions.

3-17

1      Q.    Now, Janice Sciarappa is also approaching

2  retirement age, too, isn't she?

3      A.    I'm not really certain, because she has --

4  what do you call when you leave the government and

5  come back in again?  She has a disjointed service,

6  and I'm not sure how many years she's got in.  I

7  think she's within a couple of years, but I'm not

8  exactly positive.

9      Q.    Did Mr. Malone tell you why he felt it

10  necessary to single out Marty Hines' job as needing

11  training in Item 5 and not Ann Bellezza's or Julie

12  Larkin's job?

13          MR. WILMOT:   Objection.  You can answer.

14      A.    Well, I would think it's because --

15      Q.    The question is, did he tell you.

16      A.    Did he tell me specifically?  No, he did

17  not.

18      Q.    Did you discuss with him why he singled out

19  Marty Hines position in Item 5 and not Ann

20  Bellezza's or Julie Larkin's?

21      A.    I think you're absolutely wrong there.  We

22  didn't single out anyone.  We're having the 12s put

23  together training sessions, so that they can train

24  other staff in their backup functions.  Mr. Hines is

3-18

1    not the only 12 that we're requiring to do that.

2    Every one of the 12s had at least one training

3    session.

4         Q.    What is Julie Larkin's title?

5         A.    She's a financial management specialist.

6         Q.    Does Item 5 discuss training for possible

7    financial management specialist's vacancy?

8         A.    No, it doesn't.  It says "budget analyst."

9         Q.    And what is Anne Bellezza's position?

10        A.    She's a financial management specialist.

11        Q.    And you already said that that's not

12   included in Item 5, correct?

13        A.    Right.

14        Q.    When is financial planning supposed to be

15   discussed agency-wide -- succession planning.  When

16   is succession planning supposed to be discussed

17   agency-wide at FNS?

18        A.    When?

19        Q.    Right, when.

20        A.    All the time.

21        Q.    All the time?

22        A.    Absolutely.  It's a corporate priority.

23        Q.    There's no time frame that this isn't

24   supposed to be discussed agency-wide until March of

3-19

1    2005?

2              MR. WILMOT:  Objection.

3         Q.    To your knowledge.

4         A.    I guess I don't understand your question.

5    It's an ongoing priority.  So we have to discuss it

6    all the time and consider it all the time.  Senior

7    management discuss it frequently when they meet in

8    headquarters.  As a matter of fact, I think it's on

9    the agenda every time they meet in headquarters.

10        Q.    Do you know a person by the name of Jerome

11   Lindsay?

12        A.    Yes.  Well, I know him in the organization.

13        Q.    Did Jerome Lindsay have anything to say --

14   well, where in the organization is Jerome Lindsay?

15        A.    Jerome Lindsay is -- I think they call him

16   deputy for office of regional operations.  He's

17   located in our Alexandria headquarters.

18        Q.    Did he say something about when succession

19   planning was supposed to be implemented agency-wide?

20        A.    Again, yes, he did.  And as an ongoing

21   priority, we need to consider that as an ongoing

22   issue.  Everything we do is supposed to be with an

23   eye toward providing a sufficient resource and

24   knowledge within the organization for succession

3-20

1   planning.

2       Q.   What did Jerome Lindsay say about when

3   succession planning was supposed to be implemented

4   agency-wide?

5       A.   Are you looking for -- what did he say?  I

6   don't know what he said.  He didn't say anything to

7   me.

8       Q.   He didn't make any announcement that you

9   heard?

10      A.   He didn't make any specific announcement of

11  when it would be implemented.

12      Q.   As to when succession planning was supposed

13  to be implemented agency-wide?

14      A.   When succession planning was supposed to

15  be implemented agency-wide, I don't recall.  He may

16  have made a date, but it's not there.  And it's an

17  ongoing priority, corporate priority.

18      Q.   Do you know when guidance for succession

19  planning was established agency-wide in FNS?

20      A.   Do I know specifically when?  No, but it's

21  out there.

22      Q.   Was it before March of 2005?

23      A.   I would believe it was, but I'm not sure of

24  the date.

3-21

1       Q.   Could it have been implemented in March of
2  2005, to your recollection?
3       A.   I'm not going to recall anything on the
4  specific dates now.
5       Q.   So that's a possibility that it wasn't
6  until March of 2005 that guidance for succession
7  planning agency-wide was provided?
8            MR. WILMOT:  Objection.
9       Q.   Correct?
10           MR. WILMOT:  Objection.  You can answer.
11      A.   I don't know.  I just told you I don't
12  know.
13      Q.   Are you eligible for retirement?
14      A.   Yes, I am.
15      Q.   What, if any, succession planning has taken
16  place for your job?
17      A.   Well, certainly Roger knows -- Roger
18  Hamilton, the section chief, knows how to do my job.
19  He knows how to do pretty much all of my job.
20      Q.   Anybody else?
21      A.   Well, I'm sure Michael Malone can do
22  portions of my job.  I've got other directors who
23  probably can do a great big portion of my job, too.
24      Q.   What plans -- succession planning

3-79

```
1                C E R T I F I C A T E

2        I, DOUGLAS MacALLISTER, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify that said transcript

5   (with/without) suggested corrections is a true and

6   accurate record of said testimony.

7        Dated at __9:00am__ , this __15__ day of September,

8   2005.

9

10                          Douglas A. Mac Allister
                            _____

11

12                    *   *   *   *   *

13

14

15        On this ____ day of _____, 2005, before

16   me, the undersigned Notary Public, personally

17   appeared _____ and proved to

18   me through satisfactory evidence of identification,

19   which was _____, to be the person

20   whose name is signed above.

21

22   _____

23   Notary Public

24   My commission expires: _____
```

## SUGGESTED CORRECTIONS

RE:  John G. Pedicini v. United States of America, et al.
WITNESS:  Douglas MacAllister, Vol. III

The above-named witness wishes to make the following changes to the
testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 3-8 | 6 | Change "through" to "in" | |
| 3-8 | 23 | Change "you" to "me" | |
| 3-11 | 17 | Change "we've done" to "it's" | |
| 3-15 | 7 & 9 | Change "Kurt" to "Kirk" | |
| 3-16 | 21 & 23 | Change "Kurt" to "Kirk" | |
| 3-22 | 4 | Change "with get" to "get with" | |
| 3-23 | 5 | Change "of that" to "then" | |
| 3-27 | 19 | Change "but" to "about" | |
| 3-28 | 10 | Change "supervisor" to "supervisors" | |
| 3-29 | 17 | Change "equal" to "annual" | |
| 3-44 | 23 | Change "training" to "Themi" | |
| 3-48 | 18 | Delete "the" | |
| 3-50 | 18 | Change "separation" to "administration" | |
| 3-69 | 21 | Change "lines" to "Hines" | |

DORIS O. WONG ASSOCIATES, INC. * 50 FRANKLIN STREET * BOSTON, MA  02110

**EXHIBIT 3**

1

Volume I
Pages 1 to 214
Exhibits 32 - 46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
        Plaintiff,              :
                                 :
        vs.                      :  Civil Action
                                 :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,       :
UNITED STATE DEPARTMENT OF       :
AGRICULTURE,                     :
        Defendants.             :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF MICHAEL D. MALONE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 8, 2005, commencing
at 11:30 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

77

1    with Doug MacAllister before you created this

2    agenda?

3        A.    Yes, I did.

4        Q.    Tell us about that discussion or those

5    discussions.

6        A.    The discussion was initially not

7    specifically related to Item 5 in the fact that I

8    didn't go to him and say, "Here is my agenda item.

9    I want your input."

10            The discussion was in advance of setting up

11    training plans and cross-training for individuals

12    within the sections so in that discussion then he

13    said to me and reiterated, because I know I had

14    heard it on other occasions that --

15        Q.    From him?

16        A.    Yes.

17        Q.    Okay.

18        A.    That we need to make sure that we have

19    everyone trained for all the functions performed,

20    not just budget analyst but all of the functions

21    that we do in the region, in our division and the

22    region.

23        Q.    And how did that pertain to Item 5?

24        A.    That's one of the positions that is in my

78

1    section.

2        Q.    Did you learn from Mr. MacAllister that it

3    was quote-unquote common knowledge that Mr. Hines

4    was planning to retire?

5        A.    From him?  Not just from him but yes, from

6    him.

7        Q.    From him, yes.

8        A.    Yes.

9        Q.    And was that part of the discussion as to

10   why the position of budget analyst needed to be

11   trained, the functions of budget analyst needed to

12   be trained -- other employees needed to be trained

13   on the functions of budget analyst?

14       A.    I don't know if it was specifically related

15   to this meeting, but yes, I do remember discussions

16   about that.

17       Q.    With Mr. MacAllister, correct?

18       A.    Yes.

19       Q.    All right.  Did you and Mr. MacAllister

20   identify any other specific position the functions

21   on which other employees needed to be trained?

22       A.    Yes.

23       Q.    What other positions?

24       A.    The position itself is financial management

79

1   specialist but that encompasses all of the other

2   financial-related functions that are performed in

3   the Northeast Region.

4        Q.   What is John Pedicini's position?

5        A.   Financial management specialist.

6        Q.   Why was that item not included in your

7   agenda of October 7, 2004?

8        A.   It actually is Number 11.

9        Q.   Oh, it's Number 11.  Okay.  How is that

10  encompassed by Number 11?

11       A.   "OJT by GS-12s" is a plan that all of the

12  GS-12s including the budget analyst position would

13  go through similar training on functions that they

14  perform.

15            I simply chose to start with the budget

16  analyst first and actually as it turned out, it

17  didn't even roll out that way.  He wasn't the first

18  one.  There were others in front of him.  My initial

19  plan was let's start with this one and we're going

20  to get them all done because we had to start

21  somewhere.

22       Q.   In putting Item 5 in the agenda, it was

23  your original plan to train people on Marty Hines'

24  job first, correct?

80

1          MR. WILMOT:  Objection.  You can answer.

2     A.   Yes, that's correct.

3     Q.   And Item 11 you intended to train people on

4     other Grade 12 jobs?

5     A.   That is correct.

6          MR. WILMOT:  Objection to the question.

7     Q.   Including financial management specialists?

8     A.   That's correct.

9     Q.   Are the financial management specialists

10    Grade 12s?

11    A.   At the time of this meeting, there were

12    only Grade 11 and Grade 12 positions.

13    Q.   So there were financial management

14    specialists who were Grade 12 at the time of the

15    meeting?

16    A.   Yes.

17    Q.   And there are financial management

18    specialists who are Grade 11?

19    A.   That's correct.

20    Q.   And Mr. Pedicini, though, what grade was he

21    at that time?

