**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **JOHN G. PEDICINI,** | **CIVIL ACTION NO. 04-12395-JLT** |
| **Plaintiff** | **Memorandum in Support of** |
|  | **Motion For Leave To Depose** |
| **-vs-** | **Additional Witnesses, Make** |
|  | **Document Requests, Order** |
| **UNITED STATES OF AMERICA** | **Defendants To Reimburse** |
| **UNITED STATES DEPARTMENT OF** | **Plaintiff For Payment Of** |
| **AGRICULTURE,** | **Travel Costs For Defendants'** |
| **ANN M. VENEMAN, SECRETARY,** | **Employees, And Order The** |
| **Defendants** | **Application Of 29 CFR1614.605(b)** |
|  | **Under F.R.C.P. 26, 30, 34, and** |
|  | **L.R. 26.1 (C)** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO DEPOSE**
**ADDITIONAL WITNESSES, MAKE DOCUMENT REQUESTS, ORDER DEFENDANTS TO**
**REIMBURSE PLAINTIFF FOR PAYMENT OF TRAVEL COSTS FOR DEFENDANTS'**
**EMPLOYEES, AND ORDER THE APPLICATION OF 29 CFR 1614.605(b)**

Plaintiff JOHN G. PEDICINI, pro se, comes before this Court

pursuant to Federal Rules of Civil Procedure 26, 30, and 34 and

Local Rules 26.1(c) for an order allowing the deposition of two

additional witnesses who are relevant to his cause of action,

whose relevance was unknown to Plaintiff until recently, and to

make formal document requests for relevant documents. Plaintiff

requests a reasonable amount of time up to March 31, 2006 to

allow him to depose these witnesses, obtain and review the

following documents, and make any needed follow up requests based

upon examination of these witnesses and documents. Plaintiff also

requests Defendants be ordered to reimburse him for payment of

travel costs for Defendants' employees and an order to apply 29

1

CFR 1614.605(b) to enable Plaintiff sufficient time to prepare for this case.

## Statement of Facts and Procedural History

On November 12, 2004, John G. Pedicini, through his former counsel, filed a Complaint against the United States of America and the U.S. Department of Agriculture via its Secretary, in her official capacity, for violations of Title VII, the Administrative Procedure Act ("APA"), the 5th Amendment and Breach of Contract. The Defendants filed their answer dated January 19, 2005.  On March 21, 2005 Plaintiff received the initial disclosures from Defendants.  Whether or not Plaintiff was an alternate or backup funds officer with certification rights and duties is relevant to whether or not Defendants have retaliated against Plaintiff by stripping him of this title and duties, as alleged in the Amended Complaint in the above captioned matter. Whether or not Defendants have sought to block Plaintiff's career path by training others in his position and to the only direct position of advancement for which Plaintiff is uniquely qualified in his office is also a relevant claim and relevant to Plaintiff's proof of retaliatory animus against him, as alleged in the Amended Complaint in this matter.  Whether or not Defendants hold any retaliatory animus towards Plaintiff based on his participation in protected activities is relevant to Plaintiff's claims of retaliation.

2

Defendants have claimed in their original Answer to the
original Complaint that Plaintiff was never a backup or alternate
funds officer, that no such position exists, and Plaintiff never
had certification duties or responsibilities. (Answer of the
United States of America dated January 19, 2005, paragraph 37 and
38). In addition, Defendants have claimed they did not retaliate
against Plaintiff in the Answer of the United States dated
January 19, 2005.

Plaintiff has alleged in his Amended Complaint in paragraphs
34 through 48, paragraphs 76 through 82, paragraph 93, and
paragraphs 107-113, without limit, that he held the title of
Alternate or Backup Funds Officer, that he had certifying rights,
and that his supervisors retaliated against him in part by taking
away his title and certifying duties. In Defendant's Answer to
Plaintiff's first Complaint, Defendants claimed that there was no
such title as backup or alternate funds officer, that Plaintiff
never held that title and that Plaintiff never had the
responsibility or ability to certify funds availability
(Defendants' Answer Paragraphs 37-38). Defendants have claimed in
their Answer to Plaintiff's amended Complaint, dated December 2,
2005, that Plaintiff " …does not have certifying rights and that
he does not, and never did have the title of Alternate/Backup
Funds Officer." See Answer of the United States of America to
Plaintiff's Amended Complaint, dated December 2, 2005, page 15,
paragraph 110, attached hereto as Exhibit 2.

3

On November 2, 2005, Defendants filed Defendants' Opposition To Plaintiff's Motion For Leave To Depose Additional Witnesses, Make Document Requests, and Extend Discovery Period which included two affidavits. One was from Lisha Dorman and the other was from Larry Blim. In her affidavit, Dorman stated, "In fact, there are no FNS policies or procedures that even mention a "backup" or "alternate" funds officer". See copy of affidavit of Lisha Dorman, page 2-3, paragraph 12, attached hereto as Exhibit 1. In his affidavit, Blim stated, "In fact, there are no USDA policies or procedures that even mention a "backup" or "alternate" funds officer." See copy of affidavit of Lawrence Blim, page 2, paragraph 8, attached hereto as Exhibit 2.

On November 15, 2005, Plaintiff filed Plaintiff's Motion For Leave To Depose Additional Witnesses, Make Document Requests, and Extend Discovery Period, asking for leave from this Honorable Court to depose Roger Hamilton and Bruce Potvin. In that motion, the Plaintiff stated that Bruce Potvin had revealed to him a private conversation with Roger Hamilton, Potvin's supervisor in the Financial Management Unit. In the conversation, Hamilton told Potvin that the Plaintiff would be systematically excluded from selection for the Budget Analyst position when the current Budget Analyst, Marty Hines, retired. Hamilton further stated that the Defendants would be providing training prior to selection. Bruce Potvin confirmed this conversation and its relation to blocking the career advancement of the Plaintiff. See Deposition of Bruce Potvin, attached hereto as Exhibit 3.

4

Defendants filed Defendants Opposition To Plaintiff's Motion For Leave To Depose Additional Witnesses, Make Document Requests, and Extend Discovery Period on November 29, 2005, objecting to additional depositions as duplicative and burdensome.

On December 6, 2005, this Court ordered five additional depositions, which included Bruce Potvin, Roger Hamilton, Angela McElmurray, Lisha Dorman, and Larry Blim, to be completed by January 31, 2006.

Since December 6, 2005, Plaintiff has learned of two additional witnesses with relevant testimony to his allegations that he was and is the backup funds officer for Defendant's Northeast Regional Office and that such designation is in writing signed by supervisor on Form FNS-1143. See copy of Form FNS-1143, attached hereto as Exhibit 4. Two supervisors granted, in writing, to Plaintiff the rights and duties of a funds officer on March 12, 2002 (See copy of Form FNS-674, attached hereto as Exhibit 5) and on February 24, 2004 (See copy of Form FNS-674, attached hereto as Exhibit 6). These are agency authorization forms handled by computer security officers. At the regional level, Lori Lodato is a Computer Security Officer and keeper of the original records. Juanita Makuta is the Agency Computer Security Officer and keeper of the records at the agency's headquarters office in Alexandria, VA.

## Argument

**Point 1:   Plaintiff's Motion For Leave To Make Document Requests Should Be Granted Because the Document Requests Are Relevant to Retaliatory Motive and Animus**

5

Federal Rules of Civil Procedure 26(b)(1)states that, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party… ."

The documents requested by Plaintiff relating to the FSP/IF Section Chief ("Section Chief") job announcements at FNS-NERO after he began to participate in EEO activities are relevant to show retaliatory motive and animus against Plaintiff. Plaintiff believes that the requested documents will show that he was the best qualified person for the position each time it was announced, that he was not selected and that he was not selected based purely on retaliatory animus against him for his participation in EEO activities and that this retaliatory animus continued throughout his career at FNS-NERO. It is based on his continuing EEO activities and through February and March 2003 when the Defendants began significantly reducing Plaintiff's responsibilities as a backup or alternate funds officer. The testimony of Bruce Potvin is indeed telling to the extent of this animus toward the Plaintiff, whereby the Plaintiff is excluded, beforehand, in October 2004 from consideration for a possible vacancy in the Budget Analyst position. See Deposition of Bruce Potvin, pages 8-10, attached hereto as Exhibit 3. Plaintiff has clearly been placed in a broom closet where he is excluded from any career advancement opportunities and his duties are reduced to filing and typing.

6

In Defendants Opposition Motion filed on November 29, 2005, the Defendants claim that the documents requested by Plaintiff should not be produced because Plaintiff did not exhaust his remedies in the administrative process relating to the Defendant's failure to promote Plaintiff to the FSP/IF Section Chief position. In their Opposition motion, Defendants misstated Plaintiff's previous EEO claims, Agency claims, and 2001 Federal Complaint, by stating that Plaintiff never claimed failure to promote as retaliation by Defendants. Not only is this untrue, any failure by Plaintiff to exhaust his administrative remedies for retaliation, based upon his previous filing of an EEO claim, agency claim or court claim would be irrelevant and would not bar the bringing of such claims in this action under prevailing case law for the 1st Circuit and District of Massachusetts.

While Defendants in their Opposition claim that Plaintiff never claimed a failure to promote in his 2001 complaint filed in the District of Massachusetts, Plaintiff's 2001 Federal Complaint, brought by Plaintiff pro se, ( See Complaint filed by Plaintiff, pro se, on 9/13/01, pages 11-12, attached hereto as Exhibit 7), clearly states as Count II "Denial of Promotional Opportunity". Under this Count II, Plaintiff clearly lists the denial of promotion to Edmund Kelly's job in the FSP/IF section by the same, second-line supervisor, Douglas MacAllister, as in all EEO complaints. This denial closely followed Plaintiff's 2000 agency and EEO complaint alleging retaliation and discrimination. On information and belief, no one ever investigated Plaintiff's

7

2000 complaint and Plaintiff never received notice that the
complaint was dismissed.

Under 1st Circuit precedent, retaliation which arises after
the filing of an EEO Complaint or after informal or formal
complaint to the agency may be included in a civil case and will
not be barred for lack of exhaustion of administrative remedies.
The leading case stating this in the 1st Circuit is Clockedile v.
New Hampshire Dept. of Corrections, 245 F. 3d 1 (1st Cir. 2001),
ruling, that when a public employee fails to file retaliation
complaints on actions following the filing of an EEO Complaint or
agency complaint, that, "retaliation claims are preserved so long
as the retaliation is reasonably related to and grows out of the
discrimination complained of to the agency—e.g. the retaliation
is for filing the agency complaint itself." Id. At 6. This ruling
intentionally expanded the previous ruling of the 1st Circuit in
Johnson v. General Electric, 840 F. 2d 132, 139 (1st Cir. 1988),
in which the 1st Circuit had concluded that, "a lawsuit is limited
to claims that 'must reasonably be expected to…have been within
the scope of the EEOC's investigation,' 840 F. 2d at 139… ." Id.
At 4. Therefore, all that is required to bring charges of
retaliation in court is that the subsequent retaliation be
related to the initial charges brought. The subsequent
retaliation need not have been expected to have come up in the
scope of an investigation, nor need it have been pled in any
administrative manner.

8

In the instant case, as in Clockedile, Plaintiff's November 2000 complaint was never investigated. However, Plaintiff did allege in that complaint retaliation by way of denial of training and removal from ADR Mediator. See Exhibit 20, attached hereto, which is the November 17, 2000 Complaint filed by Plaintiff. If any investigation had occurred, it would have included the denial of promotion, signified by the Plaintiff's non-selection for the section chief position in 2001. The promotion denial occurred as retaliation for Plaintiff's complaint in 2000. Indeed, Plaintiff did allege this denial of promotional opportunity in his civil action in the District of Massachusetts filed in September 2001. Similarly, we see the same pattern of discrimination (i.e. retaliating against the Plaintiff through denial of promotional opportunity) occurring in September 2004 when Bruce Potvin, an employee in the Plaintiff's work unit, is told by a supervisor and close confidant to Douglas MacAllister, Roger Hamilton, that a Budget Analyst position will be opening up in the Plaintiff's work area, and the Plaintiff is "…not going to get that". See Deposition of Bruce Potvin, page 9, Line 20, attached hereto as Exhibit 3. Now, the retaliation has been raised to a new heightened level whereby a supervisor is openly telling another employee about the denial of promotional opportunity to the Plaintiff. More odious, Hamilton has served as a selecting official for such job announcements as the one at issue in this case.

In early 2001, shortly after Plaintiff filed his agency and EEO complaint in late 2000, Defendants posted and reposted job announcements for the FSP/IF Section Chief position. Plaintiff was excluded from interviews by Defendants and not selected for the position by Defendants in an attempt to further retaliate against Plaintiff for filing his agency and EEO complaint in 2000. Plaintiff did not receive his Section Chief position, despite his qualifications because Defendants wished to prevent his promotion in retaliation for his official complaints. Plaintiff initially received a 99 out of 100 ranking on the external list for the position. Defendants have admitted that Plaintiff was on the "most qualified" external list. See, Deposition of Douglas MacAllister, dated July 15, 2005, page 114, attached hereto as Exhibit 8. Plaintiff was not selected for this position and a candidate outside of the agency was selected— Joseph Stanco. Because these actions are retaliatory at least in part for filing a previous EEO complaint, Plaintiff is not required under the ruling of the 1st Circuit to exhaust all of his administrative remedies before bringing them before this court.

A similar event occurred again in 2003 when Joseph Stanco retired from his position as FSP/IF Section Chief. Plaintiff filed an EEO and agency complaint in March of 2003 which became a formal complaint in May of 2003, alleging retaliation. The FSP/IF Section Chief position was again posted as a job vacancy in July 2003 and Plaintiff again applied. However, Defendants retaliated against Plaintiff by refusing to select him for this position.

10

Defendants even went so far as to change the crediting plan for
this position to lower Plaintiff's ranking on the external list.
Since this retaliation grew out of Plaintiff's fling of a formal
complaint, Plaintiff need not have exhausted his administrative
remedies to allege the retaliation in this civil complaint. Nor
need the Plaintiff file individual administrative complaints or
EEO complaints to allege the further reduction of his duties,
further loss of promotion, further refusals to train Plaintiff or
any other retaliatory action that has occurred since the filing
of this current action in November, 2004, which occurred in
further retaliation against Plaintiff for his 2003 and 2004
protected activities and complaints.

Nonetheless, Plaintiff did file informal complaints with FNS
and the EEO on the subject of his non-selection for the FSP/IF
Section Chief position in 2003. It was only because a USDA EEO
Counselor, Gregory Ferby, told the Plaintiff not to file a formal
Complaint, that a formal Complaint was not filed.

Therefore, it is important that Plaintiff be allowed to
examine the job announcements for the Section Chief position in
FSP/IF on or about April 1, 2001, August 29, 2003, October 31,
2003, and the Temporary Promotion position on September 29, 2005,
including all crediting plans and most qualified lists (i.e.
internal and external), in relation to Plaintiff's allegations
that Defendants intentionally denied him a promotion despite
Plaintiff being the best qualified for the position. In light of
the Potvin testimony, this factor looms large over this case.

There is now a pattern of retaliation connecting the events in
1999, the job announcements in 2001 and 2003, and the events on
October 7, 2004, regarding the announced training in a possible
vacancy in the Budget Analyst position. The facts prove a pattern
of retaliation and, thus, this action is to be treated as one
claim, not a series of discrete acts as alleged by the
Defendants.

**Point 2: The Court Should Allow Plaintiff to Depose Juanita
Makuta and Lori Lodato Because They Have Relevant Evidence As Yet
Uncovered And Their Deposition Would Not Be Unduly Burdensome**

Federal Rules of Civil Procedure 26(b)(1) states that,
"Parties may obtain discovery regarding any matter, not
privileged, that is relevant to the claim or defense of any
party… ."

Under the FRCP 30 and Local Rules 26.1(c) Plaintiff must
obtain permission from this court to depose these additional
witnesses. Advanced Sterilization Prods. V. Jacob, 190 F.R.D. 284
(D. Mass. 2000).

The depositions of Juanita Makuta and Lori Lodato are
essential to the further discovery of Defendants' retaliatory
animus toward Plaintiff.

**A. Juanita Makuta**

In the depositions of Blim and Dorman on January 12, 2006,
both deponents identified Juanita Makuta as the person who would
have knowledge of the agency policy and procedure regarding Form
FNS-1143 and can authenticate this form, which authorizes the

12

Plaintiff with the title of FCO backup, also known as "backup funds officer". See Deposition of Lisha Dorman, page 82,attached hereto as Exhibit 9; Deposition of Lawrence Blim, pages 15,72-73,80-81, attached hereto as Exhibit 10. Both deponents also identified Juanita Makuta as the most knowledgeable person regarding Form FNS-674. Indeed, Ms. Makuta is listed in the Federal Register as the agency contact for Form FNS-674. See copy of Federal Register announcement, attached hereto as Exhibit 7. These authorization forms indicate that Plaintiff has the duties of a funds officer. More importantly, Form FNS-1143 designates Plaintiff with the title of "FCO backup", also known as Funds Control Officer backup or "backup funds officer", executed under FNS policy and procedure, a fact that the Defendants have vehemently denied in their Answer to Plaintiff's Amended Complaint, filed on December 2, 2005, whereby they state that Plaintiff "..never did have the title of Alternate/Backup Funds Officer". See Answer To Plaintiff's Amended Complaint, dated December 2, 2005, page 15, paragraph 110, attached here to as Exhibit 12. Form FNS-1143 pierces the heart of the Defendants' argument in this case. It is the designation of the title, "Funds Control Officer backup", also known as "backup funds officer", and it is signed by Plaintiff's first-line supervisor, Joseph Stanco, See copy of FNS-1143, attached hereto as Exhibit 4. Thus, Ms. Makuta plays an important role in authenticating this form.

Juanita Makuta is the Agency Computer Security Officer. As such, Plaintiff asks for leave from the Court to depose Juanita Makuta.

## B. Lori Lodato

Lori Lodato is the Regional Computer Security Officer, located at the Northeast Regional Office in Boston. She is the keeper of the original records and can authenticate Form FNS-1143 and Form FNS-674, which provide substantial support to the Plaintiff's allegations. Ms. Lodato's testimony will be relevant in helping to establish the function of the Plaintiff's duties as backup funds officer, a crucial point of contention between Plaintiff and the Defendants.

The issue of spoilage of evidence has also occurred. On December 15, 2005, Ms. Lodato's statements indicate why the Defendants are unable to produce key emails regarding major issues in this case, including the right to certify funds availability as cited in Michael Malone's testimony on July 11, 2005. See Deposition of Michael Malone, page 85, attached hereto as Exhibit 13. Malone's computer files were erased. See affidavit of John Pedicini, attached hereto as Exhibit 14.

Lodato's testimony will show that Malone, first-line supervisor to the Plaintiff and the delivery person of several harassing letters of instruction to the Plaintiff and to the Northeast Region's funds control officer, Martin Hines, was present at a July 2005 training session conducted by Juanita Makuta. The training session dealt with agency security policy

14

and procedure for handling computer files from computers used by employees who were leaving the agency. Ms. Lodato's testimony will also show that Lori Lodato, herself, was present at this training session and that Mr. Malone knowingly violated the agency's computer security procedures. In addition, Ms. Lodato's testimony will show that on or about September 22, 2005, Ms. Lodato attempted to secure files on Malone's computer and found all files to be erased. Her testimony will support the Plaintiff's allegations that spoilage of evidence has occurred.

The testimony of Juanita Makuta and Lori Lodato will show that the incident of erased files from Malone's computer was reported by Lodato to Makuta, whereby Makuta instructed Lodato to record the finding on a Form FNS-674, dated on or about September 22, 2005. Makuta further instructed Lodato to keep one copy of the Form FNS-674 at the Northeast Regional Office and forward a second copy to Makuta at the agency headquarters office in Alexandria. Such actions by the Defendants are in violation of agency security policy and have irreparably damaged the Plaintiff's right to due process.

Therefore, Plaintiff requests from the Honorable Court leave to depose Lori Lodato.

