UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,                      :
                                       :
            Plaintiff,                 :
                                       :
      v.                               :
                                       :   Case No. 04-12395-JLT
UNITED STATES OF AMERICA,              :
ANN M. VENEMAN, SECRETARY,             :
UNITED STATES DEPARTMENT OF            :
AGRICULTURE, AND LINDA                 :
SPRINGER, DIRECTOR, UNITED             :
STATES OFFICE OF PERSONNEL             :
MANAGEMENT,                            :
                                       :
            Defendants.                :

**DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

A.    Plaintiff's Employment Background With USDA-FNS

1.    Plaintiff, John Pedicini, began his employment in the
      Financial Management Division, Northeast Regional Office
      ("NERO") of the United States Department of Agriculture,
      Food and Nutrition Service ("USDA-FNS") on August 1, 1997,
      as a Financial Management Specialist. See Deposition of
      John G. Pedicini ("Pedicini Dep."), p. 20-21, relevant pages
      attached hereto as Exhibit 1.

2.    Plaintiff's official title with USDA-FNS since August 1,
      1997, to present day has been "Financial Management
      Specialist." Id., p. 26.

3.    Plaintiff started as a Grade 7 on the federal employee pay
      scale. Id., p. 25. Since August 1, 1997, USDA-FNS
      increased Plaintiff's grade level from 7 to 9 in 1998, and
      from 9 to 11 in 1999. Id., p. 26-27. Today, Plaintiff is a
      Grade 11 ("GS-11"). Id., p. 27.

4.    As a Financial Management Specialist, Plaintiff generally is
      responsible for "planning, organizing, reviewing, analying
      and monitoring fiscal activity, accounting and internal
      controls in the Region to provide proper accountability and
      financial management over Federal funds." See Position
      Description, attached hereto as Exhibit 2; Pedicini Dep., p.
      36-37.

5.   When Plaintiff began his employment at USDA-FNS, he reported
     directly to Arthur LeBlanc, the Section Chief of the
     Financial Management Division.  <u>Id.</u>, p. 29.  Mr. LeBlanc
     held this position from 1985 until 2000.  <u>See</u> Deposition of
     Arthur LeBlanc ("LeBlanc Dep."), p. 6, relevant pages
     attached hereto as Exhibit 3.

6.   After Mr. LeBlanc left the position, Joseph Stanco became
     the Section Chief of the Financial Management Division and
     Plaintiff's first-line supervisor from 2001 until 2003.  <u>See</u>
     Pedicini Dep., p. 29; Deposition of Joseph Stanco ("Stanco
     Dep."), p. 6, relevant pages attached hereto as Exhibit 4.

7.   After Mr. Stanco left the position, Michael Malone, then the
     Supervisory Information Technology Specialist, assumed the
     responsibilities of Section Chief of the Financial
     Management Division sometime in March 2004 until September
     2005.  <u>See</u> Pedicini Dep., p. 29; Deposition of Michael
     Malone ("Malone Dep."), p. 8-9, 151-52, relevant pages
     attached hereto as Exhibit 5.  Mr. Malone assumed these
     responsibilities on a temporary basis.  <u>Id.</u>

8.   Throughout Plaintiff's employment with the USDA, his second-
     line supervisor has been Douglas MacAllister, the Director
     for Financial Management.  <u>See</u> Pedicini Dep., p. 29;
     Deposition of Douglas MacAllister ("MacAllister Dep."), p.
     7, relevant pages attached hereto as Exhibit 6.

9.   Plaintiff's third-line supervisor until January 2004, was
     John Ghiorzi, the Deputy Regional Administrator for NERO.
     Deposition of John Ghiorzi ("Ghiorzi Dep."), p. 11, relevant
     pages attached hereto as Exhibit 7.  Robert Canavan filled
     the Deputy Regional Administrator position soon after Mr.
     Ghiorzi's retirement in 2004.  Deposition of Robert Canavan
     ("Canavan Dep."), p. 7-8, relevant pages attached hereto as
     Exhibit 8.

10.  Frances Zorn, the Regional Administrator, headed NERO from
     1996 until June 2005.  <u>See</u> Pedicini Dep., p. 29; Deposition
     of Frances Zorn ("Zorn Dep."), p. 9, 155-56, relevant pages
     attached hereto as Exhibit 9.  Ms. Zorn indirectly reported
     to Roberto Salazar, the Administrator of USDA-FNS.
     Deposition of Roberto Salazar ("Salazar Dep."), p. 7-9,
     relevant pages attached hereto as Exhibit 10.

B.   <u>USDA-FNS's Funds Control Policy</u>

15.  The Secretary for the USDA requires the National Finance
     Center to consolidate the administrative payments of all the
     sub-agencies within USDA and to provide centralized

accounting services for the entire agency.  See Affidavit of Lisha Dorman ("Dorman Aff.") at ¶ 6, attached hereto as Exhibit 11; Deposition of Lisha Dorman ("Dorman Dep."), p. 92, relevant pages attached hereto as Exhibit 12.

16. Each sub-agency, however, is responsible for "funds control."  Dorman Aff. at ¶ 6.

17. The USDA defines "funds control" as the various policies, procedures, and records used to exercise management control over public funds.  Id.  Funds control requires that each sub-agency implement specific procedures which the sub-agency and its employees must follow whenever they obligate or expend Federally Appropriated Funds.  Id.

18. The Budget Division of the USDA allocates Federally Appropriated Funds to "allowance holders," which could include the Administrator, Deputy Administrators, Staff Directors, and Regional Administrators.  Id. at ¶ 7.

19. Since February 22, 1982, the USDA had required the allowance holders to designate an employee as a "certifying officer." See Memorandum from USDA to Regional Administrators, dated February 22, 1982, attached hereto as Exhibit 13.

20. To satisfy this obligation, the allowance holders in each region typically designate a funds officer as the "certifying officer."  Zorn Dep., p. 170-78.

21. Also, each allowance holder has the authority to delegate his/her authority to allocate Federally Appropriated Funds to whomever he/she decides.  Dorman Aff., at ¶ 13.

22. Each of the seven regions within USDA-FNS has at least one funds officer.  Id.

23. A funds officer is responsible for monitoring/tracking the agency's status of funds and for providing data on fund availability to the allowance holder.  Id. at ¶ 8.  The funds officer is also responsible for (i) certifying that funds are available before spending actions occur, (ii) committing the funds for the spending actions in the agency financial system (i.e., the Foundation Financial Information System ("FFIS")), and (iii) reporting the monthly status of the accounts to his/her allowance holder and quarterly to the Budget Division.  Id.

24. In each region, allowance holders assign certain employees "back up" roles to the some or all of the funds officer's functions.  Id., at ¶ 10-12.  The "back up" is responsible

for performing those functions only in the absence of the funds officer.  Id.

25. There is no USDA policy prohibiting the allowance holder from not delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to a designated "back-up" funds officer.  Id., at ¶ 14.

26. Further, there is no USDA policy prohibiting the allowance holder from delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to a USDA-FNS supervisor or manager.  Id., at ¶ 15.

C.   Funds Control At USDA-FNS, NERO

24. In USDA-FNS, NERO, the Regional Administrator is the allowance holder of Federally Appropriated Funds.  Zorn Dep., p. 172-73.

25. The practice in NERO is that funds officer, his/her first-line supervisor, and his/her second-line supervisor have the authority to certify that funds are available before spending actions occur.  See Zorn Dep., p. 107; MacAllister Dep., p. 10; LeBlanc Dep., p. 8-10; Stanco Dep., p. 9-10; Malone Dep., p. 51-52.

26. Ms. Zorn was the allowance holder in NERO from 1996 until June 2005.  Zorn Dep., 155-56, 172-73.

27. Before 1996, the Regional Administrator designated Martin Hines as the funds officer (or certifying officer) for USDA-FNS, NERO, and Ms. Zorn affirmed that designation.  Id., p. 106.

28. Mr. Hines is not (and never has been) a managerial employee at USDA-FNS and reports to the same chain-of-command as Plaintiff.  Id., 181-82; Deposition of Martin Hines ("Hines Dep."), p. 251-55, relevant pages attached hereto as Exhibit 14.

29. Throughout Plaintiff's employment with the USDA, the Regional Administrator has delegated to Messrs. Hines and MacAllister, and the Section Chief of the Financial Management Unit, the authority to certify that funds are available before spending actions occur.  See Zorn Dep., p. 107; MacAllister Dep., p. 10; LeBlanc Dep., p. 8-10; Stanco Dep., p. 9-10; Malone Dep., p. 51-52; see also Delegation of Authority Memoranda, attached hereto as Exhibit 15.

D.    <u>USDA-FNS Assigns Plaintiff Certain "Back-Up"</u>
      <u>Responsibilities</u>

29.   According to Plaintiff, in the spring of 1998, Mr. LeBlanc
      informed Plaintiff that he was to serve as a "back-up" on
      all of Mr. Hines's duties as a Funds Officer.  Pedicini
      Dep., p. 30, 33-34.  Plaintiff claims that Mr. LeBlanc, by
      designating Plaintiff as the "back-up" Funds Officer, gave
      him the authority to certify that funds are available.  <u>Id.</u>

30.   Ms. Zorn, who was the allowance holder during the relevant
      time period, however, never delegated Plaintiff the
      authority to certify that funds are available.  Zorn Dep.,
      p. 105.  Further, there is no document delegating Plaintiff
      with such authority similar to the memoranda wherein such
      authority is delegated to Messrs. Hines, MacAllister, and
      the Section Chief.  <u>See</u> Exhibit 15.

31.   Despite the fact that Plaintiff's superiors did not grant
      him the authority to certify that funds are available, he
      has certified funds availability, unbeknownst to his
      superiors, on at least three occasions.  <u>See</u> Procurement
      documents, attached hereto as Exhibit 16.

E.    <u>Plaintiff's First EEO Complaint And Law Suit Against The</u>
      <u>USDA</u>

32.   On December 29, 1999, Plaintiff's co-worker, Antoinette
      Bellezza, filed an EEO complaint against the USDA, alleging
      age and gender discrimination.  <u>See</u> Complaint ¶ 19.

33.   Ms. Bellezza identified Plaintiff as a witness to her claims
      and designated him as her EEO representative.  <u>Id.</u>
      Accordingly, the EEO Investigator investigating Ms.
      Bellezza's complaint interviewed Plaintiff.  <u>Id.</u>, at ¶ 20.

34.   On November 17, 2000, Plaintiff filed his own EEO complaint
      against the USDA, claiming retaliation for his support of
      Ms. Bellezza's complaint.  <u>See</u> Complaint of Employment
      Discrimination, dated November 17, 2000, attached hereto as
      Exhibit 17.  Specifically, Plaintiff claimed that after Ms.
      Bellezza filed her complaint, naming Plaintiff as a witness
      and her representative, Mr. MacAllister removed Plaintiff as
      an Alternate Dispute Resolution ("ADR") Mediator and refused
      to send Plaintiff to two separate training sessions.  <u>Id.</u>

35.   On September 13, 2001, Plaintiff filed a civil action in the
      United States District Court, District of Massachusetts,
      alleging that the USDA retaliated against him for his

involvement in Ms. Bellezza's complaint.  <u>See</u> Complaint for Civil Action 01-11564-DPW, attached hereto as Exhibit 18. Specially, Plaintiff alleged that the USDA discriminated against him by (i) removing as the ADR Mediator for FNS-NERO without explanation, (ii) denying him a promotion for which he was the best qualified, and (iii) denying him training opportunities that would have advanced his career.  <u>Id.</u>

36.  On June 17, 2002, Plaintiff resolved his civil action against the USDA via a settlement agreement after mediation. <u>See</u> Settlement Agreement, dated June 17, 2002, attached hereto as Exhibit 19.  In engage for Plaintiff's dismissal of the action and waiver of all other claims he could have against the USDA up to the date of the agreement, the USDA promised to (i) treat Plaintiff equally with regard to training opportunities, (ii) provide Plaintiff training so that he could become a "Shared Neutral."[1]  <u>Id.</u>

37.  Also pursuant to the settlement agreement, both parties agreed that Plaintiff and his supervisor should frequently communicate and, in the event of a disagreement, discuss such disagreements privately.  <u>Id.</u>  They also agreed that if the Plaintiff and his supervisor could not resolve the disagreement during the private meeting, Plaintiff could address the issue with his second-line supervisor (Mr. MacAllister), who would act as an objective third-party. <u>Id.</u>  If Plaintiff's second-line supervisor cannot resolve the disagreement between Plaintiff and his first-line supervisor, the agreement calls for the Deputy Regional Administrator to review the issue and make a final determination.  <u>Id.</u>

38.  Thereafter, on June 25, 2002, both parties moved to dismiss Plaintiff federal law suit.  <u>See</u> Stipulation of Dismissal Without Costs, filed June 25, 2002, attached hereto as Exhibit 21.

F.  <u>Perez Selects Plaintiff As His EEO Representative</u>

39.  In 2001, Plaintiff's co-worker, Luis Perez, filed an EEO complaint against the USDA, and identified Plaintiff as a his EEO representative.  <u>See</u> Complaint, ¶ 32.

---

[1]    On January 28, 2003, Plaintiff informed the then-Deputy Regional Administrator, John Ghiorzi, that he no longer wanted to pursue the "Shared Neutral" position due to his father's declining health.  <u>See</u> Pedicini Dep., p. 177; Email from Plaintiff to J. Ghiorzi, dated January 28, 2003, attached hereto as Exhibit 20.

40.  On February 11, 2003, Plaintiff deposed Ms. Zorn, Mr. MacAllister and the Deputy Regional Administrator, Robert Canavan, concerning Mr. Perez's claims.  <u>Id.</u>, at ¶ 33.

G.  <u>ALLEGED RETALIATORY ACTS NUMBERS 1 AND 2: USDA-FNS Excludes Plaintiff's Name From Training List And Took Away His "Right" To Certify Funds Availability</u>

41.  On February 19, 2003, Mr. Stanco, prepared a list of employees who should receive training in the USDA-FNS's new procurement system, the Integrated Acquisition System.  <u>See</u> emails, dated February 19 through 27, 2003, attached hereto as Exhibit 22.  He sent this list to headquarters Lisa Wilusz, via email, and copied Plaintiff.  <u>Id.</u>

42.  In response, on February 27, 2003, Plaintiff asked Mr. Stanco why his name did not appear on the list as the "alternate" to the funds officer.  <u>Id.</u>; <u>see also</u> Pedicini Dep., p. 72-74.

43.  Mr. Stanco replied that Plaintiff's name should be on the user list, and, accordingly, edited the list to include Plaintiff's name.  Exhibit 22.

44.  Thereafter, on March 4, 2003, Plaintiff emailed Mr. Stanco, asking what his new duties with regard to funds control would be in the Integrated Acquisition System.  <u>See</u> email exchange between Plaintiff and J. Stanco, dated March 4, 2003, attached hereto as Exhibit 22.  Plaintiff further asked whether management would require him to back up Mr. Hines in the event that Mr. Hines was not in the office, as his co-worker Janice Sciarappa does.  <u>Id.</u>

45.  Mr. Stanco replied to Plaintiff's email, stating that management expected Plaintiff to back up Mr. Hines when he is absent from the office, however, if a situation arose where an employee needs certification that funds are available before a spending action occurs, Plaintiff must refer that situation to Messrs. Stanco or MacAllister.  <u>Id.</u>

46.  After receiving Mr. Stanco's email, Plaintiff emailed co-worker, Jonathan Lash, a budget analyst, asking whether Plaintiff's name appeared on a list on "backup funds officers" and whether Plaintiff had "certification rights," to which Mr. Lash answered in the affirmative.  <u>See</u> email correspondence between Plaintiff and J. Lash, dated March 4, 2003, attached hereto as Exhibit 23.  Plaintiff forwarded this Mr. Lash's response to Mr. Stanco.  <u>Id.</u>

47.  Plaintiff then emailed Mr. Ghiorzi, the Deputy Regional
     Administrator, stating that USDA "headquarters" confirmed
     that he was the "backup funds officer" and had
     "certification rights."  See email from Plaintiff to J.
     Ghiorzi, dated March 4, 2003, attached hereto as Exhibit 24.
     He also stated therein that he expected the agency to abide
     by the June 17, 2002 settlement agreement and not reduce his
     duties.  Id.

48.  Mr. Lash, however, admitted during his deposition however
     that he has never been a management employee at USDA and
     that his list of "backup funds officers" was never approved
     by any member of management. See Deposition of Jonathan Lash
     ("Lash Dep."), p. 40-42, attached hereto as Exhibit 25.  Mr.
     Lash also admitted that he wrote the March 4, 2003, e-mail
     to Plaintiff assuming that Plaintiff had the authority to
     certify funds availability, but no manager from NERO had
     ever told him that Plaintiff had this authority.  Id., p.
     45-46.

49.  Plaintiff claims that prior to March 3, 3003, he had the
     "right" to certify that funds were available and that
     Messrs. MacAllister and Stanco took this "right" away,
     thereby, reducing his duties.  See Complaint, at ¶ 39.

50.  Oddly, Plaintiff now claims that he believed Messrs. Stanco
     and MacAllister only took his ability to certify funds
     availability in the Integrated Acquisition System.  Pedicini
     Dep., p. 96-99.  He claims that he did not learn that he had
     no "certification rights" at all until June 2004, when Mr.
     Malone informed him that he could not certify funds
     availability on procurement requests.  Id.  Nevertheless,
     Plaintiff amended his EEO complaint to include this latter
     allegation. Id., p. 99.

51.  Plaintiff admitted, however, during his deposition that this
     "reduction of his duties" had no effect on his compensation,
     benefits or grade at USDA-FNS.  Id., p. 78-83.  Furthermore,
     Plaintiff testified that, at best, he had only certified
     that funds were available one to three times a year before
     March 2003.  Id., p. 191.

52.  Plaintiff argues that he should be a Grade 12 employee on
     the federal employee pay scale, but cannot receive the grade
     increase because he no longer has the "right" to certify
     that funds are available.  Id., p. 79-83.  Such a grade
     increase, however, is not automatic, Plaintiff would have to
     first apply for a "desk audit" with the Office of Personnel
     Management ("OPM"), which Plaintiff has never done.  Id.

53. Plaintiff claims that he failed to file such an application with OPM because, based on his own observations, such action would be futile as OPM would not grant him the grade increase without having the "right" to certify that funds are available. <u>Id.</u> Plaintiff admits, however, no one at OPM or USDA-FNS has ever represented to him that OPM would not grant him a grade increase or that a grade increase would hinge on whether he can certify funds availability. <u>Id.</u>

H. <u>ALLEGED RETALIATORY ACTS NUMBERS 3 AND 4: MacAllister Retaliates Against Plaintiff By Denying Him EEO Representation And By Issuing Him A Letter Of Instruction</u>

54. On March 5, 2003, Mr. Stanco attempted scheduled a meeting between Mr. MacAllister, Plaintiff, and himself to discuss Plaintiff's duties in the Integrated Acquisition System. <u>See</u> email correspondence, March 4 through 10, 2003, attached hereto as Exhibit 26; MacAllister Dep., p. 3/52.

55. In response, Plaintiff inquired whether union representative, Louis Spychalski, could attend the meeting; to which Mr. Stanco had no objection. Exhibit 26. Accordingly, Mr. Stanco scheduled the meeting for Monday, March 10, 2003. <u>Id.</u> Mr. Spychalski, however, became unavailable for the meeting. <u>Id.</u>

56. That same day, Plaintiff contacted an EEO Counselor, alleging that USDA-FNS retaliated against him by "remov[ing] him as the alternate to the [NERO] Funds Officer." <u>See</u> EEO Counselor's Report, dated May 27, 2003, attached hereto as Exhibit 27. Plaintiff also informed the EEO Counselor that Mr. Hines was his designated EEO representative. <u>See</u> Complaint ¶ 55.

57. The next morning, Plaintiff contacted Mr. Stanco and asked whether he could substitute Mr. Hines for Mr. Spychalski at the March 10, 2003 meeting with his supervisors. Exhibit 26.

58. Mr. MacAllister denied Plaintiff's request, stating that Mr. Hines was not a party to the meeting. <u>Id.</u> Plaintiff responded to Mr. MacAllister stating that he had a "right" to have a representative at the meeting and would not attend a meeting with his supervisors without Mr. Hines. <u>Id.</u> Mr. MacAllister again informed Plaintiff that the purpose of the meeting was to discuss Plaintiff's duties in the Integrated Acquisition System, and, therefore, pursuant to the union agreement, Plaintiff did not have a right to representation at the meeting. <u>Id.</u>

59.  On March 10, 2003, at 6:38 am, on the morning of the
     scheduled meeting, Plaintiff sent Mr. MacAllister and other
     management members an email stating that Plaintiff had filed
     an EEO complaint against Mr. MacAllister and other regarding
     Plaintiff's duties.  Id.  Plaintiff also stated that Mr.
     Hines was his "EEO representative" and, therefore, Plaintiff
     had a right to have Mr. Hines attend the meeting with him
     and that no meeting would occur without Mr. Hines.  Id.

60.  After Plaintiff and Mr. MacAllister exchanged a few more
     emails restating their positions on Mr. Hines's attendance
     at the meeting, Plaintiff, despite Mr. MacAllister's
     objections, arrived at Mr. MacAllister's office with Mr.
     Hines for the scheduled meeting.  Id.; MacAllister Dep., p.
     2/197.  Mr. MacAllister again informed Plaintiff that he did
     not have a right to representation in a discussion about
     Plaintiff's duties in the Integrated Acquisition System.
     Exhibit 26; Letter from D. MacAllister to Plaintiff, dated
     March 13, 2003, attached hereto as Exhibit 28.  Eventually,
     Mr. Hines left and the meeting between Messrs. MacAllister,
     Stanco, and Plaintiff began.  Exhibit 26; MacAllister Dep.,
     p. 2/197-2/198.  Plaintiff, however, refused to answer most
     of Mr. MacAllister's questions, stating that Mr.
     MacAllister's questions concerned the subject matter of his
     EEO complaint.  MacAllister Dep., p. 3/52; Exhibits 26 and
     28.  Mr. MacAllister therefore adjourned the meeting.
     Exhibits 26 and 28.

61.  Thereafter, on March 13, 2003, Mr. MacAllister wrote
     Plaintiff a "letter of instruction" regarding Plaintiff's
     refusal to cooperate during the March 10, 2003 meeting.
     Exhibit 28.

62.  Mr. MacAllister did not place the letter of instruction in
     Plaintiff's personnel file.  MacAllister Dep., p. 3/53-3/54.
     Moreover, the letter, which is not a form of discipline, had
     no effect on Plaintiff's compensation, benefits or grade at
     USDA-FNS.  Id.

63.  Based on the events surrounding the March 10, 2003 meeting,
     Plaintiff claims that Mr. MacAllister retaliated against him
     by denying Plaintiff's request that Mr. Hines attend the
     meeting and issuing him a letter of instruction on March 13,
     2003.  Complaint, ¶ 68.

64.  On March 17, 2003, Plaintiff amended his March 5, 2003 EEO
     complaint, claiming only that the agency retaliated against
     him by "issu[ing] him a letter of counseling [on March 13,
     2003]."  See Exhibit 27.  After receiving a "notice to file"

letter from the EEO Counselor, Plaintiff filed a Formal
Complaint of Discrimination on March 25, 2003, alleging
reprisal and harassment based upon the agency issuing him a
"warning letter" on March 13, 2003.  <u>See</u> Formal Complaint of
Discrimination, dated March 25, 2003, attached hereto as
Exhibit 29.  The Office of Civil Rights for USDA dismissed
Plaintiff's harassment claim but accepted for investigation
his allegations that USDA retaliated against him by removing
him as the "alternative [NERO] Funds Officer" and issuing
him a letter of instruction on March 13, 2003.  <u>See</u> Letter
from L. Newell to Plaintiff, dated July 11, 2003, attached
hereto as Exhibit 30.

65.  Plaintiff also claims that the USDA breached the June 17,
     2002 settlement agreement by not activating the "third party
     neutral" stage of the ADR process with regard to his dispute
     with Messrs. MacAllister and Stanco over the March 10, 2003
     meeting.  Complaint, ¶ 46.  Plaintiff, however, did not
     request the "third party neutral" stage of the ADR process
     concerning the March 10, 2003 meeting, nor did he attempt to
     initiate the process thereafter.  <u>See</u> Email correspondence
     between J. Ghiorzi and Plaintiff, dated March 7 through
     March 10, 2003, attached hereto as Exhibit 31; <u>see also</u>
     Pedicini Dep., at p. 182-83.

I.   <u>ALLEGED RETALIATORY ACT NUMBER 5: USDA-FNS Does Not Hire
     Plaintiff For The Vacant Supervisory Financial Management
     Specialist Position In October 2003</u>

66.  On July 16, 2003, the USDA posted a vacancy announcement for
     the position of Supervisory Financial Management Specialist
     (GS-13) in the NERO, USDA-FNS.  Pedicini Dep., p. 87-88; <u>see
     also</u> Vacancy Announcement, dated July 16, 2003, attached
     hereto as Exhibit 32.

67.  The agency re-posted the vacancy on October 31, 2003,
     because it wanted to revise some of the listed requirements.
     Pedicini Dep., p. 87-88; <u>see also</u> Vacancy Announcement,
     dated October 31, 2003, attached hereto as Exhibit 33.
     Plaintiff claims that the re-posted announcement, however,
     did not contain the revised requirements, so the agency
     posted the announcement for a third time on November 3,
     2003, containing the revised requirements.  Pedicini Dep.,
     p. 87-88.

68.  Plaintiff applied to each of these postings.  <u>Id.</u>  Because
     Plaintiff was a GS-11, and not a GS-12 or GS-13, pursuant to
     agency policy, human resources could not place his name on
     the internal list of applicants for the position.  <u>Id.</u>, 90.
     Instead, pursuant to agency policy, human resources placed

Plaintiff's name on the external list of applicants.  <u>Id.</u>

69.  Pursuant to agency procedure, after compiling both the internal and external lists, human resources then assigned each applicant a numerical score (0-100) and divided the applicants into three categories based on their number: best qualified, satisfactory, and not qualified.  <u>Id.</u>

70.  During his deposition, Plaintiff testified that in October 2003, he called human resources to inquire what his score was for the Supervisory Financial Management Specialist position.  <u>Id.</u>, p. 88-89.  Plaintiff alleges that Human Resources informed him that he was in the "best qualified" category having received a score of 97.  <u>Id.</u>, p. 88.

71.  In a complaint to the U.S. Office of Special Counsel, however, Plaintiff claimed that he had a score of 97 for the initial July 16, 2003, regional posting, but that his score dropped to 81 for the August 29, 2003, because the agency altered the crediting plan.  <u>See</u> Page 3 of Plaintiff's Complaint to the U.S. Office of Special Counsel, attached hereto as Exhibit 34.  Because Plaintiff's score was 81, he was no longer on the list of "best qualified" candidates.  <u>Id.</u>

72.  Plaintiff further claims that during a Financial Management Division meeting in October 2003, Mr. MacAllister stated that he reviewed the external list of applicants for the vacant Supervisory Financial Management Specialist position and "did not like what he saw on the list."  Pedicini Dep., p. 89.

73.  Mr. MacAllister denies ever reviewing the external list or making these comments.  MacAllister Dep., p. 2/95-2/97, 2/99.  Instead, in February of 2004, the agency ultimately decided not to fill the vacant Supervisory Financial Management Specialist position until management of NERO fully understood the impact a then ongoing agency restructuring would have on the Financial Management Division and the office as a whole.  <u>Id.</u>, p. 2/72-2/80, 2/85; Canavan Dep., p. 71-73.

74.  Accordingly, Mr. MacAllister asked Messrs. Malone, who was the supervisor of the information technology unit, to assume, in additional to his duties, the responsibilities of Supervisory Financial Management Specialist until management decided to fill the vacancy.  MacAllister Dep., p. 2/58-2/59, 2/72-2/80; Malone Dep., p. 8-9.  As a result, in March 2004, Mr. Malone assumed the responsibilities of Plaintiff's first line supervisor.  Malone Dep., p. 8-9,

151-52.

75. Nevertheless, Plaintiff admitted during his deposition that
the external list likely contained the names of other
applicants, some of which could have scored higher than
Plaintiff. Pedicini Dep., p. 90. Plaintiff testified that,
at best, his name, at some point in time, was merely among
the names of other "best qualified" candidates. Id., p. 92.
Finally, Plaintiff admitted that even had the agency decided
to fill the position, any conclusion that it would have
hired him for the job would be pure speculation. Id.

76. Plaintiff claims that he contacted an EEO counselor claiming
that his non-selection for these positions was
discriminatory in February 2004. Pedicini Dep., p. 94. He
admits, however, that he failed to subsequently file a
formal EEO complaint alleging the same. Id., at p. 94-95.

J.   ALLEGED RETALIATORY ACT NUMBER 6: USDA-FNS Does Give
     Plaintiff A Performance Award On October 7, 2004

80. On October 7, 2004, during an agency awards ceremony in
NERO, FNS-USDA, Ms. Zorn gave several employees awards of
money or certificates of recognition. Pedicini Dep., p.
184. Plaintiff and other employees did not receive an award
or certificate at this ceremony. Id.; Zorn Dep., p. 184-85.

81. Plaintiff claims that his performance in 2004 was exemplary
and superior to some of the employees who received awards on
October 7, 2004. Complaint, at ¶¶ 86-87. He alleges that
Ms. Zorn did not give him an award in 2004 in retaliation.
Id.; Pedicini Dep., at p. 183-84.

82. Plaintiff, however, did not receive an award in 2004 because
no one nominated him for an award in 2004. Malone Dep., p.
200-201. Furthermore, the accomplishments Plaintiff claims
made him worthy of an award occurred late in the year and
past the deadline for award nominations in 2004. Id.

83. Mr. Malone however nominated Plaintiff for a recognition
award in 2005 for his job performance in 2004, which he did
receive. Pedicini Dep., p. 183-85; Malone Dep., p. 200-201.

K.   ALLEGED RETALIATORY ACT NUMBER 7: USDA-FNS Announce A
     Potential Vacancy In The Budget Analyst Position And Begins
     Training Employees Other Than Plaintiff On Those Functions

69. It is agency policy to prepare succession training plans for
key positions. Canavan Dep., p. 79-82. That is, to ensure
continuity in key positions, USDA policy calls for

management to cross-train employees on the functions performed by key personnel.  Id.

70.  Management at NERO determined, based on the fact that it had several retirement-eligible employees in the Financial Management Division, that it needed to implement a succession training for the division.  Id., p. 82-83.

71.  Although Mr. Hines did not submit any "official" statement to the agency concerning his desire to retire from the agency, he made several employees aware that he intended to retire in the near future.  See, e.g., Lash Dep., 47-48; Dorman Dep., 93-94.  As such, management decided that it would begin its succession training plan with Mr. Hines's position, Budget Analyst.  Malone Dep., p. 74-75, 79.

72.  On October 7, 2004, during a staff meeting, Mr. Malone announced management's succession training plan for the Financial Management Division and stated that several employees would have to begin training on the functions of Budget Analyst.  Pedicini Dep., p. 105.

73.  Plaintiff, who believes that he is the best qualified employee to replace Mr. Hines when he retires, claims that management devised this plan and began training other employees on the Budget Analyst position to obstruct Plaintiff's career path.  Complaint, at ¶ 92.

74.  Although the agency is training other employees on the Budget Analyst position, Mr. Hines, however, has not yet elected to retire from the position.  Pedicini Dep., p. 107; Hines Dep., p. 2/44.  Moreover, even if Mr. Hines decided to retire, the agency could not simply promote Plaintiff to the position of Budget Analyst, as the agency is required to post vacancy and engage in an non-biased selection process. Canavan Dep., p. 176-77.

L.   ALLEGED RETALIATORY ACT NUMBER 8: Malone Issues Plaintiff A Letter Of Instruction On October 13, 2004

75.  Plaintiff claims that during a staff meeting in September, 2004, he informed Mr. Malone that he had to relinquish his previously assigned Nutrition Education responsibilities because he was having difficulty simultaneously preparing the budget for Nutritional Education and helping Mr. Hines prepare the administrative funds control budget as both tasks had the same annual deadline.  Pedicini Dep., p. 110-112.  Plaintiff further alleges that he told Mr. Malone that management would have to find another employee after the fiscal year ended to assume the Nutrition Education

responsibilities.  Id., p. 112.  In response, Mr, Malone purportedly, saying nothing, nodded his head in agreement. Id.

76. On October 7, 2004, during another staff meeting, Plaintiff again told Mr. Malone that he would no longer handle the Nutrition Education duties.  Id., p. 112.

77. Immediately following the October 7 meeting, some of Plaintiff's co-workers complained to Mr. Malone about Plaintiff's unprofessional behavior during the meeting and in the workplace generally.  Malone Dep., p. 160.

78. On October 13, 2004, Mr. Malone issued Plaintiff a letter of instruction informing him that he could not unilaterally relinquish a responsibility given to him by management.  See Letter from M. Malone to Plaintiff, dated October 13, 2004, attached hereto as Exhibit 35.  Mr. Malone also informed Plaintiff that his disruptive behavior must not continue and reminded Plaintiff that, pursuant to EEO guidelines, he must first receive permission from management to perform EEO-related activity during official time.  Id.

79. Although Mr. Malone had not been the subject of Plaintiff's, Ms. Bellezza's, or Mr. Perez's EEO complaints, Plaintiff claims that Mr. Malone issued him the October 13, 2004 letter in retaliation for his previous EEO-related activities.  Pedicini Dep., p. 112.

80. Mr. Malone did not place the letter of instruction in Plaintiff's personnel file.  Pedicini Dep., p. 116; MacAllister Dep., p. 3/58.  Also, the letter had no effect on Plaintiff's compensation or benefits.  Pedicini Dep., p. 116; MacAllister Dep., p. 3/58-3/59.

M.  ALLEGED RETALIATORY ACT NUMBER 9: Malone Refers Plaintiff To The USDA's Employee Assistance Program On October 18, 2004

81. On October 18, 2004, Mr. Malone informed Plaintiff that he had referred Plaintiff to the Employee Assistance Program counselor, who scheduled an appointment to meet with Plaintiff.  See Letter from M. Malone to Plaintiff, dated October 18, 2004, attached hereto as Exhibit 36.  Mr. Malone informed Plaintiff that while Plaintiff was under no obligation to meet with the counselor, he strongly encouraged Plaintiff to do so.  Id.

82. Plaintiff claims that Mr. Malone issued him the October 18, 2004 letter in retaliation and to harass him.  Pedicini Dep., p. 118.

83. Plaintiff, however, did not contact an EEO counselor or file a formal EEO complaint asserting this claim.  Pedicini Dep., at p. 122, 139.

84. Moreover, the letter had no effect on Plaintiff's compensation or benefits.  MacAllister Dep., p. 3/62-3/64; Pedicini Dep., at p. 118-19.

N.   ALLEGED RETALIATORY ACT NUMBER 10: Malone Issues Plaintiff A Letter Of Instruction On October 22, 2004

85. On October 19, 2004, Plaintiff sent a memorandum to Mr. Canavan wherein he referred to himself with the title "Alternate Funds Officer."  See Memorandum from Plaintiff to R. Canavan, dated October 19, 2004, attached hereto as Exhibit 37.

86. After receiving a memorandum from Plaintiff bearing the title "Alternate Funds Officer," Mr. Canavan directed Mr. Malone to issue Plaintiff a letter of instruction informing him that his proper title is "Financial Management Specialist."  Canavan Dep., p. 124-26.

87. Accordingly, on October 22, 2004, Mr. Malone gave Plaintiff a letter explaining that his use of the title of "Alternate Funds Officer" on a memorandum was inappropriate.  See Letter from M. Malone to Plaintiff, dated October 22, 2004, attached hereto as Exhibit 38.

88. Plaintiff also claims that Mr. Malone issued him the October 22, 2004 letter in retaliation.  Pedicini Dep., p. 123.

89. Plaintiff admits, however, that he had never used the title of "Alternate Funds Officer" on a memorandum to a supervisor before his October 19, 2004, memorandum.  Pedicini Dep., p. 126.

90. Plaintiff further admits that he did not contact an EEO counselor asserting this claim.  Id.

91. Moreover, Mr. Malone did not place the letter of instruction in Plaintiff's personnel file, nor did it have any effect on Plaintiff's compensation or benefits.  MacAllister Dep., p. 3/55-3/57.

O.   ALLEGED RETALIATORY ACT NUMBER 11: MacAllister Removes
     Plaintiff's Name From List Of Funds Officers on November 9,
     2004

92.  In February, 2005, Messrs. MacAllister and Malone appointed
     Plaintiff assistant administrator for approving travel
     arrangements made on the agency's "E-Travel" system.
     Pedicini Dep., p. 130.

93.  Soon thereafter, Lisha Dorman, an administrative officer,
     sent Plaintiff an email attaching a spreadsheet listing the
     approval chain for the E-Travel system in each unit within
     NERO.  Id.  On the spreadsheet, Plaintiff name appeared in
     the column entitled "Alternative Funds Officer."  Id.
     Plaintiff forwarded the email to Mr. MacAllister.  Id.

94.  Mr. MacAllister then edited the spreadsheet, changing the
     column entitled "Alternative Funds Officer" to read
     "Alternative Funds Approver."  Id., p. 131.

95.  Plaintiff claims that Mr. MacAllister edited the column in
     retaliation against him.  Id., p. 130.

96.  Plaintiff admits, however, that he did not contact an EEO
     counselor asserting this claim.  Id., p. 132.

P.   ALLEGED RETALIATORY ACT NUMBER 12: Salazar Informs Plaintiff
     That Could Not Participate In Co-Worker's Telephone
     Conference

97.  On October 12, 2004, John Ingemi, an employee of the USDA,
     contacted Roberto Salazar, the director of the agency,
     requesting an informal meeting between them to discuss
     employment problems Mr. Ingemi was having.  Salazar Dep., p.
     15-16.  Mr. Salazar agreed to have the meeting by telephone.
     Id.

98.  Mr. Ingemi also asked Mr. Salazar whether Plaintiff could
     participate in the telephone conference, to which Mr.
     Salazar initially agreed.  Id.  Accordingly, Mr. Salazar's
     secretary contacted Plaintiff to inform him that she would
     connect him to the telephone conference between Mr. Ingemi
     and Mr. Salazar.  Id.; Pedicini Dep., p. 127.

99.  Before the start of the meeting, Ms. Zorn contacted Mr.
     Salazar and informed him that, pursuant to a provision in
     the June 17, 2002, Settlement Agreement, Plaintiff agreed
     not to participate in such matters.  Salazar Dep., p. 16.
     Ms. Zorn's information, however, was inaccurate because the
     provision, which was conditioned on Plaintiff serving as a

"Shared Neutral," became void on January 28, 2003, when Plaintiff ceased his pursuit of the "Shared Neutral" position. Id., p. 19. Ms. Zorn was unaware that Plaintiff had chose not to become a "Shared Neutral." Zorn Dep., p. 164.

100. Moreover, Mr. Ingemi never designated Plaintiff as his representative, he just wanted Plaintiff's assistance during the telephone conference. Deposition of John Ingemi, p. 63-64, attached hereto as Exhibit 39.

101. Accordingly, Mr. Salazar conducted the telephone conference with Mr. Ingemi without Plaintiff. Salazar Dep., p. 16-17. After learning of the error in reasoning, Mr. Salazar apologized to Plaintiff for the confusion. Id., p. 18-20.

102. Plaintiff claims his exclusion from this telephone call was in retaliation. Pedicini Dep., p. 126.

103. Plaintiff admits, however, that he did not contact an EEO counselor asserting this claim. Id., p. 129.

Respectfully submitted,

Michael J. Sullivan
United States Attorney

BY:  /s/ Damian W. Wilmot
     DAMIAN W. WILMOT
     Assistant U.S. Attorney
     Moakley Federal Courthouse
     One Courthouse Way, Suite 9200
     Boston, MA 02110
Dated: March 23, 2006     (617) 748-3398

## CERTIFICATE OF SERVICE

I certify that on March 23, 2006, I caused a copy of the foregoing document to be served on *pro se* Plaintiff, John G. Pedicini, 10 Milano Drive, Saugus, MA 01906, by first class mail, postage pre-paid.

 /s/ Damian W. Wilmot
DAMIAN W.  WILMOT
Assistant U.S. Attorney

# EXHIBIT 1

1

1 - 251

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,                    )
                    Plaintiff,       )
                                     )
vs.                                  )   CIVIL ACTION NO.
                                     )   04-12395-JLT
UNITED STATES OF AMERICA,            )
ANN M. VENEMAN, SECRETARY,           )
UNITED STATES DEPARTMENT OF          )
AGRICULTURE, AND LINDA               )
SPRINGER, DIRECTOR, UNITED           )
STATES OFFICE OF PERSONNEL           )
MANAGEMENT,                          )
                    Defendants.      )

        THE VIDEO TAPED DEPOSITION OF JOHN G. PEDICINI,

held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before Jeffrey Mocanu,

a Court Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices of the United

States Attorney, John J. Moakley Federal Courthouse, Suite

9200, 1 Courthouse Way, Boston, Massachusetts, on Tuesday,

October 25, 2005, commencing at 9:04 a.m.

ORIGINAL

*APEX Reporting*
(617) 426-3077

1    Mercedes Benz.  And my job there was to review long-term

2    disability cases.  I had a case load of one thousand cases.

3    I adjudicated the cases according to the Federal Employees

4    Compensation Act.  I reviewed attorney billings to clients,

5    and approved them or rejected them.  I approved or rejected

6    medical billings.  And that's pretty much it.

7        Q    Okay.  And how long were you at the Department of

8    Labor?

9        A    Until October of '95.

10       Q    Okay.  And you remained in that same position for

11   that entire time?

12       A    Well, I -- the grade level increased.  I went up

13   in grade level.  But, yes, the title stayed the same.

14       Q    What grade level did you come in as?

15       A    Grade 7.

16       Q    Okay.  And by 1995, where were you?

17       A    Eleven, Step 4, I think.  I'd have to look that

18   one up, though.  But I was eleven something.

19       Q    Okay.  After October of 1995, where did you go?

20       A    I worked, uh, again at my brother's company to

21   implement another automated accounting system for -- I was

22   there from October of '95 to August of '97.

23       Q    Okay.

24       A    Then on August 1, '97, I was hired by the USDA

25   FNS.

1      Q    Okay.  Now, when you were at the Department of

2  Labor, out of which office did you work?

3      A    It was -- it's the Boston office.  It went from a

4  regional office to a field office.

5      Q    Okay.

6      A    It was down-sized.

7      Q    And FNS, you were in the Boston office?

8      A    Right.

9      Q    And what position were you hired for in August,

10  August 1, 1997?

11      A    Financial Management Specialist, the same position

12  I have now.

13      Q    Do you remember who hired you?

14      A    Joe Mahan.

15      Q    How do you spell the last name?

16      A    M-A-H-A-N.

17      Q    What was his title at the time?

18      A    He was the Section Chief of Special Nutrition

19  Programs in the Financial Management Unit.

20      Q    Okay.  And who did Joe Mahan report to at that

21  time?

22      A    Douglas MacAllister.

23      Q    What was Doug MacAllister's title at that time?

24      A    Ah, the same as now, Financial Management

25  Director.

1    was his thing at that time.  He felt, and he told me that

2    EBT was the way of the future at the office.  And he was

3    working with another employee, John Ingemi in EBT.  So I had

4    very few meetings with Art LeBlanc.

5        Q    What grade did you come in at?

6        A    Seven.  I think I said that earlier.  Seven.

7        Q    Okay.  Now you said that a Joe Manahan ---

8        A    Joe Mahan.

9        Q    --- Joe Mahan hired you.  Where -- Did you report

10    to him once you started?

11        A    No.  No, he was a -- He -- When I say hired, he

12    called me up and said 'we're offering you the job.'  That to

13    me is the hiring.

14        Q    Okay.

15        A    Art LeBlanc did not call me up, and Douglas

16    MacAllister did not call me up.

17        Q    Okay.  But you did not report to Joe once ---

18        A    No.

19        Q    --- you started?

20        A    No.

21        Q    Who interviewed you for the job?

22        A    Joe Mahan and Arthur LeBlanc one interview.  And

23    then the second interview was Joe Mahan, Arthur LeBlanc,

24    with Douglas MacAllister in his office.

25        Q    Okay.  Now, after August 1, 1997, has your

*APEX Reporting*
(617) 426-3077

26

1    official title USDA FNS changed?

2        A    My title?  Let's see.  I think in '98, was the

3    first time there was a change to it.

4        Q    And what did your official title change to?

5        A    The official -- excuse me, the official title

6    that's ---

7        Q    Yes.

8        A    --- on my job, it's Financial -- it's always been

9    Financial Management Specialist ---

10       Q    Okay.

11       A    --- on the job announcement.

12       Q    Okay.  After August 1, 1997, has your grade within

13   USDA FNS changed?

14       A    Yes.  It went up to a nine the next year, and then

15   an eleven, and stayed at a -- It was in a particular series.

16   I had told them I was a Grade 11 when I started.  And they

17   said, 'Well, you're going to have to go through seven, nine,

18   eleven, but it'll be real quick.  Art, I think,

19   misinterpreted the rules.  He said it'd be like one month,

20   two months, three months.  It ended up two years, so --

21       Q    So in '98, you went to a grade nine?

22       A    Right.

23       Q    And then in '99, you went to a Grade 11?

24       A    Ah, from what I -- from the official -- the

25   official -- Let's see.  It was a grade -- I believe it was

1    '99; it might have been '98, but I think it was -- I'm

2    pretty sure it was '99.

3        Q    Okay.  Now, were these automatic grade changes?

4        A    Yes.

5        Q    And is a grade change considered promotion within

6    USDA or no?

7        A    In this scenario, it's -- if you don't do

8    something -- if you do something bad, you might not get

9    there.  But it's sort of automatic.  It's more money, but

10   essentially the same duties.  So a lot of people have gone

11   through this that are thirteens.  They go through the seven,

12   nine, eleven process.  It's sort of like a probationary

13   period where if they made a mistake in the hiring process,

14   it's going to reveal itself in the first couple years.  I

15   think I was technically on probation during those two years,

16   and in '99, I was off probation.  That's similar to

17   everybody.

18       Q    Does someone within FNS have to sign off on the

19   grade changes?

20       A    Yes.

21       Q    Who?  Whose, you know, whose authority would allow

22   your grade to change?

23       A    Arthur LeBlanc.  I mean, it would also be that the

24   Personnel Officer would, as an administrative thing, sign

25   it.  And it's ---

1    answer that ques -- that's the situation right now.

2        Q    Okay.  I'm going to ask you in another way.  Going

3    back to August 1997, who were your official supervisors, up

4    ---

5        A    First line ---

6        Q    --- to the present?

7        A    --- was -- was Arthur LeBlanc; second line was

8    Douglas MacAllister; and third line was Frances Zorn.

9        Q    Okay.

10       A    And that stayed all the way until April of 2002.

11   LeBlanc became -- his titled was -- He had a funny -- He

12   deals with EBT.  His -- half his salary is paid by

13   headquarters; half is us.  He occupies a cubicle that's the

14   side of his old cubicle right near mine.  MacAllister

15   assumed the first line duties of the Section Chief in 2000,

16   and kept those all the way until September 10, 2001, when

17   Joe Stanco assumed the duties of Section Chief, everyone

18   else staying the same.  Then Stanco kept those duties as

19   Section -- as first line supervisor until September of 2003.

20            And then Malone -- we weren't quite sure what

21   Malone was.  It was never explained to us exactly.  He was

22   assuming temporarily the duties.  Malone picked up the

23   supervision of the unit in March of '04.  In September of

24   '05, Malone left.  Also in May of '05, Zorn left.  And Zorn

25   was replaced acting by Robert Canavan in June of '05, to the

30

1    present.  So presently, there's no one really first line.

2    Second line is Douglas MacAllister, and then Acting is

3    Robert Canavan.  I think I got it all in there, yeah.

4         Q    Now, at some point -- and I think you were

5    referring to this before -- after August 1, 1997, did your

6    responsibilities within FNS change?

7         A    Yes.

8         Q    And when did that change?

9         A    In the spring of '98, Arthur LeBlanc told me -- he

10   came and had a meeting with me.  It was May.  I believe it

11   was May or June, and said -- I think it was more May -- that

12   'we want you to spend more time on Marty's duties and less

13   time on Janice -- on the GAD LOC.  Apparently, they were

14   convinced that I had demonstrated that I had a proficiency

15   with GAD/LOC.  But he explained to me that they were

16   concerned with Marty leaving, retiring.  And if Marty

17   retires, there's no one here to take up his duties.

18        Q    Okay.

19        A    And you have to be ready to go.  So you have to

20   learn all his duties, including certification of funds

21   availability.  So you spend more -- And at that point, I

22   spent very little time with Sciarappa, from the spring of

23   '98 until now, which has worked against me, too, and almost

24   all with Marty Hines over in Budget, administrative funds

25   control.  But I have picked up -- they had -- they gave me

1  office.  Up to this point, you've been doing support duties,

2  so to speak, but you have to back him up.  You have to do

3  all his duties.'  And I said why?  He says, 'Because if he

4  leaves, we can't afford to have someone trying to learn the

5  job on the job.  We have to have someone ready to go.'  And

6  he specifically said, 'If Marty leaves, Doug is going to put

7  you in that position, Marty's position, and expects you to

8  do it.  It'll be on an acting basis, but he expects you to

9  do it from Day 1, not 30 days down the road or 60 days down

10  the road.'

11        Those are the exact words he used, 'Doug will put

12  you in Marty's position if Marty leaves, and he expects you

13  to do all his duties.'  Those are the exact words he used to

14  me.  And that's when I went on the trip with Ed, and I said,

15  you know, he's going to put me in ---

16     Q    But before you move on with Ed, is that all that

17  you remember ---

18     A    Certification of funds availability.

19     Q    I want you to repeat what you remember Art telling

20  you from that meeting?

21     A    He said, 'You're going to have to learn

22  certification of funds availability; appropriations law; all

23  adjustments, accounting adjustments.  You have to learn

24  leave without pay reporting.  You have to learn accounting

25  adjustments on' -- All the forms we had at that time was

34

1    ATMUS.   It was a different accounting system.   The whole

2    job.   'So you spend all your time with him and less with

3    Janice.'   And that's where things changed in terms of what I

4    was doing in there, and what the needs of the office were.

5        Q    Do you remember anything else from that meeting

6    that Art said to you, or you said to Art?

7        A    Certification; all the duties.   That's all I can

8    remember off the top of my head.   To the best of my

9    recollection, that's all I can remember.   I remember the

10   putting me in the position to do all the duties,

11   specifically, because I came away with the idea, you know,

12   that I had to get going fast.

13                        (Exhibit No. 2 was marked for

14                        identification.)

15       BY MR. WILMOT:

16       Q    Now, you said you were a Grade 11.   I'm going to

17   show you a position description, and I just want you to take

18   a moment to review it, and let me know when you're finished.

19   That's marked as exhibit -- Defendant's Exhibit Number 2.

20            (Witness reviews exhibit.)

21       A    Okay.

22       Q    Can you just identify for the record what this

23   document is?

24       A    It's a general description.   Let's see.   It's

25   looks like it's put out by Food and Consumer Service, not

1  Office of Personnel Management has a whole process of that

2  issue, dealing with that issue, and it's called -- it starts

3  off with the term, "desk audit."   Any employee -- any

4  employee -- that has this description, and over time, two

5  things change to this description, accretion of duties,

6  complexity of duties elevates the position, the employee

7  applies for a desk audit, saying I'm not a Grade 11 any

8  more; I'm a Grade 12 because I have all these new duties;

9  I'm a Grade 13.   You apply to the Personnel office based on

10  that fact of a desk audit.   And then you appeal to the

11  Office of Personnel Management, who is the final authority

12  on whether or not the position has increased in grade level.

13      Q    So I think my question was, so is it your

14  testimony that this document represents the basics of what

15  ---

16      A    That's not my testimony.

17      Q    I know what your testimony.   I'm ---

18      A    Oh, I'm sorry.

19      Q    --- asking you a question.

20      A    Go ahead.

21      Q    You know, my question was does this document serve

22  as the basics of what a Financial Management Specialist

23  would perform on just coming into the job?

24      A    Beginning.   Right, the beginning of the job.

25      Q    Okay.   And over time, your testimony is, honestly,

1    things would get more complex; you're given additional

2    duties over time?

3        A    Right.  The business of the office changes,

4    correct.

5        Q    Okay.

6        A    Beginning -- You had missed out one.  You said

7    you're given more duties.  That's accretion of duties.

8        Q    Okay.

9        A    These current duties can increase in complexity.

10   In other words, Marty Hines has got general ledger from

11   1971, that they just put in, figures in.  Now it's Excel,

12   and it's advanced Excel.  The complexity of his duties has

13   increased because now you have to know a wider range of

14   commands and computer software, whereas before, you just had

15   to know basic accounting and how to write on a piece of

16   paper.  So complexity of duties, and accretion of duties,

17   those two variables are applied.

18       Q    Do you ever -- Do you ever lose -- or are any of

19   these responsibilities described in the document ever taken

20   away from your function?

21       A    Have they been in my particular case, or as a

22   general employee question?

23       Q    General employee question.

24       A    They -- An accretion of duties and complexity of

25   duties both add to the thing.  Whether or not they're taken

72

1  where he was saying this is what -- you're not supposed to

2  represent people; you signed it; we know it's different, but

3  we did that because we don't want a conflict of interest.

4         The reason he was giving to me indicated to me

5  that -- which was not a reason at all; I considered not to

6  be a reason at all -- indicated to me that they were really

7  getting back at me to stop me from doing EEO, and to stop

8  any continued EEO action.

9         Q    So this was the first retaliatory act against you,

10  you believe?

11         A    The first ---

12         Q    After the settlement agreement.

13         A    After the settlement agreement, to set the

14  groundwork for me in terms of retaliating against me to stop

15  me from doing any EEO work, and limiting me in that area.

16         Q    So when did ---

17         A    Against me.  My duties and things would be '03,

18  where actually, my immediate job duties started to decline.

19         Q    That's why I want -- That's what I'm asking you.

20  I want the detail as to each specific act, and if you can

21  give me the dates when they occurred, starting with the

22  first one after the settlement agreement.

23         A    March of '03.

24         Q    Okay.

25         A    The right to certify funds availability in IAS.

1    Q    And what occurred in March of '03 with regard to

2    your right to certify funds in IAS?

3    A    Douglas MacAllister said I did not have the right

4    to do that.

5    Q    Okay.  And when did you first learn, or do you

6    know the specific date on which you first learned that you

7    did not have this right to certify funds in IAS?

8         MR. CATAPANO-FRIEDMAN:  Objection.  You can

9    answer.

10   A    The week preceding March 10, 2003.  I don't know

11   the exact -- In that week, I think it was a Tuesday or a

12   Wednesday, I had told Mr. Stanco that I had -- why don't I

13   have this right to certify funds availability.  And he came

14   out, and he says, 'I'm going to go into a discussion with

15   Douglas MacAllister in his office and talk about it.'  And

16   he came out and he said to me, 'Do you have the email that

17   Art sent in to headquarters about in '98?'  Hines was there.

18   LeBlanc was there.  LeBlanc said, 'I remember sending in

19   something for Pedicini on the alternate funds officer in

20   '98.'  Stanco, 'Do you have it in writing?'  I said, no,

21   because in '99, the end of '99, the office web cleaned its

22   email cc mail at that time, and switched over to Microsoft

23   Outlook.  So I did not have any of those files left.

24        Whereupon, Stanco went back in there; informed

25   Mr. MacAllister of that; came back out and said, 'Doug said

74

1   he never appointed you as alternate funds officer; you don't

2   have the right to certify funds.'  That's when I first

3   learned about it.

4                            (Exhibit No. 10 was marked for

5                            identification.)

6            BY MR. WILMOT:

7        Q    Okay.  I'll show you what's been marked as

8   Defendant's Exhibit Number 10.  Do you recognize that

9   document?

10       A    This in an email, a group of emails, yes, from

11  '03.

12       Q    Okay.  If I can bring your attention to the email,

13  I believe it's the third email down, from Joe, Joseph Stanco

14  to you; it's dated March 4, 2003.  There it says -- I'll

15  just read it for the record -- "John, Yes, you'll be

16  expected to back up the funds officer when his absence.

17  However, when you have a situation requiring funds

18  certification and Marty is absent, you'll refer it to my

19  action, or in my absence, Doug's action."  Then it says, "I

20  don't know nothing about the IPAS training in Chicago, Joe."

21           Do you remember reading this email on or about

22  March 4, 2003?

23       A    I remember seeing it, yes.

24       Q    Okay.  Now, you mentioned a verbal discussion with

25  Joe Stanco about you not having the right to certify funds

1    February, late February of '03, from Lisa Wilusz, who was

2    the national head of IAS.  And IAS is a national extension

3    of the fund officer's job since you have to -- there's a

4    certification process in IAS.

5           So I got an email, and Joe got an email.  And then

6    Joe put something out.  There was an email on the last day

7    of February saying these are the people going to training.

8    My name wasn't on the list.  That's what -- I said what's

9    going on.  That's what prompted the start-up of this whole

10   thing.

11       Q    Okay.  Now, did this, this act of taking away your

12   ability to certify rights, did it affect your compensation

13   in any way?

14       A    It eventually would.

15       Q    Did it affect your compensation in ---

16       A    At that day?

17       Q    Yes.

18       A    No, it didn't.

19       Q    Okay.  And you said eventually, it would.  Did it

20   affect your compensation at some point in time?

21       A    Under the President's initiatives that are for OPM

22   right now, my pay will drop by 50 percent under the current

23   duties.

24       Q    As of today, has your compensation been affected

25   at all in any way?

1    A    It's the same as it was before.

2    Q    No?

3    A    No.

4    Q    Did that fact that you just described that, you

5  know, they are taking away your ability to certify funds,

6  did it affect your employee -- employment benefits in any

7  way?

8    A    Well, it deprived me of career advancement

9  opportunities.  You know, I can't -- I, for -- I score 99

10  out of 100 on a -- I don't even get an interview.  I can't

11  apply for other funds officer positions in other agencies

12  because I don't have these rights.  I don't have that, that

13  career advancement ability.

14    Q    Can you identify for me specifically what

15  employment benefits that their taking away your right to

16  certify funds has deprived you of?

17    A    Other than career advancement opportunities?  I

18  consider that to be a career advancement opportunity.

19    Q    Well, you're telling me about kind of a, you know,

20  this idea of career advancement.  Do you have anything

21  specific as to where your ability not to certify funds has

22  cost you something within the agency?

23    A    Experience.  Experience in the job duties that I'm

24  doing -- that I was doing, excuse me, past tense.  I don't

25  have the experience any more.

```
 1        Q    Anything else in the way it's affected your

 2   employment benefits within the agency?

 3        A    You mean health insurance?  No, I still get my

 4   health insurance.  I mean, that's a -- You're talking

 5   employee benefits in terms of health insurance and thrift

 6   savings?

 7        Q    I'm actually acting about tangible things, and the

 8   way it's affected you.  And I'm asking ---

 9        A    Well, I can you give me an example of what

10   tangible ---

11        Q    Hold on.  I'm asking you to be as specific as

12   possible, tangible things like, you know, my pay was

13   deducted; my grade was -- was lowered, or anything that

14   happened where it -- you can cite to something specifically

15   in the way you losing this right to certify funds has

16   affected your job?

17        A    Based upon the job at that time, I was a Grade 12.

18   When they took away my right, I became a Grade 11.  I could

19   have became a Grade 12 by going through a desk audit

20   immediately, within two weeks, okay.  They took that away

21   deliberately, non-performance based because they don't want

22   me to advance up due to the fact that I represent people in

23   EEO.

24        Q    So your testimony is that two weeks after ---

25        A    I could have -- If -- Go ahead.
```

APEX Reporting
(617) 426-3077

1        Q    Your testimony is, two weeks after this

2   conversation or the, you know, the verbal communication and

3   the emails, early March of '03, two weeks after that time

4   - - -

5        A    Less than two weeks.

6        Q    - - - less than two weeks, you were scheduled to

7   become a Grade 12?

8        A    Not scheduled.  I could have became a Grade 12 if

9   I went through the desk audit process.  There is no Grade 11

10  in the entire agency who has certified funds, who has

11  released travel documents in FFIS by written approval from

12  Douglas MacAllister who is a Grade 11.  They're

13  automatically up to a Grade 12.

14       Q    Would your -- Would your promotion to a Grade 12

15  happen automatically?

16       A    Yes.

17       Q    And that would have automatically occurred two

18  weeks after this incident?

19       A    Well, if the Personnel office is on vacation, it

20  might have been longer.  But it could have occurred as soon

21  as I got that information from the Personnel office.

22       Q    I mean, you keep saying "it could have".

23       A    Well, it would have.  Based -- It could have -- As

24  soon as I got it to the Personnel office, it would happen.

25  If you -- If you are a fund -- There was no Grade 11 funds

1   officer in FNS.  All I had to do was just get the

2   application, desk audit memorandum in order; present it, and

3   I would have.

4       Q    Okay.  Did you submit that application for a desk

5   audit?

6       A    No, I did not because I didn't have the right.  I

7   was -- They would have opposed me.  You didn't have the

8   right to certify funds.

9       Q    So your application for -- your application for a

10  desk audit to be advanced to a Grade 12 was going to be

11  based solely on your ability to certify funds?

12      A    And funds -- alternate funds officer's duties

13  together.

14      Q    Okay.  And because you didn't have the ability to

15  certify funds, that's why you didn't submit the application?

16      A    Correct.

17      Q    And it's your testimony that you know that without

18  the ability to certify funds, you would not have been

19  advanced to a Grade 12?

20      A    Right, I do, yes.

21      Q    And how do you know that?

22      A    From other alternate funds officers that I trained

23  with in 1999, that are now funds officers, not alternate

24  funds officers.

25      Q    So they all told you that without the right to

1   certify that funds are available, you would not be upgraded

2   to a Grade 12?

3       A    They did not tell me.  Based upon my review of the

4   alternate funds officers in the region, that I would not be

5   able to go up to a Grade 12 without the right to certify

6   funds, and the -- all the alternate funds duties.

7       Q    Okay.

8       A    You said they told me.  I said they -- My

9   testimony is they did not tell me.  It's my review.

10      Q    Okay.  Other than your own review ---

11      A    Right.

12      Q    --- has anyone within USDA -- at least at that

13  time, were you told by anyone that without the ability to

14  certify that funds are available, your application for a

15  desk audit -- audit to be advanced to a Grade 12 would be

16  denied?

17      A    No one told me.

18      Q    Okay.  Now, the individuals that you described

19  that were involved in this, this action of taking away your

20  right to certify that funds are available, I think you

21  identified them as Doug MacAllister, Joe Stanco?

22      A    Yeah.  Michael Malone.

23      Q    Just in March of '03?

24      A    Okay.  Joseph Stanco, John Ghiorzi, Frances Zorn.

25      Q    Okay.  Now, which of your EEO activities that you

1    with?

2         A    Greg, Gregory Ferby, F-E-R-B-Y.

3         Q    And did you ever file a formal EEO complaint

4    concerning that incident?

5         A    Yes, I did.

6         Q    And when did you file that?

7         A    The end of March of '03.  I think it was around

8    the 25th of March 2003.

9         Q    Okay.  Now, following this incident in March of

10   '03, what was the next retaliatory act you were -- you were

11   subjected to?

12        A    The next one, I believe, was the '04 one, June of

13   '04 -- Excuse me.  Let's go back.

14        Q    Okay.

15        A    February of '04.

16        Q    And can you describe what that incident was?

17        A    It was a job announcement that was posted for the

18   section chief.  And this posting started in September of '03

19   -- oh, excuse me, July of '03, and it went through a series

20   of re-postings, three different re-postings.

21        Q    Okay.

22        A    In other words, the same job was put up there.

23   Applicants were allowed to apply; deadline passed; two weeks

24   came out, and the scores were distributed.  And then, all of

25   a sudden, we found out -- it was announced originally in

1   July of '03; then it was re-posted in October of '03.  As I

2   said, they wanted to change the duties, knowledge skills of

3   the KSAs.  And then I looked at the KSAs, and they were

4   identical to the ones in the July.  So I called up the

5   Personnel office, and I said why did you re-post?  I talked

6   to Donna Davis.  I said it's the same thing.  You put out an

7   announcement saying it was revised.  It's not revised.  It's

8   the same set of questions, word for word identical.  'Oh, I

9   think we made a mistake.  We have to re-post again.'

10          So they re-posted in November.  They changed one

11  question, the order of it, and that was the third.  And that

12  final job announcement was -- the deadline passed in

13  December of '03.  And it '04, it was announced by Douglas

14  MacAllister that he'd decided, through budget cuts and

15  changing duty, whatever -- I forget.  It was budget, budget

16  issues, and reorganization, he'd decided not to fill the

17  position.

18          Q    Okay.

19          A    And then in February of '04, he puts over Mike

20  Malone, and it says Mike -- We said, well, what's Mike going

21  to do?  He says, 'Well, Mike is gonna supervise the unit.'

22  So I called Personnel in Alexandria, and I said, what

23  happened to these job announcements?  What's the difference

24  between the one in October and the one in November?  What's

25  going on.  I said -- So they said, 'Well, in October' -- In

1    October, I had called.  When I mentioned the fact that the

2    announcement was wrong, I says where was I?  I want to know

3    what my score was on this.  And they said, 'You're in the

4    best qualified, 97 out of a hundred on the external list.

5         I went -- In October of '03, I went to a financial

6    management meeting with Douglas MacAllister, where the issue

7    a about the section chief hiring came up.  And he said there

8    -- and a number of people were there when he said it -- that

9    he looked at both the internal list and the external list,

10   and he did not like what he saw on the external list.  I was

11   at the top of the external list, according to Personnel.

12   Now, I don't know if 97 would get me there at that point.

13        Q    Well, let me -- let me stop you there at that

14   point.  Now, you said that when you spoke with Personnel,

15   and they told you were ---

16        A    Ninety-seven.

17        Q    --- among the best qualified ---

18        A    Right.

19        Q    --- does that mean that you were at the top of the

20   list?

21        A    They would change ---

22             MR. CATAPANO-FRIEDMAN:  Objection.  You can

23   answer.

24        A    Okay.  They were changing the way they evaluated

25   applications at that time.  The old system was a numerical

1   score.  The new system was to just throw applicants in three

2   pools:  best qualified, satisfactory, and not qualified.

3        Q    Right.

4        A    Okay, in that group, okay, they had done a

5   numerical score and the grouping on this particular job

6   announcement, and I was in the best qualified pool, and 97

7   out of a hundred on the external list only.  I did not

8   qualify on the internal list because I'm Grade 11.  In no

9   instance did I qualify.  That's what they told me in

10  October.  And then I heard back from MacAllister that he

11  didn't like the external list.  So he doesn't like me.

12  That's what it is.  I mean, why -- why -- why not -- like

13  why didn't he like the external list?

14       Q    Um, just a question.  But someone could be -- You

15  said you had 97 out of a hundred.

16       A    Right.

17       Q    Someone could have been 98 out of a hundred, or

18       A    Could have been.

19       Q    --- 99 out of a hundred ---

20       A    Right.

21       Q    --- correct?

22       A    It's possible, yeah.

23       Q    You've never seen the actual external list?

24       A    I'm not allowed to see it.

25       Q    Now, you said there was a meeting where Doug said

92

1      Q    Okay.  Um, is it your belief that you were the

2  best qualified person for this job?

3      A    I was among the top.  I couldn't say the highest

4  score because I couldn't see the list.

5      Q    Right.

6      A    So -- But I would say, based on my experience

7  externally, that I was among the most qualified for this

8  job.

9      Q    You would agree with me, however, that that would

10 not automatically mean that you would have actually gotten

11 the position had they decided to go forward with filling it,

12 right?

13     A    I can't agree with that, no.  I can't agree with

14 that.

15     Q    How -- How do you know that you would have gotten

16 the position then?

17     A    Well, we don't know.  Well, I don't know.

18     Q    That's exactly what ---

19     A    But the bottom line is, I've never been given an

20 interview.  I've consistently been -- I was Number 1 in '01,

21 99 out of a hundred.  I didn't get an interview, and he

22 interviewed a lot of people.  He didn't interview me.  I

23 never got an interview in any situation on these job

24 announcements that I applied for.

25     Q    This particular job announcement that was posted

94

1    correct?

2        A    On the external list?

3        Q    On the external list.

4        A    Right, I do not know.  I'm not allowed to see the

5    list.

6            MR. WILMOT:  Okay, we can take a break now.

7            (Off the Record from 11:25 a.m. to 11:26 a.m.)

8            BY MR. WILMOT:

9        Q    Now, did you ever contact an EEO counselor

10    concerning what you just described, that you were, you know,

11    not selected or -- for a position, for this section chief

12    position?

13        A    Yes, I did.

14        Q    And when did you do that?

15        A    February of '03 -- excuse me, it was '04, February

16    of '04.

17        Q    Okay.  And who did you speak with?

18        A    Greg Ferby.  I also contacted Laura Wilmot.

19        Q    And who's Laura Wilmot?

20        A    Personnel officer at FNS.  Currently, as well.

21    She's -- I think she's the Director.  I'm not sure, but

22    she's a Personnel officer.

23        Q    But she is not an EEO officer?

24        A    No.

25        Q    Okay, did you file a formal complaint with regard

1    to not being selected for the section chief?

2        A    No.

3        Q    Did not, okay.  Following -- Following this

4    incident which you've, I guess for the time frame, you've

5    said it was February '04; I guess that's when Mike Malone

6    was then ---

7        A    Well, actually, March.  The first week in March,

8    he effectively started, in '04.

9        Q    Okay.  What was the next retaliatory act you

10   believe you were subjected to?

11       A    Well, uh, he asked for individual development --

12   IDP, individual development plans.  And then he asked for an

13   EDP.  It's in the Union regulations about setting up

14   courses, training that you want to take in the coming, in

15   the current year related to possible career advancement, et

16   cetera, et cetera.  And I emailed him, and I says I'd like

17   to set up an IDP.  You asked, and I'm -- I want to go

18   forward with it.  Time go by.  He wouldn't respond to my

19   email.

20       Q    Now, when you're saying, you keep referring to

21   "he".  Who is "he"?

22       A    Mike Malone.  Sorry.  Finally, I drew some courses

23   up, and I says I've got something.  And he, he went back and

24   forth saying he needed more time.  He kept -- This is going

25   March, April, May.  This is all going to three months now of

1    emails back and forth.  I'd wait a couple weeks; you know,

2    maybe he's busy.  Finally ---

3        Q    This is of '03?

4        A    Of '0 -- Excuse me.  This is '04.  This is '04,

5    now going into '04.  And I mentioned the issue of provision

6    Number 1 of the settlement agreement, which states about an

7    IDP, and getting training, at least one course.  He put

8    together an IDP eventually, and we signed it, I believe it

9    was mid-May of '04.

10       Q    Okay.

11       A    And at that time, we got the issue of -- A woman

12   came to me, Patricia Churchill.  A certification, right in

13   the midst of this.  She said -- And people have a habit,

14   because they -- I've been dealing with the funds so long.

15   Marty wasn't there.  Marty Hines took a vacation in May of

16   '04, one of a rare events, and there was no one to certify.

17   So she came to me and says, 'John, can you certify the funds

18   availability of this?'  And I says, well, this is another

19   trouble on the horizon, given what I went through last year.

20   I went to Malone and MacAllister, and I said is it all right

21   for me to certify; this is not an IAS.  And they said, you

22   know, no, you are not to have any certification rights

23   whatsoever, anywhere, at any time.  That was, I believe it

24   was the first week of June of '04.

25             And I says, well, when did this come up?  So I

1    filed an EEO complaint in June of '04, on now, certification

2    of anything, not just IAS, but anything.  And that was, I

3    guess, continued as a continuing violation of what was filed

4    in '03.

5        Q    Let me back up.

6        A    I went forward with a formal complaint on that.

7        Q    Okay.

8        A    And what happened was -- I'm going to have to skip

9    ahead here to sort of get your -- everything, the

10   information in one thought process here.  But what happened

11   was, the investigation, we filed this action in November of

12   '04.  And it took them awhile to get an investigator.  In

13   April of '05, I was contacted by an outside investigator,

14   investigating the June of '04 complaint, formal complaint.

15   And I informed them there was -- We filed an action in U.S.

16   District Court.  I gave them your name; I gave them my

17   attorney's name.  And he says, 'I don't care.'  He says, 'I

18   think you should still talk to me.'  I says, well, contact

19   my attorney, and if they say it's okay, I'll talk to you.

20   So I never heard from him again.  So that's sort of that

21   formal complaint.

22       Q    Okay, now ---

23       A    Meanwhile, getting back to the IDP, which we'd

24   come to May, and then we just didn't do it any more.

25       Q    Well, before you go there, you described this

1    conversation with Doug MacAllister in June of 2004, you

2    said, where you were, I guess this was the first time you

3    were learning that you had no certification rights at all?

4        A    The first time they told me, 'You have no

5    certification rights at all.'

6        Q    Okay.  So is it your testimony that prior to this

7    meeting in June of '04, you thought your right to certify

8    that funds were available were only taken away with regards

9    to IAS?

10       A    IAS, right.  I did certify funds availability,

11   which is in the record, subsequent to that.

12       Q    And you said -- Who was at this meeting again in

13   ---

14       A    Which meeting are ---

15       Q    --- June of '04?

16       A    --- we talking?  Well, it was not -- It was -- I

17   made a statement about what's the situation; do I have --

18   can I certify this; am I going to get reprimanded or

19   something of I certify this.  Malone took it to MacAllister.

20   I spoke directly to Malone.  And MacAllister came out and

21   said, 'No, you don't have any right.'  And Malone put an

22   email out to me directly saying you -- you're not to

23   certify.  And I believe -- I don't know if it's in the

24   record, but he put an email so that it made clear to me that

25   I do not have the right to certify funds availability

99

1    anywhere.

2        Q    Do you remember when in June of '04 that took

3    place?

4        A    It had to be the first week, I think.  I'd have to

5    look back at the dates, you know.  It's got to be the first

6    week in June.  The following week, Hines came back from his

7    vacation, and problems.

8        Q    And when did you first contact an EEO counselor

9    with regards to this incident?

10       A    It's either that week or the following week,

11   within a week's time.  So by June 15, I think I had

12   contacted an EEO counselor.

13       Q    Okay.  And when did you file your formal

14   complaint?

15       A    I believe that was in the beginning of July of

16   2004.

17       Q    Okay, I think you were continuing to describe an

18   incident with regards to the individual development plans?

19       A    Right.  Um, we put it together.  We signed it,

20   okay.  It was training and everything.  And we -- I made it

21   clear in my email this was pursuant to the provision in the

22   settlement agreement, and I got nothing.  Everyone else got

23   courses; I got nothing.

24       Q    Okay.

25       A    Okay, essentially, he breached the settlement

104

1   identifying for me right now?

2       A     Yes.

3       Q     Did you ever raise this issue with an EEO

4   counselor?

5       A     I have not, no.  I did not raise that as part of

6   the settlement agreement; I did not raise that issue with

7   the EEO counselor.

8       Q     Okay.  So you've never filed a formal complaint

9   ---

10      A     This case was -- Okay, go ahead.

11      Q     You've never filed a formal complaint asserting

12  these allegations that you were being deprived of training

13  between May 2004 to June 2005?

14          MR. CATAPANO-FRIEDMAN:  Objection.  You can

15  answer.

16      A     I had to give them until December 31, 2004.  I

17  can't file an allegation before that because, technically,

18  under the provision, he had all of '04 to give me a training

19  course.  If I start filing in July and August, I might --

20  You know what I'm saying?  He's got the rest of the year;

21  why are you filing an EEO complaint.

22      Q     Okay.

23      A     So along in November came the lawsuit which sort

24  of consumed everything.  So, you know, in my opinion, it was

25  retaliation as an ongoing basis.  And that's what I --

1    that's part of -- because it included the settlement

2    agreement.  And my assumption, as a lay person, was since

3    the breach of the settlement agreement is an issue in this

4    case, that that was another related issue of breach of the

5    settlement agreement.

6        Q    Right.

7        A    Now, if I wanted to go off in January of '05, in

8    this case, and go back to the Civil Rights office and say,

9    hey, they breached another provision -- You know, to me as a

10   lay person, I think the whole item was being -- my

11   assumption was, it was all being covered in this case.

12       Q    Okay.  Now, you keep referring to a breach of the

13   settlement agreement.  But I'm asking about retaliation

14   right now.  But as I think you already said, you did not

15   speak to an EEO counselor about what you perceived to be

16   retaliation when you were being denied training for this

17   time frame; is that correct?

18       A    Not in '05, no.

19       Q    Okay.  What is the next retaliation that you were

20   subjected to?

21       A    That came in the fall of '04, with the -- October

22   7, '04, with the announcement, the possible -- the training

23   for a possible vacancy in the budget analyst position.

24       Q    And how was that retaliation?

25       A    Those were my duties.  And the question is ---

1   looking for someone else to train, other than John Pedicini.

2       Q    Now, Martin Hines's position -- or strike that.

3   Martin Hines still holds the position of budget officer?

4       A    Whatever you want to call it, analyst.  Yeah,

5   correct.

6       Q    So that position is not vacant?

7       A    No.

8       Q    And are you still the back-up to Martin Hines?

9       A    Not that I know of, no.  They have not assigned

10  those duties to me.

11      Q    Okay.

12      A    And this is based on the October 22, 2004 letter.

13      Q    Okay, so we'll get to that.

14      A    Okay.

15      Q    So it's your testimony that you were retaliated

16  against because Mike Malone announced that he was going to

17  train some of your coworkers on a possible vacancy, and that

18  vacancy being in Martin Hines's position?

19      A    Right, correct.

20      Q    What is the next -- Well, before I move on, did

21  you ever raise this issue with an EEO counselor?

22      A    I went to -- Those issues, I -- Did I raise it?  I

23  have to remember if I did or didn't.  I don't think I called

24  -- I think -- No.  I went to -- I said at the time -- This

25  was with a series of events, okay, a series of letters.

1   They seemed so intense on me.  This was not something, oh,

2   here's just one item.  This was, in my experience, was an

3   intense effort to say the following to John Pedicini:  we're

4   getting you out of the office; if you don't do -- you're

5   going to sit in that position where you are, and we're

6   getting you out of here if you don't like -- I mean, out,

7   meaning out on the street.

8       Q    If you could, though, if you could answer my

9   question.

10      A    Go ahead.

11      Q    Did you raise this issue with an EEO counselor?

12      A    No.  I raised it with an attorney.

13      Q    So, you did not?

14      A    No.

15      Q    Okay.  And did you file a formal complaint with

16  the EEOC concerning this issue?

17      A    On those issues, no.

18      Q    Okay.  When was the next incident of retaliation

19  that you believe you were subjected to?

20      A    Oh, let's see.  Let's see.  We're into '05 now.

21      Q    Well, that was the fall of '04.

22      A    Yeah, yeah.  That's when the lawsuit was filed on

23  the 14th, I believe, of November.  And we all sort of noted

24  -- meaning myself, Marty Hines, Bruce Potvin, Lori Lodato

25  all noticed a transformation.  The issue was dropped, like a

1    letters of instructions.

2        Q    Well, that's -- When I say the next, I'm asking

3    about a specific act.

4        A    Oh, okay.

5        Q    So what would be the next in time, after when

6    Michael Malone announces that, you know, he's going to train

7    others on Marty Hines's position, what's ---

8        A    Right.  And ---

9        Q    --- the next thing?

10       A    I consider it all one event.  You're considering

11   it differently.  Okay, there's a series of letters at that

12   time, along with the announcement on October 7th.

13       Q    Okay.

14       A    It's connected to October 7th.

15       Q    All right.

16       A    This is certainly connected to it because it says

17   it in the first sentence.  So it's not a separate, you know.

18   You want to call it a separate incident, we'll call it

19   separate, but I'm not calling it a separate incident.  It

20   says October 7th on the top.

21       Q    All right.

22       A    In that issue, which is the second time I said

23   that to Mr. Malone, I said to him, I says, Where -- My

24   duties, these sound like my duties, I said to him.  Where am

25   I supposed to -- I already told you that I'm relinquishing

1  my duties in Nutrition Ed in September. And the reason I

2  said that in September was because there was a problem.

3  Someone who had knowledge of the funds control system in the

4  office, IPAS in the office, and Nutrition Ed in the office

5  would know that. I haven't found that supervisor yet.

6       What happens is, Nutrition Ed budget has to be

7  approved by September 30th. What is September 30th in the

8  federal government? It's the end of the fiscal year. What

9  do you think Budget Analyst Marty Hines is doing in

10  September? He doesn't take any -- In fact, he works

11  overtime in September. He works on Saturdays, Fridays. He

12  has to close out the year. So you get the Nutrition Ed

13  budget being -- has to be approved. All states, including

14  New York, has to be approved by September 30th.

15       You have the administrative funds control budget

16  has to be approved and set by September 30th. You have the

17  adjusting entries; the open-end obligations that have to be

18  calculated. The IPAS system has to be closed out. These

19  are all my duties, by the way.

20       What's wrong with that scenario? I sat and I

21  talked with Malone in September. I cannot do all these

22  duties in one month. Marty Hines is asking me for help;

23  Janice is asking me for help. The people in Nutrition Ed

24  are asking me to do these budgets. I have to give something

25  up. This is not a critical element. It's an other. It's a

1  non-critical element.  You've got to come up with somebody

2  else.  I told him that in September.  I told him that here.

3  And I specifically -- He nods his head like this.  He

4  doesn't say, 'No, John, I don't want you to do it.'  He

5  didn't say no.  Like he just sits there because he doesn't

6  know anything about it.  He just sits there as if he's just

7  taking it all in and nodding his head.  He never issued

8  anything.

9          Femi Stanbelitis, in March of '04, came to Mike

10  Malone and said, 'I don't want to do Nutrition Ed any more.'

11  So, yes, I said this issue is connected to the October 7th

12  because that's where I said it for the second time.  The

13  first time was in a meeting with him about the whole thing.

14  He was there.  Kirk Hassel was there.  We were at a meeting

15  with the Nutrition Ed people from the program unit.

16          Now, in this instance, why he discriminated

17  against me is because other people are allowed to give it

18  up, and somehow, I'm not, and I get a letter of instruction.

19  This is disciplinary.  This is not low.

20      Q    Okay.  Now, if I can interrupt you for a moment,

21  now you're -- We have the incident, as you said, where he

22  announces that Marty Hines -- he's going to start training

23  others on Marty Hines's responsibilities.

24      A    Right.

25      Q    After that meeting, is this the next, I guess

116

1    this was a disciplinary letter?

2         A    Yes, it is.

3         Q    Is this letter placed in your Personnel file?

4         A    Based upon -- It is not, no.

5         Q    Does this letter have an effect on your

6    compensation within the Agency?

7         A    It has the potential to, yes.

8         Q    Did it?  Does it have ---

9         A    Immediate impact.

10        Q    Since October 13, 2004, has it had any effect on

11   your compensation?

12        A    It has not had an effect, no.

13        Q    Since October 13, 2004, when you received this,

14   has it had any effect on your employment benefits within the

15   Agency?

16        A    Well, it causes me a lot of worry and everything

17   else.  But, I mean, I don't want to lose my health insurance

18   because of this.

19        Q    And what was the -- And again, separate them for

20   me.  I know you said you don't want to, but separate for me

21   what was the next retaliatory act that ---

22        A    There was one on EEO activities, and there was one

23   use of the alternate funds officer title.

24        Q    Okay.

25        A    They were very close, maybe a couple days, maybe

118

1  all.

2      Q    Okay.  Now, do you believe that this letter was

3  issued to you in retaliation for your ---

4      A    Harassment.  Excuse me.  Go ahead.

5      Q    Do you believe that this letter was issued to you

6  in retaliation for your prior EEO activities?

7      A    Yes.

8      Q    And can you tell me how -- Well, before we get

9  there, strike that.  Where was this -- Was this letter

10  placed in your employment file?

11      A    I don't know.

12          MR. CATAPANO-FRIEDMAN:  Objection, yeah.  But you

13  can answer.

14          THE WITNESS:  Okay.

15      Q    What was your answer?

16      A    I don't know.  That's my answer.

17      Q    What effect has this letter had on your

18  compensation since October 18, 2004, to the present day?

19          MR. CATAPANO-FRIEDMAN:  Objection.  You can

20  answer.

21      A    It's affected my well-being.  It has not affected

22  my compensation.

23      Q    What effect on your employment benefits within the

24  agency has this letter had on you since October 18, 2004, to

25  the present day?

1    A    I don't -- Employee benefits?  I know it's a

2    pretty -- No, it has no -- no effect.

3    Q    And you mention in here that he made an

4    appointment with you with Catherine Weisbrod?

5    A    Right.

6    Q    Do you know who she is?

7    A    No, I do not.  I assume she associated with the

8    Employee Assistance Counseling Program, but I don't know

9    what her -- what exactly her position is.

10   Q    Okay.  Now, you said just a minute ago that you

11   felt that this was some form of harassment.  Do you know if

12   Mr. Malone made any of your coworkers aware that he was

13   referring you to the Employee Assistance counseling?

14   A    Yes.

15   Q    Who did he tell?

16   A    That's not your question.  Your question, did he

17   make anyone aware, and then you said who did he tell.

18   Q    Who did he make aware?

19   A    Very good.  He made aware Lori Lodato.

20   Q    And how did he make Lori Lodato aware?

21   A    He kept all this, this and the other one on his

22   desk while he was in consultation with Ms. Lodato, and he

23   went back and forth to Douglas MacAllister, saying 'Is this

24   sentence okay, Doug; is this sentence okay, Doug; do I take

25   out that sentence, Doug.'  And he came back with scratches,

122

1    because to come out with the phrase, 'What is Fran and Doug

2    going to do to you next, cut the power off to your cubicle

3    to stop you from doing EEO.'  That's what -- Why would

4    they -- I assumed, my assumption is that that was based on

5    some sort of knowledge of this being served on me.

6        Q    Have you had any other conversations, other than

7    the one you described with Lori Lodato, with any of your

8    coworkers concerning the fact that Michael Malone referred

9    you to Employee Assistance counseling?

10       A    No, I have not.

11                        (Exhibit No. 13 was marked for

12                        identification.)

13            BY MR. WILMOT:

14       Q    I'm going to show you what's marked as Defendant's

15   Exhibit 13.  And before I have you identify that, did you

16   ever raise this issue, that you were referred to Employee

17   Assistance counseling, with an EEO counselor?

18       A    No, I did not.

19       Q    Okay.  Can you identify what I just showed you,

20   which is Defendant's Exhibit Number 13?

21       A    This is a letter of instruction, a disciplinary

22   letter of instruction, tell me that it was inappropriate to

23   use the term, "Alternate Funds Officer NERO" when your job

24   title was Financial Management Specialist.  And it goes on

25   to say about designations, designations regarding roles.  Do

1    you want me to read it?

2        Q    Sure.

3        A    Okay.  "Designations regarding roles and/or

4    rights.  You have in assistance, such as alternate funds

5    officer and certifying officer, does not mean that you have

6    those job titles or have signatory responsibilities using

7    those titles.  Please refrain from using these titles in the

8    future.  Please see in questions if you -- Please see me in

9    person if you have any questions."

10        Q    Okay.  And you believe that this letter was issued

11    to you in retaliation for your prior EEO activities?

12        A    Correct.

13        Q    Can you describe for me the specific incident here

14    where you, I guess have -- you were using the title of

15    alternate funds officer?

16            MR. CATAPANO-FRIEDMAN:  Objection.  You can

17    answer.

18        A    Leave without pay analysis.  I completed a leave

19    without pay analysis on, it had to be like a couple days

20    before this, and I brought it to the front where we normally

21    bring it to the front office.  My name has been on the

22    alternate -- excuse me, it's been on the leave without pay

23    analysis since 19 -- I do every one of them.  I received an

24    award for it from Frances Zorn.

25            MR. CATAPANO-FRIEDMAN:  I'm going to withdraw that

1    time was in an email to Jonathan Lash with regard to the

2    situation about my -- My telephone number was on there, on

3    the list, the alternate fund, but my name was not on.  That

4    would be two that come to mind.  That's the two that come to

5    mind right now.

6        Q    Have you ever used the title of Alternate Funds

7    Officer/NERO on any other memo, other than the one that's

8    described in Defendant's Exhibit Number 13 to a supervisor

9    within -- within FNS?

10       A    Other than that memo, I don't think I have done a

11   memo to any supervisor, any memo, in like two, three years.

12       Q    Okay.  Did you ever speak with an EEO counselor

13   concerning the fact that you received this letter of

14   instruction in October 2002 -- October 22, 2004?

15       A    No.

16       Q    Following this incident on October 22, 2004, what

17   is the next retaliatory act you believe you were subjected

18   to?

19       A    Ah, it would be the telephone called I received

20   from Robert Salazar, Robert Salazar's office.

21       Q    Okay.  And can you tell me when that occurred and

22   describe the incident?

23       A    About late October 2004, right around this time.

24   And it was a call from his secretary, saying to me that --

25   We have a gentleman by the name John Ingemi.  Prior to, the

127

1   day before, and Jimmy had called me up and said he was

2   discussing -- He had an appointment with Roberto Salazar to

3   discuss why he didn't get a job, wasn't selected for a job

4   announcement; would you be willing to sit in because you had

5   Department of Labor experience on job announcements.

6           So I said, well, how long is it going to take, and

7   he said, 'Well, I contact Salazar and see if it's okay.

8   So ---

9       Q   Who did you receive that phone call from?

10      A   John Ingemi, I-N-G-E-M-I.

11      Q   Okay.

12      A   And that was the day before.  The following day, I

13  got a call from a secretary of Roberto Salazar, identifying

14  herself as, I believe it was Nancy Garcia.

15      Q   Okay.

16      A   And said -- This was early in the morning,

17  probably around nine o'clock, maybe 8:30; I don't know,

18  saying that in two hours, at ten o'clock, Mr. Salazar was

19  going to hook up with me on a teleconference regarding

20  Mr. Ingemi; please stay by the phone at ten o'clock in case

21  -- when we call you.  In case -- she was definitive, like

22  you were going to -- I was going to be in it.

23          And then at ten o'clock, you know, I was sitting

24  by the phone.  At 10:15, I look up.  There was no call.  So

25  I said maybe they -- I called her up again.  She gave me her

1   I ---

2      Q   Restate that for me.  You said that no one -- no

3   one else within the Agency has that -- the limitation?

4      A   No, in the -- Excuse me.  Let me -- In my office.

5      Q   In your office.  Now, specifically, what is that

6   limitation that ---

7      A   Get prior approval in writing from a supervisor

8   before engaging in any EEO activity, including filing a

9   complaint.

10      Q   Does the letter say including filing a complaint?

11      A   Any EEO activity.  My interpretation -- No, it

12   does not.  But my interpretation of EEO activity,

13   representation, complaint filing, any EEO activity.

14      Q   Okay.  In this incident you just described, did

15   you speak to an EEO counselor concerning this letter of

16   instruction?

17      A   Not -- I got to look at my notes on this, if I did

18   call Ferby up on this or not.  I don't have -- No, I don't

19   believe I did.  I think that this was -- It was with

20   counsel, and this was going right to my legal counsel.  I

21   discussed it with them.

22      Q   Okay.

23      MR. CATAPANO-FRIEDMAN:  I'm going to instruct you

24   not to discuss any privileged communication with counsel,

25   any discussion with counsel.

1          THE WITNESS:  Okay.

2          MR. CATAPANO-FRIEDMAN:  Okay?

3          THE WITNESS:  All right.

4          MR. WILMOT:  I don't think he has, but --

5     Q    Okay.  Following this incident, what was the --

6     the next retaliatory act you believe you were subjected to?

7     A    The travel, E-travel spreadsheet.

8     Q    Okay.  Can you describe that incident?

9     A    MacAllister and Malone had appointed me Assistant

10    Administrator for E-travel in February of 2005.

11    Q    Okay.

12    A    And I was receiving emails on E-travel.  And along

13    came one document called the spreadsheet, which listed a

14    chain, an approval chain.  In that approval chain, it has

15    supervisor, back-up supervisor.  As you go from left to

16    right on the spreadsheet, it ended with funds officer and

17    alternative funds officer was the category, the title.  And

18    knowing that this action was ongoing, and that this was a

19    sensitive issue, I submitted it to Mr. MacAllister and told

20    MacAllister what do you want me to do with this.  And, uh,

21    he received the email.  I cc'd Michael Malone on it.  And

22    they came to me, and were very upset when they got it and

23    asked me if was the one who had put the title Alternative

24    Funds Officer after -- in that column after the Funds

25    Officer title.  And I said no.  And they said, 'Well, can

1    you prove that to us?'  I said, yeah, I'll forward the whole

2    email from Licia Dorman so you can see it was untouched by

3    me.

4          So I forwarded it to them, and that apparently

5    satisfied them, whereupon, Mr. MacAllister scratched out

6    officer, alternative funds officer and put alternate funds

7    approver, and told me my name was to go under that name --

8    column, alternate funds approver, and that the second

9    alternate funds approver would be Janice Sciarappa.  It was

10   his idea to scratch out, and to tell me that you had no

11   funds certification rights.  That's why he was scratching

12   out the name, part of the name officer and putting approver

13   in.

14   Q    You already knew at that point, however, that he

15   believed you didn't have those rights, correct?

16   A    And he was going to stop it anywhere he can see it

17   coming, right.

18          MR. CATAPANO-FRIEDMAN:  Damian, we'll need to take

19   a break pretty soon.  So when you -- if you can get to a

20   point where you can, we'd appreciate it.

21          MS. CATAPANO-FRIEDMAN:  I just want to take a

22   quick restroom break.

23          MR. WILMOT:  That's fine.  We'll take a break in

24   like two minutes.

25          MS. CATAPANO-FRIEDMAN:  Okay.

132

1    Q    Concerning this particular incident -- or strike

2    that.  When exactly did this, the change to this document

3    occur?

4    A    In March of '05.

5    Q    Okay.

6    A    We were setting up the approval change with all

7    the units.

8    Q    Okay.

9    A    And MacAllister wanted it to go through him.  He

10   specifically -- It was me and MacAllister.  Really, Malone

11   was not right -- really involved in it.  We cc'd him sort of

12   as a courtesy.

13   Q    And did you contact EEO, an EEO counselor

14   concerning this incident?

15   A    No, I did not.  I considered it to be an ongoing

16   violation.

17          MR. WILMOT:  Okay, we can take a break now.

18          (Off the Record.)

19          (Whereupon, at 12:17 p.m., the deposition was

20   recessed, to be reconvened this same day.)

21

135

1  continually getting secretarial type work.  And so, that was

2  a severe reduction in duties, and that's emanating from --

3  that went ongoing through '05, and it's right up to the

4  present day.

5      Q    Okay.  So the event in March 2005, was that the

6  last discrete act of retaliatory ---

7      A    Yeah.

8      Q    --- action you were subjected to?

9      A    Yes.

10          MR. CATAPANO-FRIEDMAN:  Objection.

11          THE WITNESS:  Wait, wait, wait a ---

12          MR. CATAPANO-FRIEDMAN:  Objection.  You can

13  answer.

14          THE WITNESS:  There was one more thing in, let's

15  see, August, September.  I'm trying to think if it's in '05.

16  He would -- Oh, excuse me, September of 05.

17      Q    Um-hmm.

18      A    When Malone left, there was no section chief.  In

19  other units in FNS NERO, as well -- and specifically,

20  recently, as recently as August of '05, the procedure has

21  been to rotate the acting duties of the section chief among

22  whoever is interested in the unit.  I asked this question

23  twice of MacAllister.  He would not respond to the question.

24  Instead, he appointed two people.  I had mentioned that I

25  was interested.  He appointed two other people, one for IT

1    A    That's leads us to today.  So that's it.

2    Q    Okay.  And you have not filed this, this incident

3  that you said occurred in September of '05, you did not

4  contact an EEO counselor with regards to that; is that

5  correct?

6    A    Not this one, but the ones, I think, in November

7  of last year, I believe I contacted the EEO on the letters

8  of instruction.  But this one, I didn't.

9    Q    This is the one I'm talking about.

10   A    Yeah, this one I didn't.  I did not.  It's still

11 ongoing.  A decision hasn't been made.

12   Q    Okay.  Now, we went through this before with

13 regards to the events that occurred in October, and you told

14 me you did not bring it to an EEO counselor's attention.

15 Are you now saying ---

16   A    I had contacted an EEO in November, okay.  But

17 with all -- they were all lumped together with the training

18 for possible vacancy in budget analyst position and the

19 three letters of instruction of one complaint of

20 retaliation.

21   Q    Okay.

22   A    And I think I had a one-minute conversation with

23 the counselor.  It was very brief.  And I just went forward.

24 I think I just checked off the formal.  And that's what

25 brought that attorney in the spring of '05.

177

1    is that the same shared neutral position or responsibilities

2    as described in the settlement agreement?

3        A    Yes.

4        Q    And those are the ones that you decided that you

5    did not want to pursue any further?

6        A    No.  I was going to continue to pursue it, but I

7    had a family situation that developed in November of '02.

8        Q    Right.

9        A    And I could not -- Eventually, in January, when my

10   father was on a feeding tube 23 out of 24 hours a day, and I

11   was the only at home at night, and he was in my in-law

12   apartment, I had to hook him at -- take him down at eleven

13   o'clock at night and hook him back up at 3:30 in the

14   morning, and then get to work.  I could not travel or assume

15   those duties.  So at that point is when I sent the letter to

16   Casey, and I can't do the shared mutual duties.

17            But in September of '02, I didn't have that

18   foresight to see what was coming around the corner on that

19   issue.

20       Q    Are you aware of what the USDA states its reasons

21   are for not rotating you into the section chief position ---

22       A    Yeah -- Go ahead.

23       Q    --- in September of '05?

24       A    I've asked.  They haven't answered my question.

25            (Pause.)

1    their intention was to change things, and that the change

2    was, I was going to be cut down in duties, which I was.  I

3    was included on the list, but not with certifying rights.

4        Q    Okay.  So you were added to the list?

5        A    Right, but not at the same level I was ---

6        Q    Okay.

7        A    --- prior to the list.

8        Q    And did you receive training on IAS?

9        A    No, I did not.

10       Q    Okay.  So you never received training on IAS?

11       A    I was scheduled.  My father died that week.

12       Q    Okay.  And after that, you never received training

13   on ---

14       A    I received the manuals, and I taught myself.

15       Q    Okay.  If your -- And I understand about the issue

16   with your father the week, I guess, this training was

17   scheduled.

18       A    Right.

19       Q    But for your father's death, would you have been

20   able to attend that training?

21       A    Yes.

22       Q    Looking at Paragraph 46 --

23       A    Okay.

24       Q    -- Paragraph 46 says on March 4, 2003, that you

25   contacted the Deputy Regional Administrator, John Ghiorzi,

1    put the IDP together, and Provision 1, which was in the

2    March of '04.  I had the -- I had only five months more of

3    Stanco, and he was gone in September of '03.  And then from

4    September '03 to March of '04, I had nobody.  And so, the

5    next time would have been March of '04, when I had to put

6    the IDP together.

7        Q    For Mike Malone?

8        A    For Mike Malone, right.

9        Q    Okay.  And so, in March of '04, you tried to

10   implement the -- this ADR process that's contained ---

11       A    Well, I was ---

12       Q    --- that's contained in the settlement agreement?

13       A    Excuse me.  It didn't get to that point.

14       Q    Okay.

15       A    It didn't get to that point.

16       Q    So what was the next time that you tried to

17   implement this ADR process that's contained within the

18   settlement agreement, following March 2003?

19       A    I don't recall.  At that point, my concern was to

20   bring the settlement agreement itself to whoever oversees

21   these people.  And I researched it, and I found out that in

22   the Civil Rights office of the USDA, fortunately, there's a

23   mechanism for resolving -- for adjudicating alleged breaches

24   of settlement agreements, and that was the Compliance

25   Division.  And so, I devoted a lot of my time at this point,

1    which is -- you know, I produced this thing for them, and

2    it's already in the record, to adjudicate the process of

3    resolving this dispute.  The dispute was centered on the

4    certification of funds availability, and it wasn't going to

5    go away.  And so, that's the path I took.  And I took that

6    path.

7          I had the EEO complaint going, and I had the

8    complaint with non-compliance with the Compliance Division

9    of the Civil Rights office in March of '03.  So that was --

10   to implement or to use it again, at that point, we're

11   talking March of '03, it was my opinion that I needed

12   somebody, somebody in the department or in the agency, who

13   would step forward and say, look, there's a settlement

14   agreement here, and it's got to work.  And so, rather than

15   continue with a broken wheel, I chose to fix the wheel and

16   go to the Compliance Division.

17        Q    If you could jump to Paragraph 86 of your

18   complaint --

19        A    Go ahead.

20        Q    --- Paragraph 86 said that there was an awards

21   ceremony on October 7, 2004.

22        A    Right.

23        Q    And that Frances Zorn gave many people in your

24   department an award of cash or a certificate, except for

25   you, despite your exemplary performance, even amongst those

1    who received the awards.  Do you believe that Mrs. -- or

2    Frances Zorn's act of not giving you an award on October 7,

3    2004, was done in retaliation?

4         A    Yes.  She also took a picture, and didn't want to

5    print it in the NERO bulletin.

6         Q    Okay.  Now, are you aware of what the USDA states

7    as to why you did not get an award on October 7, 2004?

8         A    Based on what I have heard from attending

9    depositions, my understanding of their reason is that I was

10   not on a cycle; that I had -- my accomplishments had been at

11   the end of a cycle, and they couldn't get my name in.

12   However, as is customary with every supervisor in FNS,

13   including Eric Bostia and the secretary, in instances of

14   significant accomplishments, they have the power to give

15   what's known as a spot award, an instantaneous award, which

16   Zorn has done.  She did not do it here.

17        Q    Okay.  And you said you got an award this year, in

18   2005, correct?

19        A    Right.

20        Q    Okay.

21        A    But it did not identify this accomplishment.

22        Q    Did it ---

23        A    Nutrition Ed.

24        Q    Did it identify anything?

25        A    It identified national recognition for the unit in

1    reviews.  So I -- I assume it's that, but I can't be 100

2    percent certain, since I do other areas, Food Stamp and BC.

3        Q    Okay.  If you could turn to Paragraph 111 for me,

4    please.  The paragraph states that your stature has been

5    further reduced within FNS NERO, to your no longer holding

6    the position of alternate backup funds officer.  A list of

7    fund officers was created on November 9, 2004, and omitted

8    your name as funds officer.  Do you see that there?

9        A    Yes, I do.

10       Q    Do you believe that that act was a retaliatory

11   act?

12       A    Yes, I do.

13       Q    Do you understand, or are you aware of what the

14   USDA states its reasons are as to why your name was not on

15   that list?

16       A    I'm not aware of any reasons they've offered to

17   me.

18       Q    Okay.  Now, other than the incidents we've

19   discussed so far that you believe were retaliation, and the

20   additional ones I've just pointed out in your complaint, are

21   there any other retaliatory acts you believe you were

22   subjected to within the Agency that we have not discussed

23   today?

24       A    I think we've hit them, just about all.

25       Q    Okay.  Before we move on, let me just ask you some

191

1    that were available?

2        A    Over the last seven or eight years, you're talking

3    about?

4        Q    From the point where you said Arthur LeBlanc told

5    you that you were the alternate funds officer?

6        A    At the most, one to two times per year, maybe

7    three; not more than three.  It all depended.  This is all a

8    function of Martin Hines's availability.  And he's the kind

9    of guy that he doesn't take vacations.

10       Q    Okay.  So only one to two, three -- one to two

11   times a year, you would actually certify that funds are

12   available?

13            MR. CATAPANO-FRIEDMAN:  Objection.

14            THE WITNESS:  Is this like -- Do you want me

15   answer the question?

16            MR. CATAPANO-FRIEDMAN:  Yes.

17       A    Okay.  Yeah, the maximum three; usually, the

18   minimum of one.

19       Q    Okay.  Were you ever the recipient of any

20   insulting comments concerning your EEO activities?

21       A    Can we -- Are we off this now?  Do you want me to

22   close this?

23       Q    Yes.  Yes, we're moving on.

24       A    Okay.  Now, go ahead.

25       Q    Were you ever the recipient of any insulting

192

1   comments concerning your EEO activities within the Agency?

2        MR. CATAPANO-FRIEDMAN:  Objection.  You can

3   answer.

4        A    Well, facial expressions.  I don't know if you'd

5   call those comments.  I'd call them comments.

6        Q    I would call a comment something verbal.

7        A    Verbal?  Well, if someone makes expressions at

8   you, you know, like gives you the finger or something like

9   that, I call that an expression.

10       Q    All right.  Before you give me expressions or

11  facial expressions, any comments?

12       A    Joseph Stanco.  What was it?  He made a comment

13  that, you know, these activities were taking away from my

14  career advancement opportunities.  That was the reason why I

15  wasn't going anywhere.

16       Q    And when did he make that comment?

17       A    August of 2002.

18       Q    And when -- After Joseph Stanco told you that, did

19  you contact an EEO counselor?

20       A    No.  I confronted him with it.  I says, you know,

21  are you saying that this is the reason -- You know, I

22  confronted him in an email after the -- to get it in writing

23  because I knew if I went to an EEO counselor at that point,

24  it would be his word against my word.  So I emailed him.  I

25  said, based upon our meeting -- And I have the email if you

250

## CORRECTION SHEET

### DEPOSITION OF JOHN G. PEDICINI

| PAGE NO. | LINE NO. | SUGGESTED CORRECTION |
|---|---|---|
| 8 | 21 | should be "Dr." instead of "Cr." |
| 9 | 24 | should be "Coastal States" instead of "Coast States" |
| 12 | 15 | should be "own in trust" instead of "own" |
| 17 | 6 | should be "Golf Oil Co." instead of "Gulf Oil Co." |
| 18 | 21 | should be "staff accountant" instead of "staff accounting" |
| 19 | 25 | should be "Charity Benz" instead of "Cherry Benz" |
| 23 | 17-19 | should be "All duties needed to ensure that all administrative funds transactions are completed timely and accurately" |
| 29 | 13-14 | should be "aside" instead of "the side". |
| 31 | 1 | should be "Themi Stamboulidis and Ann Bellezza" instead of "Stan Bulegis and Anne Bellezza" |
| 34 | 1 | should be "AFMS" instead of "ATMUS". |
| 38 | 21 | should be "paradigm" instead of "paragram". |
| 38 | 22 | should be "paradigm" instead of "paragram" |
| 53 | 6 | should be "Meyi" instead of "Mehey" |
| 53 | 11 | should be "Courtney Wilkerson" instead of "Courtney Wilkinson" |
| 55 | 3 | should be "Wilkerson" instead of "Wilkinson". |
| 62 | 19 | should include "The 2003 complaint was the statutory basis for the claim." |
| 63 | 14 | should include "and Canavan". |
| 64 | 13 | should include "and Bellezza". |
| 68 | 16 | should include "talking about EEO". |
| 76 | 16 | should be "DOL" instead of "OL". |
| 83 | 4 | should be "agency" instead of "region". |
| 85 | 20 | should include "Ghlorzi and Malone were involved in settlement discussions with me in the Perez case in November - December 2002." |

251

## CORRECTION SHEET

### DEPOSITION OF JOHN G. PEDICINI

| PAGE NO. | LINE NO. | SUGGESTED CORRECTION |
|---|---|---|
| 91 | 6 | should be "Janice Sciarappa" instead of "Gina Schraff" |
| 93 | 18 | should be " I'm not in the office every day" instead of "I'm not the alternate." |
| 102 | 16-17 | should be "until November 30, 2004" instead of " June 2005" |
| 102 | 25 | should be "Budget courses", instead of IPAS |
| 103 | 7 | should be "--Budget courses" not "-- IPAS" |
| 103 | 23 | should include "for the time period covered by the IDP - June 1, 2004 to Nov. 30, 2004" |
| 104 | 7 | should include "I consider it to be a continuing violation." |
| 104 | 16 | should be "until November 30, 2004" instead of "December 31, 2004" |
| 104 | 18 | should be " up to November 30, 2004" instead of "all of '04". |
| 106 | 13 | should be "no" instead of "right." |
| 106 | 20 | should be "Themi Stamboulidis" instead of "Femi Stanbolitis" |
| 107 | 19 | should be " No, train co-workers to backup duties of Martin Itnes' position" |
| 108 | 12 | should be "Yes, and I raised it with my attorney". |
| 108 | 14 | should be "Yes" instead of "No." |
| 108 | 17 | should be "Yes" instead of "On those issues, no." |
| 112 | 9 | should be "Themi Stamboulidis" instead of "Femi Stanbelitis" |
| 120 | 25 | should be "the letters of instruction" instead |
| 121 | 1 | of "the letter on Employee counseling, on EEO" |
| 126 | 15 | should be "Yes" instead of "No." |
| 127 | 1 | should be "Ingemi" instead of "Jimmy." |
| 129 | 17-19 | should be "Yes, Gregory Ferby was informed by me that I had to get prior approval for EEO activity." |
| 130 | 9-10 | should be "System Administrator" instead of "Assistant Administrator" |
| 136 | 6 | should be "Themi Stamboulidis" instead of "Femi Stanbelitis" |

**APEX Reporting**
(617) 426-3077

## CORRECTION SHEET

### DEPOSITION OF JOHN G. PEDICINI

| PAGE NO. | LINE NO. | SUGGESTED CORRECTION |
|---|---|---|
| 137 | 18 | Should be "Kirk Hassel" instead of "Kirk Hassle" |
| 139 | 10-11 | Subsequent to the deposition of 10/25/05, I filed an EEO complaint. |
| 144 | 2 | should be "June 1, 2004" to Nov. 30, 2004" instead of "May 2004 to December 31, 2004" |
| 144 | 18 | should include "in 2004" |
| 144 | 22 | Should be "On IDP training for the time period of June 1, 2004 to Nov. 30, 2004." |
| 145 | 6 | should be "for backup duties to Marty Hines function." |
| 159 | 4 | should be "Komloske" instead of "Comlowski" |
| 162 | 12 | should be "Kamloske" instead of "Comlowiki" |
| 162 | 13 | should be "Kamloske" instead of "Comlowski" |
| 162 | 15 | should be "April" instead of "May" |
| 165 | 6 | delete "funds". |
| 165 | 25 | should be "Fuoco" instead of "Forkol" |
| 167 | 1 | should be "Marty" instead of "Maureen". |
| 167 | 14 | Subsequent to the deposition, Bruce Potvin informed me that Roger Hamilton told him in September of 2004 that Marty Hines was retiring, and the office was looking for someone for the position. Also, Potvin told me that Hamilton emphasized the fact that the selectee "was not going to be John Pedicini. |
| 171 | 11 | should include "e-mail appointment by LeBlanc". |
| 173 | 7 | should be "when I" instead of "when the" |
| 184 | 13 | should be "Bost" instead of "Bostia" |
| 187 | 1 | Should be "John G. Pedicini" instead of "John D. Pedicini" |
| 187 | 15 | Should be "There is" instead of "The 'alternate uses'" Also should include, "to the best of my knowledge" |

## CORRECTION SHEET

### DEPOSITION OF JOHN G. PEDICINI

| PAGE NO. | LINE NO. | SUGGESTED CORRECTION |
|---|---|---|
| 188 | 19 | Should be "no for comp. time, yes for overtime" |
| 208 | 6 | should be "Johnnie" instead of "Joanie". |
| 211 | 21 | Should be "2003" instead of "2000". |
| 231 | 2 | Should be "yes" instead of "no". |
| 231 | 4 | Should be "yes" instead of "no". |
| 231 | 5 | Should be "In '04", instead of "In '03". |
| 240 | 1 | Subsequent to the deposition, Potvin informed me that in Sept. 2004, NERO planned to train people for the sole purpose of selecting anybody but me for the position of Budget Analyst. |

# EXHIBIT 2

EXHIBIT

_Dept_ 2

10/25/05

FOOD AND CONSUMER SERVICE
NORTHEAST REGIONAL OFFICE
FINANCIAL MANAGEMENT
FINANCIAL RESOURCES MANAGEMENT SECTION
FINANCIAL MANAGEMENT SPECIALIST GS-501-11


## I.  INTRODUCTION

This position is located in the Financial Resources Management Section,
Financial Management, Northeast Regional office.  This Section carries out
regional activities essential to proper financial operation of FCS Programs
administered by cooperating State agencies and the Regional Office.

## II.  DUTIES AND RESPONSIBILITIES

Serves as a Financial Management Specialist with responsibility for planning,
organizing, reviewing, analyzing and monitoring fiscal activity, accounting
and internal controls in the Region to provide proper accountability and
financial management over Federal funds.

- Responsible for control of assigned areas of the Regional
  reporting system.  Ensures timely, accurate and complete
  submissions, recommending solutions and resolving independently
  all reporting problems with the State agencies.

- Monitors, analyzes, evaluates, recommends and affects improvements
  and alternative procedures for effective cash management practices
  within the scope of assigned programs.

- Meets independently and as needed with State agency and local
  agency financial and program personnel.

- Prepares periodic reconciliations of State Agency Letters of
  Credit (at least quarterly), verifying drawdowns, entitlements,
  obligations, outlays and initiating any necessary accounting
  adjustments.

- Negotiates with the State Officials to closeout State agency
  accounts at years end; preparing Statements of Accounts, closing
  Letters of Credit to accurately identify unliquidated obligations
  and establishes appropriate accounts payable for future payment.

- Provides the Section Chief with any information that would assist
  in improving internal controls in the Region and States.

- Counsels and assists the Section Chief or lead specialist in
  financial management and accounting systems.

- Participates in dissemination and clarification of policy, through
  financial regulations, instructions and management circulars and
  discussions with, and technical assistance to, affected parties.

FINANCIAL MANAGEMENT SPECIALIST, GS-501-11                          2.

- Reviews State and local agency internal control systems.

- Performs the financial portion of Program Management Evaluations and reviews of State agency Financial Management Systems including the full range of cash payments and all other internal accounting procedures like A/R, A/P, reports generation.

- Presents findings and prepares comprehensive reports of recommendations to Regional Financial Management Director through the Section Chief.

- Maintains audits, internal control and management information systems as required.

- Provides technical assistance and training to Regional and State personnel on financial management and accountability policy and procedures.

- Investigates audit findings with specific emphasis on internal controls and financial systems and recommends fiscal closure of audits.

- Reviews and approves the financial portion of State plans of operations.

Employee is assigned the major part of their responsibilities covering one of the three program areas that follow:

FOOD STAMP PROGRAM

- Independently conducts Financial reviews of State Agencies or assigned portions there of, in the areas of cash management, expenditures/drawdowns, report development and verification, FSP billing, accountability and reporting procedures, and other internal accounting procedures. These reviews are conducted to recommend corrections and/or improvements and to ensure corrective action has been taken.

- Responsible for the preparation of execution of semi-annual Food Stamp billings for each of the seven NERO State Agencies. Prepares semi-annual billing statement for each local project area which is consolidated into a single State bill. The incumbent makes the required adjustments to reflect differences arising from cashier errors at local levels, thefts, reports of State and U.S. Department of Agriculture auditors, coupon losses due to negligence or catastrophe, etc., such as fire, floods, mail losses, mutilated coupons, recoveries from ineligible recipients and other factors affecting a State's liability for operating the FSP.

Exhibit 16
Page 4 of 9

FINANCIAL MANAGEMENT SPECIALIST, GS-501-11                                    3.

- Responsible for the settlement of all outstanding bills, initiates "demand" cycle when it is determined SA is not making reasonable efforts to settle. Has the authority to negotiate adjustments in the bills, when applicable, directly with the State agencies. Is responsible for assuring that audit trails exist and proper documentation is available when adjusting and/or writing off claims.

- Manages Regional FSP Accountability and Participation Reporting System to insure timely, accurate and complete submission for all documents and initiates corrective action in cases of delinquent and inaccurate reporting. Resolves the majority of problems independently with SA personnel and elevates other problems to supervisor or senior level staff with recommendation for resolution.

- Provides technical direction and training to lower grade employees who are specifically responsible for the review and processing of the following FNS accountability reports: FNS-33, FNS-250, FNS-259, FNS-260, and FNS-560 and SF-269.

CHILD NUTRITION PROGRAM

- Independently conducts financial reviews of State Agencies, local agencies or assigned portions of either, in the areas of cash management, expenditures/drawdowns, report development and verification, accountability and reporting procedure, internal controls, audit resolution procedures and other internal accounting procedures.

- Monitors, analyzes and evaluates cash management practices within the scope of the Special Nutrition Programs. This includes, but is not limited to; operating and maintaining the SNP Cash Management Control System to produce estimates of Regional Funding needs; preparation of the monthly status of Block Funding Report for use in National Office planning; maintaining management control over SA and ROAP utilization of funds issued; and distribution/reprogramming of funds based on analysis/ identification of need. These actions are accomplished independently with significant latitude in reprogramming funds to the areas of greatest need to ensure optimum distribution of Federal funds within the Northeast Region.

- Provides technical direction and training to lower grade employees who may assist in the review and processing of the following FNS accountability reports: FNS-10, FNS-13, FNS-44, FNS-418 and SF-269.

FINANCIAL MANAGEMENT SPECIALIST, GS 501-11                                    4.

Supplemental Feeding Program

- Monitors, analyzes and evaluates cash management practices within the scope of the Supplemental Feeding Programs. This includes, but is not limited to; maintaining management control over the utilization of funds issued and quarterly analyses of funds authorized, obligations and funds availability levels.

- Provides technical direction and training to lower grade employees who are specifically responsible for review and processing of FNS accountability reports, i.e., FNS-498.

- Independently conducts financial reviews of State Agencies, local agencies or assigned portions of either, in the areas of cash management, expenditures/drawdowns, report development and verification, accountability and reporting procedure, internal controls, audit resolution procedures, and other internal accounting procedures.

FACTOR 1. - Knowledge Required

- Knowledge of established accounting, internal controls and financial management principles, concepts and practices, in order to conduct reviews of internal controls and financial systems.

- Knowledge of pertinent Federal program and financial management regulations and instructions.

- Skill in analyzing financial data to recognize significant trends in order to meaningfully review State and local agency Financial Management Systems and reports.

- Knowledge of Regional and State agency financial and administrative policies and procedures, in order to conduct system reviews of internal and financial controls adapting the reviews as needed from State to State.

These are necessary in order to:

1. Properly review Regional and State financial management and internal control systems.

2. Recommend corrections and/or improvements as needed.

3. Assist in corrective action/improvement implementation.

Exhibit 10
Page 16 of 9

FINANCIAL MANAGEMENT SPECIALIST, GS-501-11                                5.

## FACTOR 2. - Supervisory Controls

Assignments are given in terms of objectives and scope of desired results. The adequacy of the incumbent's work is determined by an evaluation of the degree to which objectives are achieved, timeliness, adherence to policy, and initiative exhibited in performance. Routine work is normally executed independently and the completed project is then reviewed by the supervisor for technical accuracy before being presented to the Regional management or States. For unusual or complex problems, supervisor or senior specialist(s) suggests broad possible approaches to resolution. The incumbent is expected to identify and resolve unusual conditions brought about by the complexity of State funding requirements.

## FACTOR - Guidelines

-      Pertinent Federal, State and local Regulations and Instructions along with generally accepted accounting and financial management principles, techniques, and methodology serve as general guidelines. Departmental and Agency regulations, procedures and policies, OMB Circulars, Treasury Department Manuals, GAO and Comptroller General decisions relative to proper funds management and control provide added guidance. Oral instructions are given by the Section Supervisor.

-      When guidelines are not appropriate, the specialist must select proper action in dealing with such matters as are concerned with intricate automated financial and internal control systems. The guidelines and regulations are changed frequently.

## FACTOR 4 - Complexity

-      Assignments relate to the review of Regional, State and local agency financial systems with follow-up actions to be taken as determined during the course of the system's analysis and evaluation. The incumbent applies a wide range of analyses and control techniques. In the process incumbent reviews systems output with source documents for correctness and adequacy of system processing.

-      Resourcefulness, ingenuity, and inventiveness are required to some degree in applying accepted financial/accounting and internal control principles, techniques, and methodology to problems.

-      The work is further complicated by the varied and changing Federal and State regulations.

US0182

238

Exhibit 10
Page 7 of 9

FINANCIAL MANAGEMENT SPECIALIST, GS-501-11                                    6.

**FACTOR 5. - Scope and Effect**

- The purpose of the work is to optimize Federal and State agency management of, and accountability for, Federal funds invested in the assigned NERO programs.

- The work affects the design and implementation of financial management and accountability systems at the Regional office and State and local levels.

**FACTOR 6. - Personal Contacts**

Contacts are:

Federal Level - Regional Office program and financial staffs; Headquarter's Financial Management Staff.

State Level - Program Directors and comptrollers responsible for program management, and their staffs.

Local Level - Program Directors and accounting managers responsible for program management, and their staffs.

**FACTOR 7 - Purpose of Contacts**

At the Federal Level - To request policy clarification; resolve problems within the scope of Regional and National funds management and to recommend changes to Agency Financial Management, internal control and accounting policy and procedures where indicated.

At the State Level - For ascertaining status of, and making corrections or improvements to Financial Management, internal control and accountability systems and reports.

At the Local Level - For ascertaining status of, and making corrections or improvements to Financial Management and internal control accountability systems and reports.

Exhibit 10
Page 8 of 9

239                US0183

FINANCIAL MANAGEMENT SPECIALIST, GS-501-11                                    7.

FACTOR 8. - Physical Demands

The work is mostly sedentary with some lifting of books and files.

FACTOR 9. - Work Environment

The work is performed in an office setting.

Requires being in travel status about one-fourth to one-third of the time.
Travel is mostly within the seven Northeastern States.

This position is exempt from minimum wage and overtime provisions of Fair
Labor Standards Act.

Exhibit ___16___

Page __9__ of __9__

240          US0184

# EXHIBIT 3

1

Volume I
Pages 1 to 57
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
JOHN G. PEDICINI,                 :
          Plaintiff,              :
      vs.                         :    Civil Action
                                  :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and     :
ANN M. VENEMAN, SECRETARY,        :
UNITED STATES DEPARTMENT OF       :
AGRICULTURE,                      :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF ARTHUR J. LeBLANC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston, Massachusetts,
on Thursday, June 23, 2005, commencing at 1:25 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.) 50 Franklin
        Street, Boston, MA  02110, for the Plaintiff.

    United States Department of Justice, United
        States Attorney's Office
        (By Gina Y. Walcott-Torres, Assistant
        United States Attorney) United States
        Courthouse, 1 Courthouse Way, Suite 9200,
        Boston, MA  02210, for the Defendants and
        the Deponent.

Also Present: John G. Pedicini
              Salama Abdurrahim, summer intern.

6

1    because we can't waste time there.

2        BY MR. CATAPANO-FRIEDMAN:

3        Q.    Mr. LeBlanc, you are currently employed

4    where?

5        A.    I am employed with the Food and Nutrition

6    Service.  I work for Alexandria, but I work out of

7    Boston.

8        Q.    What is your current position?

9        A.    Systems accountant.

10       Q.    How long have you held that position?

11       A.    Five years.

12       Q.    Before you held that position, what

13   position did you hold?

14       A.    Chief of financial operations.

15       Q.    For what?

16       A.    For how long?

17       Q.    For what?  NERO?

18       A.    For NERO.  Excuse me.

19       Q.    NERO, which is the Northeast Regional

20   Office?

21       A.    Yes.

22       Q.    How long did you hold that position?

23       A.    1985 through 2000.

24       Q.    Okay.  While you were chief, did Mr.

8

1     Q.    What was his position?

2     A.    He was the funds officer.

3     Q.    As the funds officer, what did Marty Hines

4  do?

5     A.    He was responsible for the FPA, the

6  administrative funds that were given.

7     Q.    As part of his responsibilities did he

8  certify funds, the availability of funds?

9     A.    Administrative funds, yes.

10     Q.    Who was Mr. Hines's backup in certifying

11  funds?

12          MS. WALCOTT-TORRES:   Objection.

13     Q.    Did Mr. Hines have a backup in certifying

14  funds?

15     A.    Yes.

16     Q.    Who was Mr. Hines's backup in certifying

17  funds?

18     A.    When I was chief, I was the backup.

19     Q.    Was there anybody else who was backup?

20          MS. WALCOTT-TORRES:   With respect to

21  certifying the funds?

22     Q.    With respect to certifying funds.

23     A.    Yes.   After me would be Douglas

24  MacAllister.

9

1     Q.    Anybody else?

2     A.    Fran Zorn, the regional administrator.

3     Q.    Did Mr. Pedicini work closely with Marty

4  Hines?

5     A.    It wasn't his full job.  But yes, he did

6  work with Mr. Hines.

7     Q.    Did Mr. Pedicini know how to certify the

8  availability of funds?

9           MS. WALCOTT-TORRES:  Know how, or did he do

10  it?

11    Q.    Did he know how?

12    A.    I'm not sure.

13    Q.    So you never learned whether Mr. Pedicini

14  could certify the availability of funds while you

15  were his boss?

16          MS. WALCOTT-TORRES:  I'm sorry.  "Could" in

17  terms of ability or "could" in terms of authority?

18          MR. CATAPANO-FRIEDMAN:  "Could" in terms of

19  ability.

20    A.    Again, I don't know.

21    Q.    Do you know whether Mr. Pedicini ever

22  certified funds when you were his supervisor?

23    A.    I don't know.  May I qualify that?  He

24  should not have.  I don't know that he did, but he

10

1    should not have, because, as I mentioned, it went to

2    me after Marty.

3        Q.    Do you recall whether someone from FNS

4    headquarters -- strike that.  Do you recall whether

5    Mr. Hines came to you and told you that someone at

6    headquarters had required that Mr. Hines have a

7    backup in connection with the availability -- to

8    certify the availability of funds?

9        A.    I am not aware.

10       Q.    You don't recall whether Mr. Hines came to

11   you about that or not?

12       A.    I don't remember that, no.

13       Q.    So you don't remember whether or not you

14   named Mr. Pedicini as a backup to certify funds?

15       A.    No.  As previously mentioned, I was his

16   backup.  I would have been the backup.  That was

17   part of my role.

18       Q.    Let me ask you this:  Who appointed you

19   backup to certify availability of funds?

20       A.    Douglas MacAllister.

21       Q.    Did he do this verbally or in writing?

22       A.    In writing.

23       Q.    Do you have a copy of the writing by which

24   he did that?

# EXHIBIT 4

1

Volume I
Pages 1 to 61
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
          Plaintiff,            :
     vs.                        :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - - -x

          VIDEOCONFERENCE DEPOSITION OF PARIDE MONTI
f/k/a JOSEPH STANCO, a witness called on behalf of
the Plaintiff, taken pursuant to the Federal Rules
of Civil Procedure, before Daniel P. Wolfe,
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Offices of Doris O. Wong Associates, 50 Franklin
Street, Boston, Massachusetts, on Thursday, June 23,
2005, commencing at 3:25 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Gina Y. Walcott-Torres, Assistant
          United States Attorney) United States
          Courthouse, 1 Courthouse Way, Suite 9200,
          Boston, MA 02210, for the Defendants.

Also Present: John Pedicini
              Salama Abdurrahim, summer intern.

6

1      Q.    Okay.  Did you work for the U.S. Department

2  of Agriculture FNS at some point in time?

3      A.    Yes.

4      Q.    When did you work there?

5      A.    Between 2001 and 2003.

6      Q.    Okay.  And you did not work there before

7  2001?

8      A.    No.

9      Q.    What was your position between 2001 and

10  2003?

11      A.    Section supervisor.

12      Q.    Okay.  For what section?

13      A.    I don't remember exactly the name, but

14  basically administering grants to the states in the

15  Northeast Region.

16      Q.    So the main function of your job was to

17  administer grants to states in the Northeast Region

18  for FNS; is that correct?

19      A.    Yes.  Supervising the personnel.  But it

20  implied, obviously, I will be administering the

21  grants.

22      Q.    When you started the job in 2001, did you

23  know how to certify grants?

24      A.    Specifically certifying grants, no.

9

1    availability of funds; is that correct?

2        A.    If you don't confirm what I am asking, I

3    will say yes, I do not understand your question.

4        Q.    Did a fellow by the name of Marty Hines

5    report to you when you were at FNS?

6        A.    Yes.

7        Q.    What was his job title?

8        A.    Budget officer, I believe.

9        Q.    Do you know what functions he performed as

10   budget officer?

11       A.    Administering the budget for the region.

12       Q.    Did he also certify the availability of

13   funds?  Did he function in that capacity?

14       A.    Certifying the availability of operational

15   funds.

16       Q.    Okay.  And did John Pedicini act as his

17   backup in certifying the availability of operational

18   funds when you were section chief?

19           MS. WALCOTT-TORRES:    Objection.  You may

20   answer.

21       A.    That was always an unclear point.  And I

22   believe that Mr. Pedicini was never assigned to

23   certifying funds for him specifically.

24       Q.    Nevertheless, did Mr. Pedicini certify

10

1    operational funds on occasion while you were a

2    section chief?

3            MS. WALCOTT-TORRES:   Objection.   You may

4    answer.

5        A.    I cannot remember any time, specific time

6    that Mr. Pedicini certified funds for Mr. Hines.

7    Basically it was really my job to certify in the

8    absence of Mr. Hines.

9        Q.    Did you have training in certifying the

10   availability of funds?

11       A.    Yes.

12       Q.    Where did you get this training?

13       A.    Again, throughout my career as a civil

14   servant in the government, I had the best experience

15   in certifying funds availability.

16       Q.    Who gave you the authority to certify the

17   availability of funds while at FNS?

18       A.    I believe it was a memo or a letter that

19   officially assigned these duties to me.

20       Q.    Who did that memo come from?

21       A.    I'm not sure at this point exactly who the

22   issuer was.

23       Q.    Okay.   Can you tell me what the process was

24   at FNS for certifying the availability of funds

# EXHIBIT 5

1

Volume I
Pages 1 to 214
Exhibits 32 - 46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
            Plaintiff,          :
                                 :
        vs.                     :  Civil Action
                                 :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
            Defendants.         :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF MICHAEL D. MALONE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 8, 2005, commencing
at 11:30 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

8

1        A.    Supervisory information technology

2    specialist.

3        Q.    At what organization?

4        A.    I'm with the USDA Food Nutrition Service in

5    the Financial Management Organization.

6        Q.    In what division?

7        A.    Financial management.

8        Q.    And what regional office?

9        A.    Northeast.

10       Q.    Are you a section chief?

11       A.    Yes.

12       Q.    Section chief of what?

13       A.    I am section chief of the Information

14   Technology Section and per assignment I'm handling

15   supervisory duties of the Food Stamp Financial

16   Program and Internal Finance Section.

17       Q.    And how did you obtain those supervisory

18   duties?

19       A.    Which ones?

20       Q.    The ones over the Food Stamp Program and

21   Internal Finance.

22       A.    I was directed to do so by my immediate

23   supervisor.

24       Q.    And who is that?

9

1       A.    Douglas MacAllister.

2       Q.    Okay.  Can you tell me what's "SS," the

3  initials "SS"?

4       A.    Support services.

5       Q.    Support services.  Do you have different

6  official titles and working titles?

7       A.    No.

8       Q.    What is your official title now?

9       A.    Supervisory information technology

10  specialist.

11      Q.    And what is your working title?

12      A.    To my knowledge, working title is section

13  chief.

14      Q.    Of what?

15      A.    There's no working title, and my PD is

16  section chief.

17      Q.    Have you ever referred to yourself as

18  something other than simply section chief or what

19  did you say, supervisor --

20      A.    Supervisory information technology

21  specialist.

22      Q.    Supervisory information technology

23  specialist.  Have you ever referred to yourself as

24  something different than that?

51

```
 1        Q.    Who gave you the authority to certify

 2   funds?

 3        A.    My immediate supervisor.

 4        Q.    Who is that?

 5        A.    Douglas MacAllister.

 6        Q.    Before Mr. MacAllister gave you the

 7   authority to certify funds, had you ever certified

 8   funds before?

 9        A.    Not at USDA.

10        Q.    Had you done it elsewhere?

11        A.    I can't recall.

12        Q.    Did you know how to certify funds?

13        A.    Can you please elaborate?

14        Q.    Okay.  Well, do you know how to certify

15   funds?

16        A.    I can't answer that question without

17   further elaboration.

18        Q.    Okay.  Mr. MacAllister has given you the

19   authority to certify funds at USDA, correct?

20        A.    Correct.

21        Q.    Can you tell me what your understanding of

22   that authority is?

23        A.    My understanding is that in the event the

24   budget analyst that reports to me in the FSP/IF
```

52

1    section --

2        Q.   Okay.  And that's Marty Hines?

3        A.   That is Marty Hines.  In the event that he

4    is not available and immediate certification is

5    required, then I have the authority to on the form,

6    which is the AD700 form, to sign that form saying

7    that funds are available to be used for the purpose

8    intended on that document.

9        Q.   Has anybody ever come to you since you

10   received this authority asking you to certify funds

11   for USDA?

12       A.   Yes.

13       Q.   Can you tell me step by step what you did

14   on those occasions when you were asked to certify

15   funds for USDA?

16       A.   I took the AD700 to Mr. Pedicini and said,

17   "Would you please look in the FFIS system to see if

18   there are funds available."  He did so.  They were

19   available, and I signed the document saying that

20   they were available and could be used for the

21   purpose intended on the document.

22       Q.   So you knew that Mr. Pedicini knows how to

23   certify funds, correct?

24            MR. WILMOT:  Objection.

74

1    A.    It was for a staff meeting with both

2    sections that I supervise.

3    Q.    Okay.  I'd like to refer you to Item 5 on

4    the agenda.  Can you tell me what that's about?

5    First of all, can you read Item 5?

6    A.    "Training for possible Budget Analyst

7    vacancy."

8    Q.    Okay.  Can you tell me what you meant by

9    that item?

10    A.    It was to have a discussion and offer

11    opportunities for all of the Grade 11s that were

12    currently in my financial section to get training on

13    different functions that are performed by the budget

14    analyst in the Northeast Region.

15    Q.    And who was that budget analyst?

16    A.    That is Marty Hines.

17    Q.    Can you tell me why you felt this was an

18    appropriate agenda item for that meeting?

19    A.    Two reasons.  One is that I have the

20    responsibility of ensuring that should any of my

21    staff be unavailable that we can continue to

22    complete the work required of our section and in

23    doing so, we needed to make sure that I had several

24    backups for various functions.  Not all functions

75

1    within the position but for various functions that

2    were performed in that position.

3            Secondly, the incumbent had expressed to

4    many people and it was public knowledge that he was

5    planning to retire, although nothing official had

6    been submitted, and this was not --the reason I used

7    the word "possible" is because it could be within

8    six months or it could be within six years so

9    there's no way to know.

10           So I had to again make sure that the

11   functions were being performed in the event a person

12   was out for a week or indefinite or if a vacancy did

13   occur and that was the discussion.

14       Q.    Had Mr. Hines come to you and told you that

15   he was planning on retiring?

16       A.    No, he had not.

17       Q.    You said it was common knowledge that he

18   was planning on retiring; is that correct?

19       A.    That is correct.

20       Q.    How did it come to your attention that this

21   was public knowledge?

22       A.    Several people had mentioned it to me

23   before this occasion.

24       Q.    Who?

79

1    specialist but that encompasses all of the other

2    financial-related functions that are performed in

3    the Northeast Region.

4         Q.    What is John Pedicini's position?

5         A.    Financial management specialist.

6         Q.    Why was that item not included in your

7    agenda of October 7, 2004?

8         A.    It actually is Number 11.

9         Q.    Oh, it's Number 11.  Okay.  How is that

10   encompassed by Number 11?

11        A.    "OJT by GS-12s" is a plan that all of the

12   GS-12s including the budget analyst position would

13   go through similar training on functions that they

14   perform.

15             I simply chose to start with the budget

16   analyst first and actually as it turned out, it

17   didn't even roll out that way.  He wasn't the first

18   one.  There were others in front of him.  My initial

19   plan was let's start with this one and we're going

20   to get them all done because we had to start

21   somewhere.

22        Q.    In putting Item 5 in the agenda, it was

23   your original plan to train people on Marty Hines'

24   job first, correct?

83

1    retiring?

2        A.    No, I do not.

3        Q.    Did Mr. MacAllister ever tell you whether

4    she was planning on retiring?

5        A.    No, he did not.

6        Q.    Can you tell me what a letter of

7    instruction is?

8        A.    It is a written instruction to an employee

9    from a management official that instructs on

10   either -- indicating our proper processes/procedures

11   to follow.  I assume it can be used for several

12   different items where it related to actions,

13   performing work functions, and detailing what is

14   appropriate or inappropriate.

15       Q.    Is that a precursor to more formal

16   discipline?

17            MR. WILMOT:  Objection.

18       A.    There is no link between the two.

19   Certainly if someone is given instruction and they

20   know how to do something and they continue not to do

21   it, then there could be follow-up action but that's

22   not the official intent of the letter.

23       Q.    What's the official intent of the letter?

24       A.    To explain what is the proper or improper

84

1    actions related to the subject matter.

2        Q.   Have you ever followed up a letter of

3    instruction with more formal discipline when the

4    letter was not followed, the instructions in the

5    letter were not followed?

6            MR. WILMOT:  Objection.  I think he's

7    already said it's not a form of discipline.

8            MR. CATAPANO-FRIEDMAN:  He can answer the

9    question.

10           MR. WILMOT:  You're misconstruing his

11   testimony.

12           MR. CATAPANO-FRIEDMAN:  I'm not

13   misconstruing his testimony.

14           MS. CATAPANO-FRIEDMAN:  He's asking if that

15   ever happened.

16       Q.   Will you answer the question?  Did you ever

17   follow up a letter of instruction with formal

18   discipline when an individual received a letter of

19   instruction and did not follow those instructions?

20       A.   To my knowledge, no.

21       Q.   Did you ever issue a letter of instruction

22   where the employee refused to follow the

23   instructions in the letter?

24       A.   I need clarification.

151

1    A.    I don't recall that conversation.  I've

2    stated on the record I have conversations daily with

3    my staff.  I don't remember a specific conversation

4    about relinquishing Nutrition Education.

5    Q.    You had conversations in your cubicle with

6    Mr. Stamboulidis, correct?

7    A.    That's correct.

8    Q.    My understanding was you just didn't

9    specifically remember discussing with him any

10   relinquishment of Nutrition Education duties; is

11   that right?

12   A.    That's correct.

13   Q.    Can you tell me who was performing the

14   duties that you assigned to Mr. Hassel immediately

15   before you assigned them to him?  I'm again

16   referring to the Nutrition Education duties that you

17   assigned to Mr. Hassel back around March of 2004.

18   A.    No, I cannot.

19   Q.    Can you tell me who in your section

20   performs Nutrition Education duties?

21   A.    As of today?

22   Q.    As of March 2004 and then you can tell me

23   as of today if you wish.

24   A.    As of March 2004 prior to me assuming the

152

1   position that I'm in now?

2       Q.    Or just when you assumed it or at the time

3   you assumed it.

4       A.    When I assumed it, no, I did not know.

5       Q.    Do you know now who performed Nutrition

6   Education duties back at the time you assigned

7   certain Nutrition Education duties to Mr. Hassel

8   back in March or around March of 2004?

9       A.    I know what I've been told.  I don't have

10  personal knowledge of that.

11      Q.    What have you been told?

12      A.    That it was shared amongst almost everyone

13  in the section and that was the problem that the

14  food stamp section chief had, that they were getting

15  responses from everyone, not getting a cohesive

16  response, a consolidated response from FM.

17          That was the purpose of his contacting me

18  and that's when I made the assignment of two

19  individuals to perform those duties.

20      Q.    Who are the two individuals who perform

21  Nutrition Education duties now within your unit?

22      A.    Kirk Hassel and John Pedicini, and I need

23  to amend that also.  We have a Grade 7 career ladder

24  employee that was just hired recently that works for

160

1   occurrences at that meeting.

2       A.    Without recalling specifics, the indication

3   was that -- and again I'm using what they said --

4   that they felt extremely sorry for me being in that

5   position, that individuals were acting very

6   unprofessionally.

7       Q.    Individuals?  They just said the word

8   individuals?  Did they name people?

9       A.    They named people.

10      Q.    Who did they name?

11      A.    Mr. Pedicini and Mr. Hines.

12      Q.    Okay.  So they named Mr. Pedicini and

13  Mr. Hines as acting very unprofessionally at that

14  meeting?

15      A.    Yes.

16      Q.    Okay.  And what else did they say?

17      A.    That my attempts try to move forward and

18  not discuss issues that should not be discussed in a

19  public forum was very appropriate and that

20  statements that were made by the individuals

21  mentioned in their minds was showing obvious

22  insubordination.  This is their statements.  I'm not

23  stating that fact.

24      Q.    No, I'm just asking you what they said.

200

1    employee meeting that awards were given that I felt

2    like that the Nutrition Ed. team should be given one

3    and that included Kirk Hassel and John Pedicini.

4         Q.    Did Kirk Hassel receive an award in 2004?

5         A.    Not for Nutrition Education.  I don't

6    recall him receiving one, but I did nominate him for

7    an award in 2004.

8         Q.    Did you tell Mr. MacAllister informally

9    that you thought John Pedicini should get an award

10   for what he did with Nutrition Ed.?

11        A.    I believe that I told him the conversation

12   that I had with the Food Stamp Program section chief

13   and that I -- we both concurred that -- the Food

14   Stamp section chief and I both concurred that the

15   team should be nominated for an award.

16        Q.    And anybody can actually nominate somebody

17   for an award, right?

18        A.    That's correct.

19        Q.    And why did you not nominate John Pedicini

20   for an award if you could have?

21        A.    There's not been an award ceremony since

22   the complete process was finished in the year

23   that -- to my knowledge, the last award ceremony we

24   had was in October of 2004.

201

1       Q.    Right.

2       A.    And the next time that an award came up --

3    because the process was not complete.  The states

4    submit plans and in reviewing the plans and doing

5    the reviews, John found -- had the findings but we

6    wait until the entire process was completed, so it

7    was never indicated that there would not be a

8    nomination.  It was all a timing issue.

9       Q.    I see.  So it's your intention to nominate

10   John for an award this year then for those

11   accomplishments?

12      A.    It's my intention to reiterate with the

13   Food Stamp section chief, which I did recently this

14   year within the last couple months, that I felt

15   like, you know, let's don't forget this, that the

16   team needs to be nominated and he agreed.

17      Q.    So it's your intention to have John

18   nominated then for such an award this year, correct?

19   Whether it's by you or by somebody else, it's your

20   intention to have him nominated, correct?

21      A.    Yes, I would like to see that happen.

22      Q.    Okay.

23            MR. CATAPANO-FRIEDMAN:  Okay.  We are done.

24   We're only a few minutes late.  I apologize.

202

1          MR. WILMOT:  All right.  Give me about two

2     minutes.  Hopefully I won't have any questions.

3          (Recess taken)

4                   CROSS EXAMINATION

5     BY MR. WILMOT:

6          Q.    I'm going to just try to fly through these

7     as quick as possible but just some minor things I

8     don't think we touched on.  You testified earlier

9     about the time that you were asked to assume these

10    FSP/IF duties and responsibilities.  Do you remember

11    that?

12         A.    Yes, I do.

13         Q.    Did your pay change at all when you assumed

14    those responsibilities?

15         A.    No, it did not.

16         Q.    It remained the same or has it gone down?

17         A.    It's remained the same.

18         Q.    Letters of instruction, are these a form of

19    discipline?

20         A.    No, they are not.

21         Q.    Where are they kept, do you know?

22         A.    They are only kept by the supervisor and in

23    my case just in my locked cabinet but not put in any

24    employee personnel file.

E R R A T A   S H E E T

RECEIVED
U.S. ATTORNEY
05 AUG -8 PM 4:30

| Page | Line | Corrections |
|------|------|-------------|
| 39 | 17 | SHOULD BE 2005 NOT 2002 |
| 132 | 6 | ANSWER - JANICE SCIARAPPA |
| 161 | 4 | ANSWER - NO |
| 193 | 7 | ANSWER - KIRK HASSEL AND GERALYN WADDINGTON |

# EXHIBIT 6

1

Volume I
Pages 1 to 39
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
JOHN G. PEDICINI,                  :
          Plaintiff,               :
                                   :
     vs.                           :   Civil Action
                                   :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and      :
ANN M. VENEMAN, SECRETARY,         :
UNITED STATE DEPARTMENT OF         :
AGRICULTURE,                       :
          Defendants.              :
                                   :
- - - - - - - - - - - - - - - - - -x

          DEPOSITION OF DOUGLAS MacALLISTER, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Monday, June 6, 2005, commencing
at 4:06 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA  02110, for
          the Plaintiff.


          (Continued on Next Page)

7

1    Agriculture, Food and Nutrition Service.  I'm

2    employed in the northeast regional office.

3        Q.    How long have you been in the northeast

4    regional office?

5        A.    Since May of 1976.

6        Q.    And what's your current position?

7        A.    I am the director for financial management.

8        Q.    And how long have you held that position?

9        A.    I believe it will be 16 years this month.

10       Q.    So that's since 1989?

11       A.    Yes.

12       Q.    Can you tell us what your duties are as the

13   director of the financial management unit?

14       A.    I manage the information technology

15   section, the support services section, the financial

16   management section, to include the accounting, the

17   budgeting, grants management, report analysis.

18   Basically I'm overall responsible for putting

19   together the work plans that meet the goals and

20   requirements and aims of the agency.

21       Q.    And as part of your duties, are you

22   authorized to delegate certifying of funds

23   authority?

24       A.    Yes, I am.

10

1   that gives you the right to delegate to other

2   employees this authority, correct?

3       A.   Not explicitly, correct.

4       Q.   But you do have in writing the delegation

5   to you to certify funds?

6       A.   Yes, I do.

7       Q.   And this is because you have the ability to

8   do so, to certify funds, correct?

9       A.   Yes.

10      Q.   And your current administrator, Frances

11  Zorn, delegated to you the authority to certify

12  funds, correct?

13      A.   Yes, she did.

14      Q.   Who else in the northeast region of FNS has

15  the authority to certify funds?

16      A.   The funds officer, who currently is Marty

17  Hines; the supervisor to the funds officer in his

18  absence; and then myself.

19      Q.   And who is the supervisor to the funds

20  officer?

21      A.   Currently it's Mr. Michael Malone.

22      Q.   And in the past who was it?

23      A.   Art LeBlanc, Joe Stanco.

24      Q.   And all of you know how to certify funds?

2-1

Volume II
Pages 2-1 to 2-267
Exhibits 47 to 67

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
JOHN G. PEDICINI,                    :
            Plaintiff,               :
                                     :
        vs.                          :   Civil Action No.
                                     :   04-12395 JLT
UNITED STATES OF AMERICA, and        :
ANN M. VENEMAN, SECRETARY,           :
UNITED STATES DEPARTMENT OF          :
AGRICULTURE,                         :
            Defendants.              :
- - - - - - - - - - - - - - - -x

        CONTINUED DEPOSITION OF DOUGLAS A.
MacALLISTER, a witness called on behalf of the
Plaintiff, taken pursuant to the Federal Rules of
Civil Procedure, before Susan J. Cataldo, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of Doris
O. Wong Associates, Inc., 50 Franklin Street, Boston,
Massachusetts, on Friday, July 15, 2005, commencing at
10:13 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (by Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.

    United States Department of Justice,
        United States Attorney's Office
        (by Damin Wilmot, Assistant United States
        Attorney) United States Courthouse,
        1 Courthouse Way, Suite 9200,
        Boston, MA 02210, for the Defendants.

Also Present:  John G. Pedicini

                *  *  *  *  *



2-58

1    rights, and I hadn't formally put a letter out.  So

2    we wanted to make sure that we made it absolutely

3    crystal clear to everybody that Mr. Malone had all

4    the rights and responsibilities of the supervisor of

5    the Food Stamp program internal finance system

6    Section G. That's why that letter --

7        Q.    Right.

8        A.    -- was issued.

9        Q.    Because Mr. Malone at that juncture was the

10   section chief of internal finance at FNS NERO,

11   correct?

12       A.    He was a section chief for a hybrid section

13   on an interim basis, as he is now, for information

14   technology, Food Stamp program and internal finance

15   system section, yes.

16       Q.    Okay.  Had Mr. Malone been officially given

17   the position of section chief, internal finance, on

18   the date of his e-mail to you?

19       A.    Prior to that he had been assigned that

20   function, yes, that role.

21       Q.    That function, but had he been given that

22   position, that title?

23       A.    Are you saying does he hold two PDs?  No,

24   he doesn't hold two position descriptions.  His

2-59

1    formal position description is a supervisory

2    computer specialist for the information technology

3    support services section.

4        Q.    Okay.  Does Mr. --

5        A.    That's the PD that he -- that is his PD.

6        Q.    Okay.

7        A.    His formal PD.

8        Q.    As you sit here today, does Mr. Malone have

9    the official or working title of section chief,

10   internal finance, as part of his official or working

11   title?

12       A.    Mr. Malone occupies the position of Food

13   Stamp program IFS section chief, and he also is the

14   section chief for information technology.  Yes, he

15   occupies that position.

16            (Mr. Pedicini and Mr. Catapano-Friedman

17            confer)

18       Q.    So his working title includes section

19   chief, IF, correct?

20       A.    It certainly could, yeah, absolutely.

21   That's what he's doing.

22       Q.    So if Mr. Malone has consistently been

23   using as part of his title on written documentation

24   section chief, IF, he's entitled to use that title,

2-72

1    organization, but, no.

2        Q.    Can you tell me what educational background

3    he had regarding doing audits?

4        A.    No.  I don't have any, and I'm the

5    financial director.

6        Q.    Can you tell me what educational background

7    he had doing grants?

8        A.    Educational background, no, I can't.  I

9    know he had some experience with Treasury because we

10   talked about it.

11       Q.    Has Mr. Malone come to you saying he feels

12   he needs more training in doing financial reviews?

13       A.    Yes, he has.

14       Q.    When has he -- when did he come to you

15   saying he needed more training?

16       A.    I don't specifically recall, but it's since

17   he was assigned that he has now.

18       Q.    Well, didn't he come to you even in the

19   beginning right up front and tell you he needed more

20   training doing financial reviews?

21            MR. WILMOT:  Objection.  You can answer.

22       A.    We had a number of discussions -- and when

23   I say "we," I'm talking about Roger Hamilton,

24   Michael Malone and myself -- in regards to how to

2-73

1    handle the financial organization given that we were

2    having an IT restructure and we had no idea how the

3    IT restructure was going to end up, so we suspended

4    filling the 13 for the FSP/IFS job.  And amongst the

5    three of us, we discussed how we wanted to handle

6    the functions and assignments within the

7    organization unit.  After several meetings and

8    discussions, we decided on the arrangement we have

9    now.

10          Mr. Hamilton took his own section and took

11   over support services.  Mr. Malone, besides

12   maintaining his IT function, took the vacant section

13   that Mr. Stanco had retired from and took the

14   responsibilities.  At that time we discussed

15   significantly issues in regards to helping

16   Mr. Malone become more familiar with the financial

17   arena and also helping Mr. Hamilton become more

18   familiar with the support services arena which

19   Mr. Malone had a better background in where he came

20   from, and we also talked about helping Mr. Malone

21   understand a little bit better the budget function.

22   We talked about potential future training in order

23   to help Mr. Malone be more familiar with the

24   financial arena, and we also talked about using

2-74

1  Mr. Hamilton as a crossover in assistance to Mr.

2  Malone to provide him his expertise, and it's worked

3  out extremely well.  And Mr. Hamilton has done that

4  on a number of occasions as well as helping to cross

5  train -- help Mr. Malone understand the financial

6  arena, and so far as far as I'm concern it's working

7  out real -- as well as it can be expected to work

8  out given I cannot fill that position.

9       Q.    When you say "we discussed these matters,"

10  who is -- who are you referring to?

11       A.    As I said, the direct discussions were

12  Roger Hamilton, Michael Malone and myself.  Nothing

13  I do in my section can be done in a vacuum.  It has

14  to be taken up to the front office and discussed

15  with the front office for agreement by the front

16  office.  It was taken up to the front office.  It

17  was discussed in the front office, and the front

18  office agreed with this approach.

19       Q.    When you say "the front office," who are

20  referring to?

21       A.    Both the regional administrator and the

22  deputy regional administrator were involved in these

23  discussions or the acting deputy if there was an

24  acting deputy.  We don't know that.

2-75

1    Q.    And who were those?

2    A.    Frances Zorn and John Ghiorzi, if he was

3    still around.

4    Q.    And did they concur with your

5    recommendation to provide Mr. Malone with these

6    functions?

7    A.    I wouldn't be doing it if they didn't.

8    Yes, they did.

9    Q.    Okay.  Did you discuss with them the fact

10   that Mr. Malone needed some training and was light

11   in background and experience in the financial area?

12   A.    We discussed our plan for total coverage of

13   financial management which would include those

14   kinds of things for not just Mr. Malone but for

15   Mr. Hamilton in his new functions and assignments

16   and also how you would cross over the gap and assist

17   both of them in that arena and what the front office

18   could do for us to make sure that we transitioned

19   and kept operations as smooth as possible during

20   this particular period of time which was an

21   undefined period of time.

22   Q.    Okay.  And can you -- you said you could

23   not fill the position at that time.  Can you tell me

24   why you could not fill it?

2-76

1    A.   Well, it's called the luck of the draw.  As

2    we were in the middle of trying to fill it, we had

3    an IT restructure come out, basically A-76

4    realignment and all that kind of thing.  And there

5    was -- the whole IT function in the agency was

6    decided to be looked at for a decision on whether we

7    could contract it out, whether we could do things

8    more efficiently, et cetera.

9         So in the middle of a recruitment for the

10   13 in the FSP/IFS section we realized that there

11   might be a decision that we didn't need an IT 13

12   section chief, so we suspended -- in discussions

13   with the front office, it was decided that the best

14   course of events would be to suspend the recruitment

15   for the 13.  Since I had two 13 supervisors already

16   on board, suspend the 13 in the FSP/IFS section,

17   that we would discuss some kind of an accommodation

18   and arrangement to handle FM until the IT

19   infrastructure report and decision was made, and

20   then based on that report and decision would revisit

21   the issue.

22   Q.   Did headquarters tell you that you could

23   not fill the section chief, internal finance, Food

24   Stamp program position?

2-77

1    A.   It's not a headquarters decision.  It's a

2    regional decision.  They did not tell us that.

3    Q.   Okay.  So this was a position that you, in

4    fact, could have filled, correct?

5    A.   No --

6    MR. WILMOT:  Objection.

7    A.   -- because my regional administrator told

8    me I couldn't.

9    MR. WILMOT:  Objection to the question.

10    Q.   Your regional administrator had the

11    authority to fill that position, correct?

12    MR. WILMOT:  Objection.  You can answer.

13    A.   The regional administrator has a ceiling

14    with which they work, and they decide what positions

15    are filled within that ceiling especially if you

16    have a structure that exceeds the ceiling that you

17    have based on goals and objectives of the agency,

18    priorities, et cetera.  They make a determination

19    when a vacancy comes up whether it gets filled right

20    away, gets filled later.  They make a determination

21    if they want to restructure, the position goes away,

22    a new position comes up.  Basically that's what they

23    did, in conjunction hopefully with the rest of their

24    managers.

2-78

1        Q.    And who provides that ceiling to the

2    regional administrator?

3        A.    Headquarters, Food and Nutrition Services

4    in headquarters.

5        Q.    Okay.  Did headquarters in providing that

6    ceiling to Ms. Zorn tell Ms. Zorn she could not fill

7    the position of section chief, internal finance,

8    Food Stamp program?

9        A.    No, they did not.

10       Q.    And Ms. Zorn decided not to fill that

11   position because she feared that because of an IT

12   restructuring she might in the future have the

13   section chief of IT position eliminated; is that

14   correct?

15            MR. WILMOT:  Objection.  You can answer.

16       A.    It's unfair to characterize that Ms. Zorn

17   made the decision that that position would not be

18   filled.  The management team made a decision that

19   the best course of action would be to suspend

20   filling that position for the time being, that we

21   would handle it the way that we are currently

22   handling it, that we would revisit it after the IT

23   infrastructure was determined and/or implemented

24   again depending on what happens and then redecide

2-79

1    how the regional office and financial management

2    needs to be structured.

3        Q.    Okay.  Can you name me the individuals who

4    made that decision?

5        A.    I can name you the people who discussed it

6    and made various positions and that in the end we

7    all agreed this is the way we're going to go, not

8    neces -- some kicking and screaming, some not

9    kicking and screaming.  There was myself.  There was

10    Roger Hamilton.  There was Mike Malone.  There was

11    the deputy regional administrator, and there was the

12    regional administrator, the personnel officer, and I

13    think that's it.  I was going to say EEO civil

14    rights, but I don't think --

15        Q.    Can you name --

16        A.    -- he was involved.

17        Q.    -- those people whose positions you named?

18            MR. WILMOT:  Before you answer, could we go

19    off the record for a moment.

20            (Discussion off the record)

21            MR. CATAPANO-FRIEDMAN:  Back on the record.

22        Q.    Can you name those individuals whose

23    positions you just named?

24        A.    I'll try to go back to that time.  I don't

1    think any of them -- well, Ghiorzi is retired.  Fran

2    Zorn, regional administrator; John Ghiorzi, deputy

3    regional administrator; Roger Hamilton, FM section

4    chief; Mike Malone, FM section chief; Doug

5    MacAllister, director of financial management; and

6    Peggy Mann, personnel officer or personnel liaison

7    officer.  I don't specifically know her title.

8        Q.    Okay.  And you said some people agreed to

9    this decision kicking and screaming, correct?

10       A.    I believe I phrased it that way, yes.  What

11   I was saying was --

12       Q.    Could you tell me --

13       A.    Yeah, I can --

14           MR. WILMOT:  You're doing it again there.

15   Could you let him finish his answer.

16           MR. CATAPANO-FRIEDMAN:  No.  I think he did

17   answer it.

18       Q.    Can you tell me what you -- can you tell me

19   who agreed to this decision kicking and screaming

20   and what you mean by "kicking and screaming," which

21   I think you were going to do anyway.

22       A.    Okay.  Kicking and screaming just means

23   that some of us didn't agree to all of it.  I kicked

24   and screamed about some of it.  I'm sure Peggy was

2-85

1    A.   It's not -- again, I think you're

2  mischaracterizing Ms. Zorn's position.  Based on

3  goals and objectives that the agency had and the

4  fact that we have resource requirements in other

5  areas, I know that we discussed that she did not

6  feel comfortable that, at this juncture, that to

7  meet her goals and objectives filling that

8  particular position was a priority position, so

9  other positions have be filled in the interim to

10  meet the agency's goals and objectives, her

11  decision.

12    Q.   When did the IT restructuring occur,

13  finalize itself?

14    A.   Let's see.  March of 2004 we were in a war.

15  I want to say the final report came out, I'm going

16  to say, September of 2004.

17    Q.   And who was the regional administrator at

18  that time?

19    A.   Fran Zorn.

20    Q.   And after that report came out, did you go

21  to Ms. Zorn and ask for permission to fill the

22  section chief, internal finance, Food Stamp program

23  position?

24    A.   Not then, no.

2-95

1    recruitment, that I would be returning back their

2    register of merit federal employees.  Two days later

3    I got the outside register, which is a separate

4    register.  It usually takes a little longer to go

5    through.  I returned that unopened.

6        Q.    Can you tell me how many times this

7    position was posted following Mr. Stanco's

8    retirement?

9        A.    Once.  My recollection is once.

10       Q.    Are you sure it wasn't three times?

11       A.    My recollection is once.

12       Q.    So you have no recollection of it having

13   been posted more than once?

14       A.    Unless we made a mistake which we've done

15   in the past and the announcement was incorrect and

16   it was reannounced, we only posted it once.  We only

17   went to recruit it one time.  Whether headquarters

18   made a mistake and had to reissue it and extend the

19   timelines, I don't recall, but we only went out to

20   recruit for it one time.

21       Q.    And can you tell me whether Mr. Malone

22   applied for this position when it was --

23       A.    I cannot.

24       Q.    -- posted for recruitment?

2-96

1       A.    I cannot.

2       Q.    But I thought you said his name was on a

3  list of qualified candidates.  Is that not correct?

4       A.    I don't remember mentioning Mr. Malone's

5  name.  Perhaps --

6            MR. CATAPANO-FRIEDMAN:  Could you --

7       A.    -- let's reconsider.

8            MR. CATAPANO-FRIEDMAN:  Could you read back

9  that portion, please, for us.

10           (Discussion off the record)

11      A.    Maybe I can help you.  You're confusing the

12  panel.  Mr. Malone was on the panel to discuss the

13  applicants.  Mr. Malone never applied.

14      Q.    Oh, he never applied?

15      A.    Right.  He was -- Roger Hamilton, Mike

16  Malone, Lou May, myself were panel people to discuss

17  with the applicants.

18      Q.    Oh, okay.  I see.  Okay.  And do you recall

19  who was on the list of those seven or eight who were

20  qualified?  Did I misunderstand you that there were

21  seven or eight --

22      A.    Yeah.

23      Q.    -- on a list?

24      A.    I can name some of them.  I don't remember

2-97

1    all of them.  Would you like me to name the ones I

2    remember?

3        Q.    If you would.

4        A.    Basically I remember the internal

5    candidates because the other people, it's been so

6    long.  Pauline Driscoll, Julie Larkin, Kirk Hassel

7    and Bruce Potvin, I believe.

8            THE WITNESS:    Bruce P-o-t-v-i-n.

9        A.    I believe Mr. Hassel was on the register.

10    He might not have been.  He was on another register

11    I had before, and I could be confusing that

12    register.  There was a candidate from Baltimore, I

13    don't remember her name, who when I called her to

14    confirm that we had put on our announcement that we

15    didn't pay moving expenses she withdrew her name

16    immediately, because she thought, you know, that we

17    paid moving expenses.  Other than that, there were

18    either two or three other external candidates.  I

19    don't remember who they were.

20            (Mr. Pedicini and Mr. Catapano-Friedman

21            confer)

22        Q.    Now, was your testimony that Pauline

23    Driscoll was on the internal list of candidates?

24        A.    I think she was.  If I'm wrong, I'm wrong.

2-99

1   in a position one grade lower from the position

2   that's being recruited.

3       Q.   Okay.  Did Bruce -- oh, I'm sorry.  Did I

4   interrupt you, or were you going to say anything

5   further or can I move on to my next question?

6       A.   No.  Go ahead.  Nothing else important.

7       Q.   Did Bruce Potvin meet with you regarding

8   his application to be IF, FSP section chief?

9       A.   If I'm correct about him being on the list,

10  he would have because I interviewed everybody on

11  that list before we suspended the job, yes.

12      Q.   And Pauline Driscoll, do you know what

13  grade she is?

14      A.   Pauline is an 11, and that's why I think I

15  may have misspoke about Pauline.

16      Q.   So she could not have been on the merit

17  promotion?

18      A.   Unless she had other federal experience at

19  the grade 12, correct, she couldn't be.

20      Q.   Okay.  And is it your testimony that you

21  never looked at the external list for the position?

22      A.   I returned it unopened.  They had already

23  made a decision not to recruit.

24      Q.   So you never --

2-197

1    recognize the document.

2        Q.    Okay.  And this is a series of e-mails

3    either to you or in which you're copied?

4        A.    Yes.

5        Q.    Okay.  And it refers to Mr. Pedicini's

6    request to have Marty Hines present in your March

7    meeting with Mr. Pedicini, correct?

8        A.    Yes.

9        Q.    And Mr. Pedicini in there insists upon

10   having Mr. Hines present, and you insist that he not

11   be present, correct?

12       A.    Yes.

13       Q.    And, in fact, you never changed your

14   position regarding whether Mr. Hines could or could

15   not be present, correct?

16       A.    Correct.

17       Q.    Correct.  And, in fact, Mr. Hines was not

18   allowed to attend the meeting, correct?

19       A.    Correct.

20       Q.    Okay.  You denied him being present,

21   correct?

22       A.    Correct.

23       Q.    Okay.  Who was at the meeting?

24       A.    Joe Stanco, John's first line supervisor,

2-198

1    myself and John.

2        Q.    Pedicini?

3        A.    Yes.

4        Q.    Okay.  And did the meeting take place on

5    March 10, 2003?

6        A.    To my recollection, yes.

7        Q.    Okay.  And what occurred at the meeting?

8        A.    We started to discuss FFIS in relationship

9    to IAS, Federal Foundation Information System, and

10   IAS is Integrated Acquisition System.  IAS was new.

11   The agency was going to implement that system during

12   the course of the year.  The purpose for the meeting

13   was to discuss with John Pedicini his functions in

14   FFIS, how we saw them relating to IAS, so that we

15   could make a determination on how we wanted to

16   implement IAS in the Northeast Regional Office.

17       Q.    Okay.

18       A.    The questions I asked him were in

19   relationship to some functions he performed in FFIS

20   so that we could determine how they might relate or

21   transfer to IAS.

22       Q.    Okay.  Can you tell me what specific

23   questions you asked Mr. Pedicini?

24       A.    I don't recollect them specifically, but I

3-1

Volume III
Pages 3-1 to 3-80
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
     vs.                        :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          CONTINUED DEPOSITION OF DOUGLAS
MacALLISTER, a witness called on behalf of the
Plaintiff, taken pursuant to the Federal Rules of
Civil Procedure, before Jane M. Williamson,
Registered Merit Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the
Offices of Doris O. Wong Associates, 50 Franklin
Street, Boston, Massachusetts, on Friday, August 19,
2005, commencing at 1:05 p.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Damian W. Wilmot, Assistant United
          States Attorney) John Joseph Moakley
          Federal Courthouse, 1 Courthouse Way,
          Suite 9200, Boston, MA  02210, for the
          Defendants.

Also Present:  John Pedicini

3-52

1    A.    The determination was that we had called --

2    I had called a meeting and requested Mr. Pedicini to

3    meet with myself and Mr. Stanco.  And I had asked --

4    the purpose of the meeting was to ask him about his

5    current functions in FFIS, to discuss IAS, so that

6    we could get some information -- the IAS system was

7    new.  It was going to be implemented within the

8    agency.  It required procurement people involved.

9    It required that management and supervision be there

10   to certify requisitions, and it required that the

11   budget people be part of the system, so that

12   commitments and obligations could be done and

13   payments could be made once these things were

14   procured.

15        Basically we were meeting to discuss

16   functions, so we could see what the carryover was,

17   because the IAS information was to feed into the

18   FFIS system.  And I asked him just questions about

19   what he was doing in FFIS currently.  And I asked

20   him I think three or four, and I got a no answer, no

21   answer, no answer, and then I suspended the meeting.

22   Q.    Was the fact that Mr. Pedicini engaged or

23   was involved in EEO activities within the agency a

24   reasonable factor in your decision to issue him this

3-53

1    instruction?

2        A.    No, it was not.

3        Q.    Was this instruction placed in Mr.

4    Pedicini's personnel file?

5        A.    No, it was not.

6        Q.    What effect, if any, does or did this

7    instruction have on Mr. Pedicini's salary?

8            MR. CATAPANO-FRIEDMAN:    Objection.    You can

9    answer.

10        A.    Nothing.    No effect at all.

11        Q.    What effect, if any, does or did this

12    instruction have on Mr. Pedicini's performance

13    ratings?

14            MR. CATAPANO-FRIEDMAN:    Objection.    You can

15    answer.

16        A.    I don't believe it affected his performance

17    rating at all.

18        Q.    What effect, if any, does this instruction

19    have on Mr. Pedicini's ability to receive promotions

20    within the agency?

21            MR. CATAPANO-FRIEDMAN:    Objection.    You can

22    answer.

23        A.    None.

24        Q.    What effect, if any, does this instruction

3-54

1    have on Mr. Pedicini's ability to be nominated for

2    or receive some type of recognition award?

3             MR. CATAPANO-FRIEDMAN:   Objection.

4        A.    None.

5        Q.    Prior to this meeting that is described in

6    this letter in the meeting that you've testified to

7    that was I believe on March 10, 2003, when did you

8    learn that Mr. Pedicini had filed an EEO complaint

9    against the agency?

10       A.    I would still say that morning before the

11   meeting.

12       Q.    Now, I believe previously plaintiff's

13   counsel showed you an email showing you that Mr.

14   Pedicini had emailed you some type of notice that he

15   had filed an EEO complaint prior to the morning of

16   that meeting.

17            Can you explain why your answer is still

18   that you didn't know until the morning of the

19   meeting.

20       A.    Because even with an email sent to me --

21   and presuming I read it, which I do presume -- it

22   did not strike me that there was anything of an EEO

23   matter in that message.

24       Q.    I'm showing you what's been marked as

3-55

1    Plaintiff's Exhibit No. 21.   This I believe you

2    testified to before.   And this has to do with Mr.

3    Pedicini's use of the title "Alternate Funds

4    Officer/NERO."   What was your role in the issuance

5    of this letter of instruction?

6        A.   Basically the deputy regional administrator

7    called me in, mentioned to me that he had received

8    the document from Mr. Pedicini that used that title

9    under his name, and that he was not aware there was

10   such a title; was there such a title.   And I

11   mentioned to him I was not aware there was such a

12   title.   He said, "Would you please go to his

13   supervisor, discuss this and take care of it.   We

14   can't have people using titles that they're not --

15   using bogus titles on correspondence."

16       Q.   And what did you do?

17       A.   I took it back to Mr. Malone.   Basically we

18   discussed it and decided that it would be

19   appropriate to caution or give a letter of -- I

20   forget what they call this -- to not use the title

21   again.

22       Q.   When you discussed with your deputy

23   regional administrator the issuance of the letter of

24   instruction, did you discuss Mr. Pedicini's prior

3-56

1    involvement in EEO activities within the agency?

2        A.   No, I did not.

3        Q.   Was the fact that Mr. Pedicini was engaged

4    in EEO activities within the agency a reasonable

5    factor in the decision to issue him this instruction

6    that's been marked as Plaintiff's Exhibit 21?

7            MR. CATAPANO-FRIEDMAN:  Objection.  You can

8    answer.

9        A.   No, it was not.

10       Q.   Do you know whether this instruction was

11   placed in Mr. Pedicini's personnel file?

12       A.   As a letter of instruction, I believe it is

13   not.

14       Q.   What effect, if any, does or did this

15   letter of instruction have on Mr. Pedicini's salary?

16           MR. CATAPANO-FRIEDMAN:  Objection.  You can

17   answer.

18       A.   None.

19       Q.   What effect, if any, does or did this

20   instruction have on Mr. Pedicini's performance

21   ratings?

22           MR. CATAPANO-FRIEDMAN:  Objection.

23       A.   None that I'm aware of.

24       Q.   What effect, if any, does or did this

3-57

1  instruction have on Mr. Pedicini's ability to

2  receive promotions within the agency?

3         MR. CATAPANO-FRIEDMAN:  Objection.

4      A.    None.

5      Q.    What effect, if any, does or did this

6  instruction have on Mr. Pedicini's ability to be

7  nominated for or receive some type of recognition

8  award within the agency?

9         MR. CATAPANO-FRIEDMAN:  Objection.

10     A.    None.

11     Q.    I show you what's been marked as

12 Plaintiff's Exhibit No. 16.  This is the letter of

13 instruction dated October 13, 2004 issued to Mr.

14 Pedicini for making the comment that he will

15 relinquish his nutrition education duties.

16         Whose decision was it to issue Mr. Pedicini

17 this instruction?

18     A.    In discussions with Mr. Malone, we agreed

19 Mr. Malone issue the instruction that an instruction

20 was necessary.

21     Q.    Why did you believe that it was necessary?

22     A.    Because individuals cannot be allowed to

23 decide for themselves the functions they are or are

24 not going to do, and to make a statement in front of

3-58

1    other staff to the effect that they were not was not

2    acceptable to the organization.

3        Q.    When you had this discussion with Mr.

4    Malone, did you discuss Mr. Pedicini's prior

5    involvement in EEO activities within the agency?

6        A.    No, we did not.

7        Q.    Was the fact that Mr. Pedicini engaged and

8    was involved with EEO activities in the agency a

9    reason or a factor in your decision to issue him

10   this letter of instruction?

11        MR. CATAPANO-FRIEDMAN:    Objection.    You can

12   answer.

13        A.    No, it was not.

14        Q.    And was this instruction placed in Mr.

15   Pedicini's personnel file?

16        A.    Again, it being a letter of instruction, it

17   should not have been.    No, it was not.

18        Q.    What effect, if any, does or did this

19   letter of instruction marked as Plaintiff's Exhibit

20   No. 16 have on Mr. Pedicini's salary?

21        MR. CATAPANO-FRIEDMAN:    Objection.

22        A.    None.

23        Q.    What effect, if any, does or did this

24   instruction have on Mr. Pedicini's performance

3-59

1    ratings?

2             MR. CATAPANO-FRIEDMAN:  Objection.

3        A.   None.

4        Q.   What effect, if any, does or did this

5    instruction have on Mr. Pedicini's ability to

6    receive promotions within the agency?

7             MR. CATAPANO-FRIEDMAN:  Objection.

8        A.   None.

9        Q.   What effect, if any, does or did this

10   instruction have on Mr. Pedicini's ability to be

11   nominated for or receive some type of recognition

12   award within the agency?

13            MR. CATAPANO-FRIEDMAN:  Objection.

14       A.   None.

15       Q.   I show you what's been marked as

16   Plaintiff's Exhibit No. 18.  This is the letter of

17   instruction that was issued to Martin Hines by Mr.

18   Malone for his comments in the October 7, 2004

19   meeting, specifically that he will not train anyone

20   on the budget analyst functions except for Mr.

21   Pedicini.  Whose decision was it to issue this

22   instruction?

23       A.   Again, Mr. Malone and I met.  We discussed

24   it.  We felt that statements like this in front of

3-62

1   concerning this letter of instruction?

2       A.   No, it was not.

3       Q.   Was the fact that Mr. Hines was engaged or

4   involved with EEO activities in the agency a reason

5   or factor in your decision to issue him this letter

6   of instruction?

7            MR. CATAPANO-FRIEDMAN:   Objection.

8       A.   No, it was not.

9       Q.   Was this letter of instruction placed in

10  Mr. Hines' personnel file?

11      A.   No, it was not.

12      Q.   Was the fact that Mr. Hines has a personal

13  relationship with Mr. Pedicini a consideration in

14  your decision to issue Mr. Hines this letter of

15  instruction?

16           MR. CATAPANO-FRIEDMAN:   Objection.

17      A.   No, it was not.

18      Q.   I show you what's been marked as

19  Plaintiff's Exhibit No. 25.  This has been

20  previously identified as a letter of referral given

21  to Mr. Pedicini from Michael Malone.  It is dated

22  October 18, 2004.  It's a referral to Employee

23  Assistance Counseling.

24           Did you have any role in the issuance of

3-63

1    this letter?

2        A.    Mr. Malone and I discussed basically

3    whether or not it was now appropriate to just try

4    and help Mr. Pedicini in regards to making -- in

5    regards to understanding the organization.  And

6    maybe one of the things that might help is if we

7    referred him to an employee assistance program on a

8    voluntarily basis.  That's what supervisors are

9    basically tasked to do, and it's one of their

10   functions, is to make recommendations and

11   suggestions to staff to help them within the

12   organization.

13          Mr. Malone determined that he would like to

14   make that recommendation, and I concurred.

15       Q.    Was the fact that Mr. Pedicini was engaged

16   or was involved with EEO activities within the

17   agency a reason or factor in the decision to issue

18   him this letter of referral to Employee Assistance

19   Counseling?

20          MR. CATAPANO-FRIEDMAN:  Objection.

21       A.    No, it was not.

22       Q.    What effect, if any, does this letter of

23   referral have on Mr. Pedicini's salary?

24          MR. CATAPANO-FRIEDMAN:  Objection.

3-64

1    A.    None.

2    Q.    What effect, if any, does this referral

3    have on Mr. Pedicini's performance ratings?

4         MR. CATAPANO-FRIEDMAN:  Objection.

5    A.    None.

6    Q.    What effect, if any, does this referral

7    have on Mr. Pedicini's ability to receive promotions

8    within the agency?

9         MR. CATAPANO-FRIEDMAN:  Objection.

10    A.    None.

11    Q.    What effect, if any, does this referral

12    have on Mr. Pedicini's ability to be nominated for

13    or receive some type of recognition award within the

14    agency?

15         MR. CATAPANO-FRIEDMAN:  Objection.

16    A.    None.

17         MR. WILMOT:  That's all I have.

18         MR. CATAPANO-FRIEDMAN:  I have a few

19    follow-up, but I think we'll be done soon.

20                   REDIRECT EXAMINATION

21    BY MR. CATAPANO-FRIEDMAN:

22    Q.    Do you know whether Julie Larkin or Anne

23    Bellezza were instructed to put together a training

24    program for their positions following the October 7,

# EXHIBIT 7

1

Volume I
Pages 1 to 106
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
          Plaintiff,            :
     vs.                        :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF JOHN J. GHIORZI, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Thursday, June 23, 2005,
commencing at 10:05 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Gina Y. Walcott-Torres, Assistant
          United States Attorney) United States
          Courthouse, 1 Courthouse Way, Suite 9200,
          Boston, MA  02210, for the Defendants.

Also Present: John G. Pedicini
          Salama Abdurrahim, summer intern.

11

1          MR. CATAPANO-FRIEDMAN:  To read and sign.

2    Okay.

3       BY MR. CATAPANO-FRIEDMAN:

4       Q.   Do you understand that, what that means?

5    In other words, you can review the transcript.  You

6    have 30 days to send it back with any corrections

7    that you have.

8       A.   Okay.

9       Q.   I will send it to you, and you have to sign

10   it or send it back with corrections.

11      A.   Okay.

12      Q.   If you don't do that within 30 days, then

13   it will be assumed that everything in the transcript

14   is correct.

15      A.   Okay.

16      Q.   Do you understand that?

17      A.   Yes.

18      Q.   Fine.  Mr. Ghiorzi, what was your position

19   at USDA FNS?

20      A.   I had several positions.  The last one

21   before I retired was deputy regional administrator.

22      Q.   When did you hold those positions?

23      A.   I resigned -- I mean, I retired on January

24   2 of '04, and I had the position two and a half

# EXHIBIT 8

1

Volume I
Pages 1 to 195
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                              :
JOHN G. PEDICINI,            :
        Plaintiff,       :
                              :
     vs.                  :  Civil Action
                           :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and  :
ANN M. VENEMAN, SECRETARY,    :
UNITED STATE DEPARTMENT OF     :
AGRICULTURE,               :
        Defendants.      :
                              :
- - - - - - - - - - - - - - - -x

       DEPOSITION OF ROBERT L. CANAVAN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Tuesday,
June 7, 2005, commencing at 11:09 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.

       (Continued on Next Page)

7

1  follow his instructions, whatever they might be.

2      Now, if you don't understand a question

3  that I ask, I would like you to tell me that you

4  don't understand the question, so that I can

5  rephrase it in a way that you do understand it,

6  because it's very important that you understand my

7  questions, so that you can respond to them in an

8  appropriate fashion.  Do you understand that, sir?

9      A.    Yes, I do.

10     Q.    And do we agree that if you don't

11 understand a question that I ask, that you will tell

12 me, so I can rephrase it for you?

13     A.    Yes.

14     Q.    Sir, is there any reason today why your

15 memory might be impaired or you might not be able to

16 tell the truth because of some physical or mental

17 impairment or medication that you might be taking?

18     A.    No.

19     Q.    All right.  Well, then, let's begin.

20     Mr. Canavan, who is your current employer?

21     A.    The United States Department of

22 Agriculture, Food and Nutrition Service.

23     Q.    And what is your position there?

24     A.    I am the deputy regional administrator of

8

1   the northeast region.

2        Q.    And how long have you held that position?

3        A.    Approximately 11 and one-half months.

4        Q.    And before that, what was your position?

5        A.    I was the regional director of the food

6   stamp program.

7        Q.    And how long did you hold that position?

8        A.    Approximately ten years.

9        Q.    Ten years, okay.  And before that?

10       A.    I was a supervisor in the food stamp

11  program.

12       Q.    And for how long did you hold that

13  position?

14       A.    Approximately ten years.

15       Q.    And before that?

16       A.    A specialist position in the food stamp

17  program and in the child nutrition programs.

18       Q.    And how long did you hold that position?

19       A.    Six or seven years.

20       Q.    Was that your first position within FNS?

21       A.    My first position was as a program

22  specialist in 1976.

23       Q.    And that was the immediate previous

24  position you held to the last one you mentioned to

71

1    Q.    And who had those responsibilities before

2    Mr. Malone took them over?

3    A.    Joseph Stanco.

4    Q.    Okay, Joseph Stanco.

5    A.    As I said, there's been changes in the

6    overall organization --

7    Q.    But Joseph Stanco had those duties, right?

8    A.    Yes.

9    Q.    Okay.  And Joseph Stanco was officially

10   given those duties, was he not, officially hired to

11   assume those duties?

12   A.    Yes.

13   Q.    Can you tell me why Mr. Malone has not been

14   officially hired to assume Joseph Stanco's prior

15   duties, Mr. Canavan?

16   A.    The question is -- Mr. Malone was

17   officially hired.  He is an employee of the

18   financial management unit at NERO.

19   Q.    Right.

20   A.    The work and the staffing resources of the

21   financial management unit have been restructured.

22   And work that was previously assigned to another

23   section chief has been assigned or distributed

24   amongst the two remaining section chiefs, which

72

1   doesn't equate to his not being officially hired.

2   That's what I'm struggling with.

3       Q.   What position did Mr. Stanco hold with Mr.

4   Canavan?

5       A.   He's a section chief.

6       Q.   Of what?

7       A.   Financial management of food stamps and --

8   I really would need to go back to the organizational

9   chart to --

10      Q.   When he left, was that position officially

11  posted?

12      A.   No.

13      Q.   That position was not officially posted

14  when Mr. Stanco left?

15      A.   Not to the best of my recollection.

16      Q.   Well, do you know, sir?  Because you are

17  under oath.  Do you know whether that position was

18  officially posted?

19          MR. WILMOT:  Asked and answered.

20          MR. CATAPANO-FRIEDMAN:  No, he hasn't

21  answered it.

22      Q.   Do you know.  I'm asking you whether you

23  have knowledge whether the position held by Mr.

24  Stanco was officially posted when Mr. Stanco left.

73

1      A.    The responsibilities of that position were

2   reassigned in a larger reorganization within the

3   financial management area, that at least temporarily

4   resulted in three section chief positions being

5   reduced to two section chief positions.

6      Q.    That's not my question.  My question is, do

7   you know whether the position held by Mr. Stanco was

8   posted upon Mr. Stanco's departure?

9      A.    And my answer to that question was?

10     Q.    I don't know.  I want you to answer the

11   question.  Do you know whether it was posted or not

12   posted.  Do you know?

13     A.    To the best of my recollection, it was not

14   posted.  The functions and resources of that

15   position were redistributed within existing two

16   section chiefs areas of responsibility.

17     Q.    Okay.  So you have no knowledge of the

18   posting, correct?

19          MR. WILMOT:  Objection.  He can answer.

20     A.    That's my recollection; that the position

21   was not posted.

22     Q.    Okay.  Does FNS maintain records of job

23   postings?

24     A.    Sure.

79

1                          AFTERNOON SESSION

2          BY MR. CATAPANO-FRIEDMAN:

3          Q.    Mr. Canavan, do you know of any situations

4    where FNS-NERO is actively engaged in succession

5    planning?

6          A.    Everywhere?

7          Q.    Everywhere.

8          A.    We're all under the president's management

9    agenda responsibility to do succession planning.  We

10   are collaborating with other regions to develop a

11   blueprint for succession planning.  And we are all,

12   to some extent, engaged, including GAAP assessment,

13   between where our organization is going and where we

14   are now in terms of resources and skill sets.  We're

15   constantly reviewing -- we review every position

16   vacancy as it occurs to evaluate what the

17   organization should look like when we go ahead and

18   refill positions or choose to fill different

19   positions.

20               We have training for senior specialists

21   going on within financial management.  When the

22   statistician in the food stamp program retired, we

23   used that as an opportunity to have her train

24   several of her colleagues who are not in the

80

1    statistical job series of her components of her

2    responsibility.

3           And then when we in fact filled the former

4    statistician's position in the food stamp program,

5    we filled it with a program analyst job series

6    position, which is a broader -- calls for a broader

7    set of skills and also will enable us to use the

8    skills of the current incumbent in a wider range of

9    responsibilities than the food stamp statistician

10   historically had filled.

11          So we are carrying out the directives, as

12   an agency, of the information technology

13   restructuring team, which was a national effort, and

14   the administrative support restructuring team --

15   these are all efforts where we've looked at existing

16   resources, existing skill sets, done our best to

17   prognosticate about what the agency's needs are

18   going to be, and then tried to train people and

19   recruit positions that best fit what we anticipate

20   the evolving mission of the agency will be.  It's

21   everywhere.

22          We are a shrinking agency.  When I came to

23   work with the agency, there were 2,700 people.  I

24   want to say now we are 1,400 or fewer nationwide.

81

1   That calls for us to always look at where we need to

2   be, as opposed to where we have been.  And that's

3   active succession planning.  It's one of the primary

4   responsibilities of every federal manager.  As I

5   say, it's part of the White House's management

6   agenda items.

7       Q.    Now, as part of succession planning, does

8   the agency also look to identify people having

9   existing job skills that can fill another position

10  in addition to training people without those job

11  skills to have them?

12      A.    I'm sorry, would you mind just rephrasing

13  that.  Do we look at people's --

14      Q.    Yes.  Do you look to see whether existing

15  employees have job skills that would enable them to

16  assume a position, another position in addition to

17  looking to train people who don't have those job

18  skills to obtain them?

19      A.    You know, I think skill set inventories are

20  a regular part of succession planning.  Those skill

21  set inventories recognize existing resources, in

22  terms of individual skills and experience, and looks

23  to expand those skill sets and to develop all

24  employees in directions where they have either

82

1    potential or areas where they need development.

2        Q.    Now, you mentioned one situation where a

3    statistician announced his or her retirement.  And

4    you had that individual train a number of other

5    people to take over his or her duties.

6              Have you had other situations where an

7    individual has not announced his or her retirement

8    and you had that individual train others to assume

9    his or her duties?

10       A.    Yeah.  I think that's what's going on in

11   financial management, where a number of senior

12   specialists who have areas of specialization or

13   focus are being asked to train the whole cadre of

14   people that work with them.  Yeah, and we do that --

15   I mean, we do it in broad anticipation of turnover

16   in staff, some of which comes from retirement, some

17   of it comes from attrition.  Some people take jobs

18   elsewhere.

19       Q.    Can you give me an example of where you're

20   doing that currently.

21       A.    Well, I think the financial management

22   group is doing training in several different areas.

23   I think --

24       Q.    In several different areas or in one area?

83

1      A.   As I understand, they have training modules

2   either in development or they're being delivered in

3   several areas of financial specialization.

4           MR. CATAPANO-FRIEDMAN:   I'd like to have

5   this marked as whatever next plaintiff's exhibit is.

6                   (Document marked as Plaintiff's

7                   Exhibit 17 for identification)

8      Q.   I would like to show you a document that's

9   marked Plaintiff's Exhibit 17.   I'd like you to

10  review it and see if this is a document that you

11  recognize.   Have you had a chance to review the

12  document?

13     A.   Yes, I have.

14     Q.   Do you recognize the document?

15     A.   I've seen this document before.

16     Q.   Can you identify it for us?

17     A.   It's an agenda for an IT/IF, information

18  technology/internal finance staff meeting, October

19  7, 2004.

20     Q.   And do you know who prepared the document?

21     A.   I believe that this was prepared by Michael

22  Malone.

23     Q.   And he showed you the document before he

24  distributed it to employees in his section?

124

1  report?

2      A.    I don't recall whether I immediately picked

3  up the phone or whether it was the next time I saw

4  Doug MacAllister.  I returned this to him.  I

5  clarified that for purposes of keeping clear control

6  over these kinds of reports, that I wanted to send

7  it back to Marty and have it prepared for Marty's

8  signature, wherein Marty certified to us that this

9  reflects his review of whatever the particular

10  contents -- in this instance, it was leave without

11  pay.  In other instances, it could be other

12  documents, some of which would include research

13  conducted by other members of the section staff.  I

14  recognized that.

15      Q.    And did you tell Mr. MacAllister and Mr.

16  Malone anything else that you found objectionable

17  about this report?

18      A.    It wasn't objectionable so much as

19  inaccurate.  It was the assignment of the title

20  "alternate funds officer" to Mr. Pedicini.

21      Q.    What did you tell them about that

22  inaccuracy?

23      A.    Confirmed with them that there is not a

24  title "alternate funds officer" and directed them to

125

1   clarify any misunderstanding that might be on

2   anybody's part.

3        Q.    I'd like you to see -- examine Plaintiff's

4   Exhibit No. 21 and let me know whether you can

5   identify that.

6        A.    That was October 19th?

7        Q.    Right.

8        A.    And this is October 22nd from Michael

9   Malone to John Pedicini.  "Subject:  Inappropriate

10  use of non-official job title."

11           "In reviewing recent correspondence, I

12  recognized that you included in a memorandum your

13  title as 'Alternate Funds Officer-NERO.'  This was

14  inappropriate because your official job title on

15  your AD-332 is 'Financial Management Specialist.'

16  Designations regarding roles and/or rights you have

17  in a system such as Alternate Funds Officer (FFIS)

18  and Certifying Officer (IAS) does not mean that you

19  have those job titles or have signatory

20  responsibility using those titles.

21           "Please refrain from using those titles in

22  the future.

23           "Please see me in person if you have any

24  questions."

126

1     Q.   So Mr. Malone made it clear to Mr. Pedicini

2  he was not to use the title "alternate funds

3  officer," correct?

4     A.   Yes.

5     Q.   And he did that pursuant to your

6  instructions, correct?

7     A.   I had directed him and Mr. MacAllister -- I

8  don't recall whether one or both of them were in

9  that meeting -- to clarify that misunderstanding.

10  And this, I would say, is the end product of that

11  clarification.

12     Q.   You wanted him to send that letter,

13  correct?

14     A.   I wanted him to clarify it.  Doing it by

15  this memorandum is fine.

16     Q.   So you approve of what he did, correct?

17     A.   Yes.

18     Q.   I'd like to also show you Plaintiff's

19  Exhibit No. 20 and see if you can identify that.

20         MR. CATAPANO-FRIEDMAN:  Off the record.

21         (Off the record)

22  BY MR. CATAPANO-FRIEDMAN:

23     Q.   Could you identify both pages here and see

24  if you can also link the second page with Exhibit 22

176

1   and 11 perhaps as one agenda item.  Do you remember

2   that?

3       A.    They could be effectively combined into one

4   item, yes.

5       Q.    Can you explain what you meant by that; it

6   would have been better.

7       A.    They both speak to the same topic, which is

8   on-the-job training by GS-12s.  And having one such

9   item would cover both items effectively.

10      Q.    Are you aware if whether Mr. Malone

11  separated out the budget analyst position from Item

12  No. 11 for any improper or discriminatory reason?

13      A.    No.

14      Q.    Assuming for a moment, if you could, that

15  Mr. Pedicini does have the appropriate skills to

16  take over Marty Hines' current position as budget

17  analyst, are you aware if -- is it your stated

18  policy that Mr. Pedicini should then be

19  automatically put into that position once it becomes

20  available?

21      A.    We will make a decision about filling that

22  position and any changes to be made according to

23  good position management principles, and then we are

24  bound by the contract provisions that state to the

177

1    very promotion requirements of civil service law

2    that would require us to open the position to all

3    interested and qualified candidates.

4        Q.    Making that same assumption that Mr.

5    Pedicini has the appropriate skills to function as

6    the budget analyst, are you aware of any USDA policy

7    that requires your agency to train him solely for

8    that position once it becomes available?

9        A.    No.  We're rather precluded from training

10   any individual in a way that would reflect a

11   preselection that would undermine the merit

12   promotion requirements that federal managers have to

13   follow.

14       Q.    I'm showing you what's been marked as

15   Plaintiff's Exhibit No. 18.  This is the October 13,

16   2004 supervisory instruction to Martin Hines that

17   you testified to earlier.

18       A.    Yes.

19       Q.    What is a letter of instruction?

20       A.    The letter instruction is a --

21       Q.    I'm sorry, generally, what is a letter of

22   instruction?

23       A.    It's a communication between a supervisor

24   and an employee to clarify or to restate or to

# EXHIBIT 9

1

Volume I
Pages 1 to 208
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
        Plaintiff,              :
                                :
        vs.                     :    Civil Action
                                :    No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATE DEPARTMENT OF      :
AGRICULTURE,                    :
        Defendants.            :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF FRANCES E. ZORN, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Monday,
June 6, 2005, commencing at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.


        (Continued on Next Page)



9

1   is Frances Zorn?

2       A.    It is.

3       Q.    Do you prefer being called "Ms. Zorn" or

4   "Frances"?  What makes you more comfortable?  How

5   shall I address you?

6       A.    Why don't you call me "Ms. Zorn."

7       Q.    Okay.  Ms. Zorn, I understand that you have

8   occupied the position of -- was it regional

9   administrator, is it, for the northeast region?

10          MR. WILMOT:  Objection.

11      Q.    What is your position?

12      A.    My title is the regional administrator for

13  the northeast region, Food and Nutrition Service,

14  United States Department of Agriculture.

15      Q.    How long have you held that position?

16      A.    Since March of 1996.

17      Q.    And before that, where were you employed?

18      A.    I was employed in the headquarters

19  organization for the Food and Nutrition Service.

20      Q.    And where was that?  In Virginia?

21      A.    That was in Alexandria, Virginia, where our

22  headquarters are located.

23      Q.    And how long were you there?

24      A.    I was there 18 years.

105

1      Q.    Do you know whether John Pedicini has fund

2   certification authority?

3      A.    He does not.  And by that, I mean, he is

4   not delegated authority as the budget officer or an

5   alternate in the budget officer role.

6      Q.    Do you know whether John Pedicini ever

7   obtained the title of alternate funds officer

8   during --

9      A.    He did not.

10      Q.    He did not.  He never did?

11      A.    That's correct.

12      Q.    And it never came to your attention that he

13   had obtained this title?

14          MR. WILMOT:  Objection.

15      A.    The funds officer position is one that is

16   delegated from the regional administrator.  And I

17   sign letters of delegation, and they have been

18   consistently to Martin Hines and with alternates

19   being the first and second line supervisors.

20      Q.    Has John Pedicini ever held the title of

21   backup funds officer?

22      A.    There is no such title.

23      Q.    So there's no such title that you have

24   approved for John Pedicini, correct?

106

1      A.    He has a title.

2      Q.    All right.  Well, what is his title?

3      A.    His title is financial management

4  specialist.

5      Q.    Okay.  What about Martin Hines?  Does he

6  have the title of funds officer?

7      A.    He does.

8      Q.    Does he also have the title of budget

9  analyst?

10     A.    His position description I think is called

11  "budget officer" or something like that.

12     Q.    Budget analyst or funds officer; are they

13  interchangeable?

14     A.    No, they're not.

15     Q.    They're not interchangeable, funds officer

16  and budget analyst?

17     A.    The funds officer is delegated through the

18  agency.  He has delegation authority from me through

19  a letter of delegation.

20     Q.    And what about the position of budget

21  analyst?

22     A.    That is a classification of a job within

23  the federal personnel system.

24     Q.    Okay.  And was that a classification used

107

1    to describe Martin Hines' job with your agency?

2        A.    It can be.  But he has been given a

3    specific delegated role, called "funds officer."

4        Q.    In addition to being a budget analyst?

5        A.    Yes.

6        Q.    And does Mr. Hines have fund certification

7    authority?

8        A.    He certifies that funds are available in

9    order to release funds in our financial systems.

10       Q.    Okay.  And who else has that authority

11   within your agency, within your region?

12       A.    Marty is the primary person, Martin Hines.

13       Q.    Okay.

14       A.    And if he is unavailable, it is his

15   supervisor, Mike Malone, or it is Doug MacAllister,

16   the financial management director.

17       Q.    Okay.  And then at some point in time did

18   Mr. Stanco have that authority as well?

19       A.    He did, as the first line supervisor.

20       Q.    And each of these people received that

21   authority by your designation?

22       A.    A letter of delegation, yes.

23       Q.    A letter of delegation from you?

24       A.    Yes.

155

1      A.    Yes.

2      Q.    If you felt that it was inconsistent, you

3  would have gotten involved at that point?

4           MR. WILMOT:   Objection.

5      A.    I think we would have at least discussed

6  it.  I would have at least had a discussion with

7  John about it, yes, John Ghiorzi in this case.

8      Q.    As we sit here today, you're not sure

9  whether or not it complied with the settlement

10  agreement?

11           MR. WILMOT:   Objection.

12      A.    To me, it looks like this is in line with

13  the settlement agreement.

14      Q.    But you're not sure at this point?

15           MR. WILMOT:   Objection.

16      A.    Well, without putting it right next to the

17  settlement agreement, that's all I'm saying.

18      Q.    I don't feel we need to do that with us.

19  We can do that with other people.  But when you got

20  it, you thought it was consistent, and that's why

21  you didn't get involved?

22      A.    Right.

23      Q.    One other question I have is, I understand

24  you are leaving the region, the northeast region?

156

1        A.    I am.

2        Q.    You are.  When is that going to happen?

3        A.    I will be at my new assignment on the 27th

4    of June.

5        Q.    So you remain the regional administrator

6    until when?

7        A.    Until the 25th.  We start assignments

8    usually on the beginning of a pay period, which

9    usually begins on a Sunday.

10       Q.    So where will you be going?  You'll be

11   going back to Alexandria?

12       A.    I'll be going to our headquarters

13   organization.

14       Q.    In Alexandria.  That's where you came from

15   in 1996?

16       A.    Yes.

17       Q.    And what position will you have there?

18       A.    I'll be the deputy associate administrator

19   for regional operations.

20       Q.    And that will be on the same level as you

21   currently are?

22       A.    It is.

23       Q.    And will you have a lot of people reporting

24   to you, as you do now?

164

1   yourself.  And let me know when you're finished.

2          MR. CATAPANO-FRIEDMAN:  Excuse me, this is

3   an email from John?

4          MR. WILMOT:  Yes, it is.

5      A.   Okay.

6      Q.   Can you describe for me generally what that

7   email says.

8      A.   This is John Pedicini saying that he will

9   not be able to pursue the mediator's position,

10  because essentially of his personal responsibilities

11  to his father, who's quite ill.

12     Q.   Were you ever made aware of that?

13     A.   I was not.

14         MR. WILMOT:  Mark this as the next exhibit,

15  please.

16                (Document marked as Defendants'

17                Exhibit 3 for identification)

18     Q.   I'm showing you what's marked as

19  Defendants' Exhibit No. 3.  Can you take a moment

20  and just look at that document, review it.

21     A.   (Witness reviews document)  Okay.

22     Q.   Have you ever seen that document before?

23     A.   This specifically?

24     Q.   Yes.

170

1    these.

2            MR. CATAPANO-FRIEDMAN:  Are you going to

3    mark these as exhibits?

4            MR. WILMOT:  Yes.

5            MR. CATAPANO-FRIEDMAN:  What was the date

6    of the letter that John Pedicini --

7            MR. WILMOT:  Are you asking me?

8            MR. CATAPANO-FRIEDMAN:  Yes.  What was the

9    date of the letter that he sent with respect to

10   withdrawing from the Shared Neutral Program?

11           MR. WILMOT:  It was an email, I believe.

12           MR. PEDICINI:  January of 2003, after I

13   came from the Lahey Clinic.

14           MR. WILMOT:  January 28.

15           MR. CATAPANO-FRIEDMAN:  So January 28,

16   2003, J.P. withdrew from the Shared Neutral Program.

17           MR. WILMOT:  Uh-hum.

18           MR. CATAPANO-FRIEDMAN:  Okay.

19                    (Documents marked as Defendants'

20                    Exhibits 6 through 10 for

21                    identification)

22       Q.   I show you what's been marked as Exhibit 6.

23   Have you seen that document before today?

24       A.   When Doug pulled together some information

171

1    for you, he gave me a set of it.

2        Q.    Before that, had you ever seen it before?

3        A.    No.

4        Q.    What does it purport to be?

5        A.    It is a message from our headquarters

6    organization outlining the steps necessary to

7    establish authority to designate certain officers in

8    the regional offices.  And it's about financial

9    management certifying.

10       Q.    Can you describe what those steps are.

11           MR. CATAPANO-FRIEDMAN:  Excuse me, Damian,

12   since we've got MacAllister outside waiting, maybe

13   it's more appropriate, since it's a document he

14   pulled out and she's never seen before --

15           MR. WILMOT:  She's the regional

16   administrator.

17           MR. CATAPANO-FRIEDMAN:  I'm suggesting it

18   might be better to use the time and spend it on him;

19   but if you want to talk to her, you can, because

20   she's not able to identify it.

21           MR. WILMOT:  She can identify it.  She

22   wasn't familiar with it before today.

23       A.    So it asks the regions to complete

24   delegations in a signature authentication sheet for

172

1    the regional administrator, who then can certify

2    others.

3        Q.   Do you follow that process today in your

4    office?

5        A.   We do.

6        Q.   Has there been any variations on this

7    letter, any changes since the date of that letter?

8            MR. CATAPANO-FRIEDMAN:   I'm going to object

9    to that for lack of foundation.

10           MR. WILMOT:   That you're aware of.

11       A.   That I'm aware of, no.

12       Q.   And what's the date of that letter?

13       A.   February 22, 1982.

14       Q.   I show you a document that's been marked as

15   Defendants' Exhibit No. 7.   Have you seen that

16   document before today?

17       A.   Only in the same context as the previous

18   one.

19       Q.   Before that, you had not seen this

20   document?

21       A.   No.

22       Q.   Can you identify what it is?

23       A.   It's a delegation of authority.   It says,

24   In accordance with my authority described for the

173

1   Food and Nutrition Service, Harry McLean, my

2   predecessor as regional administrator, he

3   delegated -- "I delegate to Harry McLean the

4   authority to designate certifying officers for the

5   Northeast Regional Office."  This is a new

6   delegation pursuant to a functional reorganization.

7       Q.   So he delegated it to himself?

8       A.   He did.

9       Q.   I'm showing you what's been marked as

10  Defendants' Exhibit No. 8.  Can you review that and

11  let me know when you're finished.

12      A.   Okay.

13      Q.   Can you identify what that is?

14      A.   It's a memo for the files from Doug

15  MacAllister on the topic of the certifying officer,

16  the budget officer, reaffirming and extending Marty

17  Hines as the certifying officer.

18      Q.   Does it say anything else with regards to

19  Marty Hines?

20      A.   Yes.  It says two things; that he served

21  effectively in this capacity for several years; and

22  that "When Marty is absent, either Arthur LeBlanc or

23  I" -- and he means Dough MacAllister -- "will serve

24  as alternate certifying officer."

174

1      Q.    What was Arthur LeBlanc's position at the

2   date of this letter?

3      A.    At the time he was the section chief.

4      Q.    And section chief; is that --

5      A.    He was the supervisor, the first line

6   supervisor of Marty.

7      Q.    And what was Doug MacAllister's position at

8   that time?

9      A.    He was the director of financial

10  management.  That's the position he still holds.

11     Q.    And what's the date of that memo?

12     A.    May 26, 1995.

13     Q.    Is there a reason as to why Doug

14  MacAllister was preparing this memo in May of 1995?

15           MR. CATAPANO-FRIEDMAN:  I'm going to

16  object.  How could she know?

17     Q.    To the best of your knowledge, do you know

18  why?

19     A.    To the best of my knowledge, there was no

20  regional administrator at the time.  There were a

21  series of acting regional administrators.  This

22  could have been done in the interim, in between some

23  of them, or it could have been something that fell

24  through the cracks, and he felt that it needed to be

175

1   reaffirmed and extended.

2       Q.   Now, if it fell through the cracks and he

3   felt the need to do this, how would he have the

4   authority to do that?

5       A.   Something I mentioned earlier.  Doug is the

6   accountable person for the financial management

7   functions of the northeast region.  And as such, he

8   is responsible for everything that happens in

9   financial management.  And he is to advise and

10  provide other information to the regional

11  administrator or on behalf of the regional

12  administrator.

13      Q.   So it's not unusual for Mr. MacAllister to

14  draft such a memo?

15      A.   It's -- no.  He would be -- my pause is

16  that, you know, there are different functions that

17  he might write different letters about without

18  having me sign them.

19      Q.   But you testified earlier that the

20  authority to delegate the certification function is

21  your responsibility; is that right?

22      A.   It is.

23      Q.   And so Mr. MacAllister would be allowed to

24  do it because -- could you explain?

176

1       A.    Well, because he is delegated the financial

2   management functions of this region, of the

3   northeast region.

4       Q.    I'm showing you what's been marked as

5   Defendants' Exhibit No. 9.  Could you take a moment

6   to look at that and let me know when you're

7   finished.

8       A.    (Witness reviews document)  Okay.

9       Q.    What's the date of this document?

10      A.    March 26, 1998.

11      Q.    Can you identify what it is?

12      A.    It's a memorandum from me to Martin Hines

13  delegating approval for a form of travel.  The

14  authority to approve trip-by-trip authorizations for

15  travel.

16      Q.    Is this the same under the certification of

17  funds issue that we've been talking about?

18      A.    Yes.

19      Q.    And who is it signed by?

20      A.    It's signed by me.

21      Q.    That's your signature?

22      A.    Yes.

23      Q.    So before when you were testifying as to

24  delegations of this certification function, Mr.

177

1    Catapano showed you two documents.  Mr. Catapano

2    referred you to Plaintiff's Exhibits 7 and 8 and

3    questioned whether or not -- I believe he asked

4    whether or not this June 16, 2003 memo was the first

5    time that you drafted such a memo.

6         Does looking at Defendants' Exhibit No. 9

7    refresh your memory that Plaintiff's Exhibit No. 7

8    is not the first time you drafted such a memo?

9         MR. CATAPANO-FRIEDMAN:  I'm going to object

10   to the form of the question.

11   A.    Yes, it does.

12   Q.    And I'm showing you what's been marked as

13   Defendants' Exhibit No. 10.  Could you take a moment

14   to look at that, please.

15   A.    Okay.  (Witness reviews document)  Okay.

16   Q.    Can you identify what it is?

17   A.    It's a letter dated May 28, 2002 from Doug

18   MacAllister, memorandum for the record, extending

19   Marty Hines as certifying officer for NERO's

20   management control over FPA funds.  And it states

21   that when Marty is absent, either Joe Stanco or Doug

22   MacAllister will serve as alternate certifying

23   officer.

24   Q.    In May of 2002, what was Joseph Stanco's

178

1    position at the USDA?

2        A.    He was the supervisor of the internal

3    budget function.

4        Q.    Was he a first line supervisor?

5        A.    Yes, he was.

6        Q.    What was Doug MacAllister's position in May

7    of 2002?

8        A.    He was the director of financial

9    management.

10       Q.    And that's a second line supervisor

11   position?

12       A.    Yes.

13       Q.    You also testified as to Plaintiff's

14   Exhibit No. 13.  I believe Mr. Catapano took you

15   through some of the functions there that a funds

16   officer are supposed to have knowledge of.  Do you

17   remember that testimony?

18       A.    Yes.

19       Q.    And I believe you responded that generally,

20   you believed that Doug MacAllister and the first

21   line supervisors, that over the last few years

22   generally would have such knowledge of those

23   functions described in this document.  Do you

24   remember that?

181

1    best of your knowledge?

2        A.    To the best of my knowledge, no.

3        Q.    And as you said, Mr. Pedicini is the only

4    federal employee that you know of that served as an

5    EEO representative, correct?

6        A.    That I'm aware of, yes.

7        Q.    You also testified as to a Jonathan Lash?

8        A.    Yes.

9        Q.    Is Mr. Lash a supervisor within the USDA?

10       A.    Not to my knowledge.

11       Q.    Do you know if Mr. Lash has any supervisory

12   responsibilities?

13       A.    Not to my knowledge.

14       Q.    Does he have any authority to designate who

15   has the ability to certify funds in the different

16   regions?

17       A.    No.

18       Q.    You also testified as to Martin Hines.    Is

19   Martin Hines a supervisor within the USDA?

20       A.    No.

21       Q.    Does Mr. Hines have any supervisory

22   authority?

23       A.    No.

24       Q.    Does Marty Hines have the authority to

182

1    designate someone with this certification of funds

2    ability?

3        A.    No.

4        Q.    I'm just showing you again what Mr.

5    Catapano --

6            MR. WILMOT:  I keep calling you "Catapano."

7    Is it "Catapano-Friedman"?  Do you go by both

8    surnames?

9            MR. CATAPANO-FRIEDMAN:  Yes.

10           MR. WILMOT:  I apologize.

11           MR. CATAPANO-FRIEDMAN:  No offense taken.

12       BY MR. WILMOT:

13       Q.    I'm showing you what's been marked as

14   Plaintiff's Exhibits 10, 12 and 14.  If you would

15   just refamiliarize yourself with those documents.

16       A.    Okay.

17       Q.    Do you know who prepared those documents?

18       A.    I don't.

19       Q.    Do you know if you ever asked an employee

20   within your region to prepare documents such as

21   those?

22       A.    I didn't.

23           MR. WILMOT:  If we could just take two

24   minutes, I think I'm done.

184

1      A.    Yes.

2      Q.    Can you describe what that process is?  How

3   does an employee receive an award?

4      A.    There's a nomination process that goes on

5   periodically.  We request nominations for awards.

6   Awards can come from the supervisors or they can

7   come from peers.  They're reviewed, and a decision

8   is made about whether or not an award is to be

9   given.

10     Q.    So if an employee is not nominated for an

11   award, is it logical that it will follow that that

12   employee would then not get an award?

13     A.    Yes.

14     Q.    Do you remember who in Mr. Pedicini's

15   section in October of 2004 received merit awards?

16     A.    In his section I think -- in October of

17   2004 --

18     Q.    If you don't remember --

19     A.    I can't remember.

20     Q.    Do you remember if anyone did?

21     A.    There might have been one person.

22     Q.    Do you know how many employees are in Mr.

23   Pedicini's unit or how many were in October of 2004?

24     A.    Somewhere between eight and ten.

185

1      Q.    Do you remember if Mr. Pedicini received an
2    award in October of 2004?
3      A.    He did not.
4      Q.    Did the rest of his co-workers in his unit
5    receive awards?
6      A.    As a group, no.
7      Q.    So Mr. Pedicini was not the only employee
8    to not receive an award at that time?
9      A.    He was among a number of people who did not
10   receive an award.
11           MR. WILMOT:   Can I just mark this as our
12   last exhibit.
13                 (Document marked as Defendants'
14                 Exhibit 11 for identification)
15     Q.    I'm showing you what's been marked as
16   Defendants' Exhibit No. 11.  Do you recognize the
17   document?
18     A.    Yes.  It's a listing of employees that
19   received cash awards for Pay Period 19 of last year.
20     Q.    There's some handwriting on this document.
21   Do you know whose handwriting that is?
22     A.    Yes.  It's Doug MacAllister's.
23     Q.    And what does the handwriting show?
24     A.    It indicates who within all of FM received

# EXHIBIT 10

1

Volume I
Pages 1 to 87
Exhibits 78 to 80

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
           Plaintiff,           :
      vs.                        :    Civil Action No.
                                 :    04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
           Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF ROBERTO SALAZAR, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Susan
J. Cataldo, Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, Inc., 50 Franklin Street, Boston,
Massachusetts, on Thursday, September 29, 2005,
commencing at 10:07 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.) 50 Franklin
          Street, Boston, MA  02110, for the Plaintiff.

     United States Department of Justice, United
          States Attorney's Office
          (By Damian W. Wilmot, Assistant United
          States Attorney) John Joseph Moakley
          Federal Courthouse, 1 Courthouse Way,
          Suite 9200, Boston, MA  02210, for the
          Defendants.

Also Present:  John G. Pedicini

7

1      A.    No.

2      Q.    Okay.  Then let's proceed.  If you could

3   just tell us what your -- I understand you have a

4   high level position with USDA FNS; is that correct?

5      A.    I'm the administrator of the USDA's Food

6   and Nutrition Service.

7      Q.    Okay.  And is that the highest position

8   within FNS?  FNS being Food Nutrition Service.

9      A.    Yes.

10      Q.    Okay.  So you're the boss?  You're the

11   ultimate person in charge of FNS, correct?

12      A.    That is correct.

13      Q.    Okay.  And where are you stationed?  Where

14   is your office?

15      A.    I'm located at the Food and Nutrition

16   Service headquarters in Alexandria, Virginia, at

17   3101 Park Center Drive.

18      Q.    Okay.  And what's the relationship of

19   Frances Zorn to you, the professional relationship,

20   or what was it?  I understand she's no longer with

21   FNS; is that correct?

22      A.    That is not correct.

23      Q.    Oh, that is not correct.  Okay.  Has her

24   position changed, though, recently?

8

1      A.    Fran Zorn is currently the deputy associate

2  administrator for regional operations, a promotion

3  she received.  Prior to which, she was serving as

4  the regional administrator of our northeastern

5  regional office where Mr. Pedicini is employed.

6      Q.    Okay.  Could you tell me when this change

7  in her position occurred, and what's the difference

8  between what she was doing before and what she's

9  doing now?

10      A.    The change in her position occurred

11  approximately June or July of this year, I believe.

12  I'm not sure of the exact date.  Previously as the

13  regional administrator for the northeastern region

14  of the Food and Nutrition Service, Ms. Zorn oversaw

15  our program operations in that respect the region in

16  those respective states.  She currently now oversees

17  all program operations through regional operations

18  on a national level through the office of regional

19  operations which is an arm of my office.  That's the

20  distinction.

21      Q.    Okay.  Previously who did she report to

22  directly?

23      A.    She previously reported directly to my

24  associate administrator for regional operations

9

1    Jerome Lindsay who in turn directly reports to me.

2    She currently continues to report directly to Jerome

3    Lindsay who reports directly to me.

4        Q.    Now, you described the change in her

5    positions as a promotion; is that correct?

6        A.    That is how we can perceive it in the

7    organization, yes.

8        Q.    That is how we can perceive it within the

9    organization.  I'm not sure that that was responsive

10   to my question.  My question is, was this a

11   promotion --

12       A.    Yes.

13       Q.    -- that she received?

14       A.    Yes.

15       Q.    Yes.  Okay.

16       A.    How do you define promotion, sir?

17       Q.    Well, is she at a higher grade level than

18   she was before?

19       A.    Let me clarify for you, sir.  Ms. Zorn is

20   in the senior executive service of the federal

21   government.  She was in the senior executive service

22   previously as a regional administrator, and she

23   continues to be in the senior executive service.

24   Senior executives when they are moved into positions

15

1       A.    I'd be happy to.

2       Q.    Okay.

3       A.    I had received -- prior to Mr. Pedicini's

4  initial e-mail of October 14th, at 7:48 a.m., I had

5  receive prior to that, approximately two days prior,

6  I believe, on the 12th of October, an e-mail request

7  from Mr. Ingemi indicating that there were serious

8  issues that were occurring in the office that he was

9  employed at and he wanted to make me aware of those

10  issues and discuss them with me.  I directed my

11  scheduling assistant Pam Paterson to schedule a

12  conference call with Mr. Ingemi as soon as possible

13  so that I could hear his concerns and instructed

14  Ms. Paterson to set up that meeting.  I simply

15  forwarded Mr. Ingemi's e-mail to her and asked her

16  to follow through in setting up a meeting and

17  indicated to her that I wanted certain staff members

18  from headquarters present at that meeting who might

19  be able assist me in resolving issues that he might

20  bring to my attention, because I'm an individual who

21  like to get to the bottom of things and get them

22  resolved quickly particularly when an employee

23  reaches out to me directly.

24       Ms. Paterson called Mr. Ingemi to schedule

16

1   the conference call, and it is my understanding that

2   Mr. Ingemi requested that Mr. Pedicini and Mr.

3   Upchurch also participate in this conference call

4   and so at that request my scheduler Pam Paterson

5   took it upon herself to set up that meeting and

6   make respective invitations to Mr. Pedicini and

7   Mr. Upchurch for the conference call as it was

8   scheduled.  She then informed me that the meeting

9   was scheduled and who the participants were to

10  participate in the conference call.

11          I had received also on the 12th of October

12  information from Frances Zorn that indicated to me

13  that indicated to me that Mr. Pedicini might be

14  calling on me in a request to represent an employee

15  in a EEO matter.  She went on to explain to me that

16  Mr. Pedicini had signed an agreement with the agency

17  in which he had agreed not to function in that

18  capacity, not to represent other employees in EEO

19  matters.  Based on that information from a senior

20  executive member of my team, I instructed my

21  scheduler that Mr. Pedicini would not be allowed to

22  participate in the call, that I would not permit him

23  to participate in this meeting, in addition to the

24  fact that I had no knowledge or awareness of whether

1    or not Mr. Pedicini was a party to the information

2    that Mr. Ingemi wanted to share with me, because

3    Mr. Ingemi had not indicated that this was a matter

4    involving Mr. Pedicini but rather it was a matter

5    involving himself personally, so my secretary, I

6    believe, called on Mr. Pedicini, as he articulates

7    in his e-mails to me.  He indicates my office

8    contacted him.  It was Pam Paterson of my office, I

9    think, specifically to let him know that he would

10   not be participating in this conference call.

11          Subsequently, two days later, Mr. Pedicini

12   wrote to me, as you can see from the item you

13   provided here as evidence indicating the sequence of

14   that communication, that, in fact, my office

15   contacted him to participate in no further --

16   contacted him to not participate, and then he had

17   requested that I intervene with his a supervisor who

18   had apparently reprimanded him for having that

19   communication with my office.

20          I subsequently do note from the e-mail

21   attached responded to Mr. Pedicini indicating that I

22   believed that -- it was my understanding that he had

23   signed an agreement he would not represent

24   employees, and so I had denied his request of me to

18

1    have a talk with his supervisor about the reprimand

2    that he received, so I never spoke with his

3    supervisor and have never received confirmation of

4    said reprimand.

5         Mr. Pedicini, responded to me a few days

6    later on the 18th to inform me that he was in

7    disagreement with my statement of facts and my

8    understanding of the agreement that he had signed

9    and subsequent amendment that he referenced in his

10   e-mail to me and indicated that he would take this

11   matter up in a different form and did not want to

12   use up any more of my time.  That prompted me to

13   want to know what the agreement was specifically

14   that he disagreed with, my understanding of it,

15   because I had not at this point seen the agreement,

16   I was not a party to the agreement, I had not signed

17   the agreement, I was operating on the interpretation

18   and evaluation and knowledge of the agreement

19   provided to me by a senior executive of my team.

20        I requested a copy of the agreement from my

21   in-house counsel and the subsequent amendment.  I

22   read the agreement and upon reading the agreement my

23   initial read was that of any other logical person,

24   the language said something along the lines of, if

19

1    you are to function as a shared neutral or whatever

2    the proper term is, you will not represent other

3    employees in EEO matters other than your own cases

4    except for those that are already in play or

5    something along those lines.  I'm paraphrasing.  So

6    my read was, well, it says here he can't do this.

7    He can't represent other employees.

8          I was then shown the amendment where

9    apparently Mr. Pedicini opted not to be a shared

10   neutral and pursue that role or whatever it is

11   which made that paragraph moot in essence and so

12   I clearly understood at that point in time the

13   misinterpretation of the agreement and my

14   misapplication of the misinterpretation of the

15   agreement.  I took steps immediately to correct that

16   by writing to Mr. Pedicini which is the last e-mail

17   in your sequence of e-mails correcting my

18   understanding of the agreement, clarifying my

19   understanding of his role and authority in these

20   matters of being able to represent employees and

21   apologizing to him for the misunderstanding that had

22   transpired in the previous two days with a clear

23   understanding from my perspective that he was not

24   injured in that process and was not denied the

1    ability to represent anybody as he was not requested

2    to represent anybody, to my knowledge, or directly

3    to me.  And it was my belief that I had resolved the

4    matter by taking quick action to correct it once I

5    knew the factual information.

6         Q.   Who brought it to your attention that

7    Mr. Pedicini had opted not to be a shared neutral?

8         A.   That was brought to my attention by

9    in-house counsel when I was provided a copy of the

10   amendment.

11        MR. WILMOT:  I'd ask you not to talk about

12   conversations with in-house counsel.

13        A.   That is privileged information obviously,

14   but it was brought to my attention when I read the

15   document.

16        Q.   Okay.  When -- so you didn't learn that

17   Mr. Pedicini had opted not to be a shared neutral

18   from Fran Zorn; is that correct?

19        A.   I did receive an e-mail from Fran Zorn on

20   or about October 18th in which she indicated to me

21   that her interpretation of the information was

22   wrong.

23        Q.   Do you have a copy of that e-mail?

24        A.   I do not.

# EXHIBIT 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN G. PEDICINI,

        Plaintiff,

    v.

UNITED STATES OF AMERICA, :
ANN M. VENEMAN, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE, AND LINDA
SPRINGER, DIRECTOR, UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT,

        Defendants.

Case No. 04-12395 JLT

## AFFIDAVIT OF LISHA DORMAN

Lisha Dorman, hereby state as follows:

1. I am over the age of 18, and am mentally competent to testify as to the matters contained in this affidavit.

2. The information contained in this affidavit is based upon my personal knowledge.

3. I make this affidavit knowingly and voluntarily.

4. Since 1993, I have worked for the United States Department of Agriculture, Food and Nutrition Service ("USDA-FNS") in various capacities with regard to financial management within the agency. My official title is Administrative Officer (Grade 13). I currently hold the position of Funds Officer for the Deputy Administrator of Management at Headquarters.

5. I am very familiar with USDA-FNS policies concerning financial management. In particular, I am familiar with USDA-FNS policies concerning the duties and responsibilities of the Funds Officer position. Indeed, I helped to draft the USDA-FNS's handbook on its budget and funds management process, including the duties and responsibilities of Funds Officers and allowance holders, which is entitled "FNS Administrative Accounting Handbook 101." Further, from 1993 to July 2005, I conducted training on the duties and responsibilities of Funds Officers within the agency. In addition, as I referred to above, I currently hold the position of Funds Officer for the Deputy Administrator of Management since July, 2005 to the present.

6.  By way of background, the Secretary for the USDA requires the National Finance Center to consolidate the administrative payments of all the sub-agencies within USDA and to provide centralized accounting services for the entire agency. Each sub-agency, however, is responsible for "funds control." The USDA defines "funds control" as the various policies, procedures, and records used to exercise management control over public funds. Funds control requires that each sub-agency implement specific procedures by which the sub-agency and its employees must follow whenever they obligate or expend Federally Appropriated Funds.

7.  The Budget Division of the USDA allocates Federally Appropriated Funds to "allowance holders," which could include the Administrator, Deputy Administrators, Staff Directors, and Regional Administrators. The allowance holder, in turn, designates an individual as a funds officer. Each of the seven regions within USDA-FNS has at least one funds officer.

8.  A funds officer is responsible for monitoring/tracking the agency's status of funds and for providing data on fund availability to the allowance holder. The funds officer is also responsible for (i) certifying that funds are available before spending actions occur, (ii) committing the funds for the spending actions in the agency financial system (i.e., the Foundation Financial Information System ("FFIS")), and (iii) reporting the monthly status of the accounts to his/her allowance holder and quarterly to the Budget Division.

9.  On April 19, 2005, and April 20, 2005, USDA-FNS held its annual funds officer meeting in New Orleans, Louisiana. I, along with some of my colleagues, conducted several sessions on subjects germane to the duties and responsibilities of Funds Officers.

10. On April 19, 2005, I conducted a session entitled "Responsibilities of Back-Up Funds Officers." Generally, "back-up" funds officers are persons designated within each sub-agency as having the responsibility to perform the functions of the funds officer in the event that the funds officer is unable to do so him/herself.

11  During the session on "back-up" funds officers, the plaintiff in this action, John Pedicini, asked me what are the responsibilities of a "back-up" funds officer. In response to this question I answered that a "back-up" funds officer is responsible for all of the functions the primary funds officer performs in the event that the funds officer is unable to perform them him/herself. I did not have any further discussion with Mr. Pedicini on this topic.

12. I answered Mr. Pedicini's question in a general sense, that is, that a "back-up" funds officer should be able to perform all of the functions the primary funds officer performs. There is no FNS policy, however, granting a "back-up" funds officer the authority to perform all of the functions of the primary funds officer.

In fact, there are no FNS policies or procedures that even mention a "back-up" or "alternate" funds officer.

13.    As referred to above, generally, each allowance holder has the authority to delegate his/her authority to allocate Federally Appropriated Funds to whomever he/she decides.

14.    There is no FNS policy prohibiting the allowance holder from not delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to the designated "back-up" funds officer.

15.    Further, there is no FNS policy prohibiting the allowance holder from delegating the authority to allocate Federally Appropriated Funds, including the authority to certify that funds are available, to an FNS supervisor or manager.

16.    FNS funds control policy concerning certification of funds availability has not been violated provided that the supervisor or manager - who the allowance holder has delegated the authority to allocate Federally Appropriated Funds - (i) verifies in the agency financial system (i.e., FFIS) that the agency has the funds available for the requested spending action, and (ii) executes a certification on the procurement document that funds are available for the spending action.  If the supervisor does not have access to FFIS or does not know how to verify in FFIS that the agency has the funds available for the requested spending action, he/she must have someone who does have access to FFIS take the necessary steps to verify that the agency has the funds available for the requested spending action before certifying on the procurement document that such funds are available.

Signed this 2nd day of November, 2005, under the pains and penalties of perjury.

LISHA DORMAN

# EXHIBIT 12

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3

 4    -------------------------

 5    JOHN G. PEDICINI,

 6           Plaintiff,

 7    VS.                        CA No. 04-12395-JLT

 8    UNITED STATES OF AMERICA

 9    UNITED STATES DEPARTMENT

10    OF AGRICULTURE,

11    ANN M. VENEMAN, SECRETARY,

12           Defendants.

13    -------------------------

14

15           Deposition of LISHA A. DORMAN, a witness

16    called on behalf of the Plaintiff, taken

17    pursuant to notice before Cindy M. Falcon,

18    Certified Shorthand Reporter and Notary Public

19    in and for the Commonwealth of Massachusetts, at

20    the O'Neil Federal Building, 10 Causeway Street,

21    Boston, Massachusetts, on Thursday, January 12,

22    2006, commencing at 9:20 a.m.

23

24
```

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

92

1    Q    Ms. Dorman, have you had an opportunity to

2         review your affidavit today?

3    A    Yes.

4    Q    During the examination by Mr. Pedicini, he

5         directed your attention to Paragraph 12 of your

6         affidavit, particularly to the second sentence

7         in Paragraph 12 where it states that there is no

8         FNS policy, however, granting a backup funds

9         officer the authority to perform all of the

10        functions of a primary funds officer.

11             I think you said the exception to that

12        would be the TRVL system?

13   A    The IAS system.

14   Q    Having reviewed your affidavit today, is there

15        any other paragraph or -- strike that.

16             Having reviewed your affidavit today, any

17        other modifications that you think you need to

18        identify for us today on the record?

19   A    No.

20   Q    Okay.  So you stand by what you attest to in

21        your affidavit?

22   A    Yes.

23   Q    A little bit more on this E-TRVL system.

24             Mr. Pedicini directed your attention to

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

93

```
 1        Exhibit 86, which appears to be an e-mail from
 2        Mike Malone to a Mary Ellen Cajka?
 3    A   Cajka.
 4    Q   In here, Mr. Malone's e-mail anyway identifies
 5        for the system John Pedicini and says in
 6        parentheses primary, and Janet Sciarappa,
 7        parentheses, backup.
 8            Do you know whether Janet Sciarappa, by
 9        virtue of being the backup, has the same rights
10        John Pedicini has in the E-TRVL system?
11    A   Okay.  The e-mail that we are discussing right
12        now is not about funds control.  This is to be
13        the local system administrator for E-TRVL.
14    Q   Okay.
15    A   That would give this person the right to set up,
16        I keep wanting to say spending chains, and it's
17        approval chains.
18    Q   The last question I had was:  You testified
19        earlier that you knew Martin Hines?
20    A   Yes.
21    Q   How long have you known Martin Hines?
22    A   Since roughly 1993.
23    Q   1993.  Since 1993 to the present, have you ever
24        had any discussions with Martin Hines where he
```

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

94

```
 1        has expressed an interest in retiring from the

 2        USDA?

 3   A    Yes.

 4   Q    How many times would you say you've had that

 5        discussion with him?

 6   A    I honestly don't know.

 7   Q    Do you remember when the last time you had that

 8        discussion with him was?

 9   A    It's been a long time now.

10   Q    Okay.  Do you know whether you've had that

11        discussion with him more than once?

12   A    I would have to say yes.

13             MR. WILMOT:  Nothing further.

14

15   FURTHER EXAMINATION BY MR. PEDICINI:

16

17   Q    On your affidavit, where you mention the

18        delegation of authority and the fact that the

19        allowance holder can choose not to delegate

20        authority, do you recall that in the affidavit?

21   A    Yes.

22   Q    If the allowance holder does not delegate

23        authority, who is going to certify funds

24        availability?
```

# EXHIBIT 13

## UNITED STATES DEPARTMENT OF AGRICULTURE
### FOOD AND NUTRITION SERVICE

REPLY TO
ATTN OF:

WASHINGTON, DC 20250

FEB 22 1982

SUBJECT: Authority to Designate Certifying Officers

TO: Regional Administrators

THRU: Andrew P. Hornsby, Jr.
Deputy Administrator
for Regional Operations

EXHIBIT

*Ref #'s*
*6*
*6/6/03 9mn*

This memorandum outlines the steps necessary to establish authority to designate certifying officers in the Regional Offices.

When FNS Regional Offices assume responsibility for disbursing activities, each Region will need to file with Treasury the specimen signature of the manager authorized to designate certifying officers. These specimen signatures must be authenticated by someone whose signature is already known to Treasury. In our Agency, that person is the Director of Accounting and Reporting Division (AC).

Please complete the delegation statement attached to this memorandum, have the named person sign it, and return it to AC. The Director of AC will authenticate the Regional Manager's signature and forward the form to Treasury. Thereafter the RO will be able to add or change certifying officers without Headquarters involvement.

As soon as we hear from Treasury that Agency Location Codes and servicing disbursing centers have been assigned, we will send each RO a supply of SF-210 Signature Cards for Certifying Officers, with instructions for using them. Each Region must have a primary and at least one alternate certifying officer. The position is a very responsible one, as is clear from the following excerpt from 31 USC 82c:

> "The officer or employee certifying a voucher shall (1) be held responsible for the existence and correctness of facts recited in the certificate or otherwise stated on the voucher or its supporting papers and for the legality of the proposed payment under the appropriation or fund involved; and (2) be held accountable for and required to make good to the United States the amount of any illegal, improper, or incorrect payment resulting from any false, inaccurate, or misleading certificate made by him, as well as for any payment prohibited by law or which did not represent a legal obligation under the appropriation or fund involved..."

You will want to keep these requirements in mind when making personnel designations.

USDA – FNS
FEB 23 '82
RECEIVED

Form FNS-600 (12-79)

Regional Administrators                                                    2

If you have any questions, do not hesitate to call me.  For practical
advice based on experience with the certifying function, you may wish
to call Dave Hamer, Director of AC, who is also a member of the
Decentralization Task Force.  His telephone number is 447-6990.

RAYMOND A. PUGH, SR.
Deputy Administrator
  for Financial Management

Attachment

# EXHIBIT 14

1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
          Plaintiff,             :
                                 :
     vs.                         :  Civil Action
                                 :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

     The Catapano-Friedman Law Firm
          (By Robert S. Catapano-Friedman, Esq., and
          Sarah Catapano-Friedman, Esq.)
          50 Franklin Street, Boston, MA 02110,
          for the Plaintiff.

(Continued on next page)

251

1    obviously I reserve the right to follow up on

2    anything you ask him.

3                    CROSS EXAMINATION

4        BY MR. WILMOT:

5        Q.    Mr. Hines, I hope to move quickly so we can

6    get out of here.  The one instruction I would add

7    that Mr. Catapano-Friedman didn't state in his

8    introduction is just to wait for me to finish my

9    question before you answer.

10                The importance of that obviously is that

11   when the reporter is writing down my questions and

12   your responses, it's not jumbled, that it's clear.

13       A.    I understand.

14       Q.    Mr. Hines, are you a member of the

15   management staff at USDA?

16       A.    No, I'm not a supervisor nor a director.

17       Q.    Do you have the authority to assign at USDA

18   an employee a certain grade level?

19                MR. CATAPANO-FRIEDMAN:  Object to the

20   question, but you can answer.

21       A.    Assign a grade level?

22       Q.    Yes.

23       A.    Grade levels are determined by

24   classification actions, so I don't quite follow what

252

1    you mean by that.

2        Q.    My question is do you have the authority to

3    determine what particular grade level another

4    employee has?

5        A.    No.

6        Q.    Have you ever had this authority during

7    your employment at USDA?

8            MR. CATAPANO-FRIEDMAN:    Object.    You can

9    answer.

10       A.    No.    To assign a grade level to another

11   employee?

12       Q.    Um-hmm.

13       A.    No.

14       Q.    Do you have the authority to give a USDA

15   employee a raise?

16       A.    No.

17       Q.    Have you ever had that authority?

18       A.    Well, I was a supervisor up until 1994 or

19   '93.

20       Q.    After 1994 or '93, have you ever had that

21   authority?

22       A.    No, no.    No, I'm no longer a supervisor so

23   the answer would be no.    I don't have that

24   authority.

253

1  Q. Do you have the authority to promote a USDA

2 employee?

3  A. No.

4  Q. Since 1993 or 1994, have you ever had that

5 authority?

6  A. No.

7  Q. Do you have the authority to assign a USDA

8 employee a certain title?

9  A. No.

10  Q. Since 1993 or 1994, have you ever had that

11 authority?

12  A. No.

13  Q. Do you have the authority to assign a USDA

14 employee new job responsibilities?

15  A. Can you explain that a little more in terms

16 of what do you mean by "the authority"?

17  Q. The authority?  Well, I suppose do you have

18 the independent authority without having to go to

19 someone above you I guess in management to assign an

20 employee new job responsibilities that they did not

21 have prior?

22  A. No.  But in the instance of the alternate

23 backup funds officer in which John Pedicini was

24 assigned that responsibility in 1998 or '99, I was

254

1    directed by my supervisor at that time, Art LeBlanc,
2    to begin a process of providing that individual the
3    appropriate tasks that should be assigned to educate
4    and to orientate and to bring that individual up on
5    serving in that capacity.

6        Q.    Put it another way, do you have the
7    authority to assign a USDA employee new job
8    functions?

9        A.    No, no.  I wouldn't.  I would not.  If
10   something new came out, a new function that came
11   down the pike, that would be a management decision.

12       Q.    Since 1993 or 1994, have you ever had that
13   authority?

14       A.    No, no.  I never had the authority but I
15   would answer that question by an example.  When the
16   new FFIS system came about as a clear example, both
17   myself and John Pedicini were designated to learn
18   that system and to attend formal training at
19   headquarters and then to operate the system.

20       Q.    Do you have the authority to override an
21   employment decision made by USDA management?

22       A.    No.

23       Q.    Since 1993/1994, have you ever had that
24   authority?

255

1    A.    No, I do not, no.

2    Q.    Are you a --

3    A.    These are management decisions.  I'm

4 surprised you're asking me these questions.

5    Q.    Lawyer stuff.  Are you a union member?

6    A.    No, I'm not.

7    Q.    Are you a union representative?

8    A.    No, I'm not.

9    Q.    What is your grade?

10    A.    12.

11    Q.    Just again what's your title, your official

12 title?

13    A.    Well, let's see.  After today there's about

14 six, I think.  No, my official title on my position

15 description is budget analyst.  By the way, your

16 official title also appears on your performance

17 appraisal in Block 8, budget analyst.  Working

18 titles are different.

19    Q.    What's your working title?

20    A.    Well, the principal working title is funds

21 control officer.

22    Q.    How many funds control officers are there

23 in your section?

24    A.    There's myself and John Pedicini, the

2-1

Volume II
Pages 2-1 to 2-80
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                      :
JOHN G. PEDICINI,        :
      Plaintiff,      :
                      :
      vs.             :  Civil Action
                      :  No. 04-12395 JLT
UNITED STATES OF AMERICA, and  :
ANN M. VENEMAN, SECRETARY,    :
UNITED STATE DEPARTMENT OF     :
AGRICULTURE,             :
      Defendants.     :
                      :
- - - - - - - - - - - - - - - -x

     CONTINUED DEPOSITION OF MARTIN T. HINES, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, August 19, 2005,
commencing at 3:02 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA  02110, for
        the Plaintiff.

          (Continued on Next Page)

2-44

1    answer.

2         A.    I'll repeat my answer again.

3         Q.    Before you begin your answer, your answer

4    previously stated that you never told anyone you

5    were intending to retire.  I'm not asking about

6    whether or not you spoke about your intentions.  I'm

7    asking about whether or not you ever discussed

8    yourself retiring from the agency.

9              MR. CATAPANO-FRIEDMAN:  Objection.

10        Q.    I'm not asking whether you said a specific

11   date or not.

12        A.    The answer is "no."

13        Q.    You never mentioned such an interest to

14   Jonathan Lash?

15        A.    No.

16        Q.    Janice Sciarappa?

17        A.    No.

18        Q.    So if any of your co-workers say that they

19   heard you making such comments, that would be

20   untrue?

21        A.    In my opinion, yes.

22        Q.    And have you ever thought of retiring from

23   the agency?

24        A.    No.  I have thought about when I would be

# EXHIBIT 15

**UNITED STATES DEPARTMENT OF AGRICULTURE**

**FOOD AND NUTRITION SERVICE**

WASHINGTON, DC 20250



EXHIBIT
Rytis
1
6/6/05 Ima

### Delegation of Authority

In accordance with my authority as described in 35 FR 8835 Food and

Nutrition Service Organization, Functions and Delegations of Authority,

I delegate to _Harold T. McLean_____ the authority

to designate certifying officers for the FNS _Northeast_____

Regional Office.  This is a new delegation pursuant to a functional

reorganization.

Administrator, Harold T. McLean
Northeast    Region

Specimen Signature _~~~~~~~~~~~~~~~~~~~~~~~_
    Typed Name     Harold T. McLean

Authenticated: _____

                D. L. HAMER, Director
                Accounting and Reporting Division

United States
Department of
Agriculture

Food and
Nutrition
Service

Northeast
Region

Boston, MA  02222

Reply to
Attn. of:

NEFM—300

Subject:

FPA Certifying Officer

To:

Memo for the files

**EXHIBIT**

*Rptr's*
*8*
6/6/05 *Mw*

MAY 26 1995

This memo reaffirms and extends Marty Hines duties as Certifying Officer for
NERO's management control over FPA funds.

Marty has served effectively in this capacity for several years.

When Marty is absent, either Arthur LeBlanc or I will serve as alternate
Certifying Officer.

Douglas A. MacAllister
Director of Financial Management
Northeast Region



**USDA**

EXHIBIT
*Difts*
*10*
6/6/03 /MW

**United States
Department of
Agriculture**

FSP/IF-FM                                                                    May 28, 2002

Food and
Nutrition
Service

Northeast Region

10 Causeway St.
Room 501
Boston, MA  02222

SUBJECT:  FPA Certifying Officer

TO:  Memorandum for the Record

This memorandum reaffirms and extends Marty Hines duties as Certifying
Officer for NERO's management control of FPA funds.

Marty has served effectively in this capacity for many years.

When Marty is absent, either Joseph Stanco or I will serve as alternate
Certifying Officer.

*Douglas A. MacAllister*
Douglas A. MacAllister
Director, Financial Management
FNS, Northeast Region

US0015



# USDA

## United States Department of Agriculture
Food and Nutrition Service

Northeast Region

**EXHIBIT**
PIF's
7
6/6/05 JmW

Date:    June 16, 2003

Subject:    FPA Certifying Officer

To:    Martin Hines, Budget Officer
Joseph Stanco, Section Chief, FSP/IFS Section
Douglas Mac Allister, Director, Financial Management

This memorandum re-confirms and extends my delegation to perform certifications to maintain NERO's management control of FPA funds. Marty Hines is the primary party delegated this responsibility. In his absence, or at other times when necessary, Joseph Stanco and Douglas Mac Allister are delegated authority to perform those certifications.

This delegation remains in effect until rescinded.

Frances E. Zorn
Regional Administrator
Northeast Region

P-1950



**USDA**

**United States Department of Agriculture**

Food and Nutrition Service

Northeast Region

Date:   June 9, 2004

Subject:   FPA Certifying Officer

To:   Martin Hines, Budget Officer
Michael Malone, Section Chief, FSP/IFS Section
Douglas Mac Allister, Director, Financial Management

This memorandum re-confirms and extends my delegation to perform certifications to maintain NERO's management control of FPA funds.  Marty Hines is the primary party delegated this responsibility.  In his absence, or at other times when necessary, Michael Malone and Douglas Mac Allister are delegated authority to perform those certifications.

This delegation remains in effect until rescinded.

*Frances E. Zorn*

Frances E. Zorn
Regional Administrator
Northeast Region

P-1989

# EXHIBIT 16

U.S. DEPARTMENT OF AGRICULTURE - FOOD AND NUTRITION SERVICE

## COMPENSATORY TIME & OVERTIME AUTHORIZATION

| PAY PERIOD # | PAY PERIOD DATES | |
|---|---|---|
| 15 | From 7-27-03 | to 8-09-03 |

### PRE-AUTHORIZATION SECTION

DESCRIPTION OF WORK TO BE PERFORMED
Attend Rhode Island World Breastfeeding Week Event (see attache...

I hereby voluntarily accept compensatory time off in lieu of payment of overtime for hours worked in addition to my normal work week, or I am requesting to work compensatory time for my own personal convenience.

INITIALS *MW*     DATE 7-17-03

I REQUEST OVERTIME PAY ▶          INITIALS          DATE

MAXIMUM # OF HOUR TO BE WORKED  6      SIGNATURE OF EMPLOYEE      DATE 7-17-03

| APPROVED BY | | CONCURRED BY (If required) | |
|---|---|---|---|
| 1ST LINE SUPERVISOR | DATE 7/17/2003 | 2ND LINE SUPERVISOR Robert C. Kletsing | DATE 7/25/03 |

| DATE | TIME START | TIME END | TOTAL HOURS | |
|---|---|---|---|---|
| | | | WEEK 1 | WEEK 2 |
| 8-2-03 | 10:00 am | 4:00 pm | 6 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| I hereby certify funds are available FOR Mckim 7 hrs | | | | |
| MARTIN T. HINES Budget Officer USDA/FNS/Northeast Region | | | | |
| | | TOTALS | | |

| SUPERVISOR POST APPROVAL OF ACTUAL TIME | EMPLOYEE POST-CERTIFICATION OF ACTUAL TIME |
|---|---|
| | |

REMARKS

Frances E. Zorn
Administrator, NE Region



Exhibit 18
Page 1 of 1

TOTAL P.00

P-517

245

**U.S. Government Printing Office**

# PRINTING AND BINDING REQUISITION
## To the PUBLIC PRINTER Please furnish the following:

| JACKET NO. (Assigned at GPO) | ☐ Red ☐ Black | REQUISITION NO 1-0008 |

**FROM (Department or Government Establishment)**
US DEPT of AGRICULTURE

**(Bureau or Office)**
FOOD & NUTRITION SERVICE

**DATE** 6/19/01

**APPROPRIATION CHARGEABLE/APPLICABLE LAW**
102440303    **DCN** 1159

**BILLING ADDRESS CODE (BAC)** 34199

**AUTHORIZED BY** [signature] FOR MR. HINES

**TITLE**
"FOOD STAMPS CAN HELP MAKE ENDS MEET"

**QUALITY LEVEL** 4

**QUANTITY (Units of finished products)**
66,000  (SEE ATTACHED)

**FINISHED PRODUCT (Check One)**
☐ Books or Pamphlets ☐ Blank Forms (Sheets) ☐ Sets ☐ Pads or Tablets ☒ Other (Specify) BROCHURE

**CLASSIFICATION**

### PAPER STOCK AND INK

| | FIRST CHOICE (Grade, color, and basis weight) | SECOND CHOICE (if any) | COLOR(S) OF INK |
|---|---|---|---|
| Text | 80 LB WHITE | | |
| Cover | | | |
| OTHER (Specify) | | | |

### COMPOSITION

**FURNISHED (Magnetic tape)**
☐ Direct Drive ☐ Other ☒ CD ROM

### PRESS AND BINDERY

PRINT ONE SIDE ONLY ☐   HEAD TO HEAD ☒   HEAD TO FOOT ☐

SIZE FLAT (inches) FORMS, SETS, PADS   9 x 12

FOLD TO (inches)   4 x 9

NUMBER (Inclusive) 10

### PROOFS AND DELIVERY

**REQUESTED PROOF DATE** 7/9/01

**DEPT. HOLD (Workdays) to** GPO CYNTHIA TACKETT

**REQUESTED DELIVER DATE** 7/23/01

**OTHER PACKAGING (Specify)** SHRINK WRAP   **QUANTITY IN PACKAGE** 100

**DELIVER TO** SEE ATTACHED

### ADDITIONAL INFORMATION

PRINTER TO MAKE ALL TRAPPING & DOT-GRAIN ADJUSTMENTS

PRINTER TO MAKE TEXT SUBSTITUTIONS IN BLANK COPY BOX ON LAST PANEL (SEE ATTACHED FOR TEXT & SAMPLE)

JOB PROVIDED ON CD FOR MACINTOSH. GRAPHICS AND FONTS PROVIDED

FULL BLEED

PLEASE RETURN DISK AND NEGATIVES

I hereby certify funds are available.   **GPO ESTIMATE** 6,170.00

*Martin T. Hines*
**MARTIN T. HINES**
Budget Officer
USDA/FNS/Northeast Region

**ADDITIONAL INFORMATION CONTACT (Name and Telephone Number)**
CYNTHIA TACKETT   617 565 6412

P-1375

JAN-20-2004  22:52                                                      P.02

## REQUEST, AUTHORIZATION, AGREEMENT AND CERTIFICATION OF TRAINING

**Section A— TRAINEE INFORMATION**

1. Applicant's name - *Rando, John B. Rando*
2. Social Security Number: 014429860
3. Date of birth: 4/7/11
6. Home address: 25 Susan Dr. Reading, MA 01867
7. Organization mailing address: Food and Nutrition Service, 10 Causeway St.

6. Work telephone: 781-944-2339
8. Office telephone: 617 565-6471
11a. Position title/number: Program Specialist
11b. — 301 GS 11 7

**Section B — TRAINING COURSE DATA**

15. *IMPT/OMPL Business Leadership Assoc.*
16. Location of training: P.O. Box 419107, Kansas City, MO 64141-6157
18. Course title and training objectives: *Powerful Communication Skills for Women — Improve interpersonal skills in my Day to Day Work Setting*

17. Catalog/Course No: *L.ST-9*
Year 04, Month 01, Day 16 b. Non-duty 0007
a. Start 04 / 01 / 16
b. Complete 04 / 01 / 16 c. Total 0000

**Section C — ESTIMATED COSTS AND BILLING INFORMATION**

| Item | Amount |
|------|--------|
| a. Tuition | 70.00 |
| b. Books or materials | 0 |
| c. Other (Specify) | 0 |
| d. TOTAL | 70.00 |

Tax ID #

23. Document/Purchase Order/Requisition No.: AG3083/00012

**Section D — APPROVALS**

28a. Immediate supervisor: MARY ANN FERRIS, Chief SBI — 617-565-640_
28b. Second-line supervisor — FRO to pay 35% - 17.50

**Section E — APPROVAL/CONCURRENCE**
30a. Authorizing official: Shelly Edeberg, Acting Branch Chief — (703) 305-281_
HRD/HcmB — Approved 1/22/__

**Section F — CERTIFICATION OF TRAINING COMPLETION**

Copy 7 - AGENCY (FINANCE)

P-1373

TOTAL P.02

# EXHIBIT 17

EXHIBIT
Peb. 3
10/25/05 AM
PENGAD 800-631-6989

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

| United States Department of Agriculture | 300 7th. Street SW  Rm#607 |
|---|---|
| Civil Rights. Employment Complaints and Adjudication Division | Washington. DC 20050 |

**1. Name**    (First)    (Mi)    (Last)

[✓]Mr. [ ]Ms.    John  G.  Pedicini        [✓] USDA Employee        [] USDA Applicant

**2. Address**                    **3. Telephone Number**

10 Milano Drive
(Street)                    Work (617) 565 - 6449

Savage, MA    01906        Home (781) 233 - 5274
(City)        (State)    (Zip)

**4. Name of Agency Which You Believe Discriminated Against You**

U.S. Dept. of Agriculture
Food and Nutrition Service
10 Causeway Street , Rm. 501

Boston,      MA        02222
(City)        (State)        (Zip)

**5. Bases of Discrimination on Which You Were Counseled** (Do not include bases for which you did not receive counseling.) The bases are age, race, color, national origin, religion, sex, physical or mental disability, marital status, sexual orientation and reprisal. Be specific in your identification of bases (IE: age (55), sex (female), race (white).

Reprisal for previous EEO activity

**6. Issues(s) on Which You Were Counseled** (Do not include issues or allegations for which you did not receive counseling. Provide, if you deem necessary, additional details on reverse side.) Be specific with exact issue and the date of the issue. (IE: Non-selection to vacancy announcement USDA-96-174, Secretary, GS-318-9 on March 1, 1996, or two day suspension for misconduct on January 29 & 30, 1996.) You do not need to elaborate on why you feel this was discriminatory, you be given the opportunity to support you complaint during the investigation process.

Assignment of duties and training
Removal, without cause, from ADR mediator position.

**7. Representative, if any**    (Pending receipt of Notice of Final Action)

(   )
(Telephone Number) **Exhibit**  7 Q

(Street)        (City)        (State)        (Zip)  **Page** 4 of 10

**8. Name of EEO Counselor Contacted**

USDA, FNS, OCR
PATRICIA A. LOYCO, FNS  703-305-2215,  ROOM 942-B PARK CENTER, ALEX, VA

**9. Requested Corrective Action**  Reinstatement as ADR mediator.
Transfer of MacAllister, Zorn, Mann  to position in which they will have no influence or control over personnel actions or training assignments.

**10. Signature**                    Date 11-17-00

US0085

EXHIBIT

Δ 4

10/25/05 ℠

John G. Pedicini,                    )
Complainant                          )
                                     )
v.                                   )
                                     )
                                     )
                                     )
United States Of America,            )
Francis Zorn, Margaret Mann,         )
Douglas MacAllister, individually    )
and collectively                     )

November 17, 2000

# FORMAL DISCRIMINATION COMPLAINT UNDER 29 CFR 1614.106

**DELIVERED VIA
CERTIFIED MAIL
RETURN RECEIPT
REQUESTED**

## INTRODUCTION

The Complainant, John G. Pedicini, hereby files a formal discrimination complaint against the U.S. Department of Agriculture, Food and Nutrition Service, Northeast Regional Office, Room 501, 10 Causeway Street, Boston, Massachusetts, hereinafter referred to as "FNS-NERO", Francis Zorn, Margaret Mann, and Douglas MacAllister, individually and collectively, for reprisal actions taken as a result of the Complainant's affidavit in a recent EEO investigation, in violation of 5 USC 2302(b)(8).

This action follows an informal counseling period conducted by Patricia A. Loyco, EEO Counselor/Mediator. The Complainant hereby files this formal discrimination complaint within 15 calendar days after receiving notice from Ms. Loyco on November 14, 2000, pursuant to 29 CFR 1614.106(b).

The Complainant has not filed a grievance under negotiated or administrative grievance procedures or an appeal with the Merit Systems Protection Board on the same issues contained herein.

Exhibit 7 g
Page 1 of 10

# FACTUAL BACKGROUND

1. The Complainant, John G. Pedicini, is employed as a financial management specialist in the Financial Management Unit at FNS-NERO.

2. Douglas MacAllister is the Director of the Financial Management Unit at FNS-NERO.

3. Margaret Mann is Personnel Liaison for FNS-NERO.

4. Francis Zorn is Regional Administrator of FNS-NERO and supervises Douglas MacAllister and Margaret Mann.

5. In July 1999, the Complainant offered to become ADR Mediator for FNS-NERO based on his mediation background at the U. S. Department of Labor. Douglas MacAllister accepted the offer and forwarded the Complainant's name to the EEO Office at the Food and Nutrition Service in Alexandria, VA. The Complainant received numerous progress reports on the proposed training and ADR program.

6. Sometime in or about February 2000, Ann Bellezza, another employee in the Financial Management Unit at FNS-NERO, filed a formal discrimination complaint against Douglas MacAllister and FNS-NERO.

7. On June 12, 2000, Mr. Charles Purter, a contract EEO investigator, arrived at FNS-NERO to commence investigative interviews. The Complainant was scheduled to be interviewed by Mr. Purter.

8. On June 13, 2000, while walking to the men's restroom, Douglas MacAllister informed the Complainant that he was removed, without cause, as ADR Mediator.

9. While providing Mr. Purter, the EEO investigator, with an affidavit on July 14, 2000, the Complainant stated that he believed his removal as ADR mediator was an act of reprisal for giving information to the EEO investigation.

10. On August 4, 2000, the Complainant express mailed his finalized affidavit to the EEO investigator.

11. On August 8, 2000, the Complainant filed a complaint with the Office of the Special Counsel which is OSC File No. MA-00-2308.

12. On August 21st, 2000, Douglas MacAllister was informed that there was a training session on Form 209 which is used by the Complainant in his work. The training session was to be held on August 22nd to August 23rd, 2000. There were only two

Exhibit 7g
Page 2 of 10

people available at the time. The Complainant was one of them. MacAllister chose the other employee and did not divulge any information about the training session or his selection to the Complainant until after the fact at a meeting attended by the Complainant on August 23rd.

13. On August 30, 2000, Jonathan Lash from NFC e-mailed the Complainant about a training session on salaries & benefits which was essential to the Complainant's job function.

14. At a Financial Management meeting on September 13, 2000, the Complainant asked Douglas MacAllister about obtaining approval for travel to a training session. MacAllister responded by saying that the Complainant's request "...would probably be denied."

## REMEDY SOUGHT

Wherefore, Complainant, John G. Pedicini requests the following:

1. Reinstatement as ADR Mediator for FNS-NERO.

2. Transfer of Douglas MacAllister to a position in which he will have no influence or control on personnel actions or training assignments at FNS-NERO.

3. Transfer of Margaret Mann to a position in which she will have no influence or control on personnel actions or training assignments at FNS-NERO.

4. Transfer of Francis Zorn to a position in which she will have no influence or control on personnel actions or training assignments at FNS-NERO.

Respectfully submitted this 17th day of November 2000.

John G. Pedicini, Complainant
10 Milano Drive
Saugus, MA 01906
617-565-6449 (Work)
781-233-5274 (Home)

Exhibit 7 q
Page 3 of 10

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

USDA, Office of Civil Rights
Chief, Employment Complaint
and Adjudication Div.
Reporters Building Rm #607
300 7th St. SW
Washington, DC 20024

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery
                                        11-20-0

C. Signature
X Janice Jackson            ☐ Agent
                           ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☑ Certified Mail       ☐ Express Mail
☐ Registered           ☐ Return Receipt for Merchandise
☐ Insured Mail         ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7000-0600-0022-3277-2758

PS Form 3811, July 1999        Domestic Return Receipt        102595-99-M-1789

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Article Sent To:
USDA, Office of Civil Rights

| | | |
|---|---|---|
| Postage | $ .33 | |
| Certified Fee | 1.40 | Postmark Here |
| Return Receipt Fee (Endorsement Required) | 1.25 | |
| Restricted Delivery Fee (Endorsement Required) | NOV 2000 | |
| Total Postage & Fees | $ 2.98 | |

Name (Please Print Clearly) (to be completed by mailer)
Chief, Employment Complaint & Adjudication Div.
Street, Apt. No.; or PO Box No.   Room #607
300 7th St., SW
City, State, ZIP+4
Washington, DC 20024

PS Form 3800, July 1999        See Reverse for Instructions

Exhibit 7g
Page 5 of 10

US0086

114

# EXHIBIT 18



EXHIBIT

△ 5

10/25/05

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MASSACHUSETTS

## CASE NO. _____

04 - 11564DPW

| | |
|---|---|
| JOHN G. PEDICINI, )<br>Plaintiff, )<br> )<br>v. )<br> )<br>UNITED STATES )<br>OF AMERICA, )<br>Defendant ) | **CIVIL ACTION  COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon an investigation by himself, which included a review of public documents.

## NATURE OF THE ACTION

1.    This is a civil action alleging violation of Title VII of the Civil Rights Act of 1964, as amended, in which the Defendant has engaged in numerous reprisal actions against the Plaintiff for his testimony and whistleblowing activity in a gender/age discrimination case entitled, Antoinette Bellezza v. Ann M. Veneman, Secretary. U.S. Department of Agriculture, EEOC Hearing No. 160-A1-8304X, Agency Case No. 000266.

2.    The Defendant, through its agency, the United States Department of Agriculture, has a well-documented history of mishandling civil rights complaints made by its employees as is evidenced by the **"Office of Civil Rights Status**

**Of The Implementation Of Recommendations Made In Prior Evaluations Of Program Complaints"**, <u>Audit Report No. 60801-4-Hq</u> and **"Office Of Civil Rights Management Of Employment Complaints"**, <u>Audit Report No. 60801-3-Hq,</u> compiled by the Office of the Inspector General, U.S. Department of Agriculture. Said reports are public documents.

3.    The Defendant's sub-agency, the Food and Nutrition Service, has been the subject of numerous complaints at the Equal Employment Opportunity Commission. One of the complaints is Bellezza v. Veneman, as previously cited, in which the Plaintiff has been a major witness and has given extensive testimony and key documents to a contract EEO investigator, Charles Purter. Under Title VII, the Plaintiff has engaged in protected activity. Plaintiff eventually became the EEO representative for the Complainant.

4.    As a result of the Defendant's reprisal actions, the Plaintiff has suffered severe damage to his career.

## JURISDICTION AND VENUE

5.    This action arises under Title VII of the Civil Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

6.    This Court has jurisdiction over the subject matter of this action pursuant to Title VII, Civil Rights Act of 1964, as amended, Section 2000e-16(c). The formal complaint was filed with the U.S. Department of Agriculture on November 17, 2000, Case # USDACR010147, FNS-00-26. The 180-day period has expired. No notice of final action has been issued.

7.    Venue is proper in this district under Section 2000e-16 of Title VII of the Civil Rights Act of 1964, as amended. The wrongs alleged in this Complaint occurred, in

2

substantial part, in this district.

## PARTIES

8.    Plaintiff, John G. Pedicini, is employed, at the Grade 11  Step 4 level, as a Financial Management Specialist in the Financial Management Unit of the Defendant's sub-agency, the Food and Nutrition Service, Northeast Regional Office.

9.    Defendant, the United States of America, through its agency, the United States Department of Agriculture, and its sub-agency, the Food and Nutrition Service has its Northeast Regional Office located at 10 Causeway Street, Room 501, Boston, Massachusetts.

10.    In this Complaint, the Food and Nutrition Service, Northeast Regional Office, is hereinafter referred to as "FNS-NERO" and its main office, the Food and Nutrition Service, Alexandria, Virginia, is hereinafter referred to as "FNS-HQ".

## SUBSTANTIVE ALLEGATIONS

11.    The Plaintiff was appointed Alternative Dispute Resolution (ADR) Mediator for FNS-NERO by Douglas MacAllister, Director of the Financial Management Unit, on July 15, 1999.

12.    On December 29, 1999, a female employee of the Financial Management Unit at  FNS-NERO, Antoinette Bellezza, filed a formal complaint of gender and age discrimination against the Defendant related to Job Vacancy Announcement No. 99-16-NE-M and related training for said job.

13.    In May of 2000, Charles Purter, an EEO contract investigator, notified FNS-NERO that he would be conducting an investigation of Antoinette Bellezza's complaint.

3

A list of the names of the interviewees were provided to FNS-NERO. Said list included the name of the Plaintiff.

14.    The Plaintiff was one of only two non-management employees of the Financial Management Unit, other than the complainant, who provided testimony to the investigator. The other employee, Edmond Kelly, was scheduled to retire in August of 2000.  Other employees of the Financial Management Unit declined to testify.

15.    On or about June 12, 2000, Charles Purter, the EEO Contract Investigator, started his investigation at FNS-NERO.

16.    On June 13, 2000, Douglas MacAllister informed the Plaintiff that he was being removed as the Alternative Dispute Resolution (ADR) Mediator for FNS-NERO. No reason was given to the Plaintiff for the reduction in duties. Until this date, MacAllister gave no indication to the Plaintiff that he would be removed as ADR Mediator.

17.    On or about July 14, 2000, the Plaintiff was called by Charles Purter to give testimony. The Plaintiff informed Mr. Purter of the reprisal incident of June 13, 2000.

18.    On August 4, 2000, the Plaintiff completed his extensive testimony  which not only included statements on the gender/age discrimination case of Bellezza v. Veneman, but also included statements alerting the investigator to questionable hiring practices at FNS-NERO,  regarding the special treatment given to "favored employees" and the posting of job vacancies.  As an example, the Plainitiff submitted an e-mail document issued by Douglas MacAllister on November 17, 1998.  Said document became known as Exhibit 19 in the case of  Bellezza v. Veneman, as cited previously.  The

4

Plaintiff's testimony was not confidential and could be shown to any interested party (those with a legal right to know).

19.    On or about August 21, 2000, Douglas MacAllister became aware of a training session on FORM 209 which is used by the Plaintiff in his work. The Plaintiff was only one of two employees available at the time. The other employee was Kirk Hassel, a "favored employee". MacAllister chose Hassel and did not reveal any information on the training session until after the fact at a Financial Management Unit meeting on or about August 23, 2000.

20.    Sometime in August of 2000, Edmond Kelly retired from the Financial Management Unit. His position represented a career advancement opportunity for the Plaintiff, who was a leading candidate for the position. A major part of Mr. Kelly's duties included the review of Cost Allocation Plans submitted by State agencies.

21.    In August of 2000, the Plaintiff began to make inquiries about the posting of Edmond Kelly's job vacancy. Douglas MacAllister stated that he did not know when the position would be posted for application. The Plaintiff continued to make inquiries.

22.    On September 13, 2000 at a Financial Management Unit meeting, the Plaintiff inquired about obtaining approval for training. MacAllister responded by stating that the request "…would probably be denied… ." He offered no alternative. The Plaintiff continued to make inquiries about Edmond Kelly's old job.

23.    At the Financial Management Unit meeting in October of 2000, Douglas MacAllister announced that Edmond Kelly's old job had been "given up…sacrificed" for budget reasons. It would not be available.

24.    At the February 7, 2001 meeting on the Plaintiff's performance evaluation,

the Plaintiff questioned MacAllister about the "sacrifice" of Edmond Kelly's old job.

MacAllister responded that Edmond Kelly's old job had never been sacrificed and denied

making such statements at the Financial Management Unit meeting in October of 2000.

He added that Edmond Kelly's job was still on the Organizational Chart of the Financial

Management Unit. Surprised at this revelation, the Plaintiff asked when the job would be

posted for application. MacAllister responded that he didn't know, since he didn't have

permission from the Regional Administrator, Francis Zorn. The National Treasury

Employees Union representative, Louis Spychalski, was present at the meeting.

     25.     At the February 7, 2001 meeting, the Plaintiff filed a grievance under

Article 50, Section 50.08(1) of a collective bargaining agreement between FNS-HQ and

the National Treasury Employees Union alleging that FNS-NERO failed to maintain

consistency and objectivity in the development of performance standards and subsequent

appraisal of performance against these standards, violating Article 9.01(2) (c) (1) of the

agreement. Specifically, the grievance alleged that MacAllister had displayed biased

treatment toward the "favored employee", Kirk Hassel, in career advancement, training,

and promotion actions at the expense of the Plaintiff's career. In addition, the grievance

alleged that Frances Zorn, the Regional Administrator of FNS-NERO, and Margaret

Mann, Personnel Liaison for FNS-NERO, failed to take reasonable corrective action,

when informed of MacAllister's behavior by two other employees of the Financial

Management Unit, Antoinette Bellezza and Julie Larkin. The grievance sought the

transfer of Douglas MacAllister, Frances Zorn, and Margaret Mann to positions in which

they would have no control or influence over personnel actions, training assignments, or

personnel appraisals in the Financial Management Unit. In addition, the Plaintiff sought a training plan similar to the "favored employee" that would culminate, upon satisfactory performance after a 12-month period, in promotion to a Grade 12 level as did a training plan for the "favored employee".

26.     FNS-NERO failed to respond to the Plaintiff's grievance. The Plaintiff appealed to the Acting Administrator, George Braley, under Article 50, Section 50.08(4) Step 3(b) on March 7, 2001. Braley was required to respond to the grievance but declined. Surprisingly, he referred the appeal to Margaret Mann, Personnel Liaison at FNS-NERO, and one of the individuals against whom the grievance was filed. Braley permitted Mann to respond to the appeal in his behalf. In a letter dated, March 26, 2001, Mann denied the Plaintiff's grievance.

27.     In another incident on March 20, 2001, MacAllister notified the Food Stamp Program section (FSP) of the Financial Management Unit about a Cost Allocation training session at the Southeast Regional Office of the Food and Nutrition Service, hereinafter referred to as FNS-SERO on April 3-4, 2001. MacAllister had given a one-week advance notice to other sections of the Financial Management Unit, including the Information Technology section (IT), during the week of March 12, 2001.

28.     Prior to notification to the Food Stamp Program section (FSP), MacAllister had sent materials from Cost Allocation training sessions conducted by former employee, Edmond Kelly, to the instructor of the FNS-SERO courses to determine whether or not the two courses were similar in content and scope. The FNS-SERO instructor replied that the training sessions on April 3-4, 2001 would be similar to the sessions conducted by Edmond Kelly.

29.    Due to the benefit of advance notice, Scott Vehling, an employee of the Information Technology Unit (IT), expressed an interest in attending the training session before the Plaintiff had a chance to express his interest. MacAllister gave Vehling permission to attend the training sessions even though, by MacAllister's own admission, no concepts on Information Technology were included in the training sessions. About several weeks later, Vehling was promoted to a Grade 12 level.

30.    At the March 21, 2001 meeting, the Plaintiff requested permission to attend the Cost Allocation training sessions at SERO on April 3-4, 2001. The topic of Cost Allocation was directly related to the Plaintiff's Performance Standards for job performance and was also crucial for promotion to the former job of Edmond Kelly who had retired. Moreover, the Plaintiff informed MacAllister that he had missed half of Edmond Kelly's training as a result of having to take his disabled father to the hospital. The National Treasury Employees Union representative, Louis Spychalski, was present at the meeting.

31.    At the March 21, 2001 meeting, MacAllister admitted that there were 2 openings available for the training session. Scott Vehling had filled one opening, leaving another opening available. Nevertheless, MacAllister refused to grant permission to the Plaintiff to attend the training sessions at FNS-SERO, even in light of the extenuating circumstances presented to him. When asked under what part of Article 19, Section 19.02 he was denying permission to attend the training sessions, MacAllister refused to select one of the criteria.

32.    On April 9, 2001, the Plaintiff filed a grievance under the National

Agreement Article 50, Section 50.08(1), alleging a violation of Article 19, Section 19.02 whereby the Plaintiff was denied training in Cost Allocation, without using any criteria listed in the provision. The Plaintiff sought the transfer of Douglas MacAllister, Maragaret Mann, and Frances Zorn to positions in which they would have no control or influence over personnel actions, training assignments, or performance appraisals in the Financial Management Unit. In addition, the Plaintiff sought training in Cost Allocation similar in scope and content to the training sessions given at FNS-SERO on April 3-4, 2001, as determined by an independent, third-party selected by the Plaintiff.

33.     On April 26, 2001, MacAllister denied the grievance and cited Article 19, Section 19.02(d) of the National Agreement which deals with the cost effectiveness of the training. His response was conspicuously silent on the fact that he had granted permission to another employee, Scott Vehling.

34.     Pursuant to appeal instructions in MacAllister's letter of April 26, 2001, the Plaintiff appealed to Frances Zorn, Regional Administrator of FNS-NERO, on May 10, 2001

35.     On May 23, 2001,  Ms. Zorn responded to the Plaintiff's appeal, sidestepping the Scott Vehling issue by stating that "…it represents background information, and is not directly related to the specific contract provision allegedly violated. For the same reason, I will not respond to the training of other employees."

36.     Pursuant to appeal instructions in Zorn's letter of May 23, 2001, the Plaintiff appealed to the Acting Associate Administrator, Alberta Frost, on June 6, 2001.

37.     On June 22, 2001, Ms. Frost responded to the Plaintiff's appeal. With regard to the granting of permission to attend the training for Scott Vehling, Ms. Frost

stated,

> "…it is perfectly appropriate for a supervisor to determine that
> a particular training event or other work experience meets the
> needs of one employee, but not another. In this case, since no staff
> from the financial management unit were offered this training, it would
> appear that a judgement was made, on a uniform basis, that this activity
> was not a useful investment of time or funds for Northeast Region financial
> management employees."

Ms. Frost denied the Plaintiff's grievance.

38.    MacAllister conducted an "information exchange" meeting on Cost

Allocation on June 13, 2001. No trained instructor was present to monitor the session or

to answer questions.

39.    As a result of the Defendant's reprisal actions, the Plaintiff's career has been

irreparably damaged.

## COUNT I

### Reduction of Duties And Assignments

40.    Plaintiff incorporates by reference the allegations in the preceding

paragraphs of this complaint as if fully set forth herein.

41.    This Count is brought by the Plaintiff pursuant to Title VII of the Civil

Rights Act of 1964, as amended, Sec. 2000e-3(a) and 5 USC Sec. 2302(b)(9).

42.    Plaintiff was appointed ADR Mediator for FNS-NERO on July 15, 1999.

From July 19, 1999 to June 12, 2001, the Defendant did not alter or remove, in any

manner, the Plaintiff's duties and assignments as ADR Mediator. In addition, no notice

was issued that any change was planned.

43.    After EEO investigator, Charles Purter, submitted his witness list in May

10

2000 and started his investigation on June 12, 2000, the Plaintiff was removed without cause on June 13, 2000.

44.     Because of the proximity of the adverse employment action and the commencement of the protected activity, the causal link of retaliation is obvious.

45.     Defendant's reduction in Plaintiff's duties and assignments as ADR Mediator was the beginning of a pattern of reprisal behavior against the Plaintiff.

## COUNT II

### Denial Of Promotional Opportunity

46.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

47.     This Count is brought by Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, Section 2000e-3(a), as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

48.     On August 4, 2000, the Plaintiff not only provided extensive testimony to the EEO investigator, but also alerted him to possible hiring irregularities by providing a copy of an e-mail sent by Douglas MacAllister on November 17, 1998. The document was entered into the investigative report as Exhibit 19. The report was not confidential and could be shown to any interested party (those with a legal right to know).

49.     On August 14, 2000, with the retirement of Edmond Kelly, a job vacancy occurred in the Plaintiff's section of the Financial Management Unit. Said vacancy represented a promotional opportunity for the Plaintiff.

50.     The Plaintiff was a leading candidate for the job vacancy arising from

Edmond Kelly's retirement. He made continuous inquiries as to when the vacancy announcement would be posted.

51.    Misleading statements were issued by the Defendant in an attempt to deny the Plaintiff of a promotional opportunity. At the October 2000 meeting of the Financial Management Unit, Douglas MacAllister, the Director, stated that the position was being "sacrificed...given up" for budget reasons. At a February 7, 2001 meeting with the Plaintiff and the NTEU representative, Louis Spychalski, MacAllister denied making the statement in October 2000. However, he stated that the job was still on the Organizational Chart of the Financial Management Unit, but he didn't know when it would be posted, since he didn't have permission from the Regional Administrator, Frances Zorn, who had given permission to post other job vacancies in other sections of the Northeast Regional Office of the Food and Nutrition Service.

52.    By reason of the foregoing, denials of promotional opportunities are actionable as adverse employment decisions under Title VII of the Civil Rights Act of 1964, as amended.

53.    As a result of the Defendant's failure to post the aforementioned vacancy, the Plaintiff has been deprived of a promotional opportunity and he has incurred serious damage to his career.

## COUNT III

### Obstruction From Competitive Training

54.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint as if fully set forth herein.

55.     This Count is brought by the Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, as amended, 5 USC Sec. 2302(b)(8) and 5 USC Sec. 2302(b)(9).

56.     When opportunities for competitive training have arisen, the Defendant has obstructed the Plaintiff by withholding information and/or denying training without cause.

57.     On August 23, 2000, the Plaintiff was not informed of a training opportunity on FORM 209, until after the fact.

58.     On September 13, 2000, the Plaintiff received a negative response when making a request for training.  No conditions or exceptions were placed on that negative response.

59.     On March 21, 2001, the Defendant's intent to deny the Plaintiff competitive training reached a new level, when the Plaintiff was denied training even when an opening existed.

60.     The Defendant has deprived the Plaintiff of the same competitive training which was given to other employees.

61.     If the Defendant is left unrestrained under its present policies and practices, there is no limit to the damage it may cause to the Plaintiff's career.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, prays for judgment as follows:

a.     Awarding Plaintiff a promotion of one full grade and one full step from his current Grade 11 Step 4 position to Grade 12  Step 5, retroactive from March 21, 2001.

b.     Awarding Plaintiff his costs and expenses in this litigation, including reasonable attorney's fees and experts' fees and all other costs and disbursements.

c.     Awarding Plaintiff such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues.

Dated: _____9/11/01_____

_____
**JOHN G. PEDICINI, PRO SE**
10 Milano Drive
Saugus, MA   01906
(781) 233-5274

# EXHIBIT 19



EXHIBIT
Δ6
10/25/05

## SETTLEMENT AGREEMENT
## (INFORMAL RESOLUTION THROUGH MEDIATION)

This Agreement made by and between John Pedicini (hereafter referred to as Complainant) and the Food and Nutrition Service, U. S. Department of Agriculture (hereafter referred to as Agency) constitutes a full, complete, and final settlement of all the equal employment opportunity concerns raised in the Complainant's filing in U. S. District Court for the District of Massachusetts, case number 01-11564DPW, filed on 11/27/2001, and any other pending Equal Employment Opportunity (EEO) complaints.

The parties wish to set forth the terms of the Agreement in writing. This neither determines nor implies a finding of or admission that discrimination occurred nor that the allegations are true or factual.

This Agreement does not prevent the Agency from pursuing any issues of alleged misconduct raised in the complaint, nor from initiating any preventive, corrective or disciplinary action against Agency officials, if warranted.

This Agreement is authorized under 29 CFR 1614, regulations on processing EEO complaints in the Federal Government, and the EEOC's Management Directive (MD-110).

### The Agency Agrees to:

1. In terms of training and career advancement opportunities, the Agency agrees to treat the Complainant equally. The Complainant's immediate supervisor will work with him to implement his Individual Development Plan (IDP). This plan presently exists with specific identified training courses. He will receive at a minimum, one (1) relevant training course as identified in his IDP. Selection of one course does not prevent him from substituting or attending another more relevant training course that may not have been scheduled, posted, or brought to his awareness during the development or implementation of the IDP. Nomination and substitution is subject to supervisory approval; such approval shall not be unreasonably withheld. If he is denied training, his immediate supervisor will inform him of the reason(s) using objective criteria.

2. The Complainant will also receive Alternative Dispute Resolution (ADR) training as defined by the Food and Nutrition ADR program coordinator in order to eventually become a qualified Shared Neutral. Appropriate training will begin within six to nine months of the signing of this agreement, or as soon as possible thereafter. Certification is contingent on established objective criteria and objective evaluations by professionals in the field. The practices of the Boston Federal Executive Board (BFEB) will apply regarding his inclusion on the roster of Shared Neutrals under the BFEB program. Training as a Shared Neutral will be identified on his IDP.

**Exhibt** 1
**Page** 1 of 3

3. Training opportunities that become available or known to Financial Management supervisors (1st and 2nd level) will be shared with ALL employees at the same time through e-mails so as to avoid any misperceptions.

**The Complainant Agrees to:**

4. As a Shared Neutral the Complainant agrees to practice the knowledge, skills, and abilities learned through the program in helping to diffuse conflict/disagreements informally within the Food and Nutrition Northeast Regional Office. To avoid any misperceptions of his neutrality as Shared Neutral, employees with concerns who seek his counsel will be directed to their supervisor or union representative. Cases in which the Complainant has been designated as an EEO representative, prior to the execution of the Agreement, are excepted. The Complainant agrees not to represent any new EEO cases, except his own.

5. The Complainant agrees to withdraw, without prejudice, his judicial claims now pending in U.S. District Court against the Food and Nutrition Service, U.S. Department of Agriculture.

6. The Complainant releases, waives and withdraws, without prejudice, any and all complaints, grievances, appeals or civil actions against the Agency, its employees and officers in their individual and official capacities for any employment situations prior to the signing of this Agreement. This agreement does not prevent him from exercising his rights in accordance with 29 CFR 1614, in any other matter.

**Both Parties Agree:**

7. The Complainant and his supervisor agree to communicate on a regular basis to minimize any misunderstandings concerning work assignments, performance, training, etc., with the aim of building trust and understanding. Issues, concerns, or disagreements with his supervisor(s) will be addressed in private meetings, when a public exchange would reflect poorly on one or both parties. If he and his supervisor are unable to resolve differences, they both will meet with the 2nd level manager who will serve as an objective 3rd party. If the 2nd level manager is unable to resolve the dispute, the Deputy Regional Administrator (DRA) will serve as the final reviewing official. During the discussions at the various levels identified above, the Complainant has the right to utilize the EEO complaints process.

8. The Complainant and his 2nd level supervisor Douglas MacAllister will meet with a 3rd party neutral to have a discussion about their interpersonal working relationships and ways to bridge those differences and to build trust and understanding within six weeks of the signing of this Agreement.

US0105

Exhibit 7 1
Page 2 of 3

2

9.  The Deputy Regional Administrator, Northeast Region, Food and Nutrition Service (FNS-NERO) will assume responsibility for ensuring that the actions in this agreement take place within the time frames identified above.

10.  The Food and Nutrition Service shall not take reprisal against the Complainant as a result of his having filed the complaint of discrimination which is the subject of this informal resolution agreement.  However, any future complaint on an issue not addressed in this agreement which he may file against Food and Nutrition Service or the Department Agriculture will be considered and processed as a separate action and will in no way undermine or render this informal resolution agreement as null and void.

11.  All parties agree to keep the terms of this informal resolution agreement confidential, and in doing so, agree not to discuss its terms with third parties or persons except those who need to know in order to implement the terms contained herein, without the expressed permission of all parties.

12.  The fact that the complaint was voluntarily resolved in a manner acceptable to both sides may be communicated to others.

13.  Both parties agree to cooperate in good faith to complete implementation of this Agreement and to abide by the terms of this Agreement.

14.  Both parties agree to declare this complaint resolved through this Settlement Agreement. There are no other Agreements between the parties, either expressed or implied, oral or written.

15.  After the Agreement is fully implemented, the Agency will, within thirty (30) days, provide the Complainant with a written notice explaining the specific actions taken to implement the Agreement.  A copy of the notice will be provided to the Complaints Compliance Division, USDA Office of Civil Rights, Reporter Building, Room #607, 300 7th Street SW, Washington, DC  20050.

16.  They are entering into this Agreement voluntarily, without coercion or duress, and they fully understand the terms of this Agreement.

_____
Complainant

_____
Agency Official

6/17/02
_____
Date

6/17/02
_____
Date

Exhibit ___7___
Page __3__ of __3__

US0106

3

# EXHIBIT 20

**Ghiorzi, John**

| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Tuesday, January 28, 2003 8:37 AM |
| **To:** | Ghiorzi, John |
| **Cc:** | Stanco, Joseph; MacAllister, Douglas |
| **Subject:** | RE: Mediator's Position |



**Importance:**    High

John:

This is to inform you that I will be unable to pursue the mediator's position in our Agreement set forth in June of 2002, due to the declining health of my father.

Since September 28, 1997, my father has been paralyzed from a massive stroke. On December 21, 2002, after fighting off a bout with pneumonia, his swallowing capability greatly diminished. As a result, he was placed on a feeding tube which will remain for the foreseeable future. We have home health aides taking care of him during the day (9 am to 5 pm). However, we have been unable to get aides during the night and early morning hours. The feeding tube runs 14-18 hours per day and feeds my father at the rate of 2 tablespoons per hour. I am the primary caregiver and I set up the feeding tube. My workday starts at 3:30am. I finish in time to catch the train and report to work by 6:30 am. I shut down the feeding tube at night. Consequently, this unexpected responsibility has limited my ability to travel which is part of the mediator's position. Thus, I am forced to decline the opportunity.

Thanks for your help.

Sincerely,

John Pedicini

P-1136

1

# EXHIBIT 21

FILED

UNITED STATES DISTRICT COURT
IN CLERKS OFFICE
DISTRICT OF MASSACHUSETTS

2002 JUN 25 P 4: 34

U.S. DISTRICT COURT
DISTRICT OF MASS.

**COPY**

EXHIBIT

Δ 7

10/25/05 7L

JOHN G. PEDICINI,

    Plaintiff,

       v.

UNITED STATES OF AMERICA,

    Defendants.

Civil Action No.
01-11564-DPW

## STIPULATION OF DISMISSAL WITHOUT COSTS

The parties are pleased to report that this case has settled.  Pursuant to Fed. R. Civ. P. 41 (a)(1) the parties move this Honorable Court to dismiss this action without costs.

Respectfully submitted,

JOHN G. PEDICINI,
PRO SE PLAINTIFF

UNITED STATES OF AMERICA,
By its attorney,

MICHAEL J. SULLIVAN,
United States Attorney

JOHN G. PEDICINI
Pro Se
10 Milano Drive
Saugus, MA 01906
(617) 565-6449

RAYFORD A. FARQUHAR
Assistant U.S. Attorney
1 Courthouse, Suite 9200
Boston, MA 02210
(617) 748-3284

Dated: June 25, 2002

US0001

# EXHIBIT 22

## Pedicini, John

| | |
|---|---|
| From: | Pedicini, John |
| Sent: | Thursday, February 27, 2003 9:52 AM |
| To: | Stanco, Joseph; Komloske, Brenda |
| Cc: | Wilusz, Lisa; Campusano, Beth; Perez, Luis; Hines, Marty; MacAllister, Douglas; Malone, Michael |
| Subject: | RE: IAS Rollout |
| Importance: | High |

Mr. Stanco:

Why am I not listed as an alternate to Marty ?

————————John Pedicini

-----Original Message-----
| | |
|---|---|
| From: | Stanco, Joseph |
| Sent: | Thursday, February 27, 2003 9:47 AM |
| To: | Komloske, Brenda |
| Cc: | Wilusz, Lisa; Campusano, Beth; Perez, Luis; Hines, Marty; Pedicini, John; MacAllister, Douglas; Stanco, Joseph; Malone, Michael |
| Subject: | RE: IAS Rollout |

*Brenda,*

*Sorry for not getting back to you earlier, but I was out of the office for few days. Anyway, those identified as the requisitioners in my mail of Feb 19th are the Warranted Contracting Officers.*

*I'll complete and forward to all concerned the completed User Template before the end of the day; this basic data is contained in my e-mail of Feb 19th.*

*Joe*

-----Original Message-----
| | |
|---|---|
| From: | Komloske, Brenda |
| Sent: | Friday, February 21, 2003 8:08 AM |
| To: | Stanco, Joseph |
| Subject: | FW: IAS Rollout |

Hi Joe,

Who are your Warranted Contracting Officers (acquistioners)?

Thanks,

Brenda
-----Original Message-----
| | |
|---|---|
| From: | Wilusz, Lisa |
| Sent: | Thursday, February 20, 2003 5:50 AM |
| To: | Jonathan Powell (E-mail) |
| Cc: | Green, Leonard; Komloske, Brenda |
| Subject: | FW: IAS Rollout |

Exhibit 7 P

Page 1 of 3

1    163

US0107

fyi

-----Original Message-----
**From:** Stanco, Joseph
**Sent:** Wednesday, February 19, 2003 3:01 PM
**To:** Wilusz, Lisa
**Cc:** Stanco, Joseph; Hines, Marty; Pedicini, John; MacAllister, Douglas; Malone, Michael; Campusano, Beth
**Subject:** IAS Rollout

*Lisa,*

*Following is the data on the IAS Rollout from NERO:*

*a. Accounting Codes and Vendor Data files*

*<< File: Acct. Class. Codes2003.xls >> << File: Vendor Data Template.xls >>*
*b. NERO's Internal Routing/ Approval Processes*

*(1) The Non-IAS Requestor identifies need and submits an AD-700, appropriately routed and endorsed, to the IAS Requisitioner.*

*(2) The IAS Requisitioner, one of the two individuals identified below, verifies the data on the AD-700 and enters it into IAS (Purchase Request (PR) is routed through the approval process).*

*(3) The Funds Officer certifies funds availability and routes the AD-700 to the approver (one of the approvers identified below).*

*(4) Approved PR goes back to Funds Officer who enters obligation into FFIS.*

*(5) Purchasing Agent takes required procurement steps*

*c. User Data*

*(1) Funds Officer:*
*Marty Hines, FM-FSP/IF, Tel 617-565-6454, Fax 617-565-6254, E-mail address from FNS directory, Funds Officer.*

*(2) Requisitioners:*
*Louis Perez (principle), FM-IT/SS, Tel 617-565-6392, Fax 617-565-6472, E-mail address from FNS directory, Purchasing Agent.*
*Beth Campusano (alternate), FM-IT/SS, Tel 617-565-6392, Fax 617-565-6472, E-mail address from FNS directory, Management Services Specialist.*

*(3) Approvers:*
*Doug MacAllister, FM, Tel 617-565-6446, Fax 617-565-6254, E-mail*

US0108

Exhibit 1P
Page 2 of 3

2

*address from FNS directory, Financial Management Director.*
*John Ghiorzi, DRA, Tel 617-565-7110, Fax 617-565-6472, E-mail address*
*from FNS directory, Deputy Regional Administrator.*
*Frances Zorn, RA, Tel 617-565-6370, Fax 617-565-6472, E-mail address*
*from FNS directory, Regional Administrator.*

*I'll be out through 2/26/03; in my absence please refer any questions on this matter to*
*Mike Malone at 617-565-6468.*

*Joe*

Exhibit 7 P
Page 3 of 3

US0109

**Pedicini, John**

| | |
|---|---|
| From: | Stanco, Joseph |
| Sent: | Thursday, February 27, 2003 12:59 PM |
| To: | Pedicini, John |
| Cc: | Hines, Marty; Stanco, Joseph |
| Subject: | RE: RE: ALTERNATE TO MARTY HINES ON IAS |

*John,*

*I'll include your name in the User Template I'll forward to Brenda today.*

*Joe*

-----Original Message-----
| | |
|---|---|
| From: | Pedicini, John |
| Sent: | Thursday, February 27, 2003 12:53 PM |
| To: | Stanco, Joseph |
| Cc: | Hines, Marty |
| Subject: | RE: ALTERNATE TO MARTY HINES ON IAS |
| Importance: | High |

Joe:

Pursuant to our conversation this morning, I have not received any communication from you that indicates to Brenda Komloske that I am an alternate to Marty Hines on the IAS Rollout.

What's the problem ?

----------John Pedicini

Exhibit 7a

Page 1 of 1

1

US0110

# EXHIBIT 23

```
>  From:           Pedicini, John
>  Sent: Tuesday, March 04, 2003 1:36 PM
>  To:   Stanco, Joseph
>  Subject:        FW: RE:  Alternate to NERO Funds Officer
>  Importance:   High
>
>  Joe:
>
>    Please read below.
>
>                    ---------John
>
>  -----Original Message-----
>  From:           Lash, Jonathan
>  Sent: Tuesday, March 04, 2003 1:35 PM
>  To:   Pedicini, John
>  Subject:        RE: RE:  Alternate to NERO Funds Officer
>
>  John,
>
>  As with all backup funds officers, in the absence of the primary funds
>  officer, you are authorized to certify funds availability.
>
>  Jonathan
>
>   -----Original Message-----
>  From:           Pedicini, John
>  Sent: Tuesday, March 04, 2003 1:30 PM
>  To:   Lash, Jonathan
>  Subject:        RE: RE:  Alternate to NERO Funds Officer
>
>  Am I listed as having certification rights ?
>
>                    -----------John Pedicini
>
>       ----Original Message-----
>       From:    Lash, Jonathan
>       Sent:    Tuesday, March 04, 2003 1:11 PM
>       To:      Pedicini, John
>       Subject:        RE: RE:  Alternate to NERO Funds Officer
>
>       Yes, John, we've had you listed as the backup funds officer in NERO
>  for years.
>
>       Jonathan
>
>            -----Original Message-----
>            From:   Pedicini, John
>            Sent:   Tuesday, March 04, 2003 12:41 PM
>            To:     Lash, Jonathan
>            Subject:        RE:  Alternate to NERO Funds Officer
>            Importance:     High
>
```

EXHIBIT /

EXHIBIT
P1F5
"
6/6/05 9mw

of 2

3/11/03 8:33 AM

P-1914

# EXHIBIT 24

**Pedicini, John**

| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Tuesday, March 04, 2003 2:18 PM |
| **To:** | Ghiorzi, John |
| **Subject:** | RE: THE AGREEMENT |

**Importance:**     High

Mr. Ghiorzi:

Pursuant to the Agreement signed in June of last year, the Office agreed not to take retaliatory actions against me. Please be advised that a reduction in duties is considered to be retaliatory, especially when those duties may enable an employee to gain valuable experience for career advancement opportunities.

We now find ourselves faced with such a situation.

As you know, I backup Marty on Funds Control. HQ has confirmed that I have been listed as the backup funds officer for years and **I am to have certification rights.**

With the onset of the new IAS system for funds control, I pointed out to Joe Stanco that I should be listed as Marty's alternate. He agreed last week and listed me in his correspondence.

On Monday, March 3rd, he informed me that Douglas MacAllister was objecting to me having certification rights and asked to see proof. Today, HQ confirmed that I am the backup funds officer and I am to have certifying rights.

I trust that you will abide by the Agreement and not reduce my duties.

---------John Pedicini

P-1624

# EXHIBIT 25

1

Volume I
Pages 1 to 59
Exhibit 77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN G. PEDICINI,               :
        Plaintiff,              :
                                :
        vs.                     :   Civil Action
                                :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :
        Defendants.             :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF JONATHAN LASH, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Tuesday, August 2, 2005,
commencing at 1:15 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

40

1    with his questions.  Thank you.

2                        CROSS EXAMINATION

3       BY MR. WILMOT:

4       Q.    Mr. Lash, are you a member of management at

5    USDA?

6       A.    No, I am not.

7       Q.    So does that mean you do not have the

8    authority to make any managerial decisions?

9       A.    That's true.

10      Q.    Have you ever had this authority?

11      A.    No.

12      Q.    Do you have the authority to assign a USDA

13   employee a certain grade level?

14      A.    No.

15      Q.    Have you ever had that authority?

16      A.    No.

17      Q.    Do you have the authority to give a USDA

18   employee a raise?

19      A.    No.

20      Q.    Have you ever had that authority?

21      A.    No.

22      Q.    Do you have the authority to promote a USDA

23   employee?

24      A.    No.

41

1    Q.    Have you ever had that authority?

2    A.    No.

3    Q.    Do you have the authority to assign a USDA

4    employee a certain title?

5    A.    No.

6    Q.    Have you ever had that authority?

7    A.    No.

8    Q.    Do you have the authority to assign a USDA

9    employee new job responsibilities?

10   A.    No.

11   Q.    Have you ever had that authority?

12   A.    No.

13   Q.    Do you have the authority to override an

14   employment decision made by a USDA management

15   person?

16   A.    No.

17   Q.    Have you ever had that authority?

18   A.    No.

19   Q.    I just want to bring your attention to

20   Exhibit 10.  This is the list that you gave some

21   testimony on earlier.

22          Is this list -- and I know you didn't

23   prepare this list which is marked as Plaintiff's

24   Exhibit 10, but you said you currently maintain a

42

1   similar list; is that correct?

2       A.    That's correct.

3       Q.    Is that list that you maintain approved by

4   any member of management at USDA?

5       A.    No.

6       Q.    What is the purpose of that list?

7       A.    So we can all know who is working for who.

8       Q.    Is that maintained by you?

9       A.    Yes.

10      Q.    So when you say "we can all know who is

11  working for who," who is "we"?

12      A.    We are the funds officers and people who

13  work with the funds officers.

14      Q.    How does one obtain the right to certify

15  funds availability?

16      A.    You receive a designation from a

17  supervisor.

18      Q.    Is that the case in each region?

19      A.    To the best of my knowledge, yes.

20      Q.    Which supervisor in each region has that

21  authority to I guess assign that right to someone?

22  Do you know what that position is?

23      A.    I don't know.

24      Q.    Would it be the allowance holder?

45

1    Q.    Do you know if it's a USDA policy that the

2  backup funds officer has this right to certify funds

3  availability?

4    A.    I wouldn't characterize it as a right.

5    Q.    How would you characterize it?

6    A.    A capability.

7    Q.    Do you know if it's USDA policy that every

8  backup funds officer has the capability to certify

9  funds availability?

10    A.    I don't know that.  I would suppose it.

11    Q.    Who told you that John Pedicini had the

12  capability to certify funds availability?

13          MR. CATAPANO-FRIEDMAN:  Object, but please

14  answer.  Sorry.

15    A.    I always assumed he had the authorization

16  because he has always been referred to as the backup

17  funds officer.

18    Q.    By whom?

19    A.    By Marty.

20    Q.    Anyone else?

21    A.    I never discussed it with anyone else at

22  the Northeast Region because frankly I just don't

23  know that many people there, and I only had reason

24  to deal with Marty.

46

1      Q.    So am I correct that the only person that

2   you've spoken with at FNS-NERO that has said that

3   Mr. Pedicini has the capability to backup the

4   certification of funds availability was Marty Hines?

5      A.    Right.

6      Q.    You had testified earlier about that it

7   would be a violation of policy if someone certified

8   funds availability without first accessing the FFIS

9   system.  Do you remember that?

10      A.    Yes.

11      Q.    Does the person who actually certifies that

12   the funds are available have to be the same person

13   that accesses the system to check to see if the

14   funds are available?

15      A.    I don't think it has to be that way, but it

16   certainly would be wise.

17      Q.    So for example if I did not have access to

18   FFIS, if I asked someone who did and they checked to

19   see if it was available and they told me that it is

20   and I then certify that funds are available, is that

21   a violation of USDA policy?

22      A.    I don't know that it's a violation.  I

23   think it would be or should be rare.

24      Q.    Are you aware of the title alternate funds

47

1  officer?

2      A.    No.

3      Q.    Have you ever heard of such a title?

4      A.    No.

5      Q.    Are you aware of whether in any of the

6  regions a member of management has the capability to

7  certify that funds are available?

8      A.    Yes.

9      Q.    You are aware of that?

10     A.    Typically the way -- when I have seen it

11 exercised is if a purchase is for a rush, something

12 has to be done and the funds officer is not there,

13 then typically a supervisor would sign funds are

14 available and then get someone else to sign that it

15 should be -- the purchase is in the public interest,

16 and then the supervisor who signed funds available

17 must leave a copy of that for the funds officer so

18 that it can be recorded.

19     Q.    Are you aware of any USDA policy that would

20 forbid such an arrangement as you just described?

21     A.    No.

22     Q.    Have you ever heard Marty Hines say that he

23 was contemplating retirement?

24     A.    Yes.

48

1    Q.    When did you hear him say that?

2    A.    I've heard it on several occasions.

3    Q.    When was the last time you heard him say

4    that?

5    A.    I know we were in an airport.  It probably

6    was a New Orleans airport maybe two years ago, but I

7    think since then in phone conversations he has at

8    times said he wanted to retire.

9            MR. WILMOT:  Nothing further.

10           MR. CATAPANO-FRIEDMAN:  Okay.

11           MR. WILMOT:  Thank you.

12                   REDIRECT EXAMINATION

13    BY MR. CATAPANO-FRIEDMAN:

14    Q.    Has Marty Hines told you when he wants to

15    retire?

16    A.    I think he wanted to retire by now.

17    Q.    Has he told you why he hasn't retired by

18    now?

19    A.    No.

20    Q.    Did he ever set a time line as to when he

21    would retire in conversations with you?

22    A.    No.

23    Q.    Do you know how the topic of Marty Hines'

24    retirement came up in conversations with you?

**EXHIBIT 26**

## MacAllister, Douglas

| | |
|---|---|
| From: | Stanco, Joseph |
| Sent: | Tuesday, March 04, 2003 7:46 AM |
| To: | Pedicini, John |
| Cc: | Stanco, Joseph; Hines, Marty; MacAllister, Douglas |
| Subject: | RE: RE: IAS DUTIES |

*John,*

*Yes, you'll be expected to back up the Funds Officer when his absence.  However, when you have a situation requiring fund certification and Marty is absent, you'll refer it for my action or, in my absence, Doug's action.*

*I don't know nothing about the IPAS training in Chicago.*

*Joe*

-----Original Message-----
| | |
|---|---|
| From: | Pedicini, John |
| Sent: | Tuesday, March 04, 2003 7:13 AM |
| To: | Stanco, Joseph |
| Subject: | RE: IAS DUTIES |
| Importance: | High |

Joe:

In order to prevent any misunderstanding, please explain what duties in IAS I will have as they relate to the Funds Control part of my Performance Appraisal.

For example, will I be expected to backup the Funds Officer in the event that he is not in the office, as is the case with Janice ?
Or will you be performing the duties of the Funds Officer in IAS ?

Also, am I to assume that I **will** be attending the IPAS training session in Chicago on May 25-27th ?

--------------John Pedicini



EXHIBIT
Def't's
14
PMM 6-25-0J

Exhibit 20d
Page 1 of 1

**MacAllister, Douglas**

| | |
|---|---|
| From: | MacAllister, Douglas |
| Sent: | Thursday, March 06, 2003 9:06 AM |
| To: | Stanco, Joseph |
| Subject: | RE: RE: MONDAY MEETING |

Say, 9:00am. Let me know if acceptable.
Thanks, Doug

        -----Original Message-----
| | |
|---|---|
| From: | Stanco, Joseph |
| Sent: | Thursday, March 06, 2003 9:03 AM |
| To: | MacAllister, Douglas |
| Cc: | Stanco, Joseph |
| Subject: | FW: RE: MONDAY MEETING |
| Importance: | High |

*Doug,*

*It appears that Monday is open for all participants; what time do you prefer?*

*Joe*


        -----Original Message-----
| | |
|---|---|
| From: | Pedicini, John |
| Sent: | Thursday, March 06, 2003 8:55 AM |
| To: | Stanco, Joseph |
| Cc: | Spychalski, Louis |
| Subject: | RE: MONDAY MEETING |
| Importance: | High |

Joe:

Lou is available all day on Monday.

What time do you want to meet ?

        --------John Pedicini

Exhibit 20C
Page 4 of 4

P-528

**Pedicini, John**

| | |
|---|---|
| **From:** | Stanco, Joseph |
| **Sent:** | Thursday, March 06, 2003 9:17 AM |
| **To:** | Pedicini, John |
| **Cc:** | Stanco, Joseph; MacAllister, Douglas; Spychalski, Louis |
| **Subject:** | RE: RE: MONDAY MEETING |



*John,*

*I checked with Doug and he suggested Monday at 09:00 am.  Since all indicated to be available on this day, I assume that, unless you notify me otherwise, we'll meet on Monday at 09:00am in Doug's office.*

*Joe*

-----Original Message-----
**From:**      Pedicini, John
**Sent:**       Thursday, March 06, 2003 8:55 AM
**To:**         Stanco, Joseph
**Cc:**         Spychalski, Louis
**Subject:**    RE: MONDAY MEETING
**Importance:** High

Joe:

Lou is available all day on Monday.

What time do you want to meet ?

--------John Pedicini

P-1600

1

**Pedicini, John**

| | |
|---|---|
| **From:** | MacAllister, Douglas |
| **Sent:** | Friday, March 07, 2003 2:09 PM |
| **To:** | Pedicini, John |
| **Cc:** | Stanco, Joseph |
| **Subject:** | Monday Meeting |



John,

This meeting is an informal discussion of current work assignments and how they will relate to the implementation of IAS. You, Joe and I, will be talking so that I may get the most current information on your assignments in FFIS to relate those to the pending implementation of IAS. I anticipate this meeting to provide some of the information that Joe and I need to decide how we will handle IAS.

The National Agreement between FNS and NTEU covers the provision of Union representation and employee representation in Article 6. It lists meetings that merit opportunity for official Union representation and also employee representation. This meeting fits none of these meeting types.

Our meeting will take place in my office, 9:00am. Please be on time. I will see you then.

Thanks, Doug

> -----Original Message-----
> **From:** Pedicini, John
> **Sent:** Thursday, March 06, 2003 11:15 AM
> **To:** MacAllister, Douglas
> **Subject:** RE: RE: Monday Meeting
>
> Doug:
>
> I have a right to a representative at this meeting. I have selected Marty.
>
> If you want the meeting, it is with Marty.
>
> Otherwise, I suggest you submit your response to me via e-mail.
>
> -----------John
>
> > -----Original Message-----
> > **From:** MacAllister, Douglas
> > **Sent:** Thursday, March 06, 2003 10:50 AM
> > **To:** Pedicini, John; Stanco, Joseph
> > **Subject:** RE: RE: Monday Meeting
> >
> > John,
> >
> > Marty is not a part of this meeting. I already mentioned to Joe that we will meet and discuss this matter. If Marty is needed for clarification we will solicit his input. If another meeting with Marty appears needed a second meeting will be held.
> >
> > Thanks, Doug
> >
> > > -----Original Message-----
> > > **From:** Pedicini, John
> > > **Sent:** Thursday, March 06, 2003 10:13 AM
> > > **To:** Stanco, Joseph
> > > **Cc:** MacAllister, Douglas; Hines, Marty; Spychalski, Louis
> > > **Subject:** RE: Monday Meeting
> > > **Importance:** High

*P-1467*

1

Joe:

Lou has withdrawn from the Monday Meeting. So, since Marty originally called the meeting, I have asked him to substitute for Lou.

See you and Doug at 9:00 am on Monday, March 11th


--------John

P-1468

Pedicini, John

| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Monday, March 10, 2003 6:38 AM |
| **To:** | MacAllister, Douglas |
| **Cc:** | Stanco, Joseph; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; Zorn, Frances; Wilkerson, Courtney; 'gregory.ferby@ny.usda.gov' |
| **Subject:** | RE: Monday Meeting |
| **Importance:** | High |

Dear Mr. MacAllister:

Please be advised that on Tuesday, March 5, 2003 at 9:02am, an EEO Complaint was filed against you, Frances Zorn, John Ghiorzi, and Joseph Stanco, regarding the issues stated below in your e-mail of 3/7/03, with the USDA Civil Rights Office. For verification of these facts, kindly contact EEO Counselor, Greg Ferby at 315-477-6310 or e-mail him at Gregory.Ferby@ny.usda.gov.

The Union contract is not applicable to this situation. EEO regulations apply.

In addition, Martin Hines was designated as my EEO Representative on this complaint. The paperwork was received and accepted by the USDA Civil Rights Office. Mr. Hines is my official EEO Representative, irrespective of your opinion, and he is required to attend the meeting.

Since your e-mail of 3/7/03 does not address the issue of Mr. Hines attendance, I assume that you are refusing to let him attend and that such refusal is coming under the direction of Frances Zorn and John Ghiorzi. There are two other instances in the past 6 months in which Ms. Zorn and Mr. Ghiorzi have attempted to deny representation at employee-supervisor meetings.

By copy of this e-mail, Mr. Wilkerson, Mr. Salazar, and Ms. Veneman have been notified that you, Ms.Zorn, and Mr. Ghiorzi are in violation of 29 CFR 1614.605(a). I am hereby making a formal request for them to initiate corrective action.

My EEO representative and I will be happy to meet with you at 9:00 am today, provided that he is in the office. Otherwise, we will have to reschedule the meeting. If you refuse to permit my EEO Representative to attend the meeting, then there will be no meeting and you are requested to put your proposal in writing via an e-mail or a letter in my in-box.

Please respond before 9:00am today that you will permit my EEO Representative to attend the meeting. If not, I will assume that you continue to be in violation of 29 CFR 1614.605(a).

Thank you, in advance, for abiding by EEO regulations and upholding Ms. Veneman's statements that violations of Civil Rights regulations will not be tolerated at the USDA.

-----------John Pedicini

-----Original Message-----

| | |
|---|---|
| **From:** | MacAllister, Douglas |
| **Sent:** | Friday, March 07, 2003 2:09 PM |
| **To:** | Pedicini, John |
| **Cc:** | Stanco, Joseph |
| **Subject:** | Monday Meeting |

John,

P-1641

**Pedicini, John**

| From: | Pedicini, John |
|---|---|
| Sent: | Monday, March 10, 2003 8:58 AM |
| To: | MacAllister, Douglas |
| Cc: | Hines, Marty; Zorn, Frances; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; 'Gregory.ferby@ny.usda.gov'; Stanco, Joseph |
| Subject: | RE: Monday Meeting at 9:00am |
| Importance: | High |

Doug:

   The EEO Counselor, Greg Ferby, has stated that my EEO Representative can attend any meetings related to the issues in the EEO complant.

   I trust that you agree with Mr. Ferby or disagree, please advise.

          ----------John Pedicini


-----Original Message-----
| From: | MacAllister, Douglas |
|---|---|
| Sent: | Monday, March 10, 2003 8:51 AM |
| To: | Pedicini, John |
| Cc: | Hines, Marty; Zorn, Frances; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; 'Gregory.ferby@ny.usda.gov'; Stanco, Joseph |
| Subject: | RE: Monday Meeting at 9:00am |

John,

The meeting coverage is as stated previously.  Nr. HInes is not invivted.  The meeting will take place as stated the two previous messages; you, Joe and me.

I will see you in my office.

Thanks,  Doug

-----Original Message-----
| From: | Pedicini, John |
|---|---|
| Sent: | Monday, March 10, 2003 8:21 AM |
| To: | MacAllister, Douglas |
| Cc: | Hines, Marty; Zorn, Frances; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; 'Gregory.ferby@ny.usda.gov'; Stanco, Joseph |
| Subject: | RE: Monday Meeting at 9:00am |
| Importance: | High |

Doug:

  As stated before, I will be bringing along my EEO Representative, Martin Hines. I trust you will permit him at the meeting. I assume that the subject matter is about IAS.

      -----John Pedicini

-----Original Message-----
| From: | MacAllister, Douglas |
|---|---|
| Sent: | Monday, March 10, 2003 8:15 AM |
| To: | Pedicini, John; Stanco, Joseph |
| Subject: | Monday Meeting at 9:00am |

John, Joe,

This is to remind you that we have a meeting scheduled today at 9:00am in my office to discuss current work assignments and the future implementation of IAS.

P-17 58

1

I will see you both in my office at that time.

Thanks,  Doug

P-1759

**Pedicini, John**

| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Monday, March 10, 2003 9:56 AM |
| **To:** | Pedicini, John; MacAllister, Douglas |
| **Cc:** | Stanco, Joseph; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; Zorn, Frances; Wilkerson, Courtney; 'gregory.ferby@ny.usda.gov' |
| **Subject:** | RE: Monday Meeting |
| **Importance:** | High |

Dear Mr. MacAllister:

Please note that the second sentence in my e-mail summarizing our meeting this morning at 9:00am should read as follows, "**In order to avoid a scene, I instructed Marty to leave and entered the room <u>without</u> any EEO Representative.**"

Thank you,

John Pedicini

> -----Original Message-----
> **From:** Pedicini, John
> **Sent:** Monday, March 10, 2003 9:41 AM
> **To:** MacAllister, Douglas
> **Cc:** Stanco, Joseph; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; Zorn, Frances; Wilkerson, Courtney; 'gregory.ferby@ny.usda.gov'
> **Subject:** RE: Monday Meeting
> **Importance:** High
>
> Dear Mr. MacAllister:
>
> There is one other item related to our meeting this morning which was also witnessed by my EEO Representative.
>
> You threatened disciplinary action against me if I did not meet with you **without the EEO Representative.**
>
> ------------John Pedicini
>
> > -----Original Message-----
> > **From:** Pedicini, John
> > **Sent:** Monday, March 10, 2003 9:15 AM
> > **To:** Pedicini, John; MacAllister, Douglas
> > **Cc:** Stanco, Joseph; Ghiorzi, John; Salazar, Roberto; Veneman, Ann; Zorn, Frances; Wilkerson, Courtney; 'gregory.ferby@ny.usda.gov'
> > **Subject:** RE: Monday Meeting
> > **Importance:** High
> >
> > Dear Mr. MacAllister:
> >
> > As you know, I reported to the meeting at 9:00am and you refused to admit my EEO representative. In order to avoid a scene, I instructed Marty to leave and entered the room with any EEO representative. Whereupon, you initiated an interrogation on the subject matter related to my EEO complaint, IAS and my current duties. I answered two questions, but refused to answer the remaining questions **without representation**. You then adjourned the meeting.
> >
> > Please be advised that I will be happy to answer any of your questions with my EEO representative. But, no USDA complainant should be denied representation when the subject matter involves an EEO complaint, especially when the USDA Civil Rights office has advised differently.
> >
> > ---------John Pedicini

P-1757

1

**MacAllister, Douglas**

| | |
|---|---|
| **From:** | Stanco, Joseph |
| **Sent:** | Tuesday, March 11, 2003 8:30 AM |
| **To:** | MacAllister, Douglas |
| **Cc:** | Stanco, Joseph |
| **Subject:** | Meeting of 3/10/03, 9:00am |

*Doug,*

*This is my recount of subject event among yourself, J. Pedicini and myself.*

*A couple minutes before 09:00 am I came into your office for subject meeting. Soon thereafter, J. Pedicini and Marty Hines came to the door, but you explained to John that the meeting didn't involve Marty and that Marty could not sit at the meeting. Consequently, John asked Marty to leave and the meeting began.*
*John began by saying that he had filed an EEO complaint and that he would refuse to answer any questions pertaining to the complaint's issue whose specifics were unknown to all, except to John. However, I believe his complaint regards his impression that his duties, as he understands them, might be reduced.*
*Doug asked John to summarize his functions while working with the FFIS accounting system in support of Marty, the Funds Officer, and what role he saw he would play with the upcoming implementation of the IAS, an acquisition system that will interface with FFIS.*
*John stated that under FFIS he had certified funds availability on an unknown number of purchasing documents (Form AD-700).*
*I don't recall other specific words,  except that John refused to answer further questions, claiming that he needed EEO representation.*
*Consequently, Doug adjourned the meeting.*
*This is all.*

*Joseph Stanco*
*NERO, FM*
*Tel: 617-565-6451*

Exhibit 20a

Page 1 of 1

**EXHIBIT 27**

13478

## EEO COUNSELOR'S REPORT
### FSA Case # MA-03-001E
### USDACR030362
### May 27, 2003

**Responding Agency:**          **Food and Nutrition Service**
                                **3101 Park Center Drive**
                                **Alexandria, Virginia 22302**

## Complainant Information

Name: Pedicini, John G.

Home Address:                    Work Address:
10 Milano Drive                  10 Causeway Street, Room 501
Saugus, Massachusetts 01906      Boston, Massachusetts 02222

Telephone: (781) 233-5274        Telephone: (617) 565-6449

Organizational Unit:   Financial Management Division

Job Title, Series, and Grade:  GS-0505-11/5          x __  Federal Employee
             Financial Management Specialist         ____  County Employee

Representative Name, Address and Telephone Number:   Martin Hines (non-attorney)
                                                     10 Causeway Street, Room 501
                                                     Boston, Massachusetts 02222
                                                     (617) 565-6454

Anonymity:   ___Yes      Bargaining Unit Employee:      _x_ Yes
             _x_ No                                     ____No

## Chronology of EEO Counseling Process

Date of Initial Contact with EEO Counselor:  03/05/03

Date of Initial Interview:  03/07/03

45th Day after Action(s)/Occurrence(s)/Incidence(s):  04/16/03

EXHIBIT
Δ 18
10/25/05 PM

1

Exhibit __3__
Page __1__ of __12__

Reason for Contact Beyond 45th Day (if applicable):  n/a

Date Extension Granted:  n/a

Date of Final Interview:  03/19/03

Date of Notice of Right to File A Formal (NRF):  03/19/03

Date NRF Received by Complainant:  04/03/03

## Information about the Complaint

**Basis:**   Reprisal:  Served as complainant representative in EEO complaints

| Claim # | Date of Claim: | Incident: |
|---------|----------------|-----------|
| 1) | 03/03/03 | Assignment of duties |
| 2) | 03/13/03 | Letter of Counseling |

The complainant alleged that the Food and Nutrition Service (FNS) discriminated against him when the FNS removed him as the alternate to the Northeast Regional Office (NERO) Funds Officer and issued him a letter of counseling.

**Have the same claims been raised in either of the following forums?  If yes, please attach supporting documentation or provide details.**

| | |
|---|---|
| Negotiated Grievance | No |
| MSPB Appeal | No |
| Prior EEO Complaint | No |
| Civil Action | No |

## Information about the Responding Management Official

Name:  Douglas MacAllister

Title/Series/Grade:     Director, Financial Management Division

Work Address:          Food and Nutrition Service
Northeast Regional Office
10 Causeway Street, Room 501
Boston, Massachusetts 02222

2

Exhibit ___3___
Page _2_ of _12_

Telephone: (617) 565-6446

Relationship to Complainant/Issue: Responding Official/Second Line Supervisor

## Involvement of Others in the Complaint

John Ghiorzi
Deputy Regional Director
Northeast Regional Office
Food and Nutrition Service
10 Causeway Street, Room 501
Boston, Massachusetts 02222
(617) 565-6370

## Facts Developed During the Inquiry

### Interview with Complainant

The Complainant contacted the Farm Service Agency's EEO Counseling and Mediation Branch on 03/05/03. I conducted an initial interview on 03/07/03, explained my role as an EEO Counselor and explained his rights and responsibilities in the EEO complaint process. The written Notice of Rights and Responsibilities was mailed, certified, return receipt, to the complainant on 03/07/03, and received on 03/14/03.

The Complainant explained that he has served as the alternate to the NERO Funds Officer, with certifying rights, since 1998. On 03/03/03, he learned that the Responding Official (Director, Financial Management Division) did not consider him to be the alternate to the NERO Funds Officer under the current Foundation Financial Information System (FFIS). Consequently, the Complainant would not be designated as the alternate to the NERO Funds Officer under the new Integrated Acquisition System (IAS). The Complainant feels these duties would enable him to gain valuable experience for career advancement opportunities. He believes this to be a reduction of his duties in retaliation for him serving as a representative in the EEO complaint process.

The Complainant provided a copy of an email message which indicates that he is the alternate to the NERO Funds Officer with certifying rights (Exhibit 1). The Complainant also provided an email summarizing his EEO complaint (Exhibit 2). Further, on 03/17/03, the Complainant added another issue (letter of counseling) revolving around a letter he received from the Responding Official (Exhibit 3). The Complainant feels this letter is another example of the retaliation he has been subjected to by the Responding Official.

3

Exhibit ___3___
Page __3__ of _12_

I contacted the Complainant to relay management's response to his allegations and requested remedies. I explained that management was not willing to grant the relief requested.

### Interview with Douglas MacAllister
Director, Financial Management
(Responding Official/Second Line Supervisor)

I contacted the Responding Official to discuss the Complainant's allegations and requested remedy. The Responding Official stated that he was aware of the Complainant's participation in the EEO complaint process but did not discriminate against the Complainant.

The Responding Official explained that the Complainant had been inadvertently omitted from a list of division employees slated to attend various training sessions. The omission had been corrected. He said that he scheduled a meeting with the Complainant to discuss his current work assignments in FFIS and how his work assignments would relate to the implementation of the IAS. He explained that no decision had been made to reduce the Complainant's duties in FFIS, remove him as the alternate to the NERO Funds Officer, or the implementation of the IAS.

The Responding Official further explained that his 03/13/03, letter to the Complainant was to clarify the confusion revolving around the meeting he scheduled to discuss the assignment of work and the implementation of the IAS.

### Interview with John Ghiorzi
Deputy Director, Northeast Regional Office
(Management Official)

I contacted Mr. Ghiorzi to discuss the Complainant's allegations and requested remedy. Mr. Ghiorzi stated that he was aware of the Complainant's participation in the EEO complaint process. He explained that no decision had been made to reduce the Complainant's duties in FFIS, remove him as the alternate to the NERO Funds Officer, or the implementation of the IAS.

### Specific Remedy Requested by the Complainant

The Complainant requested that the Agency:

1. Provide a letter confirming his assignment as the alternate to the NERO Funds Officer under FFIS and IAS

4

Exhibit 3
Page 4 of 12

**Resolution Efforts**

I discussed the complainant's requested remedy to resolve the complaint with management. Management was unable to meet the complainant's requested remedy.

**Closure**

Alternative dispute resolution was not offered to the complainant. Resolution was not achieved during the informal counseling phase. I conducted the final interview on 03/19/03. The Notice of Right to File a Formal Complaint was mailed, certified, return receipt requested, to the Complainant on 03/19/03, and was received on 04/03/03.

_Gregory E. Ferby_                    05/27/03

Gregory E. Ferby                     Date
EEO Counselor
Farm Service Agency
441 South Salina Street, Suite 356
Syracuse, NY 13202
(315) 477-6310
(315) 477-6338 (fax)

Exhibits

1. Email from J.Lash to J.Pedicini, dated 03/04/03
2. Email from J.Pedicini to G.Ferby, dated 03/12/03
3. Letter from D.MacAllister to J.Pedicini, dated 03/13/03
4. Notice of Right to File a Formal Complaint, dated 03/19/03
5. PS Form 3811, Return Receipt Request (7002 0860 0008 6875 3590)

5

Exhibit 3
Page 5 of 12

# EXHIBIT 28




March 13, 2003

**United States Department of Agriculture**

Food and Nutrition Service

Northeast Region

10 Causeway St.
Room 501
Boston, MA 02222

John Pedicini
**Financial Management Specialist**
**USDA Food and Nutrition Service**
**10 Causeway St., Room 501**
**Boston, MA 02222**

Dear Mr. Pedicini:

The purpose of this letter is to clarify and instruct you regarding issues and concerns about events leading up to and during the meeting that Joe Stanco and I held with you on March 10, 2003. One of the concerns brought to my attention is that you may have an inaccurate understanding of the Equal Employment Opportunity (EEO) process as it relates to the right to representation during an informal meeting on work issues. The fact that an employee has filed an EEO complaint, as you have so indicated, does not entitle him to representation in all dealings with agency management. The employee only is entitled to a representative in those matters that relate directly to the EEO complaint. *See* <u>Matuszeski v. Secretary of Treasury</u>, 01956479 (1997).

As I communicated to you in my March 7th email, the purpose of the March 10th meeting was an informal discussion of your current assignments and how they will relate to the implementation of our Integrated Acquisition System (IAS). Specifically, your input was being solicited in order for management to make a decision on how to handle the IAS implementation as it related to our Foundation Financial Information System (FFIS). In view of what was communicated to you in the aforementioned email, the purpose of the March 10th meeting was not to discuss your EEO complaint. In fact, it was not until March 10, 2003 that management learned, through you, that you had contacted an EEO counselor. It was, therefore, virtually impossible for me to engage you in a meeting on March 10, 2003 for the purpose to discuss the substance of your alleged EEO complaint.

As you acknowledged in your email dated March 10, 2003, the subject of this meeting was the discourse about your assignments in FFIS and how they relate to the pending implementation of IAS. Such a meeting does not bestow the right for union or EEO representation, even though matters discussed may tangentially be related to an employee's complaint or grievance. Therefore, it was wholly unacceptable for you to disregard my specific instructions and invite your representative to that particular meeting.

Furthermore, as an employee, you have an obligation to answer management's questions relative to your work assignments. Management

P-1201

AN EQUAL OPPORTUNITY EMPLOYER

has the right to freely enter into such discussion with its employees without the presence of a third party.  Without this freedom, management's ability to accomplish the Agency's mission and work would be unduly hindered.  Consequently, your responses to my questions were inappropriate; referencing that such responses were germane to your EEO complaint.  You were asked straightforward objective questions about your work that should have been appropriately answered.

It is the United States Department of Agriculture's regulatory requirement to ensure the civil rights of its employees and to ensure that all employees are treated fairly and equitably, with dignity and respect.  This Agency (FNS) is subject to, and has adopted, procedures for processing individual and class complaints of discrimination that include the provisions contained in 29 CFR §§ 1614.103 through 1614.110 and in § 1614.204, which is consistent with all other applicable provisions of 29 CFR § 1614 and the instructions for complaint processing contained in the Equal Employment Opportunity Commission's Management Directive 110.

In our efforts to remain compliant in EEO programs and acceptable legal standards, FNS both recognizes and acknowledges its employees' due process rights under applicable EEO law.  Management in the Northeast Regional Office has every intention to honor your rights, noting that there exist an appropriate time and venue where both parties to an EEO complaint may engage in the reasonable development of evidence on issues relevant to the issues raised in the complaint.  As stated, the March 10, 2003 meeting among you, your supervisor and me was not intended, and did not include, discussions relative to your EEO complaint.

To achieve our goals, we must have the cooperation of everyone involved within this process.   Continued noncompliance or non-cooperation with requests from your supervisors for work-related face-to-face meetings will subject you to disciplinary action.

If after receiving this letter you have concerns or questions regarding any of the above, your EEO rights, and/or appropriate workplace behavior, please contact your supervisor.

Sincerely,

*Douglas A. MacAllister*

Douglas A. MacAllister
Director, Financial Management

P-1202

2

# EXHIBIT 29

## FORMAL COMPLAINT OF DISCRIMINATION
### FSA CASE # MA-03-001E

USDACR 0303102

| Name of Complainant (Last, First, Middle Initial) | Name of Representative (Last, First, Middle Initial) | |
|---|---|---|
| John G. Pedicini | | |
| Address  10 Milano Drive  Saugus, MA  01906 | Address | |
| Home Telephone No.  781-233-5274 | Work Telephone No.  617-565-6449 | Home Telephone No. | Work Telephone No. |

| Name and Address of Agency Which You Believe Discriminated Against You | Name and Telephone Number of EEO Counselor Who Attempted Resolution |
|---|---|
| U.S.D.A. - Food and Nutrition Service  Northeast Regional Office  10 Causeway St., Rm 501  Boston, MA 02222 | Gregory Ferby  (315) 477-6310 |
| Responding Official (Alleged Discriminating Official)  Douglas MacAllister, Joseph Stance, John Ghiorzi, Frances Zorn | Date You Received the Notice of Right to File a Formal Complaint  3/24/03 . |

| Reason(s)/Basis(es) You Believe You Were Discriminated Against |
|---|
| Reprisal for prior EEO activity, and harrassment which has created a hostile work environment. |



EXHIBIT

△20

10/25/05

AN EQUAL OPPORTUNITY EMPLOYER

Exhibit 1
Page 1 of 3

16          US0033

# FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-03-001E

How Were You Discriminated Against? (Explain how you were treated differently from other employees or applicants because of your race, color, religion, national origin, marital status, disability, sex, age, reprisal, or sexual orientation. If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each).

1.) Reprisal for prior EEO activity. As EEO representative for another FNS-NERO employee, the Agency sought to retaliate against me by issuing a disciplinary warning letter on 3/13/03.

2.) Harrassment, creation of hostile work environment — the letter of 3/13/03 was unsupported by the circumstances described therein. NERO officials made *substantial errors in judgment.*

(Use additional sheets, if necessary)

Specific Corrective Action You Want Taken on your Complaint (If more than one allegation is being made, state overall corrective action desired and the specific correction action desired for each separate allegation).

$100,000 in compensatory damages and a promotion of two grades above my current grade and step, retroactive to 3/13/03.

If Applicable to This Complaint, Please Check the Statement(s) Below

I filed a grievance through the negotiated grievance procedure.

I filed an appeal with the Merit Systems Protection Board.

I filed a civil action in U.S. District Court.

| Signature of Complainant (You must sign this form unless your representative is an attorney). John H. Federini | Date 3/25/03 |
|---|---|
| Signature of Attorney | Date |

Privacy Act Statement (6 USC 552a)

This form is subject to the Privacy Act of 1974
Authority: 42 USC 2000E-16
Principal Purpose: To establish the case records and assist in the processing of the complaint
Routine Use: Used by EEO officials, administrative judges, investigators, the Equal Employment Opportunity Commission, and/or the Department of Justice for processing the complaint and appeal.
Disclosure is Voluntary: If the individual does not furnish the information requested, there will be no adverse consequences However, failure to furnish information requested on the form may delay or impair processing of the complaint.

AN EQUAL OPPORTUNITY EMPLOYER

Exhibit 1
Page 2 of 3

17



U.S. POSTA-
PAID
BOSTON, MA
MAR 25 '03
AMOUNT

$4.42

0006839D-02

9264

20024

UNITED STATES
POSTAL SERVICE

7002 2410 0003 8375 4846

USDA, Office of Civil Rights
Chief, Employment Complaint and Adjudication Div.
Reporters Building Room #607
300 7th Street, SW
Mail Stop 9440
Washington, DC 30024

20024+2511

, Milano Drive
Saugus, MA 01906

18

US0035

**Exhibit** ___1___
**Page** _3_ of _3_

# EXHIBIT 30



'ted States
~~~tment of
~~~lture

**JUL 1 1 2003**

Mr. John G. Pedicini

Office of the
Assistant Secretary
for Civil Rights

10 Milano Drive
Saugus, Massachusetts 01906

Office of
Civil Rights

**EXHIBIT**

Δ Z I
10/25/05

1400 Independence
Avenue SW

Washington, DC
20250

**Re: EEO Complaint # 030362**

Dear Mr. Pedicini:

Your Equal Employment Opportunity (EEO) complaint of discrimination against the Farm Service Agency (FSA) dated March 25, 2003, is considered filed on March 25, 2003. It has been assigned the complaint number shown above. Please refer to this complaint number in any future communication on the subject EEO complaint.

We are accepting and referring for investigation the following claims:

Whether the agency subjected the complainant to discrimination based on reprisal (participation in the EEO process) when: (1) on March 3, 2003, the Director of the Financial Management Division did not reconsider him as the alternate Northeast Regional Office (NERO) Funds Officer, which removed his certification rights and (2) he was issued a letter of instruction dated March 13, 2003?

If you desire, you may submit a written statement concerning the agency's articulation of the accepted claims. Any such statement must be submitted within 7 calendar days from receipt of this letter and will be included in the complaint file. The statement should be sent to the following address:

> United States Department of Agriculture
> Office of Civil Rights
> Employment Complaints Division
> **Intake, Accept/Dismiss Branch**
> 1400 Independence Avenue, S.W.
> Stop Code 9440
> Washington, DC 20250-9440

You also raised a claim of harassment. However, in Cobb v. Rubin, Department of the Treasury, No. 05970077 (EEOC OFO 1997), the Equal Employment Opportunity Commission (EEOC), held that unless the conduct is very severe, a single incident or group of isolated incidents will not be regarded as discriminatory harassment. Additionally, a complainant must allege facts which, if proven true, indicate that the employee may have been subjected to an action that was sufficiently severe or pervasive as to alter the employee's conditions of employment.

US0036

**Exhibit** Ƨ
**Page** 1 of 5

AN EQUAL OPPORTUNITY EMPLOYER

19

In the instant complaint, the harassment claim, even if proven true, is not severe or pervasive enough to constitute a hostile work environment. Therefore, we accepted the timely claims under the disparate treatment theory of discrimination and are dismissing the harassment allegation for failure to state a claim consistent with 29 C.F.R. §1614.107(a)(1).

In accordance with 29 C.F.R. §1614.107(b), our determination that the cited claim is dismissed will be reviewed by an administrative judge at the Equal Employment Opportunity Commission (EEOC) if you request a hearing on the remainder of the subject EEO complaint. However, you may not appeal this dismissal until a final action is taken by the Department on the remainder of your complaint.

The Department of Agriculture (Department) is required, under 29 C.F.R. §1614.108 to complete an impartial, factual and appropriate investigation of the accepted claims within 180[1] days of the date the subject EEO complaint was filed. An appropriate factual record is one that allows a reasonable fact finder to draw conclusions as to whether discrimination occurred. The complainant and the Department may voluntarily extend the 180-day time period not to exceed an additional 90 days. In addition, the Department may unilaterally extend the 180-day time period or any period of extension for not more than 30 days where it must sanitize a complaint file that contains classified information.

When the investigation begins, you will be contacted by an investigator. You are required to fully cooperate with the investigator. Failure to do so may result in dismissal of your EEO complaint. Present to the investigator all information you wish considered relevant to the accepted claims. Also, provide the investigator with the names of any witnesses you believe should be contacted.

You must keep the agency informed of you and your representative's address. If the Department is unable to locate you, it may dismiss the EEO complaint under 29 C.F.R. §1614.107(a)(6).

When you receive the investigation report, you will be notified of your right to elect either an agency decision based on the record or a hearing with a decision from an Equal Employment Opportunity Commission (EEOC) administrative judge. The notification will provide you with specifics on how to exercise your election rights.

If you have not received the investigation report after 180 days from the filing of your EEO complaint, you have the right to request a hearing from an EEOC administrative judge. Should you request a hearing, you must send the request to the EEOC office designated in the initial letter we sent you acknowledging receipt of your complaint. As instructed in that letter, you must also certify to the EEOC that a copy of the hearing request was sent to the following address:

---

[1] All references to days refer to calendar days unless specified otherwise.



Exhibit 2
Page 2 of 5

United States Department of Agriculture
Office of Civil Rights
Employment Complaints Division
**Hearings, Appeals, and Remands Branch**
1400 Independence Avenue, S.W.
Stop Code 9440
Washington, DC 20250-9440

You are also advised that, consistent with EEOC Regulations and the Secretary of Agriculture's strong commitment to the early resolution of EEO complaints, parties are encouraged to seek resolution to complaints at any stage of the EEO complaint process. Settlement discussions may take place throughout the administrative complaint process. If a resolution is achieved, a copy of the settlement agreement must be provided to this office promptly to avoid unnecessary confusion and additional cost. Likewise, if at any stage of the EEO complaint process you wish to voluntarily withdraw your complaint, you must promptly provide to this office, a written request to withdraw your EEO complaint. Your withdrawal request must be signed, dated, and include your EEO complaint number. To ensure prompt receipt, please fax a copy of the voluntary settlement agreement or voluntary withdrawal directly to the **Employment Adjudication Division, at Fax Number (202) 401-8035.**

If you have any questions or concerns regarding the status of your complaint, you may submit them in writing or call (202) 720-7467. All written status requests **must be marked ATTN: STATUS COORDINATOR.**

Sincerely,

*Elvia Mata*

Larry W. Newell
Chief, Employment Complaints Division
Office of Civil Rights

cc:    Civil Rights Director, FSA

US0038

**Exhibit** 2
**Page** 3 of 5

# EXHIBIT 31

**Pedicini, John**

From:        Pedicini, John
Sent:        Monday, March 10, 2003 4:07 PM
To:          Ghiorzi, John
Cc:          MacAllister, Douglas; Stanco, Joseph; 'Gregory.Ferby@ny.usda.gov'
Subject:     RE: REDUCTION IN DUTIES

Importance:  High


Dear Mr. Ghiorzi:

Pursuant to Paragraph #7 of the Settlement Agreement signed on June 17, 2002, you are hereby notified that the dispute, related to my reduction in duties, has not been resolved with my supervisor, Joseph Stanco, and my 2nd level manager, Douglas MacAllister. You are the final reviewing official.

You are also reminded that the Settlement Agreement **is authorized under 29 CFR 1614, regulations on processing EEO complaints.** As such, you are required to abide by all provisions of that regulation, **including 29 CFR 1614.605(a)**. Mr. MacAllister did not abide by this regulation this morning and denied me access to an EEO -designated representative, Marty Hines.

An EEO complaint was filed on March 5, 2003. Martin Hines was designated my EEO representative, in writing. I discussed the situation with Greg Ferby last week. Under 29 CFR 1614.605(a), I am entitled to an EEO representative" at **any time during the EEO complaint process". The EEO Complaint process started last week.**

Explain why NERO is denying my right to EEO representation ?

Also, please inform me by the close of business tomorrow, Tuesday, March 12, 2003, whether or not you plan to exercise your right as final reviewing official. If I don't hear from you by the close of business tomorrow, I will assume that you do not intend to exercise this right. If you do want a meeting, kindly note that I am exercising my rights under 29 CFR 1614.605(a) and requiring the presence of my EEO-designated Representative, Marty Hines.

----------------John Pedicini



P-1626

**Pedicini, John**

| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Tuesday, March 04, 2003 2:18 PM |
| **To:** | Ghiorzi, John |
| **Subject:** | RE: THE AGREEMENT |
| **Importance:** | High |

Mr. Ghiorzi:

Pursuant to the Agreement signed in June of last year, the Office agreed not to take retaliatory actions against me. Please be advised that a reduction in duties is considered to be retaliatory, especially when those duties may enable an employee to gain valuable experience for career advancement opportunities.

We now find ourselves faced with such a situation.

As you know, I backup Marty on Funds Control. HQ has confirmed that I have been listed as the backup funds officer for years and **I am to have certification rights.**

With the onset of the new IAS system for funds control, I pointed out to Joe Stanco that I should be listed as Marty's alternate. He agreed last week and listed me in his correspondence.

On Monday, March 3rd, he informed me that Douglas MacAllister was objecting to me having certification rights and asked to see proof. Today, HQ confirmed that I am the backup funds officer and I am to have certifying rights.

I trust that you will abide by the Agreement and not reduce my duties.

---------John Pedicini

1

EXHIBIT
P/f's
27
DPW   6-23-05
tabbies®

P-1177

**Pedicini, John**

EXHIBIT
P iF's
15
6/6/05 9mw

| | |
|---|---|
| **From:** | Ghiorzi, John |
| **Sent:** | Friday, March 07, 2003 1:16 PM |
| **To:** | Pedicini, John |
| **Cc:** | Zorn, Frances; Stanco, Joseph; MacAllister, Douglas |
| **Subject:** | RE: Monday Meeting |

It is our policy that employees contact their first line supervisor in an attempt to resolve issues. If that does not lead to a satisfactory conclusion, we expect that the employee will discuss the matter with their second line supervisor. If that does not work, then the issue can be elevated to me. In all cases, you are expected to keep each level of supervision aware of what you are doing. Please copy Joe and Doug on any future correspondence to me. Thanks.

-----Original Message-----
| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Thursday, March 06, 2003 1:10 PM |
| **To:** | Ghiorzi, John |
| **Cc:** | Zorn, Frances |
| **Subject:** | FW: RE: Monday Meeting |
| **Importance:** | High |

Dear Mr. Ghiorzi:

When I telephoned you this morning at about 7:15 am, you indicated to me that you had met with Mr. MacAllister and Mr. Stanco, regarding my duties as backup funds officer and IAS.

Listed below is Mr. MacAllister's attempt to deprive me of my right to representation under the Civil Rights Act. As you know, the Secretary of Agriculture has stated that violations of civil rights regulations will not be tolerated at the U.S. Department of Agriculture.

Since you met with Mr. MacAllister and Mr. Stanco prior to the exchange of e-mails listed below, am I to assume that he is acting under direction from you and the Regional Administrator, Fran Zorn ?

If not, then please send me an e-mail confirmation that Mr. MacAllister has been corrected.

If I do not receive such confirmation by the close of business today, then I will assume that his actions have been under the direction of you and Ms. Zorn.

--------John Pedicini

-----Original Message-----
| | |
|---|---|
| **From:** | Pedicini, John |
| **Sent:** | Thursday, March 06, 2003 11:15 AM |
| **To:** | MacAllister, Douglas |
| **Subject:** | RE: RE: Monday Meeting |

Doug:

I have a right to a representative at this meeting. I have selected Marty.

If you want the meeting, it is with Marty.

Otherwise, I suggest you submit your response to me via e-mail.

-----------John

P-1645

1

Original Message-----
**From:**   MacAllister, Douglas
**Sent:**   Thursday, March 06, 2003 10:50 AM
**To:**     Pedicini, John; Stanco, Joseph
**Subject:** RE: RE: Monday Meeting

John,

Marty is not a part of this meeting.  I already mentioned to Joe that we will meet and discuss this matter.  If Marty is needed for clarification we will solicit his input.  If another meeting with Marty appears needed a second meeting will be held.

Thanks,  Doug

-----Original Message-----
**From:**       Pedicini, John
**Sent:**       Thursday, March 06, 2003 10:13 AM
**To:** Stanco, Joseph
**Cc:** MacAllister, Douglas; Hines, Marty; Spychalski, Louis
**Subject:**    RE:  Monday Meeting
**Importance:**  High

Joe:

Lou has withdrawn from the Monday Meeting. So, since Marty originally called the meeting, I have asked him to substitute for Lou.

See you and Doug at 9:00 am on Monday, March 11th

---------John

2

P-1646

# EXHIBIT 32

**Pedicini, John**

| | |
|---|---|
| **From:** | Powell, Lisa |
| **Posted At:** | Wednesday, July 16, 2003 12:49 PM |
| **Conversation:** | NE_043-03-O-Supervisory Financial Management Specialist-GS-0501-13 |
| **Posted To:** | Vacancy Announcements |

**Subject:**    NE-043-03-O-Supervisory Financial Management Specialist-GS-0501-13

US DEPARTMENT OF AGRICULTURE
FOOD AND NUTRITION SERVICE
HUMAN RESOURCES DIVISION
3101 PARK CENTER DRIVE, RM 420
ALEXANDRIA, VA  22302


VACANCY ANNOUNCEMENT


Announcement No: NE-043-03-O

Position:       Supervisory Financial Management Specialist
                GS-0501-13
                $70,439  to  $91,573  per annum
                Promotion Potential:  None
                Career/Career Conditional Appointment
                Full Time Permanent Position

Location:       USDA, Food and Nutrition Service
                Regional Administrator - NERO
                Financial Management
                Northeast Regional Office
                Boston, MA


Opens:  07/16/2003                        Closes:  08/29/2003

**AREA OF CONSIDERATION:** ALL SOURCES

USDA CTAP  eligibles,  Federal ICTAP eligibles, Federal and non-Federal applicants.
Special selection priority will be given to eligible, well-qualified surplus/displaced USDA applicants and eligible, well-qualified displaced Federal applicants with permanent status in the local commuting area.  See eligible, well-qualified definition below for surplus/displaced applicants.  Applications will also be accepted from non-Federal applicants, current Federal employees with or without status, former Federal employees with or without reinstatement eligibility, and from individuals eligible for special appointments (e.g., severely disabled, disabled veterans, and volunteers from the Peace Corps or VISTA, etc.).  Veterans who are preference eligibles or who have been separated from the armed forces under honorable conditions after 3 years or more of continuous active service may apply.  Please indicate if you are in one of these special appointment categories.   P-2089

1

The Food and Nutrition Service is an agency of the Department of Agriculture that strives to reduce hunger and food insecurity by providing children and needy families access to food, a healthful diet, and education in its administration of the nation's nutrition assistance programs:

Food Stamps, enabling low-income families to buy nutritious food with coupons and Electronic Benefit Transfer (EBT) cards:
Child Nutrition, providing nutritious school meals and nutrition education materials for children and families and technical assistance for school nutrition service directors, managers and staff:
WIC (Women-Infants-Children), providing supplemental foods, nutrition and breast feeding education, and access to health services to improve the health of women, infants, and children.

It is presently recruiting

**MAJOR DUTIES:**
Incumbent serves as a financial management section supervisor.  As such selects, develops and directs financial management personnel in accomplishing program objectives.  Directly participates in all aspects of section's work as necessary.  Serves as technical/financial advisor to management and provides counsel on matters with financial implications.  Participates with FM Director and other key officials in formulating and determining short and long range financial management objectives, policies and procedures for fiscal impact on or related to accountability for FNS programs.  Establishes Division policy and plans for program proposals and justifies policy and program proposals to the Division Director and Regional Administrator.  The incumbent plans work to be accomplished by subordinates, sets and adjusts short and long term priorities, and prepares schedules for completion of work.   Approximately 25% travel is required.

**QUALIFICATION REQUIREMENTS:**
Applicants are required to have one year of specialized experience which has equipped them with the particular knowledge, skills, and abilities to perform successfully the duties of the position and which is typically related to the work of the position to be filled.  This year of specialized experience must be comparable to the next lower grade, GS-12, in the Federal service.  Time-in-grade restrictions apply to applicants under Merit Promotion procedures.  United States citizenship is required.

RELOCATION EXPENSES WILL NOT BE PAID

**EVALUATION CRITERIA:**
Provide on a separate sheet of paper or a supplemental form examples of experience, training and awards that demonstrate possession of the items listed below.  **YOU MUST ADDRESS THE EVALUATION CRITERIA ON A SEPARATE SHEET OF PAPER IN ORDER TO BE CONSIDERED.**

A  Ability to gather and analyze facts, devise practical solutions to problems and negotiate resolutions.  Ability to review financial operations of grantees, cost allocation plans, coordinate management controls, and coordinate audit handling/resolution.
B  Ability to plan, organize, make decisions, set priorities and work under pressure.
C  Ability to communicate orally in order to effectively convey information to a wide variety of persons with varying levels of understanding of FNS operations and requirements.

2

P-2090

D  Ability to communicate in writing including email, spreadsheets and graphics displays. In order to develop and provide reports, to communicate requirements, to present policy, to provide guidance and to explain issues.

E  Ability to communicate orally, in order to convey policies/procedures, to direct staff, to report progress, to communicate requirements, and to negotiate solution.

F  Ability to coordinate, evaluate, motivate, train and discipline a subordinate staff.

HOW TO APPLY:

1  All applicants must submit an OF-612, Optional Application for Federal Employment, or resume, or any other written format you choose, or SF-171, Application for Federal Employment. Follow instructions below on what information your application must contain.

2  A narrative statement addressing the evaluation criteria listed above.

3  A recent performance appraisal is required if you are a current Federal employee.

4  Copy of most recent SF-50, Notification of Personnel Action (for current or former Federal employees only).

5  Please provide your Internet E-mail address (if applicable) on the first page of your application.

4  All status candidates and eligible veterans who want to be considered under both merit promotion and external competitive procedures MUST SUBMIT 2 COMPLETED APPLICATIONS. If only 1 is received, it will be considered under merit promotion procedures.

4  USDA Surplus/Displaced Applicants should attach proof of eligibility for special selection priority:

a)  RIF separation notice or notice of proposed removal for declining a directed reassignment or transfer of function outside the local commuting area;

a)  Certificate of expected separation or other official notice from the agency indicating that the employee is surplus or eligible for discontinued service retirement; or

a)  Other official agency certification identifying the employee as being in a surplus organization or occupation.

**Other Federal Displaced applicants should attach proof of eligibility for special selection priority:**
a)  RIF separation notice, or notice of proposed removal for declining a directed reassignment or transfer of function to another commuting area;

a)  Documentation showing that they were separated as a result of reduction in force, or for declining a transfer of function or directed reassignment to another commuting area (e.g. SF-50);

a)  Official certification from an agency stating that it cannot place an individual whose injury compensation has been or is being terminated;

P-2091

3

d) Official notification from OPM that an individual's disability annuity has been or is being terminated; or

a) Official notification from the Military Dept. or National Guard Bureau that the employee has retired under 5 USC 8337 (h) or 8456.

a) 9. The Defense Authorization Act of November 18, 1997, extended veteran's preference to persons who served on active duty during the Gulf War from August 2, 1990 through January 2, 1992. The law grants preference to persons otherwise eligible and who served on active duty during this period, regardless of where the person served or for how long. The law also authorizes the Secretary of each military department to award the Armed Forces Expeditionary Medal for service in Bosnia during the period November 20, 1995, to a date to be determined. The award of the Medal is qualifying for veteran's preference. More information on veteran's preference is available in the VetGuide that may be found on the U.S. Office of Personnel Management's web site at HTTP://www.opm.gov.

## Method of Evaluation:
-------------------------------
Applicants must meet all application and qualification requirements and selective placement factors in order to be qualified.

## Basis of Rating (Applies to Open-competitive applications):
---------------------------------------------------------------------------
No written test is required. Qualified applicants will be assigned a numerical rating from 70 - 100, based on an evaluation of their education, experience and training related to the position to be filled.

## Equal Employment Opportunity:
----------------------------------------------
The U. S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political and employer beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audio tape, etc.) should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).

The Food and Nutrition Service provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application and hiring process, please notify the servicing specialist at 703-305-2348 (via a relay service). The decision on granting reasonable accommodation will be on a case-by-case basis.

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider.

## Eligible, Well Qualified Definition for Surplus/Displaced Applicants:
------------------------------------------------------------------------------------------
Surplus/Displaced applicants must meet the qualification requirements and selective placement factor

4

P-2092

(s) on the vacancy announcement and be rated at least at the fully successful level for each criteria listed on this vacancy announcement. The fully successful level is described in the crediting plan, which is only available to the evaluators.

## Your Application Must Contain:
-----------------------------------------------

The Announcement number you are applying under. Personal information: full name, social security number, mailing address, internet E-mail address (if applicable), citizenship status, veterans preference, highest Federal grade held, including from and to dates and job series. Education: high school name, date of diploma/GED, colleges and universities attended with cities, states, attendance dates, type and year of degree or credits earned, academic major. Employment history: Positions held, duties and accomplishments, employer's name and address, supervisors name and phone number, starting and ending dates, hours per week, salary, whether we can contact current employer; Other - Job-related: training courses, skills, awards and honors, certificates and licenses.

## Where to get Forms and Information:
-------------------------------------------------------

Please call our Job Information hotline at (703) 305-1474, to request forms and additional information. Hearing-impaired applicants should use a relay service. Announcement materials are also available in alternative formats for applicants with disabilities. You may also request materials by internet E-mail at the address shown below.

## Application Filing Procedures - Merit Promotion:
---------------------------------------------------------------------

For applications filed under our merit promotion plan, all requested materials must be postmarked by 11:59 PM Eastern Time on the closing date shown above.

## Application Filing Procedures - Open Competitive (External Candidates):
-------------------------------------------------------------------------------------------

For applications filed as open competitive, all requested materials must be postmarked by 11:59 pm Eastern Standard Time on the closing date shown above. Any residence restrictions shown in the area of consideration above do not apply to external candidates.

## Where to File your Application(s):
-----------------------------------------------

Applications should be mailed or delivered to: **USDA, Food and Nutrition Service, 3101 Park Center Drive, Room 420, Alexandria, VA  22302.** Electronic applications will be accepted at Quintina.Neal@fns.usda.gov (DOS text file transmissions will be accepted only. Please indicate this announcement number in the subject line of your E-mail message). Electronic applications will not be considered if attachments **(SEE "HOW TO APPLY")** are not sent under separate mailing and postmarked by closing date.

THE DEPARTMENT OF AGRICULTURE IS AN EQUAL OPPORTUNITY EMPLOYER

P-2093

5

# EXHIBIT 33

**Pedicini, John**

| | |
|---|---|
| **From:** | Hamilton, Roger |
| **Sent:** | Monday, November 03, 2003 10:36 AM |
| **To:** | Agostinho Nunes; Ann Bellezza; Arthur LeBlanc; Betty Dufresne; Douglas MacAllister; Janice Sciarappa; John Pedicini; Julie Larkin; Kirk Hassel; Lisa Fitzgerald; Marty Hines; Pauline Driscoll; Potvin, Bruce; Themi Stamboulidis |
| **Subject:** | FW: NE-043-03-1O-Supervisory Financial Management Specialist-GS-0510-13 |

fyi

Thanks,

Roger Hamilton

617-565-6463

-----Original Message-----

| | |
|---|---|
| **From:** | Powell, Lisa |
| **Sent:** | Monday, November 03, 2003 10:08 AM |
| **Posted To:** | Vacancy Announcements |
| **Conversation:** | NE-043-03-1O-Supervisory Financial Management Specialist-GS-0510-13 |
| **Subject:** | NE-043-03-1O-Supervisory Financial Management Specialist-GS-0510-13 |

US DEPARTMENT OF AGRICULTURE
FOOD AND NUTRITION SERVICE
HUMAN RESOURCES DIVISION
3101 PARK CENTER DRIVE, RM 420
ALEXANDRIA, VA  22302


VACANCY ANNOUNCEMENT

Announcement No: NE-043-03-1O

| | |
|---|---|
| Position: | Supervisory Financial Management Specialist<br>GS-0501-13<br>$70,439 to $91,573 per annum<br>Promotion Potential:  None<br>Career/Career Conditional Appointment<br>Full Time Permanent Position |
| Location: | USDA, Food and Nutrition Service<br>Regional Administrator - NERO<br>Financial Management<br>Northeast Regional Office<br>Boston, MA |

*P-2083*

Opens:  10/31/2003                    Closes:  12/05/2003

**REANNOUNCEMENT-BASED ON AN AMENDMENT OF THE EVALUATION CRITERIA (KSA'S). APPLICANTS WHO APPLIED UNDER NE-043-03-O MUST REAPPLY TO NE-043-03-1O IN ORDER TO RECEIVE CONSIDERATION**

**AREA OF CONSIDERATION:** ALL SOURCES

USDA CTAP eligibles, Federal ICTAP eligibles, Federal and non-Federal applicants.
Special selection priority will be given to eligible, well-qualified surplus/displaced USDA applicants and eligible, well-qualified displaced Federal applicants with permanent status in the local commuting area. See eligible, well-qualified definition below for surplus/displaced applicants. Applications will also be accepted from non-Federal applicants, current Federal employees with or without status, former Federal employees with or without reinstatement eligibility, and from individuals eligible for special appointments (e.g., severely disabled, disabled veterans, and volunteers from the Peace Corps or VISTA, etc.). Veterans who are preference eligibles or who have been separated from the armed forces under honorable conditions after 3 years or more of continuous active service may apply. Please indicate if you are in one of these special appointment categories.

The Food and Nutrition Service is an agency of the Department of Agriculture that strives to reduce hunger and food insecurity by providing children and needy families access to food, a healthful diet, and education in its administration of the nation's nutrition assistance programs:

Food Stamps, enabling low-income families to buy nutritious food with coupons and Electronic Benefit Transfer (EBT) cards:
Child Nutrition, providing nutritious school meals and nutrition education materials for children and families and technical assistance for school nutrition service directors, managers and staff:
WIC (Women-Infants-Children), providing supplemental foods, nutrition and breast feeding education, and access to health services to improve the health of women, infants, and children.

**MAJOR DUTIES:**
The Food and Nutrition Service is an agency of the Department of Agriculture that strives to reduce hunger and food insecurity by providing children and needy families access to food, a healthful diet, and education in its administration of the nation's nutrition assistance programs:

Food Stamps, enabling low-income families to buy nutritious food with coupons and Electronic Benefit Transfer (EBT) cards:
Child Nutrition, providing nutritious school meals and nutrition education materials for children and families and technical assistance for school nutrition service directors, managers and staff:
WIC (Women-Infants-Children), providing supplemental foods, nutrition and breast feeding education, and access to health services to improve the health of women, infants, and children.

Incumbent serves as a financial management section supervisor. As such selects, develops and directs financial management personnel in accomplishing program objectives. Directly participates in all aspects of section's work as necessary. Serves as technical/financial advisor to management and provides counsel on matters with financial implications. Participates with FM Director and other key officials in formulating and determining short and long range financial management objectives, policies and procedures for fiscal impact on or related to accountability for FNS programs. Establishes Division policy and plans for program proposals and justifies policy and program proposals to the Division Director and Regional Administrator. The incumbent plans work to be accomplished by

P - 2084

subordinates, sets and adjusts short and long term priorities, and prepares schedules for completion of work.   Approximately 25% travel is required.

**QUALIFICATION REQUIREMENTS:**
Applicants are required to have one year of specialized experience which has equipped them with the particular knowledge, skills, and abilities to perform successfully the duties of the position and which is typically related to the work of the position to be filled.  This year of specialized experience must be comparable to the next lower grade, GS-12, in the Federal service.  Time-in-grade restrictions apply to applicants under Merit Promotion procedures.  United States citizenship is required.

**EVALUATION CRITERIA:**
Provide on a separate sheet of paper or a supplemental form examples of experience, training and awards that demonstrate possession of the items listed below.  **YOU MUST ADDRESS THE EVALUATION CRITERIA ON A SEPARATEIY SHEET OF PAPER IN ORDER TO BE CONSIDERED.**

A   Ability to gather and analyze facts, devise practical solutions to problems and negotiate resolutions.  Ability to review financial operations of grantees, cost allocation plans, coordinate management controls, and coordinate audit handling/resolution.
B   Ability to plan, organize, make decisions, set priorities and work under pressure.
C   Ability to communicate orally in order to effectively convey information to a wide variety of persons with varying levels of understanding of FNS operations and requirements.
D   Ability to communicate in writing including email, spreadsheets and graphics displays, in order to develop and provide reports, to communicate requirements, to present policy, to provide guidance and to explain issues.
E   Ability to communicate orally, in order to convey policies/procedures, to direct staff, to report progress, to communicate requirements, and to negotiate solution.
F   Ability to coordinate, evaluate, motivate, train and discipline a subordinate staff.

HOW TO APPLY:

1   All applicants must submit an OF-612, Optional Application for Federal Employment, or resume, or any other written format you choose, or SF-171, Application for Federal Employment.  Follow instructions below on what information your application must contain.
2   A narrative statement addressing the evaluation criteria listed above.
3   A recent performance appraisal is required if you are a current Federal employee.
4   Copy of most recent SF-50, Notification of Personnel Action (for current or former Federal employees only).
5   Please provide your Internet E-mail address (if applicable) on the first page of your application.
6   All status candidates and eligible veterans who want to be considered under both merit promotion and external competitive procedures MUST SUBMIT 2 COMPLETED APPLICATIONS.  If only 1 is received, it will be considered under merit promotion procedures.
7   USDA Surplus/Displaced Applicants should attach proof of eligibility for special selection priority:

   a)  RIF separation notice or notice of proposed removal for declining a directed reassignment or transfer of function outside the local commuting area;
   b)  Certificate of expected separation or other official notice from the agency indicating that the employee is surplus or eligible for discontinued service retirement; or   P-2085

3

a) Other official agency certification identifying the employee as being in a surplus organization or occupation.

**Other Federal Displaced applicants should attach proof of eligibility for special selection priority:**

a) RIF separation notice, or notice of proposed removal for declining a directed reassignment or transfer of function to another commuting area;
b) Documentation showing that they were separated as a result of reduction in force, or for declining a transfer of function or directed reassignment to another commuting area (e.g. SF-50);
c) Official certification from an agency stating that it cannot place an individual whose injury compensation has been or is being terminated;
d) Official notification from OPM that an individual's disability annuity has been or is being terminated; or
e) Official notification from the Military Dept. or National Guard Bureau that the employee has retired under 5 USC 8337 (h) or 8456.
f) The Defense Authorization Act of November 18, 1997, extended veteran's preference to persons who served on active duty during the Gulf War from August 2, 1990 through January 2, 1992. The law grants preference to persons otherwise eligible and who served on active duty during this period, regardless of where the person served or for how long. The law also authorizes the Secretary of each military department to award the Armed Forces Expeditionary Medal for service in Bosnia during the period November 20, 1995, to a date to be determined. The award of the Medal is qualifying for veteran's preference. More information on veteran's preference is available in the VetGuide that may be found on the U.S. Office of Personnel Management's web site at HTTP://www.opm.gov.

**Method of Evaluation:**
--------------------------------
Applicants must meet all application and qualification requirements and selective placement factors in order to be qualified.

**Basis of Rating (Applies to Open-competitive applications):**
---------------------------------------------------------------------------
No written test is required. Qualified applicants will be assigned a numerical rating from 70 - 100, based on an evaluation of their education, experience and training related to the position to be filled.

**Equal Employment Opportunity:**
-----------------------------------------------
The U. S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political and employer beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audio tape, etc.) should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).

The Food and Nutrition Service provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application and hiring process, please

P - 2086

4

notify the servicing specialist at 703-305-2348 (via a relay service).  The decision on granting reasonable accommodation will be on a case-by-case basis.

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC 20250-9410 or call (202) 720-5964 (voice or TDD).  USDA is an equal opportunity provider.

**Eligible, Well Qualified Definition for Surplus/Displaced Applicants:**
-------------------------------------------------------------------------------------
Surplus/Displaced applicants must meet the qualification requirements and selective placement factor (s) on the vacancy announcement and be rated at least at the fully successful level for each criteria listed on this vacancy announcement.  The fully successful level is described in the crediting plan, which is only available to the evaluators.

**Your Application Must Contain:**
-----------------------------------------------
The Announcement number you are applying under.  Personal information: full name, social security number, mailing address, internet E-mail address (if applicable), citizenship status, veterans preference, highest Federal grade held, including from and to dates and job series.  Education:  high school name, date of diploma/GED, colleges and universities attended with cities, states, attendance dates, type and year of degree or credits earned, academic major.  Employment history:  Positions held, duties and accomplishments, employer's name and address, supervisors name and phone number, starting and ending dates, hours per week, salary, whether we can contact current employer; Other - Job-related:  training courses, skills, awards and honors, certificates and licenses.

**Where to get Forms and Information:**
-------------------------------------------------------
Please call our Job Information hotline at (703) 305-1474, to request forms and additional information.  Hearing-impaired applicants should use a relay service.  Announcement materials are also available in alternative formats for applicants with disabilities.  You may also request materials by internet E-mail at the address shown below.

**Application Filing Procedures - Merit Promotion:**
------------------------------------------------------------------------
For applications filed under our merit promotion plan, all requested materials must be postmarked by 11:59 PM Eastern Time on the closing date shown above.

**Application Filing Procedures - Open Competitive (External Candidates):**
------------------------------------------------------------------------------------------------
For applications filed as open competitive, all requested materials must be postmarked by 11:59 pm Eastern Standard Time on the closing date shown above.  Any residence restrictions shown in the area of consideration above do not apply to external candidates.

**Where to File your Application(s):**
-----------------------------------------------
Applications should be mailed or delivered to: **USDA, Food and Nutrition Service, 3101 Park Center Drive, Room 420, Alexandria, VA  22302.**  Electronic applications will be accepted at Donna.Davis@fns.usda.gov (DOS text file transmissions will be accepted only.  Please indicate this

P- 2087

announcement number in the subject line of your E-mail message).  Electronic applications will not be considered if attachments **(SEE "HOW TO APPLY")** are not sent under separate mailing and postmarked by closing date.

THE DEPARTMENT OF AGRICULTURE IS AN EQUAL OPPORTUNITY EMPLOYER

P-2088

# EXHIBIT 34

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**
Page 3 of 12

12. What official is responsible for the violation(s) that you are reporting, and what is his/her employment status? *(See question 10 for appropriate description of employment status. If space is needed to identify more than one official, use Continuation Sheet at page 12.)*

Name: _Donna Davis_    Tel. # _703-305-2324_

Position/Title: _Personnel Specialist_

Employment status: _Career Conditional_
                  (see continuation sheet)

13. What are the actions or events that you are reporting to OSC? *(To the extent known, specifically list: (a) any suspected prohibited personnel practices or other prohibited activity, other than reprisal for whistleblowing; and (b) any personnel actions involved.)* **IF YOU ARE ALLEGING REPRISAL FOR WHISTLEBLOWING, SKIP TO PART 2 ON THE NEXT PAGE.**

_Job Announcement # NF-043-03-10, Supervisory Financial Management Specialist was posted twice on 7/16/03 and on 8/29/03. I was an internal and external applicant both times. In October 2003, at a financial management meeting, Douglas MacAllister stated that they looked at the external list and "didn't like what they (selecting officials) saw." The job was reopened on 8/29/03. The crediting plan was deliberately altered to lower the rating of "undesirables" and increase the rating of "desirables". My rating had previously been a 97 NV and went down to 81 NV. As a result, I was knocked off the "most qualified list."_

14. Provide details of the actions or events shown in your response to question 13. *(Be as specific as possible about dates, locations, and the identities and positions of all persons mentioned. In particular, identify actual and potential witnesses, giving work locations and telephone numbers when possible. Also, attach any pertinent documents that you may have. Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your request for OSC action. If more space is needed, use Continuation Sheet at page 12.)*

FNS

_Donna Davis rated the applications and was the person at the Personnel office in Alexandria, VA who processed the applications. She informed me on January 22, 2004 that the score of 81 NV was the result of a change in the crediting plan (see attached e-mail from Donna Davis dated January 22, 2004). Douglas MacAllister and Frances Zorn have sought to obstruct my career advancement at any opportunity that arises. I am charging violations of 5 U.S.C. 2302(b)(4), 5 U.S.C. 2302(b)(6), and 5 U.S.C. 2302(b)(10)._

15. What action would you like OSC to take in this matter (that is, what remedy are you asking for)?

_Automated promotion to GS-13._

P-2218

# EXHIBIT 35

Date:          October 13, 2004

Subject:       Supervisory Instruction

To:            John Pedicini
               Financial Management Specialist
               GS-0501-11



The purpose of this memorandum is to make it clear in writing that the statement you made during the IT/IF staff meeting on October 7, 2004, "I will relinquish my Nutrition Education duties" is not acceptable.

You are responsible for performing the functions identified by your supervisor, and you do not have the authority to decide which functions you want to perform. If a reallocation of duties is needed as a result of new work, whether it is EEO related as you indicated or not, it is the responsibility of your supervisor to reallocate those duties.

You will continue to work on Nutrition Education related activities, and you will provide to me by COB Thursday, October 14, 2004, comments you have on any e-mails this week from FSP, including a negative response.

You will secure from me approval for official time to engage in any EEO related activity prior to engaging in such activity.

I trust that you fully understand the contents of this instruction and will comply in your future actions.

I will answer in person any questions that you might have about this instruction, and be available to meet with you as often as you need in order to clarify expectations.

A copy of this letter will not be placed in your OPF.


Michael D. Malone
Section Supervisor
FSP-IF/IT
Northeast Region

P-1328

# EXHIBIT 36

TO:        John Pedicini

FROM:      Michael Malone  *Mom*

DATE:      October 18, 2004

SUBJECT:   Letter of Referral to Employee Assistance Counseling

This is a formal Employee Assistance Program Referral. It is issued because I am concerned that you may have some health or personal issues that are negatively impacting the workplace. I initially indicated my concerns in our meeting on October 13, 2004. Since that time I continue to be concerned.

An appointment with Catherine Weisbrod has been made for you. You are scheduled to meet with her on October 21, 2004 at 10:30 in room 179. If you need to contact Catherine Weisbrod you may reach her at 617-565-6512.

While you are under no obligation to keep this appointment, I strongly encourage you to take advantage of this assistance. The service is free and confidential.

Offering and scheduling this meeting does not mean that a conclusion has been made that you have a problem, it is only to ensure you are aware this assistance is readily available to you. Please feel free to approach me with any questions you might have.

cc: Catherine Weisbrod

P-1312

**EXHIBIT 37**

# MEMO



DATE:  October 19, 2004

TO:  Robert Canavan, Deputy Regional Administrator

FROM:  John G. Pedicini, Alternate Funds Officer –NERO

RE:  Leave-Without-Pay Analysis for FFY 2004
   (see enclosed spreadsheet)

P-1781

# EXHIBIT 38

Date:          October 22, 2004



Subject:       Inappropriate use of non-official job title

To:            John Pedicini
               Financial Management Specialist
               GS-0501-11

In reviewing recent correspondence, I recognized that you included in a memorandum your title as "Alternate Funds Officer --NERO". This was inappropriate because your official job title on your AD-332 is "Financial Management Specialist". Designations regarding roles and/or rights you have in a system such as Alternate Funds Officer (FFIS) and Certifying Officer (IAS) does not mean that you have those job titles or have signatory responsibility using those titles.

Please refrain from using those titles in the future.

Please see me in person if you have any questions.


Michael D. Malone
Section Supervisor
FSP-IF/IT
Northeast Region

P-1327

# EXHIBIT 39

1

Volume I
Pages 1 to 89
Exhibits:  None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
           Plaintiff,           :
                                 :
        vs.                      :   Civil Action
                                 :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and    :
ANN M. VENEMAN, SECRETARY,       :
UNITED STATES DEPARTMENT OF      :
AGRICULTURE,                     :
           Defendants.           :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF JOHN INGEMI, a witness called
on behalf of the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure, before Laura E.
Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Thursday, July 28, 2005,
commencing at 2:00 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

63

1      A.    Not an official one.  Though I did speak

2   with different people in the union and EEO and other

3   people for advice on the matter, there was no

4   official grievance filed at that time.

5      Q.    Before your telephone conference in October

6   2004, had you designated any employee as your EEO

7   representative?

8      A.    No, I didn't have a designated EEO

9   representative.

10          MS. LUCAS PISMAN:  John, could you speak

11   up, too?

12          THE WITNESS:  He asked me if I had an EEO

13   representative, if I designated anybody, and I said

14   I didn't have an EEO representative.

15          MS. LUCAS PISMAN:  Thank you.

16      Q.    At the time that the telephone conference

17   occurred, did you have a designated EEO

18   representative?

19      A.    Before I answer, maybe I have to understand

20   it.  When you say "EEO representative," I had

21   serious problems with management.  I asked John to

22   help me because I thought he could be helpful in

23   that capacity because I needed help in understanding

24   the unfair treatment I was facing.  So if you call

64

1  that an EEO representative, then I'm not -- maybe

2  I'm getting mixed up on the lingo I guess.

3      Q.    Did you ever notify the EEOC prior to your

4  telephone conference with Mr. Salazar in October

5  2004 of someone that you wanted to represent your

6  interests with regards to the problems you were

7  having?

8      A.    I never spoke with anybody over there to

9  have them represent me, no.

10     Q.    And was that the case when the telephone

11 conference actually took place?

12     A.    When the telephone conference took place, I

13 didn't have any EEO representative officially

14 designated to me.  I spoke with EEO but no one was

15 officially designated to me.

16     Q.    At some point did you file an EEO

17 complaint?

18     A.    I did not file an EEO complaint.

19     Q.    This meeting or the telephone conference in

20 October 2004, who requested that telephone

21 conference?

22     A.    I'm not sure of the exact answer for that.

23 I contacted Mr. Salazar for help for the problem

24 which was ongoing and relentless.  I asked him if he

# EXHIBIT 40

04/06/05  16:03 FAX 2024011138          CR-ECD                                    002

USDACR05010l



EXHIBIT
A25
10/25/05

# FORMAL COMPLAINT OF DISCRIMINATION
## FSA CASE # MA-05-001E

| Name of Complainant (Last, First, Middle Initial) | Name of Representative (Last, First, Middle Initial) |
|---|---|
| John G. Pedicini | |
| **Address** 10 Milano Drive  Saugus, MA 01906 | **Address** |

| Home Telephone No. | Work Telephone No. | Home Telephone No. | Work Telephone No. |
|---|---|---|---|
| 781-233-5274 | 617-565-6449 | | |

| Name and Address of Agency Which You Believe Discriminated Against You | Name and Telephone Number of EEO Counselor Who Attempted Resolution |
|---|---|
| U.S.D.A. — Food and Nutrition Sue.  10 Causeway St, Rm. 501  Boston, MA 02222 | Greg Ferby  315-477-6310 |

| Responding Official (Alleged Discriminating Official) | Date You Received the Notice of Right to File a Formal Complaint |
|---|---|
| Michael Malone, Douglas MacAllister, Frances Zorn, Robert Canavan, Roberto Salazar | Nov. 15, 2004 |

**Reason(s)/Basis(es) You Believe You Were Discriminated Against**

reduction in duties, assignment of duties, restricted use of official time, hostile work environment based on reprisal for previous EEO activity.

**AN EQUAL OPPORTUNITY EMPLOYER**

NOV 29 2004

18917

04/06/05  16:03 FAX 2024011138          CR–ECD                              Ø003

## FORMAL COMPLAINT OF DISCRIMINATION
### FSA CASE # MA-05-001E

How Were You Discriminated Against? (Explain how you were treated differently from other employees or applicants because of your race, color, religion, national origin, marital status, disability, sex, age, reprisal, or sexual orientation.  If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each).  Agency is training people in my duties. The Agency has prohibited me from using the title Alternate Funds Officer, per my Deputy Regional Administrator. Agency has placed restrictions on my EEO activity that are not placed on other employees, Agency has issued numerous disciplinary letters of instruction as a means of harassment. The FNS Administrator, Roberto Salazar, has participated in (Use additional sheets, if necessary) these retaliatory acts.

Specific Corrective Action You Want Taken on your Complaint (If more than one allegation is being made, state overall corrective action desired and the specific correction action desired for each separate allegation).  Immediate Promotion to Grade 13, retroactive to March of 2003, disciplinary action under Section 204 of the No Fear Act against Roberto Salazar, Frances Zorn, Douglas MacAllister, Robert Canavan, and Michael Malone.

If Applicable to This Complaint, Please Check the Statement(s) Below

|   | I filed a grievance through the negotiated grievance procedure. |
|---|---|
|   | I filed an appeal with the Merit Systems Protection Board. |
| ✓ | I filed a civil action in U.S. District Court. filed on 11/12/04. |

| Signature of Complainant (You must sign this form unless your representative is an attorney). *John H. Pedicini* | Date 11/22/04 |
|---|---|
| Signature of Attorney | Date |

### Privacy Act Statement (6 USC 552a)

This form is subject to the Privacy Act of 1974.
Authority: 42 USC 2000E-16
Principal Purpose: To establish the case records and assist in the processing of the complaint
Routine Use: Used by EEO officials, administrative judges, investigators, the Equal Employment Opportunity Commission, and/or the Department of Justice for processing the complaint and appeal.
Disclosure is Voluntary: If the individual does not furnish the information requested, there will be no adverse consequences. However, failure to furnish information requested on the form may delay or impair processing of the complaint.

**AN EQUAL OPPORTUNITY EMPLOYER**

**EXHIBIT 41**



**USDA**

United States
Department of
Agriculture

Office of the
Assistant Secretary
for Civil Rights

Office of
Civil Rights

1400 Independence
Avenue SW

Washington, DC
20250

## DEPARTMENT OF AGRICULTURE FINAL DETERMINATION
## on an ALLEGATION of NON-COMPLIANCE

**Complainant:**      John Pedicini          MAY 1 9 2004

**Complaint No.**      010147

**Date of Allegation:**   March 20, 2003

**Agency:**        Food and Nutrition Service

**Issue:**        Non-compliance with Settlement Agreement dated
                June 17, 2002

### INTRODUCTION

Pursuant to 29 C.F.R. § 1614.504(b), the Department of Agriculture (USDA) hereby renders the following determination on the complainant's allegation of non-compliance with a Settlement Agreement dated June 17, 2002.

### STATEMENT OF FACTS

On or about June 17, 2002, the complainant, Mr. John Pedicini, and the Food and Nutrition Service (the Agency) entered into a Settlement Agreement that resolved his formal complaint No. 010147. On March 20, 2003, the complainant notified the Office of Civil Rights (CR) that the Agency failed to comply with the following specific terms of the Settlement Agreement:

> Item 7: "The Complainant and his supervisor agree to communicate on a regular basis to minimize any misunderstandings concerning work assignments, performance, training, etc., with the aim of building trust and understanding. Issues, concerns, or disagreements with his supervisor(s) will be addressed in private meetings, when a public exchange would reflect poorly on one or both parties. If he and his supervisor are unable to resolve differences, they both will meet with the 2nd level manager who will serve as an objective 3rd party. If the 2nd level manager is unable to resolve the dispute, the Deputy Regional Administrator (DRA) will serve as the final reviewing official. During the discussions at the various levels identified above, the Complainant has the right to utilize the EEO complaints process."

> Item 10: "The Food and Nutrition Service shall not take reprisal against the Complainant as a result of his having filed the complaint of discrimination which is the subject of this informal resolution agreement.



EXHIBIT
P/R's
31
6-23-01

P-1282

However, any future complaint on a issue not addressed in this agreement which he may file against Food and Nutrition Service or the Department Agriculture will be considered and processed as a separate action and will in no way undermine or render this informal resolution agreement as null and void."

Item 13: "Both parties agree to cooperate in good faith to complete implementation of this Agreement and to abide by the terms of this Agreement."

The complainant stated that Item 7, required both parties to follow a prescribed format in resolving disputes relating to "work assignments, performance, training, etc." He continued by saying that on February 10, 2003, the Agency stated that Items 7 and 10 were ongoing provisions of the Settlement Agreement, but that the Agency had not complied with these provisions because the Agency Official named to be the final reviewing official had failed to abide by the format. As an example the complainant stated that on March 10, 2003, via electronic mail, he contacted the final reviewing official notifying him that he had not been able to resolve a dispute with his first and second line supervisors. He requested a meeting with the final reviewing official at that time. He also asserted that the final reviewing official had failed to respond to his request, and had abandoned the role of final reviewing official, which was also a breach of Item 7.

The complainant stated that he had been issued a disciplinary warning letter, which caused the Agency to be in non-compliance with the section of Item 13 that refers to "good faith cooperation."

The complainant stated that the Letter of Instruction he received on March 13, 2003, was reprisal and not a Letter of Instruction to clarify policy and discuss work assignments. As an example the complainant cited the provision of the letter that states, "Continued non-compliance or non-cooperation with requests from your supervisors for work-related face- to-face meetings will subject you to disciplinary action." The complainant asserted that the March 13, 2003, letter was a disciplinary letter that follows a pattern and practice by the Agency of retaliation against employees for prior EEO activity. He also asserted that it was a violation of Item 10, of the Settlement Agreement.

On February 10, 2003, CR received an initial compliance report from the Agency. In that report the Agency identified Items 7, 10, and 13, as "Ongoing" and not as "completed."

On August 28, 2003, the Agency provided an additional compliance report to demonstrate its compliance with the Settlement Agreement. In particular, the Agency stated that the complainant had raised some of the same issues in his Formal Equal Employment Opportunity (EEO) complaint No. 030362 as in his allegation of non-compliance.

Specifically: The Agency acceptance letter stated, "Whether the Agency subjected the complainant to discrimination based on reprisal (participation in the EEO process) when:

2

P-1283

(1) on March 3, 2003, the Director of the Financial Management Division did not reconsider him as the alternate Northeast Regional Office (NERO) Funds Officer, which removed his certification rights and (2) he was issued a letter of instruction dated March 13, 2003."

The Agency stated that after a review of the facts, they could not identify any evidence to substantiate the claims alleged by the complainant.

## ANALYSIS AND FINDINGS

The Equal Employment Opportunity Commission (EEOC) Regulation 29 C.F.R. § 1614.504(a) provides that "any Settlement Agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process, shall be binding on both parties." The EEOC has held that a Settlement Agreement constitutes a contract between the employee and the agency, to which ordinary rules of contract construction apply. See Herrington v. Department of Defense, EEOC Request No. 05960032 (December 9, 1996). The EEOC has further held that it is the intent of the parties as expressed in the contract, not some unexpressed intention, that controls the contract's construction. Eggleston v. Department of Veterans Affairs, EEOC Request No. 05900795 (August 23, 1990). In ascertaining the intent of the parties with regard to the terms of a Settlement Agreement, the EEOC has generally relied on the plain meaning rule. See Hyon v. United States Postal Service, EEOC Request No. 05910787 (December 2, 1991). This rule states that if the writing appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature. See Montgomery Elevator Co. v. Building Eng'g Servs. Co., 730 F.2d 377 (5th Cir. 1984).

We have reviewed all of the documentation submitted by the complainant and Agency and have concluded that the complainant has met his burden of demonstrating that the Agency failed to comply with the Settlement Agreement. Vega v. United States Postal Service, EEOC Appeal No. 01986613 (June 30, 2000) (complainant bears the burden of proof to show that the agreement was breached). The complainant is required to show that the Agency's actions to implement the terms of the Settlement Agreement were insufficient.

In particular, the Agency's compliance report did not address the process for resolving disputes in Item 7.

"Issues, concerns, or disagreements with his supervisor(s) will be addressed in private meetings, when a public exchange would reflect poorly on one or both parties. If he and his supervisor are unable to resolve differences, they both will meet with the 2nd level manager who will serve as an objective 3rd party. If the 2nd level manager is unable to resolve the dispute, the Deputy Regional Administrator (DRA) will serve as the final reviewing official."

P-1284

3

The complainant provided a copy of an e-mail dated March 10, 2003, that requested the final reviewing official to act in his role to resolve a dispute. The complainant's allegation that the agency did not implement the dispute resolution process outlined in Item 7 has not been disputed by the Agency. In particular the Agency has presented no documentation to show its compliance with the dispute process outlined in Item 7. Although specifically requested from the Agency, the Agency did not address this issue in any response it made to requests for a compliance report.

The allegations of non-compliance raised by the complainant in particular, Items 10, 13, and the portion of Item 7 that refers to the complainant's duties as funds officer, and the alleged letter of instruction, will not be addressed in this decision, as they were raised in a new complaint.

## CONCLUSION

It is the final determination of the USDA that the Agency has not complied with Item 7 of the Settlement Agreement. Therefore, the Agency shall implement the dispute process outlined in Item 7 in writing. This is the final determination of USDA on the complainant's notice of non-compliance.

The Agency **must** provide a report of compliance to this office within **30** days of receipt of this decision.

> **Department of Agriculture**
> **Office of Civil Rights**
> **Employment/Program Compliance and**
> **Technical Assistance Division**
> **1400 Independence Avenue, S.W. - Mail Stop 9403**
> **Washington, DC 20250-9403**

## APPEAL RIGHTS TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

If the complainant is not satisfied with USDA's final determination on the allegation of non-compliance, then the complainant may appeal to the Equal Employment Opportunity Commission (EEOC) for a determination as to whether the Agency has complied with the terms of the Settlement Agreement. A Notice of Appeal may be filed with the EEOC at any time up to thirty (30) calendar days after receipt of this decision. EEOC Form 573, EEOC Notice of Appeal, should be used to indicate what is being appealed. A copy of the form is provided with this decision. Such notice should be addressed to:

> **Equal Employment Opportunity Commission**
> **Office of Federal Operations**
> **P.O. Box 19848**
> **Washington, DC 20036**

P-1285

If there is an attorney of record, the thirty (30) day time frame within which to appeal shall be calculated from the date of receipt of this decision by the attorney. In all other cases, the time within which to appeal shall be calculated from the date of receipt of this decision by the complainant. An appeal shall be deemed filed on the day it is postmarked, or in the absence of a postmark, on the date it is received by the EEOC.

Any statement or brief in support of the appeal must be submitted to the EEOC within thirty (30) calendar days of filing the Notice of Appeal.

At the same time information is provided to the EEOC (to include a copy of the Notice of Appeal and of any submissions in support of the appeal), there must be a certification that a copy of the submission has been submitted to the Employment/Programs Compliance and Technical Assistance Division and the date and method of submission. The address is provided below:

> **Department of Agriculture**
> **Office of Civil Rights**
> **Employment/Programs Compliance and**
> **Technical Assistance Division**
> **1400 Independence Avenue, S.W. - Mail Stop 9403**
> **Washington, DC 20250-9403**

The thirty (30) day time limit within which to file a Notice of Appeal will not normally be extended by the EEOC. However, the EEOC may, at its discretion, extend the time limit and accept the appeal based upon a written statement that there was no notification of the time limit, or that a timely Notice of Appeal could not be filed due to uncontrollable circumstances.

Clyde Thompson
Acting Director

5/19/04
Date

5

P-1286

**DEPARTMENT OF AGRICULTURE**
**OFFICE OF CIVIL RIGHTS**
**Allegation of Non-compliance with a Settlement Agreement**

**Complainant:**          John Pedicini

**Date of Allegation:**   March 20, 2003

**Agency:**               Food and Nutrition Service

**Certificate of Service**

I certify that the documents listed below were sent on this date by certified mail (unless otherwise specified) to:

Complainant:          John Pedicini
                      10 Milano Drive
                      Saugus, MA 01906

Attorney:             None

Agency Head:          Roberto Salazar (interoffice mail)
                      Administrator, FNS
                      POC, Room 906-AO

Agency Liaison:       Michael G. Watts, FNS (interoffice mail)
                      Director, Civil Rights
                      POC, Room 942

Enclosures:    Final Determination Dated   MAY 19 2004
               EEOC Form 573 (*to complainant only*)

Certified by: _Antonette L. Carter_          MAY 21 2004
              Name                           Date

P-1287

6

**EXHIBIT 42**

**USDA**

United States
Department of
Agriculture

Food and
Nutrition
Service

3101 Park
Center Drive

Alexandria, VA
22302-1500

October 18, 2004

Department of Agriculture
Office of Civil Rights
Employment/Programs Compliance and
Technical Assistance Division
ATTN: Larry Newell
1400 Independence Avenue, S.W. – Mail Stop 9403
Washington, D.C. 20250-9403

Dear Mr. Newell:

The following constitutes the Agency's Compliance Report to resolve the Department's Final Determination on an Allegation of Non-Compliance pertaining to Mr. John Pedicini (issued May 19, 2004).

The Agency (Food and Nutrition Service) remains committed to fully and vigorously complying with the specific terms of the March 20, 2003, Settlement Agreement (SA) that resulted in the resolution of Mr. Pedicini's formal complaint (No. 010147).[1]

The respective principals at our Northeast Regional Office and here at Headquarters are fully aware of the specific requirements of the SA. My office will continue to provide the necessary oversight and monitor compliance with the SA.

Please contact me or Courtney Wilkerson on this matter if you need additional information. Your professional approach and spirit of partnership were evident and greatly appreciated throughout this process.

Michael G. Watts
Director
Civil Rights Division

---

[1] While the Agency certainly takes this finding seriously, we would like the record to reflect that this determination turned on a technical shortcoming at the 3rd supervisory level when he used the 2nd level supervisor to respond to Mr. Pedicini on his behalf. This action was in direct contradiction of the SA.

AN EQUAL OPPORTUNITY EMPLOYER

US0002