UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN G. PEDICINI, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Case No. 04-12395-JLT |
| UNITED STATES OF AMERICA, | : | |
| MICHAEL JOHANNS, SECRETARY, | : | |
| UNITED STATES DEPARTMENT OF | : | |
| AGRICULTURE, AND LINDA | : | |
| SPRINGER, DIRECTOR, UNITED | : | |
| STATES OFFICE OF PERSONNEL | : | |
| MANAGEMENT, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants, the United States of America, Michael Johanns,[1] Secretary of the United States Department of Agriculture ("USDA"), and Linda Springer,[2] Director of the United States Office of Personnel Management ("OPM"), by their attorney, Michael J. Sullivan, the United States Attorney for the District of Massachusetts, respectfully submit this Reply Memorandum in Support of their Motion for Summary Judgment dismissing Plaintiff John Pedicini's Complaint in its entirety.  Defendants also

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d)(1), the new Secretary of the United States Department of Agriculture, Michael Johanns, is hereby substituted for Ann M. Veneman as a defendant in this case.

[2]    Pursuant to Federal Rule of Civil Procedure 25(d)(1), the new Director of the United States Office of Personnel Management, Linda Springer, is hereby substituted for Dan G. Blair as a defendant in this case.

oppose herein Plaintiff's Cross-Motion for Summary Judgment.

## A.    THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN DISPUTE

Plaintiff bizarrely argues that genuine issues of material fact exist in order to defeat Defendants' Motion for Summary Judgment, while simultaneously asserting that no material facts exist for the purposes of his cross-motion on the same claims. Notwithstanding Plaintiff's confusing argument, a close read of the record reveals that Plaintiff's objections to Defendants' statement of facts and his own proffered statement of facts are unsupported. Indeed, Plaintiff relies heavily on his own self-serving affidavit (which he submitted with his cross-motion and after his sworn deposition testimony) and the testimony of non-supervisory employees that contradicts the supported record evidence. And when he does cite to the record, he overstates or misrepresents what it actually says. Pursuant to Local Rule 56.1,[3] the Court must ignore these unsupported statements and summarily strike them from his papers.[4]

---

[3]    Local Rule 56.1 states in relevant part:  "Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  L.R. 56.1.

[4]    There are many assertions in Plaintiff's objections to Defendants' Statement of Material Facts and his own Statement of Facts that are either inaccurate and immaterial or simply immaterial.  Solely for purposes of this motion, the Defendants do not take issue with Plaintiff's objections to paragraphs 1-4, 8, 15-18, 22, 23, 29+, 33-38, 44, 54, 55, 57, 63, 66, 82, 83, 79+, 85, 92-94, 97, 99, and 101 of Defendants' Statement of Facts

For example, Plaintiff's objections to paragraphs 19, 20, 24, 25, 29, 73-75, 75+ and 76+ of Defendants' Statement of Facts and paragraphs 8, 11-13, 15, 17, 24, 25, 69, 77, 94, 97 and 98 of his Statement of Facts are based largely on his own self-serving deposition testimony and affidavit, and the testimony of agency employees, who admitted to having no managerial responsibility or decision- or policy-making authority.  Plaintiff's "evidence," however, cannot refute the documentary evidence and testimony of employees with decision- and policy-making authority because it lacks foundation and is, therefore, irrelevant.

Indeed, neither Plaintiff nor his associates (i.e., Martin Hines, Bruce Potvin, Angela McElmurray Speshock, and Jonathan Lash) have or ever had the authority to create or interpret USDA policies or procedures concerning funds control.  See Deposition of John Pedicini ("Pedicini Dep."), pp. 25-27, attached to Defendants' Statement of Facts as Exhibit 1; Deposition of Martin Hines ("Hines Dep."), pp. 251-255, 299-300, attached hereto as Exhibit A; Deposition of Bruce Potvin ("Potvin Dep."), p. 24, attached hereto as Exhibit B; Deposition of Angela McElmurray Speshock, pp. 23-29, attached hereto as Exhibit C; Deposition of Jonathan Lash, pp. 40-41, attached hereto as Exhibit D.  Indeed,

---

or paragraphs 1-5, 9-11, 19, 20, 32-37, 39-41, 44-48, 50, 51, 53, 56, 58-60, 63-68, 71, 72, 74-76, 78, 79, 85, 87, 88, 91-93, and 95 of Plaintiff's Statement of Material Facts, because they are immaterial.

even Mr. Hines stated that one should not rely on his interpretation of agency policy but that of management employees. Hines Dep., pp. 299-300.  Accordingly, the fact that Plaintiff or Mr. Hines, based on their own understanding of agency policy, has declared testimony from an employee with decision- and policy-making authority on which employees have the authority to certify funds availability "wrong" cannot create an issue of material fact.  Similarly, Mr. Hines, based on his own belief, lacks the authority and support to declare that a document (which employees with decision- and policy-making authority have authenticated) is "irrelevant."  Although Plaintiff benefits from all reasonable inferences favorable to him, he "may not rest upon mere allegations; [he] must set forth *specific* facts demonstrating that there is a genuine issue for trial." Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988) (emphasis added). He cannot survive summary judgment with "unsupported allegations and speculations," but rather must "point to specific facts detailed in affidavits and depositions -- that is, names, dates, incidents, and supporting testimony -- giving rise to an inference of discriminatory animus." Lipsett v. Univ. of Puerto Rico, 864 F.2d 811, 895 (1st Cir. 1988).  Clearly, Plaintiff's reliance on this so-called evidence fails to meet this standard.

Further, Plaintiff's reliance on the apocryphal "Federal Manager's Guide to Discipline" to support his contention that

- 4 -

letters of instruction are in fact disciplinary is misplaced.
The handbook has not been properly authenticated by an agency
employee with sufficient knowledge of the identify and use of the
handbook.  See Fed. R. Evid. 901.  Indeed, Plaintiff was the only
person in the course of discovery who identified the handbook as
a book taught by the agency at the "USDA Graduate School."
Pedicini Dep., p. 241-242.  Plaintiff's statement, however, based
entirely on hearsay, is not based upon any direct knowledge, and
he has never held a manager or supervisor position within the
agency nor has he gone through managerial training within the
agency.  Accordingly, the handbook is not admissible nor can
Plaintiff's statements concerning it establish genuine issues of
fact.  See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000)
("Documents supporting or opposing summary judgment must be
properly authenticated."); Hamilton v. Keystone Tankship Corp.,
539 F.2d 684, 686 (9th Cir. 1976) ("Exhibits which have not had a
proper foundation laid to authenticate them cannot support a
motion for summary judgment.").