22    A.   Grade 11.

23    Q.   Can you tell me why Mr. Pedicini was not a

24    Grade 12?

E R R A T A    S H E E T

RECEIVED
U.S. ATTORNEY
05 AUG -8  PM 4: 30

| Page | Line | Corrections |
|------|------|-------------|
| 39 | 17 | SHOULD BE 2005 NOT 2002 |
| 132 | 6 | ANSWER - JANICE SCIARAPPA |
| 161 | 4 | ANSWER - NO |
| 193 | 7 | ANSWER - KIRK HASSEL AND GERALYN WADDINGTON |

213

```
 1              C E R T I F I C A T E

 2      I, MICHAEL D. MALONE, do hereby certify that I

 3  have read the foregoing transcript of my testimony,

 4  and further certify under the pains and penalties of

 5  perjury that said transcript (with) without)

 6  suggested corrections is a true and accurate record

 7  of said testimony.

 8      Dated at WORK_____, this 3RD_ day of AUGUST__,

 9  2005.

10

11                          _____

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT 4

1

1 - 251

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


JOHN G. PEDICINI,                   )
                    Plaintiff,      )
                                    )
vs.                                 )   CIVIL ACTION NO.
                                    )   04-12395-JLT
UNITED STATES OF AMERICA,           )
ANN M. VENEMAN, SECRETARY,          )
UNITED STATES DEPARTMENT OF         )
AGRICULTURE, AND LINDA              )
SPRINGER, DIRECTOR, UNITED          )
STATES OFFICE OF PERSONNEL          )
MANAGEMENT,                         )
                    Defendants.     )


        THE VIDEO TAPED DEPOSITION OF JOHN G. PEDICINI,

held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before Jeffrey Mocanu,

a Court Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices of the United

States Attorney, John J. Moakley Federal Courthouse, Suite

9200, 1 Courthouse Way, Boston, Massachusetts, on Tuesday,

October 25, 2005, commencing at 9:04 a.m.

ORIGINAL

*APEX Reporting*
(617) 426-3077

Page 93

[1] you said in July of 03, the first time, are you aware of
[2] whether or not the Agency interviewed anyone from the
[3] external list?
[4]    A I was aware that they did not interview anyone in [5] July
of '03.
[6]    Q Okay. So not just Mr.Pedicini ---
[7]    A They re-posted, October. You're talking about – [8] You're
jumping from July to October now.
[9]    Q All right. Well, let me rephrase the ---
[10]   A That's the second posting.
[11]   Q Let me rephrase the question. You've identified [12] three
different postings with regard to this job.
[13]   A Right. Right.
[14]   Q July of 2003, August 2003, and November 2003. Are
[15] you aware of whether or not the Agency interviewed anyone
[16] from the external list for any of those three postings for
[17] this position?
[18]   A I'm not the alternate, so I can't say for certain. [19] You
know, I'd be speculating here at this point because
[20] Mr.MacAllister is – I'm not there on Fridays, and he likes
[21] to hold interviews on Fridays. So I do not know for
[22] certain, okay, whether or not he interviewed for these. I
[23] can't say yes; I can't say no.
[24]   Q Okay. And again, you don't know who else was
[25] among the best qualified for each of those postings,

Page 94

[1] correct?
[2]    A On the external list?
[3]    Q On the external list.
[4]    A Right, I do not know. I'm not allowed to see the [5] list.
[6]    MR. WILMOT: Okay, we can take a break now.
[7]    (Off the Record from 11:25 a.m. to 11:26 a.m.)
[8]    BY MR. WILMOT:
[9]    Q Now, did you ever contact an EEO counselor
[10] concerning what you just described, that you were, you know,
[11] not selected or – for a position, for this section chief
[12] position?
[13]   A Yes, I did.
[14]   Q And when did you do that?
[15]   A February of '03 – excuse me, it was '04, February [16] of
'04.
[17]   Q Okay. And who did you speak with?
[18]   A Greg Ferby. I also contacted Laura Wilmot.
[19]   Q And who's Laura Wilmot?
[20]   A A Personnel officer at FNS. Currently, as well. [21] She's – I
think she's the Director. I'm not sure, but [22] she's a Personnel
officer.
[23]   Q But she is not an EEO officer?
[24]   A No.
[25]   Q Okay, did you file a formal complaint with regard

Page 95

[1] to not being selected for the section chief?
[2]    A No.
[3]    Q Did not, okay. Following – Following this [4] incident
which you've, I guess for the time frame, you've [5] said it was
February '04; I guess that's when Mike Malone [6] was then ---
[7]    A Well, actually, March. The first week in March, [8] he
effectively started, in '04.
[9]    Q Okay. What was the next retaliatory act you [10] believe
you were subjected to?
[11]   A Well, uh, he asked for individual development – [12] IDP,
individual development plans. And then he asked for an [13] EDP.
It's in the Union regulations about setting up [14] courses, training
that you want to take in the coming, in [15] the current year related
to possible career advancement, et [16] cetera, et cetera. And I
emailed him, and I says I'd like [17] to set up an IDP. You asked,
and I'm – I want to go [18] forward with it. Time go by. He wouldn't
respond to my [19] email.
[20]   Q Now, when you're saying, you keep referring to [21] "he".
Who is "he"?
[22]   A Mike Malone. Sorry. Finally, I drew some courses [23] up,
and I says I've got something. And he, he went back and [24] forth
saying he needed more time. He kept – This is going [25] March,
April, May. This is all going to three months now of

Page 96

[1] emails back and forth. I'd wait a couple weeks; you know,
[2] maybe he's busy. Finally ---
[3]    Q This is of '03?
[4]    A Of '0 – Excuse me. This is '04. This is '04, [5] now going
into '04. And I mentioned the issue of provision [6] Number 1 of
the settlement agreement, which states about an [7] IDP, and
getting training, at least one course. He put [8] together an IDP
eventually, and we signed it, I believe it [9] was mid-May of '04.
[10]   Q Okay.
[11]   A And at that time, we got the issue of – A woman
[12] came to me, Patricia Churchill. A certification, right in [13] the
midst of this. She said – And people have a habit, [14] because
they – I've been dealing with the funds so long. [15] Marty wasn't
there. Marty Hines took a vacation in May of [16] '04, one of a rare
events, and there was no one to certify. [17] So she came to me
and says, 'John, can you certify the funds [18] availability of this?'
And I says, well, this is another [19] trouble on the horizon, given
what I went through last year. [20] I went to Malone and
MacAllister, and I said is it all right [21] for me to certify; this is not
an IAS. And they said, you [22] know, no, you are not to have any
certification rights [23] whatsoever, anywhere, at any time. That
was, I believe it [24] was the first week of June of '04.
[25] And I says, well, when did this come up? So I

## Page 105

[1] that's part of – because it included the settlement
[2] agreement. And my assumption, as a lay person, was since
[3] the breach of the settlement agreement is an issue in this
[4] case, that that was another related issue of breach of the
[5] settlement agreement.
[6]     Q Right.
[7]     A Now, if I wanted to go off in January of '05, in [8] this case,
and go back to the Civil Rights office and say, [9] hey, they
breached another provision – You know, to me as a [10] lay
person, I think the whole item was being – my [11] assumption
was, it was all being covered in this case.
[12]     Q Okay. Now, you keep referring to a breach of the
[13] settlement agreement. But I'm asking about retaliation
[14] right now. But as I think you already said, you did not
[15] speak to an EEO counselor about what you perceived to be
[16] retaliation when you were being denied training for this
[17] time frame; is that correct?
[18]     A Not in '05, no.
[19]     Q Okay. What is the next retaliation that you were
[20] subjected to?
[21]     A That came in the fall of '04, with the – October [22] 7, '04,
with the announcement, the possible – the training [23] for a
possible vacancy in the budget analyst position.
[24]     Q And how was that retaliation?
[25]     A Those were my duties. And the question is ---

## Page 106

[1]     Q Be as specific as you can. What do you mean, [2] those
were your duties?
[3]     A The budget officer's duties – The idea behind the
[4] announcement was that they were training somebody; they
were [5] open to training for somebody who they claim was
leaving the [6] office, name of Martin Hines, a budget analyst.
They didn't [7] put his name in there, but they put his position in
there. [8] And that's the schedule of events that was put out by
Malone [9] on October 7, 2004.
[10]     Q So your belief is that Mike Malone began, or at [11] least
announced that he was going to train others on the [12] duties
held by Martin Hines, in ---
[13]     A Right.
[14]     Q --- retaliation against you?
[15]     A Everyone in the office thought that just about – [16] Well,
excuse me. I'm not going to say everyone, but most of [17] the
people at the meeting came to me. Lori Lodato came to [18] me.
Marty Hines became quite upset at that meeting over [19] that. He
came to me and said, 'They're trying to railroad [20] you, John.'
Femi Stanbelitis says, 'I don't know, John, [21] about, you know,
you and your position. You know, I mean, [22] it just sounds like
they got someone else in mind.' I'm [23] trying to think of who else
was there – one, two, three – [24] IT, Lori Lodato. Those are the
people that came to me, and [25] could interpret what they were
saying, that they were

## Page 107

[1] looking for someone else to train, other than John Pedicini.
[2]     Q Now, Martin Hines's position – or strike that. [3] Martin
Hines still holds the position of budget officer?
[4]     A Whatever you want to call it, analyst. Yeah, [5] correct.
[6]     Q So that position is not vacant?
[7]     A No.
[8]     Q And are you still the back-up to Martin Hines?
[9]     A Not that I know of, no. They have not assigned [10] those
duties to me.
[11]     Q Okay.
[12]     A And this is based on the October 22, 2004 letter.
[13]     Q Okay, so we'll get to that.
[14]     A Okay.
[15]     Q So it's your testimony that you were retaliated
[16] against because Mike Malone announced that he was going
to [17] train some of your coworkers on a possible vacancy, and
that [18] vacancy being in Martin Hines's position?
[19]     A Right, correct.
[20]     Q What is the next – Well, before I move on, did [21] you
ever raise this issue with an EEO counselor?
[22]     A I went to – Those issues, I – Did I raise it? I [23] have to
remember if I did or didn't. I don't think I called [24] – I think – No. I
went to – I said at the time – This [25] was with a series of events,
okay, a series of letters.

## Page 108

[1] They seemed so intense on me. This was not something, oh,
[2] here's just one item. This was, in my experience, was an
[3] intense effort to say the following to John Pedicini: we're
[4] getting you out of the office; if you don't do – you're [5] going
to sit in that position where you are, and we're [6] getting you out
of here if you don't like – I mean, out, [7] meaning out on the
street.
[8]     Q If you could, though, if you could answer my [9] question.
[10]     A Go ahead.
[11]     Q Did you raise this issue with an EEO counselor?
[12]     A No. I raised it with an attorney.
[13]     Q So, you did not?
[14]     A No.
[15]     Q Okay. And did you file a formal complaint with [16] the
EEOC concerning this issue?
[17]     A On those issues, no.
[18]     Q Okay. When was the next incident of retaliation [19] that
you believe you were subjected to?
[20]     A Oh, let's see. Let's see. We're into '05 now.
[21]     Q Well, that was the fall of '04.
[22]     A Yeah, yeah. That's when the lawsuit was filed on [23] the
14th, I believe, of November. And we all sort of noted [24] –
meaning myself, Marty Hines, Bruce Potvin, Lori Lodato [25] all
noticed a transformation. The issue was dropped, like a

# EXHIBIT 5

John G. Pedicini,          )          **November 17, 2000**
Complainant           )
                      )
v.                   )

**FORMAL**
**DISCRIMINATION**
**COMPLAINT**
**UNDER 29 CFR 1614.106**

United States Of America,     )
Francis Zorn, Margaret Mann,   )
Douglas MacAllister, individually )
and collectively           )