The depositions of Juanita Makuta and Lori Lodato will not be duplicative or burdensome. No deponent has authenticated or testified as being conversant on the regulations governing the computer authorization forms FNS-1143 and FNS-674. Ms. Makuta and Ms. Lodato have that knowledge. The depositions should take no

15

longer than 2 hours, provided that the deponents are cooperative. In addition, Lori Lodato works at the Northeast Regional Office of the Food and Nutrition Service, at 10 Causeway Street, Boston, MA and is conveniently located to be deposed. Thus, these depositions are not burdensome.

Plaintiff respectfully asks this court to permit a reasonable period of time from February 7, 2006 to March 31, 2006 to allow him to conduct the additional depositions requested in this Motion and to discover the additional documents also requested in this Motion.

Plaintiff believes that a time period from February 7, 2006 to March 31, 2006 is appropriate to set up and conduct the depositions in question, to allow Plaintiff opportunity to obtain the above-mentioned documents, to allow Defendants time to gather and transmit to Plaintiff the above-mentioned documents, and to allow Defendants and Plaintiffs to make any other motions necessary based upon the depositions of Juanita Makuta and Lori Lodato. In addition, the requested time period takes into account the limited availability of Plaintiff, pro se, or Defendants' attorney during the holiday season in February 2006, as well as any unavailability of either Lori Lodato or Juanita Makuta.

As such, Plaintiff requests this Honorable Court grant a reasonable period of time to conduct the above-mentioned actions from February 7, 2006 to March 31, 2006.

**Point 3: Defendants Should Be Ordered To Reimburse Plaintiff For Payment Of Travel Costs For Defendants' Employees**

On December 20, 2005, Plaintiff's former counsel withdrew from this case. The Defendants were informed of the withdrawal by the Court's electronic system. The Plaintiff became a plaintiff, pro se. Previously, at the December 6, 2005 conference, Defendants' counsel stated that he would provide Defendants' employees for deposition.

Plaintiff contacted Defendants' counsel on December 23, 2005 to confirm deposition dates, previously established with Plaintiff's former counsel, for January 12, 2006 and January 19, 2006. Defendants' counsel requested to change the January 19th date to January 18th. Plaintiff agreed.

On January 5, 2006, Defendants' counsel, without warning, and one week before the January 12th depositions, informed the Plaintiff that Plaintiff would have to pay air travel expenses, round trip, for two witnesses, presently employed by the Defendants at the Food and Nutrition Service in Alexandria, VA. See email from Damian Wilmot dated January 3, 2006, attached hereto as Exhibit 15. Those witnesses were Lisha Dorman and Larry Blim. Plaintiff objected. But, in order to expedite the depositions and maintain the peace with the Defendants' counsel, Plaintiff paid the air travel expenses for Dorman and Blim. However, Plaintiff informed Defendants' counsel that we would bring the issue before the Court, retaining all rights to reimbursement. See email from John Pedicini dated January 6, 2006, attached hereto as Exhibit 16.

17

In all prior depositions, Defendants paid air travel expenses, round trip, for all deponents employed by the Defendants' agency. Suddenly, after Plaintiff's counsel withdrew and one week before the first depositions were scheduled to take place, Defendants presented this new objection to the Plaintiff.

The U.S. Attorneys' Manual, Title 3, Section 19.421, states, "Any officer or employee of the United States or any agency thereof, summoned as a witness on behalf of the United States, shall be paid his/her necessary expenses incident to travel in accordance with the provisions of the Standardized Government Travel Regulations." This case involves work activity of Dorman's and Blim's employing agency, the Food and Nutrition Service. Defendants granted the travel time for Blim and Dorman as "official time", similar to other deponents employed by the Defendants. Yet, due to some unknown reason, Defendants decided to hurl this obstacle at the Plaintiff just before the depositions. Plaintiff questions the motives of the Defendants on this point.

Plaintiff requests this Honorable Court to order Defendants to reimburse Plaintiff for the air travel costs of deponents, Lisha Dorman and Lawrence Blim.

## Point 4: Application Of 29 CFR 1614.605(b) And Reinstatement of Time Used During Depositions Should Be Ordered

This action has grown out of the EEO complaint process. Due to the Defendants' inability to process complaints in a timely manner, and in light of the severe retaliatory efforts initiated

18

by the Defendants in October of 2004 against the Plaintiff, as
exemplified by the testimony of Bruce Potvin and Martin Hines,
the latter who equated the actions of the Defendants in October
of 2004 to that of being shot at by the Iraqis in Desert Storm
(See Deposition of Martin Hines, page 30, attached hereto as
Exhibit 17), this action was filed to prevent more serious
consequences for the Plaintiff. As such, the Plaintiff, as a
plaintiff, pro se, should be allotted a reasonable amount of
official time to prepare his case.

On January 9, 2006, Plaintiff requested use of a reasonable
amount of official to attend depositions ordered by the Court on
January 12, 2006 and January 18, 2006 through the Defendants'
counsel. That request was denied and he was referred to his
supervisor. See email from Damian Wilmot dated December 21, 2006,
attached hereto as Exhibit 18. On January 10, 2006, the temporary
supervisor, Kirk Hassel, denied the Plaintiff's request without
giving a reason. See email from Kirk Hassel dated January 5,
2006, attached hereto as Exhibit 19. Plaintiff was forced to use
20 hours of his own personal time to attend the depositions on
January 12, 2006 and January 18, 2006. Such action, denial
without a reason, constitutes an improper denial. Because
complainants are entitled to a reasonable amount of official time
for processing their EEO complaints under EEOC regulation 29 CFR
1614.605(b), when the time is improperly denied, agency motives
need not be reviewed. Lambert v. Social Security Administration,
EEOC No. 05990820(1999), 100 FEOR 3107.

Plaintiff requests this Honorable Court to order Defendants
to implement 29 CFR 1614.605(b) so he can a reasonable amount of
official time to prepare his case, since he is a plaintiff pro se
and this action has grown out of the EEO complaint process, as
well as reinstate 20 hours of annual leave that Plaintiff used
while conducting depositions on January 12, 2006 and January 18,
2006.

### Conclusion

Accordingly, Plaintiff asks the Court to grant his Motion
for Leave to depose Juanita Makuta and Lori Lodato, to obtain
Production of Documents, to establish February 7, 2006 to March
31, 2006 as a reasonable time period to complete the actions
herein described, to order Defendants to reimburse Plaintiff for
payment of travel costs for Defendants' employees, to order the
application of 29 CFR 1614.605(b) to provide Plaintiff with
enough time to prepare his case and reinstatement of 20 hours of
annual leave for the depositions of January 12, 2006 and January
18, 2006.

### Request For Oral Argument

Plaintiff requests oral argument.

Dated: January 25, 2006            Respectfully Submitted,

John G. Pediduni, Pro se
10 Milano Drive
Saugus, MA  01906
781-248-1385

# EXHIBIT 1

### ( 4 PAGES)



# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,

       Plaintiff,

   v.

UNITED STATES OF AMERICA, :        **Case No. 04-12395 JLT**
ANN M. VENEMAN, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE, AND LINDA
SPRINGER, DIRECTOR, UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT,

       Defendants.

## AFFIDAVIT OF LISHA DORMAN

   Lisha Dorman, hereby state as follows:

1.    I am over the age of 18, and am mentally competent to testify as to the matters contained in this affidavit.

2.    The information contained in this affidavit is based upon my personal knowledge.

3.    I make this affidavit knowingly and voluntarily.

4.    Since 1993, I have worked for the United States Department of Agriculture, Food and Nutrition Service ("USDA-FNS") in various capacities with regard to financial management within the agency. My official title is Administrative Officer (Grade 13). I currently hold the position of Funds Officer for the Deputy Administrator of Management at Headquarters.

5.    I am very familiar with USDA-FNS policies concerning financial management. In particular, I am familiar with USDA-FNS policies concerning the duties and responsibilities of the Funds Officer position. Indeed, I helped to draft the USDA-FNS's handbook on its budget and funds management process, including the duties and responsibilities of Funds Officers and allowance holders, which is entitled "FNS Administrative Accounting Handbook 101." Further, from 1993 to July 2005, I conducted training on the duties and responsibilities of Funds Officers within the agency. In addition, as I referred to above, I currently hold the position of Funds Officer for the Deputy Administrator of Management since July, 2005 to the present.

P- 2261

6.  By way of background, the Secretary for the USDA requires the National Finance Center to consolidate the administrative payments of all the sub-agencies within USDA and to provide centralized accounting services for the entire agency. Each sub-agency, however, is responsible for "funds control." The USDA defines "funds control" as the various policies, procedures, and records used to exercise management control over public funds. Funds control requires that each sub-agency implement specific procedures by which the sub-agency and its employees must follow whenever they obligate or expend Federally Appropriated Funds.

7.  The Budget Division of the USDA allocates Federally Appropriated Funds to "allowance holders," which could include the Administrator, Deputy Administrators, Staff Directors, and Regional Administrators. The allowance holder, in turn, designates an individual as a funds officer. Each of the seven regions within USDA-FNS has at least one funds officer.

8.  A funds officer is responsible for monitoring/tracking the agency's status of funds and for providing data on fund availability to the allowance holder. The funds officer is also responsible for (i) certifying that funds are available before spending actions occur, (ii) committing the funds for the spending actions in the agency financial system (i.e., the Foundation Financial Information System ("FFIS")), and (iii) reporting the monthly status of the accounts to his/her allowance holder and quarterly to the Budget Division.

9.  On April 19, 2005, and April 20, 2005, USDA-FNS held its annual funds officer meeting in New Orleans, Louisiana. I, along with some of my colleagues, conducted several sessions on subjects germane to the duties and responsibilities of Funds Officers.

10. On April 19, 2005, I conducted a session entitled "Responsibilities of Back-Up Funds Officers." Generally, "back-up" funds officers are persons designated within each sub-agency as having the responsibility to perform the functions of the funds officer in the event that the funds officer is unable to do so him/herself.

11  During the session on "back-up" funds officers, the plaintiff in this action, John Pedicini, asked me what are the responsibilities of a "back-up" funds officer. In response to this question I answered that a "back-up" funds officer is responsible for all of the functions the primary funds officer performs in the event that the funds officer is unable to perform them him/herself. I did not have any further discussion with Mr. Pedicini on this topic.

12. I answered Mr. Pedicini's question in a general sense, that is, that a "back-up" funds officer should be able to perform all of the functions the primary funds officer performs. There is no FNS policy, however, granting a "back-up" funds officer the authority to perform all of the functions of the primary funds officer.

P-2262

In fact, there are no FNS policies or procedures that even mention a "back-up" or "alternate" funds officer.

13.    As referred to above, generally, each allowance holder has the authority to delegate his/her authority to allocate Federally Appropriated Funds to whomever he/she decides.

14.    There is no FNS policy prohibiting the allowance holder from not delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to the designated "back-up" funds officer.

15.    Further, there is no FNS policy prohibiting the allowance holder from delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to an FNS supervisor or manager.

16.    FNS funds control policy concerning certification of funds availability has not been violated provided that the supervisor or manager - who the allowance holder has delegated the authority to allocate Federally Appropriated Funds - (i) verifies in the agency financial system (i.e., FFIS) that the agency has the funds available for the requested spending action, and (ii) executes a certification on the procurement document that funds are available for the spending action.  If the supervisor does not have access to FFIS or does not know how to verify in FFIS that the agency has the funds available for the requested spending action, he/she must have someone who does have access to FFIS take the necessary steps to verify that the agency has the funds available for the requested spending action before certifying on the procurement document that such funds are available.

Signed this 2nd day of November, 2005, under the pains and penalties of perjury.

*Lisha Dorman*

LISHA DORMAN

P- 2263

# EXHIBIT 2

( 4 PAGES)



# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,

      Plaintiff,

  v.

                           Case No. 04-12395 JLT

UNITED STATES OF AMERICA,
ANN M. VENEMAN, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE, AND LINDA
SPRINGER, DIRECTOR, UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT,

      Defendants.

## AFFIDAVIT OF LARRY BLIM

I, Larry Blim, hereby state as follows:

      I am over the age of 18, and am mentally competent to testify as to the matters contained in this affidavit

2.    The information contained in this affidavit is based upon my personal knowledge.

3.    I make this affidavit knowingly and voluntarily.

4.    Since 1987, I have worked for the United States Department of Agriculture, Food and Nutrition Service ("USDA-FNS") in various capacities with regard to financial management within the agency. My official title is Director, FFIS Operations (Grade 15). I currently hold the position of Assistant to the Deputy Administrator for Financial Management in **Alexandria, Virginia.** I supervise the agency's administrative accounting system (i.e., Foundation Financial Information System ("FFIS")).

5.    I am very familiar with USDA-FNS policies concerning financial management. In particular, I am familiar with USDA-FNS policies concerning the duties and responsibilities of the Funds Officer position. Indeed, since 2001, I have conducted training on the duties and responsibilities of Funds Officers within the agency.

P-3149

6. On April 19, 2005, and April 20, 2005, USDA-FNS held its annual funds officer meeting in New Orleans, Louisiana. I, along with some of my colleagues, conducted several sessions on subjects germane to the duties and responsibilities of Funds Officers.

7 I do not remember having any discussions with John Pedicini or Martin Hines during the annual meeting, or at any other time, concerning Mr. Pedicini's role or responsibilities as "back-up" funds officer to Mr. Hines in the North East Regional Office ("NERO"). I did not inform Mr. Pedicini that he was the "alternate funds control officer" for e-travel in NERO. Nor did I inform Mr. Pedicini that he had the right to certify that funds were available by virtue of serving as a back up to Mr. Hines, the funds officer in NERO. I also did not inform Mr. Pedicini that Douglas MacAllister violated agency policy by removing Mr. Pedicini's "right" to certify funds availability.

8. There is no USDA policy granting a "back-up" funds officer the authority to perform all of the functions of the primary funds officer. In fact, there are no USDA policies or procedures that even mention a "back-up" or "alternate" funds officer.

9 Generally, each allowance holder has the authority to delegate his/her authority to allocate Federally Appropriated Funds to whomever he/she decides.

There is no USDA policy prohibiting the allowance holder from not delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to the designated "back-up" funds officer.

11. Further, there is no USDA policy prohibiting the allowance holder from delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to a USDA-FNS supervisor or manager.

USDA funds control policy concerning certification of funds availability has not been violated provided that the supervisor or manager - who the allowance holder has delegated the authority to allocate Federally Appropriated Funds - (i) verifies in the agency financial system (i.e., FFIS) that the agency has the funds available for the requested spending action, and

P-3/50

(ii) executes a certification on the procurement
document that funds are available for the spending
action.  If the supervisor does not have access to FFIS
or does not know how to verify in FFIS that the agency
has the funds available for the requested spending
action, he/she must have someone who does have access
to FFIS take the necessary steps to verify that the
agency has the funds available for the requested
spending action before certifying on the procurement
document that such funds are available.

Signed this 2nd day of November, 2005, under the pains and
penalties of perjury.

LARRY BLIM

P-3151

# EXHIBIT 3

( 34 PAGES)

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

1

```
 1            UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3

 4     -------------------------

 5     JOHN G. PEDICINI,

 6            Plaintiff,

 7     VS.                        CA No. 04-12395-JLT

 8     UNITED STATES OF AMERICA

 9     UNITED STATES DEPARTMENT

10     OF AGRICULTURE,

11     ANN M. VENEMAN, SECRETARY,

12            Defendants.

13     -------------------------

14

15            Deposition of BRUCE POTVIN, a witness

16     called on behalf of the Plaintiff, taken

17     pursuant to notice before Cindy M. Falcon,

18     Certified Shorthand Reporter and Notary Public

19     in and for the Commonwealth of Massachusetts, at

20     the O'Neil Federal Building, 10 Causeway Street,

21     Boston, Massachusetts, on Wednesday, January 18,

22     2006, commencing at 10:00 a.m.

23

24
```

2

```
1     APPEARANCES:

2

3         John G. Pedicini, Pro Se

4         10 Milano Drive

5         Saugus, Massachusetts 01906

6

7         Damian W. Wilmot

8         Assistant United States Attorney

9         John Joseph Moakley Federal Courthouse

10        1 Courthouse Way

11        Boston, Massachusetts 02116

12        On behalf of the Defendants

13

14    ALSO PRESENT:

15

16        Jamal Lacy, Intern

17

18

19

20

21

22

23

24
```

3

```
 1                          INDEX

 2

 3     WITNESS                        EXAMINATION

 4

 5     BRUCE POTVIN

 6     (By Mr. Pedicini)                 4

 7     (By Mr. Wilmot)                  22

 8     (By Mr. Pedicini)                29

 9

10

11

12

13

14

15

16                        EXHIBITS

17

18     No.                                      Page

19                        None

20

21

22

23

24
```

4

```
 1                    STIPULATIONS

 2

 3              It is stipulated and agreed by and

 4       between counsel for the respective parties that

 5       the witness shall read and sign the deposition,

 6       and that the sealing, filing, and certification

 7       thereof are waived.

 8              It is further stipulated that all

 9       objections, except as to form of the question,

10       and motions to strike are reserved until the

11       time of trial.

12            .

13              BRUCE POTVIN, having been satisfactorily

14       identified by the production of his driver's

15       license, and duly sworn by the Notary Public,

16       was examined and testified as follows:

17

18       EXAMINATION BY MR. PEDICINI:

19

20   Q   Bruce, my name is John G. Pedicini.  I'm a

21       plaintiff in a lawsuit against the U.S.

22       Department of Agriculture.

23              MR. WILMOT:  If I could interrupt you

24       briefly, I think again we have to say
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

5

```
 1        stipulations for this case, usual stipulations
 2        for this case.
 3            What I want to state, as I stated for the
 4        last three depositions, that today's deposition
 5        is being held pursuant to a motion that you
 6        filed with the Court where you attest to the
 7        Court that you were going to ask a specific
 8        instance, in particular, Paragraph 8 of your
 9        affidavit states that you're essentially going
10        to question him with about a conversation he had
11        with Roger Hamilton in September of 2004.
12            So I'm going to hold you to that and object
13        to the extent you exceed that scope of the
14        questions.
15   Q    Damian Wilmot is counsel for the defendants.
16        Since you're not represented here today, I just
17        want you to know that if you feel a need for a
18        lawyer, just let us know.  You have the right to
19        be represented by counsel, and I'm informing you
20        have that right.
21            To your left is the court reporter.  She's
22        going to take down every word you say.  You need
23        to respond verbally to the questions.  You can't
24        nod your head or shake your head.  She can't
```

6

```
 1            record a nod or a shake of the head.
 2                 If you don't understand a question that I
 3            ask, please let me know and I'll rephrase the
 4            question for you.  It's important that you
 5            understand the questions.
 6                 If you find the need to take a break, we
 7            can take a break.  Just let us know.
 8                 Is there any reason why you would be unable
 9            to fulfill your obligation to tell the truth
10            today?
11       A    No.
12       Q    Are you on any kind of medications that would
13            prevent you from telling the truth?
14       A    No.
15       Q    Do you have any kind of illness that would
16            prevent you from telling the truth?
17       A    No.
18       Q    Is there any reason right now why your memory
19            might be impaired due to any kind of illness or
20            medication you might be taking?
21       A    No.
22       Q    Whenever you answer a question, please pause for
23            about 20 seconds before you answer it to give
24            Mr. Wilmot an opportunity to object to the
```

7

1       question and so the reporter can record Mr.

2       Wilmot's objection if he objects.

3               Since you're not represented by counsel,

4       you have privileges.  You can refuse to answer

5       any questions if I'm asking you and Mr. Wilmot

6       is asking you about a privileged conversation.

7               You can waive the privilege if you want and

8       answer the question, but you don't have to.  You

9       can assert a privilege.  Areas were you assert a

10      privilege would be conversations with your wife,

11      your doctor, your attorney.  And if there's any

12      question that might implicate you criminally,

13      you have the right to be silent, so you don't

14      have to answer a question like that.

15              You can assert your rights to those types

16      of questions.  Other than that, you have to

17      answer the questions that we ask.

18              Today, the questioning is being limited to

19      conversations or a conversation that you had

20      with Roger Hamilton regarding a possible vacancy

21      in the funds officer position.  Do you recall

22      that conversation?

23  A   Yes.

24  Q   And can you tell us what exactly took place in

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

8

1       that conversation?

2    A   I remember at that time I had applied for a

3        position in another agency.  It was a 13

4        position, and I was going to apply for it or had

5        applied for it.  It was in the process.

6            And I informed Roger of that situation, and

7        I remember at that time his answer was:  Well,

8        okay, but my understanding is there's going to

9        be a vacancy over on the other side, and he

10       stated Marty, Marty Hines, and that that

11       position would become vacant.

12           And he said:  That's something that you

13       have had training in, obviously.  That's

14       something that I would want to expose you to,

15       and obviously it was a grade increase.

16           And my answer at that time was:  All right,

17       I understand, sure, I have the experience, there

18       is no question.  But I said:  There's also other

19       people over there that have been involved in

20       that before I got there.

21           And that's when the answer -- and this is

22       where it was to the effect of:  Yes, there is

23       someone over there that wants to be trained in

24       it or has been training in it, I'm not sure

which, but they're not going to get it.

And at that point I wasn't sure who exactly he was talking about. I said: Well, John's been involved in it. This goes back when I was here maybe two years, okay? I've been here four. Maybe two and a half.

And so that's when I made the statement, and then the other statement was: That's not going to happen. And that's the best I can recall.

Now, I can't remember the exact words or how it was, you know, the exact wording of it, per se, but I'm pretty close and the focus -- I focused on you.

Q You being?

A You being John Pedicini. I said: John has been involved in that, and again, it was said: That's not going to happen.

Q What's not going to happen?

A Or: He's not going to get that.

Q He specifically said some words to the effect that John is not going to be selected?

A Words to the effect, yes. I don't think it's exact -- like I said, it's not going to happen.

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

10