Plaintiff's repeated contention that Lisha Dorman "recanted"
paragraph 12 of her affidavit is patently false.  The record is
clear that Ms. Dorman, during her deposition, testified that
since March 2005 there is one exception to the rule she set forth
in paragraph 12 of her affidavit, namely that there is no agency
policy granting "backup funds officers" the authority to perform

- 5 -

all of the functions of a primary funds officer.  Deposition of
Lisha Dorman, p. 42, 92, attached hereto as Exhibit E.  The
exception to the rule, Ms. Dorman testified, is when a "backup
funds officer" approves a request for travel in the agency's
Integrated Acquisition System ("IAS") because the system does not
segregate the functions of approval and certifying that funds are
available for a travel request.  Id., p. 43-44.  Therefore, when
a "backup funds officer" approves a travel request in IAS,
technically, he or she is also certifying that funds are
available for the travel request as a funds officer would for all
other spending request.  Id.  Plaintiff's claim that Ms. Dorman
recanted the paragraph is a clear misstatement of the record.[5]

    The remainder of Plaintiff's objections to Defendant's
Statement of Facts and his Statement of Facts contain nothing
more than argumentative statements - most of which lack any
support.  In some of these paragraphs, Plaintiff, at best, raises
as an issue the range of permissible inferences the Court can
make from the undisputed facts.  This, however, does not create

---

[5]    Plaintiff misrepresents Mr. Potvin's testimony when he
claims that supervisor Roger Hamilton said the agency would not
hire Plaintiff for the position of funds officer if it became
open.  Potvin Dep., pp. 17-19, 27-29.  A read of the record
evidence further demonstrates that Plaintiff misrepresents what
the record says in his objections to paragraphs 5, 6, 21, 28, 30,
31, 48, 49, 53, 58-60, 65, 71, 76, 77+, 78+, 83+, 90, 100 and 103
of the Defendants' Statement of Facts and in paragraphs 14, 16,
18, 21-23, 26-31, 38, 42, 43, 49, 52, 54, 55, 57, 70, 73, 80-84,
86, 89, 90, 96, 99, and 100 of his Statement of Facts.

an issue of material fact.  See, e.g., Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 28 (1st Cir. 2003).

The Defendants' Statement of Facts, however, is supported properly and not properly opposed on the facts discussed above. Because Plaintiff fails properly to controvert those facts, the "material facts of record set forth in [the government's concise statement of material facts] will be deemed for purposes of the motion to be admitted by [the Plaintiffs] . . . ."  L.R. 56.1; see also Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) ("Because the [plaintiff] did not controvert the statement of undisputed material facts that the defendants filed with their summary judgment motion, we deem those facts admitted"); GE Capital Healthcare Fin. Servs. v. Fall River Walk-In Emergency Med. Office, P.C., CA No. 02-11789-RCL, 2004 U.S. Dist. LEXIS 75, at *3 (D. Mass. Jan. 7, 2004).  As such, the Court must take the government's proffered facts as true and undisputed.  Given that the material facts are undisputed, this Court need only apply the law to resolve the Complaint.

**B.    CLOCKEDILE DOES NOT SAVE PLAINTIFF'S UNTIMELY RETALIATION CLAIMS**

Plaintiff argues that under Clockedile v. New Hampshire Dep't of Corrections, 245 F.3d 1 (1st Cir. 2001), he had no obligation to contact an EEOC counselor and/or file a formal EEO complaint for the retaliatory acts he is claiming for the first time before this Court.  A close examination of Clockedile,

- 7 -

however, reveals that it is inapplicable here.  In Clockedile,
the First Circuit held that certain retaliation claims, although
unexhausted, are preserved "so long as the retaliation is
reasonably related to and grows out of the discrimination
complained of to the agency. . . ."  Id., at 6.  The First
Circuit was concerned with retaliatory acts that arise after, if
not as a result of, an employee's use of the EEOC process.  See
Kenney v. MNL Investors Servs., Inc., 266 F.Supp.2d 239, 245-246
(D. Mass. 2003).  Indeed, the First Circuit explained that such
retaliation "uniquely chills remedies; and by retaliating against
an initial administrative charge, the employer discourages the
employee from adding a new claim of retaliation."  Clockedile,
245 F.3d at 5 (citation omitted).  Here, in contrast, the
retaliation Plaintiff complains of, with two exceptions, took
place *before* he filed his last EEO complaint on November 22,
2004.[6]  Plaintiff's filing of this complaint shows that (1) the

---

[6]    The two retaliatory acts Plaintiff claims took place
after he filed his November 22, 2004, complaint was (1) that he
did not receive training that he requested in November 2004, and
(2) that the agency has not allowed him to rotate into the
superior position left vacant by Mr. Malone.  Pedicini Dep., p.
99, 135.  These claims, however, do not amount to adverse
employment actions.  See e.g. Blackie v. State of Maine, 75 F.3d
716, 725 (1st Cir. 1996) (for employment decision to constitute
adverse employment actions under Title VII, "employer must either
(1) take something of consequence from the employee, say, by
discharging or demoting her, reducing her salary, or divesting
her of significant responsibilities or (2) withhold from the
employee an accouterment of the employment relationship, say, by
failing to follow a customary practice of considering her for
promotion after a particular period of service" (internal

alleged retaliation did not intimidate Plaintiff from filing a subsequent EEO complaint - which was the concern of the Clockedile court; and (2) he had the opportunity to exhaust these claims administratively before raising them here.  Accordingly, the Clockedile retaliation exception does not apply.