**DELIVERED VIA**
**CERTIFIED MAIL**
**RETURN RECEIPT**
**REQUESTED**

## INTRODUCTION

The Complainant, John G. Pedicini, hereby files a formal discrimination complaint against the U.S. Department of Agriculture, Food and Nutrition Service, Northeast Regional Office, Room 501, 10 Causeway Street, Boston, Massachusetts, hereinafter referred to as "FNS-NERO", Francis Zorn, Margaret Mann, and Douglas MacAllister, individually and collectively, for reprisal actions taken as a result of the Complainant's affidavit in a recent EEO investigation, in violation of 5 USC 2302(b)(8).

This action follows an informal counseling period conducted by Patricia A. Loyco, EEO Counselor/Mediator. The Complainant hereby files this formal discrimination complaint within 15 calendar days after receiving notice from Ms. Loyco on November 14, 2000, pursuant to 29 CFR 1614.106(b).

The Complainant has not filed a grievance under negotiated or administrative grievance procedures or an appeal with the Merit Systems Protection Board on the same issues contained herein.

P-2202

**FACTUAL BACKGROUND**

1. The Complainant, John G. Pedicini, is employed as a financial management specialist in the Financial Management Unit at FNS-NERO.

2. Douglas MacAllister is the Director of the Financial Management Unit at FNS-NERO.

3. Margaret Mann is Personnel Liaison for FNS-NERO.

4. Francis Zorn is Regional Administrator of FNS-NERO and supervises Douglas MacAllister and Margaret Mann.

5. In July 1999, the Complainant offered to become ADR Mediator for FNS-NERO based on his mediation background at the U. S. Department of Labor. Douglas MacAllister accepted the offer and forwarded the Complainant's name to the EEO Office at the Food and Nutrition Service in Alexandria, VA. The Complainant received numerous progress reports on the proposed training and ADR program.

6. Sometime in or about February 2000, Ann Bellezza, another employee in the Financial Management Unit at FNS-NERO, filed a formal discrimination complaint against Douglas MacAllister and FNS-NERO.

7. On June 12, 2000, Mr. Charles Purter, a contract EEO investigator, arrived at FNS-NERO to commence investigative interviews. The Complainant was scheduled to be interviewed by Mr. Purter.

8. On June 13, 2000, while walking to the men's restroom, Douglas MacAllister informed the Complainant that he was removed, without cause, as ADR Mediator.

9. While providing Mr. Purter, the EEO investigator, with an affidavit on October July 14, 2000, the Complainant stated that he believed his removal as ADR mediator was an act of reprisal for giving information to the EEO investigation.

10. On August 4, 2000, the Complainant express mailed his finalized affidavit to the EEO investigator.

11. On August 8, 2000, the Complainant filed a complaint with the Office of the Special Counsel which is OSC File No. MA-00-2308.

12. On August 21st, 2000, Douglas MacAllister was informed that there was a training session on Form 209 which is used by the Complainant in his work. The training session was to be held on August 22nd to August 23rd, 2000. There were only two

P-2203

people available at the time.  The Complainant was one of them.  MacAllister chose the other employee and did not divulge any information about the training session or his selection to the Complainant until after the fact at a meeting attended by the Complainant on August 23rd.

13. On August 30, 2000, Jonathan Lash from NFC e-mailed the Complainant about a training session on salaries & benefits which was essential to the Complainant's job function.

14. At a Financial Management meeting on September 13, 2000, the Complainant asked Douglas MacAllister about obtaining approval for travel to a training session. MacAllister responded by saying that  the Complainant's request "…would probably be denied."

## REMEDY SOUGHT

Wherefore, Complainant, John G. Pedicini requests the following:

1. Reinstatement as ADR Mediator for FNS-NERO.

2. Transfer of  Douglas MacAllister to a position in which he will have no influence or control on personnel actions or training assignments at FNS-NERO.

3. Transfer of  Margaret Mann to a position in which she will have no influence or control on personnel actions or training assignments at FNS-NERO.

4. Transfer of  Francis Zorn to a position in which she will have no influence or control on personnel actions or training assignments at FNS-NERO.

Respectfully submitted this 17th day of  November 2000.

John G. Pedicini, Complainant
10 Milano Drive
Saugus, MA  01906
617-565-6449 (Work)
781-233-5274 (Home)

P-2204

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

| United States Department of Agriculture<br>Civil Rights, Employment Complaints and Adjudication Division | 300 7th. Street SW Rm#607<br>Washington. DC 20050 |
|---|---|

**1. Name**    (First)    (Mi)    (Last)

[✓]Mr. [ ]Ms.   John  G.  Pedicini          [✓]USDA Employee        [ ] USDA Applicant

**2. Address**                    **3. Telephone Number**

10  Milano  Drive          Work (617) 565 - 6449
(Street)

Saugus,  MA    01906      Home (781) 233 - 5274
(City)      (State)    (Zip)

**4. Name of Agency Which You Believe Discriminated Against You**

U.S Dept. of Agriculture
Food and Nutrition Service
10 Causeway Street , Rm. 501

Boston,      MA          02222
(City)        (State)        (Zip)

**5. Bases of Discrimination on Which You Were Counseled** (Do not include bases for which you did not receive counseling.) The bases are age, race, color, national origin, religion, sex, physical or mental disability, marital status, sexual orientation and reprisal. Be specific in your identification of bases (IE: age (55), sex (female), race (white).

Reprisal for previous EEO activity

**6. Issues(s) on Which You Were Counseled** (Do not include issues or allegations for which you did not receive counseling. Provide, if you deem necessary, additional details on reverse side.) Be specific with exact issue and the date of the issue. (IE: Non-selection to vacancy announcement USDA-96-174, Secretary, GS-318-9 on March 1, 1996, or two day suspension for misconduct on January 29 & 30, 1996.) You do not need to elaborate on why you feel this was discriminatory, you be given the opportunity to support you complaint during the investigation process.

Assignment of duties and training
Removal, without cause, from ADR mediator position.

**7. Representative, if any**    (Pending receipt of Notice of Final Action)

(___)
(Telephone Number)

(Street)      (City)      (State)      (Zip)

**8. Name of EEO Counselor Contacted**

USDA, FNS, OCR
PATRICIA A. LOYCO, FNS  703-305-2215, Room 942-KPark Center, Alex, VA

**9. Requested Corrective Action**  Reinstatement as ADR mediator

Transfer of MacAllister, Pan, Mann to positions in which they will have no influence or control over personnel actions or training assignments.

**10. Signature**                        Date 11-17-00    P-2205
J.W. H. Pedicini                  (Month) (Day) (Year)

EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSETTS

### CASE NO. _____

C 1 - 11564DPW

| | | |
|---|---|---|
| JOHN G. PEDICINI, | ) | **CIVIL ACTION  COMPLAINT** |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
| OF AMERICA, | ) | |
| Defendant | ) | |

Plaintiff, individually, alleges upon personal knowledge as to himself and his own acts,

and upon information and belief as to all other matters, based upon an investigation by

himself, which included a review of public documents.

### NATURE OF THE ACTION

1.      This is a civil action alleging violation of Title VII of the Civil Rights Act of

1964, as amended, in which the Defendant has engaged in numerous reprisal actions

against the Plaintiff for his testimony and whistleblowing activity in a gender/age

discrimination case entitled, Antoinette Bellezza v. Ann M. Veneman, Secretary, U.S.

Department of Agriculture, EEOC Hearing No. 160-A1-8304X, Agency Case No.

000266.

2.      The Defendant, through its agency, the United States Department of

Agriculture, has a well-documented history of mishandling civil rights complaints

made by its employees as is evidenced by the **"Office of Civil Rights Status**

**Of The Implementation Of Recommendations Made In Prior Evaluations Of Program Complaints"**, Audit Report No. 60801-4-Hq and **"Office Of Civil Rights Management Of Employment Complaints"**, Audit Report No. 60801-3-Hq, compiled by the Office of the Inspector General, U.S. Department of Agriculture. Said reports are public documents.

3.    The Defendant's sub-agency, the Food and Nutrition Service, has been the subject of numerous complaints at the Equal Employment Opportunity Commission. One of the complaints is Bellezza v. Veneman, as previously cited, in which the Plaintiff has been a major witness and has given extensive testimony and key documents to a contract EEO investigator, Charles Purter. Under Title VII, the Plaintiff has engaged in protected activity. Plaintiff eventually became the EEO representative for the Complainant.

4.    As a result of the Defendant's reprisal actions, the Plaintiff has suffered severe damage to his career.

### JURISDICTION AND VENUE

5.    This action arises under Title VII of the Civil Rights Act of 1964, as amended,  Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(8) and  5 USC Sec. 2302(b)(9).

6.    This Court has jurisdiction over the subject matter of this action pursuant to Title VII, Civil Rights Act of 1964, as amended, Section 2000e-16(c). The formal complaint was filed with the U.S. Department of Agriculture on November 17, 2000, Case # USDACR010147, FNS-00-26. The 180-day period has expired. No notice of final action has been issued.

7.    Venue is proper in this district under Section 2000e-16 of Title VII of the Civil Rights Act of 1964, as amended. The wrongs alleged in this Complaint occurred, in

2

substantial part, in this district.

## PARTIES

8.     Plaintiff, John G. Pedicini, is employed, at the Grade 11 Step 4 level, as a

Financial Management Specialist in the Financial Management Unit of the Defendant's

sub-agency, the Food and Nutrition Service, Northeast Regional Office.

9.     Defendant, the United States of America, through its agency, the United

States Department of Agriculture, and its sub-agency, the Food and Nutrition Service has

its Northeast Regional Office located at 10 Causeway Street, Room 501, Boston,

Massachusetts.

10.     In this Complaint, the Food and Nutrition Service, Northeast Regional

Office, is hereinafter referred to as "FNS-NERO" and its main office, the Food and

Nutrition Service, Alexandria, Virginia, is hereinafter referred to as "FNS-HQ".

## SUBSTANTIVE ALLEGATIONS

11.     The Plaintiff was appointed Alternative Dispute Resolution (ADR) Mediator

for FNS-NERO by Douglas MacAllister, Director of the Financial Management

Unit, on July 15, 1999.

12.     On December 29, 1999, a female employee of the Financial Management

Unit at  FNS-NERO, Antoinette Bellezza, filed a formal complaint of gender and age

discrimination against the Defendant related to Job Vacancy Announcement No. 99-16-

NE-M and related training for said job.

13.     In May of 2000, Charles Purter, an EEO contract investigator, notified FNS-

NERO that he would be conducting an investigation of Antoinette Bellezza's complaint.

3

A list of the names of the interviewees were provided to FNS-NERO. Said list included the name of the Plaintiff.

14.    The Plaintiff was one of only two non-management employees of the Financial Management Unit, other than the complainant, who provided testimony to the investigator. The other employee, Edmond Kelly, was scheduled to retire in August of 2000. Other employees of the Financial Management Unit declined to testify.

15.    On or about June 12, 2000, Charles Purter, the EEO Contract Investigator, started his investigation at FNS-NERO.

16.    On June 13, 2000, Douglas MacAllister informed the Plaintiff that he was being removed as the Alternative Dispute Resolution (ADR) Mediator for FNS-NERO. No reason was given to the Plaintiff for the reduction in duties. Until this date, MacAllister gave no indication to the Plaintiff that he would be removed as ADR Mediator.

17.    On or about July 14, 2000, the Plaintiff was called by Charles Purter to give testimony. The Plaintiff informed Mr. Purter of the reprisal incident of June 13, 2000.

18.    On August 4, 2000, the Plaintiff completed his extensive testimony  which not only included statements on the gender/age discrimination case of Bellezza v. Veneman, but also included statements alerting the investigator to questionable hiring practices at FNS-NERO,  regarding the special treatment given to "favored employees" and the posting of job vacancies.  As an example, the Plaintiff submitted an e-mail document issued by Douglas MacAllister on November 17, 1998.  Said document became known as Exhibit 19 in the case of  Bellezza v. Veneman, as cited previously.  The