```
 1        I raised your name.  In my mind there is no
 2        doubt that the conversation, it was directed at
 3        you.  That's my recollection.
 4   Q    And did Mr. Hamilton say to you that Marty was
 5        retiring and that was causing this vacancy?
 6   A    He stated to me that he heard that Marty was
 7        going to retire.  He didn't tell me specifically
 8        when he was going -- he said:  My understanding
 9        is there's going to be a vacancy in there, I
10        understand Marty is going to retire.  He didn't
11        say he was.  He said I understood.
12   Q    Did he say who he heard it from?
13   A    No, he did not.
14   Q    He didn't identify who he heard --
15   A    No.
16   Q    -- that Marty was retiring, did he mention any
17        conversations he had with Marty Hines about
18        retiring?
19   A    No, not to me.
20   Q    Did he say why John Pedicini was not going to
21        get the position?
22   A    No, no.  I just let it go.  I, you know, really
23        didn't understand at that point what was going
24        on or anything.
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

11

```
 1   Q   I'd like you to take a look at a document.  I'd
 2       like you to take a look at what is known as
 3       Exhibit 43 and tell me what that is.
 4   A   That's a list of -- that's a list of training or
 5       requirements for a position.
 6   Q   Tell us what position that's for.
 7   A   Oh, budget analyst.
 8   Q   Did you ever receive a copy of that?
 9   A   No, I did not, no.
10   Q   That's fine.  In the conversation with Mr.
11       Hamilton about the opening or the potential
12       possible budget analyst opening, did Mr.
13       Hamilton ever say to you they were looking for
14       someone to fill the budget analyst funds
15       officer's position?
16   A   No, no.
17   Q   Did he say how he knew it was not going to be
18       John Pedicini?
19   A   No.
20   Q   Did you interpret the statement to mean that
21       there was something -- what did you interpret
22       the statement to mean, that it wasn't going to
23       be John Pedicini?
24   A   Well, what I interpreted at that time with my
```

12

```
 1        dealings with federal service was if the

 2        position became vacant and the person retired,

 3        the vacancy would be posted, everyone would

 4        apply, and the best candidate would be selected.

 5   Q    Did he ever make a statement before they posted

 6        that a certain person wasn't going to get it?

 7   A    No, they did not.

 8   Q    So this was kind of a little bit of a new

 9        experience when you heard that a particular

10        person wasn't going to get the position?

11   A    Yes.

12             MR. WILMOT:  Objection.

13   Q    What did you interpret -- why would someone be

14        systematically eliminated from the start?

15   A    I didn't know.  I looked at him and I just

16        said:  Oh, okay.  And it was more or less he

17        was-- the conversation was geared towards me,

18        towards -- I had applied to an outside agency

19        and whatnot.

20             And as I stated, his statement to me was:

21        Well, if you can sit tight a little bit, there

22        may be something down here, there's a

23        retirement, and the rest took place.  I was kind

24        of surprised at it, but I didn't know at that
```

13

```
 1        time the dynamics of --
 2    Q   What was going on?
 3    A   What was going on.  So I mean, I was new to it,
 4        and I'm used to the procedure occurring, as I
 5        stated, the vacancy, the position becomes
 6        vacant, the announcement is announced, and the
 7        candidates apply, as has been the case.
 8    Q   And your understanding of John Pedicini's duties
 9        with regard to this position were what?
10                 MR. WILMOT:  Objection.
11    A   I didn't know.
12    Q   You didn't know.  Does John Pedicini work at all
13        with Marty Hines, to the best of your knowledge?
14                 MR. WILMOT:  Objection.  You don't
15        have to answer.
16    Q   Did you e-mail Mr. Hamilton or anybody else
17        regarding anything about this conversation with
18        Mr. Hamilton?
19    A   Oh, no.
20    Q   Was there any request to send your name in or as
21        a trainee?
22                 MR. WILMOT:  Objection.
23    Q   This conversation you've testified to just now
24        that Mr. Hamilton said to you:  If you can wait
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

14

| | | |
|---|---|---|
| 1 | | a little bit, something is going to open up on |
| 2 | | the other side; is that correct? |
| 3 | | MR. WILMOT: Objection as to the |
| 4 | | form. You can answer. |
| 5 | Q | Is that correct? You can answer it? |
| 6 | A | Repeat it again. |
| 7 | Q | Okay. Your testimony previously, what did you |
| 8 | | testify to about what Mr. Hamilton told you when |
| 9 | | this position was going to open up? |
| 10 | A | I didn't know when. He just said: If you can |
| 11 | | sit tight, I understand that there will be a |
| 12 | | vacant position. Marty is going to retire is |
| 13 | | what I hear. That was the only part. |
| 14 | Q | When you had this conversation with Mr. |
| 15 | | Hamilton, was that on or around September of |
| 16 | | 2004? |
| 17 | A | I'd have to check the dates on that. If I |
| 18 | | didn't throw the papers away for the position |
| 19 | | and whatnot -- |
| 20 | Q | You had papers on the position? |
| 21 | A | No, the position that I had applied for at that |
| 22 | | point, but generally the position was in New |
| 23 | | York and Boston was not funded, and it was |
| 24 | | transferred to central office in Washington, so |

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

15

```
 1        it became a centralized function, and I don't
 2        remember the exact date.  But that sounds
 3        obviously correct.
 4    Q   Did Mr. Hamilton mention anything else you had
 5        in this conversation with him?
 6            Did he mention anything you would have to
 7        do to apply for this position that was supposed
 8        to be coming up?
 9    A   No, no, nothing at all.  Fact is at that point I
10        said okay and stood up and walked away.
11    Q   Was there anyone else in the conversation with
12        you and Mr. Hamilton?
13    A   No.
14    Q   Did he mention any other supervisor's name in
15        that conversation?
16    A   No, he did not.
17    Q   Did he mention -- he did not mention Mr. Malone
18        at all?
19    A   No, he did not.
20    Q   And at the time Mr. Hamilton was involved in
21        this conversation with you, what was Mr.
22        Hamilton's position at FNS?
23    A   Section chief.
24    Q   Did he frequently come up with openings, job
```

16

```
1        openings and advancement?

2    A   No.

3    Q   Was this conversation a very rare conversation

4        with Mr. Hamilton?

5                MR. WILMOT:  Objection.  You can

6        answer.

7    A   Yes.  I had never discussed any openings with

8        him, nor anything prior to that time.  I just

9        informed him that the Office of Education

10       application, that I had, you know, had

11       previously submitted.  But before and subsequent

12       to that, no.

13   Q   And in the conversation you referred to a couple

14       of times here, one time you said that person was

15       not going to get it, was referred to the

16       plaintiff, John Pedicini?

17   A   Yes.

18   Q   Did Mr. Hamilton say the name John Pedicini?

19   A   I did.

20   Q   What was Mr. Hamilton's reaction when you said

21       it?

22   A   I mentioned your name, and he said he wouldn't

23       be involved in that or he won't get that or --

24   Q   John Pedicini will not get the job?
```

17

```
 1                    MR. WILMOT:  Objection.

 2   A    Yes.

 3   Q    That was your interpretation of the

 4        conversation, the fact that you mentioned John

 5        Pedicini's name, and Hamilton responded how to

 6        that?

 7                    MR. WILMOT:  Objection to the

 8        question.  You can answer.

 9   A    Okay.  I'll go back.  As I stated earlier, when

10        he stated that there would be an opening,

11        possible opening, that Marty was going to

12        possibly retire, and they would have to train

13        someone in his duties and that I had experience

14        in that area, that I would be involved.

15             And that's when I raised the statement,

16        again, that, wait a minute, there are people

17        over there that, A, must be helping Marty do

18        that, and B, I'm sure would be interested in the

19        position, words to that effect.

20             It was just a quick conversation, and

21        that's when his statement back was, well -- and

22        I said John Pedicini is one, and that's when he

23        made the statement, again, to go back, he's not

24        going to be involved in this, he's not going to
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

18

```
 1          get that.
 2    Q     Did you mention anybody else's name?
 3    A     No.
 4    Q     Just John Pedicini's name?
 5    A     I had raised his name and he acknowledged it.
 6    Q     And he said that John Pedicini was not going to
 7          get that job?
 8                    MR. WILMOT:  Objection.
 9    Q     Is that your testimony?
10    A     It was that or when I raised your name the
11          reference was exactly:  No, he is not.
12    Q     Not meaning what; not going to get the job?
13    A     Not going to get -- not going to be involved in
14          it, I think were his actual words.
15    Q     You said that there were people -- excuse me.
16              You said that Hamilton told you in a
17          conversation they were looking to train people
18          in Marty's duties?
19    A     If he retired?
20    Q     Correct.
21    A     Correct.
22    Q     What was your interpretation of that?  Was there
23          going to be a job vacancy?
24    A     I took it as a job vacancy.  As I stated, my
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

19

1   experience with federal and private industry is

2   a position becomes vacant, the situation, the

3   position is posted, and people apply for it.

4     I mean, I know there there's ways of doing

5   it, but that didn't enter my mind.

6 Q Is it correct, did he say that they had to train

7   somebody in Marty's duties?

8 A Somebody would be trained.  He did use the words

9   someone will be trained.

10 Q He used the word trained?

11 A Yes.

12 Q Did he mention anything about people already

13   being trained over there?

14 A No.

15 Q You mentioned that you told Mr. Hamilton in this

16   conversation that there were people qualified

17   over there for Marty's job.  Did you say that?

18 A I did.  I said:  There's people that I'm sure

19   would be interested in this that must have --

20   must be qualified for that.

21 Q How did you arrive at that conclusion?

22 A Just with the idea that I watched and listened.

23   I sat on the other side.  I've seen your

24   involvement in areas there and Kirk's.

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

20

```
1              Anybody else, I don't know about Ann or
2         anything or Themi.
3    Q    With regard to your view or what you told Mr.
4         Hamilton in the conversation, did you notice
5         anyone working with Marty more than others in
6         the unit?
7    A    No, I would not have noticed that, you know.
8    Q    Is there any reason why in the conversation you
9         mentioned the name John Pedicini and threw that
10        out to Mr. Hamilton?
11   A    Well, I was just thinking of individuals that
12        was the next grade level, and in areas that I've
13        worked it's pretty common.
14   Q    When you heard the statement from Mr. Hamilton
15        in this conversation -- strike that.
16             Did Mr. Hamilton mention in the
17        conversation anything about who you had to see
18        for training in this position?
19   A    No, he did not.  I just said all right and I
20        left.
21   Q    Did he indicate at any time, did Mr. Hamilton
22        indicate at any time who was saying it wasn't
23        going to be John, John Pedicini was going to be
24        excluded from this vacancy?
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

21

```
 1              Did Mr. Hamilton at any time indicate to
 2        you during the conversations, the conversation
 3        you had, did he indicate how he arrived at that
 4        conclusion?
 5   A    No.
 6   Q    He didn't indicate that.
 7              Did he indicate -- did he mention the name
 8        Douglas McAllister at all?
 9   A    No.
10   Q    Did he name Frances Zorn at all?
11   A    No, he did not.
12   Q    So nobody else?
13   A    No.
14   Q    When you first relayed this conversation, the
15        details of this conversation to John Pedicini,
16        was that over a lunch that you had with him?
17   A    It was over a situation where John Pedicini,
18        myself, and Marty Hines were going up the street
19        for lunch to satisfy a little baseball bet.
20   Q    So Marty Hines was present when you were giving
21        the details of this conversation to John
22        Pedicini?
23   A    Yes, yes.
24   Q    Have you talked to anybody -- excuse me, strike
```

22

1          that.

2                    Have you been admonished by anybody for

3          divuling the details of this conversation?

4      A   No.

5      Q   Did you, in the conversation with Roger

6          Hamilton, did you get involved in any details

7          that outlined your qualifications for the job?

8      A   No.

9                    MR. PEDICINI:  I don't have any

10         further questions.  It's up to you.

11

12         EXAMINATION BY MR. WILMOT:

13

14     Q   I just have a couple follow-up questions for

15         you.

16                   Now, this conversation that you claim you

17         had with Mr. Hamilton in September, on or about

18         September of 2004, where did it occur?

19     A   It was in his cubicle, in his office area.

20     Q   Were there any witnesses at all to the

21         conversation?

22     A   No, not in the office.  I have no idea who was,

23         you know, who could have been around the outside

24         and who may have heard the conversation.  I

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

23

```
 1        don't know.

 2   Q    And you just mentioned that you first revealed

 3        this to John Pedicini during a lunch break or

 4        something where you were settling a bet?

 5   A    Right.

 6   Q    When was that conversation?

 7   A    When was that conversation?  That would have

 8        been in October of this year.

 9   Q    So from September 2004 to October of 2005, you

10        did not have -- you never revealed that to John

11        Pedicini?

12   A    No.

13   Q    Did you discuss the fact that that conversation

14        happened with Roger Hamilton with anyone within

15        the USDA?

16   A    No one.

17   Q    How do you know John Pedicini?

18   A    Through work in the office.

19   Q    Do you know him socially?

20   A    Not at all.

21   Q    Didn't you just testify that you settled a

22        gambling bet with him during a lunch break?

23   A    It was a hotdog bet.

24              MR. PEDICINI:  Objection to the form
```

24

```
1            of the question.

2    A    Boston-Yankees series.

3    Q    It wasn't a bet?

4    A    It was a hotdog between John Pedicini and Marty

5         and myself for Boston versus New York winning

6         the division.

7    Q    Is that the first time you've had a lunch break

8         with John Pedicini?

9    A    No, we had them before.  We had three others

10        before that, because we had a standing hotdog

11        every 40 games between John, Marty and myself.

12   Q    So you discussed baseball?

13   A    Baseball, nothing -- anything but work.

14   Q    What grade were you in September of 2004?

15   A    GS-11.

16   Q    And you stated you had applied for a Grade 13

17        position?

18   A    Correct.

19   Q    And how did you apply for that; as an external

20        internal candidate?

21            MR. PEDICINI:  Objection.

22   A    No, as an internal.  I've been a GS-12 with the

23        federal government for at least 12 years.

24            MR. PEDICINI:  Objection to the
```

25

```
 1          question.  You know, you're supposed to stick to
 2          the conversation.
 3                   MR. WILMOT:  This is my cross, and it
 4          certainly relates to this conversation.
 5     A    And on the private side, I was in private
 6          industry, and I was vice president for financial
 7          management for approximately eight years for a
 8          very large not-for-profit corporation.
 9     Q    So you were, because you were a GS-12 at some
10          point, you could apply for a GS-13 position?
11     A    Correct.
12     Q    And you stated that you made Mr. Hamilton aware
13          that you were applying for this GS-13 position?
14     A    Yes.
15     Q    Are you clear that that conversation with Mr.
16          Hamilton concerned Marty Hines' position and not
17          a vacancy in the section chief position?
18                   MR. PEDICINI:  Objection to the form
19          of the question.
20     A    He had nothing do with the section chief.
21     Q    You did not discuss the section chief position?
22     A    No.
23     Q    During that conversation?
24     A    Oh, no.
```

26

```
 1   Q   Now, which section does Marty Hines work in?

 2   A   Food stamp section.

 3   Q   Did he report to Roger Hamilton?

 4   A   No.  When I arrived for the first two years that

 5       was -- they had a section chief, Joe Stanco.

 6   Q   Let me ask a different one.  In September 2004,

 7       who was Marty Hines' supervisor, if you know?

 8   A   Beats me.  I mean, at that point I think Joe was

 9       gone, and I think that's when he was trying to

10       get Mike Malone -- I'm not sure if Roger ever --

11       I don't know.  I didn't pay much attention.

12           He was shifting personnel around, and the

13       objective -- at one point, obviously he got Mike

14       Malone in there.  Sorry, I don't -- I didn't pay

15       any attention who was supervising that side.  It

16       was just one big fiasco so --

17   Q   Your supervisor was Roger?

18   A   Roger Hamilton, yes.  He has always supervised

19       the financial management section.

20   Q   Marty Hines was not in your section?

21   A   No, sir.

22   Q   He was not Marty Hines' supervisor, correct?

23   A   Not to my understanding at that time.  I don't

24       know if he ever was on paper or not.  I really
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

27

```
1        don't know.

2    Q   Do you know when there is a vacancy who within

3        your office makes the hiring decisions in 2004?

4    A   I really don't know how much Doug's involved in

5        this, in the final selection of that.  I would

6        assume the branch chief or section chief would

7        make a selection.  That's the way it's normally

8        done.

9    Q   Just for my own sake, when you were discussing

10       this conversation, you mentioned that Roger

11       Hamilton mentioned that there was going to be

12       training for this position, and then you also

13       discussed somehow hiring for that position.

14           What exactly did you discuss in that

15       conversation?

16   A   He said that there would be some training for

17       that position.  It was my understanding -- I

18       didn't think about it that much because my

19       understanding is that's not really the way it

20       works from my experience, but so I just said,

21       okay, you know, with the conversation and then

22       left.

23   Q   So when he discussed with you that you should

24       show some interest in this position, he was
```

28

| | | |
|---|---|---|
| 1 | | talking about showing interest in the training |
| 2 | | for it? |
| 3 | A | We never got to that because Marty was still |
| 4 | | there.  It would have been if Marty does retire. |
| 5 | Q | So he said:  If Marty does retire, we are going |
| 6 | | to train some people on those functions? |
| 7 | A | Someone's going to have to be trained, yes. |
| 8 | Q | Did he say that someone was going to have to be |
| 9 | | hired for that position? |
| 10 | A | He used the word trained.  I really don't |
| 11 | | remember the word hired. |
| 12 | Q | And also to clarify, Roger Hamilton did not |
| 13 | | state John Pedicini's name during that |
| 14 | | conversation; is that correct? |
| 15 | A | I raised John Pedicini's name, and his answer |
| 16 | | was:  He will not or John Pedicini will not, it |
| 17 | | was one or the other.  But there was no question |
| 18 | | in my mind about it. |
| 19 | Q | That John Pedicini would not get training for |
| 20 | | that position? |
| 21 | | MR. PEDICINI:  Objection to the |
| 22 | | question. |
| 23 | A | Whatever he meant by it. |
| 24 | Q | Whatever he meant? |

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

29

```
 1   A   Whatever he meant.  I didn't ask.

 2             MR. WILMOT:  No further questions.

 3

 4       FURTHER EXAMINATION BY MR. PEDICINI:

 5

 6   Q   When you had discussions in this conversation

 7       with Mr. Hamilton, it came as a result of a

 8       previous application somewhere for a higher

 9       level position; is that correct?

10   A   Yes.

11   Q   And Mr. Hamilton's words -- I want to make

12       sure.  You may have said this before.  I want to

13       make sure I understand it.