**C.    PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW**

**1.    Plaintiff Fails To Establish A Prima Facie Case Of Retaliation**

In arguing that he has established a prima facie case of retaliation, Plaintiff opposes Defendants' arguments that (1) he never had the "right" to certify that Federally Appropriated Funds are available before spending actions occur; (2) even if Ms. Zorn had designated Plaintiff as a "certifying officer" or delegated to him the authority to certify that funds are available, the USDA's purported act of taking this function from him would not amount to an adverse employment action; (3) the three letters of instruction were not a form of discipline and had (and has) no effect on Plaintiff's employment, compensation, benefits, or grade level at USDA; and (4) the agency's training of his co-workers on Mr. Hines's functions has not caused Plaintiff any cognizable harm.

To counter Defendants' first argument, Plaintiff contends that (1) by virtue of being Mr. Hines's back-up, he also had the

citations omitted)).

- 9 -

right to certify funds availability; (2) Mr. Hines disputed Ms.
Zorn's testimony and certain authenticated documents; (3) Ms.
Zorn did not delegate to any employee the authority to certify
funds availability until after Plaintiff filed an EEO complaint;
and (4) he had the authority to certify funds availability on
travel documents in IAS.  As addressed in detail above, these
contentions are based wholly on unsupported statements and
misstatements of the record.  Also, the record is clear from the
Delegation of Authority memoranda that since at least May 26,
1995, the practice in NERO has been that the funds officer,
his/her first-line supervisor, and his/her second-line supervisor
have the authority to certify that funds are available before a
spending action can occur.  See Exhibit 15 to Defendants'
Statement of Material Facts.  The first of such memoranda pre-
date not only Plaintiff's purported involvement in protected
activities, but also his employment with the USDA all together.
Id.  The fact that Ms. Zorn did not author the memoranda prior to
June 16, 2003, is irrelevant and certainly does not undermine the
fact that the certification process described above was in place
well before Plaintiff's involvement in any protected activities.
Further, the USDA has never disputed Plaintiff's authority to
approve travel documents, which his supervisors granted him as
recently as February 2004 (well after some of the events at issue
in this case).  His authority concerning these requests is

- 10 -

irrelevant and his reliance on this fact is a clear attempt on his part to mislead the Court.

To counter Defendants' second argument, Plaintiff makes the unsupported argument that the right to certify funds availability is a "higher level right." Plaintiff's Opposition, p. 14.  This unsupported statement, however, fails to address Defendants' arguments that when Plaintiff did perform the function of certifying that funds are available, unbeknownst to his superiors, he did so only one to three times a year; see Pedicini Dep., p. 191; and that this purported reduction of his duties has had no tangible effect on his compensation, benefits, or grade level.  Pedicini Dep., pp. 78-83.

In opposition to Defendants' third argument, Plaintiff merely contends, relying on his unsupported observations and the purported "Federal Manager's Guide to Discipline," that the letters of instruction are forms of discipline.  He also strangely emphasizes that while the agency has not placed the letters in his personnel file, it has kept copies in a supervisor's file.  As addressed in detail above, the "Federal Manager's Guide to Discipline" is inadmissible and irrelevant to the issues before the Court.  Also, the fact that copies of the letters of instruction are kept in a supervisor's file means nothing and certainly does not dispute Defendants' contention that the three letters had (and has) no effect on Plaintiff's

employment, compensation, benefits, or grade level at USDA.  <u>See</u>,
<u>e.g.</u>, <u>Nelson v. Univ. of Me. Sys.</u>, 923 F. Supp. 275, 282 (D. Me.
1996) (a letter of reprimand, by itself, does not constitute an
adverse employment action under Title VII because such a claim is
far too speculative).

### 2.    Plaintiff Cannot Establish That USDA's Legitimate, Non-Discriminatory Reasons For Its Employment Actions Are Pretexts For Discrimination

It bears repeating that at this final stage of the <u>McDonnell
Douglas</u> analysis, Plaintiff is required to show, unassisted by
the original inference of discrimination, that the USDA's
proffered reason is actually a pretext for unlawful
discrimination.  <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 57-58
(1st Cir. 1999), <u>cert. denied</u>, 528 U.S. 1161 (2000) ("The
plaintiff must present sufficient evidence to show both that 'the
employer's articulated reason for laying off the plaintiff is a
pretext' and that 'the true reason is discriminatory.'")
(citation in parenthetical omitted); <u>Mesnick v. Gen. Elec. Co.</u>,
950 F.2d 816, 823 (1st Cir. 1991).  "In assessing pretext, a
court's 'focus must be on the perception of the decisionmaker,'
that is, whether the employer believed its stated reason to be
credible."  <u>Mesnick</u>, 950 F.2d at 825 (citations omitted).  "It is
not enough for a plaintiff merely to impugn the veracity of the
employer's justification; he must 'elucidate specific facts which
would enable a jury to find that the reason given is not only a

sham, but a sham intended to cover up the employer's real motive:
[unlawful] discrimination.'" Id.  Plaintiff can satisfy this
burden through circumstantial evidence, such as, statistical
evidence showing disparate treatment of members of Plaintiff's
protected class, comments by decision makers that denigrate
members of his class, and other incidences of differential
treatment in the workplace.  Id. at 824.  It is clear, however,
that he cannot meet this burden.

Indeed, Plaintiff's arguments that USDA's legitimate, non-
discriminatory reasons for its employment decisions are a pretext
for discrimination are based solely on the unsupported statements
and misstatements of the record discussed in detail above.
Simply put, Plaintiff has failed to demonstrate that Plaintiff's
engagement in protected activity was a "determining factor" in
any of the USDA's challenged decisions.  See Mesnick, 950 F.2d at
825; see also Thomas, 183 F.3d at 57-58.  Accordingly, his
retaliation claims fail.

With regard to the remainder of Plaintiff's claims,
Defendants rely on the arguments presented in its Memorandum of
Law in Support of the Defendants' Motion for Summary Judgment.[7]

---

[7]    Defendants add only that Plaintiff's argument that the
Court must find that the USDA breached the settlement agreement
because the EEOC previously found so is specious.  The doctrine
of collateral estoppel provides "that when an issue of fact or
law is actually litigated and determined by a valid and final
judgment and the determination is essential to the judgment, the
determination is conclusive in a subsequent action between the

- 13 -

**D.    CONCLUSION**

For the foregoing reasons, and for those contained in the Defendant's Memorandum of Law in Support of his Motion for Summary Judgment, this Court should enter summary judgment for the Defendants dismissing Plaintiff's Complaint in its entirety and deny Plaintiff's Cross-Motion for Summary Judgment.