4

Plaintiff's testimony was not confidential and could be shown to any interested party (those with a legal right to know).

19.    On or about August 21, 2000, Douglas MacAllister became aware of a training session on FORM 209 which is used by the Plaintiff in his work. The Plaintiff was only one of two employees available at the time. The other employee was Kirk Hassel, a "favored employee". MacAllister chose Hassel and did not reveal any information on the training session until after the fact at a Financial Management Unit meeting on or about August 23, 2000.

20.    Sometime in August of 2000, Edmond Kelly retired from the Financial Management Unit. His position represented a career advancement opportunity for the Plaintiff, who was a leading candidate for the position. A major part of Mr. Kelly's duties included the review of Cost Allocation Plans submitted by State agencies.

21.    In August of 2000, the Plaintiff began to make inquiries about the posting of Edmond Kelly's job vacancy. Douglas MacAllister stated that he did not know when the position would be posted for application. The Plaintiff continued to make inquiries.

22.    On September 13, 2000 at a Financial Management Unit meeting, the Plaintiff inquired about obtaining approval for training. MacAllister responded by stating that the request "...would probably be denied... ." He offered no alternative. The Plaintiff continued to make inquiries about Edmond Kelly's old job.

23.    At the Financial Management Unit meeting in October of 2000, Douglas MacAllister announced that Edmond Kelly's old job had been "given up...sacrificed" for budget reasons. It would not be available.

24.    At the February 7, 2001 meeting on the Plaintiff's performance evaluation,

the Plaintiff questioned MacAllister about the "sacrifice" of Edmond Kelly's old job.
MacAllister responded that Edmond Kelly's old job had never been sacrificed and denied
making such statements at the Financial Management Unit meeting in October of 2000.
He added that Edmond Kelly's job was still on the Organizational Chart of the Financial
Management Unit. Surprised at this revelation, the Plaintiff asked when the job would be
posted for application. MacAllister responded that he didn't know, since he didn't have
permission from the Regional Administrator, Francis Zorn. The National Treasury
Employees Union representative, Louis Spychalski, was present at the meeting.

25.    At the February 7, 2001 meeting, the Plaintiff filed a grievance under
Article 50, Section 50.08(1) of a collective bargaining agreement between FNS-HQ and
the National Treasury Employees Union alleging that FNS-NERO failed to maintain
consistency and objectivity in the development of performance standards and subsequent
appraisal of performance against these standards, violating Article 9.01(2) (c) (1) of the
agreement. Specifically, the grievance alleged that MacAllister had displayed biased
treatment toward the "favored employee", Kirk Hassel, in career advancement, training,
and promotion actions at the expense of the Plaintiff's career. In addition, the grievance
alleged that Frances Zorn, the Regional Administrator of FNS-NERO, and Margaret
Mann, Personnel Liaison for FNS-NERO, failed to take reasonable corrective action,
when informed of MacAllister's behavior by two other employees of the Financial
Management Unit, Antoinette Bellezza and Julie Larkin. The grievance sought the
transfer of Douglas MacAllister, Frances Zorn, and Margaret Mann to positions in which
they would have no control or influence over personnel actions, training assignments, or

personnel appraisals in the Financial Management Unit. In addition, the Plaintiff sought a training plan similar to the "favored employee" that would culminate, upon satisfactory performance after a 12-month period, in promotion to a Grade 12 level as did a training plan for the "favored employee".

26.     FNS-NERO failed to respond to the Plaintiff's grievance. The Plaintiff appealed to the Acting Administrator, George Braley, under Article 50, Section 50.08(4) Step 3(b) on March 7, 2001. Braley was required to respond to the grievance but declined. Surprisingly, he referred the appeal to Margaret Mann, Personnel Liaison at FNS-NERO, and one of the individuals against whom the grievance was filed. Braley permitted Mann to respond to the appeal in his behalf. In a letter dated, March 26, 2001, Mann denied the Plaintiff's grievance.

27.     In another incident on March 20, 2001, MacAllister notified the Food Stamp Program section (FSP) of the Financial Management Unit about a Cost Allocation training session at the Southeast Regional Office of the Food and Nutrition Service, hereinafter referred to as FNS-SERO on April 3-4, 2001. MacAllister had given a one-week advance notice to other sections of the Financial Management Unit, including the Information Technology section (IT), during the week of March 12, 2001.

28.     Prior to notification to the Food Stamp Program section (FSP), MacAllister had sent materials from Cost Allocation training sessions conducted by former employee, Edmond Kelly, to the instructor of the FNS-SERO courses to determine whether or not the two courses were similar in content and scope. The FNS-SERO instructor replied that the training sessions on April 3-4, 2001 would be similar to the sessions conducted by Edmond Kelly.

29.     Due to the benefit of advance notice, Scott Vehling, an employee of the

Information Technology Unit (IT), expressed an interest in attending the training

session before the Plaintiff had a chance to express his interest. MacAllister gave Vehling

permission to attend the training sessions even though, by MacAllister's own admission,

no concepts on Information Technology were included in the training sessions. About

several weeks later, Vehling was promoted to a Grade 12 level.

30.     At the March 21, 2001 meeting, the Plaintiff requested permission to attend

the Cost Allocation training sessions at SERO on April 3-4, 2001. The topic of Cost

Allocation was directly related to the Plaintiff's Performance Standards for job

performance and was also crucial for promotion to the former job of Edmond Kelly who

had retired. Moreover, the Plaintiff informed MacAllister that he had missed half of

Edmond Kelly's training as a result of having to take his disabled father to the hospital.

The National Treasury Employees Union representative, Louis Spychalski, was present at

the meeting.

31.     At the March 21, 2001 meeting, MacAllister admitted that there were 2

openings available for the training session. Scott Vehling had filled one opening, leaving

another opening available. Nevertheless, MacAllister refused to grant permission to the

Plaintiff to attend the training sessions at FNS-SERO, even in light of the extenuating

circumstances presented to him. When asked under what part of Article 19, Section 19.02

he was denying permission to attend the training sessions, MacAllister refused to select

one of the criteria.

32.     On April 9, 2001, the Plaintiff filed a grievance under the National

Agreement Article 50, Section 50.08(1), alleging a violation of Article 19, Section 19.02 whereby the Plaintiff was denied training in Cost Allocation, without using any criteria listed in the provision. The Plaintiff sought the transfer of Douglas MacAllister, Maragaret Mann, and Frances Zorn to positions in which they would have no control or influence over personnel actions, training assignments, or performance appraisals in the Financial Management Unit. In addition, the Plaintiff sought training in Cost Allocation similar in scope and content to the training sessions given at FNS-SERO on April 3-4, 2001, as determined by an independent, third-party selected by the Plaintiff.

33.    On April 26, 2001, MacAllister denied the grievance and cited Article 19, Section 19.02(d) of the National Agreement which deals with the cost effectiveness of the training. His response was conspicuously silent on the fact that he had granted permission to another employee, Scott Vehling.

34.    Pursuant to appeal instructions in MacAllister's letter of April 26, 2001, the Plaintiff appealed to Frances Zorn, Regional Administrator of FNS-NERO, on May 10, 2001

35.    On May 23, 2001, Ms. Zorn responded to the Plaintiff's appeal, sidestepping the Scott Vehling issue by stating that "…it represents background information, and is not directly related to the specific contract provision allegedly violated. For the same reason, I will not respond to the training of other employees."

36.    Pursuant to appeal instructions in Zorn's letter of May 23, 2001, the Plaintiff appealed to the Acting Associate Administrator, Alberta Frost, on June 6, 2001.

37.    On June 22, 2001, Ms. Frost responded to the Plaintiff's appeal. With regard to the granting of permission to attend the training for Scott Vehling, Ms. Frost

stated,

> "…it is perfectly appropriate for a supervisor to determine that
> a particular training event or other work experience meets the
> needs of one employee, but not another. In this case, since no staff
> from the financial management unit were offered this training, it would
> appear that a judgement was made, on a uniform basis, that this activity
> was not a useful investment of time or funds for Northeast Region financial
> management employees."

Ms. Frost denied the Plaintiff's grievance.

38.     MacAllister conducted an "information exchange" meeting on Cost

Allocation on June 13, 2001. No trained instructor was present to monitor the session or

to answer questions.

39.     As a result of the Defendant's reprisal actions, the Plaintiff's career has been

irreparably damaged.

## COUNT I

### Reduction of Duties And Assignments

40.     Plaintiff incorporates by reference the allegations in the preceding

paragraphs of this complaint as if fully set forth herein.

41.     This Count is brought by the Plaintiff pursuant to Title VII of the Civil

Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(9).

42.     Plaintiff was appointed ADR Mediator for FNS-NERO on July 15, 1999.

From July 19, 1999 to June 12, 2001, the Defendant did not alter or remove, in any

manner, the Plaintiff's duties and assignments as ADR Mediator. In addition, no notice

was issued that any change was planned.

43.     After EEO investigator, Charles Purter, submitted his witness list in May

2000 and started his investigation on June 12, 2000, the Plaintiff was removed without cause on June 13, 2000.

44.     Because of the proximity of the adverse employment action and the commencement of the protected activity, the causal link of retaliation is obvious.

45.     Defendant's reduction in Plaintiff's duties and assignments as ADR Mediator was the beginning of a pattern of reprisal behavior against the Plaintiff.

## COUNT II

### Denial Of Promotional Opportunity

46.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

47.     This Count is brought by Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, Section 2000e-3(a), as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

48.     On August 4, 2000, the Plaintiff not only provided extensive testimony to the EEO investigator, but also alerted him to possible hiring irregularities by providing a copy of an e-mail sent by Douglas MacAllister on November 17, 1998. The document was entered into the investigative report as Exhibit 19. The report was not confidential and could be shown to any interested party (those with a legal right to know).

49.     On August 14, 2000, with the retirement of Edmond Kelly, a job vacancy occurred in the Plaintiff's section of the Financial Management Unit. Said vacancy represented a promotional opportunity for the Plaintiff.

50.     The Plaintiff was a leading candidate for the job vacancy arising from

Edmond Kelly's retirement. He made continuous inquiries as to when the vacancy announcement would be posted.