14           Did you ask Mr. Hamilton or did the issue

15       come up in this conversation that you were

16       looking for another higher level position above

17       Grade 11?

18   A   Not specifically, but obviously he knew I was

19       because I had applied for the 13.

20   Q   And then this thing about Marty Hines retiring

21       came up in the conversation?

22   A   Yes, correct.

23   Q   Again, he said --

24   A   There may be.
```

30

1   Q   There may be another position opening over here?

2   A   Yes, right.

3   Q   So the conversation was -- did Mr. Hamilton give

4       you the impression that a job vacancy would open

5       up as a result of Mr. Hines' retirement?

6              MR. WILMOT:  Objection.  You can

7       answer.

8   A   That's the way I thought it.  That's the way I

9       thought of it, would be if Marty retired, once

10      he knew Marty was going to retire, then --

11      that's the way it normally works.  That's what

12      came into my mind.

13  Q   You brought the plaintiff John Pedicini's name

14      up?

15  A   Yes.

16  Q   In the conversation as a result of what?

17            MR. WILMOT:  This is all asked and

18      answered several times.

19  Q   I just want to clarify one thing because you may

20      have --

21            MR. WILMOT:  You can answer it.

22  A   I brought it up knowing that there were

23      personnel over there, yourself, whatever,

24      whomever, only because as a former supervisor,

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

31

```
 1        that's the way you normally look at it.  That's

 2        the way I looked at it, and it's the

 3        responsibility of the supervisor.

 4   Q    And at the time of this conversation, were you--

 5        did you know that Michael Malone was the section

 6        chief of that section?

 7   A    I really, you know, don't recall back then.

 8        There was so much --

 9   Q    Do you recall Roger Hamilton at one time being

10        section chief of that section as well as his own

11        section?

12   A    We may have, you know, I vaguely remember when

13        Joe left -- he had to be, he would have had to

14        have been for a short time because of the IT

15        situation.  There was some changing around of

16        responsibilities at that point between -- Mike

17        always had IT, yes, but Roger -- where Beth came

18        in that area, there was some shifting around, he

19        could have been --

20   Q    Malone could have been the section chief?

21   A    At that time -- I know eventually he was.

22   Q    And in the questioning by Mr. Wilmot on

23        cross-examination, you mentioned the fact that

24        there was training for this position, Roger
```

32

```
 1          Hamilton mentioned training for this position?

 2     A    Correct.

 3     Q    Did he mention anybody else's name who would be

 4          needing -- did he mention the -- excuse me,

 5          strike that.

 6               Did he mention the plaintiff's name as

 7          being a person who would be trained in the

 8          position?

 9     A    No, no names.

10     Q    And with regard to hiring decisions at FNS,

11          specifically the financial management unit, not

12          just the permanent positions but also the

13          temporary positions, do you know whether or not

14          Douglas McAllister is on the selection panel or

15          has acted as a selecting official for these

16          positions?

17     A    For the temporary?

18     Q    For the temporary as well as the permanent, the

19          one we are talking -- if a budget analyst

20          position would open up, is it your opinion and

21          testimony here today that Mr. McAllister would

22          be a selecting official?

23               MR. WILMOT:  Objection.  You can

24          answer.
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

33

| 1 | A | Yes, because I know he -- I know for a fact, he |
|---|---|---|
| 2 | | told me he was for the acting position, which |
| 3 | | Kirk currently is in.  He said, in fact, his |
| 4 | | e-mail said that he would be looking, making a |
| 5 | | selection, and then when he talked to me, he |
| 6 | | made the selection.  Those were the terms he |
| 7 | | used. |
| 8 | Q | And given what was told to you in this |
| 9 | | conversation by Mr. Hamilton and your knowledge |
| 10 | | of what has gone on in the financial management |
| 11 | | unit hiring decisions, do you believe that the |
| 12 | | hiring decision outlined by Mr. Hamilton in |
| 13 | | September '04 was consistent with FNS policy or |
| 14 | | what you understand it to be? |
| 15 | | MR. WILMOT:  Objection.  You don't |
| 16 | | have to answer that. |
| 17 | Q | If you don't answer, that's okay. |
| 18 | A | I didn't at that point know.  I couldn't swear |
| 19 | | to anything.  I just said okay and walked away. |
| 20 | | MR. PEDICINI:  I have no further |
| 21 | | questions.  Do you have anything? |
| 22 | | MR. WILMOT:  No. |
| 23 | | (Whereupon, the deposition was concluded at |
| 24 | | 10:40 a.m. |

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

34

```
1        COMMONWEALTH OF MASSACHUSETTS

2        MIDDLESEX, SS

3

4            I, Cindy M. Falcon, a Notary Public duly

5        commissioned and qualified in and for the

6        Commonwealth of Massachusetts, do hereby certify

7        that there came before me the person

8        hereinbefore named and was by me duly sworn to

9        testify to the truth of his knowledge concerning

10       the matters in controversy in this cause; that

11       he was thereupon carefully examined upon his

12       oath and his examination reduced to typewriting

13       under my direction; and that the deposition is a

14       true and accurate record of the testimony given

15       by the witness.

16           I further certify that I am not

17       interested in the cause of this action.

18           IN WITNESS WHEREOF, I have hereunto set

19       my hand this      23rd      day of January 2006.

20

21                    Cindy M. Falcon

22                    Notary Public

23       My Commission Expires:

24       June 25, 2010
```

# **EXHIBIT 4**

( 2 PAGES)

| **Food and Nutrition Service (FNS)** | 1. Check System Name |
|---|---|
| **Foundation Financial Information System (FFIS)** and **Financial Data Warehouse** **User Registration/Change Request** | __X____ FFIS Application <br> __X____ FFIS Financial Data Warehouse Application |

## USER INFORMATION (See Privacy Statement on Reverse)

| 2. User's Name (last, first, middle initial) <br><br> PEDICINI, JOHN G. | 3. User's Job Title <br><br> FINANCIAL MANAGEMENT SPECIALIST |
|---|---|

**4. User's Mailing Address (including room number)**
FNS-NERO
10 CAUSEWAY STREET, RM 501
BOSTON, MA 02222

| 5. User's <br> E-mail address JOHN.PEDICINI@FNS.USDA.GOV | 6. User's phone number 617-565-6449 |
|---|---|

**7.  User Acknowledgment**
I have read the automated information systems security rules on the reverse side of this form and understand the security requirements of the automated information systems and/or applications described on this form.  I understand disciplinary action, removal from the agency/USDA, and/or criminal prosecution may be taken based on violation of these rules.

**User's Signature**     *John H. Pedicini*

## ACTION REQUESTED

| **Name Change** | 8.   Old name | 9.  New name |
|---|---|---|

10.    Enter NPC User ID (user ID should begin with FN__)

*FN 107*

11. Type of System Access (Indicate "A" for add or "D" for delete)

**A** Funds Control Officer or (FCO Backup)     ____ NFC ABCO

____ Accounting Staff     ____ NFC FOB

____ Procurement     ____ Auditor

____ COTR (including regional/field procurement)     ____ Other (specify below)

## AUTHORIZATIONS

| 12.   Print Users Supervisor's Name <br><br> Joseph Stanco | 13. User's Supervisor's Signature and DATE of Signature <br><br> *[signature]*     9/20/01 |
|---|---|

14.   Approving Official's Signature (Financial Policy & Systems Branch Chief) and DATE of Signature

| 15.    Security Administrator (Indicate approval/disapproval) |
|---|
| Approved          Disapproved          Date: |

16.    Security Administrator's Signature and phone number
Phone Number:

P- 2315

*[handwritten at top]* Tryst line to MIS × 12/11/01  or 9-20-200

**U.S. DEPARTMENT OF AGRICULTURE - Food and Nutrition Service**

DATE OF REQUEST

# FNS COMPUTER SYSTEM ACCESS REQUEST

*[handwritten]* 9-20-200

PLEASE TYPE. Instructions for completing this form may be found in Section 110 of Handbook 702

| | | |
|---|---|---|
| 1. PRINT USER NAME (First, MI, LAST) JOHN G. PEDICINI | USER SIGNATURE *John H. Pedicini* | LOGON ID FN107   ☐ NEW   ☒ EXISTING |

| | | |
|---|---|---|
| 2A. FNS USER (Check One) HQ ☐   REGION ☒   FIELD ☐ | 3. ORGANIZATION NAME (Federal or State Agency, Branch/ Division, RO program, FO or satellite, or Company) FOOD AND NUTRITION SERVICE, U.S.D.A. | |

| | |
|---|---|
| 2B. NON FNS USER (Check One) USDA ☐   OTHER ☐   STATE ☐   FIELD ☐ OTHER ☐ STATE ACCESS CODE: _____ PRINT STATE SECURITY OFFICER NAME: \| PHONE NO: STATE AGENCY VPS PRINTER ID: | 4. ADDRESS: 10 CAUSEWAY STREET ROOM 501 |

| | | |
|---|---|---|
| BOSTON | MA | 02222 |
| CITY | STATE | ZIP CODE |

5. TELEPHONE NO. (Give Area Code & Number) 6176656449

5A. SOCIAL SECURITY NO. (NEW NFC USERS ONLY)

## 6. SYSTEM ACCESS ACTION

**a. SYSTEM(S) YOU ARE REQUESTING ACCESS TO**

☐ LAN (Local Use Only)   ☐ MAINFRAME   ☐ BRSB (Specify) _____

☐ RO/HQ MINI _____ (Regional Location)   ☐ CLIENT/SERVER   ☐ OTHER (Specify) _____

**b. ACCESS REQUIREMENTS**

| ACTION REQUESTED (Add, Modify, or Delete) | NAME OF SYSTEM (Ex. FSPIIS, ROAP, SNPIIS, STARS TRYL, CADI, PAYPERS) | SRP FORM/SCREEN (System Class or) (Ex. FNS-269, FNS-388A) | TYPE OF ACCESS (1) Inquiry, (2) Update, (3) Certify, (4) Delete, (5) Post, (6) Reject | TIME LIMIT (Beginning and end date, or NONE) |
|---|---|---|---|---|
| ADD | FFIS | | | |
| ADD | Data Warehouse | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**c. "COMMENTS, JUSTIFICATIONS, SPECIFIC INSTRUCTIONS"**

_____

_____

_____

## 7. APPROVALS

| APPRVL | DISAPP | DATE | | PHONE NO. |
|---|---|---|---|---|
| ☒ | ☐ | 9/20/01 | a. SIGNATURE OF SUPERVISOR *[signature]* | 617-565-6451 |
| ☒ | ☐ | 9-20-2001 | b. SIGNATURE OF REGIONAL DEPUTY OR STATE COMPUTER SECURITY OFFICER *[signature]* | 617-565-6463 |
| ☒ | ☐ | 9/26/2001 | c. SIGNATURE OF AUTHORIZING OFFICIAL OR REGIONAL OFFICE COORDINATOR *[signature] Douglas A. McAllister* | 617-565-6446 |

8. DATE RECEIVED BY COMPUTER SECURITY OFFICER/DCSO MCSO

DATE COMPLETED

*[handwritten]* P-2316

# EXHIBIT 5

( 1 PAGE)

FILE
1-12-06 OF

TAKEN ON

**U.S. DEPARTMENT** od and Nutrition Service

# FNS COMPUTER SYSTEM ACCESS REQUEST

**DATE OF REQUEST**

3/12/02

PLEASE TYPE. Instructions for completing this form may be found in Section 110 of Handbook 702

| 1. PRINT USER NAME (First, MI, LAST) | USER SIGNATURE | LOGON ID | ☐ NEW | ☑ EXISTING |
|---|---|---|---|---|

John G. Pedicini    John H. Pedicini    FN 107

**2A. FNS USER (Check One)**

HQ ☐    REGION ☑    FIELD ☐

**3. ORGANIZATION NAME (Federal or State Agency, Branch/ Division, RO program, FO or satellite, or Company)**

FNS-NERO

**2B. NON FNS USER (Check One)**

USDA ☐    OTHER ☐    STATE ☐    FIELD ☐

OTHER ☐

STATE ACCESS CODE: _____

PRINT STATE SECURITY OFFICER NAME: | PHONE NO:

STATE AGENCY VPS PRINTER ID:

**4. ADDRESS:**

U. S. D. A.

10 Causeway St., Rm 501

Boston,    MA    02222
CITY        STATE      ZIP CODE

**5. TELEPHONE NO. (Give Area Code & Number)**

**5A. SOCIAL SECURITY NO.** (NEW NFC USERS ONLY)

## 6. SYSTEM ACCESS ACTION

**a. SYSTEM(S) YOU ARE REQUESTING ACCESS TO**

☐ LAN (Local Use Only)        ☐ MAINFRAME        ☐ BRSB (Specify) _____

☐ RO/HQ MINI _____        ☐ CLIENT/SERVER        ☑ OTHER (Specify) TRVL
    (Regional Location)

Right to Release + Unrelease
Travel Documents.

**b. ACCESS REQUIREMENTS**

| ACTION REQUESTED (Add, Modify, or Delete) | NAME OF SYSTEM (Ex. FSPIIS, ROAP, SNPIIS, STARS TRYL, CADI, PAYPERS) | SRP FORM/SCREEN (System Class or) (Ex. FNS-269, FNS-388A) | TYPE OF ACCESS (1) Inquiry, (2) Update, (3) Certify, (4) Delete, (5) Post, (6) Reject | TIME LIMIT (Beginning and end date, or NONE) |
|---|---|---|---|---|
| ADD | TRVL | Travel Document | Release and unrelease | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**c. "COMMENTS, JUSTIFICATIONS, SPECIFIC INSTRUCTIONS"**

| APPRVL | DISAPP | DATE | 7. APPROVALS | |
|---|---|---|---|---|
| ☑ | ☐ | 2/12 | a. SIGNATURE OF SUPERVISOR | PHONE NO. 617-565-6451 |
| ☑ | ☐ | 3/13/02 | b. SIGNATURE OF REGIONAL DEPUTY OR STATE COMPUTER SECURITY OFFICER | PHONE NO. 617-565-6483 |
| ☑ | ☐ | 3/12/2002 | c. SIGNATURE OF AUTHORIZING OFFICIAL OR REGIONAL OFFICE COORDINATOR | PHONE NO. 617-565-6446 |

**8. DATE RECEIVED BY COMPUTER SECURITY OFFICER/DCSO MCSC**    **DATE COMPLETED**

P-3142

# EXHIBIT 6

## ( 1 PAGE)

**U.S. DEPARTMENT OF AGRICULTURE - Food and Nutrition Service**

# FNS COMPUTER SYSTEM ACCESS REQUEST

**DATE OF REQUEST** 2/24/04

PLEASE TYPE. Instructions for completing this form may be found in Section 110 of Handbook 702

| 1. PRINT USER NAME (First, MI, LAST) John G. Pedicini | USER SIGNATURE *John G. Pedicini* | LOGON ID ☐ NEW ☒ EXISTING FN 107 |

**2A. FNS USER (Check One)**
HQ ☐   REGION ☒   FIELD ☐

**3. ORGANIZATION NAME (Federal or State Agency, Branch/ Division, RO program, FO or satellite, or Company)**
FNS-NERO

**2B. NON FNS USER (Check One)**
USDA ☐   OTHER ☐   STATE ☐   FIELD ☐
OTHER ☐
STATE ACCESS CODE: _____
PRINT STATE SECURITY OFFICER NAME: | PHONE NO.:
STATE AGENCY VPS PRINTER ID:

**4. ADDRESS:**
10 Causeway Street

| Boston, | MA | 02222 |
| CITY | STATE | ZIP CODE |

**5. TELEPHONE NO. (Give Area Code & Number)** 617-565-644

**5A. SOCIAL SECURITY NO.** (NEW NFC USERS ONLY) _____

## 6. SYSTEM ACCESS ACTION

**a. SYSTEM(S) YOU ARE REQUESTING ACCESS TO**
☐ LAN (Local Use Only)         ☐ MAINFRAME          ☐ BRSS (Specify) _____
☐ RO/HQ MINI _____            ☐ CLIENT/SERVER      ☒ OTHER (Specify) NFC
    (Regional Location)

**b. ACCESS REQUIREMENTS**

| ACTION REQUESTED (Add, Modify, or Delete) | NAME OF SYSTEM (Ex. F5PIIS, ROAP, SNPIIS, STARS TRYL, CADI, PAYPERS) | SRP FORM/SCREEN (System Class or) (Ex. FNS-269, FNS-388A) | TYPE OF ACCESS (1) Inquiry, (2) Update, (3) Certify, (4) Delete, (5) Post, (6) Reject | TIME LIMIT (Beginning and end date, or NONE) |
|---|---|---|---|---|
| Add | NFC TRVL | | Release travel vouchers | NONE |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**c. "COMMENTS, JUSTIFICATIONS, SPECIFIC INSTRUCTIONS"**
_____
_____
_____

## 7. APPROVALS

| APPRVL | DISAPP | DATE | | PHONE NO. |
|---|---|---|---|---|
| ☒ | ☐ | 2-25-04 | a. SIGNATURE OF SUPERVISOR *Regn K Hamilton* | 617-565-6463 |
| ☒ | ☐ | 2-25-04 | b. SIGNATURE OF REGIONAL DEPUTY OR STATE COMPUTER SECURITY OFFICER | 617-565-64-6 |
| ☒ | ☐ | 2-25-04 | c. SIGNATURE OF AUTHORIZING OFFICIAL OR REGIONAL OFFICE COORDINATOR *Douglas A. MacAllister* | 617-565-6446 |

**8. DATE RECEIVED BY COMPUTER SECURITY OFFICER/DCSO MCSC** | **DATE COMPLETED**

FORM FNS-674 (5/98) Previous edition obsolete
Electronic Form Version Designed in JetForm 5.01 version

Faxed on 2-25-2004

P-3415

# EXHIBIT 7

( 14 PAGES)

(A5)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSETTS

CASE NO. _____

## C 1 - 1 1 5 6 4 DPW

| | |
|---|---|
| JOHN G. PEDICINI, )<br>Plaintiff, )<br> )<br>v. )<br> )<br>UNITED STATES )<br>OF AMERICA, )<br>Defendant ) | **CIVIL ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon an investigation by himself, which included a review of public documents.

### NATURE OF THE ACTION

1.     This is a civil action alleging violation of Title VII of the Civil Rights Act of 1964, as amended, in which the Defendant has engaged in numerous reprisal actions against the Plaintiff for his testimony and whistleblowing activity in a gender/age discrimination case entitled, Antoinette Bellezza v. Ann M. Veneman, Secretary, U.S. Department of Agriculture, EEOC Hearing No. 160-A1-8304X, Agency Case No. 000266.

2.     The Defendant, through its agency, the United States Department of Agriculture, has a well-documented history of mishandling civil rights complaints made by its employees as is evidenced by the **"Office of Civil Rights Status**

Of The Implementation Of Recommendations Made In Prior Evaluations Of Program Complaints", <u>Audit Report No. 60801-4-Hq</u> and "Office Of Civil Rights Management Of Employment Complaints", <u>Audit Report No. 60801-3-Hq,</u> compiled by the Office of the Inspector General, U.S. Department of Agriculture. Said reports are public documents.

3.    The Defendant's sub-agency, the Food and Nutrition Service, has been the subject of numerous complaints at the Equal Employment Opportunity Commission. One of the complaints is Bellezza v. Veneman, as previously cited, in which the Plaintiff has been a major witness and has given extensive testimony and key documents to a contract EEO investigator, Charles Purter. Under Title VII, the Plaintiff has engaged in protected activity. Plaintiff eventually became the EEO representative for the Complainant.

4.    As a result of the Defendant's reprisal actions, the Plaintiff has suffered severe damage to his career.

<div align="center">JURISDICTION AND VENUE</div>

5.    This action arises under Title VII of the Civil Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

6.    This Court has jurisdiction over the subject matter of this action pursuant to Title VII, Civil Rights Act of 1964, as amended, Section 2000e-16(c). The formal complaint was filed with the U.S. Department of Agriculture on November 17, 2000, Case # USDACR010147, FNS-00-26. The 180-day period has expired. No notice of final action has been issued.