Respectfully submitted,

Michael J. Sullivan
United States Attorney

BY:    /s/ Damian W. Wilmot
DAMIAN W. WILMOT
Assistant U.S. Attorney
Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02110
Dated: May 1, 2006          (617) 748-3398

---

parties whether the same or different claims." Rogers v. Town of Northborough, 188 F.Supp.2d 10, 13 (D. Mass. 2002).  Before a court may apply collateral estoppel, it must first determine: "1) that the issue at stake [is] identical to the one involved in the prior litigation; 2) that the issue has been actually litigated in the prior litigation; and 3) that the determination of the issue in the prior litigation [has] been a critical and necessary part of the judgment in that earlier action." Walker v. Kerr-McGee Chemical Corp., 793 F. Supp. 688, 694 (N.D. Miss. 1992)(citing Stovall v. Price Waterhouse Co., 652 F.2d 537, 540 (5th Cir. 1981)).  There is no evidence in the record, for example, that the parties fully litigated this issue before the EEOC, nor is there any basis that the EEOC finding is binding on the Court.  Therefore, the Court may review the undisputed record in determining whether summary judgment is warrant.  As discussed in Defendant's Memorandum of Law, the Court should grant summary judgment in favor of the government on this claim.

## CERTIFICATE OF SERVICE

I certify that on May 1, 2006, I caused a copy of the foregoing document to be served on *pro se* Plaintiff, John G. Pedicini, 10 Milano Drive, Saugus, MA 01906, by first class mail, postage pre-paid.

 /s/ Damian W. Wilmot
DAMIAN W. WILMOT
Assistant U.S. Attorney

# EXHIBIT A



1

Volume I
Pages 1 to 304
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
 JOHN G. PEDICINI,              :
           Plaintiff,           :
                                 :
        vs.                     :   Civil Action
                                 :   No. 04-12395 JLT
 UNITED STATES OF AMERICA, and  :
 ANN M. VENEMAN, SECRETARY,     :
 UNITED STATES DEPARTMENT OF    :
 AGRICULTURE,                   :
           Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF MARTIN T. HINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Friday, July 22, 2005, commencing
at 10:05 a.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)



251

1    obviously I reserve the right to follow up on

2    anything you ask him.

                    CROSS EXAMINATION

4        BY MR. WILMOT:

5        Q.    Mr. Hines, I hope to move quickly so we can

6    get out of here.  The one instruction I would add

7    that Mr. Catapano-Friedman didn't state in his

8    introduction is just to wait for me to finish my

9    question before you answer.

10           The importance of that obviously is that

11   when the reporter is writing down my questions and

12   your responses, it's not jumbled, that it's clear.

13       A.    I understand.

14       Q.    Mr. Hines, are you a member of the

15   management staff at USDA?

16       A.    No, I'm not a supervisor nor a director.

17       Q.    Do you have the authority to assign at USDA

18   an employee a certain grade level?

19           MR. CATAPANO-FRIEDMAN:  Object to the

20   question, but you can answer.

21       A.    Assign a grade level?

22       Q.    Yes.

23       A.    Grade levels are determined by

24   classification actions, so I don't quite follow what

252

1    you mean by that.

2        Q.    My question is do you have the authority to

3    determine what particular grade level another

4    employee has?

5        A.    No.

6        Q.    Have you ever had this authority during

7    your employment at USDA?

8              MR. CATAPANO-FRIEDMAN:  Object.  You can

9    answer.

10       A.    No.  To assign a grade level to another

11   employee?

12       Q.    Um-hmm.

13       A.    No.

14       Q.    Do you have the authority to give a USDA

15   employee a raise?

16       A.    No.

17       Q.    Have you ever had that authority?

18       A.    Well, I was a supervisor up until 1994 or

19   '93.

20       Q.    After 1994 or '93, have you ever had that

21   authority?

22       A.    No, no.  No, I'm no longer a supervisor so

23   the answer would be no.  I don't have that

24   authority.

253

1      Q.    Do you have the authority to promote a USDA

2    employee?

3      A.    No.

4      Q.    Since 1993 or 1994, have you ever had that

5    authority?

6      A.    No.

7      Q.    Do you have the authority to assign a USDA

8    employee a certain title?

9      A.    No.

10      Q.    Since 1993 or 1994, have you ever had that

11    authority?

12      A.    No.

13      Q.    Do you have the authority to assign a USDA

14    employee new job responsibilities?

15      A.    Can you explain that a little more in terms

16    of what do you mean by "the authority"?

17      Q.    The authority?  Well, I suppose do you have

18    the independent authority without having to go to

19    someone above you I guess in management to assign an

20    employee new job responsibilities that they did not

21    have prior?

22      A.    No.  But in the instance of the alternate

23    backup funds officer in which John Pedicini was

24    assigned that responsibility in 1998 or '99, I was

254

1    directed by my supervisor at that time, Art LeBlanc,

2    to begin a process of providing that individual the

3    appropriate tasks that should be assigned to educate

4    and to orientate and to bring that individual up on

5    serving in that capacity.

6        Q.    Put it another way, do you have the

7    authority to assign a USDA employee new job

8    functions?

9        A.    No, no.  I wouldn't.  I would not.  If

10   something new came out, a new function that came

11   down the pike, that would be a management decision.

12       Q.    Since 1993 or 1994, have you ever had that

13   authority?

14       A.    No, no.  I never had the authority but I

15   would answer that question by an example.  When the

16   new FFIS system came about as a clear example, both

17   myself and John Pedicini were designated to learn

18   that system and to attend formal training at

19   headquarters and then to operate the system.

20       Q.    Do you have the authority to override an

21   employment decision made by USDA management?

22       A.    No.

23       Q.    Since 1993/1994, have you ever had that

24   authority?

255

1      A.    No, I do not, no.

2      Q.    Are you a --

3      A.    These are management decisions.  I'm

4  surprised you're asking me these questions.