51.    Misleading statements were issued by the Defendant in an attempt to deny the Plaintiff of a promotional opportunity. At the October 2000 meeting of the Financial Management Unit, Douglas MacAllister, the Director, stated that the position was being "sacrificed...given up" for budget reasons. At a February 7, 2001 meeting with the Plaintiff and the NTEU representative, Louis Spychalski, MacAllister denied making the statement in October 2000. However, he stated that the job was still on the Organizational Chart of the Financial Management Unit, but he didn't know when it would be posted, since he didn't have permission from the Regional Administrator, Frances Zorn, who had given permission to post other job vacancies in other sections of the Northeast Regional Office of the Food and Nutrition Service.

52.    By reason of the foregoing, denials of promotional opportunities are actionable as adverse employment decisions under Title VII of the Civil Rights Act of 1964, as amended.

53.    As a result of the Defendant's failure to post the aforementioned vacancy, the Plaintiff has been deprived of a promotional opportunity and he has incurred serious damage to his career.

## COUNT III

### Obstruction From Competitive Training

54.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

55.     This Count is brought by the Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

56.     When opportunities for competitive training have arisen, the Defendant has obstructed the Plaintiff by withholding information and/or denying training without cause.

57.     On August 23, 2000, the Plaintiff was not informed of a training opportunity on FORM 209, until after the fact.

58.     On September 13, 2000, the Plaintiff received a negative response when making a request for training.  No conditions or exceptions were placed on that negative response.

59.     On March 21, 2001, the Defendant's intent to deny the Plaintiff competitive training reached a new level, when the Plaintiff was denied training even when an opening existed.

60.     The Defendant has deprived the Plaintiff of the same competitive training which was given to other employees.

61.     If the Defendant is left unrestrained under its present policies and practices, there is no limit to the damage it may cause to the Plaintiff's career.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, prays for judgment as follows:

a.      Awarding Plaintiff a promotion of one full grade and one full step from his current Grade 11 Step 4 position to Grade 12  Step 5, retroactive from March 21, 2001.

b.      Awarding Plaintiff his costs and expenses in this litigation, including reasonable attorney's fees and experts' fees and all other costs and disbursements.

c.    Awarding Plaintiff such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues.

Dated: ___9/11/01_____

_____
JOHN G. PEDICINI, PRO SE
10 Milano Drive
Saugus, MA   01906
(781) 233-5274

**EXHIBIT 6**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSETTS

CASE NO. _____

**C 1 - 11564DPW**

| | | |
|---|---|---|
| JOHN G. PEDICINI, | ) | **CIVIL ACTION COMPLAINT** |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
| OF AMERICA, | ) | |
| Defendant | ) | |

Plaintiff, individually, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon an investigation by himself, which included a review of public documents.

### NATURE OF THE ACTION

1.     This is a civil action alleging violation of Title VII of the Civil Rights Act of 1964, as amended, in which the Defendant has engaged in numerous reprisal actions against the Plaintiff for his testimony and whistleblowing activity in a gender/age discrimination case entitled, Antoinette Bellezza v. Ann M. Veneman, Secretary, U.S. Department of Agriculture, EEOC Hearing No. 160-A1-8304X, Agency Case No. 000266.

2.     The Defendant, through its agency, the United States Department of Agriculture, has a well-documented history of mishandling civil rights complaints made by its employees as is evidenced by the **"Office of Civil Rights Status**

**Of The Implementation Of Recommendations Made In Prior Evaluations Of Program Complaints"**, Audit Report No. 60801-4-Hq and **"Office Of Civil Rights Management Of Employment Complaints"**, Audit Report No. 60801-3-Hq, compiled by the Office of the Inspector General, U.S. Department of Agriculture. Said reports are public documents.

3.     The Defendant's sub-agency, the Food and Nutrition Service, has been the subject of numerous complaints at the Equal Employment Opportunity Commission. One of the complaints is Bellezza v. Veneman, as previously cited, in which the Plaintiff has been a major witness and has given extensive testimony and key documents to a contract EEO investigator, Charles Purter. Under Title VII, the Plaintiff has engaged in protected activity. Plaintiff eventually became the EEO representative for the Complainant.

4.     As a result of the Defendant's reprisal actions, the Plaintiff has suffered severe damage to his career.

### JURISDICTION AND VENUE

5.     This action arises under Title VII of the Civil Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

6.     This Court has jurisdiction over the subject matter of this action pursuant to Title VII, Civil Rights Act of 1964, as amended, Section 2000e-16(c). The formal complaint was filed with the U.S. Department of Agriculture on November 17, 2000, Case # USDACR010147, FNS-00-26. The 180-day period has expired. No notice of final action has been issued.

7.     Venue is proper in this district under Section 2000e-16 of Title VII of the Civil Rights Act of 1964, as amended. The wrongs alleged in this Complaint occurred, in

2

substantial part, in this district.

## PARTIES

8.      Plaintiff, John G. Pedicini, is employed, at the Grade 11 Step 4 level, as a

Financial Management Specialist in the Financial Management Unit of the Defendant's

sub-agency, the Food and Nutrition Service, Northeast Regional Office.

9.      Defendant, the United States of America, through its agency, the United

States Department of Agriculture, and its sub-agency, the Food and Nutrition Service has

its Northeast Regional Office located at 10 Causeway Street, Room 501, Boston,

Massachusetts.

10.     In this Complaint, the Food and Nutrition Service, Northeast Regional

Office, is hereinafter referred to as "FNS-NERO" and its main office, the Food and

Nutrition Service, Alexandria, Virginia, is hereinafter referred to as "FNS-HQ".

## SUBSTANTIVE ALLEGATIONS

11.     The Plaintiff was appointed Alternative Dispute Resolution (ADR) Mediator

for FNS-NERO by Douglas MacAllister, Director of the Financial Management

Unit, on July 15, 1999.

12.     On December 29, 1999, a female employee of the Financial Management

Unit at  FNS-NERO, Antoinette Bellezza, filed a formal complaint of gender and age

discrimination against the Defendant related to Job Vacancy Announcement No. 99-16-

NE-M and related training for said job.

13.     In May of 2000, Charles Purter, an EEO contract investigator, notified FNS-

NERO that he would be conducting an investigation of Antoinette Bellezza's complaint.

A list of the names of the interviewees were provided to FNS-NERO. Said list included the name of the Plaintiff.

14.     The Plaintiff was one of only two non-management employees of the Financial Management Unit, other than the complainant, who provided testimony to the investigator. The other employee, Edmond Kelly, was scheduled to retire in August of 2000. Other employees of the Financial Management Unit declined to testify.

15.     On or about June 12, 2000, Charles Purter, the EEO Contract Investigator, started his investigation at FNS-NERO.

16.     On June 13, 2000, Douglas MacAllister informed the Plaintiff that he was being removed as the Alternative Dispute Resolution (ADR) Mediator for FNS-NERO. No reason was given to the Plaintiff for the reduction in duties. Until this date, MacAllister gave no indication to the Plaintiff that he would be removed as ADR Mediator.

17.     On or about July 14, 2000, the Plaintiff was called by Charles Purter to give testimony. The Plaintiff informed Mr. Purter of the reprisal incident of June 13, 2000.

18.     On August 4, 2000, the Plaintiff completed his extensive testimony which not only included statements on the gender/age discrimination case of Bellezza v. Veneman, but also included statements alerting the investigator to questionable hiring practices at FNS-NERO, regarding the special treatment given to "favored employees" and the posting of job vacancies. As an example, the Plaintiff submitted an e-mail document issued by Douglas MacAllister on November 17, 1998. Said document became known as Exhibit 19 in the case of Bellezza v. Veneman, as cited previously. The

Plaintiff's testimony was not confidential and could be shown to any interested party (those with a legal right to know).

19.    On or about August 21, 2000, Douglas MacAllister became aware of a training session on FORM 209 which is used by the Plaintiff in his work. The Plaintiff was only one of two employees available at the time. The other employee was Kirk Hassel, a "favored employee". MacAllister chose Hassel and did not reveal any information on the training session until after the fact at a Financial Management Unit meeting on or about August 23, 2000.

20.    Sometime in August of 2000, Edmond Kelly retired from the Financial Management Unit. His position represented a career advancement opportunity for the Plaintiff, who was a leading candidate for the position. A major part of Mr. Kelly's duties included the review of Cost Allocation Plans submitted by State agencies.

21.    In August of 2000, the Plaintiff began to make inquiries about the posting of Edmond Kelly's job vacancy. Douglas MacAllister stated that he did not know when the position would be posted for application. The Plaintiff continued to make inquiries.

22.    On September 13, 2000 at a Financial Management Unit meeting, the Plaintiff inquired about obtaining approval for training. MacAllister responded by stating that the request "…would probably be denied… ." He offered no alternative. The Plaintiff continued to make inquiries about Edmond Kelly's old job.

23.    At the Financial Management Unit meeting in October of 2000, Douglas MacAllister announced that Edmond Kelly's old job had been "given up…sacrificed" for budget reasons. It would not be available.

24.    At the February 7, 2001 meeting on the Plaintiff's performance evaluation,

the Plaintiff questioned MacAllister about the "sacrifice" of Edmond Kelly's old job.

MacAllister responded that Edmond Kelly's old job had never been sacrificed and denied

making such statements at the Financial Management Unit meeting in October of 2000.

He added that Edmond Kelly's job was still on the Organizational Chart of the Financial

Management Unit. Surprised at this revelation, the Plaintiff asked when the job would be

posted for application. MacAllister responded that he didn't know, since he didn't have

permission from the Regional Administrator, Francis Zorn. The National Treasury

Employees Union representative, Louis Spychalski, was present at the meeting.

   25.    At the February 7, 2001 meeting, the Plaintiff filed a grievance under

Article 50, Section 50.08(1) of a collective bargaining agreement between FNS-HQ and

the National Treasury Employees Union alleging that FNS-NERO failed to maintain

consistency and objectivity in the development of performance standards and subsequent

appraisal of performance against these standards, violating Article 9.01(2) (c) (1) of the

agreement. Specifically, the grievance alleged that MacAllister had displayed biased

treatment toward the "favored employee", Kirk Hassel, in career advancement, training,

and promotion actions at the expense of the Plaintiff's career. In addition, the grievance

alleged that Frances Zorn, the Regional Administrator of FNS-NERO, and Margaret

Mann, Personnel Liaison for FNS-NERO, failed to take reasonable corrective action,

when informed of MacAllister's behavior by two other employees of the Financial

Management Unit, Antoinette Bellezza and Julie Larkin. The grievance sought the

transfer of Douglas MacAllister, Frances Zorn, and Margaret Mann to positions in which

they would have no control or influence over personnel actions, training assignments, or

personnel appraisals in the Financial Management Unit. In addition, the Plaintiff sought a training plan similar to the "favored employee" that would culminate, upon satisfactory performance after a 12-month period, in promotion to a Grade 12 level as did a training plan for the "favored employee".