7.    Venue is proper in this district under Section 2000e-16 of Title VII of the Civil Rights Act of 1964, as amended. The wrongs alleged in this Complaint occurred, in

substantial part, in this district.

## PARTIES

8.    Plaintiff, John G. Pedicini, is employed, at the Grade 11 Step 4 level, as a

Financial Management Specialist in the Financial Management Unit of the Defendant's

sub-agency, the Food and Nutrition Service, Northeast Regional Office.

9.    Defendant, the United States of America, through its agency, the United

States Department of Agriculture, and its sub-agency, the Food and Nutrition Service has

its Northeast Regional Office located at 10 Causeway Street, Room 501, Boston,

Massachusetts.

10.    In this Complaint, the Food and Nutrition Service, Northeast Regional

Office, is hereinafter referred to as "FNS-NERO" and its main office, the Food and

Nutrition Service, Alexandria, Virginia, is hereinafter referred to as "FNS-HQ".

## SUBSTANTIVE ALLEGATIONS

11.    The Plaintiff was appointed Alternative Dispute Resolution (ADR) Mediator

for FNS-NERO by Douglas MacAllister, Director of the Financial Management

Unit, on July 15, 1999.

12.    On December 29, 1999, a female employee of the Financial Management

Unit at FNS-NERO, Antoinette Bellezza, filed a formal complaint of gender and age

discrimination against the Defendant related to Job Vacancy Announcement No. 99-16-

NE-M and related training for said job.

13.    In May of 2000, Charles Purter, an EEO contract investigator, notified FNS-

NERO that he would be conducting an investigation of Antoinette Bellezza's complaint.

A list of the names of the interviewees were provided to FNS-NERO. Said list included the name of the Plaintiff.

14.    The Plaintiff was one of only two non-management employees of the Financial Management Unit, other than the complainant, who provided testimony to the investigator. The other employee, Edmond Kelly, was scheduled to retire in August of 2000. Other employees of the Financial Management Unit declined to testify.

15.    On or about June 12, 2000, Charles Purter, the EEO Contract Investigator, started his investigation at FNS-NERO.

16.    On June 13, 2000, Douglas MacAllister informed the Plaintiff that he was being removed as the Alternative Dispute Resolution (ADR) Mediator for FNS-NERO. No reason was given to the Plaintiff for the reduction in duties. Until this date, MacAllister gave no indication to the Plaintiff that he would be removed as ADR Mediator.

17.    On or about July 14, 2000, the Plaintiff was called by Charles Purter to give testimony. The Plaintiff informed Mr. Purter of the reprisal incident of June 13, 2000.

18.    On August 4, 2000, the Plaintiff completed his extensive testimony which not only included statements on the gender/age discrimination case of Bellezza v. Veneman, but also included statements alerting the investigator to questionable hiring practices at FNS-NERO, regarding the special treatment given to "favored employees" and the posting of job vacancies. As an example, the Plaintiff submitted an e-mail document issued by Douglas MacAllister on November 17, 1998. Said document became known as Exhibit 19 in the case of Bellezza v. Veneman, as cited previously. The

4

Plaintiff's testimony was not confidential and could be shown to any interested party (those with a legal right to know).

19.    On or about August 21, 2000, Douglas MacAllister became aware of a training session on FORM 209 which is used by the Plaintiff in his work. The Plaintiff was only one of two employees available at the time. The other employee was Kirk Hassel, a "favored employee". MacAllister chose Hassel and did not reveal any information on the training session until after the fact at a Financial Management Unit meeting on or about August 23, 2000.

20.    Sometime in August of 2000, Edmond Kelly retired from the Financial Management Unit. His position represented a career advancement opportunity for the Plaintiff, who was a leading candidate for the position. A major part of Mr. Kelly's duties included the review of Cost Allocation Plans submitted by State agencies.

21.    In August of 2000, the Plaintiff began to make inquiries about the posting of Edmond Kelly's job vacancy. Douglas MacAllister stated that he did not know when the position would be posted for application. The Plaintiff continued to make inquiries.

22.    On September 13, 2000 at a Financial Management Unit meeting, the Plaintiff inquired about obtaining approval for training. MacAllister responded by stating that the request "…would probably be denied… ." He offered no alternative. The Plaintiff continued to make inquiries about Edmond Kelly's old job.

23.    At the Financial Management Unit meeting in October of 2000, Douglas MacAllister announced that Edmond Kelly's old job had been "given up…sacrificed" for budget reasons. It would not be available.

24.    At the February 7, 2001 meeting on the Plaintiff's performance evaluation,

5

the Plaintiff questioned MacAllister about the "sacrifice" of Edmond Kelly's old job. MacAllister responded that Edmond Kelly's old job had never been sacrificed and denied making such statements at the Financial Management Unit meeting in October of 2000. He added that Edmond Kelly's job was still on the Organizational Chart of the Financial Management Unit. Surprised at this revelation, the Plaintiff asked when the job would be posted for application. MacAllister responded that he didn't know, since he didn't have permission from the Regional Administrator, Francis Zorn. The National Treasury Employees Union representative, Louis Spychalski, was present at the meeting.

25.    At the February 7, 2001 meeting, the Plaintiff filed a grievance under Article 50, Section 50.08(1) of a collective bargaining agreement between FNS-HQ and the National Treasury Employees Union alleging that FNS-NERO failed to maintain consistency and objectivity in the development of performance standards and subsequent appraisal of performance against these standards, violating Article 9.01(2) (c) (1) of the agreement. Specifically, the grievance alleged that MacAllister had displayed biased treatment toward the "favored employee", Kirk Hassel, in career advancement, training, and promotion actions at the expense of the Plaintiff's career. In addition, the grievance alleged that Frances Zorn, the Regional Administrator of FNS-NERO, and Margaret Mann, Personnel Liaison for FNS-NERO, failed to take reasonable corrective action, when informed of MacAllister's behavior by two other employees of the Financial Management Unit, Antoinette Bellezza and Julie Larkin. The grievance sought the transfer of Douglas MacAllister, Frances Zorn, and Margaret Mann to positions in which they would have no control or influence over personnel actions, training assignments, or

6

personnel appraisals in the Financial Management Unit. In addition, the Plaintiff sought a training plan similar to the "favored employee" that would culminate, upon satisfactory performance after a 12-month period, in promotion to a Grade 12 level as did a training plan for the "favored employee".

26.     FNS-NERO failed to respond to the Plaintiff's grievance. The Plaintiff appealed to the Acting Administrator, George Braley, under Article 50, Section 50.08(4) Step 3(b) on March 7, 2001. Braley was required to respond to the grievance but declined. Surprisingly, he referred the appeal to Margaret Mann, Personnel Liaison at FNS-NERO, and one of the individuals against whom the grievance was filed. Braley permitted Mann to respond to the appeal in his behalf. In a letter dated, March 26, 2001, Mann denied the Plaintiff's grievance.

27.     In another incident on March 20, 2001, MacAllister notified the Food Stamp Program section (FSP) of the Financial Management Unit about a Cost Allocation training session at the Southeast Regional Office of the Food and Nutrition Service, hereinafter referred to as FNS-SERO on April 3-4, 2001. MacAllister had given a one-week advance notice to other sections of the Financial Management Unit, including the Information Technology section (IT), during the week of March 12, 2001.

28.     Prior to notification to the Food Stamp Program section (FSP), MacAllister had sent materials from Cost Allocation training sessions conducted by former employee, Edmond Kelly, to the instructor of the FNS-SERO courses to determine whether or not the two courses were similar in content and scope. The FNS-SERO instructor replied that the training sessions on April 3-4, 2001 would be similar to the sessions conducted by Edmond Kelly.

7

29.    Due to the benefit of advance notice, Scott Vehling, an employee of the Information Technology Unit (IT), expressed an interest in attending the training session before the Plaintiff had a chance to express his interest. MacAllister gave Vehling permission to attend the training sessions even though, by MacAllister's own admission, no concepts on Information Technology were included in the training sessions. About several weeks later, Vehling was promoted to a Grade 12 level.

30.    At the March 21, 2001 meeting, the Plaintiff requested permission to attend the Cost Allocation training sessions at SERO on April 3-4, 2001. The topic of Cost Allocation was directly related to the Plaintiff's Performance Standards for job performance and was also crucial for promotion to the former job of Edmond Kelly who had retired. Moreover, the Plaintiff informed MacAllister that he had missed half of Edmond Kelly's training as a result of having to take his disabled father to the hospital. The National Treasury Employees Union representative, Louis Spychalski, was present at the meeting.

31.    At the March 21, 2001 meeting, MacAllister admitted that there were 2 openings available for the training session. Scott Vehling had filled one opening, leaving another opening available. Nevertheless, MacAllister refused to grant permission to the Plaintiff to attend the training sessions at FNS-SERO, even in light of the extenuating circumstances presented to him. When asked under what part of Article 19, Section 19.02 he was denying permission to attend the training sessions, MacAllister refused to select one of the criteria.

32.    On April 9, 2001, the Plaintiff filed a grievance under the National

Agreement Article 50, Section 50.08(1), alleging a violation of Article 19, Section 19.02 whereby the Plaintiff was denied training in Cost Allocation, without using any criteria listed in the provision. The Plaintiff sought the transfer of Douglas MacAllister, Maragaret Mann, and Frances Zorn to positions in which they would have no control or influence over personnel actions, training assignments, or performance appraisals in the Financial Management Unit. In addition, the Plaintiff sought training in Cost Allocation similar in scope and content to the training sessions given at FNS-SERO on April 3-4, 2001, as determined by an independent, third-party selected by the Plaintiff.

33.     On April 26, 2001, MacAllister denied the grievance and cited Article 19, Section 19.02(d) of the National Agreement which deals with the cost effectiveness of the training. His response was conspicuously silent on the fact that he had granted permission to another employee, Scott Vehling.

34.     Pursuant to appeal instructions in MacAllister's letter of April 26, 2001, the Plaintiff appealed to Frances Zorn, Regional Administrator of FNS-NERO, on May 10, 2001

35.     On May 23, 2001, Ms. Zorn responded to the Plaintiff's appeal, sidestepping the Scott Vehling issue by stating that "...it represents background information, and is not directly related to the specific contract provision allegedly violated. For the same reason, I will not respond to the training of other employees."

36.     Pursuant to appeal instructions in Zorn's letter of May 23, 2001, the Plaintiff appealed to the Acting Associate Administrator, Alberta Frost, on June 6, 2001.

37.     On June 22, 2001, Ms. Frost responded to the Plaintiff's appeal. With regard to the granting of permission to attend the training for Scott Vehling, Ms. Frost

9

stated,

> "...it is perfectly appropriate for a supervisor to determine that
> a particular training event or other work experience meets the
> needs of one employee, but not another. In this case, since no staff
> from the financial management unit were offered this training, it would
> appear that a judgement was made, on a uniform basis, that this activity
> was not a useful investment of time or funds for Northeast Region financial
> management employees."

Ms. Frost denied the Plaintiff's grievance.

38.    MacAllister conducted an "information exchange" meeting on Cost

Allocation on June 13, 2001. No trained instructor was present to monitor the session or

to answer questions.

39.    As a result of the Defendant's reprisal actions, the Plaintiff's career has been

irreparably damaged.

## COUNT I

### Reduction of Duties And Assignments

40.    Plaintiff incorporates by reference the allegations in the preceding

paragraphs of this complaint as if fully set forth herein.

41.    This Count is brought by the Plaintiff pursuant to Title VII of the Civil

Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(9).

42.    Plaintiff was appointed ADR Mediator for FNS-NERO on July 15, 1999.

From July 19, 1999 to June 12, 2001, the Defendant did not alter or remove, in any

manner, the Plaintiff's duties and assignments as ADR Mediator. In addition, no notice

was issued that any change was planned.

43.    After EEO investigator, Charles Purter, submitted his witness list in May

2000 and started his investigation on June 12, 2000, the Plaintiff was removed without cause on June 13, 2000.

44.     Because of the proximity of the adverse employment action and the commencement of the protected activity, the causal link of retaliation is obvious.

45.     Defendant's reduction in Plaintiff's duties and assignments as ADR Mediator was the beginning of a pattern of reprisal behavior against the Plaintiff.

## COUNT II

### Denial Of Promotional Opportunity

46.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

47.     This Count is brought by Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, Section 2000e-3(a), as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

48.     On August 4, 2000, the Plaintiff not only provided extensive testimony to the EEO investigator, but also alerted him to possible hiring irregularities by providing a copy of an e-mail sent by Douglas MacAllister on November 17, 1998. The document was entered into the investigative report as Exhibit 19. The report was not confidential and could be shown to any interested party (those with a legal right to know).

49.     On August 14, 2000, with the retirement of Edmond Kelly, a job vacancy occurred in the Plaintiff's section of the Financial Management Unit. Said vacancy represented a promotional opportunity for the Plaintiff.

50.     The Plaintiff was a leading candidate for the job vacancy arising from

Edmond Kelly's retirement. He made continuous inquiries as to when the vacancy announcement would be posted.

51.    Misleading statements were issued by the Defendant in an attempt to deny the Plaintiff of a promotional opportunity. At the October 2000 meeting of the Financial Management Unit, Douglas MacAllister, the Director, stated that the position was being "sacrificed...given up" for budget reasons. At a February 7, 2001 meeting with the Plaintiff and the NTEU representative, Louis Spychalski, MacAllister denied making the statement in October 2000. However, he stated that the job was still on the Organizational Chart of the Financial Management Unit, but he didn't know when it would be posted, since he didn't have permission from the Regional Administrator, Frances Zorn, who had given permission to post other job vacancies in other sections of the Northeast Regional Office of the Food and Nutrition Service.

52.    By reason of the foregoing, denials of promotional opportunities are actionable as adverse employment decisions under Title VII of the Civil Rights Act of 1964, as amended.

53.    As a result of the Defendant's failure to post the aforementioned vacancy, the Plaintiff has been deprived of a promotional opportunity and he has incurred serious damage to his career.

## COUNT III

### Obstruction From Competitive Training

54.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

55.     This Count is brought by the Plaintiff pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

56.     When opportunities for competitive training have arisen, the Defendant has

obstructed the Plaintiff by withholding information and/or denying training without

cause.

57.     On August 23, 2000, the Plaintiff was not informed of a training opportunity

on FORM 209, until after the fact.

58.     On September 13, 2000, the Plaintiff received a negative response when

making a request for training.  No conditions or exceptions were placed on that negative

response.

59.     On March 21, 2001, the Defendant's intent to deny the Plaintiff competitive

training reached a new level, when the Plaintiff was denied training even when an

opening existed.

60.     The Defendant has deprived the Plaintiff of the same competitive training

which was given to other employees.

61.     If the Defendant is left unrestrained under its present policies and practices,

there is no limit to the damage it may cause to the Plaintiff's career.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, prays for judgment as follows:

a.      Awarding Plaintiff a promotion of one full grade and one full step from

his current Grade 11 Step 4 position to Grade 12  Step 5, retroactive from March 21, 2001.

b.      Awarding Plaintiff his costs and expenses in this litigation, including

reasonable attorney's fees and experts' fees and all other costs and disbursements.

c.    Awarding Plaintiff such other and further relief as may be just and proper

under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby

demands trial by jury of all issues.

Dated: ___9/11/01___

JOHN G. PEDICINI, PRO SE
10 Milano Drive
Saugus, MA  01906
(781) 233-5274

14

# EXHIBIT 8

( 5 PAGES)

2-1

Volume II
Pages 2-1 to 2-267
Exhibits 47 to 67

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,                  :
            Plaintiff,             :
                                   :
        vs.                        :  Civil Action No.
                                   :  04-12395 JLT
UNITED STATES OF AMERICA, and      :
ANN M. VENEMAN, SECRETARY,         :
UNITED STATES DEPARTMENT OF        :
AGRICULTURE,                       :
            Defendants.            :
- - - - - - - - - - - - - - - - -x

        CONTINUED DEPOSITION OF DOUGLAS A.
MacALLISTER, a witness called on behalf of the
Plaintiff, taken pursuant to the Federal Rules of
Civil Procedure, before Susan J. Cataldo, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of Doris
O. Wong Associates, Inc., 50 Franklin Street, Boston,
Massachusetts, on Friday, July 15, 2005, commencing at
10:13 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (by Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

    United States Department of Justice,
        United States Attorney's Office
        (by Damin Wilmot, Assistant United States
        Attorney) United States Courthouse,
        1 Courthouse Way, Suite 9200,
        Boston, MA 02210, for the Defendants.

Also Present:   John G. Pedicini

                * * * * *

2-112

1    A.    Yes.

2    Q.    Mr. MacAllister, whose decision was it to

3    hire Mr. Stanco for the section chief, IF, Food

4    Stamp program, position?

5    A.    Ultimately, the regional administrator's.

6    I made the recommendation based on the interviews

7    that were conducted.  I believe Roger Hamilton sat

8    in on a number of those interviews with me.  As I

9    mentioned, the EEO civil rights coordinator has to

10   sit in on all those interviews.  It was my

11   recommendation to the front office.  The front

12   office agreed with my recommendation, and we hired

13   Mr. Stanco.

14   Q.    Who interviewed Mr. Stanco for the

15   position?

16   A.    I did, and I believe Lou was with me on the

17   phone.  It was a phone interview from Japan.  He was

18   in Japan.

19   Q.    Anybody else involved in interviewing

20   Mr. Stanco?

21   A.    I can't say for sure.  I don't recall that

22   anybody else was there, because it was real early in

23   the morning because of the time difference, but

24   Roger Hamilton might have been there.  Roger was at

2-113

1   most of the interviews with me.

2       Q.    And can you tell me anything that you

3   remember from that interview?

4       A.    I spoke with him.  He spoke with me.  He

5   answered my questions.  I rated him.  Lou May was

6   sitting there listening.  Lou didn't ask too many

7   questions.  That wasn't his role or function.  Like

8   I say, I don't believe Roger was there because it

9   was early in the morning, but he might have been.  I

10  understood him.  He understood me.  Goodbye.

11      Q.    And --

12      A.    If you're asking me do I remember specific

13  questions I asked him, no.

14      Q.    Okay.  Had Mr. Stanco any experience up

15  until that time with FNS?

16      A.    FNS, no.  He was Department of Defense.

17      Q.    Okay.  And wouldn't it have been helpful if

18  he had experience with FNS?

19      A.    Sure.

20      Q.    So if you had a candidate at FNS with as

21  good or better qualification than Mr. Stanco, would

22  you have hired him?

23          MR. WILMOT:  Objection.  You can answer.

24      A.    I don't know.  I obviously didn't think I

2-114

1   did.

2       Q.   Did Mr. Pedicini apply for that position,
3   Mr. MacAllister?

4       A.   I don't specifically recall.  He showed up
5   once on a register, an external register, yes.

6       Q.   Yes.  Wasn't it for that position?

7       A.   I -- probably.  I can't say for sure.
8   Probably.

9       Q.   Okay.  And wasn't Mr. Pedicini better
10  qualified for section chief, IF, FN -- FSP, than
11  Mr. Stanco was at the time?

12      A.   I hired Mr. Stanco from the merit promotion
13  register.

14      Q.   That wasn't my question, Mr. MacAllister.

15      A.   I didn't --

16      Q.   Wasn't Mr. Pedicini --

17      A.   I didn't --

18      Q.   -- better qualified for that job?

19      A.   My answer to you is I didn't have to review
20  his qualifications.  I didn't, so the answer to you
21  is I have no idea.

22      Q.   Didn't you have the power to hire
23  Mr. Pedicini for that job once he showed up on the
24  list?

1       A.    Did I have the power?

2       Q.    Yes.

3       A.    No.

4       Q.    Well, with Ms. Zorn's approval, correct?

5       A.    I didn't use the outside register.

6       Q.    Didn't you have the ability to use the

7    outside register?

8       A.    As part of a recruitment process, sure did.

9       Q.    So it was your choice not to use the

10   outside register, correct?

11      A.    Absolutely.

12      Q.    It was your choice not to interview

13   Mr. Pedicini for this job, correct?

14      A.    It was my choice not to use the outside

15   register.

16      Q.    Okay.  And you knew Mr. Pedicini was on the

17   outside register, correct?