5      Q.    Lawyer stuff.  Are you a union member?

6      A.    No, I'm not.

7      Q.    Are you a union representative?

8      A.    No, I'm not.

9      Q.    What is your grade?

10      A.    12.

11      Q.    Just again what's your title, your official

12  title?

13      A.    Well, let's see.  After today there's about

14  six, I think.  No, my official title on my position

15  description is budget analyst.  By the way, your

16  official title also appears on your performance

17  appraisal in Block 8, budget analyst.  Working

18  titles are different.

19      Q.    What's your working title?

20      A.    Well, the principal working title is funds

21  control officer.

22      Q.    How many funds control officers are there

23  in your section?

24      A.    There's myself and John Pedicini, the

299

1      Q.    You're the --

2      A.    I think I picked up a good title, PFO.  I

3  like that, PFO.

4      Q.    It's already been answered.  We can move

5  on.

6      A.    I'm sorry.  I just -- I'm trying to be

7  helpful and constructive.

8      Q.    I think you've been fantastic.

9      A.    It's getting late in the day.  I will look,

10  though, to see if there's other places because

11  believe me, I want to get to the bottom of this.  I

12  would like to resolve this.

13          To me we're getting into semantics at this

14  point with how -- what is the intent of this written

15  memo, what is the intent of this language, what is

16  the intent of this -- these two words.  The people

17  at headquarters are the people you need to ask as to

18  who this --

19      Q.    I think you're right.

20      A.    As to who is all encompassing with regard

21  to this.

22      Q.    I think you're right.  And management would

23  be the one to interpret what that means; isn't that

24  correct?

300

1      A.    Yes.

2            MR. CATAPANO-FRIEDMAN:  I'm objecting to

3      this.  Objection.

4      A.    But I'm only trying to do my job as I read

5      these things, too.

6      Q.    I understand.

7            MR. CATAPANO-FRIEDMAN:  I think the witness

8      is getting tired from the last comments that he's

9      made.

10           MR. WILMOT:  Excuse me?

11           MR. CATAPANO-FRIEDMAN:  The witness sounds

12     like he's getting tired.

13           MR. WILMOT:  I'm still asking questions.

14           MR. CATAPANO-FRIEDMAN:  Are you getting

15     tired?

16           THE WITNESS:  I'd like to continue.  I'd

17     like to stay very late if necessary.

18           MR. CATAPANO-FRIEDMAN:  Do you need a break

19     if we're going to be going much later?

20           THE WITNESS:  No.

21           (Discussion off the record)

22           MR. WILMOT:  Can you tell me what I'm

23     supposed to provide?

24           MR. CATAPANO-FRIEDMAN:  There was a memo

# EXHIBIT B

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

1

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3

4      ------------------------

5    JOHN G. PEDICINI,

6            Plaintiff,

7    VS.                        CA No. 04-12395-JLT

8    UNITED STATES OF AMERICA

9    UNITED STATES DEPARTMENT

10   OF AGRICULTURE,

11   ANN M. VENEMAN, SECRETARY,

12            Defendants.

13     ------------------------

14

15           Deposition of BRUCE POTVIN, a witness

16   called on behalf of the Plaintiff, taken

17   pursuant to notice before Cindy M. Falcon,

18   Certified Shorthand Reporter and Notary Public

19   in and for the Commonwealth of Massachusetts, at

20   the O'Neil Federal Building, 10 Causeway Street,

21   Boston, Massachusetts, on Wednesday, January 18,

22   2006, commencing at 10:00 a.m.

23

24

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

17

```
 1                    MR. WILMOT:  Objection.

 2    A    Yes.

 3    Q    That was your interpretation of the

 4         conversation, the fact that you mentioned John

 5         Pedicini's name, and Hamilton responded how to

 6         that?

 7                    MR. WILMOT:  Objection to the

 8         question.  You can answer.

 9    A    Okay.  I'll go back.  As I stated earlier, when

10         he stated that there would be an opening,

11         possible opening, that Marty was going to

12         possibly retire, and they would have to train

13         someone in his duties and that I had experience

14         in that area, that I would be involved.

15              And that's when I raised the statement,

16         again, that, wait a minute, there are people

17         over there that, A, must be helping Marty do

18         that, and B, I'm sure would be interested in the

19         position, words to that effect.

20              It was just a quick conversation, and

21         that's when his statement back was, well -- and

22         I said John Pedicini is one, and that's when he

23         made the statement, again, to go back, he's not

24         going to be involved in this, he's not going to
```

18

```
 1        get that.

 2   Q    Did you mention anybody else's name?

 3   A    No.

 4   Q    Just John Pedicini's name?

 5   A    I had raised his name and he acknowledged it.

 6   Q    And he said that John Pedicini was not going to

 7        get that job?

 8              MR. WILMOT:  Objection.

 9   Q    Is that your testimony?

10   A    It was that or when I raised your name the

11        reference was exactly:  No, he is not.

12   Q    Not meaning what; not going to get the job?

13   A    Not going to get -- not going to be involved in

14        it, I think were his actual words.

15   Q    You said that there were people -- excuse me.

16              You said that Hamilton told you in a

17        conversation they were looking to train people

18        in Marty's duties?

19   A    If he retired?

20   Q    Correct.

21   A    Correct.

22   Q    What was your interpretation of that?  Was there

23        going to be a job vacancy?

24   A    I took it as a job vacancy.  As I stated, my
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

19

```
 1          experience with federal and private industry is

 2          a position becomes vacant, the situation, the

 3          position is posted, and people apply for it.

 4               I mean, I know there there's ways of doing

 5          it, but that didn't enter my mind.

 6   Q    Is it correct, did he say that they had to train

 7          somebody in Marty's duties?

 8   A    Somebody would be trained.  He did use the words

 9          someone will be trained.

10   Q    He used the word trained?

11   A    Yes.

12   Q    Did he mention anything about people already

13          being trained over there?

14   A    No.

15   Q    You mentioned that you told Mr. Hamilton in this

16          conversation that there were people qualified

17          over there for Marty's job.  Did you say that?

18   A    I did.  I said:  There's people that I'm sure

19          would be interested in this that must have --

20          must be qualified for that.