26.     FNS-NERO failed to respond to the Plaintiff's grievance. The Plaintiff appealed to the Acting Administrator, George Braley, under Article 50, Section 50.08(4) Step 3(b) on March 7, 2001. Braley was required to respond to the grievance but declined. Surprisingly, he referred the appeal to Margaret Mann, Personnel Liaison at FNS-NERO, and one of the individuals against whom the grievance was filed. Braley permitted Mann to respond to the appeal in his behalf. In a letter dated, March 26, 2001, Mann denied the Plaintiff's grievance.

27.     In another incident on March 20, 2001, MacAllister notified the Food Stamp Program section (FSP) of the Financial Management Unit about a Cost Allocation training session at the Southeast Regional Office of the Food and Nutrition Service, hereinafter referred to as FNS-SERO on April 3-4, 2001. MacAllister had given a one-week advance notice to other sections of the Financial Management Unit, including the Information Technology section (IT), during the week of March 12, 2001.

28.     Prior to notification to the Food Stamp Program section (FSP), MacAllister had sent materials from Cost Allocation training sessions conducted by former employee, Edmond Kelly, to the instructor of the FNS-SERO courses to determine whether or not the two courses were similar in content and scope. The FNS-SERO instructor replied that the training sessions on April 3-4, 2001 would be similar to the sessions conducted by Edmond Kelly.

29.     Due to the benefit of advance notice, Scott Vehling, an employee of the

Information Technology Unit (IT), expressed an interest in attending the training

session before the Plaintiff had a chance to express his interest. MacAllister gave Vehling

permission to attend the training sessions even though, by MacAllister's own admission,

no concepts on Information Technology were included in the training sessions. About

several weeks later, Vehling was promoted to a Grade 12 level.

30.     At the March 21, 2001 meeting, the Plaintiff requested permission to attend

the Cost Allocation training sessions at SERO on April 3-4, 2001. The topic of Cost

Allocation was directly related to the Plaintiff's Performance Standards for job

performance and was also crucial for promotion to the former job of Edmond Kelly who

had retired. Moreover, the Plaintiff informed MacAllister that he had missed half of

Edmond Kelly's training as a result of having to take his disabled father to the hospital.

The National Treasury Employees Union representative, Louis Spychalski, was present at

the meeting.

31.     At the March 21, 2001 meeting, MacAllister admitted that there were 2

openings available for the training session. Scott Vehling had filled one opening, leaving

another opening available. Nevertheless, MacAllister refused to grant permission to the

Plaintiff to attend the training sessions at FNS-SERO, even in light of the extenuating

circumstances presented to him. When asked under what part of Article 19, Section 19.02

he was denying permission to attend the training sessions, MacAllister refused to select

one of the criteria.

32.     On April 9, 2001, the Plaintiff filed a grievance under the National

Agreement Article 50, Section 50.08(1), alleging a violation of Article 19, Section 19.02 whereby the Plaintiff was denied training in Cost Allocation, without using any criteria listed in the provision. The Plaintiff sought the transfer of Douglas MacAllister, Maragaret Mann, and Frances Zorn to positions in which they would have no control or influence over personnel actions, training assignments, or performance appraisals in the Financial Management Unit. In addition, the Plaintiff sought training in Cost Allocation similar in scope and content to the training sessions given at FNS-SERO on April 3-4, 2001, as determined by an independent, third-party selected by the Plaintiff.

33.    On April 26, 2001, MacAllister denied the grievance and cited Article 19, Section 19.02(d) of the National Agreement which deals with the cost effectiveness of the training. His response was conspicuously silent on the fact that he had granted permission to another employee, Scott Vehling.

34.    Pursuant to appeal instructions in MacAllister's letter of April 26, 2001, the Plaintiff appealed to Frances Zorn, Regional Administrator of FNS-NERO, on May 10, 2001

35.    On May 23, 2001, Ms. Zorn responded to the Plaintiff's appeal, sidestepping the Scott Vehling issue by stating that "…it represents background information, and is not directly related to the specific contract provision allegedly violated. For the same reason, I will not respond to the training of other employees."

36.    Pursuant to appeal instructions in Zorn's letter of May 23, 2001, the Plaintiff appealed to the Acting Associate Administrator, Alberta Frost, on June 6, 2001.

37.    On June 22, 2001, Ms. Frost responded to the Plaintiff's appeal. With regard to the granting of permission to attend the training for Scott Vehling, Ms. Frost

stated,

> "…it is perfectly appropriate for a supervisor to determine that
> a particular training event or other work experience meets the
> needs of one employee, but not another. In this case, since no staff
> from the financial management unit were offered this training, it would
> appear that a judgement was made, on a uniform basis, that this activity
> was not a useful investment of time or funds for Northeast Region financial
> management employees."

Ms. Frost denied the Plaintiff's grievance.

38.    MacAllister conducted an "information exchange" meeting on Cost

Allocation on June 13, 2001. No trained instructor was present to monitor the session or

to answer questions.

39.    As a result of the Defendant's reprisal actions, the Plaintiff's career has been

irreparably damaged.

## COUNT I

### Reduction of Duties And Assignments

40.    Plaintiff incorporates by reference the allegations in the preceding

paragraphs of this complaint as if fully set forth herein.

41.    This Count is brought by the Plaintiff pursuant to Title VII of the Civil

Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(9).

42.    Plaintiff was appointed ADR Mediator for FNS-NERO on July 15, 1999.

From July 19, 1999 to June 12, 2001, the Defendant did not alter or remove, in any

manner, the Plaintiff's duties and assignments as ADR Mediator. In addition, no notice

was issued that any change was planned.

43.    After EEO investigator, Charles Purter, submitted his witness list in May

2000 and started his investigation on June 12, 2000, the Plaintiff was removed without cause on June 13, 2000.

44.     Because of the proximity of the adverse employment action and the commencement of the protected activity, the causal link of retaliation is obvious.

45.     Defendant's reduction in Plaintiff's duties and assignments as ADR Mediator was the beginning of a pattern of reprisal behavior against the Plaintiff.

## COUNT II

### Denial Of Promotional Opportunity

46.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

47.     This Count is brought by Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, Section 2000e-3(a), as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

48.     On August 4, 2000, the Plaintiff not only provided extensive testimony to the EEO investigator, but also alerted him to possible hiring irregularities by providing a copy of an e-mail sent by Douglas MacAllister on November 17, 1998. The document was entered into the investigative report as Exhibit 19. The report was not confidential and could be shown to any interested party (those with a legal right to know).

49.     On August 14, 2000, with the retirement of Edmond Kelly, a job vacancy occurred in the Plaintiff's section of the Financial Management Unit. Said vacancy represented a promotional opportunity for the Plaintiff.

50.     The Plaintiff was a leading candidate for the job vacancy arising from

Edmond Kelly's retirement. He made continuous inquiries as to when the vacancy announcement would be posted.

51.     Misleading statements were issued by the Defendant in an attempt to deny the Plaintiff of a promotional opportunity.  At the October 2000 meeting of the Financial Management Unit, Douglas MacAllister, the Director, stated that the position was being "sacrificed...given up" for budget reasons.  At a February 7, 2001 meeting with the Plaintiff and the NTEU representative, Louis Spychalski,  MacAllister denied making the statement in October 2000. However, he stated that the job was still on the Organizational Chart of the Financial Management Unit, but he didn't know when it would be posted, since he didn't have permission from the Regional Administrator, Frances Zorn, who had given permission to post other job vacancies in other sections of the Northeast Regional Office of the Food and Nutrition Service.

52.     By reason of the foregoing, denials of promotional opportunities are actionable as adverse employment decisions under Title VII of the Civil Rights Act of 1964, as amended.

53.     As a result of the Defendant's failure to post the aforementioned vacancy, the Plaintiff has been deprived of a promotional opportunity and he has incurred serious damage to his career.

## COUNT III

### Obstruction From Competitive Training

54.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

55.     This Count is brought by the Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

56.     When opportunities for competitive training have arisen, the Defendant has obstructed the Plaintiff by withholding information and/or denying training without cause.

57.     On August 23, 2000, the Plaintiff was not informed of a training opportunity on FORM 209, until after the fact.

58.     On September 13, 2000, the Plaintiff received a negative response when making a request for training.  No conditions or exceptions were placed on that negative response.

59.     On March 21, 2001, the Defendant's intent to deny the Plaintiff competitive training reached a new level, when the Plaintiff was denied training even when an opening existed.

60.     The Defendant has deprived the Plaintiff of the same competitive training which was given to other employees.

61.     If the Defendant is left unrestrained under its present policies and practices, there is no limit to the damage it may cause to the Plaintiff's career.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, prays for judgment as follows:

a.      Awarding Plaintiff a promotion of one full grade and one full step from his current Grade 11 Step 4 position to Grade 12  Step 5, retroactive from March 21, 2001.

b.      Awarding Plaintiff his costs and expenses in this litigation, including reasonable attorney's fees and experts' fees and all other costs and disbursements.

c.    Awarding Plaintiff such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues.

Dated:    9/11/01

JOHN G. PEDICINI, PRO SE
10 Milano Drive
Saugus, MA   01906
(781) 233-5274

# EXHIBIT 7

13478

**EEO COUNSELOR'S REPORT**
**FSA Case # MA-03-001E**
**USDACR030362**
**May 27, 2003**



**Responding Agency:**          **Food and Nutrition Service**
                                **3101 Park Center Drive**
                                **Alexandria, Virginia 22302**

---

## Complainant Information

Name: Pedicini, John G.

Home Address:                          Work Address:
10 Milano Drive                        10 Causeway Street, Room 501
Saugus, Massachusetts 01906            Boston, Massachusetts 02222

Telephone: (781) 233-5274              Telephone: (617) 565-6449

Organizational Unit:   Financial Management Division

Job Title, Series, and Grade: GS-0505-11/5          x__  Federal Employee
                    Financial Management Specialist  ____  County Employee

Representative Name, Address and Telephone Number:   Martin Hines (non-attorney)
                                                     10 Causeway Street, Room 501
                                                     Boston, Massachusetts 02222
                                                     (617) 565-6454

Anonymity:  ___Yes          Bargaining Unit Employee:   x_Yes
            x_No                                        ___No

---

## Chronology of EEO Counseling Process

Date of Initial Contact with EEO Counselor: 03/05/03

Date of Initial Interview: 03/07/03

45th Day after Action(s)/Occurrence(s)/Incidence(s): 04/16/03

1

Exhibit  3
Page  1  of 12

Reason for Contact Beyond 45th Day (if applicable):  n/a

Date Extension Granted:  n/a

Date of Final Interview:  03/19/03