18      A.    Understand that the merit promotion

19   register usually precedes the outside register by

20   two to three weeks.  Most likely I had already

21   concluded all of my interviewing and made my

22   decision before I ever received the outside

23   register.

24      Q.    Did you tesfi --

# EXHIBIT 9

( 4 PAGES)

Case 1:04-cv-12395-JLT    Document 54-10    Filed 01/25/2006    Page 2 of 5

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

1

```
 1               UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4        ------------------------

 5    JOHN G. PEDICINI,

 6              Plaintiff,

 7    VS.                        CA No. 04-12395-JLT

 8    UNITED STATES OF AMERICA

 9    UNITED STATES DEPARTMENT

10    OF AGRICULTURE,

11    ANN M. VENEMAN, SECRETARY,

12              Defendants.

13        ------------------------

14

15              Deposition of LISHA A. DORMAN, a witness

16    called on behalf of the Plaintiff, taken

17    pursuant to notice before Cindy M. Falcon,

18    Certified Shorthand Reporter and Notary Public

19    in and for the Commonwealth of Massachusetts, at

20    the O'Neil Federal Building, 10 Causeway Street,

21    Boston, Massachusetts, on Thursday, January 12,

22    2006, commencing at 9:20 a.m.

23

24
```

81

| | | |
|---|---|---|
| 1 | | in, is it true that those forms go to the |
| 2 | | computer security officer? |
| 3 | A | Yes, they do. |
| 4 | | MR. WILMOT: Objection. |
| 5 | Q | And what happens once that information is |
| 6 | | received by the computer security officer? |
| 7 | A | The computer security officer for FFIS? |
| 8 | Q | Right, just for this time, FFIS? |
| 9 | A | The computer security officer would typically |
| 10 | | come back to someone working in Larry's group. |
| 11 | Q | Larry's group? |
| 12 | A | Larry Blim. |
| 13 | Q | What group is that? |
| 14 | A | It's an unofficial group of folks that |
| 15 | | administer FFIS, and the security officer would |
| 16 | | come back to Larry or someone in that group for |
| 17 | | them to review the request to insure that |
| 18 | | they're giving the appropriate rights to. |
| 19 | Q | So Larry Blim would review the granting of |
| 20 | | rights to various people in FFIS? Is that what |
| 21 | | you're saying? |
| 22 | A | Typically, yes. |
| 23 | Q | And he gets the -- who gives him this |
| 24 | | information from computer security? |

Case 1:04-cv-12395-JLT    Document 54-10    Filed 01/25/2006    Page 4 of 5

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

82

```
1              Who would be the person who would do that?
2      A    Juanita Makuta.
3      Q    Juanita Makuta is compiling all this information
4           of backup funds officers in FFIS and she is
5           gives it, according to your testimony, she gives
6           it to Larry Blim and his group.
7              Who are members of the Larry Blim's group;
8           do you know?
9      A    Ted Kozlow, Ozzie Zarabia.  Currently that's it.
10     Q    Just two extra people, then, besides Mr. Blim?
11     A    Yes.
12     Q    And how do they interface with you?
13             Do they give you any information at all in
14          your training of funds officers or in your role
15          as administrator of FFIS?
16     A    In the role of administrator of FFIS, and I was
17          in that role when I, too, was in Larry Blim's
18          group.
19             I no longer play that role, but in that
20          role, I, too, could have been a person that
21          would have received a security form to process.
22     Q    And once you, once they get the information, all
23          they're doing -- let me make sure I understand
24          correctly.
```

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

96

```
1      COMMONWEALTH OF MASSACHUSETTS

2      MIDDLESEX, SS

3

4                 I, Cindy M. Falcon, a Notary Public duly

5      commissioned and qualified in and for the

6      Commonwealth of Massachusetts, do hereby certify

7      that there came before me the person

8      hereinbefore named and was by me duly sworn to

9      testify to the truth of her knowledge concerning

10     the matters in controversy in this cause; that

11     she was thereupon carefully examined upon her

12     oath and her examination reduced to typewriting

13     under my direction; and that the deposition is a

14     true and accurate record of the testimony given

15     by the witness.

16                 I further certify that I am not

17     interested in the cause of this action.

18                 IN WITNESS WHEREOF, I have hereunto set

19     my hand this        23rd        day of January 2006.

20

21                      Cindy M. Falcon

22                           Notary Public

23     My Commission Expires:

24     June 25, 2010
```

# EXHIBIT 10

( 7 PAGES)

1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3

 4       ------------------------

 5    JOHN G. PEDICINI,

 6            Plaintiff,

 7    VS.                      CA No. 04-12395-JLT

 8    UNITED STATES OF AMERICA

 9    UNITED STATES DEPARTMENT

10    OF AGRICULTURE,

11    ANN M. VENEMAN, SECRETARY,

12            Defendants.

13       ------------------------

14

15            Deposition of LAWRENCE M. BLIM, a

16    witness called on behalf of the Plaintiff, taken

17    pursuant to notice before Cindy M. Falcon,

18    Certified Shorthand Reporter and Notary Public

19    in and for the Commonwealth of Massachusetts, at

20    the O'Neil Federal Building, 10 Causeway Street,

21    Boston, Massachusetts, on Thursday, January 12,

22    2006, commencing at 3:10 p.m.

23

24
```

Lawrence M. Blim 1-12-2006
John G. Pedicini v. United States of America, et al.

15

```
 1         basically is granting the person the rights and
 2         permissions in terms of I want this person to
 3         have them.
 4              Then it goes to the security administrator,
 5         who actually creates the profile in the system
 6         so the person has access, according to whatever
 7         profile is picked on the form.
 8    Q    So the original form of that -- that's a copy.
 9         The original form would be kept by who, that
10         original version?
11    A    The security administrator would have this in
12         her files.
13    Q    Who would that be; do you know?
14    A    Juanita, M-A-K-U-T-A.  Makuta.
15    Q    And the user on that form is who?
16    A    This would be you, John, John Pedicini.
17    Q    And at the bottom, is it signed by anybody at
18         the bottom?
19              MR. WILMOT:  Objection to form.
20    A    Joseph Stanco.
21    Q    Do you know who Joseph Stanco was?
22    A    I'm not remembering Mr. Stanco.
23    Q    Would it help you to know Mr. Stanco was section
24         chief of internal finance food stamp program on
```

Lawrence M. Blim 1-12-2006
John G. Pedicini v. United States of America, et al.

72

```
1    Q    And he would have the functional rights of a

2         funds officer based on releasing TRVL documents

3         in FFIS?

4    A    He would have that based on this form because,

5         again, functionality for funds officer is

6         identical.   There is no separate security

7         profile for the backup funds officer, all the

8         same profile.

9    Q    So as far as you're concerned, John Pedicini has

10        the functional rights of a backup funds officer

11        in FFIS?

12   A    I would say you have the functional rights of a

13        funds officers in FFIS.   We don't have a

14        designation for backup.

15   Q    Well, I'm looking at the form that says FCO

16        backup.

17   A    I know.   I don't know why it says that.

18   Q    Is that a preprinted form?

19   A    I don't know.

20   Q    Would that look to be that it came from the

21        office that did the form where they write the

22        letters FCO backup in there?

23   A    I can't really tell.

24   Q    Does it look like the rest of the type on the
```

73

```
 1         page?
 2    A    Not exactly.
 3    Q    So Juanita Makuta would be able to authenticate
 4         that?
 5    A    If the box is checked, she is going to give you
 6         the rights and permissions of a funds officer.
 7    Q    But she could authenticate that form, she would
 8         be the person, Juanita Makuta?
 9    A    Yes, that's her job.
10              MR. PEDICINI:   I think I've covered
11         everything.   Damian will be cross-examining.
12
13         EXAMINATION BY MR. WILMOT:
14
15    Q    I'll be brief.   We have heard a lot of testimony
16         about Ms. Indellicate.
17    A    Yes.
18    Q    And what I guess her role is within the USDA.
19              I understand from your testimony that you
20         and your staff would rely on her for a list of
21         who had certain funds control functions,
22         correct?
23    A    Yes.
24    Q    Were you aware in dealing with Ms. Indellicate
```

Lawrence M. Blim 1-12-2006
John G. Pedicini v. United States of America, et al.

80

```
 1   A   I have no way of knowing.

 2   Q   You have no way of knowing that?

 3   A   I think I saw it for the first time today, and

 4       you'll see my initials are not on this form.

 5           Now, typically I do see these forms and I

 6       do initial them, but I didn't do that in the

 7       beginning.  That was Robin.

 8   Q   So Robin Moffatt, are you identifying her as the

 9       person --

10   A   No.  There were either two people at her branch,

11       Karen Morris, I think it was, I think somebody

12       else -- I'm not sure I remember who it was.

13           Karen Morris was the security

14       administrator.  She was doing it for the

15       program, the accounting system, because of

16       separation of duties, FFIS team shouldn't do it,

17       should be somebody else, and Karen was

18       designated, I believe.  She did it for a couple

19       of years.

20   Q   These people did part of the form or the whole

21       form?

22   A   They did everything, set up the form, profiles

23       for FFIS, they designated people, they would

24       give you the profile that was authorized on the
```

Lawrence M. Blim 1-12-2006
John G. Pedicini v. United States of America, et al.

81

```
 1        form and kept the file forms in it, everything.

 2              That function has now been sent down to

 3        ITD, information technology division, and

 4        Juanita Makuta does that now.

 5   Q    Based on the data in front of you, is John

 6        Pedicini a funds officer?

 7                    MR. WILMOT:  Objection.

 8   A    I can't say.

 9   Q    You don't know?

10   A    I don't know.  I can say you have the

11        functionality.

12   Q    You can't make the statement, you can't -- can

13        you say he is not a funds officer?

14   A    I can't say either way, no.

15   Q    Okay.  And you're saying that the 1143 form was

16        spliced in two by Karen Morris and Robin Moffatt

17        in terms of the design?

18   A    I believe they gave us what the department gave

19        us and they modified it, which is fine.  That's

20        what you're supposed to do.  And it has changed

21        over the years.  They were in charge of that at

22        the beginning of FFIS.