21   Q    How did you arrive at that conclusion?

22   A    Just with the idea that I watched and listened.

23          I sat on the other side.  I've seen your

24          involvement in areas there and Kirk's.
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

24

```
1          of the question.

2    A     Boston-Yankees series.

3    Q     It wasn't a bet?

4    A     It was a hotdog between John Pedicini and Marty

5          and myself for Boston versus New York winning

6          the division.

7    Q     Is that the first time you've had a lunch break

8          with John Pedicini?

9    A     No, we had them before.  We had three others

10         before that, because we had a standing hotdog

11         every 40 games between John, Marty and myself.

12   Q     So you discussed baseball?

13   A     Baseball, nothing -- anything but work.

14   Q     What grade were you in September of 2004?

15   A     GS-11.

16   Q     And you stated you had applied for a Grade 13

17         position?

18   A     Correct.

19   Q     And how did you apply for that; as an external

20         internal candidate?

21              MR. PEDICINI:  Objection.

22   A     No, as an internal.  I've been a GS-12 with the

23         federal government for at least 12 years.

24              MR. PEDICINI:  Objection to the
```

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

27

1     don't know.

2  Q  Do you know when there is a vacancy who within

3     your office makes the hiring decisions in 2004?

4  A  I really don't know how much Doug's involved in

5     this, in the final selection of that.  I would

6     assume the branch chief or section chief would

7     make a selection.  That's the way it's normally

8     done.

9  Q  Just for my own sake, when you were discussing

10    this conversation, you mentioned that Roger

11    Hamilton mentioned that there was going to be

12    training for this position, and then you also

13    discussed somehow hiring for that position.

14        What exactly did you discuss in that

15    conversation?

16  A  He said that there would be some training for

17    that position.  It was my understanding -- I

18    didn't think about it that much because my

19    understanding is that's not really the way it

20    works from my experience, but so I just said,

21    okay, you know, with the conversation and then

22    left.

23  Q  So when he discussed with you that you should

24    show some interest in this position, he was

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

28

| | | |
|---|---|---|
| 1 | | talking about showing interest in the training |
| 2 | | for it? |
| 3 | A | We never got to that because Marty was still |
| 4 | | there.  It would have been if Marty does retire. |
| 5 | Q | So he said:  If Marty does retire, we are going |
| 6 | | to train some people on those functions? |
| 7 | A | Someone's going to have to be trained, yes. |
| 8 | Q | Did he say that someone was going to have to be |
| 9 | | hired for that position? |
| 10 | A | He used the word trained.  I really don't |
| 11 | | remember the word hired. |
| 12 | Q | And also to clarify, Roger Hamilton did not |
| 13 | | state John Pedicini's name during that |
| 14 | | conversation; is that correct? |
| 15 | A | I raised John Pedicini's name, and his answer |
| 16 | | was:  He will not or John Pedicini will not, it |
| 17 | | was one or the other.  But there was no question |
| 18 | | in my mind about it. |
| 19 | Q | That John Pedicini would not get training for |
| 20 | | that position? |
| 21 | | MR. PEDICINI:  Objection to the |
| 22 | | question. |
| 23 | A | Whatever he meant by it. |
| 24 | Q | Whatever he meant? |

Bruce Potvin 1-18-2006
John G. Pedicini v. United States of America, et al.

29

```
 1    A    Whatever he meant.  I didn't ask.

 2              MR. WILMOT:  No further questions.

 3

 4    FURTHER EXAMINATION BY MR. PEDICINI:

 5

 6    Q    When you had discussions in this conversation

 7         with Mr. Hamilton, it came as a result of a

 8         previous application somewhere for a higher

 9         level position; is that correct?

10    A    Yes.

11    Q    And Mr. Hamilton's words -- I want to make

12         sure.  You may have said this before.  I want to

13         make sure I understand it.

14              Did you ask Mr. Hamilton or did the issue

15         come up in this conversation that you were

16         looking for another higher level position above

17         Grade 11?

18    A    Not specifically, but obviously he knew I was

19         because I had applied for the 13.

20    Q    And then this thing about Marty Hines retiring

21         came up in the conversation?

22    A    Yes, correct.

23    Q    Again, he said --

24    A    There may be.
```

# EXHIBIT C

Angela McElmurray 1-18-2006
John G. Pedicini v. United States of America, et al.

1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3

4        ------------------------

5    JOHN G. PEDICINI,

6             Plaintiff,

7    VS.                          CA No. 04-12395-JLT

8    UNITED STATES OF AMERICA

9    UNITED STATES DEPARTMENT

10   OF AGRICULTURE,

11   ANN M. VENEMAN, SECRETARY,

12             Defendants.

13       ------------------------

14

15           Deposition of ANGELA McELMURRAY

16   SPESHOCK, a witness called on behalf of the

17   Plaintiff, taken pursuant to notice before Cindy

18   M. Falcon, Certified Shorthand Reporter and

19   Notary Public in and for the Commonwealth of

20   Massachusetts, at the O'Neil Federal Building,

21   10 Causeway Street, Boston, Massachusetts, on

22   Wednesday, January 18, 2006, commencing at 12:00

23   p.m.

24

23

```
 1        sure about that.

 2             It was actually written probably I would

 3        say five years that the basics -- the

 4        boilerplate was written five years before I

 5        started in the budget division, and we just

 6        revised it, did revisions to it.

 7             So the vast majority of what you find in

 8        there had to be revised when we went to the

 9        FFIS.  It's IFS at the IRS.

10   Q    It's different at the IRS, sure.

11                  MR. PEDICINI:  Damian, I have no

12        further questions.

13                  THE WITNESS:  Here is funds control

14        procedures.

15

16        EXAMINATION BY MR. WILMOT:

17

18   Q    I don't think there is a question before you.  I

19        just have a couple of questions.

20   A    I was going to look for my organizational

21        chart.

22   Q    What was your grade level during the 1994 to

23        2003 period?

24   A    GS-12.
```