Date of Notice of Right to File A Formal (NRF):  03/19/03

Date NRF Received by Complainant:  04/03/03

## Information about the Complaint

Basis:  Reprisal:  Served as complainant representative in EEO complaints

| Claim # | Date of Claim: | Incident: |
|---------|----------------|-----------|
| 1) | 03/03/03 | Assignment of duties |
| 2) | 03/13/03 | Letter of Counseling |

The complainant alleged that the Food and Nutrition Service (FNS) discriminated against him when the FNS removed him as the alternate to the Northeast Regional Office (NERO) Funds Officer and issued him a letter of counseling.

**Have the same claims been raised in either of the following forums?  If yes, please attach supporting documentation or provide details.**

| | |
|---|---|
| Negotiated Grievance | No |
| MSPB Appeal | No |
| Prior EEO Complaint | No |
| Civil Action | No |

## Information about the Responding Management Official

Name:  Douglas MacAllister

Title/Series/Grade:    Director, Financial Management Division

Work Address:    Food and Nutrition Service
Northeast Regional Office
10 Causeway Street, Room 501
Boston, Massachusetts 02222

2

Exhibit 3
Page 2 of 12

Telephone: (617) 565-6446

Relationship to Complainant/Issue: Responding Official/Second Line Supervisor

---

**Involvement of Others in the Complaint**

John Ghiorzi
Deputy Regional Director
Northeast Regional Office
Food and Nutrition Service
10 Causeway Street, Room 501
Boston, Massachusetts 02222
(617) 565-6370

---

**Facts Developed During the Inquiry**

### Interview with Complainant

The Complainant contacted the Farm Service Agency's EEO Counseling and Mediation Branch on 03/05/03. I conducted an initial interview on 03/07/03, explained my role as an EEO Counselor and explained his rights and responsibilities in the EEO complaint process. The written Notice of Rights and Responsibilities was mailed, certified, return receipt, to the complainant on 03/07/03, and received on 03/14/03.

The Complainant explained that he has served as the alternate to the NERO Funds Officer, with certifying rights, since 1998. On 03/03/03, he learned that the Responding Official (Director, Financial Management Division) did not consider him to be the alternate to the NERO Funds Officer under the current Foundation Financial Information System (FFIS) . Consequently, the Complainant would not be designated as the alternate to the NERO Funds Officer under the new Integrated Acquisition System (IAS). The Complainant feels these duties would enable him to gain valuable experience for career advancement opportunities. He believes this to be a reduction of his duties in retaliation for him serving as a representative in the EEO complaint process.

The Complainant provided a copy of an email message which indicates that he is the alternate to the NERO Funds Officer with certifying rights (Exhibit 1). The Complainant also provided an email summarizing his EEO complaint (Exhibit 2). Further, on 03/17/03, the Complainant added another issue (letter of counseling) revolving around a letter he received from the Responding Official (Exhibit 3). The Complainant feels this letter is another example of the retaliation he has been subjected to by the Responding Official.

3

Exhibit 3

Page 3 of 12

US0043

I contacted the Complainant to relay management's response to his allegations and requested remedies. I explained that management was not willing to grant the relief requested.

### Interview with Douglas MacAllister
Director, Financial Management
(Responding Official/Second Line Supervisor)

I contacted the Responding Official to discuss the Complainant's allegations and requested remedy. The Responding Official stated that he was aware of the Complainant's participation in the EEO complaint process but did not discriminate against the Complainant.

The Responding Official explained that the Complainant had been inadvertently omitted from a list of division employees slated to attend various training sessions. The omission had been corrected. He said that he scheduled a meeting with the Complainant to discuss his current work assignments in FFIS and how his work assignments would relate to the implementation of the IAS. He explained that no decision had been made to reduce the Complainant's duties in FFIS, remove him as the alternate to the NERO Funds Officer, or the implementation of the IAS.

The Responding Official further explained that his 03/13/03, letter to the Complainant was to clarify the confusion revolving around the meeting he scheduled to discuss the assignment of work and the implementation of the IAS.

### Interview with John Ghiorzi
Deputy Director, Northeast Regional Office
(Management Official)

I contacted Mr. Ghiorzi to discuss the Complainant's allegations and requested remedy. Mr. Ghiorzi stated that he was aware of the Complainant's participation in the EEO complaint process. He explained that no decision had been made to reduce the Complainant's duties in FFIS, remove him as the alternate to the NERO Funds Officer, or the implementation of the IAS.

---

### Specific Remedy Requested by the Complainant

The Complainant requested that the Agency:

1. Provide a letter confirming his assignment as the alternate to the NERO Funds Officer under FFIS and IAS

4

Exhibit 3

Page 4 of 12

**Resolution Efforts**

I discussed the complainant's requested remedy to resolve the complaint with management. Management was unable to meet the complainant's requested remedy.

**Closure**

Alternative dispute resolution was not offered to the complainant. Resolution was not achieved during the informal counseling phase. I conducted the final interview on 03/19/03. The Notice of Right to File a Formal Complaint was mailed, certified, return receipt requested, to the Complainant on 03/19/03, and was received on 04/03/03.

_____     05/27/03
Gregory E. Ferby                        Date
EEO Counselor
Farm Service Agency
441 South Salina Street, Suite 356
Syracuse, NY 13202
(315) 477-6310
(315) 477-6338 (fax)

**Exhibits**

1. Email from J.Lash to J.Pedicini, dated 03/04/03
2. Email from J.Pedicini to G.Ferby, dated 03/12/03
3. Letter from D.MacAllister to J.Pedicini, dated 03/13/03
4. Notice of Right to File a Formal Complaint, dated 03/19/03
5. PS Form 3811, Return Receipt Request (7002 0860 0008 6875 3590)

5

Exhibit 3
Page 5 of 12

28                    US0045

# EXHIBIT 8

## FORMAL COMPLAINT OF DISCRIMINATION
### FSA CASE # MA-03-001E

USDACR 030302

| Name of Complainant (Last, First, Middle Initial) | Name of Representative (Last, First, Middle Initial) | |
|---|---|---|
| John G. Pedicini | | |
| Address  10 Milano Drive  Saugus, MA   01906 | Address | |

| Home Telephone No. | Work Telephone No. | Home Telephone No. | Work Telephone No. |
|---|---|---|---|
| 781-233-5274 | 617-565-6449 | | |

| Name and Address of Agency Which You Believe Discriminated Against You | Name and Telephone Number of EEO Counselor Who Attempted Resolution |
|---|---|
| U.S.D.A. - Food and Nutrition Service  Northeast Regional Office  10 Causeway St., Rm 501  Boston, MA 02222 | Gregory Ferby  (315) 477-6310 |

| Responding Official (Alleged Discriminating Official) | Date You Received the Notice of Right to File a Formal Complaint |
|---|---|
| Douglas MacAllister,  Joseph Stanco,  John Ghiorzi,  Frances Zorn | 3/24/03 . |

Reason(s)/Basis(es) You Believe You Were Discriminated Against

Reprisal for prior EEO activity, and harrassment which has created a hostile work environment.

AN EQUAL OPPORTUNITY EMPLOYER

Exhibit ___1___

Page __1__ of _3_

10          US0033

# FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-03-001E

How Were You Discriminated Against? (Explain how you were treated differently from other employees or applicants because of your race, color, religion, national origin, marital status, disability, sex, age, reprisal, or sexual orientation. If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each).

1.) Reprisal for prior EEO activity. As EEO representative for another FNS-NERO employee, the Agency sought to retaliate against me by issuing a disciplinary warning letter on 3/13/03.

2.) Harrassment, creation of hostile work environment — The letter of 3/13/03 was unsupported by the circumstances described therein. NERO officials made substantial errors in judgment.

(Use additional sheets, if necessary)

Specific Corrective Action You Want Taken on Your Complaint (If more than one allegation is being made, state overall corrective action desired and the specific correction action desired for each separate allegation).

$100,000 in compensatory damages and a promotion of two grades above my current grade and step, retroactive to 3/13/03.

If Applicable to This Complaint, Please Check the Statement(s) Below

| | |
|---|---|
| | I filed a grievance through the negotiated grievance procedure. |
| | I filed an appeal with the Merit Systems Protection Board. |
| | I filed a civil action in U.S. District Court. |

| Signature of Complainant (You must sign this form unless your representative is an attorney). John H. Redican | Date 3/25/03 |
|---|---|
| Signature of Attorney | Date |

Privacy Act Statement (6 USC 552a)

This form is subject to the Privacy Act of 1974
Authority: 42 USC 2000E-16
Principal Purpose: To establish the case records and assist in the processing of the complaint
Routine Use: Used by EEO officials, administrative judges, investigators, the Equal Employment Opportunity Commission, and/or the Department of Justice for processing the complaint and appeal.
Disclosure is Voluntary: If the individual does not furnish the information requested, there will be no adverse consequences. However, failure to furnish information requested on the form may delay or impair processing of the complaint.

AN EQUAL OPPORTUNITY EMPLOYER

Exhibit 1
Page 2 of 3

17

**EXHIBIT  9**

## Pedicini, John

| | |
|---|---|
| **From:** | Gregory Ferby [gregory.ferby@ny.usda.gov] |
| **Sent:** | Friday, February 06, 2004 8:26 AM |
| **To:** | Pedicini, John |
| **Subject:** | RE: EEO Complaint Against FNS-NERO and FNS-ALEXANDRIA |

Hi John;

I was out of the office this week just in today to return emails and voice-messages. I will not return to the office until Wednesday-02/11/04. I will call you then. Please email your work and home phone numbers and copy emails to my alternate worksite email address at: eeosyracuse@aol.com

Talk to you next week--------Greg

-----Original Message-----
**From:** Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
**Sent:** Thursday, February 05, 2004 2:58 PM
**To:** gregory.ferby@ny.usda.gov
**Subject:** RE: EEO Complaint Against FNS-NERO and FNS-ALEXANDRIA
**Importance:** High

Mr. Ferby:

Please consider this e-mail as an EEO complaint against the U.S.D.A., Food and Nutrition Service in Boston ( i.e. FNS-NERO) and in Alexandria, Virginia (i.e. FNS-Alexandria). The charge is reprisal for EEO activity in the selection process for Job Announcement #NE-043-03-10, Financial Management Specialist.

I applied for this job as an internal candidate and as an external candidate. I did not qualify as an internal candidate because I am a Grade 11. However, as an external candidate, I did qualify. In the past, I applied for this job and the KSAs were the same. My rating as an external candidate was 97 NV.

Originally, the announcement opened on 7/16/03 and closed on 8/29/03. At a monthly meeting of the Financial Management Unit at FNS-NERO in October 2003, Douglas MacAllister stated that "...they [the selecting officials at FNS-NERO] looked at the External List and didn't like what they saw."

On October 31, 2003, the position was announced again with essentially the same KSAs. It closed on December 5, 2003. I applied again as an internal candidate and as an external candidate.

In an e-mail dated January 21, 2004, Donna Davis, the personnel specialist at FNS-Alexandria who performed the ratings for the job announcement, stated my rating as an external candidate was 81 NV. She said, "This did not make the top 3; therefore, you were not referred for consideration for this vacancy." I asked how my rating could go from 97 NV to 81 NV. In addition, I asked for information on the crediting plan.

In an e-mail dated January 22, 2004, Ms. Davis refused to release information on the crediting plan. She explained that a **different crediting plan** was used when the job announcement was reposted on October 31, 2003, resulting in my reduced rating. I find this change to be more than coincidental. It was a deliberate attempt by FNS-NERO to remove me from the most qualified list. Thus, I am filing this complaint.