23   Q    FCO backup, where would that terminology come

24        from?
```

Lawrence M. Blim 1-12-2006
John G. Pedicini v. United States of America, et al.

85

1    COMMONWEALTH OF MASSACHUSETTS

2    MIDDLESEX, SS

3

4            I, Cindy M. Falcon, a Notary Public duly

5    commissioned and qualified in and for the

6    Commonwealth of Massachusetts, do hereby certify

7    that there came before me the person

8    hereinbefore named and was by me duly sworn to

9    testify to the truth of his knowledge concerning

10   the matters in controversy in this cause; that

11   he was thereupon carefully examined upon his

12   oath and his examination reduced to typewriting

13   under my direction; and that the deposition is a

14   true and accurate record of the testimony given

15   by the witness.

16            I further certify that I am not

17   interested in the cause of this action.

18            IN WITNESS WHEREOF, I have hereunto set

19   my hand this        23rd        day of January 2006.

20

21                        *Cindy M. Falcon*

22                        Notary Public

23   My Commission Expires:

24   June 25, 2010

# EXHIBIT 11

( 2 PAGES)

practical utility; (b) the accuracy of the agency's estimate of the burden of the collection of information including the validity of the methodology and assumptions used; (c) ways to enhance the quality, utility, and clarity of the information technology; or (d) ways to minimize the burden of the information collection on those who are to respond (such as through the use of appropriate automated, electronic, mechanical, or other technological collection techniques) or other forms of information technology; e.g., permitting electronic submission response. The information collection package may be obtained from Roger Hinkle, at the address listed below. Comments should be sent to the Desk Officer for Agriculture, Office of Information and Regulatory Affairs, OMB, Washington, DC 20503, and to Roger Hinkle, USWA Program Manager, Warehouse and Inventory Division, FSA, USDA, STOP 0553, 1400 Independence Avenue, SW., Washington, DC 20250–0553.

Comments received in response to this notice will be made a matter of public record. Comments will be summarized and included in the submission for approval by OMB.

Signed in Washington, DC on March 25, 2005.

**Thomas B. Hofeller,**

*Administrator, Farm Service Agency.*

[FR Doc. 05–6361 Filed 3–30–05; 8:45 am]

**BILLING CODE 3410–05–P**

---

# DEPARTMENT OF AGRICULTURE

## Farm Service Agency

### Information Collection; Transfer of Farm Records Between Counties

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notice; request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, the Farm Service Agency (FSA) is seeking comments from interested individuals and organizations on a new information collection associated with transferring of farm records from one administrative county office to another.

**DATES:** Comments on this notice must be received on or before May 31, 2005 to be assured consideration. Comments received after that date will be considered to the extent practicable.

**ADDRESSES:** Comments concerning this notice should be addressed to Farm Service Agency, USDA, Attn: Alison Groenwoldt, Agricultural Program Specialist, Common Provisions Branch, 1400 Independence Ave, SW. Washington, DC 20250. Comments

should also be sent to the Desk Officer for Agriculture, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

Comments also may be submitted by e-mail to: alison.groenwoldt@usda.gov.

**FOR FURTHER INFORMATION CONTACT:** Alison Groenwoldt, Agricultural Program Specialist, (202) 720–4213 and alison.groenwoldt@usda.gov.

**SUPPLEMENTARY INFORMATION:**

**Description of Information Collection**

*Title:* Transfer of Farm Records Between Counties.

*OMB Control Number:* 0560–NEW.

*Type of Request:* New.

*Abstract:* Farm owners or operators may elect to transfer farm records between counties when the principal dwelling of the farm operator has changed, a change has occurred in the operation of the land, or there has been a change that would cause the receiving administrative county office to be more accessible such as a new highway, relocation of the county office building site, etc. The transfer of farm records is also required when an FSA county office closes. The FSA County Committees from both the transferring and receiving county must approve or disapprove all proposed farm transfers. In some cases, the State Committee and/or the National Office must also approve or disapprove proposed farm transfers.

*Estimate of Burden:* Average 10 minutes per response.

*Type of Respondents:* Owners and operators.

*Estimated Number of Respondents:* 25,000.

*Estimated Number of Responses per Respondents:* 1.

*Estimated Total Annual Burden on Respondents:* 2,500 hours.

Comment is invited on: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility and clarity of the information from those who are to respond, including the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this notice, including names and addresses when provided, will be a matter of public record. Comments will

be summarized and included in the submission for Office of Management and Budget Approval.

Signed at Washington, DC, on March 25, 2005.

**Thomas B. Hofeller,**

*Acting Administrator, Farm Service Agency.*

[FR Doc. 05–6363 Filed 3–30–05; 8:45 am]

**BILLING CODE 3410–05–P**

---

# DEPARTMENT OF AGRICULTURE

## Food and Nutrition Service

### Agency Information Collection Activities: Proposed Collection; Comment Request; Form FNS–674, Computer System Access Request

**AGENCY:** Food and Nutrition Service, USDA.

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, this notice invites the general public and other public agencies to comment on proposed information collections. The FNS–674 Form is a standard form used by the Food and Nutrition Service (FNS) to collect information necessary to grant access to FNS computer systems. The collected data will be used to identify all users granted access to FNS internal systems as required by USDA and FNS Security Policy.

**DATES:** Comments on this notice must be received by May 31, 2005.

**ADDRESSES:** Comments are invited on (a) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information has practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; (d) ways to minimize the burden of the collection of information on those who are to respond, including the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology. Comments may be sent to Juanita Makuta, Information Systems Security Officer, Information Technology Division, Food and Nutrition Service, U. S. Department of Agriculture, 3101 Park Center Drive, Alexandria, VA 22302.

All responses to this notice will be summarized and included in the request for OMB approval. All comments will also become a matter of public record.

D-2869

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of the FNS–674 form and instructions should be directed to: Juanita Makuta, (703) 305–2241.

**SUPPLEMENTARY INFORMATION:**

*Title:* FNS Computer System Access Request, Form FNS–674.

*OMB Number:* 0584–NEW.

*Expiration Date:* Not Yet Determined.

*Type of Request:* New Collection.

*Abstract:* The Office of Management and Budget Circular No. A–130, Appendix III Revised, dated February 8, 1996, requires that the information be collected. The FNS Computer System Access Request Form, FNS–674, is designed for use in all situations where access to an FNS computer system is required, where current access is required to be modified, or where access is no longer required and must be deleted. Users who access FNS systems are: State agencies, other Federal agencies, and FNS Regional Office, FNS Field Office and FNS Compliance Office users.

In State agencies, the State Coordinators provide a liaison between the State agency and the Deputy Regional Information Systems Security Officers (DRISSO), in the FNS Regional Offices, and the Information Systems Security Office in FNS Headquarters. The State Coordinator is responsible for ensuring that State users and entities comply with the FNS Information Systems Security Policy Handbook 701 and the FNS Information Systems Security Standards and Procedures Handbook 702 developed for State systems and that they maintain proper controls over FNS security features used by State clients.

The DRISSOs act on behalf of the Headquarters Information Systems Security Office to ensure that Regional, Field Office, and Compliance Office users comply with FNS handbook security policies developed for the regional environment.

*Affected Public:* FNS Headquarters, FNS Regional, Field Office and Compliance Office users, State agencies, other Federal agencies, and Trust Territories.

*Estimated Number of Respondents:* 5,000 (includes the 50 States and Trust Territories).

*Estimate of Burden:*

Number of responses per respondent—One.

Estimated total annual responses—5000.

Hours per response—.16666.

Total annual reporting burden—833.3.

Number of record keepers—5000.

Estimated annual hours per record keeper—.03333.

Total annual record keeping hours—166.5.

Total annual reporting and record keeping hours—999.5.

Dated: March 24, 2005.

**Jerome A. Lindsay,**

*Acting Administrator.*

[FR Doc. 05–6330 Filed 3–30–05; 8:45 am]

**BILLING CODE 3410-30-P**

---

## DEPARTMENT OF AGRICULTURE

**Natural Resources Conservation Service**

**Notice of Proposed Changes to Section 4 of the Iowa State Technical Guide**

**AGENCY:** Natural Resources Conservation Service (NRCS), U.S. Department of Agriculture.

**ACTION:** Notice of availability of proposed changes in the Iowa NRCS State Technical Guide for review and comment.

**SUMMARY:** It has been determined by the NRCS State Conservationist for Iowa that changes must be made in the NRCS State Technical Guide specifically in Section 4, Practice Standards and Specifications #328, Conservation Crop Rotation; #330, Contour Farming; and #332, Contour Buffer Strips, to account for improved technology. These practices can be used in systems that treat highly erodible land.

**DATES:** Comments will be received for a 30-day period commencing with the date of publication.

**FOR FURTHER INFORMATION CONTACT:** Richard Van Klaveren, State Conservationist, Natural Resources Conservation Service, Federal Building, 210 Walnut Street, Suite 693, Des Moines, Iowa 50309; at (515) 284–6655; fax (515) 284–4394.

**SUPPLEMENTARY INFORMATION:** Section 343 of the Federal Agriculture Improvement and Reform Act of 1996 states that revisions made after enactment of the law to NRCS State technical guides used to carry out highly erodible land and wetland provisions of the law shall be made available for public review and comment. For the next 30 days the NRCS will receive comments relative to the proposed changes. Following that period a determination will be made by the NRCS regarding disposition of those comments and a final determination of change will be made.

Dated: March 21, 2005.

**Richard Van Klaveren,**

*State Conservationist.*

[FR Doc. 05–6366 Filed 3–30–05; 8:45 am]

**BILLING CODE 3410-16-M**

---

## DEPARTMENT OF COMMERCE

**Office of the Secretary**

**Strengthening America's Communities Advisory Committee**

**AGENCY:** Office of the Secretary, Department of Commerce

**ACTION:** Reopening of nomination period.

**SUMMARY:** On March 1, 2005, the Department of Commerce (the "Department") published a notice in the **Federal Register** (70 FR 9916) announcing the formation of the Strengthening America's Communities Advisory Committee (the "Committee") and soliciting nominations for persons to serve on the Committee. The March 1, 2005 notice provides that all nominations of potential members must be received by the Department no later than 4 p.m. (EST) on March 11, 2005. The March 1, 2005 notice also provides additional information concerning the Committee and membership on the Committee. On March 11, 2005, the Department published a notice in the **Federal Register** (70 FR 12180) extending the deadline for submitting nominations of potential members until 4 p.m. (EST) on March 25, 2005. This notice reopens the nomination period from 4:01 p.m. (EST) on March 25, 2005 until 4 p.m. (EST) on April 1, 2005, in order to provide the public with a final opportunity to submit nominations. Other than extending the deadline for submitting nominations, the evaluation criteria for selecting members and the specific instructions for submitting nominations contained in the March 1, 2005 notice shall continue to apply.

**DATES:** The Department will accept nominations received between 4:01 p.m. (EST) on March 25, 2005 and 4 p.m. (EST) on April 1, 2005. Nomination materials received after 4 p.m. (EST) on April 1, 2005 will not be accepted. Please note that nominations previously submitted at any time prior to the date of this notice (including those submitted after 4:01 p.m. (EST) on March 25, 2005) should not be resubmitted.

**ADDRESSES:** Nominations of potential members may be submitted by (i) postal mail, (ii) facsimile, or (iii) e-mail. Please submit nominations by postal mail to David A. Sampson, Assistant Secretary for Economic Development, Economic

P-2870

# EXHIBIT 12

( 2 PAGES)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,                    :
                                     :
            Plaintiff,               :
                                     :
    v.                               :
                                     :  Case No. 04-12395-JLT
UNITED STATES OF AMERICA,            :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE, AND LINDA               :
SPRINGER, DIRECTOR, UNITED           :
STATES OFFICE OF PERSONNEL           :
MANAGEMENT,                          :
                                     :
            Defendants.              :

## ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Pursuant to Rule 12 of the Federal Rules of Civil Procedure,
the Defendants in the above-captioned action respond to the
Amended Complaint ("Complaint") of Plaintiff John G. Pedicini
("Plaintiff") as follows:

The allegations contained in the Complaint's introductory
paragraph constitute legal arguments and conclusions of law to
which no response is required. To the extent a response is
required, Defendants deny those allegations.

## PARTIES

1. Defendants lack knowledge and information sufficient to
form a belief as to the truth of this Paragraph's allegations
concerning Plaintiff's residence. To the extent a response is
required, Defendants admit that Plaintiff has represented his
residence to be 10 Milano Drive, Saugus, Massachusetts, 01906.

2. Defendants deny that Plaintiff has had three first line

103.  Defendants deny the allegations contained in Paragraph 103 of the Complaint.

104.  Defendants deny that Mr. Malone sought to humiliate Plaintiff.  Defendants admits, however, that Mr. Malone did make an appointment for Plaintiff with a counselor.

105.  Defendants deny the allegations contained in Paragraph 105 of the Complaint.

106.  Defendants deny the allegations contained in Paragraph 106 of the Complaint.

107.  Defendants admit that on or about October 22, 2004, Mr. Malone issued a letter of instruction to Plaintiff. Defendants deny the remaining allegations contained in Paragraph 107 of the Complaint.

108.  Defendants deny that the letter of instruction contained a reprimand.  Defendants admit the remaining allegations contained in Paragraph 108 of the Complaint.

109.  Defendants admit the allegations contained in Paragraph 109 of the Complaint.

110.  Defendants deny that Plaintiff's position was reduced. Defendants admits, however, that Plaintiff does not have certifying rights and that he does not, and never did have the title of Alternate/Backup Funds Officer.

111.  Defendants deny the allegations contained in Paragraph 111 of the Complaint.

112.  Defendants deny the allegations contained in Paragraph

# EXHIBIT 13

### ( 3 PAGES)

1

Volume I
Pages 1 to 214
Exhibits 32 - 46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
            Plaintiff,          :
                                 :
        vs.                      :    Civil Action
                                 :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and    :
ANN M. VENEMAN, SECRETARY,       :
UNITED STATE DEPARTMENT OF       :
AGRICULTURE,                     :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF MICHAEL D. MALONE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 8, 2005, commencing
at 11:30 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

85

1       Q.    Okay.  What clarification do you need?

2       A.    Verbally refused or actually did not do

3   what was instructed?

4       Q.    Actually did not do what was instructed.

5       A.    No, not to my knowledge.

6             MR. CATAPANO-FRIEDMAN:  Can I have this

7   marked.

8                   (Document marked as Plaintiff

9                   Exhibit 38 for identification)

10      Q.    Did Marty Hines ever inform you that you

11  were not allowed to certify funds, the availability

12  of funds?

13      A.    I really can't answer that without further

14  explanation on it.

15      Q.    Well, let me ask you this.  As you sit here

16  today, do you recall Marty Hines ever telling you

17  that you are not allowed to certify funds for USDA

18  NERO?

19      A.    He may have said that in an E-mail.

20      Q.    Do you remember what your response to that

21  was?

22      A.    I don't know if I responded in an E-mail or

23  verbally, but my response was he doesn't have the

24  authority to tell me to do that.  I'm a supervisor.

1    Q.    And did you make that decision on your own

2    or did you go to somebody else who helped you make

3    that decision?

4    A.    Mr. MacAllister explained the process to me

5    and understanding the process, I knew that I had

6    that authority.

7         MR. CATAPANO-FRIEDMAN:    I'd like to mark

8    these as exhibits.

9              (Documents marked as Plaintiff

10             Exhibits 39 and 40

11             for identification)

12        MR. CATAPANO-FRIEDMAN:    Let me have these

13   marked as exhibits.

14        MS. CATAPANO-FRIEDMAN:    I think they

15   already are.    I think I just gave them to you.

16        MR. PEDICINI:    No.    Wait a minute.

17        MR. CATAPANO-FRIEDMAN:    It's not the same,

18   is it?

19        MR. PEDICINI:    There's different ones.

20   That's the 13th.

21        MS. CATAPANO-FRIEDMAN:    This is the 13th.

22   That is marked already.

23        MR. CATAPANO-FRIEDMAN:    Okay.    What about

24   the other one, the 21st?

# EXHIBIT 14

( 2 PAGES)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

JOHN G. PEDICINI,

     Plaintiff

                              **CIVIL ACTION NO. 04-12395-JLT**

−vs−

                              **AFFIDAVIT**

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF
AGRICULTURE,
ANN M. VENEMAN, SECRETARY,
     Defendants

---

Commonwealth of Masachusetts )
                        )   SS.:
COUNTY OF ESSEX        )

JOHN PEDICINI, being duly sworn, deposes and says:

    1.    I am the Plaintiff in the above-captioned case and I assert the following based on my personal observation and knowledge, I am over 18, and I am of sound mind and am mentally competent to testify to the matters contained in this affidavit.

    2.    Since December 7, 2005, I have learned of two additional witnesses in the above-captioned matter—Juanita Makuta and Lori Lodato.

    3.    Juanita Makuta is the Agency Computer Security Officer and is in charge of computer authorization records and regulations that govern those records.

    4.    Lori Lodato is the Regional Computer Security Officer and is in charge of original versions of computer authorization records and regulations that govern those records.

    5.    Sometime in October 2005, I requested a computer authorization form, FNS-674, signed by a former supervisor, Joseph Stanco from Lori Lodato. I asked her about any authorizations from Michael Malone. She told me that there were none. In addition, she informed me that some files on Mr. Malone's computer had been erased. I referred the matter to my former counsel, Sarah Catapano-Friedman.

    6.    On December 15, 2005, I requested all computer authorization forms for me from Lori Lodato. I noticed that there were none from Michael Malone. Also, Ms. Lodato informed me that all computer files from Mr. Malone's computer had been erased.

1

She said that she had informed Juanita Makuta about this occurrence and had recorded it on a form FNS-674, dated on or about September 22, 2005. I asked her if a chain of custody had been established. She said that no chain of custody, involving computer security officers at NERO, had been established and that nobody had informed her of any establishment of a chain of custody since he was the keeper of the backup computer files. She stated that she found Mr. Malone's actions to be quite unusual, especially in light of the fact that he had attended a training session sometime on or about July 2005, conducted by Juanita Makuta, that set forth agency policy and procedure about erasing computer files. In addition, she said that Douglas MacAllister had requested the backup files from her. She informed him that agency policy and procedure for computer security prohibited her from turning the backup files over to him.

7.    I have claimed in the above-captioned matter that Defendants have sought to block my career advancement by reducing my duties, reducing my title, and training others for the avenue of career advancement available to me—into the Budget Analyst position.

8.    I believe Juanita Makuta will testify that the rights and title indicated on the computer authorization forms are reflective of the rights and title of employees in the workplace. In addition, she will testify about the findings recorded on form FNS-674, regarding the spoilage of evidence by Michael Malone.

9.    I believe Lori Lodato will authenticate the copies of computer authorizations currently filed in this case. Also, I believe she will provide extreme detail into the actions of Michael Malone and how they relate to the spoilage of evidence in this case.

10.    Whether or not my superiors and the agency had a retaliatory motive in reducing my duties, denying me training opportunities, reducing my position and title, and training others in my duties to advance them instead of me is a key issue in this case. It is a contested issue because the Defendants have claimed in their answer that they did not retaliate against me and, as such, there can be no retaliatory motive for any of their actions I allege against me. Furthermore, the Defendants have claimed that I never had the title or duties of a backup funds officer. The computer authorization forms prove that I did and still do. As such, it is important I be allowed to depose Juanita Makuta and Lori Lodato.

Dated: 1/23/06

John G. Pedicini, Plaintiff pro se

Sworn to me on this 23 day of January, 2006.

Notary Public

personally appeared before me, and proved his/her identification through satisfactory evidence, which were _____ to be the person whose name is signed on the preceding or attached document in my presence on this 23 day of _____ 2006
Paula Cummings    Commonwealth of Massachusetts
Notary Public    My Commission Expires February 6, 2009

2

# EXHIBIT 15

(4 PAGES)

## Pedicini, John

**From:** Wilmot, Damian (USAMA) [Damian.Wilmot@usdoj.gov]

**Sent:** Thursday, January 05, 2006 8:24 AM

**To:** Pedicini, John

**Subject:** RE: Deposition Dates

John, please respond to my email below ASAP considering that you plan to depose Blim and Dorman on January 12.

**From:** Wilmot, Damian (USAMA)
**Sent:** Tuesday, January 03, 2006 2:32 PM
**To:** 'Pedicini, John'
**Subject:** RE: Deposition Dates

John, please confirm where you are planning to conduct your depositions. As you may know, because your action is in federal court and not the EEOC, the agency is under no obligation to provide you a conference room in order to conduct your depositions. Similarly, with regard to Mr. Blim and Ms. Dorman, just so we are clear, while the agency is making them available for depositions, the government is under no obligation to pay for their travel to Boston. We need to discuss how you will pay for this expense. Finally, please remember that you will need to serve Roger Hamilton and Angie MacElmurray with subpoenas to compel their appearances at their depositions. Thanks.

Damian W. Wilmot
Assistant United States Attorney
John Joseph Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
t: (617) 748-3398
f: (617) 748-3969

**From:** Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
**Sent:** Thursday, December 22, 2005 1:10 PM
**To:** Wilmot, Damian (USAMA)
**Subject:** RE: Deposition Dates

Damian:

Nice try. But, no.

I look forward to meeting Mr. Blim and Ms. Dorman, in person, at the O'Neil building. They might want to stop in the offfice and say hello to our new Regional Adminstrator, Suzanne Biermann. She is very well-liked in this office.

### John G. Pedicini, M.B.A. (Beta Gamma Sigma)
"Leges sine moribus vanae"

**From:** Wilmot, Damian (USAMA) [mailto:Damian.Wilmot@usdoj.gov]
**Sent:** Thursday, December 22, 2005 11:17 AM
**To:** Pedicini, John
**Subject:** RE: Deposition Dates

John, one more question. With regard to Mr. Blim's and Ms. Dorman's depositions, is it possible to conduct their depositions telephonically? Understandably, they would prefer not to travel to Boston in January.

**From:** Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
**Sent:** Thursday, December 22, 2005 6:31 AM
**To:** Wilmot, Damian (USAMA)
**Subject:** FW: Deposition Dates

Good morning, Damian!

Are the dates listed below okay ?

Please respond, I am in the process of reserving the conference room.

Thanks,

### John G. Pedicini, M.B.A. (Beta Gamma Sigma)
"Leges sine moribus vanae"

**From:** Pedicini, John
**Sent:** Wednesday, December 21, 2005 10:40 AM
**To:** 'Wilmot, Damian (USAMA)'
**Subject:** RE: Greetings!

Damian:

I propose the following:

    January 12, 2006, 9:00am..........Lisha Dorman
                     12:00pm.........Larry Blim

    January 19, 2006  9:00am.........Roger Hamilton
                     12:00pm........Angie MacElmurray
                      3:00pm........Bruce Potvin

I disagree with USDA counsel's statements on the use of "official time" in pro se cases involving EEO violations and will seek the appropriate forum to address this issue.

Let me know if these times work out for you. If you want to start earlier in the day, then we can start earlier. I am in at 6:30am.

Thanks,

### John G. Pedicini, M.B.A. (Beta Gamma Sigma)
"Leges sine moribus vanae"

**From:** Wilmot, Damian (USAMA) [mailto:Damian.Wilmot@usdoj.gov]
**Sent:** Wednesday, December 21, 2005 10:24 AM
**To:** Pedicini, John
**Subject:** RE: Greetings!

Jon,

Bob and I agreed to hold the depositions on the 12th and 19th of January. Please let me know ASAP who you wish to depose on those days or if you need to change those dates. Also, you are correct that you do not have to subpoena Mr. Blim, Ms. Dorman, or Mr. Potvin to appear for their depositions, but you will have to subpoena Mr. Hamilton (as he will be retired in the new year) and Ms. MacElmurray (because she is not an employee of the USDA).

With regard to your use of "official government time" to conduct the depositions, USDA counsel informed me that plaintiffs in court actions, whether pro se or not, do not get official government time to pursue their lawsuits. If you believe the policy says something different, you should bring that to the attention of your supervisors.

**From:** Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
**Sent:** Wednesday, December 21, 2005 7:23 AM
**To:** Wilmot, Damian (USAMA)
**Subject:** Greetings!
**Importance:** High

Hi Damian!

Per receipt from Attorney Sarah Catapano Friedman, you have been notified of my appearance via the Court's ECF system.

I will be handling the case, pro se, during the month of January 2006. Based on Judge Tauro's ruling from December 7, 2005, we are to conduct depositions of the following people: Larry Blim, Lisha Dorman, Angie MacElmurray, Roger Hamilton, and Bruce Potvin.

Sarah has informed me that you have agreed to produce Larry Blim, Lisha Dorman, and Bruce Potvin who are current employees of the Defendant. However, she mentioned that you have stated that Roger Hamilton will be retired after December 30, 2005 and you will not produce him. Also, she mentioned that you will not produce Angie MacElmurray.
**Is this correct ?**

At present, Sarah has provided me with one date that you claim you are available during January of 2006 and that is January 12th. Unfortunately, these depositions will last more than one day and I will need more dates from you on your availability next month. I would agree with you to rule out the first week of January 2006 (i.e. January 2-6). Also, I would agree with you on early start times for these depositions and I would agree to do multiple depositions per day to expedite this process.