24

```
 1   Q   Were you a member or were you considered a

 2       management employee by USDA during that time?

 3   A   Can you define that?

 4   Q   During that time frame, I'm talking about 1994

 5       to 2003, did you have the authorized authority

 6       to hire or fire other employees?

 7           MR. PEDICINI:  Objection to the

 8       question.

 9   A   No.

10   Q   Did you play any role in the hiring or firing of

11       other employees?

12           MR. PEDICINI:  Objection to the

13       question.

14   A   So I don't have to answer that?

15   Q   I imagine it's an objection to the form.

16           MR. PEDICINI:  Go ahead and answer.

17       Object to the form.

18   A   No.

19   Q   No?

20   A   No.

21   Q   Did you have any authority to assign titles --

22           MR. PEDICINI:  Object to the form.

23           MR. WILMOT:  You have to let me ask a

24       question.
```

25

```
 1              MR. PEDICINI:  Sorry.

 2    Q   Did you have the authority during that time

 3        frame to assign a title to another employee?

 4              MR. PEDICINI:  Objection to the form

 5        of the question.

 6    A   Let me think about that because as a funds

 7        control officer we received hiring registers

 8        from our HR personnel folks, and those came

 9        through me to review.

10          But I was not an employee of personnel, and

11        my job description did not include hiring

12        employees or firing employees or establishing

13        title.  But if there were -- if a position title

14        didn't fit with what we were going to fund and

15        it was a higher level and we could not fund that

16        position, say budget analyst 560 versus finance

17        specialist 501, then we would say we cannot hire

18        this level, we can hire this level, this is the

19        funding that we have.

20          So that would have been the role that I

21        would have played in the individual that

22        ultimately was hired into that position.  And

23        that would be, that could be negotiated between

24        myself, between our administrator, you know, it
```

Angela McElmurray 1-18-2006
John G. Pedicini v. United States of America, et al.

26

```
 1        could be negotiated at several levels as far as
 2        that grade that the individual came on board at.
 3   Q    So you played a technical role in that process,
 4        but it wasn't in your discretion to decide which
 5        employees had certain titles?
 6   A    That's right.  That's a good evaluation.  So
 7        there was some involvement.
 8   Q    Okay.  Did you have the authority during that
 9        time frame to dictate how a regional office
10        would delegate its fund control
11        responsibilities?
12             MR. PEDICINI:  Objection to the form
13        of the question.
14   A    Say it again.
15   Q    Did you have the authority during that time
16        frame by virtue of your position to delegate to
17        a regional office how it can or could not
18        delegate its funds control responsibilities?
19   A    Delegate from one individual to another
20        individual?
21   Q    For example, the regional administrator to a
22        subordinate employee?
23             MR. PEDICINI:  What does she have to
24        do with this question?
```

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Angela McElmurray 1-18-2006
John G. Pedicini v. United States of America, et al.

27

```
 1                    MR. WILMOT:  She has to answer and you

 2         need to stop talking.

 3                    MR. PEDICINI:  It's not related with--

 4                    MR. WILMOT:  You can state your

 5         objection, but with regard to your speaking

 6         objection in terms of telling her how to

 7         testify, I ask that you stop doing that.

 8    A    We conducted reviews of regional offices, and in

 9         those reviews we would cite issues that would be

10         raised to the regional administrator's

11         attention, as far as shortcomings, as far as

12         areas we felt their staff may not be reading our

13         funds control policies.

14              So from that standpoint of review, as far

15         as problems and positive things and what we

16         would call best practices and exemplary

17         behavior, those we definitely had meetings with

18         our RAs and discussed those.

19              And certainly in the northeast region, we

20         had more positive comments I would say as far as

21         the management of their -- their financial

22         management operations during that period.  And

23         we, in terms of best practices, we borrowed from

24         northeast for other regions.
```

28

```
 1   Q   Let me ask you in terms of an example.  Take,

 2       for example, the regional administrator decided

 3       to delegate certain funds control

 4       responsibilities such as certifying that funds

 5       are available to one employee and not the

 6       other.

 7           It was not within your function to call the

 8       regional administrator and tell him or her that

 9       she could not do that, correct?

10                MR. PEDICINI:  Objection to the form

11       of the question.

12   A   I'll say that that didn't, that didn't come up

13       during the time period when I was at FNS.

14           That was not an issue that ever surfaced

15       because we pretty much placed our faith in the

16       branch chief and the RA because the funds

17       control officer -- my understanding was that

18       they briefed the RA directly.  Monthly status

19       briefings were pretty much directly with the

20       RA.

21           So if there was an issue or a problem, then

22       it probably surfaced between the RA and the

23       funds control officer.

24   Q   And you just gave some testimony as to the
```

Angela McElmurray 1-18-2006
John G. Pedicini v. United States of America, et al.

29

```
 1          Handbook 101 document.

 2               I believe you testified that you had

 3          occasion to revise that document?

 4    A     Mm-hmm.

 5    Q     Is that correct?

 6    A     Yes.

 7    Q     Those revisions to that document, were those

 8          done within your discretion?

 9    A     Not just my discretion.  Those had to be cleared

10          through my branch chief, through my budget

11          director, and we typically went out for a

12          comment.

13               Once we made revisions, then those were

14          commented on.  We received comments on revisions

15          just to make sure that the southeast region, you

16          know, didn't have problems with something we

17          were attempting to provide guidance on.

18    Q     Drawing your attention to Exhibit 10 there, how

19          did you obtain John Pedicini's name to include

20          on this list?

21    A     Through his branch chief.

22    Q     Do you have a specific memory of speaking to his

23          branch chief to include his name on this list?

24    A     No, I would not have spoken.  It would have been
```

# EXHIBIT D

1

Volume I
Pages 1 to 59
Exhibit 77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN G. PEDICINI,               :
            Plaintiff,          :
                                 :
        vs.                      :   Civil Action
                                 :   No. 04-12395 JLT
UNITED STATES OF AMERICA, and   :
ANN M. VENEMAN, SECRETARY,      :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                     :
            Defendants.         :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF JONATHAN LASH, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Laura
E. Antoniotti, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Tuesday, August 2, 2005,
commencing at 1:15 p.m.

PRESENT:

    The Catapano-Friedman Law Firm
        (By Robert S. Catapano-Friedman, Esq., and
        Sarah Catapano-Friedman, Esq.)
        50 Franklin Street, Boston, MA 02110,
        for the Plaintiff.


(Continued on next page)

40

1    with his questions.   Thank you.