----John Pedicini

*P-2050*

11/14/2005

# EXHIBIT 10

## Pedicini, John

| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Thursday, June 17, 2004 8:58 AM |
| **To:** | 'gregory.ferby@ny.usda.gov' |
| **Subject:** | EEO Complaint |
| **Importance:** | High |

Mr. Ferby:

I am hereby filing an EEO complaint against my first-line supervisor, Michael Malone; second-line-supervisor, Douglas MacAllister; Regional Administrator, Frances Zorn, based on events of June 2, 2004.

The allegations are reprisal for EEO activity (EEO representation of other employees), reduction in duties that amounts to a constructive demotion, and hostile environment harassment.

During March and April of 2004, I initiating counseling another employee, Kathy Tankersley, on an EEO complaint.

On June 2, 2004, in response to a request for certification of funds availability from another employee at NERO, Mr. Malone informed me that I could not certify **any** requests for fund availability. Previously, the former Section Chief, Joseph Stanco had continued allowing me to certify funds availability that had been ongoing duties as part of my position as Alternate Funds Officer for the office. Mr. Stanco had not granted the certification rights for a new system, Integrated Acquisition System (IAS) which is the subject of a previous EEO Complaint (#010147). While Mr. Malone has taken away higher-level duties (i.e. certification of funds availability), he has added lower-level duties (i.e. travel voucher data entry duties of an Accounting technician). The combined actions have the effect of a constructive demotion for my position.

In Mr. Malone's haste to prevent me from certifying funds availability for a purchase order on June 2, 2004, he illegally certified funds availability when he had no authority to do so. To make matters worse, Mr. Malone does not have any training in the funds approval process and has virtually no experience in financial accounting. These actions took place under the direction of Douglas MacAllister, Financial Management Director, and Frances Zorn, the Regional Administrator.

The sole reason for these actions is to obstruct career advancement opportunities for me, as a result of my EEO activity. The act of certifying funds availability enables me to advance to the next Grade level. This is the reason for the actions by Ms. Zorn, Mr. MacAllister, and Mr. Malone. Ms. Zorn has been obsessed with my EEO representation of NERO employees and has taken extraordinary steps in the past to prevent it.

--------John G. Pedicini

P-2183

6/17/2004

# EXHIBIT 11

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com℠

OFFICIAL USE
WASHINGTON DC 20024

| | | | |
|---|---|---|---|
| Postage | $ | 0.37 | UNIT ID: 0114 |
| Certified Fee | | 2. | Postmark |
| Return Receipt Fee (Endorsement Required) | | 1.75 | Here |
| Restricted Delivery Fee (Endorsement Required) | | | JUL 15 2004 |
| Total Postage & Fees | $ | 4.42 | 07/15/04 |

Sent To  USDA - office of Civil Rights
Street, Apt. No.  Chief, Employment Comp. & Adj. Division
or PO Box No.  300 7th Street, SW
City, State, ZIP+4  Washington, DC 20024

PS Form 3800, June 2002                See Reverse for Instructions

USDA, Office of Civil Rights
Chief, Employment Complaint and Adjudication
Reporters Building Room #607
300 7th Street, SW
Mail Stop 9440
Washington, DC 20024


July 15, 2004

CERTIFIED MAIL
RETURN RECEIPT
REQUESTED


# <u>RE: FILING OF FORMAL COMPLAINT</u>

To whom it may concern:

Enclosed is the completed form entitled, **Formal Complaint of Discrimination, FSA Case #MA-04-005E.**

The filing of this complaint is timely, since it falls within the 15 calendar day period after receipt of the notice. It is 7 calendar days after receipt of the notice.

If you have any questions, please contact me at 781-233-5274(Home) or 617-565-6449(work).

Sincerely,

John G. Pedicini
10 Milano Drive
Saugus, MA 01906


P-2209

# FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-04-005E

| Name of Complainant (Last, First, Middle Initial) | Name of Representative (Last, First, Middle Initial) |
|---|---|
| Pedicini, John G. | |
| Address  10 Milano Drive  Saugus, MA 01906 | Address |

| Home Telephone No. | Work Telephone No. | Home Telephone No. | Work Telephone No. |
|---|---|---|---|
| 781-233-5274 | 617-565-6449 | | |

| Name and Address of Agency Which You Believe Discriminated Against You | Name and Telephone Number of EEO Counselor Who Attempted Resolution |
|---|---|
| U.S. D/A — Food and Nutrition Service  Northeast Regional Office  10 Causeway Street, Rm. 501  Boston, MA 02222 | Gregory Ferby  (315) 477-6310 |

| Responding Official (Alleged Discriminating Official) | Date You Received the Notice of Right to File a Formal Complaint |
|---|---|
| Frances Zorn, Douglas MacAllister, Michael Malone | 7/8/04 |

**Reason(s)/Basis(es) You Believe You Were Discriminated Against**

Reprisal for prior EEO activity and hostile workplace harassment. The elimination of my ability to certify funds availability has prevented me from performing the duties and responsibilities of my job as Alternate Funds officer for the Northeast Regional office. It has created an intimidating work environment.

P-2210

**AN EQUAL OPPORTUNITY EMPLOYER**

# FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-04-005E

How Were You Discriminated Against? (Explain how you were treated differently from other employees or applicants because of your race, color, religion, national origin, marital status, disability, sex, age, reprisal, or sexual orientation. If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each).

( Reduction in duties)

I represented another USDA employee in an EEO complaint during march and April of 2004. On June 2, 2004, I was informed that I could no longer certify the availability of funds in any way whatsoever. Other employees in other regions who are Alternate funds officers do not have this restriction. It obstructs my career advancement to funds officer and my ability to perform
(Use additional sheets, if necessary), the duties of my current position.

Specific Corrective Action You Want Taken on your Complaint (If more than one allegation is being made, state overall corrective action desired and the specific correction action desired for each separate allegation).

A promotion of two grades above my current grade and step, as well as any damages, retroactive to 6|2|04.

If Applicable to This Complaint, Please Check the Statement(s) Below

| | |
|---|---|
| | I filed a grievance through the negotiated grievance procedure. |
| | I filed an appeal with the Merit Systems Protection Board. |
| | I filed a civil action in U.S. District Court. |

| Signature of Complainant (You must sign this form unless your representative is an attorney). | Date |
|---|---|
| *John H. Redicum* | 7/15/04 |
| Signature of Attorney | Date |

### Privacy Act Statement (6 USC 552a)

This form is subject to the Privacy Act of 1974.
Authority: 42 USC 2000E-16
Principal Purpose: To establish the case records and assist in the processing of the complaint
Routine Use: Used by EEO officials, administrative judges, investigators, the Equal Employment Opportunity Commission, and/or the Department of Justice for processing the complaint and appeal.
Disclosure is Voluntary: If the individual does not furnish the information requested, there will be no adverse consequences. However, failure to furnish information requested on the form may delay or impair processing of the complaint.

**AN EQUAL OPPORTUNITY EMPLOYER**

P-2211

**EXHIBIT 12**

USDA, Office of Civil Rights
Chief, Employment Complaint and Adjudication Division
Reporters Building, Room # 607
300 7th Street, SW
Mail Stop 9440
Washington, D.C. 20024

November 23, 2004                    **CERTIFIED MAIL**
                                     **RETURN RECEIPT**
                                     **REQUESTED**

**RE:  FSA CASE #MA-05-001E**

To whom it may concern:

Enclosed is the completed form for filing a Formal Complaint of Discrimination in
the above-entitled case.

_**Please note that a civil action was filed in U.S. District Court in Boston on
November 12, 2004.**_

Thank you for your attention to this matter.

Sincerely,

John G. Pedicini
10 Milano Drive
Saugus, MA  01906

P-2184

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

WASHINGTON DC 20024

| | | |
|---|---|---|
| Postage | $ 0.37 | UNIT ID: 0114 |
| Certified Fee | 2.30 | |
| Return Reciept Fee (Endorsement Required) | 1.75 | Postmark Here  Clerk: KHJ91X |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 4.42 | NOV 23 2004 |

Sent To  USDA  Office of Civil Rights
Street, Apt. No.; or PO Box No.  300 7th St. SW
City, State, ZIP+4

## FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-05-001E

| Name of Complainant (Last, First, Middle Initial) | Name of Representative (Last, First, Middle Initial) |
|---|---|
| John G. Pedicini | |

| Address | 10 Milano Drive | Address |
| | Saugus, MA 01906 | |

| Home Telephone No. | Work Telephone No. | Home Telephone No. | Work Telephone No. |
|---|---|---|---|
| 781-233-5274 | 617-565-6449 | | |

| Name and Address of Agency Which You Believe Discriminated Against You | Name and Telephone Number of EEO Counselor Who Attempted Resolution |
|---|---|
| U.S.D.A. — Food and Nutrition Svc. 10 Causeway St, Rm. 501 Boston, MA 02222 | Greg Ferby 315-477-6310 |

| Responding Official (Alleged Discriminating Official) | Date You Received the Notice of Right to File a Formal Complaint |
|---|---|
| Michael Malone, Douglas MacAllister, Frances Zorn, Robert Canavan, Roberto Salazar | Nov. 15, 2004 |

**Reason(s)/Basis(es) You Believe You Were Discriminated Against**

reduction in duties, assignment of duties, restricted use of official time, hostile work environment based on reprisal for previous EEO activity.

P-2185

AN EQUAL OPPORTUNITY EMPLOYER

# FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-05-001E

How Were You Discriminated Against? (Explain how you were treated differently from other employees or applicants because of your race, color, religion, national origin, marital status, disability, sex, age, reprisal, or sexual orientation. If your complaint involves more than one allegation of discrimination, list and number each allegation of discrimination separately and furnish specific, factual information in support of each). Agency is training people in my duties. The Agency has prohibited me from using the title, Alternate Funds Officer, per Deputy Regional Administrator. Agency has placed restrictions on my EEO activity that are not placed on other employees, Agency has issued numerous disciplinary letters of instruction as a means of harassment. The FNS Administrator, Roberto Salazar, has participated in (Use additional sheets, if necessary) these retaliatory acts.

Specific Corrective Action You Want Taken on your Complaint (If more than one allegation is being made, state overall corrective action desired and the specific correction action desired for each separate allegation). Immediate Promotion to Grade 13, retroactive to March of 2003; disciplinary action under Section 204 of the No Fear Act against Roberto Salazar, Frances Zorn, Douglas MacAllister, Robert Canavan, and Michael Malone.

If Applicable to This Complaint, Please Check the Statement(s) Below

| | |
|---|---|
| | I filed a grievance through the negotiated grievance procedure. |
| | I filed an appeal with the Merit Systems Protection Board. |
| ✓ | I filed a civil action in U.S. District Court. filed on 11/12/04. |

| Signature of Complainant (You must sign this form unless your representative is an attorney). *John A. Pedicini* | Date 11/22/04 |
|---|---|
| Signature of Attorney | Date |

Privacy Act Statement (6 USC 552a)

This form is subject to the Privacy Act of 1974.
Authority: 42 USC 2000E-16
Principal Purpose: To establish the case records and assist in the processing of the complaint
Routine Use: Used by EEO officials, administrative judges, investigators, the Equal Employment Opportunity Commission, and/or the Department of Justice for processing the complaint and appeal.
Disclosure is Voluntary: If the individual does not furnish the information requested, there will be no adverse consequences. However, failure to furnish information requested on the form may delay or impair processing of the complaint.

P-2186

## AN EQUAL OPPORTUNITY EMPLOYER