Please be advised that the depositions will take place at the O' Neil Building at 10 Causeway Street, Boston, MA. You will receive formal notification.

Currently, I am open for all dates in January 2006 and the schedule will depend on your availability. In addition, please note, as a pro se litigant, that I will be conducting these depositions on "official government time" and, as counsel for the Defendant, you are hereby requested to advise Messrs. Canavan and MacAllister of this fact prior to the depositions so as to avoid any misunderstandings. I will be informing the acting Section Chief of the times and days of the depositions so he can keep track of my attendance.

Again, please inform me of your availability in January 2006 and confirm which deponents you plan to produce for deposition.

Thanks, Damian, for your cooperation in this matter.

Sincerely,

**John G. Pedicini, M.B.A.** (Beta Gamma Sigma)
"Leges sine moribus vanae"

**EXHIBIT 16**

(3 PAGES)

## Pedicini, John

**From:** Pedicini, John
**Sent:** Friday, January 06, 2006 6:20 PM
**To:** Wilmot, Damian (USAMA)
**Subject:** RE: ALTERNATE SITE FOR DEPOSITIONS

Damian:

The words "agreed to pay for Blim's and Dorman's travel" is not quite accurate.

As in my previous emails, I am disputing your claim that the government does not have to pay these costs. I believe the government does have to pay, especially when the deponents are on official government time.

However, my interpretation of your actions is that if I didn't pay up front, the government would not pay for their travel and they would not come to Boston. In essence, the government has not provided them to the deposition site and reneged on earlier representations to the Court.

In order to maintain peace and expedite the deposition process, but retaining rights to reimbursement in this dispute, I am paying the air fare to get the deponents to the deposition site.

Please keep in mind that I will look to the Court to address this issue on February 7th.

Thanks,

---------John

**From:** Wilmot, Damian (USAMA) [mailto:Damian.Wilmot@usdoj.gov]
**Sent:** Fri 1/6/2006 1:16 PM
**To:** Pedicini, John
**Subject:** RE: ALTERNATE SITE FOR DEPOSITIONS

John:

I'm pleased that you have agreed to pay for Blim's and Dorman's travel to Boston for your depositions. Believe me, I want to conclude this matter sooner than later. However, your email seems to suggest that you will reimburse them (or the government) for their travel. If that is what you are suggesting, that will not work. You will have to pay for their travel costs up front. Let talk (or you can email me) about how you will do that so we can get Blim and Dorman here for your depositions next Thursday.

With regard to your comment that I am "objecting to the O'Neil Building," you could not be any further off base. I do not really care where they are held. I expressed to you my understanding that you would not have the privilege of reserving a room in a government building to conduct a deposition in an action against the government. Therefore, I was asking you to confirm where your depositions would take place. It didn't seem to me that you were ever given permission to conduct your depositions there. If you are granted permission to conduct your depositions in the O'Neil Building, then by all means, hold your depositions there.

-----Original Message-----
From: Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
Sent: Friday, January 06, 2006 7:45 AM
To: Wilmot, Damian (USAMA)
Subject: RE: ALTERNATE SITE FOR DEPOSITIONS

Damian:

An alternative site for the depositions, instead of the O'Neil Building
would be a conference room at the Days Inn, Route 1, in Saugus.

Potvin will probably have to travel during the work day on 1/18/06.
Mileage reimbursement rate is $0.445.

Due to the short notice of your objection to the O'Neil Building, and
the fact that you were made aware of the O'Neil site on 12/21/05, yet
you waited until less than 1 week before the deposition start date to
raise your objection, kindly confirm your agreement on this site by 9:30
am today .

I need to reserve the room by 11:00 am today. Also, I need to resend
notices of depositions.


Thanks,

  ----------John

_____

From: Wilmot, Damian (USAMA) [mailto:Damian.Wilmot@usdoj.gov]
Sent: Thu 1/5/2006 4:30 PM
To: Pedicini, John
Subject: RE: DEPOSITIONS


Please re-read my last emails. That position has not changed. If you
are paying for their travel, they will be there. Again, where exactly
are the depositions being held.

_____

From: Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
Sent: Thursday, January 05, 2006 3:45 PM
To: Wilmot, Damian (USAMA)
Subject: DEPOSITIONS


Damian:

I trust that you will be providing Lisha Dorman and Larry Blim as
scheduled for deposition on Thursday, January 12, 2006.

See you there.

Thanks,

John G. Pedicini, M.B.A. (Beta Gamma Sigma)
"Leges sine moribus vanae"


1/24/2006

# EXHIBIT 17

( 7 PAGES)

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
 JOHN G. PEDICINI,              :
          Plaintiff,            :
                                :
        vs.                     :  Civil Action
                                :  No. 04-12395 JLT
 UNITED STATES OF AMERICA, and  :
 ANN M. VENEMAN, SECRETARY,     :
 UNITED STATES DEPARTMENT OF    :
 AGRICULTURE,                   :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

2

PRESENT (Continued):

    United States Department of Justice, United
        States Attorney's Office
        (By Damian W. Wilmot, Assistant United
        States Attorney)
        John Joseph Moakley Federal Courthouse,
        1 Courthouse Way, Suite 9200,
        Boston, MA 02210, for the Defendants.

ALSO PRESENT:   John G. Pedicini
                Jessica Gray, Intern

* * * * *

1        A.    Yes.  I saw E-mails that Stanco had sent,

2    too.   There were some E-mails that I was the person

3    that requested the meeting.  I certainly expected to

4    be there.

5        Q.    So Mr. MacAllister knew that you were

6    John's EEO representative?

7        A.    Yes.  Yes, he did.

8        Q.    And he denied you --

9        A.    Yes, he denied me access to the meeting,

10    correct.  From that point on I said to myself

11    there's some reason for all of this happening.

12        Q.    So do you feel that your being named by

13    Mr. Pedicini as his EEO representative had something

14    to do with what happened to you later?

15            MR. WILMOT:  Objection.

16        A.    Yes, I do.  Absolutely.

17        Q.    What do you think the connection is?

18        A.    Well, I had prior -- prior to that I had an

19    upgrade pending.  Most of the agency funds officers

20    in FNS at headquarters are Grade 13s.  A couple of

21    them in the regions are Grade 12s and I had

22    submitted a desk audit request.  That action was

23    still pending and when I got that back a few months

24    later, the appeal came back.  The language in the

1    appeal was not very pleasant.

2          It was denied, and I feel that that role

3    and that incident tainted my request for an upgrade

4    and I wasn't very happy about it.

5          Having been involved in the EEO matters in

6    the military, you try to resolve things.  You try to

7    reconcile things, and I felt that I was now

8    potentially going to be impacted negatively from

9    actions that were directed at another individual;

10   namely, John Pedicini.

11   Q.    And do you feel that the October 7, 2004,

12   meeting that you discussed before had anything to do

13   with your being an EEO representative?

14   A.    Yes, it did.  Absolutely.  Absolutely.  I

15   was now targeted.  I've only been targeted twice in

16   my life, first by the Iraqis in Desert Storm and

17   they missed, and I felt that this was another shot

18   fired at me and I didn't like it.

19          I didn't like it at all particularly after

20   the type of work I do, the reputation I have.  I was

21   personally embarrassed by it.  I had people coming

22   up to me after the meeting saying to me, "Is there

23   something wrong with you?  Do you have some terminal

24   disease?  Do you have some kind of personal problems

1  that are impacting on all of this?"

2          I felt it was an invasion of my privacy and

3  violation of the Privacy Act which I have some

4  knowledge of, and I was shocked and stunned by it

5  all.

6          I mean I've got many, many years of

7  credible service, outstanding service, outstanding

8  ratings. I have a reputation not just in the region

9  but in the whole agency of the type of work I do,

10 and then all of a sudden I'm told that I'm going to

11 train people to replace me.

12     Q.   Well, did anything else happen during the

13 latest review year that may have justified a

14 downgrade in your performance rating other than --

15     A.   No, absolutely nothing.

16     Q.   -- other than the fact that you represented

17 John Pedicini as an EEO representative?

18     A.   There was no negative performance on my

19 part in the midyear review that was conducted last

20 summer prior to my evaluation. And prior to that

21 October meeting, Mike Malone, the acting supervisor,

22 said my performance was as it's always been, and I

23 expected to again receive another outstanding

24 rating.

32

1          I worked very, very hard to close out the

2    last fiscal year with very, very good numbers, which

3    I think were reflected very positively by

4    headquarters, and I was shocked by all of this.

5          Q.    Do you know who participated in giving you

6    your performance review rating?

7          A.    Well, Mike Malone is the acting supervisor.

8    He gave me the rating, but it's also reviewed by

9    Doug MacAllister.  The rating itself I thought was

10   improperly prepared.

11          Having been a supervisor before, it did not

12   include as an attachment -- when you give a

13   performance rating, you're supposed to attach to the

14   summary rating sheet each individual job element and

15   you're supposed to indicate on each page and check

16   off that rating and also attach any input provided

17   by the employee.

18          I think I said earlier that I sent Malone

19   an E-mail with all kinds of justification to raise

20   the one element in question, and he didn't even have

21   the courtesy to meet with me which is required by

22   FNS regulation.  When you submit documentation, the

23   supervisor and the employee are supposed to discuss

24   it.

304

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3       I, Laura E. Antoniotti, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that there came before me on the 22nd day of July,

7   2005, at 10:05 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 29th day of July,

21  2005.

22                              *Laura E. Antoniotti*

23                              Notary Public

24                              My commission expires 4/18/2008

DORIS O. WONG ASSOCIATES, INC.

# EXHIBIT 18

( 2 PAGES)

## Pedicini, John

**From:**  Wilmot, Damian (USAMA) [Damian.Wilmot@usdoj.gov]

**Sent:**  Wednesday, December 21, 2005 10:24 AM

**To:**  Pedicini, John

**Subject:** RE: Greetings!

Jon,

Bob and I agreed to hold the depositions on the 12th and 19th of January. Please let me know ASAP who you wish to depose on those days or if you need to change those dates. Also, you are correct that you do not have to subpoena Mr. Blim, Ms. Dorman, or Mr. Potvin to appear for their depositions, but you will have to subpoena Mr. Hamilton (as he will be retired in the new year) and Ms. MacElmurray (because she is not an employee of the USDA).

With regard to your use of "official government time" to conduct the depositions, USDA counsel informed me that plaintiffs in court actions, whether pro se or not, do not get official government time to pursue their lawsuits. If you believe the policy says something different, you should bring that to the attention of your supervisors.

**From:** Pedicini, John [mailto:John.Pedicini@FNS.USDA.gov]
**Sent:** Wednesday, December 21, 2005 7:23 AM
**To:** Wilmot, Damian (USAMA)
**Subject:** Greetings!
**Importance:** High

Hi Damian!

Per receipt from Attorney Sarah Catapano Friedman, you have been notified of my appearance via the Court's ECF system.

I will be handling the case, pro se, during the month of January 2006. Based on Judge Tauro's ruling from December 7, 2005, we are to conduct depositions of the following people: Larry Blim, Lisha Dorman, Angie MacElmurray, Roger Hamilton, and Bruce Potvin.

Sarah has informed me that you have agreed to produce Larry Blim, Lisha Dorman, and Bruce Potvin who are current employees of the Defendant. However, she mentioned that you have stated that Roger Hamilton will be retired after December 30, 2005 and you will not produce him. Also, she mentioned that you will not produce Angie MacElmurray.
*Is this correct ?*

At present, Sarah has provided me with one date that you claim you are available during January of 2006 and that is January 12th. Unfortunately, these depositions will last more than one day and I will need more dates from you on your availability next month. I would agree with you to rule out the first week of January 2006 (i.e. January 2-6). Also, I would agree with you on early start times for these depositions and I would agree to do multiple depositions per day to expedite this process.

Please be advised that the depositions will take place at the O' Neil Building at 10 Causeway Street, Boston, MA. You will receive formal notification.

Currently, I am open for all dates in January 2006 and the schedule will depend on your availability. In addition, please note, as a pro se litigant, that I will be conducting these depositions on "official government time" and, as counsel for the Defendant, you are hereby requested to advise Messrs. Canavan and MacAllister of this fact prior to the depositions so as to avoid any misunderstandings. I will be informing the acting Section Chief of the times and days of the depositions so he can keep track of my attendance.

Again, please inform me of your availability in January 2006 and confirm which deponents you plan to produce for deposition.

Thanks, Damian, for your cooperation in this matter.

Sincerely,

**John G. Pedicini, M.B.A.** (Beta Gamma Sigma)
"Leges sine moribus vanae"

# EXHIBIT 19

( 3 PAGES)

## Pedicini, John

**From:** Pedicini, John

**Sent:** Thursday, January 05, 2006 1:26 PM

**To:** Hassel, Kirk

**Cc:** MacAllister, Douglas; Mann, Peggy

**Subject:** RE: RE: REQUEST FOR USE OF OFFICIAL TIME IN PEDICINI V. USA

Kirk:

I am interpreting your response as a denial of my request to use official time under the USDA DM4300-001, Chapter 111, Section 7.

If you disagree, please respond by COB today.

Thanks,

### John G. Pedicini, M.B.A. (Beta Gamma Sigma)
"Leges sine moribus vanae"

**From:** Hassel, Kirk
**Sent:** Thursday, January 05, 2006 1:22 PM
**To:** Pedicini, John
**Cc:** MacAllister, Douglas; Mann, Peggy
**Subject:** RE: RE: REQUEST FOR USE OF OFFICIAL TIME IN PEDICINI V. USA

Hi John: You may have the time off from work; however, you must either take annual leave, leave-without-pay or switch your lieu day to cover your absence from work. tx. Kirk

**From:** Pedicini, John
**Sent:** Thursday, January 05, 2006 9:22 AM
**To:** Hassel, Kirk
**Subject:** RE: REQUEST FOR USE OF OFFICIAL TIME IN PEDICINI V. USA

Kirk:

I am requesting use of official time for depositions in my case, Pedicini v. USA, on January 12, 2006, 9 am to 5 pm, and on January 18, 2006, 9 am to 5 pm. I am arguing the case as plaintiff, pro se.

This request comes under USDA DM4300-001, Chapter 111, Section 7, Representation and Official Time.

This case is an EEO case that is now a civil action in U.S. District Court in Boston. This case never took place during formal EEO proceedings and I seek to exercise my rights under that section.

### John G. Pedicini, M.B.A. (Beta Gamma Sigma)
"Leges sine moribus vanae"

http://www.ocio.usda.gov/directives/files/dm/DM4300-001.htm

USDA DM4300-001, EEO COMPLAINT PROCESSING PROCEDURES (7/20/2001)

...

CHAPTER III – GENERAL PROVISIONS FOR PROCESSING EEO COMPLAINTS

...

7    REPRESENTATION AND OFFICIAL TIME

    a    The complainant is entitled to be accompanied, represented, and/or advised at any stage of the process by another individual. The complainant is expected to answer personally all questions from the counselors and investigators and is responsible for compliance with the requirements of this part whether or not represented. Where complainant has a representative, all correspondence should be addressed to both the complainant and the designated representative, and documents given to the complainant will also be given to the representative. Oral discussion with a represented complainant may be undertaken without first contacting the representative, but the complainant must be given the opportunity to contact the representative and/or make the representative a party to the discussion before it proceeds. Where the representative is an attorney and the Office Of General Counsel (OGC) is representing the agency, the OGC representative will only contact the complainant through the representative. The complainant is not required to involve the representative in any communication with USDA. Where the representative is an attorney, service on the complainant of any document will be made by service on the representative. Agencies may prohibit a particular employee from acting as a representative on a particular complaint if:

        (1)    there is a conflict of interest, or

        (2)    the priority requirements of the agency would be harmed.

    b    The complainant, representative, and any witness or Responsible Management Official in active duty status, shall be granted reasonable official time to prepare and present a complaint or a response to inquiries involved in processing the complaint. The term "reasonable amount of official time" depends on the individual circumstances of each complaint.

        Reasonable is defined as whatever is appropriate, under the factual circumstances presented in the complaint, in order to allow a complete presentation of the relevant information associated with the complaint and to respond to an agency's request for information. The actual number of hours to which the complainant and his/her representative are entitled will vary,

depending on the nature and complexity of the complaint and considering the mission of the agency, as well as the agency's need to have its employees available to perform their normal duties on a regular basis. The complainant and the agency should arrive at a mutual understanding as to the amount of official time to be used, prior to the complainant's use of such time. Ultimate authority for determining official time rests with the Agency.

The complainant and the representative, if employed by the agency and otherwise in a pay status, shall be on official time, regardless of the tour of duty, when their presence is authorized or required by the agency or the EEOC during the investigation, informal adjustment, or hearing on the complaint. Whatever time is spent in the (official EEO) meetings or hearings is automatically deemed reasonable. If a complainant or representative has already worked a full week and must attend a hearing or meeting on an off duty day, the complainant or representative is entitled to official time, which may require that the agency pay overtime. In the alternative, the supervisor can, in advance and in accordance with Agency leave policy and practices, adjust the tour of duty when appropriate or necessary.

Preparation does not include conducting independent inquiries or gathering data or testimony, but does include activities reasonably related to and anticipated in regard to responding to official requests for information during any complaint processing stage. Since USDA conducts the required investigation, official time is not necessary or reasonable for the purpose of independently obtaining evidence or statements on the complaint issue. Responsible Management Officials, witnesses and their representatives are subject to the same rules on official time as the complainant.

# EXHIBIT 20

( 5 PAGES)

| | | |
|---|---|---|
| John G. Pedicini, | ) | **November 17, 2000** |
| Complainant | ) | |
| | ) | **FORMAL** |
| v. | ) | **DISCRIMINATION** |
| | ) | **COMPLAINT** |
| | ) | **UNDER 29 CFR  1614.106** |
| United States Of America, | ) | |
| Francis Zorn, Margaret Mann, | ) | |
| Douglas MacAllister, individually | ) | **DELIVERED VIA** |
| and collectively | ) | **CERTIFIED MAIL** |
| | | **RETURN RECEIPT** |
| | | **REQUESTED** |

## INTRODUCTION

The Complainant, John G. Pedicini, hereby files a formal discrimination complaint against the U.S. Department of Agriculture, Food and Nutrition Service, Northeast Regional Office, Room 501, 10 Causeway Street, Boston, Massachusetts, hereinafter referred to as "FNS-NERO", Francis Zorn, Margaret Mann, and Douglas MacAllister, individually and collectively, for reprisal actions taken as a result of the Complainant's affidavit in a recent EEO investigation, in violation of 5 USC 2302(b)(8).

This action follows an informal counseling period conducted by Patricia A. Loyco, EEO Counselor/Mediator. The Complainant hereby files this formal discrimination complaint within 15 calendar days after receiving notice from Ms. Loyco on November 14, 2000, pursuant to 29 CFR 1614.106(b).

The Complainant has not filed  a grievance under negotiated or administrative grievance procedures or an appeal with the Merit Systems Protection Board on the same issues contained herein.

## FACTUAL BACKGROUND

1. The Complainant, John G. Pedicini, is employed as a financial management specialist in the Financial Management Unit at FNS-NERO.

2. Douglas MacAllister is the Director of the Financial Management Unit at FNS-NERO.

3. Margaret Mann is Personnel Liaison for FNS-NERO.

4. Francis Zorn is Regional Administrator of FNS-NERO and supervises Douglas MacAllister and Margaret Mann.

5. In July 1999, the Complainant offered to become ADR Mediator for FNS-NERO based on his mediation background at the U. S. Department of Labor. Douglas MacAllister accepted the offer and forwarded the Complainant's name to the EEO Office at the Food and Nutrition Service in Alexandria, VA. The Complainant received numerous progress reports on the proposed training and ADR program.

6. Sometime in or about February 2000, Ann Bellezza, another employee in the Financial Management Unit at FNS-NERO, filed a formal discrimination complaint against Douglas MacAllister and FNS-NERO.

7. On June 12, 2000, Mr. Charles Purter, a contract EEO investigator, arrived at FNS-NERO to commence investigative interviews. The Complainant was scheduled to be interviewed by Mr. Purter.

8. On June 13, 2000, while walking to the men's restroom, Douglas MacAllister informed the Complainant that he was removed, without cause, as ADR Mediator.

9. While providing Mr. Purter, the EEO investigator, with an affidavit on July 14, 2000, the Complainant stated that he believed his removal as ADR mediator was an act of reprisal for giving information to the EEO investigation.

10. On August 4, 2000, the Complainant express mailed his finalized affidavit to the EEO investigator.

11. On August 8, 2000, the Complainant filed a complaint with the Office of the Special Counsel which is OSC File No. MA-00-2308.

12. On August 21st, 2000, Douglas MacAllister was informed that there was a training session on Form 209 which is used by the Complainant in his work. The training session was to be held on August 22nd to August 23rd, 2000. There were only two

people available at the time. The Complainant was one of them. MacAllister chose
the other employee and did not divulge any information about the training session or
his selection to the Complainant until after the fact at a meeting attended by the
Complainant on August 23rd.

13. On August 30, 2000, Jonathan Lash from NFC e-mailed the Complainant about a
training session on salaries & benefits which was essential to the Complainant's job
function.

14. At a Financial Management meeting on September 13, 2000, the Complainant asked
Douglas MacAllister about obtaining approval for travel to a training session.
MacAllister responded by saying that the Complainant's request "...would probably
be denied."

## REMEDY SOUGHT

Wherefore, Complainant, John G. Pedicini requests the following:

1. Reinstatement as ADR Mediator for FNS-NERO.

2. Transfer of Douglas MacAllister to a position in which he will have no influence or
control on personnel actions or training assignments at FNS-NERO.

3. Transfer of Margaret Mann to a position in which she will have no influence or
control on personnel actions or training assignments at FNS-NERO.

4. Transfer of Francis Zorn to a position in which she will have no influence or control
on personnel actions or training assignments at FNS-NERO.

Respectfully submitted this 17th day of November 2000.

John G. Pedicini, Complainant
10 Milano Drive
Saugus, MA 01906
617-565-6449 (Work)
781-233-5274 (Home)

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

| United States Department of Agriculture<br>Civil Rights, Employment Complaints and Adjudication Division | 300 7th. Street SW  Rm#6<br>Washington, DC 20050 |
|---|---|

**1. Name**    (First)    (Mi)    (Last)

[✓]Mr. [ ]Ms.    John  G.  Pedicini        [✓]USDA Employee    [ ] USDA Applicant

**2. Address**                                 **3. Telephone Number**

10  Milano  Drive
(Street)                                   Work (617) 565-6449

Saugus,  MA    01906        Home (781) 233-5274
(City)        (State)    (Zip)

**4. Name of Agency Which You Believe Discriminated Against You**

U. S  Dept. of Agriculture
Food and Nutrition Service
10  Causeway  Street , Rm. 501

Boston,        MA            02222
(City),        (State)            (Zip)

---

**5. Bases of Discrimination on Which You Were Counseled** (Do not include bases for which you did not receive counseling.)  The bases are age, race, color, national origin, religion, sex, physical or mental disabili marital status, sexual orientation and reprisal.  Be specific in your identification of bases (IE: age (55), sex (female), race (white).

Reprisal  for  previous  EEO activity

---

**6. Issues(s) on Which You Were Counseled** (Do not include issues or allegations for which you did not rece counseling.  Provide, if you deem necessary, additional details on reverse side.)  Be specific with exact issue a the date of the issue.  (IE: Non-selection to vacancy announcement USDA-96-174, Secretary, GS-318-9 on Ma 1, 1996, or two day suspension for misconduct on January 29 & 30, 1996.)  You do not need to elaborate on v you feel this was discriminatory, you be given the opportunity to support you complaint during the investigati process.

Assignment of duties and training
Removal, without cause, from ADR mediator position.

---

**7. Representative, if any**    (Pending  receipt of  Notice of  Final Action.)

_____    (____)_____
                                                                 (Telephone Number)

(Street)            (City)            (State)        (Zip)

**8. Name of EEO Counselor Contacted**

USDA, FNS, OCR
PATRICIA A. LOYCO, FNS  703-305-2215, ROOM 942-8 PARK CENTER, ALEX, \

**9. Requested Corrective Action**    Reinstatement as  ADR mediator

Transfer of MacAllister, Bain, Mann  to positions in which they will have no influence o
control over _____ or training assignments

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

USDA, Office of Civil Rights
Chief, Employment Complaint
and Adjudication Div.
Reporters Building Rm #607
300 7th St. SW
Washington, DC 20024

*COMPLETE THIS SECTION ON DELIVERY*

A. Received by (Please Print Clearly)    B. Date of Delivery
                            11-20-00

C. Signature
X Janice Jackson    ☐ Agent
                    ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)

7000-0600-0022-3277-2758

PS Form 3811, July 1999       Domestic Return Receipt       102595-99-M-1789

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Article Sent To

USDA, Office of Civil Rights

| | | |
|---|---|---|
| Postage | $ | .33 |
| Certified Fee | 1.40 | |
| Return Receipt Fee (Endorsement Required) | 1.25 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | NOV 1? 2000 | |
| Total Postage & Fees | $ 2.98 | |

Name (Please Print Clearly) (to be completed by mailer)
Chief, Employment Complaint & Adjudication Div.
Street, Apt. No.; or PO Box No.    Room #607
300 7th St., SW
City, State, ZIP+4
Washington, DC 20024

7000 0600 0022 3277 2758