2                      CROSS EXAMINATION

3        BY MR. WILMOT:

4        Q.   Mr. Lash, are you a member of management at

5    USDA?

6        A.   No, I am not.

7        Q.   So does that mean you do not have the

8    authority to make any managerial decisions?

9        A.   That's true.

10       Q.   Have you ever had this authority?

11       A.   No.

12       Q.   Do you have the authority to assign a USDA

13   employee a certain grade level?

14       A.   No.

15       Q.   Have you ever had that authority?

16       A.   No.

17       Q.   Do you have the authority to give a USDA

18   employee a raise?

19       A.   No.

20       Q.   Have you ever had that authority?

21       A.   No.

22       Q.   Do you have the authority to promote a USDA

23   employee?

24       A.   No.

41

```
1        Q.    Have you ever had that authority?

2        A.    No.

3        Q.    Do you have the authority to assign a USDA

4    employee a certain title?

5        A.    No.

6        Q.    Have you ever had that authority?

7        A.    No.

8        Q.    Do you have the authority to assign a USDA

9    employee new job responsibilities?

10       A.    No.

11       Q.    Have you ever had that authority?

12       A.    No.

13       Q.    Do you have the authority to override an

14   employment decision made by a USDA management

15   person?

16       A.    No.

17       Q.    Have you ever had that authority?

18       A.    No.

19       Q.    I just want to bring your attention to

20   Exhibit 10.   This is the list that you gave some

21   testimony on earlier.

22             Is this list -- and I know you didn't

23   prepare this list which is marked as Plaintiff's

24   Exhibit 10, but you said you currently maintain a
```

# EXHIBIT E

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4        ------------------------

5    JOHN G. PEDICINI,

6             Plaintiff,

7    VS.                          CA No. 04-12395-JLT

8    UNITED STATES OF AMERICA

9    UNITED STATES DEPARTMENT

10   OF AGRICULTURE,

11   ANN M. VENEMAN, SECRETARY,

12            Defendants.

13       ------------------------

14

15            Deposition of LISHA A. DORMAN, a witness

16   called on behalf of the Plaintiff, taken

17   pursuant to notice before Cindy M. Falcon,

18   Certified Shorthand Reporter and Notary Public

19   in and for the Commonwealth of Massachusetts, at

20   the O'Neil Federal Building, 10 Causeway Street,

21   Boston, Massachusetts, on Thursday, January 12,

22   2006, commencing at 9:20 a.m.

23

24

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

42

```
 1              Oh, sorry, it's 14, sorry.  Wait a minute,
 2         excuse me.  It's 12, Paragraph 12.  Paragraph
 3         12.
 4              MR. WILMOT:  What's your question?
 5    Q    With regard to your affidavit, there is no USDA
 6         policy granting backup funds officer the
 7         authority to perform all of the functions of a
 8         primary funds officer, is that true for E-TRVL
 9         under Option 2 which you just read?
10    A    No.
11    Q    It's not true.  So that's an exception to that
12         statement; is that correct?
13    A    That is correct.
14    Q    So it's your testimony here today that Paragraph
15         12 is not accurate?
16              MR. WILMOT:  Objection.  You can
17         answer.
18    A    Okay.  Let's talk about Paragraph 12.  In
19         Paragraph 12, again, should a backup funds
20         officer be able to perform all the functions of
21         a funds officer?
22         Yes, I believe they should, but I cannot
23         produce any FNS policy that says they have to.
24    Q    Is the E-TRVL delegation of authority part of
```

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

43

```
 1        USDA -- well, we are talking about FNS policy.

 2             Is that part of FNS policy, at that time,

 3        was that part of FNS policy to delegate Option 2

 4        or Option 1 in E-TRVL?  Was that policy at that

 5        time?

 6                  MR. WILMOT:  Objection.  You can

 7        answer.

 8   A    I don't know if I would call it policy, John.

 9        We were configuring a system.

10             But again, I will go on to say that if and

11        when that system becomes a reality and is

12        implemented, then yes, at that point in time

13        that certainly would be policy.  You would be

14        creating policy for FNS.

15   Q    Okay.  If we step back in March, just before the

16        funds officers' meeting, at that time, given the

17        mandate from the chief financial officer,

18        technically you were implementing --

19   A    Absolutely.

20   Q    -- E-TRVL at that time?

21   A    That's right.

22   Q    That was part of FNS policy at that time?

23   A    Yes.

24   Q    So we are talking now March of '05, and things
```

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

44

```
1          have happened that no one has any control over

2          since then?

3   A      Correct.

4   Q      But at that time, given what went on, that

5          backup funds officers did have all of the

6          rights, including the right to certify funds

7          availability, that the funds officers had as

8          designated by NERO under Option 2; is that

9          correct?

10                     MR. WILMOT:  Objection.  You can

11         answer.

12  A      That is correct.

13  Q      What do you know about, in your training of

14         funds officers, about the practice of backups in

15         the regions and their right to certify funds

16         availability?

17  A      We have a variety across the whole agency, not

18         only just in the regions; and yes, we do have

19         backups.

20  Q      What's the purpose of a backup?

21  A      In some organizations the backup performs full

22         functions of the funds officer in their absence,

23         and yes, that does include certification of

24         funds.
```

Lisha A. Dorman 1-12-2006
John G. Pedicini v. United States of America, et al.

92

1    Q    Ms. Dorman, have you had an opportunity to

2         review your affidavit today?

3    A    Yes.

4    Q    During the examination by Mr. Pedicini, he

5         directed your attention to Paragraph 12 of your

6         affidavit, particularly to the second sentence

7         in Paragraph 12 where it states that there is no

8         FNS policy, however, granting a backup funds

9         officer the authority to perform all of the

10        functions of a primary funds officer.

11             I think you said the exception to that

12        would be the TRVL system?

13   A    The IAS system.

14   Q    Having reviewed your affidavit today, is there

15        any other paragraph or -- strike that.

16             Having reviewed your affidavit today, any

17        other modifications that you think you need to

18        identify for us today on the record?

19   A    No.

20   Q    Okay.  So you stand by what you attest to in

21        your affidavit?

22   A    Yes.

23   Q    A little bit more on this E-TRVL system.

24             Mr. Pedicini directed your attention to